## CASE NO. 23-4568(L), 23-4595

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TAEYAN RAYMOND WILLIAMS,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

---

## JOINT APPENDIX - VOLUME IV OF VI
### (Pages 1600 - 1973)

---

Alfred Guillaume III
LAW OFFICES OF
ALFRED GUILLAUME III
6305 Ivy Lane
Suite 700
Greenbelt, MD 20770
202-321-0549
ag3law@gmail.com

*Counsel for Appellant
  Taeyan Williams (23-4658)*

Brent E. Newton
ATTORNEY AT LAW
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
brentevannewton@gmail.com

*Counsel for Appellant
  Scott Williams (23-4595)*

Counsel for Appellee on Inside Cover

LANTAGNE LEGAL PRINTING 1108 East Main Street, Suite 1201 • Richmond, VA 23219 • 804-644-0477

Leah B. Grossi
William Moomau
OFFICE OF THE UNITED STATES ATTORNEY
Southern Division
6406 Ivy Lane
Suite 800
Greenbelt, MD 20770
301-344-4433
leah.grossi@usdoj.gov
william.moomau@usdoj.gov

Thomas E. Booth
U.S. DEPARTMENT OF JUSTICE
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Room 1511
Washington, DC 20530
202-514-5201
thomas.booth@usdoj.gov

*Counsel for Appellee*

# **TABLE OF CONTENTS**

## **VOLUME IV OF VI**

JA Page

Transcript of Proceedings Jury Trial Volume VII
Before The Honorable Theodore D. Chuang
2023.05.03 ................................................................................. 1600

KYLE SIMMS
Continued Direct by Mr. Moomau ....................................... 1608

MITCHELL DINTERMAN
Direct by Mr. Hanlon ......................................................... 1609

KERRY GEORGE
Direct by Mr. Hanlon ......................................................... 1628
Cross by Mr. Crawley ......................................................... 1659
Redirect by Mr. Hanlon ...................................................... 1662
Recross by Mr. Crawley ...................................................... 1663

OSCAR DIAZ
Direct by Mr. Moomau ....................................................... 1671
Cross by Mr. Nieto ............................................................. 1694
Cross by Mr. Hawks ........................................................... 1705
Redirect by Mr. Moomau .................................................... 1706

BRANDON DRUMMOND
Direct by Mr. Hanlon ......................................................... 1707
Cross by Mr. Guillaume ...................................................... 1728
Cross by Mr. Hawks ........................................................... 1733
Redirect by Mr. Hanlon ...................................................... 1735

Transcript of Proceedings Jury Trial Volume VIII
Before The Honorable Theodore D. Chuang

2023.05.04.................................................................................. 1754

JULIE KEMPTON
    Direct by Mr. Hanlon ....................................................... 1765
    Cross by Mr. Guillaume .................................................. 1808
    Cross by Mr. Hawks ........................................................ 1810
    Redirect by Mr. Hanlon................................................... 1811

ROMY FRANCO
    Direct by Mr. Hanlon ....................................................... 1817

KYLE SIMMS
    Direct by Mr. Moomau..................................................... 1827
    Cross by Mr. Nieto .......................................................... 1926

```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
2                          SOUTHERN DIVISION

3    UNITED STATES OF AMERICA,      )
            Plaintiff,              )
4                                   )
            vs.                     )   CRIMINAL CASE NUMBER:
5                                   )        TDC-18-0631
     SCOTT ANTHONY WILLIAMS and     )         VOLUME VII
6    and TAEYAN RAYMOND WILLIAMS,   )
            Defendants.             )
7    _____)

8

                      TRANSCRIPT OF PROCEEDINGS
9                           JURY TRIAL
            BEFORE THE HONORABLE THEODORE D. CHUANG
10              UNITED STATES DISTRICT JUDGE
                   Wednesday, May 3, 2023
11                  Greenbelt, Maryland

12                    A P P E A R A N C E S

13
     FOR THE PLAINTIFF:
14       OFFICE OF THE UNITED STATES ATTORNEY
             BY: LEAH GROSSI, ESQUIRE
15           BY: WILLIAM MOOMAU, ESQUIRE
                 6406 Ivy Lane, Suite 800
16               Greenbelt, Maryland  20770

17           BY: MICHAEL HANLON, ESQUIRE
                 36 S. Charles Street, Fourth Floor
18               Baltimore, Maryland  21201

19   FOR THE DEFENDANTS:
         For Scott Anthony Williams:
20           BY: KWASI HAWKS, ESQUIRE
                 THE HAWKS FIRM
21               8705 Colesville Road
                 Suite 162
22               Silver Spring, MD  20910

23           BY: DWIGHT E. CRAWLEY, ESQUIRE
                 LAW OFFICE OF DWIGHT CRAWLEY
24               1300 I. Street, NW
                 Suite 400e
25               Washington, DC  20005
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1600**

```
1    (Appearances, Continued)

2         For Taeyan Raymond Williams:
             BY: ALFRED GUILLAUME, III
3                 LAW OFFICES OF ALFRED GUILLAUME, III, LLC
                  1350 Connecticut Avenue NW
4                 Suite 308
                  Washington, DC  20036
5
             BY: CHRISTOPHER NIETO, Esquire
6                 LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
                  1 North Charles Street, Suite 1301
7                 Baltimore, Maryland  21201

8    _____

         ***Proceedings Recorded by Mechanical Stenography***
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1601

```
 1                    I N D E X

 2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

 3

 4    Kyle Simms

 5         By Mr. Moomau:      8

 6    Mitchell Dinterman

 7         By Mr. Hanlon:     10

 8    Kerry George

 9         By Mr. Hanlon:     29                63

10         By Mr. Crawley:            60                  64

11    Oscar Diaz

12         By Mr. Moomau:     72               107

13         By Mr. Nieto:             95

14         By Mr. Hawks:            106

15    Brandon Drummond

16         By Mr. Hanlon:    108               136

17         By Mr. Guillaume:         129

18         By Mr. Hawks:            134

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1602**

```
 1                   P R O C E E D I N G S
 2        (8:58 a.m.)
 3             THE COURTROOM DEPUTY:  The matter now pending before
 4        this Court is Criminal Action Number TDC-18-0631, United
 5        States of America v. Scott Anthony Williams and Taeyan Raymond
 6        Williams. We are here today for the purpose of a jury trial.
 7        Counsel, please identify yourselves for the record.
 8             MS. GROSSI:  Good morning, Your Honor.  Leah Grossi,
 9        Michael Hanlon, and William Moomau on behalf of the
10        Government.  Here with us at counsel's table is Kyle Simms
11        with the Maryland State Police.
12             THE COURT:  Good morning.
13             MR. HAWKS:  Good morning, Your Honor.  Kwasi Hawks
14        and Dwight Crawley on behalf of Mr. Scott Williams, who is
15        seated between us.
16             THE COURT:  Good morning.
17             MR. GUILLAUME:  Good morning, Your Honor.  For the
18        record, Alfred Guillaume and Christopher Nieto on behalf of
19        Mr. Taeyan Williams, seated to my left.
20             MR. NIETO:  Good morning, Your Honor.
21             THE COURT:  Good morning to everyone, the parties
22        and the members of the audience.
23             So I see that I have some new exhibits and it's not just
24        one or two, it's about, I don't know, ten or so. Some of these
25        are dated quite a while ago. I thought I said that the exhibit
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1603**

 1   list is the exhibit list. Why should I even accept exhibits

 2   this late in the trial?

 3        **MR. HANLON:**  Your Honor, there are two categories.

 4   One is the immunity letters.

 5        **THE COURT:**  Well, you knew they were testifying

 6   anyway so I'm not sure why those weren't on the list to start

 7   with.

 8        **MR. HANLON:**  Understood, Your Honor. The other ones,

 9   at least a number of them are the DNA reports which were

10   previously marked as ID exhibits and we've sort of moved them

11   to the exhibit-exhibit list. That was precipitated by a

12   conversation I had after court yesterday with defense counsel.

13   Defense counsel indicated they would like to move in the first

14   of those DNA reports as evidence.  That is fine. If one is

15   coming in, it seemed to me last evening that we should

16   probably not put in one and not the others. That is the reason

17   for that category of exhibits.

18        **THE COURT:**  Why would one put in one and -- how are

19   they different, I guess?

20        **MR. HANLON:**  Well, they address different data,

21   different items. The first DNA report was -- and I'm going to

22   get the numbers wrong, Your Honor -- 1 through 22 and they

23   were compared in various ways for DNA profiles and for the

24   toothbrush item. And then the subsequent reports were all

25   different items that would be submitted for follow-up

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1604**

```
 1    examination or eliminations as they came in.

 2              THE COURT:  So why are any of these admissible to

 3    start with?

 4              MR. HANLON:  Your Honor, I -- honestly, I'm not

 5    opposed to the defense bringing in the first one. The

 6    Government really is -- I won't say --

 7              THE COURT:  You weren't planning to?

 8              MR. HANLON:  No, they were brought in as ID

 9    exhibits.

10              THE COURT:  So Mr. Hawks, why do we need this

11    report?  Typically -- it's basically an expert report so

12    they're usually hearsay.  Actually, I think you're protected

13    from them under the rules generally, these law enforcement

14    reports. Obviously if you want them then that's a different

15    issue, but why should we allow this?  Because then again, the

16    Government is going to say we should include the rest which

17    seems like a relatively fair proposition, but now we're having

18    testimony by document, not by witness.

19              MR. HAWKS:  Your Honor, the document -- there is an

20    extensive slideshow that the --

21              THE COURT:  They're ready?  Okay.

22              MR. HAWKS:  --that the defense received late on the

23    eve of trial. And upon inspection of that document, there is

24    actually a single piece of information not reflected in that

25    slide show that is reflected. I intend to elicit it on
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1605**

```
1    cross-examination, but I would also like to make it very clear
2    that that's not an extraneous finding, it's a key finding of
3    the report and that --
4            THE COURT:   Okay.  Well, I mean, we're going to have
5    to deal with that later since I don't think everybody was
6    ready to go at 8:45.  So let's call the jury in. This isn't
7    the first witness anyway, right?  So we can sort this out at a
8    later point?
9            MR. HANLON:   That's correct, Your Honor.
10           THE COURT:   We can call the jury in. Why is the door
11   always open, is that new protocol or --
12           A U.S. MARSHAL:  No, sir.
13           THE COURT:   Because every day it's open for some
14   reason. Okay, thank you.
15           (The jury entered the courtroom at 9:03 a.m.)
16           THE COURT:   Thank you, everyone. Please be seated.
17   Good morning, ladies and gentlemen. Welcome back. And we're
18   here for another day of testimony. I think when we left off
19   yesterday we were in the middle of hearing some recordings. I
20   don't know, is the plan to continue with those or to call a
21   witness now, Mr. Moomau?
22           MR. MOOMAU:   Your Honor, the Government is prepared
23   to play the final two calls and then start with testimony.
24           THE COURT:   Okay. So we're going to go back to those
25   calls. Remember the instruction that the captions you see on
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1606**

```
 1   these recordings is not evidence, they're just there to assist
 2   you. If you see any difference between or if you perceive any
 3   difference between what you hear and what you see on the
 4   screen, the evidence is the recording and you should rely on
 5   that.
 6        Okay, Mr. Moomau, do you want to call Sergeant Simms back
 7   to just address some of the --
 8        MR. MOOMAU:  Yeah, the Government would call
 9   Sergeant Simms to the stand to answer any questions, if
10   necessary.
11        THE COURT:  Okay, go ahead. So Sergeant Simms, I
12   think the oath from yesterday is still applicable or it is
13   still applicable, so just keep that in mind.
14        Mr. Moomau, whenever you're ready.
15             (Witness, previously sworn.)
16        MR. MOOMAU:  And for the record, Your Honor, the
17   Government is going to be playing now captioned call ID 33.
18   The call that has been admitted un-captioned that will be --
19   the jury would have will be 532. This is on Exhibit 529 listed
20   as call 5 made on June 8, 2018.
21             (Audiotape was played.)
22        MR. MOOMAU:  Moving it forward to approximately one
23   minute and 20 seconds.
24             (Audiotape was played.)
25             D I R E C T   E X A M I N A T I O N
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1607**

1    **BY MR. MOOMAU:**

2    Q.   And Sergeant Simms, were you familiar with the voices on

3    ID Exhibit 33, which is also Exhibit 532 with the captions?

4    A.   Yes.

5    Q.   And in the captions where it said "S," who is that?

6    A.   The defendant, Scott Williams.

7    Q.   And when it said "PC"?

8    A.   Pattiann Chaplin.

9    Q.   And "R"?

10   A.   Ricardo Carty.

11        **MR. MOOMAU:**  Now playing ID 35, the captioned

12   version of Exhibit 533.  Listed on Exhibit 529 it is call 7 on

13   June 9, 2018.

14        **(Audiotape was played.)**

15        **MR. MOOMAU:**  Moving forward to approximately 1

16   minute 30 seconds.

17        **(Audiotape was played.)**

18   **BY MR. MOOMAU:**

19   Q.   And Sergeant Simms, on that particular call did you

20   recognize the voices?

21   A.   Yes, sir.

22   Q.   And the "S" and the "PC"?

23   A.   Again, "S" was the defendant, Scott Williams, and "PC"

24   was Pattiann Chaplin.

25        **MR. MOOMAU:**  Your Honor, that's all for those

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1608**

1    exhibits.

2             THE COURT:  Okay, thank you very much. Sergeant

3    Simms, you can return back to your regular seat.

4             **(Witness excused.)**

5             **MR. HANLON:**  Your Honor, the United States calls

6    Mitchell Dinterman to the stand.

7             **THE COURT:**  Okay.

8             **THE COURTROOM DEPUTY:**  Sir, please come forward.

9    Remain standing and please raise your right hand.

10            **(Witness, sworn.)**

11            **THE COURTROOM DEPUTY:**  You may be seated, sir. Speak

12   clearly into the microphone.  Please state your first and last

13   name.

14            **THE WITNESS:**  Mitchell Dinterman.

15            **THE COURTROOM DEPUTY:**  And spell your first and last

16   name for the record, sir.

17            **THE WITNESS:**  Mitchell is M-i-t-c-h-e-l-l, Dinterman

18   is D-i-n-t-e-r-m-a-n.

19            **THE COURTROOM DEPUTY:**  Thank you, sir.

20            **D I R E C T   E X A M I N A T I O N**

21   BY MR. HANLON:

22   Q.   Mr. Dinterman, good morning to you.

23   A.   Good morning.

24   Q.   Sir, you have a copy of your report with you; is that

25   correct?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1609**

```
 1   A.   Yes, I do.
 2             MR. HANLON:  Your Honor, the report is ID 26. I've
 3   conferred with counsel that the witness would have it. I'm not
 4   sure his copy is stamped, but it is ID 26, for the record.
 5             THE COURT:  Okay, thank you.
 6   BY MR. HANLON:
 7   Q.   Sir, what do you do for a living?
 8   A.   I'm a crime scene section manager for the Maryland State
 9   Police Forensic Sciences Division.
10   Q.   What do you do as a crime scene section manager?
11   A.   I manage all the crime scene investigators in the entire
12   department.  And as such, I am the technical leader of the
13   section and the quality assurance manager for the section.
14   Q.   How long have you worked in law enforcement, sir?
15   A.   41 years.
16   Q.   Could you discuss for all of us your training in law
17   enforcement, including your educational background?
18   A.   I have an associates degree in criminal justice. I was a
19   sworn member of the Department, was transferred into the
20   Forensic Sciences Division as a crime scene investigator when
21   I was a trooper in 1990. After that I received extensive
22   training in crime scene investigation, blood stain pattern
23   analysis, bullet trajectory analysis.
24   Q.   Mr. Dinterman, I'm sorry, the last two phrases you used
25   with respect to your training, what was that?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1610**

```
 1    A.    Bullet trajectory analysis and blood stain pattern
 2    analysis.
 3    Q.    Thank you, sir.
 4    A.    I was promoted numerous times. I retired after 27 years
 5    as a sworn member as the assistant commander of the division.
 6    Six months later I was asked to return as a crime scene
 7    supervisor and then I was promoted to my current position
 8    where I am now.
 9    Q.    What are your duties, sir, in your current position?
10    A.    Again, I manage the entire section. I do scheduling, I
11    write our Standard Operating Procedures, do our quality
12    assurance, respond to corrective actions when necessary, train
13    personnel, maintain the training program for my personnel.
14    Q.    What is quality assurance in this context, sir?
15    A.    Quality assurance is to ensure that we follow our
16    Standard Operating Procedures and that our Standard Operating
17    Procedures follow sound scientific principles and accepted
18    principles in the forensic field.
19    Q.    Now in addition to the duties you describe, do you also
20    do crime scene analysis work yourself on some level in your
21    current position?
22    A.    Yes. I currently do blood stain pattern analysis and
23    bullet trajectory analysis.
24    Q.    Mr. Dinterman, approximately during the course of your
25    career, how many times have you conducted a crime scene
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1611**

1    analysis?

2    A.   I would say probably in excess of a thousand times,

3    probably.

4    Q.   And how many times have you done a blood stain pattern

5    analysis, approximately?

6    A.   I would say between 20 to 30 times.

7    Q.   Do you testify about these matters on occasion?

8    A.   Yes, I do.

9    Q.   Have you been qualified as an expert witness in previous

10   court proceedings?

11   A.   Yes, I have.

12   Q.   What are the areas in which you've been qualified to

13   testify as an expert?

14   A.   I've been qualified in three separate counties in Circuit

15   Court for the state of Maryland:  In Carroll, Howard, and

16   Somerset Counties as blood stain pattern analyst. That was

17   five times, five separate occasions. I've been qualified as a

18   bullet trajectory analyst five times, several counties also in

19   Circuit Court in the state of Maryland as well as Circuit

20   Court for Baltimore City.

21        **MR. HANLON:**  Your Honor, the Government would tender

22   the witness as an expert in the fields of blood stain

23   analysis, including blood stain pattern analysis.

24        **THE COURT:**  Any issues?

25        **MR. HAWKS:**  No, Your Honor.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1612**

```
 1                    MR. GUILLAUME:  No, objection.
 2                    THE COURT:  Mr. Dinterman is qualified as an expert
 3       in crime scene analysis including blood stain pattern
 4       analysis.
 5                    MR. HANLON:  Thank you, Your Honor.
 6       BY MR. HANLON:
 7       Q.   Mr. Dinterman, can you tell us what blood stain pattern
 8       analysis is and how it relates to crime scene analysis, in
 9       general?
10       A.   Blood stain pattern analysis is the study of fluid
11       dynamics related to blood. There are certain characteristics
12       of fluids when they're airborne, there's physical properties
13       that allow us to look at different stains, different patterns
14       to interpret what may have caused those stains or sequence of
15       events related to those stains. It enables us to be able to
16       see certain aspects of what may have occurred or what may not
17       have occurred related to a crime scene.
18       Q.   And can you give us some examples of things that you may
19       try to determine by looking at an item of suspected fluid at a
20       location that might be blood?
21       A.   Certain patterns are consistent with certain actions such
22       as a very violent act may cause blood to spatter and when it
23       does, it causes a certain pattern depending on the type of
24       action that caused it. For instance, a bullet which is very
25       high velocity, a spatter pattern related to that because of
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1613**

```
 1    the actual trauma and speed of that will cause droplets to be
 2    very tiny, as opposed to if the trauma was the result of a
 3    blunt force trauma like something like a baseball bat or
 4    things like that you would still see similar characteristics,
 5    but the characteristics would be different in size and shape.
 6        There are also things that we look for such as transfer
 7    patterns which would be where an object touched blood such as
 8    a shoe and then that shoe if you were to take a step would
 9    leave a transfer pattern on the floor which is a pattern that
10    resembles the shoe. Or if you brushed up against something
11    there could be a pattern in the wall that would show that
12    there was movement involved with that blood lane.
13    Q.   Are there certain types of tests that can be done to
14    determine chemically the particular presence of something like
15    blood or other fluid, sir?
16    A.   Yes.  We use two different presumptive tests for blood in
17    our section, in our crime scene section.
18    Q.   What are the presumptive tests that your section uses for
19    blood?
20    A.   Our section uses phenolphthalein which is a presumptive
21    test for blood. That's done with using chemicals that we drop
22    on a swab or filter paper that's been saturated with the
23    substance we're testing and/or we use luminol.
24    Q.   Now what is -- how does luminal work as a testing
25    substance?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1614**

 1    A.    Luminol is a presumptive test that we use that is used

 2    usually on stains that are not highly visible. The way luminol

 3    works is we will spray a mixture of water, an oxidizer and

 4    luminol crystals that are mixed into a spray bottle and we'll

 5    spray that onto the surface where we suspect the blood stains

 6    are. The reagent, the oxidizing reagent, something like

 7    hydrogen peroxide reacts with the iron in hemoglobin when the

 8    blood gets present on the object. That reaction, that

 9    oxidation causes the luminol crystals or the molecules in the

10    luminol crystals to become energized or active.  It excites

11    those molecules and causes them to give off a glow that's

12    visible to the naked eye.

13    Q.    Now how about phenolphthalein, sir, how does

14    phenolphthalein work as a presumptive test?

15    A.    The way phenolphthalein works is my people would take a

16    sample of what they think is possibly blood.  When they take

17    that sample they will apply three separate chemicals to that

18    sample.  It's either on a cotton swab or piece of filter

19    paper.  And what happens is when they apply those three

20    chemicals, they will get a visible reaction of a pink. It's

21    not a glow, it would just turn the sample pink instantaneous.

22    Q.    Now when you do blood stain pattern analysis, Mr.

23    Dinterman, did you go to -- do you go to scenes yourself, do

24    you look at photographs?  Is it a combination?  How does that

25    work?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1615**

1    A.    I have responded to scenes in the past when they had an

2    idea that they wanted blood stain pattern analysis conducted,

3    but most of my examinations are done after the fact because it

4    wasn't determined at the time that the criminal investigation

5    or crime scene investigation was being conducted that they

6    were going to be looking into blood stain pattern analysis.

7    So much of mine is done after the fact. My personnel are

8    actually trained by me in the proper way to document crime

9    scenes photographically and with sketching so that I can --

10   would enable me in doing an interpretation of a blood stain

11   pattern case.

12   Q.    Now you mentioned the people who work in your section. Is

13   a lady named Linda Idso one of the people who work in your

14   section?

15   A.    Yes, she's one of my crime scene technicians.

16   Q.    Are there any advantages or disadvantages to using

17   photographs for a blood stain analysis as opposed to going to

18   a scene personally and looking at the stuff?

19   A.    There are many advantages to using photographs.

20   Especially with having digital cameras now, my people have

21   their cameras set to a point where for me to examine a stain,

22   it allows me to actually zoom in on that stain using a

23   computer and high resolution monitor that allows me to see

24   without having to use a magnifying glass which makes it easier

25   to make interpretations as to what I'm looking at.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1616**

1    Q.   Sir, at some point did you receive photographs in

2    connection with this case to conduct a blood stain pattern

3    analysis?

4    A.   Yes, I did.

5    Q.   And did you review various photographs?

6    A.   Yes, I examined those images.

7    Q.   Let me ask you about a few of them. Let me begin with

8    what is in evidence as Exhibit 265 for this trial.  And Mr.

9    Dinterman, I believe it would be referenced as P0720233 in

10   your report.

11   A.   Yes.

12   Q.   Do you see the image?

13   A.   I see the image, yes, sir.

14   Q.   Keep the microphone right in front of you while you look

15   at the screen. It's sometimes -- thank you, sir. Is this one

16   of the images you received in connection with your work in

17   this case?

18   A.   Yes, this is one of the images.

19   Q.   What observations and conclusions did you reach from a

20   blood stain pattern point of view about the image in Exhibit

21   265?

22   A.   There is what appears to be possible blood stain on the

23   frame area of the vehicle itself, the door frame just below

24   the roof line. You can see it in the image, this pattern has

25   characteristics that I would say are common with or what you

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1617

1    would expect to see in a transfer pattern. I see no signs of

2    droplets or fluid running down the side of the frame which

3    would be more indicative if it was a higher volume of blood.

4    And the droplets would be indicative of a type of spatter

5    pattern, but I don't see those characteristics to demonstrate

6    the characters of a possible transfer stain.

7    Q.   Mr. Dinterman, if you touch your screen you might be able

8    to draw a circle, if you'd like, to mark where the item was

9    that you were talking about.

10   A.   It's in that area there that I circled.

11          MR. HANLON:   Your Honor, for the record a circle in

12   the middle of the screen here.

13          THE COURT:   Okay.

14   BY MR. HANLON:

15   Q.   Sir, you mentioned something called a "transfer pattern"

16   a couple of times.  Can you tell us what that is?

17   A.   A transfer pattern is when an object that is coated or

18   covered with blood touches another object that is clean and

19   transfers some of the blood from the bloody object to the

20   clean surface.

21   Q.   Let me show you what is in evidence as Exhibit 266. And

22   this I believe is referenced for your information, Mr.

23   Dinterman, as P0720235. Do you see the image on your screen?

24   A.   Yes.

25   Q.   Is this one of the images that you received in connection

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1618**

```
 1    with your work in this case?
 2    A.   Yes, it is.
 3    Q.   If you would, sir, can you tell us what observations and
 4    conclusions you reached with respect to this photograph, 266?
 5    A.   This is the actual window frame of the door that
 6    coincides with the opening that we saw in the previous image.
 7    There's a stain at the top of the window frame on the metal
 8    portion that coincides with the location of the stain on the
 9    car frame itself. And again --
10    Q.   And Mr. Dinterman, not to interrupt, you can circle it if
11    you'd like.
12    A.   Yes, sir.
13    Q.   Please continue, sir. I didn't mean to interrupt you.
14    A.   This, again, coincides with the stain on the previous
15    image. Again, this shows -- demonstrates the same
16    characteristics that were in the other image. It appears to be
17    a transfer stain.
18    Q.   Now sir, you've alluded to this and I want to ask you to
19    talk specifically in terms of what you saw in 265 and 266. Can
20    you explain again the connection, if any, that you observed
21    between the two stains in those two photos?
22    A.   These two stains being both transfer stains and both
23    coincide, the door frame and the door itself is indicative of
24    a transfer stain either being first applied to the door frame
25    above the window or to the vehicle frame below the door. And
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1619**

1   when the door is closed, that causes the blood to then again

2   transfer from one side of the vehicle to the other, either

3   from the door to the vehicle frame or from the frame to the

4   vehicle door.

5   Q.   And the last point.  Are you able to state an opinion as

6   to whether the fluid came from the door and got to the frame

7   or came from the frame and got to the door?

8   A.   I cannot.

9   Q.   Are you in a position to talk about what the source is

10  for this --

11  A.   I cannot.

12  Q.   You've referred to it as "blood" a couple of times. What

13  is it about it -- leaving aside the source -- what causes you

14  to think that this material in 266 is blood?

15  A.    It has physical properties of what you would expect to

16  see if it was blood. It's a very dark maroon, almost black

17  fluid and has -- it's got the red tint to it.  So it's what I

18  would expect to see. I've been to well over a thousand crime

19  scenes throughout my career and as a sworn police officer when

20  I worked as a trooper on the road where I've seen blood.

21  Q.   Now Mr. Dinterman, do you occasionally see rust in

22  metallic surfaces that you observe in photographs or crime

23  scenes?

24  A.   Yes.

25  Q.   Given rust's coloration, do you have an opinion as to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1620**

1    whether or not this material could be alternatively described
2    as rust as opposed to blood?
3    A.   No, I do not believe so. If I remember the vehicle
4    correctly in all the images I saw, I saw no evidence of rust
5    throughout the vehicle. It appeared to be relatively new.
6    Also, rust usually has more of an orange or brownish tint to
7    it than the dark maroon or red color that you would expect to
8    see in a blood stain.
9    Q.   In the photographs you observed, did you see any evidence
10   of any kind of breakdown of metals or anything like that on
11   the vehicle?
12   A.   No, I did not.
13   Q.   But you were -- you were not present during the full
14   crime scene analysis for this vehicle, the actual crime scene
15   where people were looking at it; is that correct?
16   A.   No.  I walked through the garage several times when asked
17   to look at something by crime scene tech Idso, but no, I was
18   not present the entire time.
19   Q.   During the times that you were present, did you see any
20   metallic degradation or breakdown on the vehicle?
21   A.   No, I did not.
22   Q.   Let me show you what's been entered into evidence as
23   Exhibit 247. Is this one of the images that were provided to
24   you for your analysis, sir?
25   A.   Yes, this is an image of the luminol reaction.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1621**

1    Q.   Now sir, what observations and conclusions, if any, did

2    you reach with respect to the image in Exhibit 247?

3    A.   In this image I noted that I saw several patterns that

4    are consistent with showing movement throughout the fluid. If

5    you look at the image, the part that's glowing from the

6    luminol you can see that there are lines that are running

7    parallel to the side of the vehicle that would be these lines

8    in this area here.

9    Q.   Do you need to start over, Mr. Dinterman?  I can clear

10   the screen for you. It will be enlarged for you. Do you want

11   to start over?

12   A.   Yes. You can see these lines throughout the fluid here.

13   That's consistent with either a bloody object being moved one

14   way or the other through the vehicle either from the back of

15   the vehicle toward the front or the front of the vehicle

16   toward the back. I'm unable to determine which direction, but

17   that shows that there's movement. If a bloody object was just

18   laying in the back of this vehicle you would see no linear

19   pattern like that. It would just appear to be like a puddle or

20   pooling.

21   Q.   What, if any, other observations did you make with

22   respect to this image, sir?

23   A.   There were also some linear patterns closer to the upper

24   portion of the back seat.

25   Q.   Would it be useful for me to clear out the screen and let

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1622**

```
1     you draw on it?

2     A.   Yes, please. It's in the area here just below the top of

3     the seat. I noted several linear patterns, again, that are

4     consistent with movement that actually went across in this

5     manner, across the top portion of the back of the seat. To me

6     those images, those patterns were consistent with an object

7     moving across the car as opposed to front to back. And they

8     resembled what I believed to possibly be caused by

9     fingerprints or fingers.  Not fingerprints, but fingers or

10    knuckles because they were parallel lines.

11    Q.   Did you observe anything that to your experience, Mr.

12    Dinterman, looked like fingerprints in the blood that could be

13    recovered or anything?

14    A.   No, I did not.

15    Q.   Any other observations from this photograph?

16    A.   I also noted the pattern at the rear of the car which was

17    -- this is the portion, the plastic trim portion that's

18    actually underneath the lift gate, when you close the lift

19    gate. That pattern also as you can see there's some -- looks

20    like some running of the fluid. That seemed to me to be

21    consistent with the linear pattern that I said showed movement

22    either toward the front or toward the back of the vehicle as

23    if an object had been either pooled across, had been pooled

24    across that area of the bumper, either in or out of the

25    vehicle depositing blood on that trim piece.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1623**

```
 1    Q.    Now Mr. Dinterman, let me ask you this: With respect to
 2    the glowing parts sort of closer to the bottom of the image, I
 3    want to ask you a question in order to make sure I understand
 4    something. Luminal is itself, it's a fluid, right?
 5    A.    Yes.
 6    Q.    When luminol is applied to a surface, are there
 7    circumstances where the luminal itself might run a little bit
 8    or something like that?
 9    A.    Yes. What happens is when they apply the luminal, they
10    have to continuously spray because the luminal only fluoresces
11    for a short period of time. So to keep it luminescing so that
12    they can expose it long enough because they're doing it in
13    complete darkness, they have to continually spray. The more
14    they spray the more liquid builds up on that surface and if
15    there's any kind of pitch to that surface, meaning if it's
16    tilted one way or the other the actual luminal will start to
17    run.  And when the luminal runs, therefore that will glow and
18    you'll see that running pattern in the luminol.
19    Q.    In your analyses do you take into consideration how
20    luminol itself acts in making your observations?
21    A.    Yes.
22    Q.    Does luminol react to -- you mentioned the luminal reacts
23    -- well, let me ask another question. The glow in this exhibit
24    which is Exhibit 247, do you recognize the nature of this
25    glow, sir, from your work?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1624**

1    A.    Yes. It's consistent with being blood.

2    Q.    Now luminol reacts with a particular element for its

3    glow; is that right?

4    A.    Yes.   It typically reacts with the iron that's in the

5    blood.

6    Q.    Now I'm not a scientist, but rust has iron, right?

7    A.    I'm sorry?

8    Q.    Does rust have iron?

9    A.    Yes, rust has iron, absolutely.

10   Q.    Again, going back to the rust subject, based on your

11   review of the photographs and things like that, do you have an

12   opinion as to whether or not the luminol might have been

13   reacting to rust in the surfaces?

14   A.    Given that this was inside of the vehicle and the fact

15   that I did not observe any rust anywhere on the vehicle in any

16   of the images and when I walked through, and the fact that

17   most of this is on a plastic -- the portion at the bottom of

18   the image is over a plastic surface and what is on the back of

19   the seat and the cargo compartment was actually carpet, I do

20   not believe that there was any rust present.

21   Q.    Based on all of your observations that you've talked

22   about today and generally in this case, have you reached any

23   opinion, sir, about generally what occurred with respect -- as

24   shown by the blood stain pattern analysis that you've

25   testified here?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1625**

 1    A.    Yes.

 2    Q.    What are those conclusions?

 3    A.    My conclusion is that a bloody object was either pulled

 4    into the vehicle from the rear or pulled out of the vehicle

 5    from the rear.  And at some point an individual or something

 6    had to be in the rear passenger's side of the vehicle and

 7    pulled that pattern that went across parallel to the back of

 8    the car toward the passenger rear door, actually appears to be

 9    possibly from a hand. I saw what appeared to be possible marks

10    by fingers. That individual would have either leaned on the

11    door frame or on the rear door as they exited before closing

12    the door and closing the door caused the transfer pattern.

13          **MR. HANLON:**  Just a moment, please, Your Honor.

14    Q.    Mr. Dinterman, one more question or two about luminol.

15    Does luminol ever react in your experience to cleaning fluids?

16    A.    Yes.  Luminol is a presumptive. It reacts to other things

17    other than the iron in blood. It reacts to certain chemicals,

18    those specially used in cleaning such as bleach.

19    Q.    Are you familiar with the way -- have you seen luminal

20    react with bleach or cleaning substances?  Are you familiar

21    with how it reacts?

22    A.    Yes.  I've received no less than three trainings specific

23    to luminol and the application specific to luminol and

24    documentation. And in those trainings we were exposed to what

25    the chemical's reaction looks like and what the blood reaction

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1626**

1    looks like.  And when I train my staff, I train them on how to

2    photograph luminol.  They're given both a sample with bleach

3    and a sample with known blood so that they can see the

4    difference in the reaction.

5    Q.    What are some of the differences in the reaction of

6    luminol with bleach versus blood?

7    A.    The reaction with bleach and/or cleaning agents usually

8    has what I refer to as a sparkling or a starburst effect. When

9    it's sprayed on the bleach you can actually see its

10   fluorescence, but in a different manner. Instead of being the

11   even bluish glow that you see with blood, it will have a lot

12   of bright specs in it.

13   Q.    Going back to Exhibit 247 which remains on your screen,

14   do you have an opinion as to whether or not this luminol

15   reaction is from blood or bleach?

16   A.    Yes.  This is more consistent with the reaction to blood.

17         **MR. HANLON:**  One more moment, Your Honor. Thank you,

18   Mr. Dinterman. No further questions on direct.

19         **THE COURT:**  Okay, cross-examination.

20         **MR. HAWKS:**  None, Your Honor.

21         **MR. GUILLAUME:**  No questions, Your Honor.  Thank

22   you.

23         **THE COURT:**  Okay, Mr. Dinterman. Thank you very much

24   for coming to testify. We appreciate your testimony. You can

25   step out now.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1627**

```
 1                    THE WITNESS:  Thank you.

 2                (Witness excused.)

 3              MR. HANLON:  Your Honor, the United States' next

 4    witness is going to be Kerry George.

 5              THE COURTROOM DEPUTY:  Sir, please come forward and

 6    please take the stand. Remain standing and please raise your

 7    right hand.

 8                (Witness, sworn.)

 9              THE COURTROOM DEPUTY:  You may be seated, sir. Speak

10    clearly into the microphone.  Please state your first and last

11    name.

12              THE WITNESS:  Kerry George.

13              THE CLERK:  And spell your first and last name for

14    the record.

15              THE WITNESS:  K-e-r-r-y  George, last name

16    G-e-o-r-g-e.

17              THE COURTROOM DEPUTY:  Thank you, sir.

18              THE COURT:  If you could just move the microphone

19    closer to you and move yourself closer to the microphone, we'd

20    appreciate it.

21         Mr. Hanlon.

22              MR. HANLON:  Thank you, Your Honor.

23               D I R E C T   E X A M I N A T I O N

24    BY MR. HANLON:

25    Q.  Mr. George, good morning to you.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1628**

```
 1    A.    Good morning.

 2    Q.    Can you tell us how old you are?

 3    A.    I'm 45.

 4    Q.    And where were you born and where did you grow up, Mr.

 5    George?

 6    A.    I was born in Grenada, grew up in Grenada.

 7    Q.    And how old were you when you came to the United States?

 8    A.    26, I believe.

 9    Q.    What brought you here to the U.S?

10    A.    A better life, the American dream.

11    Q.    What kind of work have you done to support yourself?

12    A.    I do IT work.

13    Q.    Information technology?

14    A.    Correct.

15    Q.    And what kind of IT work specifically do you do?

16    A.    Computer repairs; cell phone sales and repairs;

17    electronic devices repairs and installations.

18    Q.    Do you have your own business, sir, or do you work for

19    somebody?

20    A.    I have my own business.

21    Q.    And how long have you been in business for yourself?

22    A.    2007, thereabout.

23    Q.    Approximately.

24    A.    15 years thereabout.

25    Q.    Sir, do you know an individual named Scott Williams?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1629**

```
 1    A.    Yes.
 2    Q.    Do you see Mr. Scott Williams in court today?
 3    A.    Yes.
 4    Q.    Would you please point -- identify him by where he's
 5    sitting and describe what he's wearing for the record?
 6    A.    Gray jacket, white shirt, right there.
 7              MR. HANLON:  Your Honor, for the record identifying
 8    the defendant, Scott Williams.
 9              THE COURT:  Yes.
10    BY MR. HANLON:
11    Q.    Mr. George, how do you know Scott Williams?
12    A.    I met Scott, he came to do a job one time, some duct work
13    for this business that I was at. That's how we met initially.
14    Q.    Can you tell us about how long ago that was, what the
15    business was that first brought you in contact with Mr.
16    Williams?
17    A.    This was about maybe 12, 13 years ago, give or take.
18    Q.    I'm sorry to interrupt you.
19    A.    I said give or take.
20    Q.    And it was a business thing, he did some sort of work for
21    you?
22    A.    Correct.
23    Q.    Was it for you personally or a company you worked for?
24    A.    A company.
25    Q.    How did your relationship, if any, develop with Mr.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1630**

```
 1    Williams after that time?
 2    A.   After that time we kept in contact. He did several other
 3    jobs and we became pretty close. We became friends pretty
 4    much.
 5    Q.   Have you remained friends with him since that time?
 6    A.   Correct.
 7    Q.   Have you been to Mr. Scott Williams' house?
 8    A.   Yes.
 9    Q.   Has he been to your home?
10    A.   Yes.
11    Q.   What kind of occasions have you gotten together with Mr.
12    Williams on?
13    A.   Social occasions, birthdays, cookouts, work-wise, as
14    well.
15    Q.   Have you done any kind of work for Mr. Scott Williams
16    during the time that you've known him?
17    A.   Yes.
18    Q.   What kind of work have you done for Scott Williams during
19    that period?
20    A.   Cell phone repair, computer repair, sales as well. Also
21    electronic devices, setup installations.
22    Q.   Have you ever met any members of his family, Mr. George?
23    A.   Yes.
24    Q.   What members of Mr. Scott Williams' family have you met?
25    A.   His children, his wife, girlfriend, however you want to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1631**

```
1    put it.
2    Q.   Have you met an individual named Taeyan Williams?
3    A.   Yes.
4    Q.   And Mr. Taeyan Williams, do you see him in court today?
5    A.   Yes.
6    Q.   If you would, please tell us where he's sitting and
7    describe his clothing.
8    A.   He's sitting right here, black jacket.
9            MR. HANLON:  Your Honor, for the record identifying
10   -- identifying the defendant, Taeyan Williams.
11           THE COURT:  Yes, it will.
12   BY MR. HANLON:
13   Q.   Based on how he was introduced to you, Mr. George, what
14   is Scott Williams' relationship with Taeyan Williams?
15   A.   His father.
16   Q.   Has there ever been a point during the course of the time
17   that you've known Scott Williams, Mr. George, in which Scott
18   Williams has ever asked you to delete information from his
19   cell phone?
20   A.   Yes.
21   Q.   And let me ask you about say prior to the 2018 time
22   frame, what were the occasions on which Mr. Scott Williams
23   asked you to delete information from his cell phone?
24   A.   It was actually several occasions. He loses his phones
25   regularly.  Between him and his kids -- sorry, go ahead.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1632**

```
1    Q.   Let me clarify the question. Has he ever told you why he
2    wanted information deleted from his cell phone?
3    A.   No.
4    Q.   But he's asked you to delete information from his cell
5    phone?
6    A.   Correct.
7             MR. HANLON:  Your Honor, can I confer with counsel,
8    briefly?
9             THE COURT:  Okay.
10            (Counsel conferred privately off the record.)
11   BY MR. HANLON:
12   Q.   Approximately how many times, sir, prior to say 2018 or
13   so, did you delete information for Scott Williams from his
14   cell phone?
15   A.   Five to ten.
16   Q.   Did there come a point, sir, in which you came to learn
17   that Mr. Scott Williams had been -- had gotten arrested?
18   A.   Yes.
19   Q.   How did you come to find out that information, just in
20   terms of time frame?
21   A.   I got a phone call.
22   Q.   Who was the phone call from?
23   A.   From Scott.
24   Q.   And do you recall what was said during the phone call?
25   A.   Vaguely.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1633**

```
1    Q.   Do you recall whether or not this was a phone call where
2    it was just you and him or whether or not anyone else was on
3    the phone?
4    A.   You have to be more specific.
5    Q.   Was it just -- during the phone call that you described,
6    was it just you and Mr. Williams talking to each other or was
7    there another person on the phone with you?
8    A.   It depends which particular instance you're speaking
9    about.
10   Q.   So there are multiple?
11   A.   Yes, correct.
12   Q.   During the first call, the one where you found out that
13   something had happened with Mr. Williams, was that just him or
14   was there anyone else on the call?
15   A.   There was somebody else on the call.
16   Q.   Do you recall who the other person was on the call?
17   A.   Yes.
18   Q.   And who was the other person on the phone call?
19   A.   Shelly.
20   Q.   Now who is Shelly?
21   A.   This is his significant other.
22   Q.   Is this someone else that you've met personally?
23   A.   Yes, correct.
24   Q.   Do you know if Shelly goes by any other names or is known
25   by any other names?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1634**

```
 1    A.    Yes.
 2    Q.    And what other names is she known by?
 3    A.    I know one other, Patti.
 4    Q.    Now during -- was there also a time in which you went to
 5    Mr. Williams' house to conduct some repairs in the wake of
 6    this arrest?
 7    A.    Correct.
 8    Q.    What was the nature of the repair work that you went to
 9    do at Scott Williams' house?
10    A.    I had to repair his door that was broken down.
11    Q.    Did you end up repairing the door?
12    A.    Correct.
13    Q.    Now let me -- what I'd like to do now and what the
14    Government would like to do, Your Honor, is play a portion of
15    ID-31 which corresponds to Exhibit 531 which is in evidence.
16              THE COURT:  Is this one of the ones we just played?
17              MR. HANLON:  It is, Your Honor. We're going to jump
18    to a particular part of it.
19              THE COURT:  Okay.
20              MR. HANLON:  Your Honor, at this point we are
21    playing the call from approximately 4:03. What I'm going to
22    ask my colleague to do is play it until we hear some voices
23    and I'm going to ask the witness to identify the voices. So
24    Ms. Grossi, please go ahead.
25              (Whereupon the audiotape was played.)
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1635**

```
 1    BY MR. HANLON:

 2    Q.   We've stopped at four minutes and twelve seconds. Mr.

 3    George, do you recognize the voices on that call?

 4    A.   Yes.

 5    Q.   Who were the voices that we just heard?

 6    A.   That was Scott and Shelly.

 7    Q.   Was there another voice that we heard on that call?

 8    A.   Yes, myself.

 9    Q.   So do you recall participating in this call with Mr.

10    Williams and Shelly was on?

11    A.   Yes.

12            MR. HANLON: I'll ask my colleague now to resume

13    playing, Your Honor, thank you.

14            (Whereupon the audiotape was played.)

15            MR. HANLON: We stopped at four minutes and 36

16    seconds in.

17    BY MR. HANLON:

18    Q.   Mr. George, let me ask you a couple of questions. Did you

19    hear a reference to the word "password" a moment ago?

20    A.   Yes.

21    Q.   And there's also a reference to "Gucci 225." Do you

22    recall that?

23    A.   Yes.

24    Q.   Can you tell for us based on your participation in this

25    call what was being discussed during this call with you, Scott
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1636**

```
1   Williams, and the lady?

2   A.   You'd have to play further.

3   Q.   I'm sorry, sir?

4   A.   You'd have to play further.

5        MR. HANLON: Ms. Grossi, if you could play further.

6        (Whereupon the audiotape was played.)

7   BY MR. HANLON:

8   Q.   We've stopped at 5:05 in the call, sir. Can you tell what

9   the context is of the conversation now?

10  A.   It was about me getting into his iCloud account.

11  Q.   And based on this conversation, what was your

12  understanding of what Mr. Williams was asking you to do with

13  his iCloud account?

14  A.   He wanted me to log into it and delete it.

15       MR. HANLON:  We'll resume the call, Your Honor.

16       (The audiotape was played.)

17  BY MR. HANLON:

18  Q.   We stopped at 5:40.  Mr. George, you mentioned that

19  "everything is gonna be gone." Did you hear your voice say

20  that?

21  A.   Correct.

22  Q.   And what were you trying to communicate to Mr. Williams

23  when you said that?

24  A.   He was asking me to get some information from it, but I

25  told him once I delete the iCloud, everything will be gone.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1637**

1    Q.   Now the information he was asking you to get, during the

2    call was he asking you to relay that information to someone?

3    A.   No, I don't believe so.

4             MR. HANLON:  Ms. Grossi, if you can resume.  You can

5    resume. Resume playing, Your Honor.

6             **(Whereupon the audiotape was played.)**

7    BY MR. HANLON:

8    Q.   At six minutes and four seconds in we've stopped. Mr.

9    George, did you have an understanding of the meaning of the

10   phrase "Taeyan Taeyan" when it was mentioned during this call?

11   A.   Yeah, talking about his son.

12   Q.   And which son specifically, sir?

13   A.   Taeyan.

14             **MR. HANLON:**  We're resuming playing, Your Honor.

15             **(Whereupon the audiotape was played.)**

16   BY MR. HANLON:

17   Q.   At some point you got off -- strike that. Did there come

18   a point, Mr. George, where you got off the call?

19   A.   I believe so.

20   Q.   Now based on what was said during this conversation, did

21   you take any action?

22   A.   Yes.

23   Q.   What did you do?

24   A.   I proceeded to log into the iCloud and delete it.

25   Q.   Now when you talked about logging into the iCloud, which

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1638**

```
 1    iCloud account did you log into?

 2    A.   The one I was given instructions to get into.

 3    Q.   And again, to be very specific, whose iCloud was it that

 4    you logged into?

 5    A.   Scott's iCloud.

 6    Q.   And when you say that you received instructions, what

 7    exactly were the instructions that you received to log into

 8    that iCloud?

 9    A.   To log into the iCloud and delete what's in there, as he

10    said.

11    Q.   Now during the course of this call, do you recall using

12    the phrase "credentials"?

13    A.   Yes.

14    Q.   What did you mean when you used the phrase "credentials"?

15    A.   His iCloud information; e-mail and password.

16    Q.   And how did you get those credentials in order to log in?

17    A.   As the recording stated, he'd give it to me.

18    Q.   By "he," who do you mean that gave you the credentials?

19    A.   Scott.

20    Q.   Sir, do you recall your phone number during the time

21    frame in question?

22    A.   Yes.

23    Q.   What was your phone number at the time in question?

24    A.   Do I need to say my phone number?

25    Q.   For the record, sir, yes, you do.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1639**

```
 1    A.    Okay.  202-486-9003.

 2    Q.    That was the phone number that you were using during the

 3    time frame of the call that we just heard; is that correct?

 4    A.    Correct.

 5    Q.    How long have you used that phone number?

 6    A.    Always, 15 years.

 7    Q.    Do you still use that phone number?

 8    A.    Correct.

 9    Q.    Did there come a point, sir, in which you attended a

10    court appearance -- one moment, please, Your Honor -- that you

11    attended a court appearance and saw Mr. Williams in court?

12    A.    Yes.

13    Q.    What were the circumstances under which you attended a

14    court appearance?

15    A.    He was arrested and this is where I actually made a

16    couple of calls and found out to see where he was going to be,

17    he was going to be at a particular courthouse.  So yes, I

18    showed up to see what was going on.

19    Q.    That last part, sir, I just want to make sure I

20    understand. You made a couple of phone calls?  Did I hear you

21    correctly?

22    A.    Yes, because he got arrested and I called to see exactly

23    what was going on.  And I was informed that that was where he

24    was going to be.

25    Q.    And at some point did you actually go to court and watch
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1640

```
1    a court proceeding?

2    A.   Correct.

3    Q.   And did you actually at one point come to this

4    courthouse?

5    A.   Correct.

6    Q.   And watch a court proceeding?

7    A.   Yes.

8    Q.   Do you recall what kind of court proceeding it was?

9              MR. CRAWLEY:  Objection, as to relevance.

10             THE COURT:  How is this relevant?

11             MR. HANLON:  I'll withdraw it, Your Honor.

12   BY MR. HANLON:

13   Q.   Do you recall seeing Mr. Williams in court?

14   A.   Yes.

15   Q.   Do you recall seeing Mr. Williams represented by an

16   attorney?

17             MR. CRAWLEY:  Objection, Your Honor, as to

18   relevance.

19             THE COURT:  What's the relevance?

20             MR. HANLON:  We'll have to approach, Your Honor.

21             THE COURT:  Okay.

22             (Counsel approached the bench.)

23             THE COURT:  Okay, so where is this line of

24   questioning going?

25             MR. HANLON:  Your Honor, the defense knows from the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1641**

1    grand jury testimony I think that Mr. George received a note

2    from the attorney representing Mr. Williams at the time. It

3    was none of the attorneys here and I don't think that the

4    attorney in that case did anything wrong, they just passed a

5    note for their client. The note was to Mr. George. The note is

6    not super clear, Your Honor.  There's a reference to pants and

7    some other stuff.  And then subsequent to that Mr. George went

8    to the Bristolwood house, if memory serves, found a cell phone

9    of Mr. Williams' and deleted more information.

10        There was also -- per the witness' grand jury testimony,

11   there was also a phone call with Mr. Williams during the same

12   time frame which there was discussion of this.

13            **THE COURT:**  Do we have the note or not?

14            **MR. HANLON:**  We do. Ultimately what happened, Your

15   Honor, is that the witness appeared in grand jury and

16   testified about all of this stuff and provided --

17            **THE COURT:**  Mr. George did?

18            **MR. HANLON:**  Yes.

19            **THE COURT:**  Okay.

20            **MR. HANLON:**  Now I will say, Your Honor, that the

21   witness saw Mr. Williams in court, saw counsel in court, but

22   did not personally see Mr. Williams pass the note to counsel.

23   He did not see that. What happened was he saw a court

24   proceeding and then subsequently and I don't know if it was in

25   the courtroom after Mr. Williams left or if it was outside,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1642**

1  counsel passed -- provided this note.

2        **THE COURT:**  Are you trying to get either him to

3  describe or are you going to offer the note itself or you just

4  want to say what did he do after he got the note?

5        **MR. HANLON:**  I do plan to offer the note, Your

6  Honor, and show it to him. I will say that the note is now

7  self-explanatory.

8        **THE COURT:**  Is it written by Scott Williams?  Is it

9  his handwriting?

10        **MR. HANLON:**  We can't confirm that it's his

11  handwriting, Your Honor.  Neither can the witness.

12        **THE COURT:**  It came from his counsel?

13        **MR. HANLON:** Yes, Your Honor.

14        **THE COURT:** Who are we talking about?

15        **MR. HANLON:** It's a member of the Public Defender's

16  office, Your Honor.

17        **THE COURT:**  What hearing was this?  Just for my --

18        **MR. HANLON:**  Based on the context, I believe it was

19  the initial appearance. I would want to verify that.

20        **THE COURT:**  All right. So Mr. Crawley, what's the

21  issue?

22        **MR. CRAWLEY:**  Yes, Your Honor.  First, as to the

23  note, the Government has conceded that they can't substantiate

24  that it was my client who wrote this note. So without that, I

25  don't know how that has any bearing. I don't know what this

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1643**

1    attorney -- what was in that attorney's head when they

2    actually gave this note over. So with that being said, that's

3    not relevant to anything concerning what my client would have

4    known or done.

5        But more importantly, Your Honor, if the Government is

6    only seeking to ask about what other steps did he take,

7    meaning this witness to delete information, I think they can

8    ask that question. But beyond that, to get into all of this

9    speculative stuff concerning a note that we don't know who the

10   author is, how it was written, what it was intended for, I

11   think that's objectionable.

12            **THE COURT:**  If it's an exhibit, how come we haven't

13   all looked at it?  Is it on the exhibit list?

14            **MR. HANLON:**  It's in the exhibit list, Your Honor. I

15   forgot the number.

16            **THE COURT:**  Are you going to offer it through him?

17            **MR. HANLON:**  That was my intention, yes.

18            **THE COURT:**  Okay, well this falls in the category of

19   things that probably should have been raised earlier.  But in

20   any event, so again, why do you need him to describe the court

21   hearing?

22            **MR. HANLON:**  To describe the court hearing, no, Your

23   Honor. The fact that there was --

24            **THE COURT:**  Not the content, but the fact that he

25   got a note from the attorney.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1644**

1              MR. HANLON:  Based on the context, Your Honor, right

2      after the court hearing where Scott Williams is there and

3      suddenly he's getting a handwritten note, I think it's a

4      reasonable inference that the note came from Mr. Williams,

5      based on the context.

6              THE COURT:  Okay, I'm going to allow at least -- I

7      don't know about the note itself, I haven't looked at it, but

8      in terms of the course of conduct, I'm going to allow it.

9      Because the fact that he gets a note may affect what he ends

10     up doing. The fact that he gets it from the person he

11     understood to be the attorney makes it more likely that this

12     is a statement coming from Mr. Williams. The attorney is a

13     representative of the client, so he's getting a note from that

14     person, as opposed to some other random person in the

15     courtroom.  It does make a difference.

16         We don't need to get into who the attorney is. If it's

17     helpful to clarify it's not one of current counsel, I think

18     someone should do that.  And then in terms of certainly as Mr.

19     Crawley said what he ended up doing next, that's fair game. As

20     to the content of the note, I'll have to look at it and see

21     where we are.

22              MR. HAWKS:  Your Honor, in an abundance of caution I

23     feel like I should put on the record -- and I'm sorry for the

24     two, but just --

25              THE COURT:  I'm really trying to follow this rule,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1645**

```
 1   but --
 2          MR. HAWKS:  Your Honor, the public defender in
 3   question was my spouse, just for the full situational
 4   awareness to the Court.
 5          THE COURT:  Okay, that's helpful.
 6          MR. HANLON:  Your Honor, I just want to clarify, I
 7   don't think any attorney did anything wrong, including the
 8   public defender.
 9          THE COURT:  The jury is not going to care about
10   that.  You all are concerned about that. They're not going to
11   be.
12          MR. HANLON:  Understood.
13          THE COURT:  Okay.
14          MR. HANLON:  Thank you, Your Honor.
15          (Counsel returned to their trial tables.)
16          THE COURT:  Sorry for the delay, ladies and
17   gentlemen.  Mr. Hanlon.
18   BY MR. HANLON:
19   Q.   Mr. George, so going back to this court proceeding with
20   Mr. Scott Williams, at some point -- and just to be very
21   clear, the attorneys involved in that proceeding on the
22   defense side were none of these attorneys here today; is that
23   correct?  None of them were representing Mr. Scott Williams or
24   Mr. Taeyan -- or none of them were representing Mr. Scott
25   Williams?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1646**

```
1    A.    No, sir.

2    Q.    At some point did you receive anything following that

3    court proceeding or during the court proceeding from the

4    person you understood to be Scott Williams' attorney at the

5    time?

6    A.    Yes, correct.

7              MR. HANLON:  Your Honor, at this point the Government

8    would move to admit Exhibit 417-B as in Bravo.

9              THE COURT:  Any issues?

10             MR. CRAWLEY:  Subject to our earlier objection, Your

11   Honor.

12             THE COURT:  417-B?

13             MR. HANLON:  B as in Bravo.

14             THE COURT:  Have you given me a copy of it?

15             MR. HANLON:  Your Honor, it is in the exhibit set.

16   It's in the Court's exhibit set.

17             THE COURT:  I just have straight up 417. I don't

18   have 417-B.

19             MR. HANLON:  A moment please, Your Honor. We'll look

20   for it, Your Honor. In the meantime, Your Honor, I'm going to

21   confer. I have a copy here and I can certainly provide it to

22   the Court. Does counsel have a copy?  Counsel appears to have

23   a copy. Would the Court like a copy?

24             THE COURT:  Yes, I would.

25             MR. HANLON:  May I approach, Your Honor?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1647

```
 1                    THE COURT:  Yes, and hand it to the clerk.
 2              MR. HANLON:  And Your Honor, begging the Court's
 3    indulgence, I'm hoping the Court will allow me to put it on
 4    the screen once the Court has had an opportunity to review it.
 5                    THE COURT:  Well, just for the witness only?
 6              MR. HANLON:  You know, Your Honor, we have an
 7    electronic copy; apologies.
 8                    THE COURT:  Well, you can show it to the witness
 9    first until we decide what we're doing with it.
10              MR. HANLON:  Certainly, Your Honor.
11                    THE COURT: Okay, I have it.  Do you want to lay a
12    foundation?  I think there may be an objection to this.
13              MR. HANLON:  Certainly, Your Honor.
14                    THE COURT:  Okay, go ahead.
15              MR. HANLON:  A moment please, Your Honor, so I can
16    make sure I do the technology properly. Ms. Solomon, is the
17    system set up to show things to the witness, but not to the
18    jury?
19                    THE COURTROOM DEPUTY:  Yes, it is.
20              MR. HANLON:  Thank you, ma'am. Would it be possible
21    to put for the witness, Exhibit 417-B, as in Bravo?
22    BY MR. HANLON:
23    Q.   Do you recognize this piece of paper, sir, or these
24    pieces of paper?
25    A.   Yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1648**

1    Q.    Where have you seen this piece of paper before?

2    A.    This is what was given to me at the court appearance.

3    Q.    And I'll ask you -- I'm going to ask you a direct

4    question here. Did you receive this piece of paper from a

5    particular person?  Don't worry about their name, but from a

6    particular person?

7    A.    Yes, correct.

8    Q.    And without naming the person, who was the person in

9    question?

10        MR. CRAWLEY:  Objection to the form of the question.

11        THE COURT:  Overruled.

12   BY MR. HANLON:

13   Q.    Like what was their job?  What were they doing in the

14   court proceeding?

15   A.    This was the representative for Scott.

16   Q.    Say that again, sir.

17   A.    The representative for Scott.

18   Q.    Do you -- you have no reason to believe that that person

19   knew what the note was -- or what the paper said or what its

20   meaning was?

21        MR. CRAWLEY:  Objection, calls for speculation.

22        THE COURT:  Sustained.

23   BY MR. HANLON:

24   Q.    You -- again, do you recognize this document?

25   A.    Yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1649**

```
 1                MR. HANLON:  Your Honor, the United States moves for
 2    the admission of Exhibit 417-B as in Bravo.
 3                THE COURT:  Other than saying you recognize it, what
 4    else have you had him say about this?
 5                MR. HANLON:  Let me lay more foundation, Your Honor.
 6                THE COURT:  Let's do that.
 7    BY MR. HANLON:
 8    Q.   What did you understand this piece of paper to mean?
 9                MR. CRAWLEY:  Objection, Your Honor. That doesn't go
10    to foundation.
11                THE COURT:  That could go to content. I'll sustain
12    that.
13                THE WITNESS:  Would you like me to read it?
14                MR. HANLON:  No, hold on.
15    BY MR. HANLON:
16    Q.   Do you -- yes or no, sir, did you take any action based
17    on this piece of paper?
18    A.   Yes.
19    Q.   What action did you take based on this piece of paper?
20    A.   That, again, would go towards me reading it. Would you
21    like me to read it?
22    Q.   Just tell me what the action was, for now. What action
23    did you take after receiving this piece of paper?
24    A.   Caution.
25    Q.   Did you go to -- did you go to a location based on this
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1650**

 1    piece of paper?

 2    A.    Yes.

 3    Q.    Where did you go based on this piece of paper, Mr.

 4    George?

 5    A.    To the house, to Scott's house.

 6    Q.    And to be very clear, sir, whose house was that?

 7    A.    Scott's house.

 8    Q.    Full name if you would, sir?

 9    A.    Scott Williams' house.

10    Q.    And what did you do at Scott Williams' house?

11    A.    I went to his house and I went to his room and went to

12    retrieve his contents.

13    Q.    Now what contents of Scott Williams' did you retrieve

14    from his room on that occasion?

15    A.    His wallet and a cell phone.

16    Q.    And why did you retrieve a cell phone of Scott Williams?

17    What caused you to do that?

18    A.    Because this is what was in his pants pocket. Again, it

19    goes towards me reading --

20    Q.    Let me ask you this: Is there a connection, Mr. George,

21    between the language in the note and the action you took about

22    retrieving a cell phone?

23    A.    Yes.

24    Q.    What is that connection?  Let me ask you a different way.

25    Would describing the note allow you to describe the connection

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1651**

```
 1    between the note and the cell phone?
 2    A.    Yes.
 3              MR. HANLON:  Your Honor, the United States moves for
 4    the admission of Exhibit 417-B.
 5              MR. CRAWLEY:  We maintain our objection.
 6              THE COURT:  I'm not going to allow it at this point.
 7    I still think we need to know more about how this note came
 8    about.
 9              MR. HANLON:  Understood, Your Honor.  I'll move on.
10    BY MR. HANLON:
11    Q.    You mentioned you retrieved a cell phone?
12              MR. CRAWLEY:  I would ask that the note be taken
13    down, Your Honor.
14              THE COURT:  I'm not sure if he's still trying to lay
15    a foundation, so we'll leave it up through this line.
16              MR. HANLON:  Your Honor, I'd like to move on, but
17    for now let's see where else it goes.
18              THE COURT:  Okay.
19    BY MR. HANLON:
20    Q.    You mentioned retrieving a cell phone?
21    A.    Correct.
22              MR. HANLON:  Approach the witness, Your Honor?
23              THE COURT:  Okay.
24    BY MR HANLON:
25    Q.    Mr. George, I'm going to approach and show you an item
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1652

```
 1   which has been -- you could take it, Mr. George, just for a
 2   moment. Take a look at it and let me know when you're done.
 3   A.   Okay.
 4   Q.   Do you recognize the item that I just showed you which is
 5   in evidence as Exhibit 679, sir?
 6   A.   Correct.
 7   Q.   What is this item?
 8   A.   It's a cell phone.
 9   Q.   Have you seen this particular cell phone before?
10   A.   Yes.
11   Q.   Where have you seen this particular cell phone before?
12   A.   This is the cell phone I retrieved from his pants.
13   Q.   And from whose pants did you retrieve this cell phone,
14   Exhibit 679?
15   A.   Mr. Williams.
16   Q.   When you retrieved -- when you retrieved Exhibit 679 from
17   Mr. Scott Williams' pants, what was your intention of what you
18   were going to do with it?
19   A.   My intention?
20   Q.   Yes, sir.
21   A.   At that point I didn't have any intention. This is the
22   contents of what was in his pants pocket on his person.
23   Q.   Did you ultimately do anything with Exhibit 679?
24   A.   Correct.
25   Q.   What did you do with Exhibit 679?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1653**

```
1    A.    I did a reset on it.
2    Q.    Now what do you mean by "a reset" in the context of a
3    cell phone?
4    A.    I reset the phone.
5    Q.    What does resetting a phone do to the phone in terms of
6    the data --
7    A.    Reset to factory.
8    Q.    Let me finish, sir, and apologies. Say that again.  What
9    would resetting the phone due to the data already on the
10   phone?
11   A.    Erases the data.
12   Q.    Data would include text messages?
13   A.    Data.
14   Q.    Would it include text messages?
15   A.    Yes, that's data.
16   Q.    Would it include contacts?
17   A.    Data.
18   Q.    Would it include contacts?
19   A.    Everything on the phone would be deleted, data.
20   Q.    Including the contacts, Mr. George?
21   A.    Everything.
22   Q.    Why did you erase the data on the phone?
23   A.    Because this is what I was instructed to do.
24   Q.    Who instructed you to erase the data on this phone?
25   A.    Mr. Williams.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1654**

```
1    Q.   And just for clarity of the record, sir, which Mr.
2    Williams?
3    A.   Scott Williams.
4    Q.   And when did Scott Williams instruct you?  How did Scott
5    Williams instruct you to erase the data on the phone?
6    A.   Through phone calls.
7    Q.   Did you still occasionally have phone calls with Mr.
8    Scott Williams during this time frame?
9    A.   Yes, of course.
10   Q.   After erasing the data, what did you do with this cell
11   phone?
12   A.   I kept it.
13   Q.   Ballpark, Mr. George, about how long did you keep the
14   cell phone?
15   A.   2019 at the time of his arrest, up until I give it to you
16   guys.
17   Q.   And you anticipated my next question, sir. Did there come
18   a time when you provided a cell phone, Exhibit 679 to anybody?
19   A.   Yes.
20   Q.   How did that come about?
21   A.   The police came to my house asking questions and they
22   asked do I have any contents of him and yes, I give them a
23   cell phone.
24   Q.   Did you -- as part of that discussion, did you sign a
25   form allowing the police to get the cell phone and check the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1655**

1   cell phone?

2   A.   Yes.

3          MR. HANLON:  Your Honor, the Government would move to

4   admit Exhibit 417-A as in alpha.

5          THE COURT:   Again, I don't have any copies of this.

6   Do you want to put it on the screen just for the witness?

7          MR. HANLON:  Of course, Your Honor.

8          THE COURT:   Or just give me a copy. That would be

9   easier.

10         MR. HANLON:   Yes, of course, Your Honor. Approach,

11  Your Honor, the deputy clerk?

12         THE COURT:   Yes. Okay, any objection to 417-A?

13         MR. CRAWLEY:   No objection, Your Honor.

14         THE COURT:   Okay, Exhibit 417-A is in evidence.

15  BY MR. HANLON:

16  Q.   Do you see the piece of paper on the screen in front of

17  you, Mr. George?

18  A.   Yes.

19  Q.   And what are we looking at?

20  A.   Maryland State Police consent to search and seizure.

21  Q.   Is this a form you signed to let the police take the cell

22  phone that I've shown you a couple of times?

23  A.   Correct.

24  Q.   There is roughly in the middle of the screen, sir, a

25  signature. It's sort of the middle right part of the screen,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1656**

1    signature of person consenting to search. Is that your
2    signature there?
3    A.   Yes.
4    Q.   Mr. George, when you went to the house that you
5    described, how did you know where to find or where to look to
6    find the cell phone, Exhibit 679?
7    A.   I was told where to find it.
8    Q.   I'm sorry, sir?
9    A.   I was told where to find it.
10   Q.   And who told you where to find the cell phone?
11   A.   I was given a piece of paper with instructions.
12   Q.   Is it the piece of paper -- the piece of paper that you
13   were given, is it a piece of paper that you've seen today?
14   A.   Yes.
15           MR. HANLON:  Your Honor, moving again for the
16   admission of 417-B.
17           THE COURT:  Still objecting?
18           MR. CRAWLEY:  Oh, yes, sir.  Absolutely.
19           THE COURT:  Objection is overruled. Exhibit 417-B is
20   in evidence.
21           MR. HANLON: Madam Deputy, it can be seen by the
22   jury; is that correct?
23           THE COURT:  Yes.
24           THE COURTROOM DEPUTY:  Yes.
25           MR. HANLON:  Thank you.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1657**

```
 1    BY MR. HANLON:
 2    Q.   Is this the piece of paper that you were handed that you
 3    talked about a couple of times today, Mr. George?
 4    A.   Yes.
 5    Q.   Is there a reference to pants on the note?
 6    A.   Yes.
 7    Q.   If you would, please circle the reference to pants on the
 8    note. Indicating with a green circle; is that right, Mr.
 9    George?
10    A.   Correct.
11    Q.   Let me show you what has been -- Your Honor, the
12    Government moves to admit 549-C as in Charlie.
13              THE COURT:  Any issues with 549-C?
14              MR. HANLON:  Your Honor, I'm sorry.  Were there no--
15              MR. CRAWLEY:  No objection.
16    BY MR. HANLON:
17    Q.   Putting it up, hopefully it can be seen on your screen.
18    Do you see that, Mr. George?
19    A.   Yes.
20    Q.   Do you recognize this piece of paper?
21    A.   Yes.
22    Q.   This is a piece of paper that was provided to you prior
23    to trial; is that correct?
24    A.   Correct.
25    Q.   And is it your understanding based on this piece of
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1658**

```
 1    paper, Exhibit 549-C, that what you said in court and during
 2    meetings with law enforcement won't be used against you unless
 3    you make false statements or lie under oath; is that correct?
 4    A.   Correct.
 5              MR. HANLON:  Your Honor, that's all my questions on
 6    direct.
 7              THE COURT:  Okay, who wants to go first on cross?
 8              MR. CRAWLEY:  I'll go.
 9              C R O S S - E X A M I N A T I O N
10    BY MR. CRAWLEY:
11    Q.   Good afternoon.
12    A.   Good afternoon, good morning.
13    Q.   Oh, yeah.  I'm jumping the gun. Time flies. So Mr.
14    George, you were asked about this letter earlier or this note,
15    correct?
16    A.   Correct.
17    Q.   And, in fact, you testified that you came to this court
18    building in 2019, correct?
19    A.   Correct.
20    Q.   And that was the time that you received the note that's
21    listed here, correct?
22    A.   Correct.
23    Q.   And above that note there appears to be a business card,
24    correct?
25    A.   Correct.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1659**

```
1    Q.   And, in fact, it was that person that gave you that note,
2    correct?
3    A.   Correct.
4    Q.   And, in fact, you had talked about previously with the
5    Government and/or law enforcement, I'll call law enforcement
6    police officers, et cetera, et cetera, the fact that you knew
7    that Scott Williams was arrested in 2018, correct?
8    A.   Correct.
9    Q.   But you also knew that he got out on bond at some point
10   between 2018 and 2019, correct?
11   A.   Correct.
12   Q.   And so that means he was out on the street and you and
13   him could interact one-on-one, correct?
14   A.   Correct.
15   Q.   Now at some point when he's out on bond, he has a new
16   cell phone, correct?
17   A.   Correct.
18   Q.   And this was after the alleged crimes that were committed
19   in 2018, correct?
20   A.   Correct.
21   Q.   Now so when you see here there's some instructions, there
22   appears to be some instructions, correct?
23   A.   Correct.
24   Q.   It's safe to say that you and Scott enjoyed a very good
25   relationship, right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1660**

1   A.    Correct.

2   Q.    And your relationship is so strong that when Scott would

3   engage in certain behavior like, for instance, infidelity, you

4   would try to help him cover that up, right?

5   A.    By all means.

6   Q.    But infidelity isn't a crime, is it?

7   A.    No, sir.

8   Q.    And it's safe to say that you enjoy your freedom,

9   correct?

10  A.    Of course.

11  Q.    And you enjoy your freedom more than you care about Scott

12  Williams, correct?  You enjoy your freedom more than you care

13  about lying for Scott Williams, correct?

14          **MR. HANLON:**  Objection, Your Honor.

15          **THE COURT:** It's a complicated -- sustained as to

16  form.

17  **BY MR. CRAWLEY:**

18  Q.    You're not going to come to court under oath and lie for

19  Scott Williams, are you?

20  A.    No.

21  Q.    You're not going to take a phone and try to hide evidence

22  of a crime for Scott Williams, are you?

23  A.    No.

24  Q.    You may help him and assist him in hiding an extra --

25  well, relationship affair because he's not married to Patti

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1661**

```
 1    Chaplain, is he?
 2    A.    No.
 3    Q.    But you're not going to say, for instance, discard a body
 4    for Scott Williams, are you?
 5    A.    Absolutely not.
 6    Q.    You're not going to when confronted by law enforcement,
 7    not turn over the phone, correct?
 8    A.    No.
 9    Q.    You gave them the phone?
10    A.    Absolutely.
11    Q.    And you didn't know about them wanting the phone until
12    2021 because that's the date they came and got the phone,
13    correct?
14    A.    Correct.
15              MR. CRAWLEY:  No further questions.
16              THE COURT:  Okay, Mr. Guillaume.
17              MR. GUILLAUME:  No questions, thank you.
18              THE COURT:  Okay.  Any redirect, Mr. Hanlon?
19              MR. HANLON:  Just one question, Your Honor.
20              R E D I R E C T   E X A M I N A T I O N
21    BY MR. HANLON:
22    Q.    Mr. George, you were asked a number of questions about
23    things you would do for Scott Williams. I just want to ask you
24    one question. Did you, not would you, did you delete
25    information from Scott Williams' cell phone for Scott
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1662**

```
 1   Williams?
 2   A.   Yes.
 3              MR. HANLON:  Thank you, Your Honor. Nothing further.
 4              THE COURT:  Anything else just on that?
 5              R E C R O S S - E X A M I N A T I O N
 6   BY MR. CRAWLEY:
 7   Q.   2019 you were given a phone?
 8   A.   Yes.
 9   Q.   You deleted the information from that phone?
10   A.   Yes, as well as other previous occasions as well.
11   Q.   But not with the understanding that there was criminal
12   content on the phone, correct?
13   A.   No.
14   Q.   That's correct, right?
15   A.   Correct.
16   Q.   Thank you.
17              THE COURT:  Okay. Mr. George, thank you very much
18   for coming to testify. You're free to step out now. Thank you.
19              THE WITNESS:  May I ask a question, Judge?  May I
20   stay for the rest of the proceeding?
21              MR. CRAWLEY:  We had initially called him for a
22   witness.  We no longer wish to use him as a witness.  Unless
23   the Government has an objection, we ask that he would be able
24   to attend this trial going forward as any other citizen, Your
25   Honor.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1663**

1          **THE COURT:**  Well, why don't we take the mid-morning

2     break now since it's about 10:40.

3          Ladies and gentlemen, again, thank you for your

4     attention. Do not discuss the case during the break.  Just

5     relax, enjoy the break. We'll see you back here at 5 minutes

6     to 11. Thank you very much.

7          **(Whereupon the jury exited the courtroom at 10:40 a.m.)**

8          **THE COURT:**  Thank you, everyone.  Please be seated.

9     Mr. George, you can at least go to the back of the courtroom.

10    You don't need to stay there.

11          **(Witness stepped down.)**

12          **THE COURT:** So the issue is just whether Mr. George

13    will be recalled for any reason and you're saying you will not

14    ask for that, Mr. Crawley?

15          **MR. CRAWLEY:**  That is my understanding, Your Honor,

16    after speaking with Mr. Hawks that we do not anticipate

17    calling this individual as a witness for our case.

18          **THE COURT:**  Does anyone else have that plan?

19          **MR. HANLON:**  Sitting here right this minute, Your

20    Honor, I don't anticipate that we're going to call Mr. George

21    again. The problem is things always happen and I can't

22    guarantee that something is not going to come up. Counsel is

23    absolutely correct, every citizen has the right to attend

24    court proceedings. Most witnesses are told not to for exactly

25    this reason.  None of the Government's witnesses, for

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1664**

```
 1   instance, are hanging out.
 2          THE COURT:  He is one of the Government's witnesses,
 3   if I recall.
 4          MR. HANLON:  Yes, that's correct, Your Honor, but
 5   he's friendly to the defense, which is fine.
 6          THE COURT:  Why don't we take this step by step. Mr.
 7   George, I'm going to ask you to leave the courtroom. Someone
 8   will let you know whether you can come back in today or at
 9   other points, but if you could step out while we're having
10   this discussion, that's fine.  Go outside of the courtroom,
11   you can be out in the back room or in the hallway. Either way.
12   Okay, thank you.
13          (Witness exited the courtroom.)
14          THE COURT:  So it's an unusual scenario because Mr.
15   Crawley saying they're not going to call him means at later
16   points they want to call him we would likely say no, you can't
17   do that anymore.  Mr. Guillaume has no interest?
18          MR. GUILLAUME:  Correct.
19          THE COURT:  This doesn't matter for you. So for the
20   Government, obviously, if he stays in the courtroom with the
21   consent of everyone else, it doesn't necessarily mean he can't
22   be recalled, I just don't know whether by sitting here whether
23   that's something that's perceived as helping the Government or
24   helping the defense. So that's the trickiness here.
25          MR. HANLON:  And Ms. Grossi reminds me, there is
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1665

```
1    another witness for the Government, Mr. Smothers, who has been
2    here since his testimony and that's an accommodation we
3    reached and that is in fairness, something --
4              THE COURT:  Well, the issue, my assumption is you're
5    not calling Mr. Smothers again.
6              MR. HANLON:  That's correct, that's correct.
7              THE COURT:  So you right now have no plan to call
8    Mr. George, correct?
9              MR. HANLON:  That's correct.
10             THE COURT:  So is there a scenario where you think
11   you might call him?
12             MR. HANLON:  It's very unlikely, Your Honor.
13             THE COURT:  I guess the question, Mr. Crawley, is if
14   for some reason unanticipated now they wanted to recall him,
15   would you object, given that you asked to have him in the
16   courtroom and Mr. Hanlon didn't really want him in the
17   courtroom, but if I allow him to stay would you object if that
18   came up?
19             MR. CRAWLEY:  Well, Your Honor, no more than we
20   would have objected to Mr. Smothers being here and him needing
21   to be recalled as a witness.
22             THE COURT:  Except that you're asking to allow Mr.
23   George to stay here and Mr. Hanlon is actually opposing it,
24   which is different.
25             MR. CRAWLEY:  Yes, Your Honor, I agree that's a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1666

```
1    little bit of a distinction here.  But we're asking -- well,
2    first of all, we asked to release him as our witness.
3                 THE COURT:  Fair enough.
4            MR. CRAWLEY:  He specifically wanted to address the
5    Court. We figured out and knew exactly what he wanted to
6    address the Court with, so we just went ahead and made that,
7    but --
8                 THE COURT:  Okay, so you're not really doing it for
9    him?
10           MR. CRAWLEY:  He's just like a citizen just asking
11   can I be here, no different than any other citizen.
12               THE COURT:  I think the issue is if the Government
13   is planning to recall him, then he shouldn't be in the
14   courtroom.  If you're not planning to, he should be allowed to
15   stay. If there's a scenario under which you think you might
16   recall him, I guess the question is, you know, how realistic
17   is that?  We can always cross the bridge later as to whether
18   it has any impact on whether anyone would object to it. I
19   guess that is the question. I agree, the clarification is you
20   weren't sponsoring his request, but at the same time, if for
21   some reason -- and you all know the case better than I do --
22   he were recalled, would you object if he was allowed to stay
23   in the courtroom or would you --
24           MR. CRAWLEY:  Highly unlikely, Your Honor, highly
25   unlikely that we would object.  But we would know -- there are
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1667**

```
1    so many scenarios that can occur in the world.  And as the
2    Court has taken up on many issues whereby you have reserved
3    without knowing what those issues would be, but to your point
4    he's listening to a lot of information going forward. I expect
5    there will be multiple civilian witnesses, at least two, and
6    some law enforcement witnesses today. So he's going to gather
7    a lot of information that he probably otherwise wouldn't have,
8    but I'm not going to object to that based on my understanding
9    of the evidence. I'm not going to object to him hearing that.
10   As far as I know he's not planning to come back tomorrow. It
11   may just be, I'm here today, I just want to stick around and
12   see how it goes in support of my friend and that's it. That's
13   my understanding. So to that point, we would not object, Your
14   Honor.
15            THE COURT:  Okay, well understanding that wasn't an
16   absolute, but it was a -- no, I mean, and you're right. I
17   mean, if you're not prepared to absolutely waive that
18   objection then you shouldn't, but given where we are now, Mr.
19   Hanlon, what's your position?
20            MR. HANLON:  Your Honor, so it's a tough spot for
21   the Government.
22            THE COURT:  Obviously.
23            MR. HANLON:  Because it is exceedingly unlikely that
24   anybody is going to call Mr. George again, but I can't say
25   it's 100 percent.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1668**

```
 1              THE COURT:  Well, how is it different than all the
 2    other witnesses we've had come in, all the law enforcement
 3    agents?
 4              MR. HANLON:  It's not, except that my practice is
 5    always for all of my witnesses, there's an occasional
 6    exception like victim's family, but I've told all of my
 7    witnesses, I think I told them, when you're done testifying,
 8    leave.  You're still under the rule on witnesses.  Don't talk
 9    about what's going on, don't watch court because you never
10    know what's going to happen.
11              THE COURT:  I see.  Okay, well so again, exceedingly
12    difficult, but what is your position?
13              MR. HANLON:  Unless the defense is willing to waive
14    any challenge to future testimony by the witness on the
15    grounds of him being in the courtroom which if it is so
16    unlikely that this is going to be an issue, the defense should
17    be willing to do, the Government would be opposed to any
18    possible witness being in court. If the defense is willing to
19    say we won't object, then I have no real reason to prevent him
20    from being in court. He is a citizen.
21              THE COURT:  Okay, well, I mean, you're throwing the
22    ball back to the other side. I think -- I mean, does he know
23    anything else other than --
24              MR. CRAWLEY:  We will waive, Your Honor.  If that's
25    going to make it easy for them to answer the question, we will
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1669**

```
 1    waive any future objection to Mr. George being called, if
 2    necessary.
 3              THE COURT:  Well, that's very gracious of you.  And
 4    again, obviously you can cross-examine him if some scenario
 5    arises as to what he might have known or what he might have
 6    gleaned from being in here. Okay, so we'll allow Mr. George to
 7    stay in the courtroom. Okay, we'll see you back here at 11:00.
 8    Thank you very much.
 9              (Recess was taken from 10:47 a.m. to 11:03 a.m.)
10              THE COURT:  You can ask the next witness to come
11    into the courtroom while we're waiting for the jury.
12              (The jury reentered the courtroom at 11:05 a.m.)
13              THE COURT:  Thank you, everyone. Please be seated.
14    Welcome back, ladies and gentlemen.  I believe we have another
15    witness.
16        Mr. Moomau, who is the next witness?
17              MR. MOOMAU:  Yes, Your Honor.  The witness would be
18    Oscar Diaz.
19              THE COURT:  Thank you.
20              THE COURTROOM DEPUTY:  Mr. Diaz, please come forward
21    to the witness stand. Remain standing and please raise your
22    right hand.
23              (Oscar Diaz, a witness called on behalf of the
24    Government, was duly sworn.)
25              THE COURTROOM DEPUTY:  You may be seated, sir. Speak
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1670**

```
 1    clearly into the microphone.  Please state your first and last
 2    name.
 3              THE WITNESS:  Oscar Diaz.
 4              THE COURTROOM DEPUTY:  And spell your first and last
 5    name for the record.
 6              THE WITNESS:  O s-c-a-r  D-i-a-z.
 7              THE COURTROOM DEPUTY:  Thank you, sir.
 8              D I R E C T   E X A M I N A T I O N
 9    BY MR. MOOMAU:
10    Q.   Good morning, sir.
11    A.   Good morning.
12    Q.   Sir, did you grow up in the Howard County area of
13    Maryland?
14    A.   Yes, I did.
15    Q.   Did you go to school there growing up?
16    A.   Yes.
17    Q.   What high school did you graduate from?
18    A.   Oakland Mills.
19    Q.   Do you remember what year that was?
20    A.   Yeah, that was 2013.
21    Q.   I'm going to have to ask you to sit as close to the
22    microphone as you can please, sir.
23    A.   Okay.
24    Q.   Thank you. So sir, when you were going to high school
25    when you were about that age, were you friends with a person
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1671

1    named Taeyan Williams?

2    A.    Yes, I was.

3    Q.    And were you classmates?

4    A.    Yeah, we played sports and shared similar classes.

5    Q.    And what name did you know Mr. Williams by?

6    A.    Tae, Taeyan.

7    Q.    Did you also know persons name Dominick Clark and Brandon

8    Drummond?

9    A.    Yes, we were all friends.

10   Q.    And do you remain friends?

11   A.    Yes, we do.

12   Q.    So after graduating from high school, did you stay in

13   touch with Taeyan Williams?

14   A.    Yeah, we remained friends and stayed in touch. Our friend

15   Dominick went to school in West Virginia, so we all still hung

16   out and partied.

17   Q.    And then around 2016 through 2018, where were you living?

18   A.    I was still living in Columbia, but this time downtown

19   Columbia.

20   Q.    And during that time period, 2016 through 2018, what type

21   of work were you doing?

22   A.    So I had just moved and I was doing construction at the

23   time and then it kind of stopped, but I was basically doing

24   construction around 2016, doing roofing.

25   Q.    And at some point did that stop?

```
 1    A.    Yes.
 2    Q.    And what did you do then to support yourself?
 3    A.    Well, after that we -- well, I basically sold drugs.
 4    Q.    Now you understand that you're going to be testifying
 5    today about some unlawful activity that you were engaged in?
 6    A.    Yes.
 7    Q.    And did you ask for some type of letter from our office
 8    that what you would say would not be used against you?
 9    A.    Yes.
10    Q.    I want to show you on the screen in front of you Exhibit
11    549-B. It's a two-page document.
12              MR. MOOMAU:  Your Honor, at this time the Government
13    would move into evidence, Exhibit 549-B.
14              THE COURT:  No issues?
15              MR. NIETO:  No, Your Honor.
16              THE COURT:  Okay, Exhibit 549-B is in evidence.
17    BY MR. MOOMAU:
18    Q.    Sir, do you recognize 549-B?
19    A.    Yes.
20    Q.    Is that the letter we've been referring to?
21    A.    Yes, it is.
22    Q.    And do you understand that as long as you're truthful
23    with your testimony, what you say today will not be used
24    against you?
25    A.    Yes, that's correct.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1673**

Diaz - direct                                                    VII-75

```
1    Q.    But if you would not be truthful, you could be prosecuted
2    for offenses related to untruthful testimony. Do you
3    understand that?
4    A.    Yes, I do.
5    Q.    All right. And was that letter provided to your attorney?
6    A.    Yes, it was.
7    Q.    And is that Mr. Justin Lake?
8    A.    Yes.
9    Q.    Thank you. So Mr. Diaz, from your relationship with
10   Taeyan Williams, do you know where he was living during 2017
11   and 2018?
12   A.    Yes, Taeyan was staying in West Virginia.
13   Q.    And do you know what town he was staying in there?
14   A.    He stayed in an apartment.
15   Q.    Right, but do you know what town or city he was staying
16   in?
17   A.    Oh, Morgantown, Morgantown.
18   Q.    And is the person that you know as Taeyan Williams
19   present in the courtroom?
20   A.    Yes, he is.
21   Q.    Can you just tell us where he's seated and the type of
22   clothing he has on?
23   A.    He's to the left of me, in the middle between two
24   gentlemen. He's wearing a suit, gray suit.
25              MR. MOOMAU:   Your Honor, can the record reflect the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1674

```
1    witness has identified Mr. Taeyan Williams?
2              THE COURT:  Yes, it will.
3              MR. MOOMAU:  Thank you.
4    BY MR. MOOMAU:
5    Q.   Did you ever meet Mr. Taeyan Williams' father?
6    A.   Yes, I did.
7    Q.   And where was that at?  Where do you remember meeting him
8    at?
9    A.   Um, well, we met over by -- it would be his house.
10   Q.   And where is that house at?
11   A.   Off of 295 in Laurel, Maryland.
12   Q.   I'm showing you what has been admitted as Exhibit 45.  Do
13   you recognize Exhibit 45?
14   A.   Yes, I do.
15   Q.   And the house with the pin in it, 10301 Bristolwood
16   Court, is that the house you're talking about?
17   A.   Yes, it is.
18   Q.   And when you met Mr. Williams at that house, were you
19   with Taeyan Williams also?
20   A.   Yes.
21   Q.   Every time?
22   A.   The first time I met him, yes.
23   Q.   And is the person that you knew as Taeyan Williams'
24   father in the courtroom?
25   A.   I believe so.  I don't really remember him very well, but
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1675**

1    I believe so.

2    Q.   And which person is that?  If you could point and

3    identify him by the clothing he's wearing.

4    A.   He would be to the left of me in between two gentlemen

5    with a gray suit and dreads.

6            **MR. MOOMAU:**  Could the record reflect the witness

7    has identified Mr. Scott Williams?

8            **THE COURT:**  Yes, it will.

9    **BY MR. MOOMAU:**

10   Q.   The home that's shown there in Exhibit 45, had you ever

11   been inside of there?

12   A.   Just once, yes, to go just to Taeyan's room.

13   Q.   And where was Taeyan's room?

14   A.   If I remember correctly, it was in the back of the house,

15   I'm thinking downstairs in the basement, if I remember

16   correctly.

17   Q.   So the only time you had been there, was that with Taeyan

18   Williams?

19   A.   Inside the house, yes.

20   Q.   Yes, sir. Okay. Had you ever been there outside the home

21   without Taeyan Williams?

22   A.   Yes.

23   Q.   You had mentioned that Taeyan Williams was living in

24   Morgantown, West Virginia. Had you ever visited with him

25   there?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1676**

1    A.    Yes, I did.

2    Q.    Approximately how many times?

3    A.    About four to five.

4    Q.    And in Morgantown, do you remember whether Taeyan

5    Williams was living in a house, apartment, or some other type

6    of place?

7    A.    Yeah, he lived in a nice apartment from the first time we

8    met. He moved to a better community and everything like that,

9    very nice apartment, you know, for Morgantown.

10   Q.    And in Morgantown were you aware of if Taeyan Williams

11   had a job?

12   A.    No.

13   Q.    Were you aware of what he was doing to support himself?

14   A.    Well, yeah. He would sell weed, but that's about it and I

15   know sometimes he was taking classes, but wasn't so sure.

16   Q.    Okay. Sir, back in 2016 through 2018 did you have a

17   cellular telephone?

18   A.    Yes, I did.

19   Q.    Do you remember during that period if you ever switched

20   off or got a new phone, new number or anything?

21   A.    Yeah, I had two phones at the time.

22   Q.    I want to show you what's been admitted as Exhibit 338,

23   lines 11 -- go to line 11 first. Do you recognize the number

24   there?

25   A.    Yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1677**

Diaz - direct                                          VII-79

```
1    Q.   What's that?
2    A.   It's 443-603-8461.
3    Q.   I mean, do you recognize the number?
4    A.   Yes, I do.
5    Q.   What's that?
6    A.   That's my phone.
7    Q.   Okay. And then showing you the next page, line 12. Do you
8    recognize on line 12?
9    A.   Yes.
10   Q.   And what's on line 12?
11   A.   It's my other phone number, 443-518-6146.
12   Q.   And would you use in some manner, your phone to
13   communicate with Taeyan Williams back during that time period,
14   2016 through 2018?
15   A.   Yes.
16   Q.   And how would you communicate with him during that time?
17   A.   Um, calls, texts, FaceTime, social media.
18   Q.   And when you say "social media," you mean different
19   applications?
20   A.   Like Snapchat, social media.
21   Q.   Okay. Do you know what Wickr is?
22   A.   Yes.
23   Q.   Did you ever use that back during that time period to
24   communicate with Mr. Taeyan Williams?
25   A.   I used Wickr, but I'm not sure if I remember correctly
```

**JA1678**

```
 1    using it with Taeyan. I used Wickr way before that time, but I
 2    have used it.
 3    Q.   Okay. Do you know if Taeyan Williams used it?
 4    A.   I don't know.
 5    Q.   Sir, you had indicated at some point and I don't know
 6    maybe after the construction work something happened there,
 7    you started supporting yourself by selling items; is that
 8    correct?
 9    A.   Yes.
10    Q.   And what were you selling?
11    A.   Weed mainly, at the time.
12    Q.   And were there persons who supplied you with -- and by
13    "weed," you're talking about what?
14    A.   Marijuana.
15    Q.   And during that time were there persons who supplied you
16    with the marijuana that you were selling?
17    A.   What was the question?
18    Q.   During that time period when you were selling marijuana,
19    right when you got started, were there persons who were
20    supplying you with that?
21    A.   Yes.
22    Q.   And are any of them in the courtroom?
23    A.   Yes.
24    Q.   And who is that?
25    A.   Taeyan.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1679**

```
 1    Q.   And between 2016 and 2018 was it only marijuana that you
 2    obtained from Taeyan Williams to sell?
 3    A.   No.
 4    Q.   What else?
 5    A.   Eventually progressed to cocaine.
 6    Q.   When you would get these substances from Taeyan Williams,
 7    did you have to pay him up front or would they be fronted to
 8    you and then you would sell and pay back later?
 9    A.   A little bit of both.
10    Q.   During that time when you first started, did you have
11    another supplier also?
12    A.   I did.
13    Q.   And did something happen to that supplier?
14    A.   Yeah.  After a while he was no longer accessible so he
15    stopped. I couldn't get to him, so I had to find a new source.
16    Q.   And was that pretty much the source you used then, Taeyan
17    Williams?
18    A.   Yes.
19    Q.   So when do you think that was, like in the 2016/18 time
20    period?
21    A.   It would be around 2017, in the summertime.
22    Q.   And starting then, what type of, like, quantities -- I
23    know things vary, but what type of quantities were you buying
24    of marijuana and cocaine from Mr. Taeyan Williams?
25    A.   About two to three pounds of marijuana and about two
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1680**

1    ounces of cocaine.

2    Q.    How often?

3    A.    It started off about once a month and then it gradually

4    changed to probably one-and-a-half times, two times a month.

5    Q.    So the two to three pounds then you would sell that, pay

6    Taeyan Williams, and then get some more?

7    A.    Yes.

8    Q.    Same with the cocaine?

9    A.    Yes.

10   Q.    And did you ever talk -- you were friends and socializing

11   with Taeyan Williams during that time period, correct?

12   A.    Yes.

13   Q.    Did you ever talk to him if he was distributing to other

14   persons who were selling?

15   A.    No.

16   Q.    During that time period, 2017 and into 2018, did Taeyan

17   Williams ever tell you where he was getting the marijuana and

18   cocaine --

19   A.    No.

20   Q.    --that he would provide to you?  And during this time

21   period you say Taeyan Williams was living in Morgantown, West

22   Virginia?

23   A.    Yes.

24   Q.    And would he come back to Maryland, though?

25   A.    Oh, yeah.  He would come back every once in a while, yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1681

1    Q.    But if you had to say was he in West Virginia more or

2    Morgantown more or was he in Maryland more, what would you

3    say?

4    A.    He would be more in West Virginia.

5    Q.    And during the times that he was in West Virginia he was

6    still supplying you with marijuana and cocaine?

7    A.    Yes.

8    Q.    So how would you get that?  During the times that Taeyan

9    Williams was in Morgantown, West Virginia, where would you

10   pick it up at?

11   A.    I would pick it up at Taeyan's dad's house.

12   Q.    And how would you pick it up there?  What were the

13   instructions?

14   A.    Well, I mean, I would just go there. Sometimes I would

15   just go to the car and get it out of the car.

16   Q.    And who would tell you, like, what car to get it out of

17   and where it would be?

18   A.    It would be Taeyan.

19   Q.    And what about paying for it?

20   A.    Whatever money I had I would just leave it in there.

21   Q.    In the car?

22   A.    Yeah.

23   Q.    And during these times, though, Taeyan Williams was in

24   Morgantown, West Virginia?

25   A.    Sometimes, yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1682**

```
 1    Q.    Did you ever pick the substance, like the cocaine or
 2    marijuana, up from anyone in person at the house or would it
 3    always just be in a vehicle?
 4    A.    Just the car.
 5    Q.    What about paying the money?
 6    A.    One time or two times I would say that I handed -- hand
 7    to hand contact with the money.
 8    Q.    And who was that person?
 9    A.    That would be Taeyan's dad.
10    Q.    Did you ever pay Taeyan Williams or his dad
11    electronically for any cocaine or marijuana by using like a
12    Cash App or something like that?
13    A.    From what I really remember, I mainly did cash
14    interactions.
15    Q.    Okay. I'd like to show you now what has been admitted as
16    Exhibit 352. It might take you a while to get focused on it,
17    but looking at this message, particularly the message at the
18    very bottom where it's a message to you that says, "you don't
19    need any more girl," what does that mean?
20    A.    Basically it means if I don't need any more cocaine.
21    Q.    And showing you the next page, page 2 of 5. Do you
22    remember with Taeyan Williams there ever being like issues
23    with the quality of maybe the marijuana?
24    A.    Yeah. Not all the time everything was always the best.
25    Q.    All right. But this time you're talking about cocaine. Do
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1683

```
 1    you remember this particular conversation?

 2    A.   Looking at it, yes, I do.

 3    Q.   What are you talking about there where the message from

 4    you, "Is it different?"

 5    A.   I just wanted to know if it's different.  And based on

 6    the message that I sent, it was probably not that good of a

 7    quality.

 8    Q.   Okay. And then Taeyan said, "What, yeah it's on point as

 9    always." What does that mean?

10    A.   It's that the quality is good.

11    Q.   And then going on down to the -- okay, starting right

12    there with the message to you that says "You got your whip,"

13    what does that mean?

14    A.   Do I have my car.

15    Q.   And then you said, "Yup." And then just continue with the

16    statement. "Go to my house in Laurel," that's to you. And you

17    said "Okay, bet." And then "leaving now." What are we talking

18    about?

19    A.   I guess I needed to drop off some money and get some

20    stuff, so he asked if I had the car and if I could drive down

21    to his house in Laurel.

22    Q.   And continuing on page 3. Just a continuation of the same

23    conversation. I see the message to you, "Look in the Benz, the

24    driver's seat.  I left it there for you."  What's being talked

25    about there?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1684**

1    A.    At the time what I was getting was left in the car, in
2    the Benz.
3    Q.    Now sir, in April of 2018, do you remember where you were
4    living at?
5    A.    Yeah, Columbia.
6    Q.    Were you living in a house or an apartment?
7    A.    I was living in an apartment downtown.
8    Q.    Do you remember the address or street, at least?
9    A.    Lynx Lane.
10   Q.    And is that L-y-n-x?
11   A.    L-y-n-x, correct.
12   Q.    So I want to take you back to a date in April of 2018,
13   April 6, 2018. Do you remember that particular day?
14   A.    Yeah.
15   Q.    And what were you doing on that particular day?
16   A.    Um, I had just woken up. I think I was waiting for Taeyan
17   to meet up with me that day because I needed to get some more
18   product.
19   Q.    And had you and Mr. Taeyan Williams been talking, like,
20   for a day or so or before that day about meeting up?
21   A.    Yes.
22   Q.    Do you remember any particular time of the day you were
23   supposed to meet up?
24   A.    Um, no.  Just in the afternoon. No exact time, just
25   sometime in the afternoon, before the nighttime.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1685**

```
 1    Q.   And you said "re-up," what do you mean?
 2    A.   I need to get some more weed or whatever I was getting at
 3    the time.
 4    Q.   Was there another reason also that you were going to meet
 5    with Taeyan Williams?
 6    A.   Um, not necessarily. Besides the norm, like get the
 7    product and everything like that.
 8    Q.   Okay. Well, was there a plan to -- did Taeyan Williams
 9    have a car that he drove?
10    A.   No, not that day. He had -- I believe he was Ubering that
11    day.
12    Q.   But was there a plan for you to take him anywhere or did
13    that just develop when he got there?
14    A.   Yeah, so I was going to take him that day down to
15    Virginia, to Tysons Corner so he can get some shoes because he
16    was going to go to a party.
17    Q.   So your friend, Taeyan Williams, he had -- back then he
18    had a dog, right?
19    A.   Yes, Bolt.
20    Q.   Bolt?
21    A.   Bolt.
22    Q.   And he would -- Bolt would accompany Taeyan a lot of
23    places, correct?
24    A.   Yeah, Taeyan would take Bolt everywhere.
25    Q.   So on that particular date you had mentioned that Taeyan
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1686

1     Williams came to the apartment where you were living?

2     A.   Yes.

3     Q.   And you said he got there by Uber?

4     A.   Yeah.

5     Q.   And did he have Bolt with him?

6     A.   Yes, he did.

7     Q.   So the address, 10400 Cross Fox Lane, was that close to

8     where you lived?

9     A.   Yeah, it's right next door. It was the place called

10    Splashdown that was a water park.

11    Q.   And is that a location where people would get off or --

12    A.   Yeah, it's the location I would just give all my friends

13    and everything like that so they could meet me.

14    Q.   And approximately how far was that location, the water

15    park from where you lived?

16    A.   About a minute. It was right next to it.

17         MR. MOOMAU:  At this time the Government would move

18    for the admission of Exhibit 527.

19         THE COURT:  Any issues?

20         MR. HAWKS:  No objection.

21         MR. NIETO:  No, Your Honor.

22         THE COURT:  Okay, Exhibit 527 is in evidence.

23    BY MR. MOOMAU:

24    Q.   Showing you now what's been admitted as 527. Do you see

25    anything on 527 that you recognize?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1687**

1    A.    Yes.

2    Q.    Okay, looking at the red pin, is that the area you

3    described where you would tell people to come to?

4    A.    Yeah.  So the red pin is Splashdown and then my house is

5    on the other corner.

6    Q.    And would that be kind of the way that you would walk to

7    it from Splashdown?

8    A.    Yeah, that's the front of it. That day we actually met up

9    right by the garage, which is near that Splashdown and just

10   walked in and walked around through the building because it's

11   all connected, but that's similar, the same path you would

12   take to go from one end of the building to the other.

13   Q.    Right, thank you.  Now sir, when Mr. Williams, Taeyan

14   Williams came there on April 6th, did he have anything with

15   him?

16   A.    He had Bolt and a backpack.

17   Q.    And what was in the backpack?

18   A.    Some weed.

19   Q.    Anything else?

20   A.    Yes, coke.

21   Q.    How much weed and how much coke?

22   A.    About the same thing that I usually get, three pounds and

23   two ounces.

24   Q.    Did you give him any money?

25   A.    Yes, I did.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1688**

```
1    Q.   Approximately how much money do you remember giving
2    Taeyan Williams?
3    A.   I'd say like $3,000 to $4,000.
4    Q.   Did you all sample any of the product that Mr. Taeyan
5    Williams had given to you?
6    A.   Yeah, we smoked. We got high.
7    Q.   And did you -- how did that marijuana compare to previous
8    marijuana that you had been obtaining from Taeyan Williams?
9    A.   It was getting better. It was good in quality this one
10   and it did the job.
11   Q.   Approximately how long do you think you and Taeyan
12   Williams smoked there?
13   A.   I would say about two hours. Not all smoking, you know,
14   we were talking, hanging out.
15   Q.   Right. Were you worried about the smell there where you
16   lived?
17   A.   Not necessarily because I had a routine where I went to a
18   bathroom within the master bedroom which was like in the
19   center of the entire apartment, so the smell didn't really get
20   out.
21   Q.   The marijuana that Taeyan Williams had that day, do you
22   remember how it was packaged?
23   A.   It was vacuum sealed.
24   Q.   Anything else about the bags?
25   A.   They all had labels on them.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1689**

```
1    Q.   Do you remember what kind of labels?
2    A.   Just the name of the weed, so it would be like a stick
3    label on it with the name of the strain of the weed.
4    Q.   And it was just like the white labels with the black
5    lettering on them?
6    A.   I mean, some, just yeah, with different designs and
7    things like that on them.
8    Q.   Had you had any conversation with Taeyan Williams in the
9    days leading up to that in relation to re-upping?
10   A.   Yeah.
11   Q.   What was the conversation?
12   A.   Just when he was going to get in town, I was getting low,
13   if anything has changed quality-wise.  Just the normal
14   conversations we have.
15   Q.   Was there any indication that something was coming in?
16   A.   Um, besides at the time, no. I mean, just he wanted to
17   expand and grow and, you know, do his thing.
18   Q.   So you all talked and smoked for a couple hours and then
19   at some point did you take Taeyan Williams where you were
20   going to take him to?
21   A.   Yeah.
22   Q.   So you were driving him to Tysons Corner?
23   A.   I drove him to Tysons, yes.
24   Q.   Before that day had you ever driven him there before, do
25   you remember?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1690

```
1    A.    No.

2    Q.    Do you remember the route that you took to Tysons Corner?

3    A.    Yes, I do.

4    Q.    What route did you take?

5    A.    So I went down from my apartment to Snowden River or

6    Brokenland, I don't remember exactly the name of the street in

7    Columbia, to 29. From 29 to 32; from 32 to 295; and then got

8    down to Tysons from 295.

9              MR. MOOMAU:  Your Honor, at this point the

10   Government would move into evidence Exhibit 526.

11             THE COURT:  Any issues?

12             MR. HAWKS:  No objection, Your Honor.

13             MR. NIETO:  No, Your Honor.

14             THE COURT:  Exhibit 526 is in evidence.

15   BY MR. MOOMAU:

16   Q.    Sir, showing you what's been admitted as 526. Just let

17   you look at it for a minute, but do you recognize any of the

18   locations on Exhibit 526?

19   A.    Yeah, just about Taeyan's house in Laurel.

20   Q.    Okay. And what about anything in Columbia?

21   A.    Well, Columbia, my house, Lynx Lane.

22   Q.    Right. So the blue marking, does that indicate the route

23   that you took to get to Tysons Corner?

24   A.    Yes.

25   Q.    Starting at the top there you came down 29 and then just
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1691**

```
 1    facing it you went to the right on 32 and then hit up with 295
 2    and then got on the Beltway?
 3    A.   Correct.
 4    Q.   Now you could have taken a shorter route, correct?
 5    A.   Right. And at the time I was high. I knew the map, first
 6    of all, I know how to get around.  So I grew up with my aunt
 7    and she looked at MapQuest one time back in the day and she
 8    knew how to get places. I knew where Tysons was.  I knew how
 9    to go down south, but I knew my way to DC was 295.  So I took
10    32 to 295. I could have taken 495, 95.  I could have taken 29,
11    but my idea of it at the time, I thought Tysons was on the
12    right side of the map by near Lanham. I didn't think Tysons
13    was on the other side. That's what I envisioned.  So that's
14    why I took that route, but obviously I was dead wrong, you
15    know.
16    Q.   And really going that route, you ended up just driving
17    back to where -- if Taeyan came from his home, driving back
18    down by where his dad's house was, at least?
19    A.   Right.
20    Q.   Okay. There's another marker there, a red marker there at
21    8255 Washington Boulevard. Did you ever go up that route up
22    toward there?
23    A.   No.
24    Q.   And during this time, during the trip and the time that
25    you were with Taeyan that day, did he have his phone with him?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1692**

1    A.    Yes.

2    Q.    So approximately -- I mean, what happened when you

3    arrived at Tysons Corner?

4    A.    Nothing much.  I mean, we just talked and talked about

5    what kind of shoes he was going to get, and then he went on in

6    and he got whatever he was going to get for his party. He said

7    he had to go back to Morgantown.

8    Q.    When was he going back to Morgantown?

9    A.    I believe that night.

10   Q.    Did you stay there until he was finished and take him

11   back home?

12   A.    No, no. I had to leave because I was driving my

13   girlfriend's car and I was in a toxic relationship at the

14   time, so she had no idea that I was driving her car all the

15   way down to Tysons, first of all.  She would have been furious

16   and then I had to, you know, get quickly back home.

17   Q.    And did he have Bolt with him when he got out of the car?

18   A.    Yeah.

19   Q.    Did Taeyan Williams say how he was going to get to where

20   he was going to go after Tysons Corner?

21   A.    No.

22   Q.    What about when he came -- when Taeyan Williams came to

23   your home with the backpack, with the marijuana and cocaine,

24   did you take all of it that was in the backpack?

25   A.    I don't remember if he had anything more, but I just took

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1693**

```
 1    what I had to take.
 2    Q.   And when he got out of the vehicle, did he still have his
 3    backpack with him?
 4    A.   Yup.
 5    Q.   You had mentioned earlier there's names for different
 6    kinds of marijuana?
 7    A.   Yeah.
 8    Q.   What were some of the names you remember?
 9    A.   Sour diesel is one that comes up; OG, cush -- those are
10    simple strains. It's been a long time since --
11    Q.   I understand, sir. After that particular date, do you
12    remember anything about the quality of product that Taeyan
13    would supply to you after that for a period of time?
14    A.   Yeah, it was consistently better.
15    Q.   Okay. Mr. Diaz, that's all the questions I have.  Thank
16    you.
17              THE COURT:  Okay.  Cross-examination. Mr. Nieto.
18              MR. NIETO:  Thank you, Your Honor.
19              C R O S S - E X A M I N A T I O N
20    BY MR. NIETO:
21    Q.   Mr. Diaz, good morning, sir.
22    A.   Good morning.
23    Q.   All right. Now I think you had testified that you grew up
24    with Taeyan Williams; is that correct, sir?
25    A.   Yes, that's correct.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1694**

```
1    Q.    You guys went to elementary school together?
2    A.    No, no.  Basically knew each other from late middle to
3    all of high school.
4    Q.    So late middle school into high school and then
5    thereafter, right?
6    A.    Yeah.
7    Q.    Okay. And so you had been to West Virginia to party with
8    him a few times and his friends, correct?
9    A.    Correct.
10   Q.    And I think you had said that he might have even been
11   taking some classes there at some point in time, right?
12   A.    Yeah, he mentioned that he was taking classes. He was
13   constantly reading books. He was looking, you know, to do
14   something with his time, so --
15   Q.    All right. And you grew up in Columbia as well?
16   A.    Yes, I did.
17   Q.    And that's a fairly nice area, is that fair to say?
18   A.    Yes, it is.
19   Q.    It's not like a big city, but it's got a little bit of
20   everything that you need; is that fair?
21   A.    Yeah, that's correct.
22   Q.    Safe place to grow up?
23   A.    Hundred percent, one of the best in the states.
24   Q.    I mean, for God sakes, you live next to a water park,
25   don't you?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1695

```
 1    A.    Yeah.

 2    Q.    Right?  And you knew Taeyan not only through school, but

 3    also you knew him when he was working?

 4    A.    Correct.

 5    Q.    And when I say "working," we're going to get to the drug

 6    dealing, but for purposes of like a steadier legal job, right,

 7    you were working -- I think you were doing construction or

 8    roofing; is that correct?

 9    A.    Yes, that's correct.

10    Q.    And then he was working sort of doing door-to-door sales?

11    A.    Yes.

12    Q.    All right. And you guys are approximately the same age,

13    is that fair to say?

14    A.    Yeah.

15    Q.    So right around 2018 you would have been about 23 years

16    old?

17    A.    Yup.

18    Q.    Ballpark?  All right, and of course like I said, you also

19    knew Taeyan Williams through your marijuana dealings; is that

20    correct?

21    A.    Yes.

22    Q.    And he was a source of supply of marijuana and cocaine

23    for you?

24    A.    Yes, he was.

25    Q.    Now you didn't have any concerns about identifying him in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1696**

```
 1    court either by person or by name today, did you?
 2    A.   No.
 3    Q.   No. And he had come to your house, I think it was your
 4    testimony on April 6th of 2018; is that correct, sir?
 5    A.   Yes.
 6    Q.   And that was a pre-planned meeting, right?
 7    A.   Yeah.
 8    Q.   In advance because that was the weekend and you wanted to
 9    re-up, correct?
10    A.   That's correct.
11    Q.   And by re-upping because the weekend can be a busy time
12    for people and their parties, you wanted to have enough
13    marijuana and coke to make the sales for their customers?
14    A.   100 percent.  That's why I needed it before the
15    nighttime.
16    Q.   Okay. And you guys had discussed meeting up in the
17    afternoon on April 6th; is that correct?
18    A.   Yes.
19    Q.   All right. Now at no point in time had Taeyan Williams
20    contacted you and said, "We need to change the time around" or
21    anything like that?
22    A.   No.
23    Q.   Right?
24    A.   Not at all.
25    Q.   So the time period that he came to visit with you had
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1697**

```
 1   been pre-planned for days, is that fair?

 2   A.   Yeah.

 3   Q.   Now when you -- he did meet up with you, he came to your

 4   house around 4:00; is that about right?

 5   A.   Yes.

 6   Q.   Okay. And he seemed normal to you?

 7   A.   He was fine.

 8   Q.   And he had his dog, Bolt, with him, I believe?

 9   A.   Yes.

10   Q.   Now I'd like to show you what's been marked as Exhibit

11   2001 only for identification purposes at this time, Your

12   Honor. If I may approach the witness.

13             THE COURT:  Yes.

14   BY MR. NIETO:

15   Q.   Do you see that picture, sir?

16   A.   Yes, I do.

17   Q.   Is that a fair and accurate representation of Taeyan

18   Williams and his dog, Bolt, as you knew them?

19   A.   100 percent.

20             MR. NIETO:  May I approach again?  And so Your

21   Honor, at this time respectfully I would move in Exhibit 2001.

22             THE COURT:  Any issues?

23             MR. CRAWLEY:  No.

24             THE WITNESS:  Exhibit 2001 is in evidence.

25   BY MR. NIETO:
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1698**

```
 1    Q.   Again, sir, just so I can see, that's Taeyan Williams?
 2    A.   Yes, it is.
 3    Q.   And that's his dog, Bolt?
 4    A.   Yes, it is.
 5    Q.   And I think you had testified on direct as well that he
 6    brought Bolt with him everywhere?
 7    A.   Yeah.
 8    Q.   He loved that dog, didn't he?
 9    A.   Yeah, he did.  I think he got him to become like a
10    service animal or whatever because he was able to take him
11    wherever he wanted to.
12    Q.   So with the service animal classification, he would be
13    able to go everywhere with that dog?
14    A.   Yeah.
15    Q.   Be it stores, and restaurants, Ubers, and taxis, things
16    of that sort?
17    A.   Right.
18    Q.   And so again, on this day when he shows up with Bolt, he
19    didn't seem upset, did he?
20    A.   No.
21    Q.   He wasn't acting abnormal or peculiar to you as you had
22    known him?
23    A.   Yes, that's correct.  He hadn't.
24    Q.   And so he had brought some product for you to purchase?
25    A.   Correct.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1699**

```
 1    Q.   Right?  Product that had been or a purchase that had been
 2    previously discussed, right?
 3    A.   That's correct, sir.
 4    Q.   And then you guys got high together?
 5    A.   Yup.
 6    Q.   Right?  Now as I understand it, sir, based on your
 7    apartment, you would smoke your marijuana in the bathroom?
 8    A.   Yes.
 9    Q.   I'm assuming you'd turn on the vent to help circulate the
10    air?
11    A.   Yeah.  It was automatic, but that didn't mean that it
12    couldn't get cloudy in there.
13    Q.   Right. So you're essentially smoking marijuana with
14    Taeyan Williams in a bathroom in the middle of your apartment?
15    A.   Yes.
16    Q.   Now I'm presuming you guys don't hang out in the bathroom
17    for the next two hours, do you?
18    A.   No.
19    Q.   You probably go to a common room, maybe watch TV,
20    something like that?
21    A.   To the living room, drink water, turn on music, chat.
22    Q.   And did you have a dog as well?
23    A.   I had two dogs.
24    Q.   And did they get along with Bolt?
25    A.   They did. They were all crazy together.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1700

```
 1    Q.   Did they get along with Taeyan Williams as well?
 2    A.   Yeah, they did.
 3    Q.   Is it possible then on that date as well while you guys
 4    were sitting there enjoying your high, the dogs were playing
 5    with each other as well?
 6    A.   Yeah, the whole time.
 7    Q.   Okay, now -- and forgive me, when you smoke marijuana or
 8    you get high, do you get hungry thereafter?
 9    A.   Yes, you do.
10    Q.   Okay. So during these two hours, do you remember whether
11    or not you and Taeyan Williams went to a restaurant or went
12    out for food?
13    A.   It was a long time ago. We could have ate at my house. We
14    probably ordered food, but I know we didn't really go out to a
15    specific place, if I remember correctly.
16    Q.   All right. But again, this time period we're talking
17    about here is roughly between 4 p.m. and about 7 p.m?
18    A.   Um-hum.
19    Q.   Right?  That's pretty much a dinner hour or dinnertime,
20    right?
21    A.   Supper, yeah.
22    Q.   And if you throw on a little marijuana you might be even
23    more motivated to eat?
24    A.   Correct.
25    Q.   But you can't remember the specifics as to how or whether
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1701**

1   you guys ate food on that day?

2   A.    Correct.

3   Q.    And it makes perfect sense, sir, right?  Because it has

4   been five years, right?

5   A.    Yeah.

6   Q.    And I'm assuming that smoking marijuana on that day, that

7   was not the first, nor the last time that you smoked weed,

8   right?

9   A.    Nope.

10  Q.    Okay. And so it can be hard to remember things ordinarily

11  when we go that far back, even more so if you're on a steady

12  diet of Cannibis, right?

13  A.    That's correct.

14  Q.    So after you spend time together with the dogs, you then

15  take him to Tysons Corner?

16  A.    Yes.

17  Q.    Now Tysons Corner, had you ever been there before?

18  A.    I have, but not, not recently at the time.

19  Q.    All right. But when you went, when you dropped Taeyan

20  Williams off, do you remember where you dropped him off?

21  A.    I want to say I know there's like an overpass and we were

22  near a garage and I don't know if it was like the front or

23  side of the mall, but I dropped him off right near a parking

24  lot right underneath, and the doors to the mall were right

25  there.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1702**

```
 1    Q.    And as far as you understood, right, Taeyan Williams was
 2    requesting this ride because he wanted to go shopping?
 3    A.    Yeah, he needed to get some new shoes for a party.
 4    Q.    And so he was going to a party that evening, as far as
 5    you knew?
 6    A.    Yes.
 7    Q.    And, of course, specifically for most 23-year-olds, you
 8    want to look nice, don't you?
 9    A.    100 percent.
10    Q.    Because he's going to be on a college campus,
11    potentially?
12    A.    Yes.
13    Q.    Lots of girls roughly that age?
14    A.    Yes.
15    Q.    Lastly, sir, you have received an immunity letter for
16    your testimony here today; is that correct?
17    A.    Yes.
18    Q.    But irrespective of this case, right, you had been
19    charged in the state system with drug distribution at one
20    point, haven't you?
21    A.    Yes.
22    Q.    And you have an attorney?
23    A.    Yes, I do.
24    Q.    Now that attorney, he's not from California or Los
25    Angeles, right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1703

 1                    **MR. MOOMAU:**  Objection.

 2                    **THE COURT:**  Overruled.

 3        **BY MR. NIETO:**

 4        Q.   Is that a no, sir?

 5        A.   No.

 6        Q.   Right. And obviously through your drug distribution you

 7        didn't make millions of dollars on it, did you?

 8        A.   No.

 9        Q.   You weren't able to parlay the money -- actually, strike

10        this and let's go back. If I may ask, sir, where are you

11        working currently?

12        A.   In a logistics company.

13        Q.   So you've landed on your feet fairly well; is that fair

14        to say?

15        A.   Yes, luckily.

16        Q.   But you weren't able to parlay the money you had earned

17        from the drug distribution into opening a wellness spa or

18        anything, right?

19                    **MR. MOOMAU:**  Objection.

20                    **THE COURT:**  Overruled.

21        **BY MR. NIETO:**

22        Q.   That was no, correct?

23        A.   No.

24        Q.   And you weren't able to parlay whatever money that you

25        earned from the sale of marijuana into partial ownership into

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1704**

```
 1   a Cannibis farm, did you?
 2   A.   No.
 3   Q.   In fact, you didn't make that kind of money through this
 4   work at all, did you?
 5   A.   Not at all.
 6   Q.   All right, thank you, Your Honor. Nothing further.
 7             THE COURT:  Okay, anything for Scott Williams?
 8             MR. HAWKS:  Yes, Your Honor.
 9             C R O S S - E X A M I N A T I O N
10   BY MR. HAWKS:
11   Q.   Good morning.
12   A.   Good morning, sir.
13   Q.   You testified before in this case in a grand jury. Do you
14   remember that?
15   A.   Yes, I do.
16   Q.   And it was in this building?
17   A.   Yes, it was.
18   Q.   And Mr. Moomau was there and then there was a
19   different -- another different prosecutor?
20   A.   Yes, there was.
21   Q.   Do you remember you were shown a picture of Mr. Scott
22   Williams?
23   A.   Yes.
24   Q.   And you were shown a picture of Taeyan Williams, Mr.
25   Taeyan Williams' uncle. Do you remember that?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1705**

```
 1    A.    Yes.
 2    Q.    And then you were specifically asked, "Did you ever bring
 3    -- pick up or bring cash to Taeyan Williams' uncle?"  Do you
 4    remember that?
 5    A.    Yes.
 6    Q.    And your answer was yes, that's the person who you
 7    brought the cash to?
 8    A.    Yes. Taeyan has several uncles, so I don't know exactly
 9    which one, but yes.
10    Q.    Okay. All right, thank you. Nothing further, Your Honor.
11              THE COURT:  Okay, anything else, Mr. Moomau?
12              MR. MOOMAU:  Just a little bit, Your Honor.
13              R E D I R E C T   E X A M I N A T I O N
14    BY MR. MOOMAU:
15    Q.    So Mr. Diaz, when you dropped Taeyan Williams off at
16    Tysons Corner, he was going to get some shoes so he could go
17    to a party that night?
18    A.    Yes, that's correct.
19    Q.    And that party was in Morgantown, West Virginia?
20    A.    Yes, it was.
21    Q.    And he was looking forward to that, correct?
22    A.    Yeah.
23    Q.    Thank you.
24              THE COURT:  Okay, anything else?
25              MR. HAWKS:  No, Your Honor.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1706**

```
 1              MR. NIETO:  No, Your Honor.

 2              THE COURT:  Okay, thank you very much, Mr. Diaz. You

 3    can step out now. We appreciate your testimony.

 4              (Witness excused.)

 5              THE COURT:  Okay, who is the next witness?

 6              MR. HANLON:  Your Honor, the United States calls

 7    Brandon Drummond to the stand. Step out for a moment, Your

 8    Honor?  Apologies, Your Honor.

 9              THE COURTROOM DEPUTY:  Mr. Drummond, please come

10    forward. Please take the stand. Remain standing and please

11    raise your right hand.

12              (Witness, sworn.)

13              THE COURTROOM DEPUTY:  You may be seated, sir. Speak

14    clearly into the microphone.  Please state your first and last

15    name.

16              THE WITNESS:  Brandon Drummond.

17              THE COURTROOM DEPUTY:  And spell your first and last

18    name for the record.

19              THE WITNESS:  B-r-a-n-d-o-n  D-r-u-m-m-o-n-d.

20              THE COURTROOM DEPUTY:  Thank you, sir.

21              MR. HANLON:  Thank you, Your Honor.

22                 D I R E C T   E X A M I N A T I O N

23    BY MR. HANLON:

24    Q.   Mr. Drummond, good almost afternoon to you, sir. Your

25    Honor, the Government moves to admit Exhibit 549-A as in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1707**

```
 1    alpha.
 2                THE COURT:  Okay.
 3                MR. GUILLAUME:  No objection.
 4                MR. HAWKS:  No objection.
 5                THE COURT:  So Exhibit 549-A is in evidence.
 6                MR. HANLON:  If we could bring up 549-A.
 7    BY MR. HANLON:
 8    Q.   Mr. Drummond, do you see a letter on your screen?
 9    A.   Yes.
10    Q.   And if you would, sir, the microphone, I'll ask you to
11    look at the screen once or twice, sometimes not.  Whenever you
12    talk, try to talk into the microphone if you don't mind.
13    A.   Okay.
14    Q.   So again, do you see a letter in front of you on the
15    screen?
16    A.   Yes.
17    Q.   Do you recognize this letter?
18    A.   Yes.
19    Q.   Is this a letter that my office, I have provided to you
20    in connection with your testimony today?
21    A.   Yes.
22    Q.   And it's addressed to your attorney, David Fischer, Esq;
23    is that correct?
24    A.   Yes.
25    Q.   This letter says that with respect to your testimony
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1708**

```
 1    today and also information you've provided during meetings
 2    with law enforcement, that the statements you make will not be
 3    used against you in a criminal case against you. Is that your
 4    understanding?
 5    A.   Yes.
 6    Q.   Is it also your understanding that this letter does not
 7    provide you any protection should you lie or make false
 8    statements during a meeting or during a court proceeding; is
 9    that correct?
10    A.   Correct.
11    Q.   Thank you, Mr. Drummond. Sir, how old are you?
12    A.   28.
13    Q.   And tell us about where you were born and where you grew
14    up, sir.
15    A.   I was born in Columbia, Maryland. I grew up in Oakland
16    Mills.
17    Q.   How far did you go in school, Mr. Drummond?
18    A.   I got my Bachelor's.
19    Q.   And what is your Bachelor's in?
20    A.   Information science.
21    Q.   Tell us a little bit about your higher education.  Where
22    did you go to college?
23    A.   University of Maryland, College Park.
24    Q.   What years were you at the University of Maryland,
25    College Park?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1709

```
 1    A.    2014 through 2018.

 2    Q.    Where did you go to high school, sir?

 3    A.    Oakland Mills.

 4    Q.    During the course of your time in school, did you come to

 5    know a person named Taeyan Williams?

 6    A.    Yes.

 7    Q.    Do you see Mr. Taeyan Williams in court today?

 8    A.    Yes.

 9    Q.    If you would, please identify him by telling us where

10    he's sitting and what he is wearing, sir.

11    A.    He's sitting to my left.  He's wearing a suit.

12    Q.    Now there's several people to your left wearing suits.

13    Could you be a little more specific?

14    A.    He's right there.

15              MR. HANLON:  Your Honor, may the record reflect --

16              MR. GUILLAUME:  We'll concede that that's Mr.

17    Williams.

18              THE COURT:  He's identified Mr. Taeyan Williams.

19              MR. HANLON:  Thank you, counsel.  Thank you, Mr.

20    Drummond.

21    BY MR. HANLON:

22    Q.    Sir, did there come a point in your life when you began

23    doing something illegal to make money?

24    A.    Yes.

25    Q.    How did that -- what was it you were doing that was
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1710**

1   illegal to make money?

2   A.   I was selling marijuana.

3   Q.   How did it come about that you started selling marijuana?

4   A.   Someone accidentally shipped two pounds of marijuana to

5   me and opened a package and then, yeah.

6   Q.   You received some marijuana by accident?

7   A.   Yeah.

8   Q.   When you received this marijuana, what did you do with

9   it?

10   A.   I sold it or gave it away.

11   Q.   Was there a particular financial issue you were having at

12   the time that made the money useful?

13   A.   Yes. I got a DUI when I was 19 and needed to pay the

14   lawyer fees.

15   Q.   Now after that point did you continue to sell marijuana

16   or did you take a break from that?

17   A.   I took a break.

18   Q.   Did there come a point when you began selling marijuana

19   again?

20   A.   Yes.

21   Q.   How did that come about?

22   A.   I moved into my fraternity house.  I saw an opportunity

23   and then --

24   Q.   And what was the opportunity that you saw upon moving

25   into a fraternity house?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1711**

```
 1    A.   Big house, 40 people who liked drugs, so --
 2    Q.   And when you began selling drugs, what drug was it that
 3    you were selling?
 4    A.   Marijuana.
 5    Q.   Now this fraternity, were you at the University of
 6    Maryland College Park at the time?
 7    A.   Correct.
 8    Q.   In terms of the fraternity itself, were you living at the
 9    frat house or were you living elsewhere?  What was your
10    address situation?
11    A.   I was living at the frat house.
12    Q.   And where was the frat house located?
13    A.   In College Park.
14    Q.   Do you recall the street address offhand?
15    A.   7400 Princeton Avenue, maybe.
16    Q.   In College Park?
17    A.   Yes.
18    Q.   Do you recall the name of the fraternity?
19    A.   Theta Chi.
20    Q.   Theta Chi?
21    A.   Yes.
22    Q.   Do they go by any kind of a short nickname or anything?
23    A.   Not that I know of.
24    Q.   So at the time you're selling marijuana in the fraternity
25    house, where were you getting the marijuana from?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1712**

```
1    A.    Taeyan.

2    Q.    Now just to be very clear, what Taeyan are you talking

3    about?

4    A.    Taeyan Williams.

5    Q.    The individual you identified?

6    A.    Yes.

7    Q.    How did it come about that you began obtaining marijuana

8    from Taeyan Williams?

9    A.    What do you mean?

10   Q.    Well, how did you know that he was someone you could get

11   marijuana from?  How did it come about that you guys had that

12   kind of relationship?

13   A.    He's been my friend since fifth grade, so -- I just know.

14   Q.    So let me step back and you've alluded to my next

15   question. You've known Mr. Taeyan Williams since the fifth

16   grade; is that right?

17   A.    Yes.

18   Q.    And tell us about that relationship. Did you go to school

19   with Mr. Taeyan Williams?

20   A.    Yes.

21   Q.    You mentioned fifth grade. How far in school did you go

22   with Taeyan Williams?

23   A.    High school, 12th grade.

24   Q.    Have you always been friends with Mr. Taeyan Williams?

25   A.    Yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1713**

```
 1   Q.   And Mr. Drummond, let me ask you on that subject, do you
 2   remain friends with Taeyan Williams today?
 3   A.   Yes.
 4   Q.   Would it be -- how do you feel about having to come to
 5   court today?
 6   A.   It's not convenient.
 7   Q.   Is it something that you want to do?
 8   A.   No.
 9   Q.   You've received a subpoena for your testimony; is that
10   right?
11   A.   Correct.
12   Q.   If you were not under subpoena would you be here?
13   A.   No.
14   Q.   What kinds -- when you started buying the marijuana that
15   you described, what was the process for getting it from Taeyan
16   Williams?
17   A.   I would text him and then I would get it.
18   Q.   Now in terms of texting him, we're talking about text --
19   did you have a phone number for him?
20   A.   Yes.
21   Q.   Did you have a phone number for yourself?
22   A.   Yes.
23   Q.   Do you recall what your phone number was at the time?
24   A.   443-878-4783.
25   Q.   You recall that all the way back?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1714**

1    A.   Yes, it's my current number.

2    Q.   How long have you used that phone number?

3    A.   My whole life, seventh grade maybe.

4    Q.   What kinds of quantities of marijuana would you purchase

5    from Taeyan Williams?

6    A.   Um, all the way up to a pound.

7    Q.   Now up to a pound. Were there smaller quantities that you

8    would sometimes buy from Taeyan Williams?

9    A.   Yes.

10   Q.   What were the smaller quantities that you would get from

11   Mr. Taeyan Williams?

12   A.   An ounce, half-pound.

13   Q.   About how often would you -- let me put some time frame

14   on this.  What approximately were the years that you were

15   obtaining marijuana from Mr. Taeyan Williams?

16   A.   Probably 2016 through 2018 maybe. I'm not too sure.

17   Q.   That's an approximation, correct?

18   A.   Yeah.

19   Q.   When you first began buying marijuana from Taeyan

20   Williams, where was Taeyan living?

21   A.   I'm not sure. Either West Virginia or his parents' house.

22   I'm not sure.

23   Q.   Did you have knowledge of Mr. Taeyan Williams having his

24   parents living in a house somewhere nearby?

25   A.   Yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1715

```
 1    Q.   Where was that, approximately?

 2    A.   Columbia, Laurel maybe.

 3    Q.   Have you ever been to that house?

 4    A.   Maybe.

 5    Q.   Are you not sure?

 6    A.   I'm not sure. I mean, which house are you referring to?

 7    Q.   That's a fair question. Have you ever been to a house of

 8    Taeyan Williams' family's located in Laurel, Maryland if you

 9    know of one?

10    A.   Laurel, Maryland?  Um, yes, maybe. I think so. I mean,

11    I'm not too confident that it's even in Laurel.

12    Q.   There is a house that you've been to associated with the

13    Williams family?

14    A.   Yes.

15          THE COURT:  Can you move closer to the microphone,

16    sir, or speak up, or both?

17          THE WITNESS:   Sure.

18          THE COURT:   Thank you.

19          MR. HANLON:   Thank you, Mr. Drummond.

20    BY MR. HANLON:

21    Q.   Did there ever come a point -- first of all, you

22    mentioned at some point that Taeyan Williams was also living

23    in another state; is that correct?

24    A.   Yes.

25    Q.   What state was that?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1716

```
 1    A.   West Virginia.
 2    Q.   Was there ever any drug that you purchased other than
 3    marijuana from Taeyan Williams?
 4    A.   Yes.
 5    Q.   What drug was that?
 6    A.   Cocaine.
 7    Q.   Now why were you purchasing cocaine from Taeyan Williams?
 8    A.   Any big fraternity event, people wanted cocaine, so it
 9    was an easy -- it was an easy sell.
10    Q.   Again, this was within the fraternity?
11    A.   Yes.
12    Q.   The marijuana that you were purchasing from Taeyan
13    Williams, did you ever use any of that -- any of -- let me
14    start over. The marijuana that you purchased from Taeyan
15    Williams, did you ever use any of that marijuana for yourself?
16    A.   Sometimes.
17    Q.   What else did you do with the marijuana you obtained from
18    Taeyan Williams?
19    A.   I sold it.
20    Q.   How about the cocaine that you obtained from Taeyan
21    Williams, what did you do with the cocaine?
22    A.   I sold it.
23    Q.   Did you ever use any of the cocaine?
24    A.   Yes.
25    Q.   About what amounts of cocaine did you obtain from Taeyan
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1717**

```
 1    Williams?
 2    A.   An eighth maybe, I'm not too -- I don't remember exactly.
 3    Q.   When you say "an eighth," what do you mean by that, an
 4    eighth of what?
 5    A.   3.5 grams.
 6    Q.   So an eighth of an ounce, if my math is correct?
 7    A.   Yes.
 8    Q.   About what time frames -- I think I've asked you this
 9    about the marijuana -- what approximate time frame did you
10    purchase cocaine from Taeyan Williams?
11    A.   Probably during that 2016/2018 time frame.
12    Q.   During this period of time was there anybody else that
13    you purchased marijuana from during those time frames?
14    A.   No.
15    Q.   Was there anyone else that you purchased cocaine from
16    during those time frames?
17    A.   No.
18    Q.   How about at any point from 2016 to the future, is there
19    anyone that you purchased marijuana from apart from Taeyan
20    Williams?
21    A.   I did pick up -- I did get some marijuana I guess from
22    Taeyan's father.
23    Q.   Approximately when did you pick up marijuana from
24    Taeyan's father?
25    A.   It was between the 2016 and 2018 time frame.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1718**

```
1    Q.    How did it come about?  How did it come about that you
2    obtained marijuana from Taeyan's father?
3    A.    Probably from -- Taeyan probably wasn't in town, so --
4    Q.    On the occasion when you did obtain marijuana from
5    Taeyan's father, where did you have to go to do that pickup?
6    A.    Nowhere.  It was in my fraternity house.
7    Q.    And I may have misheard you.  Did you pick it up or was
8    it brought to you?
9    A.    It was brought to me.
10   Q.    All right, describe that. Tell us how that deal was set
11   up and how the marijuana was brought to you.
12   A.    I got a text, I went outside, I grabbed the marijuana and
13   then I went inside and then -- yeah.
14   Q.    And who did you grab the marijuana from?
15   A.    Taeyan's dad.
16   Q.    Now is Taeyan's father someone that you would recognize
17   if you saw him again?
18   A.    Yes.
19   Q.    Do you see him in court today?
20   A.    Yes.
21   Q.    If you would please identify him by where he is sitting
22   and his clothing.
23   A.    He's wearing a white T-shirt under his jacket, gray
24   jacket.
25          MR. HANLON   Your Honor, may the record reflect that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1719**

1      the witness has identified the defendant, Scott Williams?

2                **THE COURT:**  Okay, it will, unless there's any

3      objection.

4                **MR. HAWKS:**  No objection.

5      **BY MR. HANLON:**

6      Q.    Do you personally know Taeyan Williams' father by name?

7      A.    I didn't until all this stuff.

8      Q.    So not at the time you were interacting?

9      A.    No.

10     Q.    Did you ever purchase cocaine or -- I'm sorry, did you

11     ever purchase or obtain cocaine from anyone other than Taeyan

12     Williams?

13     A.    No, not that I remember.

14     Q.    You mentioned that you would use your cell phone and

15     communicate by text message?

16     A.    Yes.

17     Q.    Let me -- Court's indulgence. Let me show you, Mr.

18     Drummond, what has been entered into evidence as Exhibit 339.

19     And I'm going to zoom in a couple of times here. Are you able

20     to see the text on the screen next to you, sir?

21     A.    Yes.

22     Q.    Now on the -- I'm going to use my curser to try to orient

23     you a little bit. Do you see the phone number under

24     "participants" up at the sort of roughly top left of the

25     screen?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1720**

```
 1    A.    Yes.

 2    Q.    Do you recognize that phone number?

 3    A.    Yes.

 4    Q.    And what phone number is that?  Just for the record.

 5    A.    My phone number.

 6    Q.    And your name is Brandon; is that correct?

 7    A.    Correct.

 8    Q.    Do you recognize that -- sitting here today, do you

 9    recognize that phone number, sir?

10    A.    No.

11    Q.    Sitting here today, do you recognize any of this text

12    information as a conversation you would have had with a person

13    on the subject matters discussed there?

14    A.    Yes.

15    Q.    And with whom would you have had a conversation like

16    this?

17    A.    With Taeyan Williams.

18    Q.    Now let me show you under the date 11/27/2017, next to

19    the name Brandon, there's a phrase there. Do you see that?

20    A.    Yes.

21    Q.    What does the phrase mean, "You able to get me a half of

22    the yay?"

23    A.    Cocaine.

24    Q.    Can you tell us specifically what "yay" means?

25    A.    Cocaine.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1721

```
 1    Q.   Is that a common phrase for cocaine?
 2    A.   It's a phrase.  I don't know if it's common, but it's a
 3    phrase.
 4    Q.   When you talk about a half of the yay, what did you mean
 5    in this context here?
 6    A.   Half ounce, I think.
 7    Q.   There's a response, "if so how soon" and then a reply to
 8    that, "you in College Park"  Do you see that, sir?
 9    A.   Yes.
10    Q.   Did Taeyan Williams ever come to College Park to meet you
11    for drug-related matters?
12    A.   Yes.
13    Q.   About how often would Taeyan Williams come to College
14    Park during the November 2017 time frame?
15    A.   I don't know.
16         MR. HANLON:  Moment of the Court's indulgence, Your
17    Honor.
18    BY MR. HANLON:
19    Q.   Attempt to zoom in one more time, Mr. Drummond.  Take a
20    look at the screen again.  We're on the first page of Exhibit
21    339. Do you see that text in front of you?
22    A.   Yes.
23    Q.   There's a phrase under the date 11/27/2017 next to the
24    name Brandon. Do you see that at the top of this zoom?
25    A.   Yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1722**

```
 1     Q.    "Ya and you able to front it." Can you tell us what the
 2     phrase "front it" means?
 3     A.    To lend.
 4     Q.    Now lend meaning how?  If something is fronted, drugs are
 5     fronted, what does that mean is supposed to happen?
 6     A.    They'll give it to me, then I'll pay them back later.
 7     Q.    Again, who would you have been engaged in a conversation
 8     by text message with on this subject?
 9     A.    Taeyan.
10     Q.    Flipping to page 3 of the same exhibit, zoomed in another
11     bit, Mr. Drummond. The text I've got here, are you able to see
12     it on your screen?
13     A.    Yes.
14     Q.    And here under the date 12/14/2017 and next to the name
15     Brandon, there's a phrase "you got a p" and there's a response
16     to Brandon, "yea."  Do you see that, sir?
17     A.    Yes.
18     Q.    In this context can you tell us what the phrase "P" would
19     mean?
20     A.    A pound.
21     Q.    And what would you be looking for a pound of?
22     A.    Marijuana.
23     Q.    Zooming in or coming into Page 5 of Exhibit 339, let me
24     zoom in one more time. This is, again, I'm showing some
25     language here under the date 3/7/2018 and there's a phrase
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1723**

```
1    there referencing pens. Do you see that, sir?
2    A.   Yes.
3    Q.   Now this appears to be to Brandon, is that what the
4    screen is saying?
5    A.   Yes.
6    Q.   Sir, can you tell us what "pens" would mean in the
7    context of a drug transaction?
8    A.   Vape pens.
9    Q.   What is a vape pen?
10   A.   Pens you can use to smoke things out of.
11   Q.   During the time that you were selling marijuana or buying
12   or selling marijuana, did you ever obtain vape pens?
13   A.   Yes.
14   Q.   And did you obtain them for sale, or personal use, or
15   both?
16   A.   Both.
17   Q.   From whom were you buying vape pens?
18   A.   Taeyan.
19   Q.   Did Mr. Taeyan Williams ever show you vape pens during
20   the time that the two of you were engaged together?
21   A.   Yes.
22   Q.   Jumping to page 6 of this exhibit, looking at this screen
23   again, do you recognize that phone number next to the row 12
24   sign?
25   A.   Yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1724

```
 1    Q.   Is that correct?

 2    A.   Yes.

 3    Q.   And whose phone number again is that?

 4    A.   Mine.

 5    Q.   Under the date 4/6/2018 at 8:04 p.m., there's a phrase

 6    "to Brandon" or an indicator "to Brandon" and the phrase, "got

 7    your pens." Do you see that, sir?

 8    A.   Yes.

 9    Q.   Who did you receive this message from?

10    A.   Taeyan.

11    Q.   And what was your understanding of what Taeyan Williams

12    meant when he sent you that message, "got your pens"?

13    A.   He has my vape pens.

14    Q.   Do you have a specific recollection one way or the other,

15    Mr. Drummond, of whether or not you saw Taeyan Williams on

16    April the 6th, 2018?

17    A.   No.

18    Q.   You don't recall one way or the other?

19    A.   No.

20    Q.   Zooming out one more time, same exhibit, same page, this

21    is row 13. This message is dated 4/7/2018, 1:47 a.m. Do you

22    see that, sir?

23    A.   Yes.

24    Q.   And here it's written, "when you coming through with

25    them" and there's a response to Brandon that says, "in five
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1725**

1    minutes."  Is that correct, sir?

2    A.   Yes.

3    Q.   From your recollection, do you recall what the nature of

4    this conversation was at a few minutes before 2 in the morning

5    on April 7, 2018?

6    A.   No.

7    Q.   Zooming in on row 14, same page, same exhibit, Exhibit

8    339, I'm showing you a line or a couple of lines, 4/10/2018

9    indicating Brandon; is that correct, sir?

10   A.   Yes.

11   Q.   It seems that you write, "if you don't stop ducking me"

12   and then in the next message you write, "lmao smh"; is that

13   correct?

14   A.   Yes.

15   Q.   And what did you mean when you wrote that, sir?

16   A.   He's just not being responsive.

17   Q.   The message below that, 4/10/2018 at 2:38 p.m. is to

18   Brandon; is that correct?

19   A.   Yes.

20   Q.   And there's a phrase, "oh shit I thought I texted you

21   yesterday saying I left and I forgot but you going to have to

22   pick it up at my dad's house. I left it in the silver Benz."

23   Do you see that, sir?

24   A.   Yes.

25   Q.   What did you understand that message to mean or what do

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1726

```
 1   you understand that message to mean?
 2   A.   I guess I'm wanting to pick up something from Taeyan. He
 3   left it in his -- at his dad's house in the silver Benz.
 4   Q.   What would you have been picking up from Taeyan Williams
 5   from his dad's house?
 6   A.   I don't remember exactly, but probably drug-related.
 7   Q.   Going down to page 8 of Exhibit 339. This is a phrase
 8   June -- at the very bottom of the zoom in, June 9, 2018 at
 9   1:57 p.m. and this appears to be from you; is that correct,
10   sir?
11   A.   Yes.
12   Q.   And the phrase is "you able to re me up"; is that
13   correct?
14   A.   Yes.
15   Q.   Can you tell me or can you tell us what the phrase "re me
16   up" means or "re-up" means in this context?
17   A.   Resupply.
18   Q.   Resupply with what?
19   A.   I mean, it could be anything, but --
20   Q.   In this context do you recall what it is that you would
21   have been asking to be resupplied with?
22   A.   Do I remember?  No, but could be marijuana.
23   Q.   And again, this message that we've seen here would have
24   been with whom?
25   A.   Taeyan.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1727**

```
 1                 MR. HANLON: One moment please, Your Honor. Your
 2    Honor, those are all my questions on direct examination.
 3                 THE COURT:  Okay, cross-examination?
 4                 MR. GUILLAUME:  Yes, Your Honor.
 5                 THE COURT:  Go ahead, Mr. Guillaume.
 6                 C R O S S - E X A M I N A T I O N
 7    BY MR. GUILLAUME:
 8    Q.    Good afternoon, sir.  How are you?
 9    A.    Hi.
10    Q.    I represent Mr. Taeyan Williams and I want to just ask
11    you a few questions, okay?
12    A.    Okay.
13    Q.    The Government attorney, the prosecutor asked you about
14    your relationship and your friendship with my client. Do you
15    remember that?
16    A.    Yes.
17    Q.    And you not wanting to be here today because he is your
18    friend, correct?
19    A.    Correct.
20    Q.    But you are here obviously, right?
21    A.    Yes.
22    Q.    And your plan is to tell the truth about everything that
23    has been asked of you so far and you have told the truth,
24    correct?
25    A.    Correct.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1728**

```
1    Q.    You're not going to lie to protect yourself in this
2    testimony, are you?
3    A.    No.
4    Q.    And you're not going to lie to try to protect our client,
5    Taeyan Williams either, are you?
6    A.    Correct.
7    Q.    Sir, you graduated from the University of Maryland in
8    2018, right?
9    A.    Right.
10   Q.    You started there in 2014?
11   A.    Yes.
12   Q.    So you graduated in four years?
13   A.    Um, I went to community college and then transferred
14   there, so I probably graduated in five years, however the math
15   works out.
16   Q.    But you were a full-time student I guess is my point?
17   A.    Yes.
18   Q.    So you were able to graduate and get a degree. And when
19   you were a full-time student, I'm assuming you were in school
20   present on campus from August to December and from January to
21   May of the academic school year, correct?
22   A.    Correct.
23   Q.    So you did not have an opportunity to travel and do other
24   things because you were a full-time student, correct?
25   A.    Correct.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1729**

1    Q.   And you never got a chance, an opportunity to visit
2    Taeyan Williams in West Virginia at his apartment, did you?
3    A.   No.
4    Q.   Okay. You would see him when he would be in Maryland; is
5    that correct?
6    A.   Yes.
7    Q.   Okay. And you've testified that you've known Mr. Williams
8    since about the fifth grade, right?
9    A.   Correct.
10   Q.   And you know members of his family, right?
11   A.   Yes.
12   Q.   And you know Mr. Williams' mother, correct?
13   A.   Yes.
14   Q.   And when I say "Mr. Williams" I mean Taeyan Williams,
15   excuse me.  You know Taeyan Williams' mother, right?
16   A.   Yes.
17   Q.   And his mother lives in Columbia, Maryland, right?
18   A.   Correct.
19   Q.   And as far as you know, Taeyan Williams when he would
20   visit Maryland, he also would visit his mother's house as well
21   in Columbia, correct?
22   A.   As far as I know.
23   Q.   Now you've been asked by the prosecutor about the date --
24   I know it's been a long time. We're in 2023 and April 2018 is
25   a while ago, right?  About five years; is that correct?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1730

1   A.   Yes.

2   Q.   The prosecutor asked you about the specific date, April

3   the 6th of 2018. I just want to clarify, do you remember that

4   day, one; and then before you answer that question, two, do

5   you remember on that day if you saw Taeyan Williams?

6   A.   I don't remember anything about that day.

7   Q.   But in 20 -- April the 6th of 2018 it's during the

8   academic school year, right?

9   A.   Yes.

10  Q.   And in 2018 you would have been a senior or getting ready

11  to graduate the University of Maryland; is that correct?

12  A.   Yes.

13  Q.   And graduation typically takes place in May of any given

14  academic year for most colleges, right?

15  A.   Yes. I graduated in December, though.

16  Q.   Were you still living in College Park -- wait, I'm sorry.

17  You graduated December, 2018?

18  A.   Yes.

19  Q.   So in April of 2018 you were still taking classes and you

20  weren't ready to graduate the next month, right?

21  A.   Correct.

22  Q.   And at that time you were living in your fraternity

23  house?  In April of 2018 you were living in your fraternity

24  house, right?

25  A.   Yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1731**

```
 1    Q.   And during the time that you lived in that fraternity
 2    house, your friend, Taeyan Williams, would visit you from time
 3    to time at your fraternity house, right?
 4    A.   Correct.
 5    Q.   And, in fact, he was actually very friendly with some of
 6    your fraternity brothers?
 7    A.   Correct.
 8    Q.   He was so friendly that he even had their permission, the
 9    other -- the house's permission to come and go from the house
10    as he pleased, right?
11    A.   Yes.
12    Q.   He, in fact, had other friends other than you who lived
13    in that fraternity house, right?
14    A.   Yes.
15    Q.   Although you were his oldest and best friend at that
16    house, he associated with other people, right?
17    A.   Correct.
18    Q.   Okay. Court's brief indulgence. A few more questions for
19    you. You testified that you saw an opportunity, because of
20    living in this house with a lot of young men, to potentially
21    make a profit or sell marijuana; is that right?
22    A.   Correct.
23    Q.   And you said that specifically on weekends I think was
24    your testimony there was always a lot of partying and stuff
25    going on; is that right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1732**

```
 1    A.   Yes.

 2    Q.   Was it just weekends or was it all the time?

 3    A.   For --

 4    Q.   For your fraternity house.

 5    A.   I think, I mean, it was frequent.

 6    Q.   Pretty frequent, right?

 7    A.   Yes.

 8    Q.   One can imagine.

 9    A.   Yes.

10    Q.   And you know there were times when Taeyan Williams was

11    present at some of those fraternity parties, right?

12    A.   Yes.

13    Q.   In fact, he was known to stay throughout the day and

14    night at the fraternity house when he was here; is that right?

15    A.   Yes.

16    Q.   I think that's it.  I just want to check one quick thing.

17    No further questions, thank you.

18              THE COURT:  Okay. Anything for Mr. Scott Williams?

19              MR. HAWKS:  Yes, Your Honor.

20                  C R O S S - E X A M I N A T I O N

21    BY MR. HAWKS:

22    Q.   Good afternoon.

23    A.   Hi.

24    Q.   Now you had testified on direct about Mr. Scott Williams?

25    A.   Yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1733**

```
 1    Q.    And specifically you said he went out and met you
 2    somewhere and texted you and brought you drugs?
 3    A.    Yes.
 4    Q.    You testified in the grand jury, in one of the grand
 5    juries for this case; do you remember that?
 6    A.    Yes.
 7    Q.    And it would have been back four years ago back in August
 8    of 2019?
 9    A.    Yes.
10    Q.    And that was so long ago, none of the prosecutors who are
11    here right now in the courtroom were present on that day. It
12    was two different prosecutors then?
13    A.    I believe so.
14    Q.    Okay. Now you didn't at any point testify then that Mr.
15    Williams came to you and gave you drugs?
16    A.    I don't think they -- no. I don't -- yeah, I don't
17    remember exactly all the details.
18    Q.    Okay. Do you remember that they did bring up a text
19    message?
20    A.    About what?
21    Q.    And the text message would have been that Mr. Taeyan
22    Williams texted you regarding a drug transaction and said
23    "yeah Uber to my uncle crib" and then there's an address on
24    Mapleview Drive after that text message. Do you remember that?
25    A.    At the grand jury or just in general?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1734

```
 1    Q.   Well, first in general.
 2    A.   I remember it from the text message they showed me.
 3    Q.   Okay, all right. Nothing further. Thank you.
 4              THE COURT:  Okay, anything else, Mr. Hanlon?
 5              MR. HANLON:  Yes, Your Honor.
 6              THE COURT:  Okay.
 7           R E D I R E C T   E X A M I N A T I O N
 8    BY MR. HANLON:
 9    Q.   You were asked about your grand jury testimony, sir?
10    A.   Say that again?
11    Q.   You were asked about your grand jury testimony from a
12    couple years ago?
13    A.   Yes.
14              MR. HANLON:  May I approach the witness, Your Honor?
15              THE COURT:  Yes.
16    BY MR. HANLON:
17    Q.   During your grand jury testimony, do you recall one way
18    or the other whether or not you testified about buying
19    anything from Taeyan Williams' father?
20    A.   Do you have the page?
21    Q.   Yes. For counsel, this is Exhibit ID-2. Just give me a
22    moment, sir. Page 16, line 12. Let me know when you're there,
23    sir.
24    A.   I'm here.
25    Q.   Did you -- were you asked about Taeyan's dad in the grand
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1735**

1    jury?

2    A.    Yes.

3    Q.    Were you asked if you ever purchased any drugs directly

4    from Taeyan's dad?

5    A.    Yes.

6    Q.    In the grand jury, what was your response to that

7    question?

8    A.    That I purchased marijuana and cocaine from his dad.

9    Q.    From what you can tell from the transcript, were you ever

10   asked specifically whether or not you had gone to a house to

11   do it or if somebody had come to you with respect to Taeyan's

12   dad, from what you can tell on the page I'm showing you or

13   from your recollection?

14   A.    Can you ask the question again?

15   Q.    Yes. From your recollection of the grand jury appearance

16   or from the page that we're on right now, do you recall

17   anybody asking you specifically if you had gotten anything

18   from Taeyan's dad by going to Taeyan's dad or by Taeyan's dad

19   coming to you?

20   A.    I see something that says that you saw a text message

21   from Taeyan Williams that referred to picking something up at

22   his dad's house.

23   Q.    Apart from that do you recall?

24   A.    That you guys asked me the question?  No.

25   Q.    Yes, sir. Apart from that do you recall anything?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1736**

```
 1    A.    No.
 2              MR. HANLON:  I believe that's all I have, Your
 3    Honor.
 4              THE COURT:  Okay, anything just on that from the
 5    defense?
 6              MR. HAWKS:  No, Your Honor.
 7              THE COURT:  Mr. Guillaume?
 8              MR. GUILLAUME:  No, Your Honor.  Thank you.
 9              THE COURT:  So Mr. Drummond, thank you very much for
10    coming to testify. You can step out now. We appreciate it.
11              (Witness excused.)
12              THE COURT:  Hold on one second.
13              MS. GROSSI:  Your Honor, our next witness is going
14    to take over 30 minutes. Would you like to take a break now
15    or--
16              THE COURT:  Give me a second. Hold on a second.
17    Okay, I guess we can take the break now. Why don't we -- it's
18    about 12:37 or so.  Why don't we have everyone come back at
19    1:40, so a little bit longer than an hour for lunch.
20         So ladies and gentlemen, don't discuss the case.  Keep an
21    open mind.  We'll see you back here after lunch at 1:40.
22    Thank you.
23              (Jury exited the courtroom at 12:37 p.m.)
24              THE COURT:  Thank you, everyone. Please be seated.
25    So who is next, Ms. Grossi?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1737**

 1          **MS. GROSSI:**  Ms. Amy Kelly who is one of our DNA

 2     scientists is up next.

 3          **THE WITNESS:**  You said her direct will be about half

 4     an hour or a little more than that?

 5          **MS. GROSSI:**  I believe the direct is going to be

 6     about 45 minutes, Your Honor.

 7          **THE COURT:**  Okay, so do we have anybody else after

 8     her?

 9          **MS. GROSSI:**  We have Ms. Julie Kempton who is

10     another DNA scientist and she actually tested more of the

11     samples.

12          **THE COURT:**  Okay. Any issues with these witnesses?

13     I know that there were these documents for ID and we talked

14     about reports. I don't know if those are with Ms. -- which of

15     those two witnesses those are with.

16          **MR. HAWKS:**  Your Honor, our understanding is Ms.

17     Kempton is probably the more appropriate witness for that

18     issue, but I really think either one. They both are

19     signatories to the report in question.

20          **THE COURT:**  Okay.  So I mean, again, typically these

21     reports are not technically usually offered as evidence, but I

22     have seen them, particularly if there's no objection. So do

23     you all have a common understanding or do you still need to

24     discuss that?  Not just on that one report, but perhaps how

25     anything else might be handled.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1738**

1          MR. HANLON:  So here was my plan, Your Honor.  I was

2     going to put in -- the very first report, Amy Kelly and Julie

3     Kempton cosign. I was going to move that in with Ms. Kelly.

4          THE COURT:  Use the microphone, please.

5          MR. HANLON:  I was going to move that in with Ms.

6     Kelly just so it was in.

7          THE COURT:  And these are just their reports on the

8     results?

9          MR. HANLON: Yes, Your Honor.

10          THE COURT: Of which piece?  There's a lot of

11     different pieces here.

12          MR. HANLON:  There are many different pieces, Your

13     Honor.

14          THE COURT:  So what evidence does that report relate

15     to?

16          MR. HANLON:  So that report, if memory serves,

17     covers Exhibits 1 -- I'll say items 1 through 22, some of

18     which also figure later reports would follow that.

19          THE COURT:  I'm just asking are we talking about the

20     blood in the Kia?  Are we talking about the toothbrush?  What

21     are we talking about here?

22          MR. HANLON:  All of those things come up in that

23     first report. But Amy Kelly tested and examined specifically

24     the toothbrush with items 9, 10, and 14 which if memory

25     serves, are two Kia items and one firearm item, but I would

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1739**

```
 1    want to double check that, Your Honor.

 2              THE COURT:  Okay.  I guess the question is are we

 3    offering no reports, all reports, or some yes, some no?  And

 4    if it's some yes some no, is everyone comfortable with what's

 5    going to happen or is there going to be something I have to

 6    rule on?

 7              MR. HANLON:  The Government's -- if the defense

 8    wants to move in the first report, that's fine.  The

 9    Government is unopposed.

10              THE COURT:  Okay.

11              MR. HANLON:  The Government would move in all of the

12    other reports if that first report is coming in. So I don't

13    oppose them coming in.

14              THE COURT:  Okay. How does that sound to you, Mr.

15    Hawks?

16              MR. HAWKS:  Your Honor, for the subsequent reports

17    we are agnostic.  We have no objection.

18              THE COURT:  Okay, so I guess we can do that.

19    Anything else with these two witnesses?

20              MR. HANLON:  Not from the Government, Your Honor.

21              MR. HAWKS:  Not from the defense.

22              THE COURT:  Do we anticipate this taking the rest of

23    the afternoon or not?

24              MS. GROSSI:  If it doesn't take the rest of the

25    afternoon, Your Honor, we are prepared to call Sergeant Simms
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1740

```
 1    to the stand to fill the rest of the day.
 2              THE COURT:  Okay, thank you.  We'll see you back at
 3    1:40.  Thank you.
 4         Hold on one second. Please be seated. My understanding is
 5    one of the jurors has a medical issue and is seeking to go to
 6    the emergency room. I think it was something that was flagged
 7    earlier today -- or Urgent Care, not necessarily the emergency
 8    room. It doesn't sound like it's life threatening, but it's
 9    very uncomfortable and I think the juror had said perhaps the
10    juror would want to seek medical attention at the end of the
11    day, but has just informed the clerk that she feels like she
12    can't wait that long and needs to go now. And so I don't think
13    we would stand in her way. She had flagged the issue earlier.
14         So then the issue is as you know, our only two options
15    are to suspend for the rest of the day which arguably could
16    set us back or we could -- and we don't know whether she'll be
17    fine.
18         I guess we could also see, I mean, I think it's unlikely
19    that it would be easy to say she goes there and gets checked
20    out and comes back later today.  I think that's ambitious. So
21    we could either send everyone home and then pick it up
22    tomorrow on the hope and expectation we'll be able to finish
23    overall and there won't be any other emergencies with other
24    jurors, or we could effectively release her, we have four
25    alternates so we're close to -- we're getting a lot further
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1741**

 1   along in the trial now so that would certainly be an option

 2   that given the number of alternates and given how far along we

 3   are I think that's a reasonable option as well.

 4       Does anyone have a thought on this question?

 5       **MS. GROSSI:**  Your Honor, we are actually ahead of

 6   schedule in the Government's case. We were planning to call

 7   the DNA experts tomorrow. There's a third expert for DNA

 8   that's planning to fly in tomorrow from Texas. And so we were

 9   planning to do them back to back, but we're prepared to put

10   Mr. Sergeant Simms on the stand today.  So the Government

11   would ask to recess for the day and then pick it back up

12   tomorrow with a full day.

13       **THE COURT:**  When you say "we're ahead of schedule,"

14   what was the schedule you were anticipating?  Because we told

15   them they would be done by Thursday. This is a very -- I'm

16   noticing as we're going along, this is a very lengthy case,

17   lots of exhibits. I wouldn't expect that if we do closing

18   arguments on Thursday morning they'd have a verdict by the

19   afternoon. Or even frankly if they had the case on Wednesday,

20   I would be a little surprised if they turned it around that

21   quickly, which isn't to say we can't have a jury stay past the

22   last day, it happens all the time.  But I think when we have

23   the opportunity to have them finish everything they do, not

24   just what the lawyers say to them but what they do by the

25   appointed date, it's always preferable.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1742**

```
 1        So when you say "we're ahead of schedule," what do you
 2   mean by that?  When would you anticipate resting exactly?
 3   Because again, it seemed to me like you're mostly done, but
 4   you still say you want to go into Monday.  So that means the
 5   defense case on Tuesday, closings on Wednesday. That's pretty
 6   much as far as we could go.  Ideally we'd finish earlier than
 7   that. So what do you mean by "we're ahead of schedule"?
 8        MS. GROSSI:  Your Honor, I believe we're still going
 9   to close -- if we were to break for today we would still close
10   our case on Monday.
11        THE COURT:  When on Monday, 9 a.m?  5 p.m?  Roughly
12   somewhere in the middle?
13        MS. GROSSI:  Before 5, Your Honor, it's my
14   estimation.
15        THE COURT:  You mean if we didn't do anything today?
16        MS. GROSSI:  I believe so. I'm not sure what the
17   cross is going to entail with Sergeant Simms, so it's hard for
18   me to say. Sergeant Simms will be up there for a while with a
19   lot of the additional --
20        THE COURT:  So tell me who else we have. We have
21   these two DNA people who we could have gotten through today or
22   could get through today.
23        MS. GROSSI:  That's correct.
24        THE COURT:  And the third one -- I'm not sure why we
25   have three.  Are they all doing different things or are they
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1743**

 1    sort of corroborating each other?

 2         MS. GROSSI:  They're all doing different things and

 3    the third one who is flying in from Texas, Your Honor, she

 4    works for a center at the University of North Texas that looks

 5    at unidentified remains.  And so her lab does testing that is

 6    different than the labs that do testing here in Maryland.

 7         THE COURT:  Okay. So then who else do you have

 8    besides the three of them and Sergeant Simms?  I had asked you

 9    yesterday, I mean, there's other names, but I don't know if

10    they've been eliminated because of stipulations or other

11    evidence.

12         MS. GROSSI:  Yes, only one other witness, Your

13    Honor, and that's Mathew Wilde. He is an FBI special agent who

14    will be testifying about the location of certain cell phones.

15         THE COURT:  So let me just make sure I have this

16    right. Ms. Kelly and Ms. Kempton are DNA experts. Jonathan

17    Martin, is he being called?

18         MS. GROSSI:  We are not calling him anymore.

19         THE COURT:  Okay. Mathew Wilde, you said he's an

20    expert on what?

21         MS. GROSSI:  Cell phone location.

22         THE COURT:  Okay. Richard DiSabatino?

23         MS. GROSSI:  We are no longer calling him, Your

24    Honor.

25         THE COURT:  Okay.  Romy Franco is the Texas DNA

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1744**

```
 1   expert?
 2              MS. GROSSI:  That's correct, Your Honor.
 3              THE COURT:  Is her testimony or his testimony longer
 4   or shorter than Kelly and Kempton?
 5              MS. GROSSI:  I believe it's going to be shorter,
 6   Your Honor.
 7              THE COURT:  And what about Jill Fairchild?
 8              MS. GROSSI:  We are no longer calling her.
 9              THE COURT:  So you basically have the three DNA, you
10   have Agent Wilde and then you have Sergeant Simms?
11              MS. GROSSI:  That's correct, Your Honor.
12              THE COURT:  We've dealt with the videos or the audio
13   recordings. Generally what is Sergeant Simms going to do on
14   his --
15              MS. GROSSI:  There is one other.
16              THE COURT:  --now third or fourth visit?
17              MS. GROSSI:  There is one other jail call, Your
18   Honor, that he's going to testify to. It's a Taeyan Williams
19   jail call.  And then there's additional business records that
20   were collected throughout the investigation, including Airbnb
21   records, Uber records, AOL records and things of those nature.
22   He also created summary exhibits that we have previously
23   provided to defense by the deadline that was asked by the
24   Court. Those include summary exhibits as to the DNA evidence
25   and the EZ Storage videos.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1745**

```
 1              THE COURT:  So it's things we've seen, but kind of
 2     connecting the dots.
 3              MS. GROSSI:  Correct. There's portions of the EZ
 4     Storage footage that was not seen by the jury yet which
 5     include multiple trips by Mr. Cesar Flores Gomez showing the
 6     amount of boxes that were brought into the storage facility,
 7     as well as instances in which Mr. Noah Smothers entered the
 8     facility, you can see him and the boxes and the bags he's
 9     carrying.
10              THE COURT:  These are videos from EZ Storage that we
11     haven't seen yet or --
12              MS. GROSSI:  They're in evidence, Your Honor.
13              THE COURT:  I see, okay.
14              MS. GROSSI:  But we didn't preview them yet.
15              THE COURT:  In terms of laptop, cell phones, other
16     electronic devices, have we pretty much seen what you're
17     planning to present on those for the first time?  I mean,
18     Sergeant Simms may want to put things together, but in terms
19     of witnesses who are going to say, "Well, we've extracted
20     things from phones and here's text messages, here's videos,
21     here's photos," have you pretty much pulled all of that out or
22     is there still something else to be done in that regard?
23              MR. MOOMAU:  Your Honor, since he's my witness can I
24     respond?
25              THE COURT:  Sure.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1746**

```
 1              MR. MOOMAU:  Yes, there's not going to be any new
 2    extraction witnesses. We have -- part of our case is
 3    identifying who is using a certain number and we're going to
 4    try to put the pieces together for the jury to show evidence
 5    as to who is using a certain number.
 6              THE COURT:  You mean like subscriber records or
 7    other records or --
 8              MR. MOOMAU:  Subscriber records, contacts from other
 9    phones that have come in.
10              THE COURT:  Okay. But in terms of the experts who
11    say "Hey, I've had to pull all this off a phone," we've
12    already done that, you've already done that?
13              MR. MOOMAU:  Yes, sir.
14              THE COURT:  Okay. So then my other question for the
15    defense is as much as we know now, the length of your cases?
16              MR. GUILLAUME:  Your Honor, if I may respond first,
17    Your Honor.  We anticipate calling one witness, Mr. Turner
18    Mevin as a witness that would basically -- he wouldn't be very
19    long. His testimony if I could just proffer would be that he's
20    -- he hasn't done it yet, but he's going to go to the Red Roof
21    Inn that's been testified to in this case and take some
22    photos, potentially introduce those photos if we decide that
23    they're helpful to our case and potentially visit the location
24    that was discussed today, including the residence that's in
25    question. But his testimony would just be basically
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1747**

```
 1    confirmatory, this is such -- this is the Red Roof Inn, this
 2    is the parking lot, this is the hallway, this is the lobby,
 3    that kind of thing. Other than that, we don't plan on calling
 4    any other witnesses. I think Mr. Nieto would agree with that?
 5    Right.
 6              THE COURT:  Including the defendant.
 7              MR. GUILLAUME:  We don't anticipate our client
 8    testifying.
 9              THE COURT:  How about you, Mr. Hawks, for your team?
10              MR. HAWKS:  Your Honor, we I believe listed seven
11    witnesses at this point.  The idea that any of those witnesses
12    would testify is in question.  And so in any event, I don't
13    think our case would take longer than three hours.
14              THE COURT:  Are these character witnesses, fact
15    witnesses?
16              MR. HAWKS:  Your Honor, they're fact witnesses, but
17    facts have come in and we're going to dot our I's and cross
18    our T's.
19              THE COURT:  You don't anticipate all six of them
20    testifying?
21              MR. HAWKS:  We do not, Your Honor.
22              THE COURT:  So at most, a few of them?
23              MR. HAWKS:  At most, yes, Your Honor.
24              THE COURT:  And how about your client, is he
25    planning to testify?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1748**

```
 1            MR. HAWKS:  Your Honor, it's going to be his
 2    decision at the last minute.
 3            THE COURT:  It's always a moving target, I
 4    understand, but based on what you know now.
 5            MR. HAWKS:  At this point we do not anticipate that.
 6            THE COURT:  Okay. What are the defense counsels'
 7    positions on whether we suspend today or move to the
 8    alternate?
 9            MR. HAWKS:  Your Honor, Scott Williams would argue
10    that a recess, suspension would be appropriate.
11            MR. GUILLAUME:  I'm in agreement with all parties as
12    well, Your Honor.  And if we come to it tomorrow then we can
13    make that decision if the juror can't --
14            MR. CRAWLEY:  If it helps, Your Honor, Mr. Hanlon
15    and I just had a brief conversation. We've been discussing
16    possibly trying to stipulate on the DNA evidence so that we
17    can streamline that considerably.
18            THE COURT:  Okay, well, you may have gotten the
19    impression I like to keep things moving, but at the same time
20    if all parties are comfortable, that helps. I do think, again,
21    my client in all of this is the jury. I don't want them to
22    stay any longer than they need to. It does seem that the
23    Government from what I know and how things have gone,
24    particularly whether there's a stipulation on DNA or not, it
25    seems as if it would be surprising if the Government couldn't
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1749**

 1   finish its case by midday on Monday, even though I know they

 2   don't want to commit to that and I'm not going to make them

 3   commit to that.  But I think that seems to be along the lines

 4   of what we're dealing with if we get a full day in tomorrow.

 5       And with the defense cases we may be done with all the

 6   evidence on Monday it sounds like, or if not, early Tuesday. I

 7   mean, what that means then is that we probably have some

 8   updating to do of the jury instructions, but we would be ready

 9   for closings no later than Wednesday, ideally perhaps Tuesday

10   depending on how quickly things go. Again, my preference would

11   be to give the jury as much time as they can to deliberate

12   during the time -- but hold on one second.

13       Okay, so I think we will suspend for the day. The

14   complication is the jurors are all at lunch and so they don't

15   know that. There's a couple ways to do this:  On the one hand

16   I could have the clerk tell them that because of this issue

17   we're going to suspend and/or I would tell them myself so they

18   have some sense of what's going on.  I guess the only issue

19   with that is whether everyone minds getting lunch and coming

20   back for that brief colloquy with the jury, so they understand

21   what's going on.

22           MS. GROSSI:  We don't mind coming back, Your Honor,

23   but it's up to you.

24           THE COURT:  I don't mind if it's one person per team

25   or something like that, but it's up to you how you want to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1750

```
1    handle it.  But I would be okay since that's all we're doing.
2              MR. GUILLAUME:  We would come back, Your Honor.  We
3    defer to the Court. Whatever you need us to do, we'll do.
4              MR. HAWKS:  Your Honor, Scott Williams' team is at
5    your disposal.
6         THE COURT:  Okay, why don't we plan to have the jury
7    come back in, at least, we'll be minus one at that time and
8    I'll explain that this is what happens when someone has got an
9    issue which of course is totally understandable, but that's
10   why they get to go home and then that's why we'll need them
11   tomorrow and hopefully get everyone here.
12        What I will say for all of you though is that if we don't
13   have this juror tomorrow morning, I would likely say we need
14   to move to the alternate. We have several. The Government has
15   this out-of-state witness so my guess is you would prefer to
16   get that witness on tomorrow regardless; is that correct?
17             MS. GROSSI:  That's correct, Your Honor.
18        THE COURT:  So I think that's kind of a happy medium
19   given that we've got four alternates, so we'll treat it that
20   way.  I won't tell the jury that that's what's going to
21   happen, but that's what I would expect. Obviously we will see
22   exactly what the situation is. So we'll see you all back here
23   at 1:40 and then we'll dismiss the jury at that point. And the
24   other juror I think is being told she can or already has left.
25   Thank you.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1751

1        (Proceedings ended for the day at 12:57 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1752

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, Nadine M. Bachmann, Certified Realtime Reporter

6      and Registered Merit Reporter, in and for the United States

7      District Court for the District of Maryland, do hereby

8      certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

9      true and correct transcript of the stenographically-reported

10     proceedings held in the above-entitled matter and that the

11     transcript page format is in conformance with the regulations

12     of the Judicial Conference of the United States.

13

14                   Dated this 14th day of December, 2023.

15

16                              -S-

17     _____

18                       NADINE M. BACHMANN, CRR, RMR
                         FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1753

```
 1              IN THE UNITED STATES DISTRICT COURT.
                 FOR THE DISTRICT OF MARYLAND
 2                    SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,      )
          Plaintiff,                )
 4                                  )
          vs.                       )   CRIMINAL CASE NUMBER:
 5                                  )       TDC-18-0631
     SCOTT ANTHONY WILLIAMS and     )       VOLUME VIII
 6   and TAEYAN RAYMOND WILLIAMS,   )
          Defendants.               )
 7   _____)

 8
                    TRANSCRIPT OF PROCEEDINGS
 9                       JURY TRIAL
           BEFORE THE HONORABLE THEODORE D. CHUANG
10               UNITED STATES DISTRICT JUDGE
                  Thursday, May 4, 2023
11                  Greenbelt, Maryland

12                  A P P E A R A N C E S

13
     FOR THE PLAINTIFF:
14       OFFICE OF THE UNITED STATES ATTORNEY
              BY: LEAH GROSSI, ESQUIRE
15            BY: WILLIAM MOOMAU, ESQUIRE
                  6406 Ivy Lane, Suite 800
16                Greenbelt, Maryland  20770

17            BY: MICHAEL HANLON, ESQUIRE
                  36 S. Charles Street, Fourth Floor
18                Baltimore, Maryland  21201

19   FOR THE DEFENDANTS:
         For Scott Anthony Williams:
20            BY: KWASI HAWKS, ESQUIRE
                  THE HAWKS FIRM
21                8705 Colesville Road
                  Suite 162
22                Silver Spring, MD  20910

23            BY: DWIGHT E. CRAWLEY, ESQUIRE
                  LAW OFFICE OF DWIGHT CRAWLEY
24                1300 I. Street, NW
                  Suite 400e
25                Washington, DC  20005
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1754

```
1    (Appearances, Continued)

2         For Taeyan Raymond Williams:
             BY: ALFRED GUILLAUME, III
3                LAW OFFICES OF ALFRED GUILLAUME, III, LLC
                 1350 Connecticut Avenue NW
4                Suite 308
                 Washington, DC  20036
5
             BY: CHRISTOPHER NIETO, Esquire
6                LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
                 1 North Charles Street, Suite 1301
7                Baltimore, Maryland  21201

8    _____

        ***Proceedings Recorded by Mechanical Stenography***
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1755

```
1                        I N D E X

2    WITNESS                 DIRECT    CROSS    REDIRECT   RECROSS

3    Julie Kempton

4         By Mr. Hanlon:     12                   58

5         By Mr. Guillaume:            55

6         By Mr. Hawks:                57

7    Romy Franco

8         By Mr. Hanlon:     64

9    Kyle Simms

10        By Mr. Moomau:     74

11        By Mr. Nieto:               173

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1756**

```
 1                    P R O C E E D I N G S

 2     (9:04 a.m.)

 3              THE COURTROOM DEPUTY:  The matter now pending before

 4     this Court is Criminal Action Number TDC-18-0631, United

 5     States of America v. Scott Anthony Williams and Taeyan Raymond

 6     Williams. We're here today for the purpose of a jury trial.

 7     Counsel, please identify yourselves for the regard.

 8              MS. GROSSI:  Good morning, Your Honor.  Leah Grossi,

 9     Michael Hanlon, and William Moomau on behalf of the

10     Government. Here with us at counsel's table is Kyle Simms with

11     the Maryland State Police.

12              THE COURT:  Good morning.

13              MR. HAWKS:  Good morning, Your Honor.  Kwasi Hawks

14     and Dwight Crawley on behalf of Mr. Scott Williams, who is

15     seated between us.

16              MR. CRAWLEY:  Good morning, Your Honor.

17              THE COURT:  Good morning.

18              MR. GUILLAUME:  Good morning, Your Honor.  Alfred

19     Guillaume and Christopher Nieto on behalf of Mr. Taeyan

20     Williams who is seated between us.

21              THE COURT:  Good morning to all the parties and the

22     members of the audience. First off, two issues I wanted to

23     preview with you. One is the juror who had the medical issue

24     apparently is in the hospital, so she's not going to be here

25     today. This was Juror No. 10, back row, second seat, I
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1757**

1   believe. So again, my proposal would be that I excuse her,

2   that we move to the alternates. The way that I would handle it

3   is, I mean, Juror No. 13 would effectively become Juror No.

4   10. For our purposes just to avoid confusion I would not have

5   them change seats right now on the theory that if we move that

6   person, then everybody moves down and then if there's another

7   person who leaves then we keep renumbering people.  So I think

8   for our purposes we can refer to Juror No. 13 as Juror No. 10

9   going forward.

10      Once we dismiss alternates and we go to deliberations,

11   we'll give everybody sort of a final number.  And if and when

12   they come in for questions or verdicts we'll have them sit in

13   their numbered seat, which at this point will be 10. Any

14   concerns with that?

15         **MS. GROSSI:**  Not from the Government, Your Honor.

16         **MR. GUILLAUME:**  No, Your Honor, on behalf of Mr.

17   Taeyan Williams.

18         **MR. HAWKS:**  No, Your Honor.

19         **THE COURT:**  Okay. The other issue is I don't know if

20   counsel knows about this. I was told that some witness

21   wandered into the jury room. Does anyone know about this?

22         **MS. GROSSI:**  Yes, Your Honor. Our DNA expert thought

23   that she was going into the courtroom and she went into the

24   jury room and said, "Is this a throughway?"  And someone said

25   "No" and then she exited and came back into the courtroom.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1758**

```
 1              THE COURT:  Which expert is this?  Just for the
 2    record.
 3              MS. GROSSI:  Julie Kempton.
 4              THE COURT:  Okay. So my understanding is that there
 5    was no substantive discussion or anything like that. Is that
 6    your understanding too?
 7              MS. GROSSI:  Yes, Your Honor.
 8              THE COURT:  Is there -- did they know she was a
 9    witness or did she identify herself as a witness or did she
10    talk to them at all about who they were?
11              MS. GROSSI:  No, Your Honor.  It's my understanding
12    she just asked if this was a throughway and they said no, and
13    then she came back out and came into the courtroom.
14              THE COURT:  So let me ask defense counsel, this
15    doesn't sound like a real issue or a problem, but I think
16    based on counsel's representation since it's a Government
17    witness, I'm satisfied that there was no substantive
18    interaction that makes a difference.  And this isn't somebody
19    who's really -- I mean, it's not somebody who is -- as I
20    understand there's no counter expert. However, you know, if
21    you would like out of an abundance of caution I could have a
22    brief colloquy with the witness first to see what kind of
23    interaction she had. If there's a problem we could go to the
24    jurors, but I think I'd start with the witness outside of the
25    presence of the jury if you think it's necessary.
```

**JA1759**

```
 1          Does anyone have a view on that?
 2          MR. GUILLAUME:  Your Honor, we are satisfied with
 3     the Government's representation on behalf of Mr. Taeyan
 4     Williams.
 5          MR. HAWKS:  As are we, Your Honor.
 6          THE COURT:  Okay. I think we're still waiting for
 7     one juror, but is there anything else we need to discuss
 8     beyond those juror issues?
 9          MS. GROSSI:  No, Your Honor. I believe there's a
10     possibility the Government could finish its witnesses today
11     and so I just wanted to put the Court on notice. We have Ms.
12     Julie Kempton, Ms. Romy Franco, Kyle Simms, and then Mathew
13     Wilde for today.
14          THE COURT:  What happened to Ms. Kelly?
15          MS. GROSSI:  Ms. Kelly had a scheduling conflict.
16     She was going to testify yesterday because of her scheduling
17     conflict today.  We've talked to defense and defense has
18     agreed that we can ask Ms. Kempton who was the real -- who did
19     most of the DNA testing about what Ms. Kelly did. They
20     co-authored reports and so we're going to get in that
21     information through Ms. Kempton.
22          THE COURT:  Okay. And does this still take us most
23     of the way through the day, if not all of it?
24          MS. GROSSI:  I believe so, Your Honor. I believe
25     Sergeant Simms will have a long time on the stand.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1760**

1    **THE COURT:**  Okay. So we don't have any defense
2    witnesses ready to go today if we got that far?
3    **MR. GUILLAUME:**  Correct, Your Honor.  We wouldn't be
4    ready until Monday.
5    **THE COURT:**  Okay, that's kind of what we were
6    thinking. Mr. Hawks, same with you?
7    **MR. HAWKS:**  Same, Your Honor.
8    **THE COURT:**  And then I thought there were some
9    additional exhibits that were provided, ID exhibits. Can
10   someone just explain what that's about?  Or maybe -- I don't
11   know if I have them, but I've been told that there are some.
12   **MS. GROSSI:**  Your Honor --
13   **THE COURT:**  Or a new list, I think.
14   **MS. GROSSI:**  Just a new list I think for ID exhibits
15   that were shown to the witnesses the last few days. I don't
16   know if we provided an exhibit list for them and so that's
17   what I provided Ms. Solomon last night. There was a --
18   **THE COURT:**  Oh, I see.  Okay.
19   **MS. GROSSI:**  There were some typos in Exhibit 446
20   and so I provided the Court with an updated copy of that
21   exhibit and have provided the same to defense counsel.
22   **THE COURT:**  Okay. I mean, in an ideal world, maybe
23   we only have one more day of testimony. Again, even though
24   they're ID, it's still helpful for me to have copies just so I
25   can follow along, particularly if there's an objection.  So I

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1761**

```
 1    don't need the older ones, but if there's anything that's
 2    coming up today, if there's a way to get me a copy while the
 3    testimony is occurring, that would be helpful.
 4              THE COURTROOM DEPUTY:  We are ready.
 5              THE COURT:  We're ready, okay. Okay, I think that's
 6    all we need to discuss. We can call the jury in.
 7         Sorry, Mr. Nieto?
 8              MR. NIETO:  Just very briefly, Your Honor.  I just
 9    respectfully wanted to remind the Court that at 1:00 Judge
10    Xinis requires me for that Rule 11.
11              THE COURT:  Right, okay. So the idea is we sort of
12    do our lunch break either starting at 1 or maybe five minutes
13    before 1. How much time do you need before 1, do you think?
14              MR. NIETO:  Your Honor, my hope is like every other
15    plea we should be done within an hour. And I will be just
16    right next door.
17              THE COURT:  We'll stop no later than five minutes
18    before. Maybe ten -- I mean, I don't know if you're going to
19    meet with anyone before.
20              MR. NIETO:  It's fine, Your Honor. I'll work with
21    the Court's schedule.
22              THE COURT:  I mean, if we stop ten minutes before,
23    that's fine.  It just means that ideally we're done, you know,
24    ten, fifteen minutes after the 1:00 time which usually is the
25    case, but we can stretch it a little bit, if necessary. So
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1762**

```
 1        thanks for the reminder.
 2              MR. NIETO:  Thank you, Your Honor.
 3              THE COURT:  Okay, we'll bring the jury in.
 4              (Jury entered the courtroom at 9:12 a.m.)
 5              THE COURT:  Thank you, everyone. Please be seated.
 6    Welcome back, ladies and gentlemen, and I want to apologize
 7    for some of the possible confusion that occurred yesterday. As
 8    you're aware -- well, I don't know how much you're fully
 9    aware, but at the lunch break, one of your colleagues, Juror
10    No. 10, reported a medical issue and I think some of you were
11    still here, some of you had gone off to lunch.  And the
12    conclusion was that she should go off and seek attention.  And
13    given that we can't proceed without anybody, that's why you
14    were all released.  And I think if it had happened not during
15    lunch when everyone was here we would have explained that to
16    you at the time, but given that some people were here and some
17    people weren't, we just sort of informally told you to go
18    home. So I didn't mean to sort of shorten your day
19    unnecessarily, but that's the reason why we sent you home
20    early, not because of anything happening here but because of
21    that issue.
22          Now unfortunately we've learned that your fellow juror is
23    unable to join us today. I think she's okay, but she's not
24    able to join us today.  And again, since we can't proceed
25    without everyone having seen everything, we have concluded we
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1763**

 1   should proceed even without her. We have some extra -- we
 2   don't actually -- to deliberate we don't need all of you. Part
 3   of the reason why we have 16 of you is in the event of
 4   something like this exactly happening.  So it's not unusual
 5   for medical reasons or otherwise especially in a long trial
 6   like this one for a juror to unfortunately have to drop out.
 7   So we are able to continue, it just means that everyone here
 8   should do their best to stay available to us, but we're able
 9   to continue going forward. We'll just leave that seat open for
10   now and we'll sort out exactly where we are at the end of the
11   trial.
12       My understanding is even by us losing yesterday afternoon
13   we are either at or ahead of schedule to finish the evidence
14   in this case so it won't, I don't think, extend the trial any
15   longer. So with that explanation, we're ready to continue.
16       Mr. Hanlon, do you want to call the next witness in?
17           **MR. HANLON:**  Yes, Your Honor.  The United States
18   calls Ms. Julie Kempton to the stand.
19           **THE COURTROOM DEPUTY:**  Ms. Kempton, please come
20   forward. Please take the stand and remain standing.
21           **(Witness, sworn.)**
22           **THE COURTROOM DEPUTY:**  You may be seated, please.
23   Speak clearly into the microphone. Please state your first and
24   last name.
25           **THE WITNESS:**  My name is Julie Kempton.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1764**

```
 1              THE COURTROOM DEPUTY:  And please spell your first
 2    and last name for the record.
 3              THE WITNESS:  J-u-l-i-e   K-e-m-p-t-o-n.
 4              THE COURTROOM DEPUTY:  Thank you, ma'am.
 5              D I R E C T   E X A M I N A T I O N
 6    BY MR. HANLON:
 7    Q.   Good morning, Ms. Kempton.
 8    A.   Good morning.
 9              MR HANLON: Your Honor, at this time the Government
10    would move to admit the following exhibits: Exhibit 525, which
11    is a stipulation which I would seek permission to read in a
12    moment.
13              THE COURT:  Okay.
14              MR. HANLON:  Exhibit 449 and Exhibits 449A as in
15    alpha, through 449F as in Frank.
16              THE COURT:  Okay. Any issues with any of those?
17              MR. HAWKS:  No objection, Your Honor.
18              MR. NIETO:  No, Your Honor.
19              THE COURT:  Okay, so Exhibits 449, 449A through F
20    and 525 are in evidence.  And you want to read 525 now; is
21    that correct?
22              MR. HANLON:  Yes.  Thank you, Your Honor.
23              THE COURT:  Okay, we'll put that on the screen.
24              MR. HANLON:  Your Honor, reading the stipulation
25    which is now in evidence as Exhibit 525. Stipulation, DNA
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1765**

1    samples. The Government and the defendants, Scott Anthony

2    Williams and Taeyan Raymond Williams do hereby stipulate and

3    agree to the following: During the investigation of this case,

4    DNA samples were obtained from Keri Doyle and Roger Smothers,

5    mother and father of Noah Smothers. In addition, DNA samples

6    were obtained from Cole Smothers and Evan Smothers, brothers

7    of Noah Smothers. These DNA samples were utilized during the

8    DNA analyses that were conducted in this case.

9        And that stipulation, Your Honor, is as shown on the

10    document, signed by counsel for both parties.

11    **BY MR. HANLON:**

12    Q.    Ms. Kempton, good morning to you.

13    A.    Good morning.

14    Q.    What do you do for a living?

15    A.    I am a DNA analyst with the Maryland State Police Crime

16    Lab in Pikesville, Maryland.

17    Q.    And how long have you worked as a DNA analyst for the

18    Maryland State Police?

19    A.    I've been at that lab for 16 years.

20    Q.    What other law enforcement or lab analysis experience do

21    you have?

22    A.    Prior to going to the Maryland State Police I worked for

23    the Prince George's County Police Department for nine years,

24    also as a DNA analyst.  And prior to that I worked for

25    Cellmark Diagnostics for four years. That was a private DNA

1    testing company located in Germantown, Maryland.

2    Q.    What are your current job duties?

3    A.    I am a DNA analyst in the biology section. And the

4    biology section is responsible for analyzing serology and DNA

5    testing. My duties include receiving items of evidence that

6    are submitted for testing, maintaining the chain of custody on

7    those items, examining items of evidence for the presence of

8    body fluids or other materials that might contain DNA. I

9    perform DNA testing on those items. I review the work of other

10    analysts in our laboratory. I write reports on my findings and

11    I testify in court.

12    Q.    What is your educational background, Ms. Kempton?

13    A.    I have a bachelor's in chemistry from William and Mary. I

14    have a master's in chemistry from the University of British

15    Columbia and I have a Master of Forensic Science degree from

16    George Washington University.

17    Q.    Could you tell us a little bit about the lab you work

18    for, the Maryland State Police Forensic Science Division, its

19    accreditation, quality control measures, things like that?

20    A.    Our laboratory is accredited by ANAB which is a national

21    body that accredits forensic laboratories. An accreditation

22    means that the laboratory is audited for all of their

23    operations, for all of their personnel, all of their record

24    keeping. In DNA specifically, we are under standards that are

25    put out by the FBI called the quantity assurance standards for

```
 1   DNA testing laboratories. And those standards cover everything
 2   that a laboratory does:  The physical setup of the laboratory,
 3   where different things are done in the lab; the education and
 4   the training that the analysts have to have; all of the
 5   recordkeeping that we have to do; quality assurance, quality
 6   checks on our instruments and on the chemicals that we use. It
 7   covers every aspect of our testing. And we are, in fact,
 8   audited on an annual basis to make sure that we are in
 9   compliance with all of these quality control measures.
10   Q.   Ms. Kempton, just approximately how many DNA analyses,
11   how many times have you analyzed DNA or suspected DNA samples
12   in your career?
13   A.   It's in the thousands. Probably somewhere between 1 and
14   2,000.
15   Q.   And have you testified in court on these matters?
16   A.   Yes, I have.
17   Q.   Have you been qualified as an expert witness in other
18   courts?
19   A.   Yes, I have.
20   Q.   In what fields?
21   A.   I've been qualified as an expert in DNA -- I'm sorry, in
22   forensic serology and forensic DNA testing.
23          MR. HANLON:  Your Honor, at this time the United
24   States would offer Ms. Kempton as an expert in the fields of
25   forensic serology and short tandem repeat DNA analysis.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1768**

1          **MR. HAWKS:**  No objection.

2          **MR. GUILLAUME:**  No objection.

3          **THE COURT:**  Okay, the witness is qualified as an

4    expert in forensic serology and short tandem repeat DNA

5    analysis.

6    **BY MR. HANLON:**

7    Q.   Ms. Kempton, you anticipated one of my questions. What is

8    forensic serology?

9    A.   Forensic serology is the examination of biological fluids

10   as they might pertain to criminal evidence. In DNA testing, we

11   particularly look for the presence of three fluids: Blood,

12   semen, and saliva. And these are fluids that usually will

13   contain a lot of cells and DNA is found in the cells, so these

14   are the three body fluids that contain the most amount of DNA.

15        And we have some screening tests that we use in the

16   laboratory when we're looking for the presence of these three

17   biological fluids. Generally these are color tests where you

18   take a small amount of your sample, you apply certain

19   chemicals to it and if the -- if there's a color change

20   reaction, that indicates that there may be the presence of

21   that biological fluid.

22   Q.   Are there particular types of tests that your lab does to

23   detect the presence of blood?

24   A.   Yes. One of the tests is called a phenolphthalein test

25   that is used to detect blood.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1769**

```
 1    Q.    What is DNA?

 2    A.    DNA stands for deoxyribonucleic acid.  And it's the

 3    genetic material that's contained in the cells of every living

 4    creature that has all of the instructions that any living

 5    thing needs to carryon all of its process of being alive. A

 6    lot of times it's called the blueprint of life because it has

 7    all of the instructions and whether or not we're talking about

 8    a single cell bacteria, or a human being, or an elephant, or

 9    an oak tree, the DNA of that thing has all of the instructions

10    that it needs to carryon all of our processes of being alive.

11         In human beings, our DNA is over 99 percent identical

12    between every human being.  And that's why we all look like

13    human beings and we all do all the functioning that we need to

14    do to be alive as human beings. It's less than one percent of

15    our DNA that is different between people, but there's so much

16    information in our DNA that that less than one percent

17    accounts for all of the variability between human beings.

18    Every human being, unless you happen to be an identical twin,

19    has DNA that is unique to them. There has never been another

20    person, there will never be another person with the exact same

21    DNA as any individual.

22         So in looking at the variability in DNA, we can determine

23    between different people. We can distinguish the DNA of

24    different people.

25    Q.    Now you anticipated my next question. Does DNA vary from
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1770**

1    person to person or to what degree?

2    A.   It does vary between people, as I said, unless you have

3    an identical twin. Identical twins have identical DNA, but the

4    DNA of every other person is unique to that individual.

5    Q.   How does DNA get deposited by humans on objects?

6    A.   DNA can come from biological fluids as I described

7    earlier:  Blood, semen or saliva. DNA is also found in other

8    body fluids like sweat, but to a lesser degree.  And it can be

9    deposited either through a biological fluid or through touch

10   DNA which is -- so for example, if I lay my hands on this

11   surface up here I'm going to leave some DNA on it. How much I

12   leave depends on whether I washed my hands recently or how

13   long I touched it, a whole lot of factors. And whether or not

14   you would be able to detect my DNA on here also is controlled

15   by a lot of factors.

16        DNA can also be transferred by what's called secondary

17   transfer. So it has been shown that if I shake hands with a

18   person and then touch this surface, that I could possibly

19   leave some of that other person's DNA here. But again, the

20   amount of DNA that would be deposited and whether or not it

21   could be detected, there's a wide variety of factors that

22   influence whether or not you'd actually be able to detect

23   that.

24   Q.   So let me ask you a follow-up question about that.  Do we

25   always leave DNA on the surfaces that we touch?

```
 1    A.   Basically yes, but the amount that's left and whether or
 2    not it would be detected is controlled by such a large variety
 3    of factors that if you came and swabbed this surface right
 4    now, you might or might not pick up my DNA from it. And even
 5    though I have touched it, you might not get my DNA. So whether
 6    we get DNA from something or we don't does not necessarily
 7    mean that it did not come in contact with a person.
 8    Q.   Now in this particular case did you receive some items to
 9    examine in connection with this investigation?
10    A.   Yes, I did.
11    Q.   So let me show you --
12    A.   Excuse me.  May I have a cup of water, please?
13    Q.   Oh, yes, of course. A moment, please, Your Honor.
14    Approach the witness, Your Honor?
15              THE COURT:  Yes.
16              THE WITNESS:  Thank you.
17    BY MR. HANLON:
18    Q.   Let me bring up what is in evidence now as Exhibit 449.
19    Do you see this document in front of you, Ms. Kempton?
20    A.   Yes, I do.
21    Q.   Do you recognize this document?
22    A.   Yes.
23    Q.   Let me show you, this is page 1. And let me show you page
24    2. Do you recognize page 2 of the document?
25    A.   Yes.
```

1    Q.   Now, Ms. Kempton, your lab did a series of reports in

2    connection with this investigation; is that correct?

3    A.   Yes.

4    Q.   And I believe you have in front of you Exhibits 449A

5    through 449F. Are those the various reports?

6    A.   Um, yes.  Okay, yes.  I do have all six of those.

7    Q.   Exhibit 449 here, what information is shown in Exhibit

8    449?

9    A.   Exhibit 449 is a summary of some of the tables that are

10   contained within this report. So it shows some of the DNA

11   profiles that were obtained during the testing of items within

12   this case.

13   Q.   So let me go through some of these items here. First of

14   all, on the screen you've got over here on the far side we've

15   got something called Locus and then there's a series of

16   phrases that sort of run down the column.  Do you see that

17   now?

18   A.   Yes.

19   Q.   In the context of DNA analysis, what do we mean by Locus?

20   A.   Locus means a particular location in the DNA. When we do

21   our DNA testing, we don't analyze the entire DNA molecule. We

22   look at certain specific sections, and in this case 24

23   different locations in the DNA where people's DNA is known to

24   be variable between different people. And each of these

25   locations, each of these loci has a specific designation.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1773**

Kempton - direct                    VIII-21

1       So in that first column down the left where it says
2   "locus," each of those are the 24 different locations that we
3   actually analyze when we obtain a DNA profile.
4   Q.   Now the scientific language for those names, for purposes
5   of our work today, do those phrases have any special meaning?
6   A.   They have certain designations. For example, the very
7   first one says D3S1358. D3, D stands for DNA. 3 means it's a
8   chromosome 3 out of the 23 pairs of chromosomes that we have,
9   it's on chromosome 3. S means segment and 1358 just means that
10  it was the 1,358th segment that a biologist identified on
11  chromosome 3.
12      Some of the other locations, for example, the next one is
13  vWA. That's just like the common name that was given to this
14  particular location by one of the scientists who was studying
15  that chromosome. So for our purposes, for your purposes they
16  don't have a specific meaning, they're just -- it's kind of
17  like identifying a place on the map. So they're like the
18  coordinates on the map of the chromosomes of where each of
19  these locations are.
20  Q.   Let me ask you about these three items in this box. When
21  you receive items in your lab, Ms. Kempton, do you -- does the
22  lab assign its own exhibit or item numbers to the material
23  that it receives?
24  A.   Yes, we do. When the case comes into the laboratory,
25  first of all it's assigned a unique case number that's carried

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1774**

1    throughout all of the testing. And no matter which unit tests
2    it, all of the cases are -- all of the items of evidence have
3    that same unique case number. And then within each unit, each
4    item of evidence is given its own unique exhibit number and
5    that is carried through the testing.
6    Q.   In terms of the exhibit numbers, we've got lots of
7    numbers that kind of go back and forth, but here we've got
8    Exhibits 3, 4 and 5 from the lab. Let me show you the items on
9    the screen here. What is in evidence in this case is exhibit
10   687 is on the screen and I'll just need a moment to switch.
11   There are FSD exhibit numbers on the side there; is that
12   correct?
13   A.   Yes, that's correct.
14   Q.   So they include Exhibit 3?
15   A.   Yes.
16   Q.   And Exhibit 3 is described in your report if you've got
17   it handy as stain on back of rear passenger seat; is that
18   correct?
19   A.   That's correct.
20   Q.   With respect to Exhibits 4 and 5, they are part of
21   exhibit for this case 688 shown on the screen there.  And you
22   see the FSD Exhibits 4 and 5 there, ma'am?
23   A.   Yes, I do.
24   Q.   And those are described in your report as stain on rear
25   passenger seat under fabric with respect to item four and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1775**

1    stain on rear passenger door trim with respect to item 5; is

2    that correct?

3    A.    Yes, that's correct.

4    Q.    And finally, last item on this screen since it's on the

5    screen is Exhibit 41 -- or item 41 I should say corresponding

6    to Exhibit 689 for our case was identified as a water bottle;

7    is that correct?

8    A.    Yes, that's correct.

9    Q.    So what analyses, starting with items 3, 4 and 5 as shown

10   on Exhibit 449 here, ma'am, what testing analysis did you do

11   on those swabs?

12   A.    On items 3, 4 and 5 I first examined the swabs visually

13   to see if they had any staining on them and recorded the

14   staining that was present. And then I conducted our

15   phenolphthalein test which is a presumptive test for the

16   presence of blood.

17   Q.    Go ahead, ma'am.  I'm sorry.

18   A.    The phenolphthalein test involves taking a small cutting

19   or rubbing from an item, in this case from the swabs and then

20   we add a series of three chemicals to the cutting. And if we

21   very quickly see an intense pink color change, that is a

22   positive result for the phenolphthalein test and it indicates

23   the presence of blood. We say "indicates" because it's not a

24   definitive test for the presence of blood. There are some

25   other substances that can give false positives with this test,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1776**

1    but it's a good indication again to us that this substance
2    that has a reddish-brown color may, in fact, be blood.  So
3    it's a screening tool for us to help us often sometimes also
4    differentiate between a reddish-brown stain that might be
5    paint, or stain, or mud even with our wonderful Maryland clay
6    that we have. So reddish, a reddish-brown stain might be blood
7    and might not be. So it's a screening test we use to help us
8    determine whether something could be a blood stain.
9    Q.   And you conducted those kinds of tests with respect to
10   items 3, 4 and 5 which are parts of Exhibit 687 and 688 in our
11   case?
12   A.   Yes.
13   Q.   And what determinations did you make, Ms. Kempton, with
14   respect to items 3, 4 and 5 as seen on the screen here for the
15   presence of blood?
16   A.   I got a positive screening test for the presence of blood
17   on items 3, 4 and 5. So I got a positive reaction, a positive
18   color change on those items.
19   Q.   Now did you also create or did you examine the items for
20   a DNA profile?
21   A.   Yes, I did. I took a cutting from each of the swabs and
22   took that forward for DNA testing.
23   Q.   And what determinations did you make with respect to the
24   DNA profile?
25   A.   For each of these items, 3, 4 and 5 I obtained a single

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1777**

1    source DNA profile from one male individual and I obtained the

2    same DNA profile for each of those items.

3    Q.    Now ultimately let me jump to another item on the far

4    right of the screen. Did you also conduct analysis pertaining

5    to what was designated as item 6 which is in evidence in our

6    case as Exhibit 683 for our case?

7    A.    Yes, I did.

8    Q.    Let me show you on the screen briefly. Do you see that

9    item?

10   A.    Yes.

11   Q.    And again, it's labeled as FSD Exhibit Number 60, the

12   chain of custody?

13   A.    Yes, that's correct.

14   Q.    According to the reports, what was item number 6 listed

15   at per the reports?  And give me a moment to bring it back. A

16   moment, please, Your Honor. Back to Exhibit 449.  What was

17   item 6 that I showed you a moment ago?

18   A.    Item 6 was an Oral B toothbrush that was brought to the

19   lab to be a deduced known for Noah Smothers. So it was

20   presented to us as a toothbrush belonging to Noah Smothers

21   that we could use to get a DNA profile from that individual.

22   Q.    And were you able to develop a DNA profile for that

23   individual?

24   A.    Yes, I was. I took a swab and I swabbed around the

25   bristles on the toothbrush and used that to extract DNA and

1    obtain a DNA profile.

2    Q.   Now in terms of DNA profiles we see some numbers on our

3    scene here in Exhibit 449. What is entailed in developing a

4    DNA profile?

5    A.   DNA testing involves four steps. The first step is

6    extraction. And that's where we take a cutting of material or

7    a swab, something that we think is going to contain DNA and we

8    add chemicals that break apart the cells, release the DNA and

9    purify the DNA away from everything else, all the rest of the

10   cellular debris and the swab, whatever is there.

11        The second step is called quantitation and that's where

12   we take this DNA that we've purified and see how much human

13   DNA did we get. It gives us -- it's human specific, so it

14   tells us how much total DNA did we get. It also tells us what

15   percentage of that DNA is from a male because that can help us

16   make decisions about what kind of testing we might go forward

17   with.

18        The third step is called amplification. And this is a

19   copying process that allows us to take very small amounts of

20   DNA and make millions of copies of it. In your cells, every

21   time your cell divides to make new cells it has to copy the

22   DNA for the new cells.  And it does this by a process that's

23   called polymerase chain reaction, PCR. It's an enzyme in your

24   cells that makes a whole copy of your DNA every time they make

25   a new cell so your new cell has the DNA it needs. We can use

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1779

Kempton - direct                    VIII-27

```
 1    that same process in the laboratory to make millions of copies
 2    of certain sections of the DNA, the 24 sections of DNA that
 3    we're looking at. This lets us take a very small amount of
 4    DNA. So like a DNA stain the size of a head of a pin will have
 5    enough DNA that we can make copies of what we're looking at to
 6    get a DNA profile. And then the fourth step is detection.
 7    That's when we take this DNA that we have copied, we use an
 8    instrument that's called a genetic analyzer, and it sorts out
 9    all these pieces of DNA that we have copied and gives us a DNA
10    profile.  And that's what we can use to compare profiles from
11    items of evidence, to profiles from known individuals.
12         Now when we're talking about all these numbers that are
13    on there, we specifically do a kind of testing that's called
14    short tandem repeat or STR. There are sections of your DNA
15    that have a small section of DNA that's repeated a number of
16    times, one right after another. And what differs between
17    different people is how many times you have this little
18    section of DNA repeated.
19         And so a DNA profile is, in fact, a set of numbers. And
20    each of those numbers at each DNA location refers to how many
21    times this person or the stain from this evidence has these
22    little sections repeated at each location that we look at. So
23    that's in effect what all these numbers do.
24         Another thing about our testing is that it does not tell
25    you anything physical about the person. We're not testing
```

**JA1780**

Kempton - direct                          VIII-28

```
 1    anything that says that this person has brown hair or blue
 2    eyes or it's not the kind of testing that says this person's
 3    ancestors came from Germany.  It's not any of that kind of
 4    testing. The only thing physical that I can tell from my
 5    profile is whether there's a male or a female.
 6          One of the locations that's called amelogenin, for
 7    example in Exhibit 3, has an X and a Y. That's telling me that
 8    this profile is from a male.  If it was a female it would just
 9    have an X there.  But that's the only physical characteristic
10    that I can tell you about the person who deposited this DNA.
11    Q.   So all of these numbers on the screen here for each of
12    these items, are they each what examiners refer to as a DNA
13    profile?
14    A.   Yes, they are.
15    Q.   Now as part of your examination -- in fact, let me ask
16    you about one other item. Exhibit 41. Did you prepare a DNA
17    profile for Exhibit 41, a swab from a water bottle using the
18    process you just described?
19    A.   Yes, I did.
20    Q.   And with respect to Exhibit 41 -- and I'm making you jump
21    a bit, Ms. Kempton, it will be in your 10/23/2022 report if
22    that's useful -- you also made some findings and analyses
23    about that item; is that correct?
24    A.   Yes, I did.
25    Q.   And for the record, it is Exhibit 689. Apart from the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1781**

1    profile, did you make any specific determinations about number

2    of contributors or things like that?

3    A.    From item 41 I obtained a partial DNA profile from one

4    male individual. In this case I'm calling this profile

5    "partial" because I did not get results at all 24 of the

6    locations that we generally look at. There was a very low

7    amount of DNA that was obtained from the swab from the water

8    bottle. It was less than what we typically would call our

9    target amounts of DNA that we know will give us a full good

10   profile. So I didn't get results at all of the locations, but

11   I did get enough results to show me that it was from a male,

12   that it appeared to be from a single source and that there was

13   enough of a profile there that I could say that it was

14   consistent with the profile that I got from Exhibits 3, 4, 5

15   and also from Exhibit 6.

16   Q.    And let me ask you about that. Did you then compare all

17   of these DNA profiles, the items seen on the screen, the stain

18   on the back of the rear passenger seat, the swab from a stain

19   on the rear passenger seat under fabric, the swab from a stain

20   on the rear passenger door trim, a swab from a water bottle,

21   did you compare those profiles with each other and to the

22   profile from the Oral B toothbrush?

23   A.    Yes, I did.

24   Q.    And what findings did you make with respect to your

25   comparison?

```
 1   A.   Those profiles were all consistent with each other.
 2   Q.   Now what did you mean by "consistent with each other"?
 3   And using Exhibit 449, explain it to us. You may be able to
 4   write on the screen if it's useful.
 5   A.   Which one is 449?
 6   Q.   449 is the document--
 7   A.   Oh, the chart itself.  I'm sorry, I was thinking it was
 8   one of the items.
 9   Q.   No worries.
10   A.   When we compare a DNA profile, profiles against each
11   other, we look at each DNA location to see whether or not we
12   have gotten the same DNA types at each one of these locations.
13   So for example -- if you all have it in front of you, it's
14   probably easier for me to just direct you to what lines I'm
15   looking at.
16   Q.   You can write on the screen if you'd like. And feel free
17   to move the microphone a little bit closer to you. I know it's
18   a little bit awkward, ma'am. If it's useful to use the screen,
19   go ahead.
20   A.   So for example, the first line going across, it's
21   designated the Locus D3S1358.  And on each one of -- on each
22   one of these locations, in all of these items, I obtained a
23   type 16.
24        Now a little bit more about your genetics, you get half
25   of your DNA from your mother and half of your DNA from your
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1783**

 1    father. So in this case you get one copy of chromosome 3 from
 2    your mother, one copy of chromosome 3 from your father.  And
 3    you're either going to get the same type from each parent or a
 4    different type. It's kind of like A, B, O blood typing. If you
 5    get an A from one parent and a B from the other parent you'll
 6    be an AB. If you got an A from both parents you'll be an A.
 7    It's the same kind of thing. You can either get one type  -- a
 8    different type from each parent or the same type.
 9         So in any one individual at each of these DNA locations
10    you're either going to have one number or two numbers,
11    depending on whether you got the same type or a different type
12    from each parent.
13         So at the first location I obtained a 16. So that's the
14    DNA profile of these items at that location.
15         At the second location I obtained a 15, 18. So this
16    person got a 15 from one parent and an 18 from the other
17    parent. And if you look across for all the items on that row,
18    everything has a 15, 18 except item 41, the water bottle.  And
19    that has a 15 dash. As I said about the water bottle, it was a
20    very low amount of DNA that I got off of it and the dash means
21    that there may be other genetic information at this location
22    that I'm not seeing. Because the 15 was so low we kind of know
23    that it might be a 15 something else that we're not detecting.
24         So that in itself, it's not inconsistent with the other
25    items because the other items all have a 15, but it's so low I

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1784**

1   may be missing information. So when you go down the column for

2   number 41, you'll see that several of the locations have that

3   dash.

4   Q.   I didn't mean to take away all your arrows, Ms. Kempton,

5   I apologize.

6   A.   No, that's fine because they were going to get a little

7   cluttered.

8        So the third line, D16 is what we call the location. I

9   obtained a 12 from item 3, a 12 from item 4, a 12 from item 5.

10  I called it a 12 dash for item 41 because again, it was very

11  low. I saw a 12. There might be something else there, there

12  might not be. But with very low data we allow for the

13  possibility there might be something else there. And from item

14  6 I also got a 12.

15       So when we compare profiles, we go down each location

16  individually and we go down the entire profile to see whether

17  or not we got the same types at every location. And that's how

18  we determine whether items could have come from the same

19  source.

20  Q.   Now I'm not going to ask you all the rows here, but did

21  you follow that same process for all the rows?

22  A.   Yes, I did.

23  Q.   And was there anything on these as shown in Exhibit 449

24  on this first page that caused you to find that these items

25  came from different sources?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1785**

1    A.    No.  All of these profiles are consistent with each

2    other.

3    Q.    Now let me show you, move to page 2 of Exhibit 449. Do

4    you also -- I believe I've already asked you if you recognize

5    this page. Is this another batch of similar data from this

6    case?

7    A.    Yes, it is.

8    Q.    All right. Let me show you some items, just bear with me,

9    ma'am . Your items 9 and 10, I'm going to show you Exhibit 692

10   for this trial. Do you see this Chain of Custody form in front

11   of you, ma'am?

12   A.    Yes, I do.

13   Q.    And FSD items 9/10 which are listed on Exhibit 692 are

14   listed here as a swab of suspected stain from a spring recoil

15   tube on a Sig Sauer handgun; is that correct?

16   A.    Yes.

17   Q.    And FSD item 10 on this exhibit is a swab of a stain from

18   the inside barrel on a Sig Sauer handgun; is that correct?

19   A.    Yes.

20   Q.    Also I won't flip to the document, but another item from

21   this page that I'll show you about is from Exhibit 694 for our

22   case.  Bear with me. Showing you 694, what your lab marked as

23   item 14 was a swab from a stain from the magazine catch, slide

24   catch and decocking lever of an item; is that correct?

25   A.    Yes.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1786**

1   Q.   You also examined what your lab marked as Exhibit or as
2   item 28 and in evidence as Exhibit 696. Taking a look at this
3   item, do you recognize this item?
4   A.   Yes, I do.
5   Q.   And this is a swab from a stain of the inner slide of a
6   Sig Sauer handgun; is that correct?
7   A.   That's correct.
8   Q.   Let me jump back then to Exhibit 449. So using Exhibit
9   449 as a guide, could you please talk to us about the analyses
10  and profile work you did for items 9, 10, 14 and 28 -- we can
11  go through them one at a time -- which are in evidence as
12  Exhibit 692, 694 and 696.  And 9, 10 and 14 for your
13  reference, ma'am, I think are in the 8/21, 2018 report.
14  A.   Yes, they are. I'm also going to work off of my report to
15  make sure that I get the conclusions exactly right.
16       First of all, the results from items 9, 10 and 14 are
17  mixtures of DNA from more than one person. One way that we
18  can-- well, there are a couple ways that we can determine that
19  a DNA profile is a mixture rather than being from a single
20  person. When we get the data for these DNA profiles off of our
21  genetic analyzer instrument, each of the items of data are
22  peaks on a graph. They're essentially peaks on a graph. And
23  these peaks have height. If we are just seeing DNA from a
24  single person, those peaks will generally be about the same
25  height. If we have some peaks that are much taller than

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1787**

```
1    others, this may be an indication that we have DNA from more
2    than one person where there's more DNA from one person than
3    from another person, so there's a big variation in the height.
4         The other thing that can tell us that we have a mixture
5    of DNA is how many DNA types we're seeing at each location. As
6    I said before, any single person is going to have either one
7    or two types at every DNA location because you either get the
8    same one from both parents or a different one from each
9    parent. So if we're seeing three or four or five types at a
10   single DNA location, this is an obvious sign to us that we
11   have DNA from more than one person in this mixture.
12        And when we have mixtures, there are a few different
13   kinds of conclusions we can make. If there's a lot more DNA
14   from one person we may be able to say there's a major
15   contributor, so there's a lot more DNA from one person than
16   anyone else in this mixture.  And we can essentially treat a
17   major contributor profile like it's a single source.  We say
18   this is the single source person that we have in this.
19        Sometimes there may be more DNA from one person, but it's
20   not as much as a major contributor. In that case we may call a
21   significant contributor.  So it's more than one, but it's not
22   standing out as much as a major. Sometimes we can't make any
23   conclusions at all about a mixture because the types are too
24   similar to one another, we may be missing some low-level
25   genetic information, so we may not be able to make any kind of
```

1    conclusions at all.

2        With regard to items 9, 10 and 14, each of these was

3    determined to be a mixture of DNA. In the case of 9 and 14 we

4    said that there were at least two contributors including a

5    major male.  On item 10 there were at least three

6    contributors. Again, there was a major male contributor in

7    these items.

8        And what you see on this chart is, so for example, at the

9    first location there's a 16 and then there's a dash in

10   parentheses. The parentheses mean lower level. The 16 is the

11   major person, parentheses means there's other stuff. In this

12   case we didn't detect any other stuff, but because it's a

13   mixture we're accounting for the fact that there's some other

14   stuff there we're probably not detecting.

15       On number 10 at the first location there's a 16, then a

16   14/15 dash in parentheses. That says we have a lot of this

17   person who is a type 16.  We also see a 14 and a 15 much lower

18   and there's probably also some other stuff we're not seeing.

19   So that's what the parentheses and the dashes and everything

20   mean.

21       So the numbers that are not in parentheses, that's the

22   major contributor profile.  And in each of these items we

23   obtained a major contributor male profile.

24   Q.   Now is it sometimes the case that you can prepare a full

25   profile for one contributor, but you're not able to develop a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1789

```
 1    full profile for other contributors, ma'am?  Or enough to do a
 2    comparison I should say.
 3    A.    Yes.  Sometimes you can -- you may not have enough to do
 4    a comparison. Sometimes you may not be able to determine the
 5    major contributor at every one of the 24 locations that we
 6    look at. Usually according to our protocols, in order to say
 7    someone is the major contributor there has to be at least four
 8    times as much DNA from that person as from anybody else in the
 9    mixture. So their peaks have to be at least four times as tall
10    as anybody else's peaks in this data. If we don't have that
11    much of a separation at a particular location, then we won't
12    call a major contributor at that particular location, but we
13    still have a major contributor in the overall profile.
14    Q.    So let me ask you about the Sig Sauer recoil tube item
15    which is on the screen which is one of the swabs in Exhibit
16    692. What profile and observations and conclusions did you
17    make with respect to that item?
18    A.    This is my Exhibit 9, right?
19    Q.    Yes, I'm sorry. It's on the screen in front of you. It
20    will be listed as item 9.
21    A.    So from Exhibit 9 I obtained a major contributor DNA
22    profile at all of the locations that I tested. And that DNA
23    profile was consistent with the profile from the deduced known
24    of Noah Smothers, the profile from the toothbrush.
25    Q.    And again, in terms of the process of making those
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1790**

```
 1   comparisons, is it similar to what you've already testified
 2   about with respect to the other items?
 3   A.   Exactly. We look at what types were gotten at each
 4   location and we look at all of the locations to see whether or
 5   not the types are consistent.
 6   Q.   How about item 10 on your screen, the Sig Sauer inside
 7   barrel which for the record is corresponding to trial exhibit
 8   692?
 9   A.   I obtained a major contributor profile from this item at
10   all of the locations except one. There was one location where
11   I could not pull out the major contributor. But at all of the
12   other locations there was a major male contributor that was
13   consistent with the profile from item 6, the toothbrush.
14   Q.   Ms. Kempton, I should ask you, all of the items you're
15   talking about were tested in your lab by either you or one of
16   your colleagues; is that correct?
17   A.   Yes.
18   Q.   And talking about "I" or "the lab" generally, are you
19   referring to both the work you may have done as well as work
20   done by your colleague?
21   A.   Yes.
22   Q.   And forgive me, that was item 10?
23   A.   That was 10.
24   Q.   And I'm sorry if I missed it, did you do a comparison of
25   the Sig Sauer inside barrel with the toothbrush that we've
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1791**

1    discussed previously?

2    A.   Yes, and that was -- the major contributor from item 10

3    was consistent with the profile from the toothbrush.

4    Q.   And how about what is listed here as item 14, Sig Sauer

5    levers which corresponds to our trial Exhibit 694?

6    A.   I obtained a major contributor profile from that item.

7    The major contributor was distinguished at all of those

8    locations that we tested and that major contributor profile is

9    the same as the profile from the toothbrush.

10   Q.   Did you receive swabs from the Sig Sauer inner slide

11   corresponding to your item 28 which is part of Trial Exhibit

12   696?

13   A.   Yes.

14   Q.   And what findings did you reach with respect to that

15   item?

16   A.   I obtained a single source male profile from the swab

17   from the inner slide and I compared that profile to the

18   profile from the toothbrush and those profiles were

19   consistent.

20   Q.   Did you conduct any kind of blood analysis for that item,

21   the Sig Sauer inner slide, ma'am?

22   A.   Yes, I did. I performed our screening test for blood on

23   the swab from the inner slide and I got a positive result in

24   my test for blood.

25   Q.   Now one of the things that the lab will sometimes do and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1792**

```
 1    you did in this case are to do comparisons against known
 2    reference samples; is that correct?
 3    A.    That's correct.
 4    Q.    You've referred to the toothbrush a couple times today as
 5    a deduced known. Can you tell the jury what you mean by a
 6    deduced known?
 7    A.    A deduced known means that we don't have a DNA sample
 8    that we know specifically to be from this person. When we get
 9    a known standard, usually they are oral swabs. So someone has
10    gone up to the person whose DNA we need, you take a swab which
11    essentially looks like a long Q-tip, swab the inside of the
12    mouth, package it, seal it up, maintain a chain of custody so
13    we call it a known standard. It was witnessed that this swab
14    came out of this person's mouth, so we call it a known
15    standard from that person.
16         In this case we were given a toothbrush that was said to
17    belong to Noah Smothers, but it's not an actual known in terms
18    of having been physically taken from that person at that time.
19    So we treat that a little bit separately in our laboratories.
20    We call it a deduced known. It's given to us saying that this
21    is from this person, but it doesn't have the same
22    identification ability as a swab that was physically taken
23    from a person's mouth.
24    Q.    You also received some particular reference samples from
25    identified people in the case which were marked as items for
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1793**

1    your lab; is that correct, ma'am?

2    A.    That's correct.

3    Q.    And again, let me ask you some specifics. Item 7 which I

4    believe is in evidence as Exhibit 702 was a law enforcement

5    reference sample. Does that sound correct, ma'am?

6    A.    Yes.

7    Q.    Item 13 which I believe is in evidence as 703 was a known

8    reference sample from an individual named Scott Williams. Does

9    that sound correct?

10   A.    That's correct.

11   Q.    Your item 29 which is in evidence as Exhibit 704 is a

12   known reference sample from Taeyan Williams. Does that sound

13   correct?

14   A.    Yes, that's correct.

15   Q.    And items 35 and 36 --

16   A.    Yes.

17   Q.    --are known reference samples from Evan Smothers and from

18   Cole Smothers, so that's correct?

19   A.    35 is from Cole Smothers, 36 from Evan Smothers, yes.

20   Q.    Apologies, I had those numbers mixed up.  Sorry about

21   that.  Is that correct?  A moment, please, Your Honor.

22        So did you conduct any kind of testing with your items

23   with respect to the reference samples I just rattled off?

24   A.    Yes, I did. I obtained DNA profiles from all of those

25   reference standards and compared them to the profiles that I

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1794**

Kempton - direct                      VIII-42

```
1    had obtained from the items of evidence that I had tested.
2    Q.   And let me ask you about Exhibits 3, 4 and 5 and 41. What
3    were your conclusions with respect to the reference samples I
4    just rattled off?  And I'll ask you about a particular couple.
5    Did you do comparisons for the law enforcement reference
6    sample and Scott Williams with respect to item 3, the swab
7    from the stain in the back side of the rear passenger seat?
8    A.   Give me a moment to find that in my report.
9    Q.   Of course. Your 8/21/2018 report.
10   A.   Right. Yes, I did do these comparisons and with regards
11   to items 3, 4 and 5, law enforcement elimination standard one
12   and Scott Williams were excluded as being the source of the
13   profile from items 3, 4 and 5.
14   Q.   Did you conduct a similar test for the known sample from
15   Taeyan Williams?  And I don't want to have to jump around too
16   much, Ms. Kempton, that was in your 12/4/2019 report.
17          THE COURT:  Mr. Hanlon could you check your
18   microphone and just make sure you're near it and it's on?
19          MR. HANLON:  Yes. I'm so sorry, Your Honor.
20          THE COURT:  Thank you.
21          THE WITNESS:  Yes.  I obtained a profile from the
22   standard from Taeyan Williams, compared that to the profiles
23   obtained from items 3, 4 and 5. Taeyan Williams was excluded
24   as the source of that DNA profile.
25   BY MR. HANLON:
```

**JA1795**

1    Q.   And did you also do a reference for the known DNA swabs

2    from Cole Smothers and Evan Smothers that I asked you about a

3    moment ago referencing your April 5, 2020 report?

4    A.   Yes.  Cole Smothers and Evan Smothers were also both

5    excluded as the source of the DNA from items 3, 4 and 5.

6    Q.   With respect to items 4 and 5, did you do similar

7    reference checks for the law enforcement reference sample for

8    Scott Williams, for Taeyan Williams, for Cole Smothers and

9    Evan Smothers and again reach exclusion conclusions for those

10   various items?

11   A.   Yes.  All of the other individuals that were tested were

12   excluded as the source of the DNA from those items.

13   Q.   And similar with the same result with respect to Exhibit

14   41 on your list, the water bottle swab?

15   A.   Yes.  All of the individuals that I tested were excluded

16   as the source of the DNA from the water bottle.

17   Q.   Did you do similar reference checks with respect to your

18   items 9, 10, 14, 28 on the second page of Exhibit 449?

19   A.   Yes, I did. And all of the other individuals that I

20   tested were excluded as the source of -- well, in the case

21   when I had a mixture, they're excluded as the major

22   contributor of the DNA from items 9, 10 and 14 and they were

23   excluded as the source of DNA from item 28.

24   Q.   And let me ask you about that on that contributor issue.

25   You've testified previously that there were multiple

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1796**

1    contributors for some of these items; is that correct?

2    A.    That's correct.

3    Q.    With respect to the major contributor for each of these

4    items, you've already testified about those today; is that

5    right?

6    A.    Yes.

7    Q.    With respect to the other contributors, the ones who were

8    not the major contributors for all of these items, did you

9    have enough genetic information?  Was there enough DNA to be

10   able to reach a conclusion one way or the other about who

11   might be the source for the non-major contributor of DNA on

12   those items?

13   A.    In each of those cases where I had mixtures, I can't make

14   any conclusions about the minor portions of those profiles.

15   They're very low level. There's probably genetic information

16   that I'm not detecting. So the minor portions of those

17   profiles aren't suitable for comparison to anyone.  So I can't

18   make any kind of conclusions about who might or might not be

19   minor contributors in those profiles.

20   Q.    And in the case of instances where there was only one

21   contributor seen on the items, you've testified about your

22   comparisons with the toothbrush; is that correct?

23   A.    That's correct.

24   Q.    Did you also conduct an examination of what was listed --

25   it's not on the screen, but an item 20 in your lab which is in

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1797**

```
 1    evidence as Court's Exhibit 699, a swab from a duffle bag?
 2    And it will be referenced in your 8/21/2018 report.
 3    A.    Yes, I did. I examined a swab from the tech support
 4    duffle bag.
 5    Q.    And what conclusions did you make about the swab from the
 6    tech support duffle bag?
 7    A.    From the duffle bag I obtained a DNA profile from at
 8    least four contributors. Again, I can tell that by counting up
 9    how many types I have at any one DNA location. So if I have
10    eight types somewhere, then I know there has to be at least
11    four people in this mixture. And I was able to determine that
12    there was a significant contributor present in that DNA
13    profile. As I said before, significant contributor means that
14    there's one person who's present at higher levels, but it's
15    not so much that I can call out like a single source major.
16          In this case there was -- there were at least two males
17    present and there was a significant contributor.  And the
18    profile from the toothbrush could not be excluded as that
19    significant contributor to the profile from item 20.
20    Q.    Now you've talked about how items could be consistent
21    with each other and how items could be excluded from each
22    other. What's the difference between those types of things and
23    two items that cannot be excluded from each other?
24    A.    Can't be excluded is a term that we would use when we
25    can't say that it's specifically coming from a specific person
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1798**

1    or a specific single source. It's very similar to consistent,
2    though, in this case. Can't be excluded means that all of the
3    types that are present from the significant contributor are
4    also present in the profile that I got from the toothbrush.
5    So there's nothing in there that would exclude them from being
6    from the same source, but it's not sufficient to make a single
7    identification.
8    Q.   You also did some exclusion comparisons with respect to
9    the swab from that duffle bag; is that correct?
10   A.   That's correct.
11   Q.   And did you do an exclusion comparison for the law
12   enforcement reference sample and Scott Williams, for example?
13   A.   Yes.  The law enforcement standard and Scott Williams
14   were both excluded as the significant contributor to the swab
15   from the duffle bag.
16   Q.   And how about Cole Smothers and Evan Smothers?
17   A.   They were also excluded as that significant contributor
18   to the duffle bag.
19   Q.   Just one moment, please, Ms. Kempton. Did you also do a
20   comparison with the known reference for Taeyan Williams with
21   respect to the tech support duffle bag?
22   A.   Yes, I did. Taeyan Williams was also excluded as the
23   significant contributor to the DNA profile from the duffle
24   bag.
25   Q.   Now let me ask you a couple of more questions in a more

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1799**

```
 1    summary way. There was -- did you receive a variety of other
 2    items that you examined in this case either for DNA profiles
 3    or to make a determination as to whether or not comparisons
 4    could be done between those profiles and other items?
 5    A.   Yes, I did.
 6    Q.   Let me ask you about a few batches of material. Did you
 7    examine a swab from a rear passenger seat release lever which
 8    is marked by your lab as Exhibit 1 and I believe is in
 9    evidence as Court's Exhibit 687?
10    A.   Yes.
11    Q.   Did you also review an item 17, Court's Exhibit 698, a
12    swab from a Beretta handgun?
13    A.   Yes.
14    Q.   And again, not that these items have anything to do with
15    each other, but what general conclusions did you reach about
16    those items?
17    A.   From my Exhibit 1 and Exhibit 17, I obtained a DNA
18    profile from at least three contributors, including at least
19    one male contributor.  But these mixtures were not suitable
20    for comparison.  Because of the nature of the mixture, I could
21    not compare those profiles to any known individuals and make
22    any conclusions about inclusion or exclusion.
23    Q.   Why is it that there's sometimes not enough to make a
24    comparison?  What makes a sample unsuitable?
25    A.   If we have DNA from a lot of individuals that are all
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1800

```
 1    around the same level as each other, then we can't make a
 2    comparison because we don't know what specific types might be
 3    coming from which person. If I have -- at one location if I
 4    have an 11, 12, 13, 14 and 15 and they're all around the same
 5    height, I can't say that that 13 is coming from this specific
 6    person or that 14 is coming from another specific person. So
 7    since we can't pull out individual types that could be coming
 8    from an individual person, we just -- we can't make a
 9    comparison.
10         Also, if they're very low level we may be missing some of
11    that genetic information, not detecting it. So the fact that
12    there's some -- might be some types that we're not detecting
13    also makes it unsuitable for us to compare to any individuals.
14    Q.   Let me rattle off another list of items for you.  Your
15    items 2, 8, 11, 12, 16 and 22, which I believe reference our
16    Exhibits 687, 693, 692 and 697 and they are swab from a front
17    seat adjustment lever, swab of stains from a Sig Sauer above
18    the phrase P228, swab of black magazine, swabs from grips and
19    trigger, swab from six cartridge magazines, and swabs from a
20    license plate and license plate screws. Did you conduct
21    analyses of swabs from those items?
22    A.   Yes, I did.  And for each of those items I obtained a
23    partial DNA profile from one or more contributors and those
24    profiles also were not suitable for comparison to any known
25    individuals.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1801**

1    Q.   For the same reasons as before?

2    A.   Yes.

3    Q.   How about items 15, 18 and 21 corresponding to I believe

4    Exhibit 695, 698 and 699, swab from both sides of a slide of a

5    handgun, slides from a Bryco handgun and swabs from a JP Sport

6    duffle bag. And if I have these numbers messed up, Ms.

7    Kempton, my apologies.  But did you conduct analyses on swabs

8    from those items?

9    A.   Those items were tested. Each of those items gave a

10   partial profile from at least two contributors.  At least one

11   of those contributors was male and those mixtures were not

12   suitable for comparison.

13   Q.   How about your items 19 -- your item 19 corresponding to

14   Exhibit 698, a swab from an AK-47?

15   A.   I obtained a partial DNA profile from at least three

16   contributors. At least two of those contributors were male,

17   but I could not make any other conclusions from that mixture

18   because it was, again, not suitable for comparison to any

19   individuals.

20   Q.   Did you examine swabs from item or items 37, 38, 39 and

21   40, corresponding to Exhibits 691 and 690, basically some

22   knives and knife-related handles and blades, things like that?

23   A.   Yes, I did examine those items and performed DNA testing

24   on them. Items 37, 38 and 40 -- excuse me. I obtained human

25   and male DNA from items Exhibit 37, 38 and 40 in my

1  quantitations, however the amount of DNA that I got from those
2  was so low that I didn't take them forward for DNA testing. I
3  just stopped because our studies have shown that I would not
4  get usable profiles from those items. Item 39 I did take
5  forward for DNA testing. I obtained a partial DNA profile -- I
6  obtained a partial DNA profile from one male contributor. That
7  profile was suitable for comparison.  However, all of the
8  individuals that I tested, so that's the profile from the
9  toothbrush, law enforcement elimination standard one, Scott
10  Williams, Taeyan Williams, Cole Smothers and Evan Smothers are
11  all excluded as the source of that DNA profile from item 39.
12  Q.   Which is one of the knife items; is that correct?
13  A.   Yes.  That's the swab of the blade from the black and
14  silver folding pocketknife.
15  Q.   Now Ms. Kempton, I've had you jump around to various
16  reports today on various dates and my apologies for that.
17  Sometimes the reports would reference some of the same items
18  that were referenced in previous reports; is that correct?
19  A.   That's correct.
20  Q.   Is it correct that if you reference item 5 and its
21  comparison to item 6 in one report, you might reference item 5
22  for a different comparison later on, but you're not
23  necessarily going to repeat all of your reports in every
24  single report; is that fair to say?
25  A.   That's correct. Because of -- because I had several

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1803**

```
 1    different reports in this, whenever I got a new person, a new
 2    person standard and analyzed that, I then went back and
 3    compared it to the profiles that I had previously tested that
 4    I could compare it to. So in each of my later reports, if
 5    there's a known person, a new known person, I would compare
 6    that person's profile against evidence profiles that had
 7    already been reported in the previous reports.
 8    Q.   So series reports, do any of them change the summary of
 9    conclusions that we've been talking about in Exhibit 449
10    today?
11    A.   No.
12    Q.   And, in fact, the items in 449, are they basically copies
13    from a couple of different spots in a couple of different
14    reports?
15    A.   Yes, they are. They're a summary from tables in several
16    reports.
17    Q.   Now going back to Exhibit 449, let me ask you about one
18    final thing. Do you ever conduct statistical analysis as part
19    of your work?
20    A.   Yes, we do. When we have a DNA profile from an item of
21    evidence, we can do a statistical calculation that estimates
22    how common or rare we would expect that particular profile to
23    be in different population groups. So specifically it's okay,
24    I have this DNA profile. How likely is it if I picked a random
25    person off the street that this person could have the same
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1804

```
 1    profile that I have gotten from this item of evidence?  And we
 2    do this by using a statistical database that has the
 3    frequencies for all of the different DNA types that I might
 4    get from a various -- in a particular profile. And using those
 5    frequencies we come up with a frequency for the overall
 6    profile.  And that is how rare would I expect this profile to
 7    be in the population groups that we look at which are U.S.
 8    Caucasians, African Americans, and U.S. Hispanics so I can
 9    take this profile that I have and do a calculation for the
10    frequency of the overall profile.
11    Q.   Now did you do that statistical comparison calculation
12    with respect to your conclusions with respect to the exhibits
13    listed here, your items 3, 4, 5, 6, 9, 14 and 28 with the
14    toothbrush?
15    A.   Yes, I did.
16    Q.   And what were the statistical conclusions that you
17    reached with respect to those items?
18    A.   So with respect to the profile that I obtained from these
19    items, and when it's a mixture this is referring to the major
20    contributor profile, the probabilities of selecting an
21    individual at random that would be consistent with that DNA
22    profile are approximately 1 in 250 septillion U.S. Caucasians;
23    1 in 13 nonillion African Americans, and 1 in 530 septillion
24    U.S. Hispanics.
25    Q.   Now Ms. Kempton, for those of us who aren't super great
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1805**

1    with numbers, can you tell us how many zeros there would be in

2    250 septillion?

3    A.    So 250 septillion would be 250 followed by 24 zeros.

4    Q.    How about nonillion?

5    A.    Nonillion would have 30 zeros.

6    Q.    Did you conduct a similar statistical analysis with

7    respect to Exhibit 10, swab from a stain inside the barrel?

8    A.    Yes, I did.

9    Q.    And what statistical conclusions did you reach?

10   A.    Because Exhibit 10 was the one where there was one

11   location where I couldn't call a major contributor, so I can't

12   include that location in the statistic for the overall

13   profile.  So these numbers are a little different than the

14   ones I mentioned for the other items.  But with respect to

15   Exhibit 10, the probability of selecting a random that would

16   be consistent with that major contributor profile are 1 in 62

17   septillion U.S. Caucasians, 1 in 1.2 nonillion African

18   Americans, and one in 150 septillion U.S. Hispanics.

19   Q.    And I already asked you about septillion and nonillion;

20   is that correct?

21   A.    Yes.

22   Q.    Finally, did you do a similar statistical analysis with

23   respect to the swab of an empty Deer Park water bottle?

24   A.    Yes, I did.

25   Q.    Let me exit out real quick, ma'am, making it a little bit

1    bigger. Can you tell us about your statistical analysis for
2    the Deer Park water bottle swab?
3    A.   Yes.  In this case the Deer Park bottle was -- I got a
4    partial profile.  Because it had low levels of DNA I didn't
5    get results at all of the DNA locations. So this -- the
6    statistical calculation for that profile is only at the
7    locations where I obtained the full DNA profile of that
8    contributor. And in this case using the Loci where I obtained
9    the full profile, the probability of selecting an individual
10   at random consistent with that profile are 1 in 4.3
11   quadrillion U.S. Caucasian; one in 25 quintillion African
12   Americans; and one in 6.3 quadrillion U.S. Hispanics.
13   Q.   And it's a little blurry there, Ms. Kempton, I apologize
14   for that.  Are you able to tell us how many zeros there would
15   be in a quadrillion?
16   A.   Quadrillion would have 15 zeros following the number.
17   Q.   And how about quintillion?
18   A.   Quintillion has 18 zeros.
19   Q.   Ms. Kempton, do you know offhand the approximate
20   population of the United States?
21   A.   The U.S. population is approaching 350 million, I
22   believe.
23   Q.   Is a million -- strike that. Do you know offhand the
24   approximate population of the world?
25   A.   That's about 8 billion.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1807**

1    Q.   A moment, please. Your Honor, I believe that's all my
2    questions on direct examination.
3              THE COURT:  Okay, thank you. Who wants to go first?
4              MR. GUILLAUME:  Your Honor, I'll ask brief
5    questions.
6              THE COURT:  Mr. Guillaume.
7              C R O S S - E X A M I N A T I O N
8    BY MR. GUILLAUME:
9    Q.   Good morning, ma'am.
10   A.   Good morning.
11   Q.   I just have a few questions for you just to clarify a
12   couple of things. You talked about known standards in this
13   case?
14   A.   That's correct.
15   Q.   In this case you had a known -- you had a number of known
16   samples; is that correct?
17   A.   Yes.
18   Q.   A known sample would be as you explained, if I submitted
19   to an oral swab and then you had my DNA on the swab
20   thereafter, correct?
21   A.   Correct.
22   Q.   And then you would take that swab and be able to test it
23   against other items that may or may not have my DNA; is that
24   right?
25   A.   That's right.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1808**

```
 1    Q.    And using me as an example, when you take my swab, the
 2    DNA of course is invisible to the human eye; is that right?
 3    A.    Yes.
 4    Q.    And that swab when it's in the lab, am I correct -- I
 5    want to make sure I understand this correctly -- has literally
 6    millions of my DNA or the material that makes DNA -- I'm
 7    sorry, I'm not using scientific terms -- on it?
 8    A.    Yes.  So it would have your cells and each cell is going
 9    to have a full copy of your DNA.  And a swab from your mouth
10    is going to have many, many cells, yes.
11    Q.    So there's more than enough material there on my swab for
12    you to test it repeatedly, if necessary; is that right?
13    A.    That's correct.
14    Q.    Okay. And that doesn't -- that swab doesn't have a shelf
15    life?  In other words, the DNA -- I know there's a variety of
16    conditions that can determine that, but in theory under the
17    right conditions my DNA will remain on that swab indefinitely,
18    correct?
19    A.    Yes.  DNA is generally very stable.
20    Q.    Including hundreds, thousands, and millions of years, in
21    theory?
22    A.    Theoretically, yes.
23    Q.    Okay. And for example -- just one or two more questions.
24    In that example that I just gave, when you go back to that
25    swab to test against whatever item, just so I make sure I
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1809**

```
 1   understand your testimony from earlier, if I am excluded from
 2   an item it means that my DNA is not present on that item at
 3   all, correct?
 4   A.   It means that the profile that I detected, that you are
 5   excluded as the source of that, yes.
 6   Q.   Okay, yes. Let me try to understand you correctly. And
 7   if, for example, you do not have a standard to work from, you
 8   need -- I guess let me ask the question this way. You need a
 9   standard from which to work from whether it be known or in the
10   other example you gave, I forgot the term you used, but let's
11   just stick with the knowns to make it more simple. If you
12   don't know that it's my known standard and you test an item
13   and I'm on the items but if you don't have my standard, then I
14   would show up in a test as unknown; is that right?
15   A.   That's correct.
16   Q.   Okay, thank you. No further questions.
17            THE COURT:  Okay.  Mr. Hawks?
18            MR. HAWKS:  Thank you.
19              C R O S S - E X A M I N A T I O N
20   BY MR. HAWKS:
21   Q.   Ma'am, just following up on that, you talked about each
22   cell has a complete copy. Each human cell has a complete copy
23   of that person's DNA?
24   A.   Most of our cells, yes. Cells that have a nucleus do.
25   Q.   And a human cell, I think we all know this, but a human
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1810**

```
 1   cell is microscopic. It's extremely tiny?
 2   A.   That's correct.
 3            MR. HAWKS:  Thank you.  Nothing further.
 4            THE COURT:  Okay.  Any redirect, Mr. Hanlon?
 5            MR. HANLON:  Briefly, Your Honor.
 6            R E D I R E C T   E X A M I N A T I O N
 7   BY MR. HANLON:
 8   Q.   Ms. Kempton, I want to make sure I understand something
 9   about exclusion. You were asked a couple of questions about
10   this on cross-examination.
11            MR. HAWKS:  Your Honor, object as it's beyond the
12   scope.
13            THE COURT:  Well, I think Mr. Guillaume mentioned
14   exclusion, so let's see where it goes.  Thank you. Overruled.
15   BY MR. HANLON:
16   Q.   When dealing with excluding reference samples with a
17   sample that has multiple contributors, there were several
18   instances in this case where you had a major contributor and
19   some non-major contributors; is that correct?
20   A.   Correct.
21   Q.   With respect to some of the -- with respect to the
22   exclusions you did, I believe you testified that you excluded
23   various people in this case as the major contributors?
24   A.   Yes.
25            MR. HAWKS:  Your Honor, I object to the form of the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1811**

1    question.

2            **THE COURT:**  Leading?  Okay, sustained. Why don't you

3    rephrase.

4    **BY MR. HANLON:**

5    Q.   With respect to the multiple contributor cases, were you

6    able to reach any conclusions, whether exclusion, comparison,

7    anything with respect to the DNA that was not coming from the

8    major contributors in those cases?

9            **MR. HAWKS:**  Your Honor, I just object.  Confusing.

10           **THE COURT:**  Overruled. The jury can decide.

11   **BY MR. HANLON:**

12   Q.   That may be the case, Ms. Kempton, but hopefully you

13   understand my question.

14   A.   In the cases where I had mixtures with major contributor

15   and minor contributor, the minor contributor portions, whether

16   it be from maybe one person or multiple people, they were not

17   suitable for a comparison to anyone. So I could not say

18   whether any person could or could not have been part of that

19   minor contributor portion of those profiles.

20           **MR. HANLON:** Thank you, ma'am. Thank you, Your Honor.

21           **THE COURT:**  Anything just on that from defense

22   counsel?

23           **MR. GUILLAUME:**  No, Your Honor.

24           **MR. HAWKS:**  No, sir.

25           **THE COURT:**  All right, Ms. Kempton, thank you so

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1812**

1  much for coming to testify. We appreciate it and you are free
2  to step out now.  Thank you.
3          **THE WITNESS:**  Thank you, Your Honor.
4          **(Witness, excused.)**
5          **THE COURT:**  Is the next witness a long or a short
6  witness?
7          **MR. HANLON:**  Not super long, Your Honor.  Not -- I
8  would say not five minutes, but not lengthy. Somewhere in the
9  middle.  I'm sorry, Your Honor, somewhere in the middle.
10         **THE COURT:**  I think we've learned from our jury that
11 they would rather sort of take breaks earlier even though
12 there may be a long stretch after that break before we get to
13 lunch, so just so everyone understands that. Okay, so why
14 don't we take the mid-morning break now.
15     There is as I was just alluding to, I think some
16 scheduling issues that will mean that we're going to take the
17 next section up until not quite, but close to 1:00 and so
18 probably be a couple hours when you come back.  So everyone
19 understanding that, we'll see you back here in 15 minutes.
20 Again, don't discuss the case among yourselves, just keep an
21 open mind. We'll see you back here in 15 minutes. Thank you.
22         **(Jury exited the courtroom at 10:39 a.m.)**
23         **THE COURT:**  Thank you, everyone. Please be seated.
24 Just to clarify, Mr. Hanlon, the next witness, is it -- who is
25 it?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1813**

1           MR. HANLON:  It is Romy Franco, Your Honor.  She's
2    another DNA examiner.  She will testify about the parent/child
3    comparison. She examined Noah Smothers' parents' DNA, compared
4    them to the toothbrush profile.
5           THE COURT:  So not examining the samples from the
6    Kia or the firearm?
7           MR. HANLON:  That's correct.
8           THE COURT:  Mr. Crawley?
9           MR. CRAWLEY:  I'm just trying to figure out why we
10   can't stipulate to some of this, Your Honor.  I'm just having
11   a hard time with that, but I'm just trying to figure out.
12          THE COURT:  Sure.  Well, I mean, it sounds like it's
13   not lengthy apparently and then -- I'm not -- honestly, I'm
14   not an expert on this stuff obviously.  I'm not totally sure.
15   What is going to -- what's her conclusion going to be?
16          MR. HANLON:  Her conclusion was that the profile
17   from the toothbrush was consistent with a parent/child
18   relationship with the known reference sample from the two
19   parents.
20          THE COURT:  I see. Okay, but not with respect to the
21   brothers, that analysis wasn't done?
22          MR. HANLON:  The brothers were analyzed as part of
23   our last witness' testimony as those various exclusion
24   samples, Your Honor.
25          THE COURT:  And maybe I, again, this may or may not

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1814**

1    matter because I don't think there was anything specifically

2    in evidence, but just out of curiosity, so obviously there has

3    been no claim that any of the brothers were in the cars. Was

4    it just to say that they weren't in these locations or does

5    that have something to do, again, with being able to be more

6    or less likely that it was Noah Smothers that was there?

7         **MR. HANLON:**  So Your Honor, the reference samples

8    from Cole Smothers and Evan Smothers were compared against the

9    toothbrush.  It's in one of the reports.  I'm not sure I

10   covered it in as much detail as I should have with the

11   witness, but it's in the reports that are in evidence. And

12   they were excluded as the toothbrush contributors, if memory

13   serves.

14        **THE COURT:**  So for example, between the two you'll

15   show that the toothbrush person is probably -- or there's a

16   likelihood of being a child of the parents, but not the

17   brothers.

18        **MR. HANLON:**  Correct, Your Honor.

19        **THE COURT:**  I got you. Okay. Well again, I mean, on

20   the one hand, Mr. Crawley, maybe you're not disagreeing with

21   it, on the other hand generally speaking within reason,

22   obviously either side has the right to either choose to

23   stipulate or not and so that's where we are.

24        **MR. HANLON:**  Your Honor, just so the Court is aware

25   we did -- Mr. Crawley did raise the possibility of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1815**

```
1    stipulations yesterday. And we did discuss it with the
2    defense. A few weeks ago we had sort of talked about various
3    stipulations and the DNA and we hadn't really been able to
4    reach a resolution.  So I appreciate the defense's willingness
5    to stipulate. We already had the witness coming in and what I
6    will try to do is move quickly.  If it's acceptable to the
7    Court and the defense I will provide the witness with a copy
8    of her report as a reference sample for lack of a better word,
9    and perhaps we can move through it relatively quickly.
10           THE COURT:  Okay, no.  Again, we're ahead of
11   schedule. Both sides have the right to either want to have the
12   live testimony or not within reason, of course, so we'll hear
13   from them. We'll see you all back here in 15 minutes.
14           MR. HANLON: Thank you, Your Honor.
15           (Recess was taken from 10:42 to 10:59 a.m.)
16           THE COURT:  So I think we can have the next witness
17   come into the courtroom if she's not already here.
18           MR. HANLON:  She is, Your Honor.
19           THE COURT:  And we can bring the jury in.
20           (Jury reentered the courtroom at 1:00 p.m.)
21           THE COURT:  Good morning, again.  Please be seated.
22   So we're ready to continue with another witness. Mr. Hanlon.
23           MR. HANLON:  Your Honor, the United States calls Ms.
24   Romy Franco to the stand.
25           THE COURTROOM DEPUTY:  Please come forward to the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1816**

 1    witness stand, remaining standing and raise your right hand.
 2                **(Witness, sworn.)**
 3                **THE COURTROOM DEPUTY:**  You may be seated, please.
 4    Speak clearly into the microphone.  Please state your first
 5    and last name.
 6                **THE WITNESS:**  My name is Romy Franco.
 7                **THE COURTROOM DEPUTY:**  And please spell your first
 8    and last name for the record.
 9                **THE WITNESS:**  R-o-m-y  F-r-a-n-c-o.
10                **THE COURTROOM DEPUTY:**  Thank you.
11              **D I R E C T   E X A M I N A T I O N**
12    **BY MR. HANLON:**
13    Q.   Good morning, Ms. Franco.
14    A.   Good morning.
15    Q.   What do you do for a living, ma'am?
16    A.   I'm a senior forensic analyst and assistant technical
17    leader at the University of North Texas Center for Human
18    Identification in Fort Worth, Texas.
19    Q.   And what are your duties?  What do you do in that
20    position?
21    A.   As a senior analyst, I examine evidence such as skeletal
22    remains and select samples for DNA testing. I perform
23    autosomal, STR, YSTR and mitochondrial DNA testing. I analyze
24    genetic data. I write and review laboratory reports and I
25    enter DNA profiles into a DNA database maintained by the FBI

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1817**

1    laboratory, and I provide expert witness testimony.
2    Q.   How long have you been in your current position?
3    A.   I've been at the Center for Human Identification for
4    almost eight years.
5    Q.   Could you tell us a little bit, Ms. Franco, about your
6    training and educational background?
7    A.   I have a bachelor of science in genetics from Texas A & M
8    University and a master of science in forensic genetics from
9    the University of North Texas Health Science Center in Fort
10   Worth, Texas. Prior to joining the Center for Human
11   Identification I was a DNA analyst at a private DNA testing
12   laboratory in Dallas, Texas called Cellmark Forensics for ten
13   years. It was also known as Orchid Cellmark prior to a name
14   change. I received on-the-job training prior to working on any
15   case work samples at Cellmark and that training was
16   approximately, like, six months and I specialized in
17   mitochondrial DNA testing.  And prior to working any case work
18   at the Center for Human Identification I also had to undergo
19   training which involved working mock samples through the
20   laboratory and analyzing practice data before I was competent
21   and signed off to be a qualified DNA analyst.
22   Q.   Ms. Franco, what is the University of North Texas Center
23   for Human Identification?
24   A.   We are a laboratory that provides DNA testing services
25   for law enforcement agencies within the state of Texas and we

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1818**

```
 1   also have a unit that performs anthropological analysis on
 2   skeletal remains samples. We have a forensic unit that
 3   performs DNA testing on cases from sexual assaults, to
 4   homicides, to burglaries.  And then I'm a member of the
 5   missing persons unit where we perform DNA testing on
 6   unidentified human remain samples such as bones, teeth, hair,
 7   blood, and we also perform DNA testing on known samples from
 8   family members that have a missing person.
 9   Q.   Now I'm going to ask you about that in a moment, but let
10   me ask you a couple of questions about yourself first. You
11   mentioned you've testified in trials or hearings; is that
12   correct?
13   A.   I have previous expert witness testimony, yes.
14   Q.   And you've testified as an expert witness; is that
15   correct?
16   A.   Yes.
17   Q.   In what fields have you been qualified by Courts as an
18   expert witness?
19   A.   In DNA.
20   Q.   Can you tell us just approximately how many DNA
21   examinations that you've worked on during the course of your
22   time with the University of North Texas Center for Human
23   Identification?
24   A.   I've worked thousands of cases.
25              MR. HANLON: Your Honor, the United States would
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1819**

1    tender Ms. Romy Franco as an expert witness in the field of

2    DNA analysis.

3            **MR. HAWKS:**  No objection, Your Honor.

4            **MR. GUILLAUME:**  No objection.

5            **THE COURT:**  Okay, Ms. Franco is qualified as an

6    expert witness in DNA analysis.

7            **MR. HANLON:**  Thank you, Your Honor.

8    **BY MR. HANLON:**

9    Q.   Ms. Franco, can you tell us a little bit about the

10   specific issues of DNA analysis as it pertains to missing

11   persons cases or family reference samples?

12   A.   Yes.  In our unit we are looking to help in the

13   identification of unknown samples from human origin. And the

14   majority of these samples that we test are bone samples,

15   skeletal samples. And if a family member has a missing person,

16   we can also test known samples from those family members as

17   well. And our purpose is to try to find a DNA genetic

18   association between unidentified profiles obtained from

19   skeletal samples, as well as those known samples.

20   Q.   How would you normally, if a person was not missing, how

21   do you obtain a known DNA sample from a person?

22   A.   A known DNA sample is a sample that is voluntarily

23   collected and submitted from a family member and it's usually

24   a swabbing of the inside of their cheek.

25   Q.   In the cases of missing persons, however, are there other

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1820**

```
 1   ways to obtain information about a missing person by family
 2   reference samples?
 3   A.   We can -- by using family reference samples we can
 4   establish a possible biological relationship between an
 5   unknown sample and the known samples from family members.
 6   Q.   Does your organization sometimes or has it in the past
 7   provided assistance to law enforcement agencies in Texas or
 8   outside of Texas?
 9   A.   Yes. Currently we are only testing samples within the
10   state of Texas due to funding, but in the past we had federal
11   funding that allowed us to test samples outside of the state
12   of Texas.
13   Q.   And was it providing assistance to an out-of-state law
14   enforcement agency that brings you to court today?
15   A.   Yes, it is.
16   Q.   What were you asked to do or your organization, what were
17   you asked to do in connection with this case that you're here
18   to testify about?
19   A.   So we received samples from two family members that had a
20   missing relative and those two family reference samples were
21   submitted to us from Maryland State Police. And the reference
22   samples that came to us was a sample from Keri Doyle, mother
23   of the missing person, Noah Smothers, and another sample that
24   was submitted to us from Roger L. Smothers representing the
25   father of a missing person, Noah Walter Smothers.
```

1    Q.    And what did your organization or you do upon receiving

2    these family reference samples?

3    A.    These samples are received by our evidence unit and they

4    log in the case, fill out the essential paperwork and then

5    assign these samples a unique identifier that follows that

6    sample throughout the entire laboratory process.

7    Q.    Now at some point did you prepare DNA profiles for those

8    family reference samples?

9    A.    Yes. So those samples were cut and then we performed

10   autosomal STR testing on both samples and then we also

11   performed mitochondrial DNA testing on the sample of the

12   mother from the missing person, Keri A. Doyle and we obtained

13   genetic profiles from those samples.  And we were asked to

14   compare those profiles to a profile that was submitted to us

15   from the Maryland State Police.

16   Q.    Now this other profile that you mentioned that was

17   provided to you by the Maryland State Police, can you tell us

18   about what that sample, what information was provided to you

19   by the Maryland State Police?

20   A.    The profile that was submitted to us from the Maryland

21   State Police was reported to be Exhibit 6, which was an Oral B

22   toothbrush, Noah Smothers' deduced known.

23   Q.    Did you conduct any comparison analysis between the two

24   family reference samples that you mentioned a moment ago and

25   the toothbrush deduced Noah Smothers' profile that you

1    mentioned a moment ago?

2    A.    Yes.  We were asked to compare the profiles obtained from

3    the mother and father of a Noah Smothers, to the profile

4    obtained from the toothbrush and to establish whether there

5    could be a parent/child relationship.

6    Q.    And did you conduct that comparison?

7    A.    Yes, we did.

8    Q.    How did you go about doing that?

9    A.    Since a child of two individuals is expected to share

10   half their DNA from their mother and half their father, we

11   looked at all the profiles and determined that a parent/child

12   relationship -- that there was consistency with the profile

13   from the toothbrush having a parent/child relationship with

14   those two other individuals.

15   Q.    And just so we're clear for the record, Ms. Franco, can

16   you tell us the direction in which the parent/child

17   relationship went?  In other words, was the toothbrush the

18   parent or the child?  Were the family reference samples, were

19   they the parent or the child?  Can you clarify?

20   A.    Sure.  The parent reference samples would be the parent,

21   the known mother or father of the missing person and then the

22   profile obtained from the toothbrush would be representative

23   of a child of those two individuals.

24   Q.    During these kinds of examinations, Ms. Franco, do you

25   sometimes come up against or come up with a bio phenomenon

1    called mutation?

2    A.    Yes.

3    Q.    What is mutation?

4    A.    A mutation is a change in the DNA sequence that would be

5    inherited by that child. And in this case, the profiles were

6    consistent with having a parent/child relationship.  However,

7    we did note that there was a single Locus mismatch between the

8    samples and the child.

9    Q.    Now is this notion of a mutation or a difference or

10   whatever between parent DNA and child DNA, is this something

11   that occurs in nature?

12   A.    Yes.  It was something that had occurred and that was

13   inherited by the child.

14   Q.    Anything unusual -- strike that. Have you encountered

15   this in the past in your work?

16   A.    Yes.  We've seen mutations occur in the past.

17   Q.    Do you account for it in your conclusions and in the

18   statistical analyses that I'm going to ask you about in a

19   moment?

20   A.    Yes.  We do take into account the mutation event having

21   occurred.

22   Q.    Now Ms. Franco, are you able to conduct a statistical

23   analysis based on the comparison work that you've done in this

24   case?

25   A.    Yes. So because there was the -- because the genetic data

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1824**

1    obtained from the profile obtained from the toothbrush, as

2    well as the family reference samples are consistent with

3    having a parent/child relationship, we have to provide a

4    statistical weight to that genetic association. And in this

5    case, we performed a statistical analysis which accounted for

6    a single Locus mutation. And that calculation is called a

7    likelihood ratio. And during this statistical analysis, we are

8    comparing two scenarios:  One in which the profile obtained

9    from that toothbrush originated from a child of those two

10   individuals, the mother and father of Noah Smothers as opposed

11   to that profile obtained from a toothbrush relating to some

12   unrelated individual in the Caucasian population.

13   Q.   And what statistical conclusion did you arrive at with

14   respect to those two scenarios?

15   A.   So taking into account that a Locus mutation had occurred

16   and given the genetic data, we concluded that it's

17   approximately 39 million times more likely that the profile

18   obtained from the toothbrush originated from a child of Keri

19   A. Doyle and Roger L. Smothers than if the profile obtained

20   from that toothbrush originated from an unrelated individual

21   from the Caucasian population.

22           MR. HANLON:  A moment, please, Your Honor?  Nothing

23   further on direct examination. Thank you, Ms. Franco.

24           THE COURT:  Okay. Any cross-examination?

25           MR. GUILLAUME:  No, Your Honor.  Thank you.

```
 1              MR. HAWKS:  No, Your Honor.  Thank you.

 2              THE COURT:  Okay, Ms. Franco, thank you very much

 3    for coming to testify. I hope you have a safe trip back to

 4    Texas. Thank you very much for coming.

 5              (Witness, excused.)

 6              THE COURT:  Okay, Mr. Moomau, who is our next

 7    witness?

 8              MR. MOOMAU:  Next witness would be Sergeant Kyle

 9    Simms.

10              THE COURT:  Okay.

11              THE COURTROOM DEPUTY:  Please raise your right hand.

12              (Witness, sworn.)

13              THE COURTROOM DEPUTY:  You may be seated, sir.

14    Please state your first and last name.

15              THE WITNESS:  Kyle Simms.

16              THE COURTROOM DEPUTY:  And please spell your first

17    and last name for the record.

18              THE WITNESS:  K-y-l-e   S-i-m-m-s.

19              THE COURTROOM DEPUTY:  Thank you, sir.

20              MR. MOOMAU:  Your Honor, at this time the Government

21    would move for the admission of Exhibits 158, 160, 161, 164A,

22    166 through 171, 175, 186 through 192, 303, 319, 320, 321,

23    324, 448, 450, 451, 453 through 459, 462, 468, 525B which is a

24    stipulation, 528, 534 and 535.

25              THE COURT:  Any issues?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1826**

```
1                    MR. HAWKS:  No, Your Honor.
2                    MR. NIETO:  No, Your Honor.
3                    THE COURT:  Okay. So all those exhibits are in
4        evidence. 158, 160, 161, 164A, 166 through 171, 175, 186
5        through 192, 303, 319, 320, 321, 324, 448, 450, 451, 453
6        through 459, 462, 482, 525B, 528, 534 and 535. Go ahead.
7                    MR. MOOMAU:  Thank you, Your Honor.
8                    D I R E C T   E X A M I N A T I O N
9        BY MR. MOOMAU:
10       Q.   Sir, you've previously testified during this trial,
11       correct?
12       A.   Yes, sir.
13       Q.   Just for refreshing, when were you assigned this case?
14       A.   I was assigned primary investigator on May 3, 2018.
15       Q.   And sir, as part of the investigation of this case, was
16       cellular location data obtained for various numbers?
17       A.   Yes, sir.
18       Q.   And can you tell us what you need as an investigator to
19       get cellular location data?
20       A.   Typically a search warrant.
21       Q.   And what else do you need as far as a -- do you also need
22       a phone number?
23       A.   Yes.
24       Q.   And to get a search warrant for location data for a
25       particular number, what do you need to establish?
```

```
 1    A.    Um, probable cause.
 2    Q.    As far as cellular location data, as an investigator with
 3    the Maryland State Police, are you aware of any limitations
 4    there are to obtaining cellular location data?
 5    A.    Generally the main limitation would just be retention
 6    period for the company that you're requesting records from.
 7    Q.    And what about the way a case develops compared to the
 8    retention time?
 9    A.    Sometimes you're not aware of certain devices and phone
10    numbers until after the records have already been purged
11    essentially from the company's system.
12    Q.    Sir, I would like to show you what's been admitted as
13    Exhibit 387. Showing you what's been admitted -- Court's
14    indulgence. Now showing you what's been admitted as Exhibit
15    387, I'd like to go to page 4 of that. Looking at the number
16    "Taeyan son," you recognize that number?
17    A.    Yes, sir.
18    Q.    And was that one of the numbers that cellular location
19    data was obtained for?
20    A.    Yes, sir.
21    Q.    Now showing you on the same document under record 2 the
22    name Shelly, was cellular location data also obtained for that
23    particular number?
24    A.    Yes.
25    Q.    Is that number 301-404-3782?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1828**

```
 1    A.   Yes, sir, it is.
 2    Q.   And also showing you on the same document which is 387
 3    under record four, for the name Ricky Carty, 301-538-5546, was
 4    cellular location data also obtained for that particular
 5    number?
 6    A.   Yes, sir.
 7    Q.   Now I'd like to show you what's been admitted as -- well,
 8    are those all three names and numbers that you recognize as
 9    far as the investigation of this case?
10    A.   Yes, sir.
11    Q.   Now taking you to Exhibit 338. Under the -- do you
12    recognize this document?
13    A.   Yes, sir.
14    Q.   All right. Showing you under number 6, "Dad 2," do you
15    recognize that?
16    A.   Yes, sir.
17    Q.   And that number there, 301-655-2283, was cellular
18    location data obtained for that particular number?
19    A.   Correct.
20    Q.   Now showing you what's been admitted as Exhibit 177.
21    Looking at the number there right beside the SMS, you
22    recognize that particular number?
23    A.   Yes, sir.
24    Q.   Who is that number related to?
25    A.   The victim, Noah Smothers.
```

Simms - direct                                    VIII-77

1    Q.   And is this one of the numbers that cellular location
2    data was obtained for in this case?
3    A.   Yes, sir.
4    Q.   Sir, during the testimony and during this trial there's
5    been discussion about a phone that was used by Noah Smothers
6    and it was described as encrypted, jail broken, different
7    phrases. Were you able to obtain any cellular location records
8    for that device?
9    A.   No.
10   Q.   Why not?
11   A.   We were never able to identify a phone number associated
12   with that device.
13   Q.   And sir, as part of the investigation of this case did
14   the Maryland State Police take custody of a Kia Sportage?
15   A.   Yes, sir.
16   Q.   And whose Kia Sportage was that?
17   A.   It was owned by Enterprise, but rented to the victim,
18   Noah Smothers.
19   Q.   And do you remember the date that that was taken custody
20   of?
21   A.   By the Maryland State Police?
22   Q.   Or by you.
23   A.   May 9, 2018.
24   Q.   And were any other items taken into I guess police
25   custody on that particular date?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1830**

```
 1    A.    Yes.
 2    Q.    And did that include a water bottle and a pair of boots
 3    that were in the vehicle?
 4    A.    That's correct.
 5    Q.    And did you take custody of those?  What did you do with
 6    those?
 7    A.    I got custody of them from the Maryland Transportation
 8    Police, transported them to the Maryland State Police evidence
 9    room.
10    Q.    Just for the record, what size were the boots?
11    A.    Size 15.
12    Q.    And where was the Kia Sportage taken?
13    A.    Kia Sportage was transported from Enterprise to the
14    Maryland State Police Forensic Laboratory in Pikesville.
15    Q.    Sir, as part of the -- this case and your work on the
16    case, did you obtain motor vehicle license information for
17    both Taeyan Williams and Scott Williams, the defendants?
18    A.    That's correct.
19    Q.    Showing you Exhibit 160. Do you recognize this?
20    A.    Yes, sir.
21    Q.    And as far -- what is Exhibit 160?
22    A.    Again, just a copy of the driver's license record for Mr.
23    Scott Anthony Williams.
24    Q.    And as far as his height, what was that listed at in the
25    Maryland motor vehicle records?
```

```
 1    A.    Five foot, eleven inches.
 2    Q.    Now showing you Exhibit 161. Do you recognize Exhibit
 3    161?
 4    A.    Yes, sir.
 5    Q.    And what is Exhibit 161?
 6    A.    It's a driver's license record for Mr. Taeyan Raymond
 7    Williams.
 8    Q.    And what is his height listed on the Maryland Motor
 9    Vehicle Administration records?
10    A.    Five feet, nine inches.
11    Q.    And do both of these documents, did both of them list --
12    as far as 161, does that list Mr. Taeyan Williams' date of
13    birth?
14    A.    Yes.
15    Q.    And what is that?
16    A.    ████ 1994.
17    Q.    And I didn't ask you this, but going back to 160, did
18    that list the date of birth for Mr. Scott Williams?
19    A.    Yes, sir. ████ 1976.
20    Q.    And sir, during the investigation did you learn about a
21    business that was named Super Auto Works?
22    A.    Yes, sir.
23    Q.    What was that?
24    A.    It was just a business, I guess operated by Scott Anthony
25    Williams.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1832**

1    Q.   Where was it located?

2    A.   I believe it was 5006 Cook Road in Beltsville, Maryland.

3    Q.   And were records subpoenaed and obtained from the

4    Maryland Department of Assessment and Taxation about the

5    status of that particular business?

6    A.   Yes, sir.

7    Q.   Showing you Exhibit 518. Do you recognize Exhibit 518?

8    A.   Yes, sir.

9    Q.   Whose name was that business in, according to the record?

10   A.   Pattiann Chaplin.

11   Q.   And looking down at the bottom of the page, what was the

12   date that the business was established?

13   A.   It's stamped as 3/12/2015.

14   Q.   Now turning to page 5 of the document, is there any

15   indication as to when the business was terminated?

16   A.   Document states 10/13/2017.

17   Q.   And sir, during the investigation did you learn about a

18   company known as KryptAll?

19   A.   Yes, sir.

20   Q.   And where is KryptAll located?

21   A.   Los Angeles, California.

22   Q.   I'd like to show you Exhibit 31, what's been admitted as

23   Exhibit 31. Do you recognize Exhibit 31?

24   A.   Yes, sir.

25   Q.   And just for the record, what is Exhibit 31?

Simms - direct                                         VIII-81

```
 1   A.   It's a laminated card that had been found in the
 2   residence of Noah Smothers in Susquehanna, Pennsylvania.
 3   Q.   And is there an iCloud account listed on Exhibit 31?
 4   A.   Yes, sir, kiPhone127999@iCloud.com.
 5   Q.   Did you do anything to try to get information on-line
 6   about or -- did you do a search, an iCloud search warrant for
 7   that account?
 8   A.   Yes, sir.
 9   Q.   Taking you to Exhibit 479. Going to page 2, line 6.
10   What's this information?
11   A.   This is basically the same information that we saw on the
12   card listing the same kiPhone127999@iCloud.com.
13   Q.   And where did this information that we're looking at now
14   come from?
15   A.   From the -- I believe it was the contacts from that
16   iCloud return.
17   Q.   Now I'd like to show you what's been admitted as Exhibit
18   378. Do you recognize Exhibit 378?
19   A.   Yes, sir.
20   Q.   What is Exhibit 378?
21   A.   This was a note saved in Taeyan Williams' cell phone.
22   Q.   And is there anything in that particular note that
23   relates to the last exhibit you talked about?
24   A.   Yes, sir.  It was the phrase "kiPhone164171."
25   Q.   And during the investigation of this case, did you do
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1834**

1    anything to try to find out if there was such a KryptAll or

2    kiPhone account ending in 164171?

3    A.    Yes, sir.

4    Q.    And what did you do there?

5    A.    We requested records from KryptAll directly and obtained

6    purchase history for that device.

7    Q.    I'd like to show you Exhibit 164A. Do you recognize this

8    document?

9    A.    Yes, sir.

10   Q.    And what is shown on Exhibit 164 -- or excuse me, 164A?

11   A.    So this is what was provided from the company, KryptAll

12   as far as the information regarding that account

13   kiPhone164171.

14   Q.    Does it have -- on the first page, what type of

15   information is included on there?

16   A.    The date it was activated, the model of the phone, the

17   IMEI, serial number, as well as login information.

18   Q.    And what was the activation date?

19   A.    October 18, 2017.

20   Q.    Then going on the second page, what's this information?

21   A.    Again, just similar to the first page, just an invoice

22   providing information about the purchase of that device.

23   Q.    Purchased under the name of --

24   A.    John.

25   Q.    Thank you. While working on this case, at some point did

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1835**

```
 1    you seek some information or records from a business known as
 2    the Red Roof Inn?
 3    A.   Yes, sir.
 4    Q.   The particular Red Roof Inn that you were seeking
 5    information from, where was it located?
 6    A.   It was located in Laurel at roughly the intersection of
 7    Route 295 and 197.
 8    Q.   All right.  I'd like to show you what's been admitted as
 9    Exhibit 554. Do you recognize Exhibit 554?
10    A.   Yes, sir.
11    Q.   And what is -- just tell us what it is.
12    A.   Just an aerial view of the Red Roof Inn.
13    Q.   During your investigation of this case did you go there?
14    A.   Yes, sir.
15    Q.   And you've seen what's around there and what it looks
16    like?
17    A.   Yes, sir.
18    Q.   And the parking and everything like that?
19    A.   Yes, sir.
20    Q.   How is the parking?
21    A.   It's sufficient, surrounding the building.
22    Q.   People park outside of the rooms or do you have to go in
23    to get to a room?
24    A.   Park outside.  I believe there is access to the rooms
25    from the exterior of the building.
```

```
1    Q.    Okay.  And this particular Red Roof Inn, how far is it
2    from the residence where the search was conducted, Bristolwood
3    Court?
4    A.    It was about a mile.
5    Q.    And did you obtain any lodging records by subpoena in
6    reference to the Red Roof Inn?
7    A.    Yes, sir.
8    Q.    And did you find records for any time period for either
9    Scott or Taeyan Williams or Noah Smothers?
10   A.    I attempted to obtain the records for that, yes.
11   Q.    Okay. Showing you what's been admitted as Exhibit 462. Do
12   you recognize 462?
13   A.    Yes, sir.
14   Q.    What is 462?
15   A.    It's showing multiple check-ins at that Red Roof Inn
16   under the name of Scott Williams.
17   Q.    And what were the dates of those?
18   A.    3/14/2018, 3/15/2018 and 4/25/2018.
19   Q.    Did you also check for the dates April 5, 2018 and April
20   6, 2018?
21   A.    Yes, sir.
22   Q.    And what were your findings for those dates?
23   A.    We received a list of names of people that were checked
24   into the hotel at that time.
25   Q.    And anyone, Scott Williams, Taeyan Williams, Noah
```

1    Smothers or anyone else that related to the investigation of

2    the case that you knew of, did you see those names in the

3    record?

4    A.    I checked the list. There were no names that were

5    obviously known to me in the investigation found on that list.

6    Q.    And sir, are you familiar with the term "iCloud"?

7    A.    Yes, sir.

8    Q.    Just in general, tell us what it is.

9    A.    Generally it's a backup of information, typically related

10   to Apple devices that's stored remotely for the user.

11   Q.    And was one of the accounts that you obtained iCloud data

12   for, was it Gucciforlife@iCloud.com?

13   A.    Yes, sir.

14   Q.    And what did you -- what was the manner or the legal

15   process that was used to obtain data from the iCloud accounts

16   that you did as part of this case?

17   A.    The search warrant.

18   Q.    I'd like to show you what's been admitted as Exhibit 516.

19   I'd like to go to -- yes, page 2, excuse me. Was this one of

20   the accounts that data was obtained for?

21   A.    Yes, sir.  Gucciforlife@iCloud.com.

22   Q.    And the documents you're looking at in front of you or at

23   least the page of the document on Exhibit 516, what is that,

24   what part of the information that was received is that?

25   A.    This is for the I guess subscriber information or account

1    information for that address, I guess.

2    Q.    And what was the name on the account?

3    A.    Dennis Bell.

4    Q.    And the day phone?

5    A.    301-655-2283.

6    Q.    Are you familiar with that number?

7    A.    Yes, sir.

8    Q.    Is that one of the numbers we had shown an exhibit about

9    earlier?

10   A.    Yes, sir.

11   Q.    And the address?

12   A.    10301 Bristolwood Court, Laurel Maryland, United States.

13   Q.    And sir, we had talked a little earlier about information

14   from an iCloud account that you had checked. I think it was

15   kiPhone127999. Is that one of the iCloud accounts that you had

16   obtained a search warrant for?

17   A.    Yes, sir.

18   Q.    I'd like to show you Exhibit 479. Do you recognize this

19   document?

20   A.    Yes, sir.

21   Q.    And just what is it?

22   A.    This is contact information associated with the account,

23   127999.

24   Q.    I'd like to go to number 9. Do you recognize this, I

25   guess the entry that was in number 9?

Simms - direct                    VIII-87

```
 1    A.    Yes, sir.
 2    Q.    And had you seen that number before -- well, read out the
 3    phone number that's connected to -- well, first of all, what's
 4    the contact name in number 9?
 5    A.    The letters MW.
 6    Q.    And what's the phone number listed for that number?
 7    A.    001-929-290-6897.
 8    Q.    Have you seen that number anyplace else as part of the
 9    investigation?
10    A.    Yes, sir.
11    Q.    I'd like to show you Exhibit 338 under number 9. And what
12    is 338?
13    A.    I believe it's a contact list from Taeyan Williams' cell
14    phone.
15    Q.    Under number 9, what name and number is listed?
16    A.    The name is the letters OG with a phone number of plus
17    1-929-290-6897.
18    Q.    Is that the same number you cited out earlier?
19    A.    Yes, sir.
20    Q.    Again, I'd like to go back to Exhibit 479. And I'd like
21    to go to line 13. What's the name and number associated with
22    that entry?
23    A.    It's the letters TA, the phone number is
24    001-681-404-1855.
25    Q.    And do you recognize that number?
```

**JA1840**

```
 1    A.    Yes, sir.
 2    Q.    I'd like to show you again, Exhibit 387. Are you familiar
 3    with Exhibit 387?
 4    A.    Yes, sir.
 5    Q.    Okay. Do you recognize what's shown on the screen now
 6    under record 1 of 387?
 7    A.    Yes, sir.
 8    Q.    What is that?
 9    A.    It's a contact saved in Scott Williams' cell phone by the
10    name of Taeyan son, plus 1-681-404-1855.
11    Q.    I'd like to go back to Exhibit 479. I'd like to go to
12    number 7. Can you read out the name and telephone number --
13    the name on number 7 for the contact and the phone number?
14    A.    The name is the letter M/Btown with a phone number of
15    001-404-655-9944.
16    Q.    You recognize that number from other evidence?
17    A.    Yes, sir.
18    Q.    Showing you exhibit -- back to Exhibit 338. Could you
19    read that number again?
20    A.    001-484-655-9944.
21    Q.    Now I'd like to show you what's been admitted as Exhibit
22    338.  What is 338 again?
23    A.    Again, that's a contact list from Taeyan Williams' cell
24    phone.
25    Q.    Can you just read the contact name under number 3 there?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1841**

```
1    A.    It's Cox and then the letters KA, phone number
2    484-797-0671.
3    Q.    And again, going back to Exhibit 479. Going to line 10.
4    Could you just say the name and any number that's associated
5    with that?
6    A.    Well, the name it just has the letter P. The phone number
7    it says phone 164171.
8    Q.    Again, have you seen that number as part of this case
9    investigation?
10   A.    Yes, sir.
11   Q.    Okay.  Going to what's been admitted as Exhibit 378. What
12   is Exhibit 378?
13   A.    Again, this is a note saved on Taeyan Williams' cell
14   phone.
15   Q.    And what -- do you see anything that's related to I guess
16   what you just read off there?
17   A.    Yes, it's slightly misspelled, but the same phrase
18   kiPhone164171.
19   Q.    Sir, I'd like to go to Exhibit 482. Do you recognize this
20   exhibit?
21   A.    Yes, sir.
22   Q.    And where did this come from?
23   A.    This was saved in the iCloud of the account
24   kiPhone127999.
25   Q.    And you recognize what's shown on the exhibit?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1842**

```
 1    A.    Yes, sir.  It's the EZ Storage.
 2    Q.    Are you familiar with -- what was the date -- what date
 3    was that created?
 4    A.    1/18/2018.
 5    Q.    And can you tell us what the address for the EZ Storage
 6    is?
 7    A.     8255 Washington Boulevard, Jessup, Maryland, 20794.
 8    Q.    And sir, does that particular address appear anywhere
 9    else in data that you have examined and looked at as part of
10    this case?
11    A.    Yes, sir.
12    Q.    Where?
13    A.    In that -- in the notes on Taeyan Williams' cell phone.
14    Q.    Going back to Exhibit 376. Is that what you were
15    referring to?
16    A.    Yes, sir.
17    Q.    And can you just read out the date and time created for
18    that?
19    A.    4/6/2018 at 11:17 p.m.
20    Q.    And is that Eastern Standard Time or some other time?
21    A.    It's in UTC.
22    Q.    What do you have to do to convert that?  Are you familiar
23    with the conversion to Eastern Standard Time?
24    A.    Generally, yes.
25    Q.    Okay. So what would you do?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1843**

```
 1    A.   Typically you subtract four hours from that based on the
 2    time of year it is.
 3    Q.   And the address that was entered into the note?
 4    A.   8255 Washington Boulevard.
 5    Q.   And what address is that?
 6    A.   Again, the address to the EZ Storage in Jessup.
 7    Q.   Sir, was there a video, audio/video recording that was
 8    also saved on that particular iCloud account for the
 9    kiPhone127999?
10    A.   Yes, sir.
11    Q.   And what was that -- Court's indulgence.
12             MR. MOOMAU: Your Honor, at this time I would like to
13    read into the record a stipulation that has been signed as
14    Exhibit 525B.
15             THE COURT:  Okay.
16             MR. MOOMAU:  Court's indulgence, please. Your Honor,
17    I'll proceed until we get that.
18             THE COURT:  Okay.
19    BY MR. MOOMAU:
20    Q.   And have you watched the audio/video recording?
21    A.   Yes, sir.
22    Q.   Just in brief summary, what's it of?
23    A.   It's a video from a cell phone of Noah Smothers going
24    into a police station to retrieve a cell phone that he had
25    previously lost.
```

```
 1    Q.    And he was recording that interaction?

 2    A.    Yes, sir.

 3    Q.    On what?

 4    A.    Another cell phone.

 5    Q.    Okay.

 6          MR. MOOMAU:  Your Honor, could I have permission to

 7    read the stipulation in now?

 8          THE COURT:  Yes.

 9          MR. MOOMAU:  For the record, I'll be reading in

10    stipulation 484A. The Government and the defendants, Scott

11    Anthony Williams and Taeyan Raymond Williams, do hereby

12    stipulate and agree that Exhibit 484A is a recording that

13    includes Noah Smothers interacting with a police officer when

14    Smothers picked up a cellular telephone at a police station

15    after leaving the cellular telephone in an Uber taxi. It's

16    signed by counsel for the respective parties. I moved it in

17    earlier.

18          THE COURT:  Okay, it's in evidence.

19          MR. MOOMAU:  Your Honor, at this time I would ask

20    permission to play 27 seconds of that and then maybe another

21    30 seconds at the end.

22          THE COURT:  Okay. Just identify the portions for the

23    record.

24          MR. MOOMAU:  Yes.

25          THE COURT:  Is there sound or just video?
```

**JA1845**

```
 1              MR. MOOMAU:  No, there's sound, Your Honor. And we
 2    would start that at 30 seconds.
 3              (The videotape was played.)
 4              MR. MOOMAU:  We stopped it at 53, so we played it at
 5    30 seconds to 53.
 6    BY MR. MOOMAU:
 7    Q.   Do you recognize that?
 8    A.   Yes, sir.
 9    Q.   Have you listened to that before?
10    A.   Yes, sir.
11    Q.   Now showing you -- we'll go to the final minute.
12              (The videotape was played.)
13    BY MR. MOOMAU:
14    Q.   Sir, did you see any information there at the end of that
15    video?
16    A.   Yes, sir.
17    Q.   And what was it?
18    A.   Various contacts that had popped up on that phone. The
19    top most contacts on there was -- had the letters
20    t-a-e-s-o-w-a-v.
21    Q.   And had you seen such a name before, the taesowav?
22    A.   Yes, sir.
23    Q.   Where had you seen that?
24    A.   It was associated with multiple different accounts
25    related to Taeyan Williams.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1846**

1    Q.    Showing you Exhibit 359. Do you recognize this?

2    A.    Yes, sir.

3    Q.    And where did this come from?

4    A.    This is from the extraction of the cell phone related to

5    Taeyan Williams.

6    Q.    Now I'd like to show you Exhibit 504 that's been

7    admitted. Do you recognize Exhibit 504?

8    A.    Yes, sir.

9    Q.    What is -- who is talking about Exhibit 504?

10   A.    Two usernames.  One by the name of Larrybird50 and other

11   kiPhone127999.

12   Q.    Any reference to Larrybird50 in any other evidence as

13   part of this case?

14   A.    Yes, sir.

15   Q.    Showing you Exhibit 382. Excuse me. We'll go back to

16   that. Sir, as part of the investigation -- have you ever heard

17   of America Online?

18   A.    Yes, sir.

19   Q.    What is or was America Online?

20   A.    America Online at least for me was kind of the original

21   way to access the internet. It's also an e-mail service

22   provider.

23   Q.    Did you obtain a search warrant or subpoena or serve

24   legal process on America Online or a company that had

25   purchased America Online?

```
 1    A.    Yes.

 2    Q.    Do you remember what account that was for?

 3    A.    I believe it was account Rickjames4554@aol.com.

 4    Q.    I'd like to show you Exhibit 166. What is shown in

 5    Exhibit 166?

 6    A.    This is the subscriber information or the owner

 7    information for that account.

 8    Q.    When was that account created?

 9    A.    December 10, 2007.

10    Q.    And where it has an e-mail, does it have an e-mail

11    address or alternative e-mail address down at the bottom?

12    A.    Yes, sir.

13    Q.    And what was that?

14    A.    Noahsmothers15@yahoo.com.

15    Q.    Did it have a phone number associated with it?

16    A.    Yes, sir.

17    Q.    And what was that?

18    A.    It's plus 1-607-725-9327.

19    Q.    Were any -- from this particular AOL account, was there

20    any I guess communication or notes or anything recovered?

21    A.    Yes, sir.

22    Q.    I'd like to show you what's been admitted as Exhibit 167.

23    Do you recognize this Exhibit 167?

24    A.    Yes, sir.

25    Q.    And what was that?
```

**JA1848**

1    A.    Although this appears to be an e-mail, it's actually a
2    note saved associated with the account.
3    Q.    And what does -- can you just read that off?
4    A.    Sure. It's dated May 24, 2013 with the subject line
5    Noahsmothers15. The content is the same, Noahsmothers15,
6    underneath it basketball42.
7    Q.    I want to go back and ask you a question from a previous
8    -- when you were watching the video recording.  What account
9    did that come from?
10   A.    That was from the iCloud response from kiphone127999.
11   Q.    Was that a regular phone or the encrypted phone?
12   A.    That was the account associated with the phone from
13   KryptAll.
14   Q.    All right. Going now to -- when was -- can you scroll
15   down on this?  What was the creation date for that particular
16   note, 167?
17   A.    It says created date, Friday, 24th of May, 2013.
18   Q.    Now going to Exhibit 169. Again, what is Exhibit 169?
19   A.    Again, it's another note saved in that AOL account with
20   the heading iCloud/Apple.  Content again says iCloud/Apple,
21   Noah2142, Noah2142 and Noahsmothers@iCloud.com.
22   Q.    When was that created?
23   A.    This is showing created Thursday, 7th of March, 2013.
24   Q.    Exhibit 170. Do you recognize this information?
25   A.    Yes, sir.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1849**

1    Q.    And just -- I'm not going to have you read through

2    everything, but can you kind of just, without -- just in

3    summary, what type of information is obtained here?

4    A.    It's depicting various businesses with phrases below it.

5    Q.    And just -- okay. And just, for example, for the one that

6    says YouTube, what does it say underneath it?

7    A.    I'm sorry, you said YouTube?

8    Q.    Yes.

9    A.    Under YouTube it said Noahsmothers15, Noahs2142,

10   Noah2142, symbol with a letter R, eatdatlunch and Noah2142.

11   Q.    Now going back to the exhibit, let's go to page 2 of the

12   exhibit. And just read I guess the second entry there.

13   A.    It is Noahsmothers2142@gmail.com. Below that,

14   Noahsmothers42@gmail.com, some symbols with the letter IV and

15   then Bball#42 and basketball#0.

16   Q.    So sir, you've seen a lot of numbers here and names. For

17   what kind of accounts or what kind of -- did you recognize any

18   of the names on this exhibit as being associated with any

19   business entities?

20   A.    Yes, sir.

21   Q.    Such as?

22   A.    I mean, I'm familiar with Airbnb, Golden 1, Snapchat,

23   just on this page.

24   Q.    And underneath like the -- so sir, for the information

25   that's listed for what you've described as various entities,

1   at any time did you attempt to use the number and letter

2   combinations under the names to see if you could access any

3   particular accounts?

4   A.   Yes, sir.

5   Q.   And did you prepare a report on that?

6   A.   Yes, sir.

7   Q.   At this time sitting here can you cite off all the ones

8   you checked and the numbers that you entered?

9   A.   Not specifically, no.

10  Q.   And if you were able to look at your report, would that

11  assist you in doing that?

12  A.   Yes, sir.

13          **MR. MOOMAU:**  For identification purposes only, I

14  would like for the witness to be able to see ID 50.

15          **THE COURT:**  Okay.  This is to refresh recollection?

16          **MR. MOOMAU:**  Yes.

17          **THE COURT:**  Go ahead. Are you going to show this on

18  the screen just for the witness?

19          **MR. MOOMAU:**  I hope it's been switched over.

20          **THE COURT:**  It has it looks like.

21          **MR. MOOMAU:**  Your Honor, we might -- can I approach

22  the witness?

23          **THE COURT:**  Yes.

24          **MR. MOOMAU:**  Thank you.

25  **BY MR. MOOMAU:**

1  Q.    Sir, showing you just for identification purposes only ID

2  50, do you recognize the document that I handed to you?

3  A.    Yes, sir.

4  Q.    And what is it?

5  A.    It's a copy of the report that I wrote documenting my

6  actions taken with reference to that note.

7  Q.    And what actions were those?

8  A.    I attempted to --

9  Q.    Hold on a second. I mean, just in summary what actions

10 were those?

11 A.    I attempted to log into various accounts.

12 Q.    All right. And by looking at that, does that help you as

13 far as your memory of the accounts you entered and the access

14 -- or the accounts that you tried to enter and the access

15 information you used for those accounts?

16 A.    Yes, sir.

17 Q.    Do you remember what date that was?

18 A.    It should be October 11, 2022.

19 Q.    All right. Can you just tell us what you did with the

20 accounts and what the results were?

21 A.    Sure. I checked Gmail first using the username

22 Noahsmothers42@gmail.com. I entered the password that was seen

23 on the note of basketball#0 and I was granted access to that

24 account. I also checked a similar username which was

25 Noahsmothers2142@gmail.com using the password that was shown

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1852**

1    on the note, Bball#42 and I also gained access to that account

2    using that password as well.

3        I then checked YouTube using the username

4    Noahsmothers15@yahoo.com and the password also seen on that

5    note of Noah2142.  I was again successful in logging into the

6    account using that information.

7        I then attempted to log into Yahoo from that same e-mail

8    address, the Noahsmothers15@yahoo.com using the password on

9    that note again of basketball#1 and again was able to

10   successfully access that account for AOL. I used the username

11   of Rickjames4554 which was again, the account that I had

12   requested records from from AOL directly.  I used the password

13   which was saved on the note of Bball#42 and I was, again, able

14   to access that account using that username and password.

15       I checked PayPal using the username Noahsmothers15,

16   entered the password as seen on the note basketball#42 but I

17   was unable to gain access to that account.

18       I checked Apple iCloud using the username

19   Rickjames4554@aol.com. According to the note I entered the

20   password of Alexjones1776.

21       **THE COURT:**  Can we just pause for a moment?  Let me

22   see counsel for a moment.

23           **(Counsel approached the bench.)**

24       **THE COURT:**  So Mr. Moomau, we had a whole motion on

25   this issue and the issue was whether these are passwords or

```
 1    not.  And I said he could say that he put these numbers in and
 2    he gained access.  I didn't say you could call them
 3    "passwords." He's calling every single one of these
 4    "passwords." There's no evidence that these are passwords
 5    other than perhaps what he did. He's saying I entered the
 6    password on this document or from this account which is
 7    exactly what I said he couldn't do.  So could you explain why
 8    we're doing it this way?
 9              MR. MOOMAU:  He shouldn't be using the word
10    "password."
11              THE COURT:  I mean, wasn't he here for that whole
12    discussion?  I don't know if you discussed it with him, but --
13              MR. MOOMAU:  Yes. And maybe he misunderstood the
14    Court's ruling that -- I know the Court ruled we could put on
15    some testimony to show whether the accounts could be accessed
16    with those numbers. Maybe he misunderstood that to say he
17    could testify to that.
18              THE COURT:  Well, like I said, I mean, it's not that
19    different from what I said he could do which is he could say
20    "I went to this account, I typed in the numbers I saw in the
21    AOL account under that name and it worked." But he's saying,
22    "I typed in the password." Again, there's no evidence that
23    those are passwords.
24              MR. MOOMAU:  I agree.
25              THE COURT:  So I would suggest -- I didn't hear any
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1854**

```
 1   objections to this, but I'm just saying just for the sake of
 2   the ruling that we -- maybe you try to clean that up with some
 3   questions and then we'll see if I need to strike anything.
 4        Mr. Nieto, anything?
 5            MR. NIETO:  Your Honor, yeah.  We would ask that
 6   that portion of the testimony be stricken.  But understanding
 7   the circumstances, yes, if Mr. Moomau wants to lead to get us
 8   to where we want to go --
 9            THE COURT:  We can have some leading questions for
10   this. I think, again, it's really semantics.  If he wasn't
11   using that word, he was just saying "I typed in the numbers I
12   saw on the screen underneath that" I would be totally fine
13   with it.  And that's exactly what I ruled because it's just
14   showing what happened, not what the words mean.  So see if you
15   can fix that and then we'll see if there's anything to do.
16            MR. MOOMAU:  Okay.  Thank you, Your Honor.
17            (Counsel returned to their trial tables.)
18   BY MR. MOOMAU:
19   Q.   Sergeant Simms, you're still looking at your report?
20   A.   Yes, sir.
21   Q.   And I think the last one you testified about was what?
22   A.   The Apple iCloud.
23   Q.   All right. And for the remainder, did you check Snapchat?
24   A.   Yes, sir.
25   Q.   And did you -- what account name did you check for that?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1855**

```
 1    A.   Noahsmothers15, as well as Noahsmothers42.
 2    Q.   And using the information that you had beneath that, were
 3    you able to access that particular account?
 4    A.   For that particular account, no, I was not.
 5    Q.   And did you also check Noahsmothers15@aol.com?  Excuse
 6    me, were those all the ones that you checked?
 7    A.   For Snapchat, that's correct.
 8    Q.   Okay, but did you check for any other accounts than the
 9    ones you've already testified to?
10    A.   One additional, it was eBay.
11    Q.   And using the information that was available in the
12    exhibit, were you able to access the eBay account?
13    A.   Yes, sir.
14    Q.   What was the name on the eBay account?
15    A.   The username was Noahsmothers15@yahoo.com.
16    Q.   And what name and number combination did you use to
17    access that?
18    A.   Basketball42.
19    Q.   I'd like to show you now what's been admitted,
20    stipulation 525A. Do you recognize that particular document?
21    A.   Yes, sir.
22    Q.   And just for the last portion sentence, can you read
23    that?
24    A.   I'm sorry?
25    Q.   Can you read the last portion sentence?
```

1   A.   From the comma on it said, "He wore jerseys that
2   displayed numbers 15, 21 and 42."
3   Q.   And that's referring to who?
4   A.   Noah Smothers.
5   Q.   Now showing you Exhibit 378. You recognize Exhibit 378?
6   A.   Yes, sir.
7   Q.   What is 378?
8   A.   Again, this is a note saved in Taeyan Williams' phone.
9   Q.   And under the title, what does it say?
10  A.   152142.
11  Q.   When was that created?
12  A.   It's created on 4/7/2018 at 3:57:07 am. in UTC time.
13  Q.   And to get to Eastern Standard Time what would you do?
14  A.   Subtract four hours.  So it would go a day prior,
15  4/6/2018 at 11:57 p.m.
16  Q.   Now I'd like to go back.  There was an exhibit -- show
17  you Exhibit 381. I had asked you about this earlier. Do you
18  recognize this?
19  A.   Yes, sir.
20  Q.   Where did this come from?
21  A.   Again, this was a note saved in Taeyan Williams' cell
22  phone.
23        **MR. MOOMAU:**  Your Honor, I think the last few
24  exhibits and it was my fault, I didn't ask to go off of ID
25  only. I don't think they were available for the jury to see.

```
 1              THE COURT:  Which ones are you referring to?
 2              MR. MOOMAU:  I don't think they were able to see the
 3       stipulation that was entered as 525, Exhibit 378 and again,
 4       381.
 5              THE COURT:  Okay, why don't we -- if you want to
 6       publish those why don't we turn the cameras on and we'll just
 7       quickly identify those again. Let's not redo the testimony,
 8       let's just show them again.
 9              MR. MOOMAU:  Exactly.
10              THE COURT:  Just say which exhibit we're dealing
11       with. You can ask a question just to clarify what this was
12       about, Mr. Moomau.
13              MR. MOOMAU:  Your Honor, I'm not sure they saw what
14       was on the document camera. Could I show Exhibit 525A?
15              THE COURT:  Yes.
16              MR. MOOMAU:  Thank you, Your Honor. I'm removing it
17       from the document camera.
18              THE COURT:  Okay.
19              MR. MOOMAU:  Now showing Exhibit 378. And now the
20       last one was 381.
21       BY MR. MOOMAU:
22       Q.   All right, sir, I'd like to show you, sir, what's been
23       admitted as Exhibit 171. Do you recognize this document?
24       A.   Yes, sir.
25       Q.   And where did this come from?
```

 1    A.   This was a note saved in the AOL account,
 2    Rickjames4554@aol.com.
 3    Q.   I'd like you to focus in on the first paragraph. Do you
 4    recognize any of the information on here?
 5    A.   Yes, sir.
 6    Q.   Where it starts out, the various -- could you read the
 7    first paragraph, first line I mean?
 8    A.   "MD, Mr. Nice, OG, WW, GG, CHZL, TAE, 1 Sour Chem, 4 GG,
 9    2 CHZL, DJ, some symbols, DIV."
10    Q.   Do you recognize -- as part of the investigation of the
11    case, Mr. Nice, OG, WW, GG, what do you recognize those as?
12    A.   Strains of marijuana.
13    Q.   And the name right there at the end?
14    A.   Tae.
15    Q.   When was this particular note created?
16    A.   It looks like December 2, 2017.
17    Q.   Does it say a date it was modified?
18    A.   I believe it would be December 18, 2017.
19    Q.   You mentioned the name "Mr. Nice." I want to show you now
20    what's been admitted as Exhibit 473. Do you recognize this?
21    A.   Yes, sir.
22    Q.   And where did this come from?
23    A.   It's a screenshot of a video from a search conducted in
24    West Virginia.
25    Q.   Okay. Is that the subject of a stipulation?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1859**

```
 1    A.    Yes, sir.

 2    Q.    Now showing you Exhibit 172. Do you recognize this

 3    document?

 4    A.    Yes, sir.

 5    Q.    Again, I'm not going to have you read through it, but do

 6    you recognize any of the names shown there?

 7    A.    Yes, sir.

 8    Q.    Whose name?

 9    A.    Tae.

10    Q.    Showing you Exhibit 173. Do you recognize this document?

11    A.    Yes, sir.

12    Q.    And again, did this come from the AOL account notes

13    Rickjames4554?

14    A.    Yes, sir.

15    Q.    Now exhibit -- scroll down, please. To the end. That

16    particular note, when was that created?

17    A.    It appears to be May 29, 2013.

18    Q.    When was it last, I guess, last modified?

19    A.    April 5, 2018.

20    Q.    Now showing you Exhibit 174. Do you recognize this

21    document?

22    A.    Yes, sir.

23    Q.    Can you please read that?

24    A.    "Tae gave 5900 plus 4 WGS."

25    Q.    And what was the date for that particular note?
```

```
 1    A.    April 6, 2018, 1:52 p.m.
 2    Q.    Sergeant Simms, are you familiar with the business entity
 3    Airbnb?
 4    A.    Yes, sir.
 5    Q.    And what is that?
 6    A.    It's an internet-based company, I guess facilitates
 7    individuals to rent places to stay.
 8    Q.    Did you obtain any records from Airbnb as part of your
 9    work on this case?
10    A.    Yes, sir.
11    Q.    Subpoena or search warrant?
12    A.    Yes, sir.
13    Q.    Showing you what's been admitted as Exhibit 158. Page 1
14    of 158, starting at the top, what information is included
15    there?  Or I guess whose account, the name listed for the
16    account?
17    A.    Noah Smothers.
18    Q.    And then showing you the second page, just in general,
19    what's this information?
20    A.    The various locations of stays associated with that
21    account.
22    Q.    And going down to the last line, what was the, I guess
23    the date --
24    A.    Date is 4/4/2018.
25    Q.    And the place?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1861**

```
1    A.    651 Bankard Lane, Baltimore, Maryland.
2    Q.    Thank you. At some point during the investigation did you
3    seek to obtain information from Google?
4    A.    Yes, sir.
5    Q.    And to your knowledge does Google maintain any type of
6    data you can use to locate the user?
7    A.    Yes, sir.
8    Q.    Are you familiar with how that works?
9    A.    Yes, sir.
10   Q.    How does that work?
11   A.    While using a device or account associated to that user,
12   Google will collect data, as far as the location when various
13   searches are made.
14   Q.    And was one of the accounts Gucciforlife@gmail.com?
15   A.    We requested records from that account, yes.
16   Q.    Were you able to get any location data for that account?
17   A.    We were not.
18   Q.    I'd like to show you Exhibit 175. Are you familiar with
19   this document?
20   A.    Yes, sir.
21   Q.    And what is it?
22   A.    This is a production from Google listing the subscriber
23   or owner of the account requested which is
24   Gucciforlife@gmail.com.
25   Q.    What was the name of the subscriber?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1862**

```
 1    A.    Shotta Yute.

 2    Q.    And was there a recovery e-mail address?

 3    A.    Yes, shellysteppa@hotmail.com.

 4    Q.    Was there a phone number or SMS listed for the account?

 5    A.    Yes, sir.

 6    Q.    And what was that?

 7              MR. HAWKS:  Your Honor --

 8              THE COURT:  Yes.

 9              MR. HAWKS:  Defense objects to essentially leading

10    by curser, that the supposed answer is being indicated to the

11    witness by the movement of --

12              THE COURT:  Okay, well I think they can point to

13    things, but maybe the way we can solve this is just having Mr.

14    Moomau rephrase these questions to be non-leading.

15    BY MR. MOOMAU:

16    Q.    Was there any identifying information in the subscriber

17    information for this particular account,

18    Gucciforlife@gmail.com?

19    A.    Yes, sir.

20    Q.    Other than what you've already testified about, what was

21    it?

22    A.    Phone number plus 1-301-655-2283.

23    Q.    Are you familiar with that number?

24    A.    Yes, sir.

25    Q.    Where did that number -- have you testified about that
```

1    number already?

2    A.    Yes, sir.

3    Q.    Going to Exhibit 176. Going to page 2. Any information on

4    this particular document that you found relevant as far as the

5    investigation?

6    A.    Yes, sir.

7    Q.    And what was that?

8    A.    It says "Search for EZ Storage on April 11, 2018."

9    Q.    EZ Storage where?

10   A.    Jessup.

11   Q.    Are you familiar with that facility?

12   A.    Yes, sir.

13   Q.    Was there also another account that you attempted to

14   obtain, I guess, information from Google for?

15   A.    Yes, sir.

16   Q.    Do you remember what account that was?

17   A.    It was an account associated with Noah Smothers.

18   Q.    And do you remember the account number or the account

19   name?

20   A.    I believe it was Noahsmothers15.

21   Q.    Well, we'll go to Exhibit 177.

22   A.    I'm sorry, Noahsmothers42.

23         **THE COURT:**  Mr. Moomau, did you offer 176 and 177?

24         **MR. MOOMAU:**  Court's indulgence. I thought I

25   offered -- I did not.

```
1              THE COURT:  Do you want to offer it now?
2              MR. MOOMAU:  Yes, Your Honor.  I would offer Exhibit
3    177, 178 -- Your Honor, I misread. On my list I had 175, then
4    I had a dash 184. I did not read what came after the dash.
5              THE COURT:  Okay, so I have 175. You intended to
6    offer 175 through 184?
7              MR. MOOMAU:  That's correct, Your Honor, I
8    apologize.
9              THE COURT:  Any objection to 176 through 184?
10             MR. NIETO: No, Your Honor.
11             MR. HAWKS:  No, Your Honor. Your Honor, may I
12   inquire?  There's 184A, is that intended to be offered as
13   well?
14             MR. MOOMAU:  Yes.
15             THE COURT:  And as well as 182A?
16             MR. MOOMAU:  I don't think 182A. No, I don't think
17   we intend to offer 182A, Your Honor.
18             THE COURT:  So 176 through 184, as well as 184A are
19   in evidence. That's the only one with an A in that group.
20             MR. MOOMAU:  Okay, thank you.
21   BY MR. MOOMAU:
22   Q.   Showing you Exhibit 178. Before asking you questions
23   about this, were you able to obtain location data from this
24   particular account, the Noahsmothers42@gmail.com?
25   A.   Yes, sir.
```

**JA1865**

1   Q.   And showing you Exhibit 178, can you tell us what's shown
2   on there?
3   A.   It's a result from Google. It says, "Search for food near
4   me" and on the bottom where it says "locations," it says "at
5   this place," it's a hyperlink to the location where Google
6   associated that search to have originated from.
7   Q.   And the time and date of that particular call?
8   A.   April 5, 2018 at 11:39 and 9 seconds p.m. UTC.
9   Q.   So again, you would have to adjust that like you've
10  testified to?
11  A.   Correct.  Subtract four hours.
12  Q.   Going to the second page of that particular document.
13  What's this?
14  A.   As I stated, the hyperlink on the bottom, if you look at
15  the longitude and latitude associated with that hyperlink this
16  is the location that it provides that the search originated
17  from.
18  Q.   And you're familiar with that street where the pen is?
19  A.   Yes, sir.
20  Q.   Have you just testified about that?
21  A.   Yes, sir.  651 Bankard Lane. It's the address that Noah
22  Smothers stayed at for the Airbnb.
23  Q.   Showing you 179. Time and date for this?
24  A.   April 5, 2018 at 11:39 and 19 seconds p.m. UTC.
25  Q.   Okay. Showing you the second page. Where was that

1    particular search made from, according to the data?

2    A.    That location.

3    Q.    Okay. Showing you 180. Again, what was the search for?

4    A.    "Food near me."

5    Q.    And the time?

6    A.    April 5, 2018 at 11:39 and 39 seconds p.m. UTC.

7    Q.    And the location that search was made from?

8    A.    Yes, that's accurate.

9    Q.    Excuse me?

10   A.    That is the location.

11   Q.    182, what was the search for?

12   A.    "Forno."

13   Q.    And the date and time?

14   A.    April 6, 2018 at 2:44 and 32 seconds a.m. UTC.

15   Q.    And where was that search made from?

16   A.    That location.

17   Q.    Okay. When you say "that location"?

18   A.    That's shown on the screen, I'm sorry.  Bankard Lane,

19   Baltimore.

20   Q.    And the word -- it was a search for Forno, F-o-r-n-o.

21   Are you familiar with what that is?

22   A.    Yes, sir.

23   Q.    What is it?

24   A.    It was a restaurant in Baltimore City.

25   Q.    Now showing you 183. Do you recognize 183?

```
1    A.    Yes, sir.

2    Q.    What is 183?

3    A.    It's a search for "breakfast near me" on April 6, 2018 at

4    10:48 and 57 seconds a.m. UTC.

5    Q.    The location?

6    A.    Is on Melvin Drive in Baltimore.

7    Q.    184, what was searched and the date and time?

8    A.    "Breakfast near me" again on April 6, 2018 at 10:49 and

9    30 seconds a.m. UTC.

10   Q.    Location?

11   A.    Washington Boulevard in Baltimore.

12   Q.    Okay, now Exhibit 186. What was searched for and the date

13   and time?

14   A.    "Food near me," April 6, 2018 at 4:54 and 28 second p.m.

15   UTC.

16   Q.    And showing you the second page, the location.

17   A.    It's along essentially Route 295 which is the Baltimore

18   Washington Parkway.

19   Q.    Where at?

20   A.    It's near Maryland city.

21   Q.    Okay. Showing you Exhibit 187. What was searched for and

22   the date and the time?

23   A.    It's "pupuseria near me" on April 6, 2018, 5:00 and 16

24   seconds p.m. UTC.

25   Q.    And where was that search conducted from?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1868**

1   A.   It is also along Route 295 or Baltimore Washington

2   Parkway in the Maryland city area.

3   Q.   Okay. And 188. What was searched for and the date and the

4   time?

5   A.   "Pupuseria Taqueria" on April 6, 2018 at 5:00 and 30

6   seconds p.m UTC.

7   Q.   And 189, what was searched and the date and time?

8   A.   "Pupuseria Taqueria food truck" April 6, 2018, 5:00 and

9   37 seconds p.m. UTC.

10  Q.   What was the location of that search?

11  A.   This is at the intersection essentially of Route 32 and

12  Route 1, Washington Boulevard in Jessup.

13  Q.   And 190.

14  A.   Would you like me to read it?

15  Q.   Yes.

16  A.   "Martins Total Seasoning," April 6, 2018, 5:05 and 46

17  p.m. UTC.

18  Q.   And showing you now I'm going to back up a little. But

19  182A --

20          THE COURT:  I thought you said 182A was not going to

21  be offered.

22          MR. MOOMAU:  I would offer it at this time.

23          THE COURT:  Okay. No issues I take it?

24          MR. HAWKS:  No objection.

25          THE COURT:  Okay, Exhibit 182A is in evidence.

1    BY MR. MOOMAU:

2    Q.   Date of the search, time, and what was searched for?

3    A.   Again, "food near me" on April 6, 2018, 2:46:01 a.m.

4    UTC.

5    Q.   Location?

6    A.   650 Portland Street, Baltimore.

7    Q.   Now back to where we were, Exhibit 191. What was searched

8    for, the date and time?

9    A.   "Martin's Total Seasoning food truck" April 6, 2018 at

10   5:05:54 seconds p.m. UTC.

11   Q.   Where was that located?

12   A.   Along Route 1 in Jessup, just south of the Life Storage

13   in Jessup which at the time was EZ Storage.

14   Q.   And what was the time for that particular search?

15   A.   April 6, 2018 at 5:05 p.m. UTC.

16   Q.   Now I'd like to jump to Exhibit 297. It's been admitted.

17   Are you familiar with Exhibit 297?

18   A.   Yes, sir.

19   Q.   I'd like to go to the date, April 6th. This particular

20   exhibit, 297, what is that?

21   A.   These are the, I guess, logs from EZ Storage showing the

22   entry to the facility, as well as the Unit A-207 which was the

23   locker rented by Noah Smothers.

24   Q.   Any of those times consistent with the Google location

25   data that you just testified about?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1870

```
 1    A.    Yes, sir.

 2    Q.    Which one is that?

 3    A.    The one kind of in the middle there.  It says "granted

 4    entry" on 4/6/2018 at 1:06 and 31 seconds p.m.

 5    Q.    Now showing you Exhibit 192. What is Exhibit 192?

 6    A.    It's a search term for "food near me" on April 6, 2018 at

 7    5:32 and 27 seconds p.m. UTC.

 8    Q.    Okay.  Now going down to the location data for that

 9    particular search, where is that at?

10    A.    This is essentially at the intersection of Route 295 and

11    Baltimore Washington Parkway and Route 197 just south of the

12    Red Roof Inn in Laurel.

13    Q.    Where the pin is, approximately how far would that be

14    from the Bristolwood Court residence that was searched on June

15    6th of 2018?

16    A.    About a mile away.

17    Q.    And Sergeant Simms, were there -- there were cellular

18    telephones, you've testified that there were cellular

19    telephones that were recovered and data extracted from them as

20    part of this case?

21    A.    Yes, sir.

22    Q.    And were there two particular phones in relation to Mr.

23    Taeyan Williams recovered?

24    A.    Yes, sir.

25              MR. MOOMAU:  Your Honor, I'd like to show Exhibit
```

```
1    522. It's been admitted.
2              THE COURT:   Okay.
3    BY MR. MOOMAU:
4    Q.   Sir, what was the date and place where the two particular
5    telephones -- or do you remember when they were recovered
6    related to Taeyan Williams?
7    A.   Yes, sir.
8    Q.   When was that?
9    A.   July 30, 2018.
10   Q.   Where at?
11   A.   At the North Central Regional Jail in Greenwood, West
12   Virginia.
13   Q.   Now I'd like to show you Exhibit 344. Let's go back one
14   to 343. Have you reviewed the extraction report for one of
15   those particular cell phones and iPhone?
16   A.   Yes, sir.
17   Q.   And were there images recovered from that device?
18   A.   Yes, sir.
19   Q.   I'd like to show you Exhibit 356. Do you recognize this?
20   A.   Yes, sir.
21   Q.   And what is 356?
22   A.   An image recovered from Taeyan Williams' cell phone.
23   Q.   Scroll down to -- was there a date and time as far as
24   creation, modification?
25   A.   11/25/2017 at 00:52 hours UTC.
```

```
 1    Q.   And showing you Exhibit 357. Do you recognize this item?
 2    A.   Yes, sir.
 3    Q.   And what was that?
 4    A.   It's another image found saved in the phone associated
 5    with Taeyan Williams.
 6    Q.   What was the creation date for that?
 7    A.   It would be April 18, 2017, 22:41 hours UTC.
 8    Q.   And sir, in that device did you find any evidence of --
 9    are you familiar with what Wickr is?
10    A.   Yes, sir.
11    Q.   Did you find any evidence of Wickr communication in the
12    device?
13    A.   Yes, sir.
14    Q.   And as far as the Wickr names for persons involved in the
15    communication, you remember that?
16    A.   Yes, sir.
17    Q.   And what were the names?
18    A.   Noah88 and taesowavey.
19    Q.   Showing you Exhibit 362, do you recognize this particular
20    exhibit?
21    A.   Yes, sir.
22    Q.   Now showing you Exhibit 363. Do you recognize 363?
23    A.   Yes, sir.
24    Q.   I didn't ask you, 362, where did you recognize it from,
25    what part of the phone was it in?
```

1    A.    In the images.

2    Q.    Okay, and what about 363?

3    A.    The same.

4    Q.    Okay, 363, can you just read the communication there?

5    A.    "I'll be there late so if you guys don't wanna meet

6    tonight we can meet tomorrow since I'll be staying over." From

7    the user taesowavey:  "It's all good and I'll be up." From the

8    user Noah88:  "Okay I'm bringing a lot to check out. Gorilla

9    Glue Cheeizel OG Cush Sour Chem White Widow and Mr. Nice. Got

10   some White Grapes on me too if you need lows."

11   Q.    Can you scroll down and see if we can get the date for

12   that particular communication or when it was saved?  What was

13   the date on that?

14   A.    It appeared to be saved on 11/26/2017.

15   Q.    Now I'd like to show you what's been entered as 340B. Do

16   you recognize this document?

17   A.    Yes, sir.

18   Q.    And what is 340B?

19   A.    These are an excerpt of text messages recovered from

20   Taeyan Williams' cell phone.

21   Q.    And who are the people talking?

22   A.    The user, the number assigned to the device and a contact

23   saved as Coxka.

24   Q.    And from the last two conversations it says "Yeah man I'm

25   chilling you in town?"  Who is that from?

```
 1    A.    From Coxka.
 2    Q.    And then the response to that from 681-404-1855?
 3    A.    It says "I'm in MD" or Maryland.
 4    Q.    Now moving onto Exhibit 158, second page. Going down to
 5    line 11. Again, what is this particular exhibit?
 6    A.    These are the various locations that Noah Smothers stayed
 7    in through the company Airbnb.
 8    Q.    And on November 25th did it indicate where he was
 9    staying?
10    A.    11311 Wycombe Park Lane in Glenn Dale, Maryland.
11    Q.    I'd like to show you now Exhibit 528. Are you familiar
12    where Glenn Dale is?
13    A.    Roughly, it's in Prince George's County.
14    Q.    Approximately how far would it be from the Bristolwood
15    Court?
16    A.    Probably about ten minutes.
17    Q.    Now I'd like to show you Exhibit 364. What is Exhibit
18    364?
19    A.    It's a screenshot of messages between a user taesowavey
20    and Noah88.
21    Q.    Showing you Exhibit 366. What is that?
22    A.    Again, a screenshot of communications between Taesowavey
23    and Noah88.
24          THE COURT:  So Mr. Moomau, we should probably break
25    for lunch soon. Once you're done with this exhibit?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1875**

```
1              MR. MOOMAU:  Can we do one more page from this
2    particular exhibit?
3              THE COURT:  Sure, of course.
4              MR. MOOMAU:  Thank you, Your Honor.
5    BY MR. MOOMAU:
6    Q.   Showing you 368. Do you recognize this document?
7    A.   Yes, sir.  Again, it's a screenshot of communications
8    between Taesowavey and Noah88.
9              MR. MOOMAU: That's it, Your Honor.
10             THE COURT:  Okay. So ladies and gentlemen, we'll
11   take the lunch break now. We'll see you back here in an hour.
12   Again, don't discuss the case, just enjoy the lunch break.
13   We'll see you back here in an hour at 1:50.  Thank you very
14   much.
15             (The jury exited the courtroom at 12:51 p.m.)
16             THE COURT:  Thank you.  Please be seated. Sergeant
17   Simms, you can go back to your regular seat.
18        Mr. Moomau, how much longer with this witness would you
19   say?
20             MR. MOOMAU:  At least an hour, maybe an
21   hour-and-a-half. We do have some summary recordings to play
22   through him. We have one jail call to play through him.
23             THE COURT:  But you have this other witness coming
24   up as well, correct?
25             MR. MOOMAU:  That's correct.
```

1    **THE COURT:** Okay. So I guess we'll just see everyone

2    back here at 1:50 and we'll continue.

3        Mr. Nieto, if for some reason you're delayed just let us

4    know. We'll stall for you if we need to.

5    **MR. NIETO:** Your Honor, I will do my best. I may be

6    in the actual hearing which may make it difficult to

7    communicate.

8    **THE COURT:** Yeah, right. What you can do, usually, I

9    mean, I'm assuming do what we would typically do is you could

10   let the courtroom deputy call Ms. Solomon if there is a delay,

11   let him or her know that. Thank you.

12        **(Luncheon recess was taken from 12:52 to 2:01 p.m.)**

13   **THE COURT:** Mr. Nieto, you're back no worse for the

14   wear it seems. Any reason we can't just call the jury in?

15   Okay, we'll do that.

16   **MR. MOOMAU:** We're ready, Your Honor.

17   **THE COURT:** Thank you.

18   **MR. MOOMAU:** Your Honor, there are two exhibits that

19   I will be moving in once the jury comes in.

20   **THE COURT:** Okay.

21        **(Jury reentered the courtroom at 2:02 p.m.)**

22   **THE COURT:** Thank you, everyone. Please be seated.

23   So we are ready to resume with the testimony of Sergeant

24   Simms. Go ahead, Mr. Moomau.

25   **MR. MOOMAU:** Thank you, Your Honor. At this time the

 1    Government would move in Exhibits 357 and 554.

 2             **THE COURT:**  Okay. Without objection, Exhibit -- any

 3    issues?

 4             **MR. HAWKS:**  None, Your Honor.

 5             **THE COURT:**  Exhibit 357 and 554 are in evidence.

 6             **MR. MOOMAU:**  Thank you.

 7    **BY MR. MOOMAU:**

 8    Q.    Sergeant Simms, I would like to show you what's been

 9    admitted as Exhibit 338. Do you recognize this exhibit?

10    A.    Yes, sir.

11    Q.    And just what is it, for the record?

12    A.    The contact list from Taeyan Williams' phone.

13    Q.    And there is one particular -- going to number 9, a

14    contact by the name of OG?

15    A.    Yes, sir.

16    Q.    And what's the number for that?

17    A.    It's plus 1-929-290-6897.

18    Q.    I'd like to show -- as part of the investigation, did you

19    take actions to identify the person in the contact named as

20    OG?

21    A.    Yes.

22    Q.    I'd like to show you Exhibit 344. Are you familiar with

23    what is shown in Exhibit 344?

24    A.    Yes, sir.

25    Q.    And what is it?

Simms - direct                    VIII-126

1   A.    It's a text message, a portion of text messages extracted

2   from Taeyan Williams' phone.

3   Q.    Between what persons?

4   A.    The user of that phone and a contact by the name of OG.

5   Q.    So what I'd like to do is start on lines -- start with

6   the first page. And could you tell us, like, the -- starting

7   with the group of SMS messages on lines 1 and 2. Can you read

8   those?

9   A.    From OG and it says "Yo send the list."  And then to OG

10  it says "Gorilla Glue, Cheeizel, Sour Chem, OG."

11  Q.    Okay, now going back to the full list, starting with on

12  December 6, 2017, that whole page. Can you read those and tell

13  us the date?

14  A.    It's from OG on 12/6/2017. It says "Need 20 for tomorrow.

15  6 Buba, 6 Chem, 5 Cheeizel, 3 OG." And again, from OG it says

16  "Yo link ASAP" and then to OG just says, "aight."

17  Q.    And going on after that?

18  A.    From OG on 12/7/17:  "Yo, what's good a go or not?"

19  Again from OG on 12/8/2017, "10 Buba, 5 chem, 3 OG, 2 gizzel."

20  To OG he said "he'll be there around 8." From OG, "okay send

21  the list to him." From OG, "how long?  My folks here plus got

22  to make moves." To OG he said "12." That's on 12/9/2017. From

23  OG "dam man you're killing me I told my man 9 cause you said 8

24  bad" -- I believe that's supposed to be communication -- "bro

25  not professional." And then from OG it says "how long" and

**JA1879**

1    then to OG it just says "yo."

2    Q.    And then continue on down through line 17.

3    A.    From OG on 12/9/17:  "How long?  My folks still here.

4    What's good."  "How long?  My folks still here.  What's good?"

5    Again from OG on 12/9/17:  "Why you not answering your phone

6    fag?"  To OG same date, "said he'll be there in ten minutes."

7    Q.    All right. Now sir, as part of the investigation did you

8    take actions or did the Government take actions to try to

9    determine maybe who they were waiting for when they were

10    referring to that conversation?

11    A.    Yes, sir.

12    Q.    And what's the date of that communication?

13    A.    12/9/2017.

14    Q.    And is that UTC time?

15    A.    Yes, sir.

16    Q.    All right. So how many hours would you deduct in

17    December?

18    A.    In December I believe you would subtract five hours

19    because of Daylight Savings Time.

20    Q.    I'd like to show you Exhibit 158. Go to line 14, please.

21    And what is Exhibit 158?

22    A.    Again, these are records from Airbnb in regards to Noah

23    Smothers showing that he rented a place at 501 East Baltimore

24    Street in Baltimore, Maryland on 1/9/2017.

25    Q.    If I could go back to Exhibit 344. And let's go to lines

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1880**

```
1    18 through 26. And these particular messages, who is this
2    communication between?
3    A.    Again, same as before, between OG and Taeyan Williams'
4    phone.
5    Q.    And what's the date of that?
6    A.    12/14/2017.
7    Q.    Can you read that communication between the user of this
8    particular phone and OG?
9    A.    Sure. To OG it says, "My girl dropping me off and might
10   spend the night.  That cool?"  From OG: "Yeah that's cool." To
11   OG:  "1500 0G a piece. 1600 Cheeizel. 14 Mr. Nice." To OG:
12   "74 total." From OG:  "She staying or not?" To OG:  "Nah."
13   From OG:  "Okay." To OG:  "I'm here." And then from OG:  "Walk
14   Lightning for me don't want him shit in the cage."
15   Q.    Now going down to lines of the same exhibit which will be
16   344, I want to go down to lines 29, 30 and 31. Could you read?
17   A.    Yes, sir. To OG on 1/8/2018 it says:  "What's your date
18   of birth?" Again, to OG:  ████/76."
19   Q.    And what's the response from OG after that?
20   A.    "Yeah."
21   Q.    Now I'd like to take you to Exhibit 160. Do you recognize
22   Exhibit 160?
23   A.    Yes.
24   Q.    What is it?
25   A.    A copy of a driving license record from Maryland Motor
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1881**

 1    Vehicle Administration.

 2    Q.    And the date of birth?

 3    A.    ████/1976.

 4    Q.    And who is that for?

 5    A.    Scott Williams.

 6    Q.    All right. Now showing you Exhibit 345. Do you recognize

 7    Exhibit 345?

 8    A.    Yes, sir.

 9    Q.    What is it?

10    A.    Again, it's chat messages between a user named OG and the

11    user Taeyan Williams' phone.

12    Q.    What I'd like to do is start with the group of chats, the

13    date there January 31, 2018. It's pretty much the whole first

14    page. Can you read that document just like you did with the

15    SMS messages?  Starting at the top on 5:40:28.  What was the

16    message and who is it from?

17    A.    It's from the user OG.  It says "Gucciforlife@gmail.com."

18    The next message says "it's not a valid e-mail."

19    Q.    Who is that from?

20    A.    From Taeyan Williams' phone to OG.

21    Q.    And below that?

22    A.    Then it says, "I need a e-mail to send the guarantor so I

23    can move in." Again, that's to the OG number. Then it says, "I

24    got the money handled already," again to the OG number. From

25    the OG number it says "one word no space."

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1882**

1   Q.   Now on that same Exhibit 345 I'd like to go to the

2   messaging that was on February 8 -- dated February 8, 2018.

3   Can you read this series of messages, please?

4   A.   To the contact saved as OG it says, "what up?" Again to

5   OG:  "You drop that off to Brandon yet?" Again to OG, "You

6   weigh out the joint in the bag?" Once again to OG, "Was it

7   over or under?" And then from OG, "He left." And "No I check

8   later."

9   Q.   Now I'd like -- can you continue with the --

10  A.   From the user OG, 2/11/18 it says, "54 on the Gucci you

11  got." To the contact OG, "Weigh out one for him. You at the

12  house?" The user OG responds, "I make it. 56. Just give it

13  to him." Then it's sent to OG "Aight, whatever." The user OG

14  says, "Where he at? About to leave." And then to the user OG,

15  "He coming now."

16  Q.   I'd like to go now to a series of messages on February

17  17, 2018. Do you recognize this?

18  A.   Yes, sir.

19  Q.   And again, these messages are between who?

20  A.   Taeyan Williams' phone and a contact saved as OG.

21  Q.   Can you please read that and the date?

22  A.   Sure. To the contact OG, "Noah coming?" OG responds,

23  "Yeah he just left." OG also says, "Give him your half. He

24  coming to you."

25  Q.   And that last particular message was at what time on

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1883**

1    February 17, 2018?

2    A.    4:11:04 a.m UTC.

3    Q.    And to get to a normal time Eastern Standard Time would

4    you --

5    A.    In February that should be subtracting five hours.

6    Q.    And sir, did you review records to see in the record

7    whether or not Noah Smothers would have been in the area

8    during this particular time?

9    A.    Yes, sir.

10   Q.    I'd like to show you what's been admitted as Exhibit 151.

11   Do you recognize Exhibit 151?

12   A.    Yes, sir.

13   Q.    And what is it?

14   A.    Capital One banking records related to Noah Smothers.

15   Q.    I'd like to go to page 11. Focusing on February 16, 2017

16   where it says "DC ticket payment" and below that down through

17   February 17, "Morgantown." What is shown on February 16, 2018?

18   A.    One of the transactions says "DC ticket payment" for

19   $100.

20   Q.    And then on February 17th?

21   A.    So there's an EZ Pass transaction for $25 and then

22   Morgantown Parking Authority, Morgantown, West Virginia for

23   $8.50.

24   Q.    And part of the time in February of 2018 where was Taeyan

25   Williams living?

```
 1    A.    Morgantown, West Virginia.
 2    Q.    Sir, as part of the investigation in this case, were
 3    records from Uber subpoenaed?
 4    A.    Yes, sir.
 5    Q.    For what particular username?
 6    A.    Records regarding Taeyan Williams.
 7    Q.    All right. I'd like to show you what's been admitted as
 8    Exhibit 448. We'll scroll down to the second page, third page.
 9    Do you remember the time period that the records were
10    subpoenaed for?  Anyway, do you see the date there in the top
11    right-hand corner?
12    A.    Yes, sir.
13    Q.    What's that?
14    A.    April 10, 2018.
15    Q.    Now scrolling down to the last document, what's that
16    date?
17    A.    March 28, 2018.
18    Q.    And on March 28, 2018 for Taeyan Williams, according to
19    the Uber records, what's that show?
20    A.    Showing a trip from 6003 University Town Center Drive in
21    Morgantown, West Virginia to an address on Domain Drive,
22    Granville, West Virginia.
23    Q.    And scrolling up, what's the date for this?
24    A.    March 28, 2018.
25    Q.    Same location?
```

1    A.    Same ending location.

2    Q.    Okay. In the Morgantown, West Virginia area?

3    A.    Yes, sir.

4    Q.    And scrolling up one, March 29th?

5    A.    From 10304 Bristolwood Court in Laurel, Maryland to 5006A

6    Jackson Street, Hyattsville, Maryland.

7    Q.    So what's the date on that?

8    A.    March 29, 2018.

9    Q.    So we're in Maryland now?

10   A.    Correct.

11   Q.    Scroll on up, please.  Up a little more. Okay. What's the

12   date there?

13   A.    March 30, 2018.

14   Q.    And where is the Uber transportation to?

15   A.    From 10303 Bristolwood Court, Laurel, Maryland to a

16   location in North Laurel, Maryland.

17   Q.    And scrolling on up, same date, same area on March 30th?

18   A.    Yes, sir.

19   Q.    Okay, scrolling up. Same general area, Bristolwood Court,

20   March 30, 2018?

21   A.    Correct, to 5420 Lynx Lane, Columbia, Maryland.

22   Q.    Do you recognize that address, that area?

23   A.    Yes, sir, that area.

24   Q.    Scrolling on up. What area or where was the

25   transportation at in this exhibit?  We're on page I think 22

1    or 24.

2    A.    It's an address in Columbia, Maryland to 10303

3    Bristolwood Court in Laurel, Maryland.

4    Q.    Scrolling up, what's the date there?

5    A.    April 1, 2018.

6    Q.    From where to where?

7    A.    Laurel, Maryland to Bladensburg, Maryland.

8    Q.    And keep going up, please. Now looking at page 22. What's

9    this document show?

10   A.    April 1, 2018 from Hyattsville, Maryland to College Park,

11   Maryland.

12   Q.    Scroll up to page 21. Transportation from where to where?

13   A.    Again on April 1, 2018 from College Park, Maryland to

14   Laurel, Maryland.

15   Q.    And then let's go up to page 20. What's the date on that?

16   A.    April 3, 2018.

17   Q.    And transportation from where to where?

18   A.    From Laurel, Maryland to Greenbelt, Maryland.

19   Q.    And continuing on up. Again on April 3rd, page 17.

20   A.    From Greenbelt, Maryland to College Park, Maryland.

21   Q.    And then we'll go up to page 18.

22   A.    It's April 4, 2018 from College Park, Maryland to Laurel,

23   Maryland.

24   Q.    Page 17.

25   A.    April 6, 2018 from Laurel, Maryland to Columbia,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1887

 1    Maryland.

 2    Q.    Okay. What was the time of that trip from Bristolwood

 3    Court to Fox Cross Lane in Columbia, Maryland?

 4    A.    3:59 start time, 4:37 end time.

 5    Q.    All right, scroll up.  Again, what's the date of this?

 6    A.    April 6, 2018.

 7    Q.    And where is this transportation from and to?

 8    A.    From Tysons, Virginia to College Park, Maryland.

 9    Q.    And what's the time of that?

10    A.    9:16 p.m. starting and 9:53 p.m. ending.

11    Q.    And then go up, please. Looking now at page 15. On page

12    15, what's the date of that?

13    A.    April 7, 2018.

14    Q.    From where to where?

15    A.    From Bristolwood Court in Laurel address to Tysons,

16    Virginia.

17    Q.    Same place, just the day before?

18    A.    Generally, yes.

19    Q.    Okay. And the date on that is April 7, 2018?

20    A.    Correct.

21    Q.    Then scroll up to page 14. What's the transportation and

22    the times on that and the date?

23    A.    April 7, 2018 at 10:07 p.m from Ring Road in Tysons,

24    Virginia ending at 10:44 p.m. at 10301 Bristolwood Court,

25    Laurel, Maryland.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1888**

1    Q.    You've been talking about the Bristolwood Court.  Do you
2    recognize that address?
3    A.    Yes.
4    Q.    And whose address is that?
5    A.    The address where we executed a search warrant occupied
6    by Scott Williams and Taeyan Williams.
7    Q.    What I'd like to do now is to go up to April 8th.
8              MR. NIETO:  Objection, Your Honor.
9              THE COURT:  What's the objection?
10             MR. NIETO:  If I may very briefly, Your Honor.
11             THE COURT:  Talk to counsel?
12             MR. NIETO:  Yes.
13             THE COURT:  Okay.
14             (Counsel conferred off the record.)
15             MR. NIETO:  I'll withdraw my objection.
16             THE COURT:  Okay.
17   BY MR. MOOMAU:
18   Q.    Sergeant, when I asked you about the Bristolwood Court
19   address you mentioned the residence where the search warrant
20   was executed for Scott and Taeyan Williams. Taeyan Williams
21   wasn't there when that was done on June 6th, correct?
22   A.    Correct, he was not there.
23   Q.    So I want to keep scrolling to April 8, 2018. Looking at
24   page 12. Let's go up one more. And one more, please. On this
25   particular page, page 11, transportation from where to where

1    on what time?

2    A.    April 8, 2018 at 2:31 a.m., transportation from 5005

3    Jackson Street, Hyattsville, Maryland ending at 2:49 a.m. at

4    10303 Bristolwood Court, Laurel, Maryland.

5    Q.    And scrolling up. Keep going.  Okay, then on April 8th I

6    guess later in the day in the afternoon, can you please tell

7    us about this transportation?

8    A.    It's April 8, 2018 starting at 2:10 p.m. from 10301

9    Bristolwood Court, Laurel Maryland ending at 3:01 p.m., ending

10   at 2698 Research Boulevard, Rockville, Maryland.

11   Q.    And then scroll up to page 8. What's shown on this slide?

12   A.    On April 8, 2018 at 3:34 p.m. from that same address in

13   Rockville, Maryland ending at 4:15 p.m. to 10303 Bristolwood

14   Court, Laurel, Maryland.

15   Q.    Now I want to scroll up to page 7. And what is shown on

16   this particular page?

17   A.    This is on April 10, 2018.  I'm not sure if it's a

18   completed trip or not, but it has the address, an address in

19   Westover, West Virginia as the originating location.

20   Q.    So by April 10th the transportation is back in West

21   Virginia?

22   A.    It appears to be, yes.

23   Q.    I want to scroll up to the top, sort of keep going to the

24   account. I apologize. I want to do -- this is page 2 of the

25   document, e-mail address, phone number listed on there.

```
1    A.   Yes, sir.

2    Q.   What is that?

3    A.   The name is Taeyan Williams with a phone number of plus

4    1-681-404-1855 and an e-mail address of

5    Taeyanwilliams@gmail.com.

6    Q.   Sir, are you familiar with an area or location called

7    Windsor Forest?

8    A.   Windsor Forest Apartments, yes, sir.

9    Q.   Where is that at?

10   A.   Essentially in West Baltimore.

11   Q.   And just for -- I'd like to show you an exhibit that is

12   marked -- admitted as Exhibit 528. Do you recognize this?

13   A.   Yes, sir.

14   Q.   And what is Exhibit 528?

15   A.   These would be driving directions from 10301 Bristolwood

16   Court eventually to the Windsor Forest Apartments.

17   Q.   Of course somebody can take several different routes to

18   get there, correct?

19   A.   Correct.

20   Q.   So the purpose of this is to show general locations?

21   A.   Correct, and a route that could be driven.

22   Q.   And that address, Windsor, what address is that relevant

23   to, Windsor Forest?

24   A.   That's a location where the victim's car was abandoned

25   at.
```

```
 1    Q.    I'd like to show you what's been admitted as Exhibit 315.
 2    I'd like to focus in on the license plate there. Do you
 3    recognize this document?
 4    A.    Yes, sir.
 5    Q.    And what is it?
 6    A.    It's the license plate reader image captured from the
 7    grounds of the Windsor Forest Apartments.
 8    Q.    And sir, as a member of the Maryland State Police, do you
 9    have the ability to perform license plate queries?
10    A.    Yes, sir.
11    Q.    Just how do you go about doing that?
12    A.    As a law enforcement officer you have access to
13    databases, meters, and NCIC that allows you to query
14    individual license plate sequences and states and territories
15    in order to obtain records from the Motor Vehicle
16    Administration of that respective area.
17    Q.    And do you do that as part of your regular law
18    enforcement duties?
19    A.    Yes, sir.
20    Q.    And did you run a check for license plate number 5XY974?
21    A.    Yes, sir.
22    Q.    How many states?
23    A.    All of the states, plus some additional territories and
24    tribal areas, I believe.
25    Q.    What was the result of that?
```

```
1    A.   I found only one license plate that matched the vehicle
2    description seen in this photo and that was through the state
3    of Massachusetts.
4    Q.   Sir, as part of your work on this case did you obtain
5    recordings of telephone calls made by Mr. Taeyan Williams?
6    A.   Yes, sir.
7    Q.   And from what facility did you obtain those recordings
8    from?
9    A.   They were phone calls made from the North Central
10   Regional Jail in Greenwood, West Virginia.
11   Q.   Did you serve a subpoena on that facility to obtain that
12   information?
13   A.   Yes, sir.
14   Q.   And did you also get records from that facility?
15   A.   Yes, sir.
16   Q.   I'd like to show you what's been admitted as Exhibit 468.
17   It's a four-page document, but do you recognize it looking at
18   the first page?
19   A.   These are inmate records from the North Central Regional
20   Jail for Taeyan Williams.
21   Q.   And it has a date there. What's that for?
22   A.   Booking and release date.
23   Q.   I'd also like to show you what's been admitted as Exhibit
24   534. Do you recognize this document?
25   A.   Yes, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1893**

1    Q.   What is it?

2    A.   It's a list of various phone calls made under Taeyan

3    Williams' name from the facility.

4    Q.   Looking at the very first call, what was the date on

5    that?

6    A.   It would be 8/8/2018.

7    Q.   And have you listened to that particular call?

8    A.   Yes, sir.

9    Q.   The number that the call was placed to?

10   A.   The dialed number is 301-404-3782.

11   Q.   When you listened to that particular call did you

12   recognize any of the voices on that call?

13   A.   Yes, sir.

14   Q.   How were you able to do that?

15   A.   Just from my prior interactions.

16   Q.   Interactions with who?

17   A.   Individuals associated with this case.

18   Q.   You can by names --

19   A.   Taeyan Williams.

20   Q.   And who else is a party to that phone call?

21   A.   I don't recall at this time.

22   Q.   Okay. Do you remember the date that Mr. Scott Williams

23   was placed under arrest?

24   A.   Yes, sir.

25   Q.   As a result of the search warrant at Bristolwood?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1894**

```
 1    A.    Yes, sir.

 2    Q.    And what date was that?

 3    A.    June 6, 2018.

 4    Q.    And at some point was he released on bail?

 5    A.    Yes, sir.

 6    Q.    This particular call that's been admitted as Exhibit 535

 7    also captioned ID 337 -- 37, have you had an opportunity to

 8    listen to that?

 9    A.    Yes, sir.

10    Q.    Now do you recognize -- when you listened to it, did you

11    recognize the voices on the recording?

12    A.    Yes, sir.

13    Q.    Who was it?

14    A.    Again, Taeyan Williams and I believe Scott Williams.

15    Q.    Okay. Was a transcript prepared of that call?

16    A.    Yes, sir.

17    Q.    And was anything done with the transcript as far as the

18    call?

19    A.    It was inserted into the call as captions.

20    Q.    Was a transcript as well as the caption call accurate?

21    A.    Yes, sir.

22          MR. MOOMAU:  Your Honor, at this time I would

23    request permission to play ID 37 which is the call we just

24    identified.

25          THE COURT:  What's the actual exhibit number this is
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1895**

```
 1   associated with?
 2              MR. MOOMAU:  The actual exhibit number would be 535.
 3              THE COURT:  And this is Taeyan Williams and Scott
 4   Williams, according to the witness?
 5              MR. MOOMAU:  Yes, it is.
 6              THE COURT:  Okay. Go ahead.
 7              MR. MOOMAU:  We will scroll it forward to skip
 8   through the recorded parts, Your Honor.
 9              THE COURT:  Thank you.
10              (Audiotape was played.)
11   BY MR. MOOMAU:
12   Q.   Do you recognize the voices on there?
13   A.   Yes, sir.
14   Q.   Who is that?
15   A.   Taeyan Williams and Scott Williams.
16              (Audiotape was played.)
17   BY MR. MOOMAU:
18   Q.   And Sergeant Simms, on the exhibit that you just watched
19   the captions, was "SW" Scott Williams, "TW" Taeyan Williams?
20   A.   That's correct.
21   Q.   There was a lot of conversation about a phone. Where was
22   that phone at the time they were talking about the phone?
23   A.   I believe at the time of the call the police already had
24   custody of the phone.
25   Q.   Sir, I want to ask you some questions about the EZ
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1896**

1   Storage facility. Again, what was the address of that?

2   A.   EZ Storage was 8255 Washington Boulevard, Jessup,

3   Maryland.

4   Q.   I'd like to show you an exhibit admitted as 302A. Are you

5   familiar with this photograph?

6   A.   Yes, sir.

7   Q.   What was the date on that?

8   A.   April 7, 2018.

9   Q.   And the time?

10  A.   9:06 and 35 seconds p.m.

11  Q.   Do you notice anything about the trunk of the vehicle?

12  A.   Yes, sir.  It appears to be up.

13  Q.   And 302B, do you recognize this particular picture?

14  A.   Yes.

15  Q.   What's the date on that?

16  A.   April 8, 2018.

17  Q.   I'd like to show you what's been admitted as Exhibit 444.

18  Giving you a chance to look at it, do you recognize what this

19  document is?

20  A.   Yes, sir.

21  Q.   What is it?

22  A.   Records from Enterprise regarding I guess the locations

23  or transactions regarding the Nissan Altima.

24  Q.   Which Nissan Altima is this?

25  A.   The one with the license plate 5XY984 from Massachusetts

1   that was rented by Scott Williams.

2   Q.   And on some particular day did you rent out that car?

3   A.   Yes, sir.

4   Q.   And what date was that?

5   A.   It was on June 7, 2018.

6   Q.   Showing you what's been admitted as 543. Do you recognize

7   this picture?

8   A.   Yes, sir.

9   Q.   What's this?

10  A.   It's a photograph I took of that vehicle when I rented

11  it.

12  Q.   And 541, do you recognize that?

13  A.   Yes, sir.

14  Q.   Did you make -- take any action after you -- tell us

15  about the picture in 541.

16  A.   So when I rented the car, I briefly inspected the vehicle

17  and I noticed that as you can see here, the screws to the

18  front license plate were only half screwed back in.

19  Q.   Did you take any items in addition to the vehicle into

20  your possession then?

21  A.   Yes, sir.

22  Q.   What was that?  Did you take the screws and the license

23  plate?

24  A.   Yes, sir.  I removed them from the vehicle.

25  Q.   Sir, why did you rent the particular vehicle?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1898**

1   A.    I wanted to compare it to the Nissan Altima seen in the

2   videos at the EZ Storage facility.

3   Q.    And did you prepare an exhibit, summary-type exhibit that

4   included recordings from the EZ Storage, data from the EZ

5   Storage, as well as the vehicle that you rented out so you

6   could compare it to the other vehicle that was shown in the

7   video recordings?

8   A.    Yes, sir.

9   Q.    And just in your own words, I know I asked you a long

10  question there, but what all did you include in that?

11  A.    In the presentation?

12  Q.    Yes.

13  A.    A number of videos from different entries to the EZ

14  Storage facility using Noah Smothers' front gate code, as well

15  as the times that his unit was accessed. In addition, the

16  video of myself driving the car through there for comparison,

17  as well as the actual entry data for the front gate and the

18  unit itself.

19  Q.    And is that marked as Exhibit 303?

20  A.    It may be.

21  Q.    Okay.

22        **MR. MOOMAU:** Your Honor, at this point I would like

23  to play for the Court and the jury the exhibit that has been

24  admitted as 303.

25        **THE COURT:**  Okay. Go ahead.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1899**

1              **(Videotape was played.)**

2    Q.   What date is this, Sergeant Simms?

3    A.   April 5, 2018 at 1:09 p.m.

4    Q.   And what are we seeing here?

5    A.   This is a Penske Rental van approaching the gate of the

6    EZ Storage facility and entering the code for Noah Smothers as

7    shown on the records.

8    Q.   Is that the record that's also shown on the screen?

9    A.   Yes, sir.

10   Q.   And what's shown in this slide?

11   A.   It's just a few minutes later, that same Penske Rental

12   van approaching the building where Noah Smothers' storage unit

13   was located.

14   Q.   And showing now?

15   A.   Same date, opposite view of the last view showing that

16   same van pulling up to the side of Building A.

17   Q.   And was this zoomed?

18   A.   Yes, sir.

19   Q.   All right. And what's being shown there?

20   A.   The driver of that van is getting out, opening the rear

21   of the van and eventually he'll bring boxes into the building.

22   Q.   And right there at the bottom in the white and the black,

23   what's that from?

24   A.   It's showing that Unit A-207, that the door to that unit

25   was opened on 4/5/18 at 1:11 p.m.

Simms - direct                          VIII-148

```
 1    Q.   Next slide. Now tell us what you did here.
 2    A.   So this is just a screenshot of essentially each box that
 3    the driver unloads from the van and brings into Building A.
 4    Q.   And how were you able to determine that?
 5    A.   I watched the video and counted.
 6    Q.   Okay. And showing now?
 7    A.   Same thing.
 8    Q.   How many trips or boxes were you able to determine was
 9    loaded, unloaded from the van?
10    A.   It appeared to be 15.
11    Q.   And what's being shown in this slide?
12    A.   Showing the door to Unit A-207 was closed on that same
13    date at 1:21 p.m. and the driver getting back in the vehicle.
14    Q.   And what are we looking at here, sir?
15    A.   This is that same van leaving the storage facility.
16    Q.   Now again, the next group, what date is this, starting at
17    what time?
18    A.   April 5, 2018 at 5:36 p.m.
19    Q.   Do you recognize the vehicle pulling in?
20    A.   Yes, sir.
21    Q.   Where do you recognize that?
22    A.   That's the victim's Kia Sportage that was found abandoned
23    in Baltimore City.
24    Q.   Now sir, showing you this next slide, what does this
25    show?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1901**

Simms - direct                                    VIII-149

1    A.    Again, these are screenshots taken from the video that

2    show Noah Smothers removing five boxes and a bag from his

3    locker, contemporaneous to that vehicle arriving in the last

4    video.

5    Q.    Approximately what time?

6    A.    Between 5:49 p.m. and 6:01 p.m.

7    Q.    Next. What's shown now?

8    A.    Noah Smothers in the Kia Sportage exiting the storage

9    facility.

10   Q.    And now being shown what's the date and time?

11   A.    This is the next morning, April 6, 2018 at 7:50 a.m.

12   Q.    Shown there at the bottom, where is that from?

13   A.    That's the logs from EZ Storage showing his PIN entered

14   to enter the front gate.

15   Q.    Now what is shown on the screen now?

16   A.    Again, I took screenshots from that video showing Noah

17   Smothers leaving his unit with two boxes.

18   Q.    All right. Next, please. Is that what you were referring

19   to?

20   A.    Yes, sir.

21   Q.    And we can move that forward to the next slide. What are

22   we looking at now, sir?

23   A.    This is Noah in his vehicle exiting the EZ Storage

24   facility.

25   Q.    Okay, let's move to the next slide, please. What date and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1902**

1    time here?

2    A.    April 6, 2018 at 1:07 p.m.

3    Q.    Whose vehicle is that?

4    A.    Noah Smothers' rented car.

5    Q.    Now what are we looking at on the screen?

6    A.    These are screenshots of Noah Smothers exiting his

7    storage unit with two boxes.

8    Q.    And what time was that and the date?

9    A.    It was 4/6/18 at 1:16 and 1:18 p.m.

10   Q.    Okay. Next slide, please. You can advance that to the

11   next slide. And that car beside the Sportage, was that the one

12   that followed the Kia Sportage in, kind of piggybacked?

13   A.    Yes, sir.

14   Q.    Okay. Date and time here?

15   A.    April 6, 2018 at 8:37 p.m.

16   Q.    What area?

17   A.    This is looking along the side of Building A towards the

18   entry to Noah Smothers' unit or the door that would lead to

19   his unit.

20   Q.    Was the door accessed at this time?

21   A.    It was not.

22   Q.    And now the time and date now?

23   A.    April 7, 2018 at 9:05 p.m.

24   Q.    Did you identify a still picture of this earlier?

25   A.    Yes, sir.

```
1   Q.   Going forward now to April 8th. What's being shown here?
2   A.   This is the silver Nissan Altima arriving at the front
3   gate and entering Noah Smothers' PIN to gain access.
4   Q.   This slide that you're being shown now is just a
5   different view?
6   A.   Yeah.  Essentially same video, just different view.
7   Q.   What's going on in this slide?
8   A.   It's tough to see because of the glare, but it appears
9   that a vehicle pulls up, there's some disturbances in the
10  light that looks like somebody walking in front of the
11  vehicle. And there's a log on the bottom of the unit A-207's
12  door being opened and closed.
13  Q.   Now shown on the bottom, what's that?
14  A.   Again, the unit A-207 is opened and closed.
15  Q.   Now what are we looking at now, Sergeant Simms?
16  A.   This is a comparison, two videos.  One on April 8, 2018
17  and one when I drove the vehicle through on June 7, 2018.
18  Q.   And which vehicle -- shown on the right is you?
19  A.   Correct.
20  Q.   Same car?
21  A.   Appears to be, yes.
22  Q.   And on the left?
23  A.   That's the video that we just watched from April 8, 2018.
24  Q.   Sir, I wanted to show you something I didn't actually
25  show you on Exhibit 302B. I want to go to page 3 of 10. You
```

```
 1   recognize this picture?
 2   A.   Yes, sir.
 3   Q.   And I want to advance it. And what's the date of this?
 4   A.   April 8, 2018.
 5   Q.   Still shot taken from one of the video recordings you
 6   just talked about?
 7   A.   Yes, sir.
 8   Q.   We'll go forward to page 4 now. Same?
 9   A.   Same thing, yes, sir.
10   Q.   Page 5?
11   A.   Same thing.
12   Q.   Okay. Page 6. Now, do you see anything in the vehicle?
13   A.   Yes, sir.
14   Q.   Okay. And we're going to go through to page 7. First of
15   all, does the vehicle appear to have a front license plate on
16   it?
17   A.   It does not.
18   Q.   Okay. Do you recognize any --
19   A.   It appears to be a cardboard box.
20   Q.   And what about in the back and on the side?
21   A.   Appears to be bags.
22   Q.   Okay. Next page. Can you describe that?
23   A.   Again, just looks to be bags of some sort.
24   Q.   Sir, I want to switch now to some DNA work that was done.
25   Did you assist in the preparation of a PowerPoint or slideshow
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1905**

```
 1    of the location of swabs on various items recovered during the
 2    Bristolwood search warrant?
 3    A.    Yes, sir.
 4    Q.    And do you remember what items those were?
 5    A.    Yes, there were a number of items.
 6    Q.    What were they?
 7    A.    Firearms, bags, weapons.
 8    Q.    And were you present when those items were actually
 9    swabbed for the presence of DNA and/or actually blood?
10    A.    Some of them, yes.
11    Q.    And have you prepared a summary exhibit that in addition
12    to the items or the matters shown in Exhibit 148 that has been
13    admitted actually show the location of any -- of the DNA
14    results?
15    A.    Yes.  I indicated on the presentation where swabs were
16    taken and what the results were of those swabs.
17          MR. MOOMAU: At this time I would like to show the
18    exhibit -- or the witness what has been admitted as Exhibit
19    450.
20          THE COURT:  450?
21          MR. MOOMAU:  Yes.
22          THE COURT:  Okay.
23    BY MR. MOOMAU:
24    Q.    You recognize the first page?
25    A.    Yes, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1906**

1   Q.   What is it?

2   A.   It's a presentation that I created.

3   Q.   Okay. If I go to page 2 of Exhibit 450 and just tell us

4   what this shows.

5   A.   For this first box, for example, it's showing the I guess

6   unique identifier for the swab that was taken of that area by

7   crime scene technicians. The second line would then show what

8   the exhibit number is for that swab on the DNA report. And

9   then a brief synopsis of what the results were from the DNA

10  report as well.

11  Q.   All this information regarding DNA is from the actual DNA

12  reports?

13  A.   The first line would be from the crime scene technician's

14  report and the subsequent information would be from the DNA

15  report.

16  Q.   Showing you page -- what are the items shown in page 2?

17  A.   Two knives found in the residence.

18  Q.   Showing you page 3, what item is this?

19  A.   Sig Sauer handgun located in the closet to the crawl

20  space at the Bristolwood Court residence.

21  Q.   Is this an actual -- tell us what's on this page.

22  A.   This is a photograph of that weapon with the arrows

23  pointing to the various areas where swabs were taken from the

24  weapon and the results of those swabs.

25  Q.   Now does the last box indicate where, I guess, the DNA

1    analyst found DNA consistent with that of the deduced known or

2    Noah Smothers?

3    A.    That's correct.

4    Q.    What are those particular pieces?

5    A.    Just mechanisms that help the user operate a firearm.

6    Q.    Next slide, please. Tell us about this.

7    A.    Same thing, photograph of that weapon showing the various

8    swabs, the DNA exhibit related to the swabs and the

9    corresponding results.

10   Q.    And for the record, is that page 5?

11   A.    Yes, sir.

12   Q.    And going on to page 6?

13   A.    Same thing showing the muzzle end of the firearm with the

14   slide to the rear showing swabs from that firearm, which DNA

15   exhibit it is and the results from those testing.

16   Q.    And both those locations, were those arrows showing what

17   was found there?

18   A.    The DNA reported that it was consistent with the DNA of

19   the deduced known of Noah Smothers for both.

20   Q.    Going to page 7. What are we looking at here?

21   A.    Again, this is an indication of a swab or swabs that were

22   taken of that location, the corresponding DNA exhibit number,

23   the DNA report showing that blood was indicated in that area

24   and that the results was that the DNA was consistent with the

25   deduced known of Noah Smothers.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1908**

1    Q.    All right. Page 8.

2    A.    It's a magazine from that same Sig Sauer handgun and the

3    associated swab.

4    Q.    And the DNA results?

5    A.    Correct.

6    Q.    Page 9.

7    A.    The round of ammunition related to that firearm and the

8    same thing, swabs, DNA exhibit and the results.

9    Q.    Page 10.

10   A.    The cartridge removed from the chamber of that Sig Sauer

11   handgun and the swab associated with it.

12   Q.    Now what's shown on the presentation?

13   A.    The Beretta 21A that was recovered from the primary

14   bedroom closet at the Bristolwood Court address in Laurel.

15   Q.    Okay.

16   A.    Same things, swabs or swab, the corresponding DNA exhibit

17   and the results on the DNA report for that swab.

18   Q.    Page 13?

19   A.    The magazine for that firearm.

20   Q.    Page 14?

21   A.    The rounds associated with that firearm. This is the

22   Bryco/Jennings 38.  It was located in the primary bedroom in

23   the dresser of the Bristolwood Court, Laurel address. This is

24   the swab taken from that gun, corresponding DNA exhibit, and

25   the results from that swab.

```
1    Q.   Again, that's page 16 you're referring to?

2    A.   That is correct.

3    Q.   Okay.  Page 17?

4    A.   The magazine from that firearm.

5    Q.   Page 18?

6    A.   The rounds related to that firearm.

7    Q.   Page 19?

8    A.   This is the Century Arms rifle that was located in the

9    primary bedroom closet of the Bristolwood Court, Laurel,

10   Maryland address.

11   Q.   20?

12   A.   The various swabs taken from that weapon, the

13   corresponding DNA exhibits and the results.

14   Q.   Page 21?

15   A.   These are duffle bags located in the shed of the

16   Bristolwood Court, Laurel, Maryland address.  And again, the

17   swabs, corresponding DNA exhibits, and the results.

18   Q.   Okay. Page 23?

19   A.   Duffle bags located in the crawl space of the Bristolwood

20   Court, Laurel, Maryland address. Again, the corresponding

21   swabs, DNA exhibit, and the results.

22   Q.   Okay. Page 25.

23   A.   An additional swab from another bag.

24   Q.   Page 26 and 27?

25   A.   This is a depiction of where swabs were taken from the
```

1   license plate area of the Massachusetts registration, 5XY974.

2   Again, showing the swabs, where they were taken, the DNA

3   exhibits and the results.

4   Q.   And that's slide 27?

5   A.   Yes, sir.

6   Q.   All right. So the Sig Sauer that was just shown, as part

7   of the investigation of the case did you obtain a handgun just

8   like that?

9   A.   Yes, sir.  It was the same make and model, but a

10  different firearm.

11  Q.   Where was that obtained from?

12  A.   That was obtained from the ATF, the Alcohol, Tobacco, and

13  Firearms agency.

14  Q.   The reason?

15  A.   Just as an exemplar gun so that I didn't have to continue

16  handling the actual weapon.

17  Q.   You didn't want to disturb any evidence that was still on

18  the --

19          **MR. HAWKS:**  Objection, leading.

20          **THE COURT:**  Sustained.

21  **BY MR. MOOMAU:**

22  Q.   Why didn't you want to use the evidence Sig Sauer?

23  A.   Because of the DNA evidence located on it previously.

24  Q.   Are you familiar with how to take that particular model

25  of firearm apart and put it back together?

1   A.   Yes, sir.  I'm familiar.

2   Q.   And was a video recording prepared of you doing that?

3   A.   That's correct.

4        **MR. MOOMAU:**  At this time I'd like to show the

5   witness what has been admitted as Exhibit 459. You can just

6   tell us what's going on.

7        **THE WITNESS:**  This is a video showing me

8   disassembling the firearm that I had received from the ATF

9   that's the same make and model as the firearm recovered from

10  the residence.

11  **BY MR. MOOMAU:**

12  Q.   And what's the reason for doing this?

13  A.   I'm just showing the various parts of the firearm because

14  in some of the previous photos that we've shown, the weapon is

15  in a disassembled state.

16  Q.   Okay, all right. And was that you taking it apart?

17  A.   That's correct.

18  Q.   That's you with the gloves on?

19  A.   Correct.

20  Q.   Sir, did you also take actual pictures of the firearm?

21  A.   Correct, of the replica or the exemplar gun, rather.

22  Q.   I'd like to show you Exhibit 453. Showing you now what is

23  453. Do you recognize that?

24  A.   Yes, sir.

25  Q.   What is 453?

 1    A.   That's one of the photographs I took of that exemplar

 2    gun.

 3    Q.   And are you able to point or circle on there the

 4    locations shown on the video or the slide presentation where

 5    DNA was found?

 6    A.   Sure. There was some DNA found on the barrel itself, but

 7    also on the slide that it would be in between where that

 8    barrel rests and the slide, as well as in that general area of

 9    the recoil spring.

10    Q.   Any other -- you had identified other locations on the

11    firearm, not in the barrel area?

12    A.   There were a number of areas where swabs were taken that

13    this is a difficult angle to show this.

14    Q.   To see it, all right. Going to Exhibit 454. What are we

15    looking at here, sir?

16    A.   This is a photograph depicting the firearm partially

17    disassembled. It is the slide and barrel and recoil spring

18    together, separated from the receiver of the firearm.

19    Q.   And does this show like within the internal parts of the

20    firearm where DNA of the deduced known was found?

21    A.   Some of the levers on the receiver of the firearm were in

22    some areas, yes.

23    Q.   Okay. Showing you 455. What is shown on 455?

24    A.   It's another photograph just one step further into the

25    disassembly process of the various parts of that firearm.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1913**

```
 1    Q.    And 456?

 2    A.    Again, just one additional step with the barrel removed

 3    from the slide.

 4    Q.    Are you able to show on here within the internal workings

 5    of the firearm, locations of the deduced known that was shown

 6    in the previous exhibit?

 7    A.    It was in this area on the muzzle end of this slide.

 8    Q.    Now 457. What is shown in 457?

 9    A.    It's the same thing, just with the slide turned on its

10    side.

11    Q.    And 458?

12    A.    It's the firearm raised.

13    Q.    And sir, were you present when the Kia Sportage was

14    processed for the presence of presumptive blood, as well as

15    DNA?

16    A.    I was.

17              THE COURT:  So Mr. Moomau, I think we might need to

18    take the afternoon break now if you're moving into another

19    area.

20              MR. MOOMAU:  Thank you, Your Honor.

21              THE COURT:  So we'll take a 15-minute break. Ladies

22    and gentlemen, again don't discuss the case among yourselves.

23    Enjoy the break.  We'll see you back here in 15 minutes.

24    Thank you.

25              (Jury exited the courtroom at 3:39 p.m.)
```

```
 1              THE COURT:  Thank you, everyone.  Please be seated.
 2   Sergeant Simms, you can return to your regular seat. So what I
 3   am cognizant of is we're not sitting tomorrow, we're coming
 4   back on Monday but I want to be able to identify what the
 5   right schedule is for the jury. One of the things I try to
 6   avoid is a situation where we have them come in for a very
 7   short period of time and then we can't move beyond that.  And
 8   also understanding when we're going to do instructions and
 9   closing.  Let's start by finding out how much more do you have
10   on direct, Mr. Moomau?
11              MR. MOOMAU: Your Honor, we have one more
12   PowerPoint-type slide presentation that I would say
13   half-an-hour more, maybe not that -- might be just 20 minutes.
14              THE COURT:  Okay. Does defense counsel have any idea
15   how long you'll be with this witness?
16              MR. NIETO:  I'm a bad gauge of this, but I would
17   suspect maybe a half-hour for Taeyan Williams.
18              THE COURT:  Mr. Hawks?
19              MR. HAWKS:  Your Honor's asking about Sergeant
20   Simms?
21              THE COURT:  Just Sergeant Simms, yes.
22              MR. HAWKS:  15 minutes or less.
23              THE COURT:  Okay, so we might finish today, maybe
24   not depending on all these things. And then there's only one
25   other witness for the Government; is that correct?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1915**

```
 1                MS. GROSSI:  That's correct, Your Honor.

 2           THE COURT:  How long would that witness be?

 3           MS. GROSSI:  Probably 45 minutes to an hour.

 4           THE COURT:  Okay, on direct?

 5           MS. GROSSI:  That's correct.

 6           THE COURT:  Does the defense know anything about

 7      that witness?  Is it going to be a no questions or lengthy

 8      cross?

 9           MR. GUILLAUME:  I think it would be about 20 to 25

10      minutes, maybe less depending on what else is answered by

11      Sergeant Simms.  But 20 to 25 minutes for Taeyan Williams for

12      the last witness.

13           THE COURT:  Okay.  And do you agree with that or do

14      you have a different number for you, Mr. Hawks?

15           MR. HAWKS:  Your Honor, I anticipate it would be

16      shorter.

17           THE COURT:  Okay.  And then at this point how much

18      do we know about who the defense is bringing in and how long

19      those cases will be?

20           MR. GUILLAUME:  Your Honor, we have one witness

21      anticipated for Monday.  But I've talked to Mr. Nieto during

22      the break.  We may be able to get the answers we're seeking

23      through Sergeant Simms. And if we don't, then the witness

24      would only take about five to ten minutes.

25                THE COURT:  Okay. Mr. Hawks?
```

```
 1              MR. HAWKS:  Your Honor, we are exploring with Mr.
 2    Hanlon and the team a stipulation. If that fails I anticipate
 3    certainly less than an hour, probably half-hour, but could be
 4    an hour.
 5              THE COURT:  Okay. So I mean, my impression is I
 6    thought actually we might finish the Government's case today.
 7    It doesn't look like we're going to do that. So what I want to
 8    avoid is having the jury come in for let's say an hour or so
 9    and then say look, we aren't ready for anything else.  I mean,
10    we can't make them come in for a period of time that's sort of
11    shorter than their commute. It sounds as if if we finish
12    Sergeant Simms today or maybe it takes a little longer on
13    Monday and then we add in this last Government witness, even
14    with the defense case we're probably going to be done in the
15    morning.  Does that sound right?
16              MR. GUILLAUME:  Sounds about right, Your Honor. By
17    lunchtime I would imagine.
18              THE COURT:  There are sometime scenarios, I know
19    this sometimes happens with defense cases, where we might
20    finish even earlier than that like you said if there's
21    stipulations and the like.  So is there a chance we would be
22    done even before lunch?
23              MR. GUILLAUME:  I think so, Your Honor.  Because our
24    witness at maximum is ten minutes and that's a stretch.  I
25    don't think it would be that long at all, if we can call him.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1917**

 1              **THE COURT:**  Right. So I guess the tricky part is

 2      we're not really done with our jury instructions. I think

 3      we're close. There's still a couple things I think the

 4      Government was going to provide to me which I don't think we

 5      have yet.

 6          One suggestion I have, on the one hand if we get a full

 7      half-day of testimony I would be fine sending them home and

 8      doing the jury charge conference and lock that all down in the

 9      afternoon, do closings the following morning. Again, my

10      concern perhaps is if we finish let's say at 10:30 in the

11      morning, I don't want to delay them with a charge conference

12      and so forth. I think one possibility is we do a charge

13      conference on Monday morning, have the jury come in a little

14      bit later, say at like 10 a.m. and that way if we really run

15      out of stuff to do, we could move to jury instructions at a

16      minimum on Monday, if not closing arguments. I obviously want

17      to be in a position to do that.

18          So does anybody have a view on both the likelihood of

19      what our schedule will be and whether that's a good approach

20      or whether you prefer something else?

21              **MR. GUILLAUME:**  Your Honor, I can speak for Taeyan

22      Williams.  If possible, I know this doesn't always work out,

23      but if we could do the closings at the beginning of the day

24      all at once and then they have the case by the afternoon or

25      the mid -- by the lunch break essentially, if it's three hours

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1918**

```
 1    -- hour per defendant and hour for the Government plus
 2    rebuttal that would take us to around lunchtime.  And that way
 3    they would have almost a full day or half a day.
 4             THE COURT:  You're talking about on Tuesday?
 5             MR. GUILLAUME:  Tuesday.
 6             THE COURT:  One of the problems with this is always
 7    when you add that in with the jury instructions it's hard to
 8    do it without a lunch break. So one possibility which I know
 9    some judges hate to do, it doesn't bother me that much because
10    I usually give -- I will give the jurors the instructions
11    anyway, just to instruct the day before or before lunch or
12    what have you. I don't mind separating that a little bit.
13        Mr. Hawks, you were going to say?
14             MR. HAWKS:  Your Honor, the schedule that you
15    proposed that we come in later -- or we come in on time but
16    the jury comes in later on Monday I think would probably be
17    the best, mitigate the risk that they come in early and then
18    need to leave.
19        The other thing we could do is whenever this witness is
20    concluded even if we have time, adjourn and push that to
21    Monday and that would ensure that there's enough happening on
22    Monday that they're not here for too brief a period.
23             THE COURT:  How does the Government see this?
24             MS. GROSSI:  All of those scenarios sound good to
25    the Government, Your Honor.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1919**

```
 1          THE COURT:  Is there any sense that -- Mr. Guillaume
 2   is proposing that it sounds like closings occurring on Tuesday
 3   no matter what or if we finish really early on Monday is there
 4   any reason we couldn't do that after lunch, for example?
 5          MR. GUILLAUME:  I would be prepared to close
 6   whenever, Your Honor.  My preference would be to close, have
 7   everyone do it on Tuesday and have the jury out for the
 8   remainder of the day to start deliberating on the case.  But I
 9   can do anything, Monday or Tuesday.
10          MR. HAWKS:  Your Honor, inspired by that can-do
11   spirit, I can as well.
12          THE COURT:  Okay, well then I guess the Government
13   is fine with that too, right?
14          MS. GROSSI:  Yes, Your Honor.
15          THE COURT:  Okay, so let me just see where we end
16   up. I just didn't want to have to have a big conference while
17   the jury is waiting to see what their schedule is. It will
18   either be come in -- I might have them come in a little bit
19   later on Monday because either way that charge conference has
20   to happen.  And we could if we finish early do it after, but
21   that sort of precludes us from moving into at least the
22   instructions, if not the arguments.  And again, I think
23   there's at least some advantage as Mr. Guillaume said of
24   getting to a point where we can either start the arguments
25   right after lunch on Monday or first thing in the morning on
```

```
 1    Tuesday without -- certainly without breaking it up. I
 2    wouldn't break it up between two days, for sure.
 3        So we'll see you back here in 15 minutes and then we'll
 4    see where we are at the end of the day.  Thank you.
 5            (Recess was taken from 3:46 to 4:00 p.m.)
 6            THE COURT:  Ready for the jury?
 7            MS. GROSSI:  Your Honor, can I just ask one question
 8    before the jury comes in?  We do have our last witness here.
 9    He drove up from South Carolina. Do I have permission to
10    discharge him for the day or should I ask him to sit here
11    until 5?
12            THE COURT:  You said you have another half-hour, Mr.
13    Moomau?
14            MR. MOOMAU: It's not going to take that long, Your
15    Honor.
16            THE COURT:  I mean, are we -- I feel bad in the
17    sense that like an extra 20 minutes here isn't going to make
18    the difference.  The issue is he came up on a Thursday and we
19    need him back on Monday.  I thought I heard between the two of
20    you you're talking 45 minutes, two sides together?
21            MR. GUILLAUME:  For the last witness, Your Honor?
22            THE COURT:  Sergeant Simms, just on cross.
23            MR. NIETO:  Like I said, I anticipate the cross
24    would be approximately 30 minutes, approximately.
25            THE COURT:  Okay, I think we can probably release
```

1   him. Does anybody disagree with that?  Okay.

2          MS. GROSSI:  Okay, thank you, Your Honor. May I walk

3   out to just tell him that?

4          THE COURT:  All right.

5          MS. GROSSI:  Thank you.

6          **(Jury reentered the courtroom at 4:03 p.m.)**

7          THE COURT:  Thank you, everyone. Please be seated.

8   Ladies and gentlemen, we're ready to resume with Sergeant

9   Simms' testimony. Mr. Moomau.

10         MR. MOOMAU:  Thank you, Your Honor.

11  BY MR. MOOMAU:

12  Q.   Sir, did you prepare a PowerPoint or slide presentation

13  showing the location of swabs that were taken for the presence

14  of blood and DNA in the Kia Sportage that had been rented by

15  Mr. Smothers?

16  A.   Yes, sir, I did.

17  Q.   Were you present when that vehicle was processed?

18  A.   Yes, sir.

19  Q.   Did you then prepare a supplemental PowerPoint or slide

20  presentation showing the results of the DNA analysis?

21  A.   Yes, sir.

22         MR. MOOMAU:  Your Honor, at this time we would ask

23  to be able to show what's been admitted as Exhibit 451.

24         THE COURT:  Okay.

25  BY MR. MOOMAU:

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1922**

1    Q.    What are we looking at here in the first page?

2    A.    Just identifying the vehicle that was searched.

3    Q.    Okay. In the page 1 or page 2?

4    A.    Yes, sir.  Again, just where swabs were taken, the

5    corresponding DNA exhibit, and the results from that testing.

6    Q.    Page 3?

7    A.    These are just swabs taken from the vehicle on their

8    respective locations.

9    Q.    Page 4.

10   A.    A swab from the water bottle with the corresponding DNA

11   exhibit and the results.

12   Q.    And what was the result of that?

13   A.    That the DNA was consistent with that of the deduced

14   known of Noah Smothers.

15   Q.    Page 5.

16   A.    Various swabs taken from the vehicle, corresponding DNA

17   exhibit, and the results from that testing.

18   Q.    Page 6.

19   A.    These are swabs taken from the vehicle.

20   Q.    Page 7.

21   A.    These are a number of swabs, the corresponding DNA

22   exhibit and the results.

23   Q.    Okay. And as far as the DNA for the third box down?

24   A.    Yes, sir.

25   Q.    Where that's pointing to, what were the DNA results

1    there?

2    A.    The results indicated that blood was indicated and that

3    the DNA was consistent with that of the deduced known of Noah

4    Smothers.

5    Q.    Page 8.

6    A.    It's that same slide just on its own.

7    Q.    Page 9.

8    A.    Two or three swabs taken from those areas along with the

9    corresponding DNA exhibit, as well as the results indicating

10   that blood was indicated and that the DNA was consistent with

11   the deduced known of Noah Smothers.

12   Q.    Page 10.

13   A.    Same thing with the one slide.

14   Q.    Page 11.

15   A.    Various swabs taken from this portion of the vehicle,

16   including the top box which shows swabs that were taken, the

17   corresponding DNA exhibit and results that blood was indicated

18   and that the DNA recovered was consistent with the DNA of the

19   deduced known of Noah Smothers.

20   Q.    Page 12.

21   A.    Again, the same as before, but just the top box isolated.

22   Q.    Page 13.

23   A.    Showing a swab from the vehicle.

24   Q.    Page 14.

25   A.    This is a swab from the door of the vehicle showing the

1    corresponding DNA exhibit and the results showing that blood
2    was indicated and that the DNA was consistent with the deduced
3    known of Noah Smothers.
4    Q.    And page 15.
5    A.    Showing swabs from that portion of the vehicle.
6    Q.    And page 16.
7    A.    Again, swabs from that portion of the vehicle.
8    Q.    Sir, I'd like to show you what has been admitted as
9    Exhibit 91. You recognize this document?
10   A.    Yes, sir.
11   Q.    And are you familiar with the various amount or strains
12   -- you had testified about some pictures, what type of
13   marijuana was recovered from the home, correct?
14   A.    Correct.
15   Q.    And have you studied this list about what was recovered
16   and maybe what might be shown on the list and what, of that,
17   was recovered?
18   A.    Yes, sir.
19   Q.    And just looking at the writing, the "me, Tae and Team"
20   just starting on the first page. Go to page 2, page 3, page
21   5-- or 4, page 5, page 6. The handwriting in the right-hand
22   column says what on the various pages?
23   A.    There's three different words, "me," "Tae" and "Team."
24   Q.    And from the various strands, wherever it was marked
25   "team," was any of that found in the house?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1925

```
 1    A.    It was not.

 2    Q.    And where it said "Tae," were any strands of that type

 3    named, the named "Tae, blue goo," was any of that found in the

 4    house?

 5    A.    It was not.

 6    Q.    So what was the name besides what was found in the house?

 7    A.    Everywhere that it's marked "me," we found those strains

 8    inside of the residence.

 9              MR. MOOMAU: That's all on direct, Your Honor.  Thank

10    you.

11              THE COURT:  Okay. Who wants to go first. Mr. Nieto?

12              MR. NIETO:  Thank you, Your Honor.

13              THE COURT:  For Taeyan Williams.

14              C R O S S - E X A M I N A T I O N

15    BY MR. NIETO:

16    Q.    Good afternoon, Sergeant Simms.

17    A.    Good afternoon.

18    Q.    Now I think it's fair to say, sir, that you would agree

19    this was an important and lengthy investigation?

20    A.    Yes, sir.

21    Q.    And obviously it's an investigation that you took very

22    seriously?

23    A.    Yes, sir.

24    Q.    And I assume everybody on the prosecutorial team; is that

25    fair to say?
```

```
 1    A.    Yes, sir.
 2    Q.    And as part of your role as the investigator, you're
 3    seeking to find evidence of the crime, right?
 4    A.    Seeking to find out what happened which would relate to
 5    evidence, yes, sir.
 6    Q.    And as part of that investigation you're going to follow
 7    up on leads as they develop, right?
 8    A.    Yes, sir.
 9    Q.    And as best you can to try to verify whatever information
10    you receive?
11    A.    Yes, sir.
12    Q.    And so this particular case, it poses presumably some
13    unique challenges; is that fair to say?
14    A.    In various aspects, yes.
15    Q.    I mean, one of the main factors in this case is that Noah
16    Smothers utilized an encrypted phone; is that fair?
17    A.    That was one challenge, yes.
18    Q.    I mean, because that obviously means he was operating in
19    a clandestine fashion, right?  He was trying to be secretive;
20    is that fair?
21    A.    I suppose.
22    Q.    So there is movement and activity involving Noah Smothers
23    that are simply -- that we simply don't know about because
24    that phone cannot be tracked; is that correct, sir?
25    A.    Can't be tracked to my knowledge, that's correct.
```

1  Q.   Correct. As part of your investigation?

2  A.   Correct, yes, sir.

3  Q.   Okay. And so not only is this encrypted phone like that,

4  I believe the testimony I think presumably your understanding

5  will be that Noah Smothers could change the caller ID number

6  that would appear on the phone that he was calling. Is that

7  your understanding, sir?

8  A.   That was my understanding, yes.

9  Q.   And, of course, that can create havoc for investigators

10 such as yourself when you're trying to determine whether or

11 not all these phone records are accurate. Right?

12 A.   Which phone records are accurate?

13 Q.   Fair point. So the encrypted phone as far as you

14 understand doesn't ping off of cell phone towers the way a

15 non-encrypted phone would do?

16 A.   Generally that's my understanding, correct.

17 Q.   And so if you use that phone as, for example, not

18 utilizing the regular non-encrypted phone, he can make phone

19 calls from the encrypted phone that we simply don't know

20 about, right?

21 A.   I guess that's a possibility, yes, sir.

22 Q.   I mean, right?

23 A.   I don't know whether he was making those calls or not,

24 but I guess it's possible, yes.

25 Q.   Right. And I guess that's the issue.

**JA1928**

1    A.    Okay.

2    Q.    In your investigation you did not reveal or learn any

3    call logs from the encrypted phone that Noah Smothers had?

4    A.    That's correct.

5    Q.    Right. So we don't know if he was making calls, and at

6    the same time we don't know if he wasn't making calls, right?

7    A.    That's accurate.

8    Q.    We simply don't know?

9    A.    That's true.

10   Q.    And so obviously that can make things a little more

11   difficult for you because of that lack of information?

12   A.    For that phone, yes.

13   Q.    Yes, sir. And I believe Noah Smothers had two encrypted

14   phones; is that correct?

15   A.    At the same time, at various -- can you clarify?

16   Q.    That's a fair question. Is it your understanding that

17   Noah Smothers had more than one kiphone in his possession

18   during your period of investigation?

19   A.    I was not aware of that. I don't have information to

20   support that.

21   Q.    Okay. Now again, as we said, that Noah Smothers could use

22   through this encrypted phone, right, he could call somebody

23   and then that -- the recipient's phone would reflect someone

24   else was calling?

25   A.    Again, that was what was relayed to me, but I don't know.

 1   Q.   And sir, obviously as part of your investigation you met
 2   with Connor Cox before he testified, right?
 3   A.   Yes.
 4   Q.   But you were here when Mr. Cox relayed that story about
 5   the time Noah Smothers called him from the encrypted phone but
 6   it came up on Connor Cox's phone as Connor's mother?
 7   A.   That's correct.  It was relayed to me, but I haven't
 8   interacted with a phone like that, so --
 9   Q.   That's the point of my challenge is that this kind of
10   encrypted phone is not commonplace in your investigations,
11   right?
12   A.   Correct.
13         **THE COURT:**  Mr. Nieto, can you move the microphone
14   closer to you?
15         **MR. NIETO:** Absolutely.  I apologize, Your Honor.
16   **BY MR. NIETO:**
17   Q.   I don't know if you know that, that's why I'm posing the
18   question this way.  In that Connor Cox example, if Noah
19   Smothers calls somebody and then uses a phone number for
20   someone else to come up on the caller ID, the phone records
21   for the recipient of that call might be in question; is that
22   fair?
23   A.   Are you saying what the records would reflect from the
24   phone carrier of the recipient?
25   Q.   Yes, sir.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1930**

1    A.    I don't know the answer to that.

2    Q.    No, completely fair question.  And again, we don't know,

3    right?

4    A.    All right.

5    Q.    All right?  Is that a yes or no?

6    A.    Yes, sir.  I don't know what the answer to that would be.

7    Q.    Sure. I mean, this type of encrypted phone, a phone that

8    I understand costs in excess of $3,800 or $3,700?

9    A.    It was in that range, yes, sir.

10    Q.    Right. So, you know, this is a phone geared specifically

11    to prevent anyone from knowing what the user of the phone is

12    doing, correct?

13    A.    Generally, yes.

14    Q.    Right. Ergo the encryption, correct?

15    A.    I mean, the encryption would be on the actual device. I

16    don't know how that would translate to records from individual

17    companies. But yes, encryption is just -- to my understanding,

18    just a way to secure device in that location, but, yeah.

19    Q.    All right.  So then understanding and knowing the kiphone

20    identification for Noah Smothers' phone, you were then able to

21    pull his phone records from the encrypted phone to determine

22    who he was calling?

23    A.    I was not.

24    Q.    Right.

25    A.    Because I was not able to identify the number associated

```
 1    with that phone.
 2    Q.   I see. So again, I guess we really don't know, right?
 3    A.   Don't know who he was contacting, is that what you mean?
 4    Q.   Yes.
 5    A.   On that device.
 6    Q.   On that device.
 7    A.   Correct.
 8    Q.   So again, as I'm suggesting in the same vein, if Noah
 9    Smothers were to call me from that encrypted phone, we
10    wouldn't know in my phone records whether it would come up as
11    Noah Smothers' encrypted phone or as the number that he was
12    using to come up on my phone, if that makes sense.
13    A.   Correct.  I do not know the answer to that question.
14    Q.   Right, we don't know. We just don't know. All right. But,
15    of course -- and I think we had seen it in Exhibit 479, in the
16    contact section of the iCloud for Noah Smothers' encrypted
17    phone, he has both Taeyan Williams' and Scott Williams' cell
18    phone numbers saved, right?
19    A.   Yes, sir.
20    Q.   And, in fact, specifically the number 929-290-6897, that
21    was on the phone saved under "MW"?
22    A.   Correct.
23    Q.   That's your understanding, that was presumably Scott
24    Williams' phone?
25    A.   Yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1932**

1   Q.    And in the same vein, again 681-404-1855, that was a

2   saved number in that iCloud contacts under "TA," Ta or Tae,

3   and your understanding is that's Taeyan Williams' phone?

4   A.    Yes, sir.

5   Q.    So the encrypted phones also can create these additional

6   issues I think is what we said because we have these patches

7   of time in which the phone cannot provide us any information

8   about its location?

9   A.    About Noah Smothers' location?

10  Q.    Yes, sir.

11  A.    Yes, sir.

12  Q.    Right. And so your painstaking endeavor to recreate Noah

13  Smothers' movements in the beginning stages of April, 2018 are

14  done primarily through the use of his non-encrypted phone,

15  correct?

16  A.    Correct, as well as the results from Google and video and

17  other things that we piece it together with.

18  Q.    Absolutely, absolutely. And so the Google searches about

19  which I think you had testified presumably were done on his

20  phone?

21  A.    Correct.

22  Q.    Right, okay. And again, that's the non-encrypted phone?

23  A.    To my understanding, yes, sir.

24  Q.    Yes, sir, all right. And again, the manufacturing of this

25  type of encrypted phone is presumably to help thwart law

```
1    enforcement's investigation into the activities of the user of
2    the phone, right?
3    A.   I don't know that I'm necessary qualified to answer what
4    the manufacturing intended purpose is.
5    Q.   Well, let's put it this way: Noah Smothers thought it
6    appropriate to spend almost $4,000 on a phone that he
7    seemingly used for his drug distribution purposes; is that
8    correct?
9    A.   To my understanding, yes, sir.
10   Q.   Right. And with the full knowledge that this phone was
11   encrypted and could come up on people's caller IDs as a
12   different number, presumably could not be tracked, right?
13   A.   That's my understanding.
14   Q.   In fact, I think we had looked at Exhibit 170 which had a
15   variety of different -- I think it was a Note section again
16   from Noah's phone that had the eBay. Do you remember that?  It
17   had a bunch of different websites or accounts perhaps?
18   A.   It was from his AOL account, yes, sir.
19   Q.   Yes, sir.  Yes, sir. And in fact, one of them I think we
20   had seen was "hide me." Do you remember seeing that, sir?
21   A.   Yes, sir.  I believe it was hide.me, yes, sir.
22   Q.   Hide.me. And of course, that is -- again, it's another
23   service that someone can pay for with a monthly fee to hide
24   the IP address from whence that phone is searching the web;
25   did you see that?
```

**JA1934**

 1    A.    I saw the hide.me.  Unfortunately, I'm not familiar with

 2    that service.

 3    Q.    But presumably as part of your investigation you followed

 4    up on that, right?  You wanted to see in Noah Smothers' Note

 5    section of the AOL account what these subscriptions could be?

 6    A.    I did not check that one particular one.

 7    Q.    But you do acknowledge that the title was hide.me?

 8    A.    Yes, sir.

 9    Q.    Okay. Now in furtherance of the investigation you checked

10    with the neighborhood, the Bristolwood neighborhood?  You

11    checked with the neighbors near Scott Williams' home?

12    A.    Yes, sir.

13    Q.    Because obviously -- with regards to that April weekend?

14    A.    That's -- yes, sir.

15    Q.    And you were checking to see whether or not anyone had

16    seen or heard anything, right?

17    A.    Yes, sir.

18    Q.    I believe some neighbors might have had a Ring camera or

19    some video surveillance of sorts?

20    A.    Yes, sir.  It was not available for that time frame, but

21    they did have a ring camera, yes, sir.

22    Q.    So again, despite your best efforts there was no

23    investigative value if you will on that end of the

24    investigation?

25    A.    Correct.

1    Q.    Then you had an opportunity to meet with Alfred Musa,

2    right?

3    A.    Yes, sir.

4    Q.    And that happened on multiple occasions?

5    A.    Yes, sir.

6    Q.    Right. And I'm assuming you sought to verify some of the

7    information that he provided you?

8    A.    Yes, that's correct.

9    Q.    Okay. And I think as you said on direct, he had mentioned

10   the Red Roof Inn.  And so you had gone to the Red Roof Inn in

11   Laurel to see the people who had rented rooms for the weekend

12   of April 6th through April 8th of 2018?

13   A.    Yes, sir.

14   Q.    You had also looked at other dates as well for

15   cross-referencing purposes?

16   A.    I looked at other dates specific to the parties involved

17   in this investigation, but yes.

18   Q.    And I'm sorry, of course. Specific to this investigation

19   to be sure, yes?

20   A.    Yes, sir.

21   Q.    So when you reviewed the roster of those names, again,

22   you did not find anything of true evidentiary value to your

23   investigation?

24   A.    It wasn't obvious to me that any of those names matched,

25   correct.

```
 1    Q.   And so there was nothing obvious to you through your
 2    multi-year investigation that would connect any of those
 3    people renting those rooms with Taeyan Williams, Scott
 4    Williams, or Noah Smothers, correct?
 5    A.   Yes.
 6    Q.   In addition, you also went to the Red Roof Inn in Laurel
 7    to check on potential surveillance footage?
 8    A.   Yes.
 9    Q.   Because obviously as I understand it, you would
10    presumably want to see if there was a video of three men
11    escorting a 6 foot 6 guy who had been pistol whipped and
12    bloodied either through the lobby, in the parking lot to the
13    Kia Sportage parked outside, right?
14    A.   Yes, I wanted to see if there was any video surveillance
15    available of the incident, correct.
16    Q.   Of course. So there are cameras at the hotel, right?
17    A.   To my knowledge, yes, sir.
18    Q.   But again, through no fault of your own, the preservation
19    of the video had elapsed. The time period had elapsed?
20    A.   Correct. By the time I got there, that video was no
21    longer available.
22    Q.   So again, you couldn't verify that information at the Red
23    Roof Inn, right?
24    A.   Via video surveillance, right.  Yes, sir.
25    Q.   And I think Mr. Musa had also told you that while in the
```

1    jail, Scott Williams was talking on a contraband phone. Do you
2    remember him saying that?
3    A.    Yes, sir.
4    Q.    And, in fact, I believe what he had instructed or had
5    relayed to you was that he was communicating with his partner,
6    the other person that was allegedly involved in all of this
7    situation in early April of 2018. Right?
8    A.    Yes, sir.  He said that.
9    Q.    But Mr. Musa was able to identify specifically a location
10   in the phone that he said Scott Williams had used to
11   communicate with this individual, right?
12   A.    Yes, sir.
13   Q.    And of course, as is your charge, you went to the jail to
14   obtain that phone and review it for evidentiary value,
15   correct?
16   A.    Not specifically. I didn't go to the jail. I just
17   received the records from that phone.
18   Q.    So metaphorically you obtained the --
19   A.    I obtained the records, yes, sir.
20   Q.    And you did your due diligence.  But again, there was no
21   number or contact in that phone that had any significance or
22   any evidentiary value to you with regards to Scott Williams,
23   Taeyan Williams, or Noah Smothers?
24   A.    Correct.  I looked at the numbers and none were
25   abundantly obvious to me as being related.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1938

```
1    Q.   Right, all right. Now we had also through this trial we
2    have watched the video from the Windsor Forest Apartment
3    Complex, the early hours of April 7, 2018. You know the video
4    about which I'm speaking?
5    A.   Yes, sir.
6    Q.   And in this video we see Noah Smothers' Kia Sportage and
7    then we see the Nissan Altima pulling in behind it as it
8    enters the parking lot?
9    A.   It's Noah Smothers' vehicle.
10   Q.   The rental vehicle?
11   A.   Yes, sir. I thought you said that it was him.
12   Q.   Oh, allow me to rephrase. My apologies. In this video you
13   see Noah Smothers' rented Kia Sportage entering into the
14   parking lot followed by a Nissan Altima?
15   A.   That's correct.
16   Q.   Okay. Now in this video obviously you are looking, again,
17   for something of evidentiary value, specifically to try to
18   identify the individuals on that video, right?
19   A.   Yes, sir.  And the vehicles.
20   Q.   Absolutely. And so when we look at these videos, right,
21   what we see is that one of them has a red hoodie, right?  Do
22   you remember that hoodie?
23   A.   Yes, sir.
24   Q.   It's a zip-up in the front?
25   A.   That's correct.
```

**JA1939**

1    Q.    It doesn't have any designs or logos on the front or the
2    back, correct?
3    A.    It doesn't appear to from the video.
4    Q.    From the video it doesn't appear to have any of that,
5    correct?
6    A.    Correct.
7    Q.    And then the other individual has what looks like either
8    a dark gray, olive, or beige-colored hoodie similar in style
9    as the red one, correct?
10   A.    Yes, sir.  It appeared to be gray to me, but similar,
11   yes.
12   Q.    Exactly. And of course, again, no logo or salient or
13   anything that jumped out in terms of the clothes, it was just
14   sort of uniform, one color. Is that your recollection?
15   A.    That's my recollection, yes.
16   Q.    Okay.  And so obviously we've watched the video footage
17   from that particular dropoff, many, many, many times during
18   this trial, right?
19   A.    Okay.
20   Q.    Is that fair to say?
21   A.    Yes.
22   Q.    And we watched -- we had -- forgive me, I forget we had a
23   car expert come in to identify the make and models of those
24   vehicles, right?  Based on that same video?
25   A.    Yes, sir.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1940**

```
1    Q.    And we also had an expert in height I guess coming in as
2    to opine to the height of the individuals?
3    A.    Yes, sir.
4    Q.    And I think -- again, if you know, as part of your
5    investigation, do you know the average height of a U.S. male
6    in this country?
7    A.    Not off the top of my head, no, sir.
8    Q.    Do you suspect that it would be over or under 6 feet?
9    A.    I'm over 6 foot, I don't know.
10   Q.    Well, do you consider your height to be average?
11   A.    I would say it's slightly above average.
12   Q.    Slightly above average. So again, with regards to this
13   witness, establishing that the individuals are below 6 feet,
14   you didn't do any additional research on the statistics for
15   that to try to narrow the suspect pool, right?
16   A.    I did not.
17   Q.    Okay. And obviously other than this average height,
18   another as we said, another visible investigative lead was the
19   colors of the clothes?
20   A.    That's correct.
21   Q.    And so then you and other law enforcement, through search
22   warrants and arrest, were able to search the Bristolwood
23   address, for example, for articles of clothing to match those
24   descriptions, right?
25   A.    Correct.
```

1   Q.   You would also search various locations in West Virginia

2   that had a connection to Taeyen Williams, again to see, among

3   other things, but to keep an eye out for articles of clothing

4   that my match that description?

5   A.   Not me personally, but other investigators, correct.

6   Q.   But as the case agent you're kept in the loop as that

7   goes on?

8   A.   Absolutely.

9   Q.   Now you did not find a matching red hoodie or a matching

10  gray or dark gray hoodie anywhere, did you?

11  A.   Not specifically, no.

12  Q.   Right. Now there was a couple of photos that had been

13  introduced that had been Taeyan -- from Taeyan Williams'

14  phone, right?  And I'm presuming you had reviewed those?

15  A.   Yes, sir.

16  Q.   And then as part of the preparation for trial they had

17  been organized and prepared; is that right?

18  A.   Yes, sir.

19  Q.   Now there had been one specifically that we had seen

20  earlier and that was Exhibit 353. What I'll do is if you

21  remember this one, this was we'll call it a selfie of Taeyan

22  in a light gray hoodie. Do you know the exhibit about which

23  I'm speaking?  Can you see it in front of you?

24  A.   Yes, sir.

25  Q.   Okay. Now this is, of course, not the gray hoodie that we

1    see in that video, is it?

2    A.    Doesn't appear to be.

3    Q.    No, of course because again, we can see that it has the

4    black and white photo of the woman on the front, as well as an

5    in color gold chain which would be inconsistent with what we

6    had seen in that video; is that correct?

7    A.    I did not see that image in the video, that's correct.

8    Q.    Now additionally, there was another selfie image that had

9    been introduced into evidence that was Exhibit 361. Do you

10   remember that exhibit, sir?

11   A.    Yes, sir.

12   Q.    Now in all fairness, in all fairness, Sergeant Simms,

13   this particular exhibit was not previewed to the jury during

14   the trial. But this was submitted, was it not?

15   A.    If you say so, yes, sir.

16   Q.    Okay. And then again, in this -- now we see him wearing a

17   red sweatshirt that has a zip-up in front, right?

18   A.    Yes, sir.

19   Q.    But again, we can feel pretty confident that this is not

20   the red hoodie that we see in that video either; isn't that

21   correct?

22   A.    Correct.  It has no hood.

23   Q.    It has no hood, exactly. So it would be obviously

24   ridiculous to suggest that this particular image had anything

25   to do with that Windsor Mill video, right?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1943**

1   A.   I don't know "ridiculous," but it doesn't appear to be
2   the same hoodie.
3   Q.   All right. Now we had also seen some photos taken from
4   Taeyan Williams' phone of conversations that he had with Noah
5   Smothers with regards to drug purchases. Do you remember
6   those, sir?
7   A.   I'm sorry, can you repeat that?
8   Q.   Absolutely, my apologies. Now we also had seen through
9   the exhibits from Taeyan Williams' phones, screenshots of
10  Wickr conversations between him and presumably Noah Smothers?
11  A.   That's correct.
12  Q.   Okay, all right. Now in those that we had seen, I believe
13  we had -- there was maybe four or five, if not more of
14  detailed Wickr conversations between Taeyan Williams and Noah
15  Smothers clearly with regards to the marijuana distribution
16  business; is that fair?
17  A.   Yes, sir.
18  Q.   Now again, these Wickr conversations are to be deleted,
19  right?  They automatically delete after a certain period of
20  time. Is that your understanding?
21  A.   Yes, sir.
22  Q.   So as we can see here, because these messages can be
23  fleeting, sometimes people will take a screenshot so they can
24  remember. Is that fair?
25  A.   That's fair.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1944**

```
 1    Q.   That's what we see here on Taeyan Williams' phone, do we
 2    not?
 3    A.   Presumably, yes.
 4    Q.   Yes. Now during your direct testimony today we were
 5    listening to the jail call which I believe was Exhibit 535.
 6    That was the jail call between Scott Williams and Taeyan
 7    Williams. Do you remember listening to that, sir?
 8    A.   Yes, sir.
 9    Q.   And in the course Taeyan Williams was in jail in West
10    Virginia at the time?
11    A.   That's correct.
12    Q.   And Scott Williams was not incarcerated?
13    A.   Yes, sir.
14    Q.   Now, of course, this conversation, this is subsequent to
15    the search and recovery of a variety of marijuana products
16    that they were alleging or charging Taeyan Williams of being
17    in possession of. Do you remember that?
18    A.   Yes, sir.
19    Q.   Right. And I think we had actually watched a video during
20    the trial of them opening the suitcase or where we saw
21    marijuana and cash from West Virginia. Do you remember that,
22    sir?
23    A.   From West Virginia, yes, sir.
24    Q.   Yes, sir. And, in fact, Taeyan Williams was in custody in
25    West Virginia because he had been charged with the possession
```

```
 1   with intent to distribute those drugs, was he not?
 2   A.   That was my understanding, yes, sir.
 3   Q.   Yes, sir. And so he was convicted of that offense. That's
 4   your understanding; is that right?
 5   A.   I believe so, yes.
 6   Q.   And so when we listen to that call, when we listen to
 7   that call, right, it's your testimony, it's your understanding
 8   that it was Taeyan Williams' voice that we hear saying "See,
 9   you're going to leave me in the dark again and not let me know
10   what's going on." Do you remember that line?
11   A.   Something to that effect, yes, sir. I do remember that
12   part, though.
13   Q.   And it is Taeyan Williams' voice that expresses repeated
14   concern about the photos on his phone, correct?
15   A.   Yes, sir.
16   Q.   And we had seen the bulk of these photos at this trial;
17   is that fair?
18   A.   Bulk of photos from his --
19   Q.   From his phone?
20   A.   From the extraction? I wouldn't say "bulk."  I think
21   there were 50,000 photos on the phone.
22   Q.   Completely fair. Bulk is a poor adjective.  My apologies.
23   A.   But there were a lot of photos.
24   Q.   Right, but we did see and your investigative purpose was
25   we saw a variety of photos of conversations relating to drug
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1946**

```
1    distribution, right?
2    A.   Yes, sir.  There were a number.
3    Q.   There were screenshots of conversation between Noah
4    Smothers and Taeyan Williams very clearly discussing marijuana
5    and the variety of different strains that Noah Smothers might
6    have been selling, right?
7    A.   That's accurate.
8    Q.   In fact, I believe we had even seen actual photos of
9    marijuana that Taeyan Williams had, Wickr photos that he had
10   saved as photos on his phone?
11   A.   Yes, sir.
12   Q.   And when Taeyan Williams -- we had also heard in that
13   call reference to charges here in Maryland. Do you remember
14   that, sir?
15   A.   He referenced them.  Yes, sir.
16   Q.   Yes, sir. And so when Taeyan Williams was charged and
17   indicted in December of 2018, his sole charge at that time was
18   conspiracy to distribute drugs; is that true?
19   A.   I don't know if that was the sole charge, but I do
20   believe that's one of the charges. I'm not confident in that.
21   Q.   Now we had seen through Exhibit 91 that was -- we'll call
22   that -- sorry, I don't have it up, we'll call that the
23   invoice, the EQL invoice.  You know about which I'm speaking,
24   yes?
25   A.   From under the mattress?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1947**

```
 1    Q.   Yes, sir.

 2    A.   Yes, sir.

 3    Q.   Now this invoice contains presumably all the EQL

 4    inventory for the 16 boxes of weed that apparently Noah had

 5    received via the shipment, right?

 6    A.   Yes, sir.

 7    Q.   All right. And according to that manifest and the

 8    handwritten notes we see the name "Tae" next to two particular

 9    boxes, right?

10    A.   Yes, sir.

11    Q.   And I think Mr. Moomau had asked you a few questions

12    about that earlier, correct?

13    A.   Yes, sir.

14    Q.   And the contents per that ledger suggest that Blue Goo

15    and Lemon Ice, those two strains were ostensively earmarked

16    for Tae?

17    A.   That's correct.

18    Q.   But those strains were never recovered, were they?

19    A.   Correct.

20    Q.   Neither in Maryland nor in West Virginia?

21    A.   That's correct.

22    Q.   Right? In West Virginia, indeed, they had in fact

23    recovered marijuana from Taeyan Williams' premises that

24    connected him with Noah Smothers. Do you remember those?

25    A.   Prior to this investigation, yes, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1948**

1    Q.    Yes, sir. In fact, it was Mr. Nice and White Widow?

2    A.    Correct.

3    Q.    And I believe we had actually seen, one of the exhibits

4    is a photo of that what looks like a vacuum bag of marijuana

5    labeled accordingly by the name Mr. Nice?

6    A.    Correct.

7    Q.    Okay. Now, of course, Mr. Nice and White Widow, those

8    strains are not listed on Exhibit 91, were they?

9    A.    They were not, because those were recovered prior to the

10   shipment.

11   Q.    Right, they were referenced in previous Wickr screenshot

12   conversations between Noah Smothers and Taeyan Williams,

13   right?

14   A.    Those same strain names were referenced, yes. I don't

15   know which.

16   Q.    Right?  Again, we don't know, right?

17   A.    Well --

18   Q.    But we do know, we do know that those strains were

19   referenced in those photos that were earmarked -- not

20   earmarked, sorry, that were date-stamped November or December

21   of 2017, right?

22   A.    Yes.

23   Q.    So that would be four months before this April, 2018

24   shipment?

25   A.    Correct.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1949**

1    Q.   Okay. Additionally, in those December of 2017 messages,
2    those photos that were saved on Taeyan Williams' phone, we
3    also see the strains OG, Cush and Sour Kemp.  Those are
4    referenced, are they not?
5    A.   I believe so, yes, sir.
6    Q.   And even when Oscar Diaz testified he stated those were
7    the strains that he remembered Taeyan Williams selling him in
8    the early stages of 2018?
9    A.   I don't recall the exact strains that he -- but he may
10   have.
11   Q.   Okay. And, of course, those would all precede April of
12   2018, right?
13   A.   Likely, yes, sir.
14   Q.   Likely, okay. Now you had testified earlier about some
15   Uber records. Do you remember that?  Right?  Specifically
16   pertaining to Taeyan Williams' travel?
17   A.   Correct.
18   Q.   In the early stages of 2018?
19   A.   Yes, sir.
20   Q.   Right?  Okay. Now you had seen in those Uber records as
21   I'm sure you know as we've talked about at trial, Oscar Diaz
22   drove Taeyan Williams down to Tysons Corner on the evening of
23   April 6th. Do you remember that, sir?
24   A.   It's not reflected in the Uber records, but yes, I'm
25   aware that he drove him down there.

1    Q.    That was a completely compound question.  I'm not

2    suggesting Uber records, but Oscar had testified that that's

3    where he had taken Taeyan on that evening, correct?

4    A.    Yes, Tysons Corner Mall.

5    Q.    Then we heard from Brandon Drummond that he was in

6    communication with Taeyan Williams and then we see an Uber

7    receipt with Taeyan Williams leaving Tysons Corner and then

8    traveling to College Park. Do you remember that, sir?

9    A.    Yes, sir.

10   Q.    And the address to where the Uber records show he was

11   going was 5007 or 5005 Jackson Street in Hyattsville. Do you

12   remember that?

13   A.    On that particular trip?

14   Q.    Sorry?

15   A.    For that particular trip to College Park?

16   Q.    Yes, sir. I mean, again, let me take a step back. It's

17   your understanding as part of the investigation that on the

18   evening of April 6, 2018 Taeyan Williams when leaving Tysons

19   Corner went to College Park, to the University of Maryland?

20   A.    It's my understanding he went to College Park, yes, sir.

21   Q.    And of course, in that Uber receipt there is an address

22   that says 5007 Jackson Street in Hyattsville?

23   A.    Can you tell me the date of that, please?

24   Q.    I'm sorry?

25   A.    I don't know the date specifically of that.

1    Q.    Absolutely. Court's indulgence for a minute. Let me ask
2    you this, sir.  That particular address, that is the address
3    for Mr. Drummond's fraternity house, isn't it?
4    A.    The address in College Park I believe is, not the
5    Hyattsville address.
6    Q.    Okay. You're 100 percent correct. The College Park
7    address. You know what -- and I'm sorry. I've got my addresses
8    conflicted.  Forgive me, forgive me.  It's not you, you're not
9    crazy. So the address about which I'm speaking is 4603 Knox
10   Road in College Park.
11   A.    That sounds correct.
12   Q.    So sorry about that. Yes, that is the address for Mr.
13   Drummond's fraternity?
14   A.    It appears to be in the general area, yes, sir.
15   Q.    Actually, that's --
16   A.    It may be the exact address.
17   Q.    So did you follow up on that?  Did you investigate where
18   he was going that evening?
19   A.    I had from the Uber records that he went to that
20   location.
21   Q.    Absolutely. And so then you must have looked up that
22   address on Google Maps or what have you to see where it is he
23   could have been going on that evening?
24   A.    That's correct.
25   Q.    So it's your understanding that yes, he was at the

1    fraternity house in College Park at the University of

2    Maryland?

3    A.    According to those Uber records, yes.

4    Q.    Absolutely, according to the Uber records that's where he

5    was dropped off, right?

6    A.    Yes, sir.

7    Q.    All right. Now as part of your investigation, you also

8    reviewed Noah Smothers' Google searches on April 6, 2018,

9    right?

10   A.    That's correct.

11   Q.    And these were an important part of the investigation

12   because it helps provide you GPS coordinates for his phone?

13   A.    Correct.

14   Q.    The Google one specifically, right?

15   A.    I'm sorry?

16   Q.    Fair. Poor question.

17   A.    Yes, the Google searches, yes.

18   Q.    Because when someone uses their phone in terms of a phone

19   call or a text, that will ping off of a cell phone tower which

20   may give you a general sense from where the call is coming.

21   Is that your understanding of cell phone records with towers?

22   A.    Yes, sir.

23   Q.    But the GPS coordinates are a little bit different,

24   aren't they?

25   A.    Yes.

1    Q.    You actually get a latitude and longitude, you get

2    coordinates and you can plug them in just as we saw on the

3    exhibits in Google and you get a little pin as to exactly

4    where that is, correct?

5    A.    Correct.

6    Q.    Now we had seen Exhibit 554, right?  You remember this

7    exhibit, yes?

8    A.    Yes, sir.

9    Q.    Okay. And so this is as you had said, this is an aerial

10   view of the Red Roof Inn, but importantly as we can see here

11   towards the bottom left there is a yellow pushpin on this map,

12   is there not?

13   A.    Yes.

14   Q.    And that is the coordinates for Noah Smothers' Google

15   search at approximately 1:30 on April 6th of 2018?

16   A.    Approximately, yes, sir.

17   Q.    Yes, sir. And now this is, of course, Noah Smothers

18   making a Google search on the non-encrypted phone. That's how

19   you're able to obtain these coordinates, correct?

20   A.    The search warrant was to Google itself.  Whether that's

21   logged into either phone, I'm not entirely sure.

22   Q.    Is it your understanding that he was using his encrypted

23   phone to Google these things or was he using his non-encrypted

24   regular phone?

25   A.    Those records don't specifically, I don't believe tell

```
 1    you which physical device it's being used on.
 2    Q.   So we don't know that?
 3    A.   It's associated with his Gmail account.
 4    Q.   Okay. So we don't know which phone it was that he was
 5    using to do that Google search?
 6    A.   Not to my recollection.
 7    Q.   Okay. Now this is, of course, in relative proximity to
 8    the Red Roof Inn, right?
 9    A.   Yes, sir.
10    Q.   It's also relatively in close proximity to Scott
11    Williams' home over on Bristolwood; isn't that correct?
12    A.   Yes, sir.  It's about a mile, mile-and-a-half away.
13    Q.   It's also relatively in close proximity to a variety of
14    restaurants, isn't that true?
15    A.   Yes, sir.
16    Q.   All right. Now this specifically, the yellow push pin
17    that we see at the bottom left of this exhibit, right, this
18    pushpin is at the end of an off ramp off of 295, correct?
19    A.   Yes, sir.
20    Q.   So if you were traveling southbound on the Baltimore
21    Washington Parkway and took this exit, that would be the
22    intersection at the end of that exit, right?
23    A.   Correct.
24    Q.   And at that intersection there is a light, a traffic
25    light, right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1955**

```
 1    A.   Yes, sir.
 2    Q.   Because this other road which I believe is Route 197 is a
 3    fairly large thoroughfare; is that fair to say, sir?
 4    A.   Yes, sir.
 5    Q.   Right. And again, we can look at the picture. I mean, we
 6    can see that that particular road is divided by what looks
 7    like a median, right?
 8    A.   Yes, sir.
 9    Q.   So at the end of that off ramp, for example, if you
10    wanted to go left you would have to cross lanes of traffic,
11    right?
12    A.   Yes.
13    Q.   Ergo the traffic light, presumably?
14    A.   Yes, sir.
15    Q.   Now you can also go to the right off that off ramp and
16    head north towards the Red Roof Inn?
17    A.   Correct.
18    Q.   Additionally, what we can also see is that there is a
19    Shell gas station right there as well, right?
20    A.   Yes, sir.
21    Q.   And then just a little bit further north we can see a
22    Walgreens, right?
23    A.   That's correct.
24    Q.   And then immediately to the right of that there is a
25    strip mall area at that location, right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1956**

```
 1    A.   Correct.
 2    Q.   All right. And there are stores and there are restaurants
 3    there; isn't that true?
 4    A.   It appears to be, yes, sir.
 5    Q.   Now I'm going to assume, sir, but please don't let me put
 6    words in your mouth, as part of your investigation did you go
 7    to this area to investigate, to try to determine what perhaps
 8    Noah Smothers was doing at 1:32 on April 6th of 2018?
 9    A.   Other than the Red Roof Inn, no, sir.
10    Q.   Are you aware, sir, that in between on this exhibit where
11    we see the Shell gas station and then that yellow pin that
12    says "Five Sisters," that corner of that building, of the dark
13    gray building where Five Sisters is, is it your understanding
14    that there is actually a Dunkin' Donuts right on the corner of
15    that strip mall?
16    A.   I was not aware of that.  No, sir.
17    Q.   So you have not investigated that area?
18    A.   Correct.
19    Q.   But, of course, Dunkin' Donuts, they sell coffee, donuts
20    obviously, breakfast sandwiches throughout the day, that kind
21    of stuff?  Are you familiar --
22    A.   Yes, sir.  I'm familiar with Dunkin' Donuts.
23    Q.   It's a fairly popular location?
24    A.   Yes, sir.
25    Q.   It's so popular, in fact, that people often times will
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1957**

 1   buy gift cards from Dunkin' Donuts to give as gifts?
 2   A.    Yes, sir.
 3   Q.    In fact, I think we had seen a Dunkin' Donuts gift card
 4   in the Kia Sportage when it was recovered, did we not, sir?
 5   A.    Yes, sir.
 6   Q.    And, in fact, the gift card had the name "Noah" written
 7   on it, didn't it?
 8   A.    It did.
 9   Q.    And across the street still in that same strip mall there
10   is a Salvadorian restaurant named Angel Las Delicias
11   Restaurant.  Are you familiar with that?
12   A.    I am not.
13   Q.    You're not.
14   A.    Can I add something about that Dunkin' Donuts gift card
15   that you referenced?
16   Q.    Feel free.
17   A.    There was a receipt, I believe, in that folded thing with
18   the gift card that predated this time. So I did not have any
19   reason to believe that it was purchased at this Dunkin'
20   Donuts.
21   Q.    Absolutely.  But did you have any reason to determine
22   whether it was used at that location?
23   A.    I did not check that.
24   Q.    Did not check, right. And because -- and again, the
25   reason why I'm asking these questions about the restaurants is

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1958**

```
 1    because the Google search that Noah Smothers made at 1:32
 2    where he is at that intersection, do you remember what it was?
 3    A.    I believe it was "food near me."
 4    Q.    "Food near me."
 5    A.    Yes, sir.
 6    Q.    He was actively looking for food, correct?
 7    A.    Yes, sir.
 8    Q.    Right. And, in fact, that was a common refrain in his
 9    Google searches throughout that weekend?
10    A.    Correct.
11    Q.    Right?  By all accounts Noah Smothers did not live in
12    Maryland, right?
13    A.    Correct.
14    Q.    So presumably he was not as familiar with the restaurants
15    and where everything is?
16    A.    Presumably, yes, sir.
17    Q.    Presumably that also might be one of the reasons why he
18    took a screenshot on his phone of the EZ Storage unit so that
19    he would have an address and a location to remember?
20    A.    Yes, sir.
21    Q.    Because he's not from Maryland?
22    A.    Correct.
23    Q.    But we didn't, of course, see anything like that with
24    regards to the Red Roof Inn in any of the forensic reports
25    from any of his phones, did we?
```

**JA1959**

```
 1    A.    As far as a screenshot of that location?  That's correct,
 2    we did not.
 3    Q.    All right. But that day, that day starting earlier he was
 4    googling "food near me"?
 5    A.    Correct.
 6    Q.    We had seen those exhibits during direct testimony. Do
 7    you remember that, sir?
 8    A.    Yes, sir.
 9    Q.    One of them was Martin's Seasoning. Do you remember that?
10    A.    Martin's Total Seasoning.
11    Q.    That's a food truck, isn't it?
12    A.    Yes, sir.
13    Q.    And he had also looked up "Pupusería" and "taqueria"?
14    A.    Yes, sir.
15    Q.    You know a taqueria is where they sell tacos, right? And
16    Pupusería is where they sell pupusas and that's a Salvadorian
17    cuisine, isn't it?
18    A.    I'm not aware of the exact nationality, but it could be,
19    yes.
20    Q.    Right. Now if somebody wanted, if somebody were coming
21    southbound on 295 and wanted to go to Scott Williams' house on
22    Bristolwood Court, right?
23    A.    Yes, sir.
24    Q.    This is the exact same off-ramp they would take, isn't
25    it?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1960**

```
 1    A.   It is one of the off-ramps, yes, sir.
 2    Q.   Right. It's the closest and most sensible off-ramp to
 3    take if you're coming down 295 and you want to go to Mr.
 4    Williams' home?
 5    A.   Yes, sir.
 6    Q.   Right?  And so again, I think we had established that
 7    there is a traffic light at that intersection between 197 and
 8    the off-ramp, correct?
 9    A.   Yes, sir.  There is.
10    Q.   Okay.  Now if somebody wants to go left -- and by that I
11    mean if somebody wants to go south, they would need a green
12    light, correct?
13    A.   Yes, sir.
14    Q.   If it were red, if that traffic light were red they would
15    have to stop and idle until that light turned green so that
16    they could go left?
17    A.   Go left?  You said right and then left?
18    Q.   My apologies, sir. We're just talking about going left.
19    So if somebody takes this off-ramp and wishes to go south down
20    197, wants to take a left at that light, they have to wait for
21    that light to be green?
22    A.   Yes, sir.  Once it's green they can go.
23    Q.   Absolutely. But if that light is red then they have to
24    sit and idle until that light turns green before they can turn
25    left?
```

**JA1961**

```
 1    A.    Correct.
 2    Q.    Now if you wanted to go right you could just sort of look
 3    over your shoulder until there's a path and enough space and
 4    then you could just drive in, right?
 5    A.    As long as the cars weren't backed up, yes, sir.
 6    Q.    But if you wanted to go left you had to sit and idle,
 7    right?
 8    A.    Yes.
 9    Q.    And when we idle in our cars, right, that could be, could
10    be an opportunity to do a Google search for food near you. Is
11    that fair to say, maybe?
12    A.    Yes, sir.
13    Q.    But again, right, we simply don't know, do we?
14    A.    Don't know what?
15    Q.    We don't know when Noah Smothers does that Google search
16    right there for "food near me" which direction he goes.
17    A.    Correct.
18    Q.    Correct. Nothing further, Your Honor.  Thank you.
19          THE COURT:  Okay. Mr. Hawks, how much do you have?
20          MR. HAWKS:  Your Honor, I think the safest course is
21    to pick this up on Monday.
22          THE COURT:  Okay, that's fair. It's 4:53. I think
23    the jury has had a long day and so we will suspend for the
24    day.
25          Now as I mentioned to you earlier, for better or for
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1962**

```
 1   worse, we're not sitting on Friday, so I guess I leave that to
 2   you as to what that means to you whether that's a good thing
 3   or bad thing depending on what else you have to do in your
 4   life, but we're taking Friday off. We usually try to sit four
 5   days a week so that other things can happen in court on that
 6   fifth day, otherwise as you can image things get backed up.
 7   So we'll see you again on Monday.
 8        Two things I would say:  First off as I said previously,
 9   but particularly going into a weekend, it's been a long four
10   days this week and eight straight business days together.  So
11   now this is a good break, but also I just want to caution you,
12   don't discuss the case among yourselves on the way in or out
13   of court. Don't discuss it with anyone else because you'll be
14   interacting with people outside this system over the next
15   three days. Don't do any outside research.  Don't visit any
16   locations that have been mentioned, anything like that. Again,
17   no homework over the weekend. Just take care of other
18   business, relax.  We will see you back here on Monday.
19        The other thing I wanted to tell you is although it's
20   always hard to predict, we are at the stage of this case where
21   there's some things I need to discuss with the lawyers on
22   Monday. And rather than have you wait and not knowing how long
23   that will take, I'm going to ask you to arrive ready to go by
24   10 a.m. on Monday, not 9. That gives us that time to try to
25   sort out those things we need to discuss and hopefully be able
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1963**

```
 1   to start with you on time at 10. Obviously since it's a later
 2   start we ask you to try to be ready to go at 10 if we're ready
 3   at that point, but that's the only difference. We still would
 4   potentially go as late as 5 again, depending on the situation,
 5   but you have that extra hour on Monday.
 6        So we'll see you back ready to go Monday morning at 10
 7   a.m. and enjoy the weekend. Thank you very much.
 8             (Jury was excused at 4:56 p.m.)
 9        THE COURT:  Sergeant Simms, you can go back to your
10   seat.  Everyone else can be seated. I just wanted to see how
11   we did there in terms of timing. Mr. Hawks, remind me again --
12   it may have shifted based on what you heard -- how much time
13   do you think you're going to need with this witness?
14        MR. HAWKS:  Your Honor, it's sitting right around
15   ten minutes.
16        THE COURT:  Okay, any anticipated redirect at this
17   point, Mr. Moomau?
18        MR. MOOMAU:  At this point there would be none.  I
19   don't plan on doing any, but we have to see what Mr. Hawks
20   brings out.
21        THE COURT:  And then I thought I heard, I think Ms.
22   Grossi you have the last witness; is that right?
23        MS. GROSSI:  That's correct, Your Honor.
24        THE COURT:  So we're talking I think you said about
25   45 minutes on direct?  Or half-an-hour?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1964**

```
 1              MS. GROSSI:  45 to an hour, Your Honor.

 2              THE COURT:  Okay.  And then I know you said this,

 3     but just remind me again.  Do you have a sense with that

 4     witness how long you'll be on the defense side?

 5              MR. GUILLAUME:  I think based on the areas we hit on

 6     will be 10 or 15 minutes.  I also think we will not -- I have

 7     to talk to him again, but I don't think we will call a witness

 8     in our case.

 9              THE COURT:  You would not?

10              MR. GUILLAUME:  Would not.

11              THE COURT:  Mr. Hawks, Mr. Crawley, with respect to

12     the final Government witness?

13              MR. HAWKS:  Your Honor, we feel exceptionally

14     confident it will not exceed 15 minutes.

15              THE COURT:  Okay. So then what it's really going to

16     come down to so even if we start at 10, so again I'd ask

17     everyone to be here ready to go at 9. I'm going to again say

18     because it seems to be a thing, I know this is the way often

19     times is I'd still like to see everyone here at 8:45 if only

20     because the marshals need to know, they need that time to get

21     organized and certainly if there's any discussions you want to

22     have with your attorneys, with counsel and the clients, they

23     need to be able to do that before 9.  So let's shoot for 8:45.

24     We'll plan to start no later than 9 with the rest of the

25     charge conference. And then if we're allocating at most an
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1965

```
 1    hour for that because we told the jury we'd start at 10, we
 2    would pick it up with Sergeant Simms, the cross-examination
 3    from Scott Williams at 10.  And then based on what we're
 4    hearing, the Government's case should be done well before noon
 5    or like somewhere in the 11:30, 11:45 range.  And it doesn't
 6    look like we're going to have witnesses from Taeyan Williams.
 7    So from Scott Williams, really when we're done with all the
 8    evidence is somewhat driven by what happens with your
 9    witnesses.  And at this point in terms of -- less about how
10    many, more about how long, is it pretty clear or is it still
11    up in the air?
12              MR. HAWKS:  Your Honor, it's still up in the air.
13    There's still a possibility of a stipulation and if not, an
14    hour would probably be a conservative guess.
15              THE COURT:  But you're saying it also could be
16    nothing if there's stipulations on certain things?
17              MR. HAWKS:  Or the three minutes it takes to read it
18    in.
19              THE COURT:  I'm sorry, what was that you just said?
20              MR. HAWKS:  Or the three minutes it takes to read it
21    in.
22              THE COURT:  I see. So two things: First off, with
23    the charge conference, I will review what we have so far. At
24    this point I think we're pretty close to being able to make
25    some of the sort of pretty easy decisions in terms of things
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1966**

```
 1   we add or subtract based on what's happened. I know we're
 2   going to add an instruction about transcripts that might not
 3   have been there before. At this point there might be things to
 4   take out. I think I would keep in the demonstrative aid
 5   instruction if only because it's sort of the transcripts, but
 6   I'm not sure if there's anything else like that. I'm not sure
 7   if the charts and summaries exhibit whether that covers some
 8   of these videos or otherwise, but I guess I'd be inclined to
 9   keep that unless someone tells me not to. But those kinds of
10   decisions about what we've gotten so far we can try to make.
11   And so what I'll try to do is if there's obvious things like
12   that we might try to go through and perhaps send you a revised
13   version sometime tomorrow, but I'd also like to try to get
14   these things if the Government -- I think at least the
15   Government has told me you would get me, so something on this
16   aiding and abetting piece, the willfulness, the 924(c) aiding
17   and abetting. Ideally if we could get that -- could we get
18   that tomorrow by midday or something so I can fold that in?
19   If not, I'll send you what I have, but we'll have to tweak
20   that based on what you give me later.
21           MR. HANLON:  Yes, Your Honor.
22           THE COURT:  So we'll try to do that. I'm not going
23   to promise you'll get something before then, it might just be
24   Monday morning.  But if we can give you a provisional revised
25   version to look at so you'll be ready to comment on it, if not
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1967**

```
 1    I don't think there's that many things to change here so I
 2    imagine we can just comment on them at 9 on Monday.
 3        Just again, if you see anything in there that you have a
 4    comment on, plan to have it -- plan to raise it, but ideally
 5    talk with each other.  If everyone agrees that something
 6    should be added or subtracted it's going to be a lot easier
 7    and we can plan to discuss those at 9 on Monday.
 8        And then in terms of whether we would move to
 9    instructions only, instructions and closing, I think I'm going
10    to have to say it's a moving target because it somewhat
11    depends on how long the Scott Williams case is. So I'm going
12    to ask everyone given Mr. Guillaume's supreme confidence that
13    he'll be ready on Monday, I'd ask everyone to be ready to go
14    with closings on Monday afternoon, if necessary. Again, we
15    might do that, we might do that Tuesday morning. I might do
16    the instructions on Monday afternoon first and then be able to
17    start closings first thing on Tuesday.  But my suspicion would
18    be that if there really is not much to be put on by Scott
19    Williams because of stipulations we would be able to do those
20    things, so be ready for that. To some degree if you talk among
21    yourselves, if you hear that the Scott Williams case is going
22    to be very short you should plan on that and if you hear it's
23    going to be very long, then maybe you can at least have a
24    greater likelihood that we won't get that far. So you all may
25    know better than I do.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1968**

```
 1        I'd ask everyone to be sort of free-flowing with the
 2   communication just as a matter of professional courtesy on
 3   that so that once you know, Mr. Hawks, you should let
 4   everybody know. And again, not just for that planning, but as
 5   we've said we've had the Government providing the witnesses
 6   and potentially the exhibits at issue and so to the extent you
 7   are planning to offer anything on Monday, the Government
 8   particularly, but also I should know that as soon as possible.
 9   So try to do that if you can.
10        MR. HAWKS:  Understood, sir.
11        THE COURT:  Okay. Two other things just to be aware
12   of. One is although we still have a little bit of time, again
13   if the Government is planning to rest on Monday I would ask
14   everybody just to check the exhibit list. Again, I'm not
15   trying to play gotcha with the change in the protocol on that,
16   so if there's anything that should have been offered that
17   wasn't that could probably be done beforehand. Hopefully
18   everyone will be flexible on that. Same would obviously be
19   true with defense exhibits.
20        And then the one other thing I just wanted to highlight
21   for everybody since there's three days here to work with and
22   I'm sure during trial there might be other things to do, but
23   this is a little bit of a breathing point is with this number
24   of exhibits, it is not at all unusual for us to get a request
25   from the jury to have the exhibit list or an index or
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA1969

```
1    something like that. As a practical matter, again, since the
2    jury is effectively my client, I prefer to be able to give
3    them things that help them do their job which would include
4    some sort of list of the exhibits. That's not evidence and I
5    would tell them it's not, but it is helpful.
6         One of the things I've run into before is when that
7    request comes in in the middle of deliberation the parties --
8    I can't imagine anybody would disagree with the idea they
9    should have a list, but sometimes there's debates about what
10   the items are called and are they prejudicial and things like
11   that.  And that can really make it difficult.  So I'd ask you
12   all to consider and perhaps meet and confer on whether there
13   is an agreed upon exhibit list, including everyone's, both
14   sides' exhibits that we could provide to the jury either
15   affirmatively up front or if asked that's neutral, that
16   doesn't prejudice anybody, but that just helps the jury find
17   what they're looking for.  So I'd ask you to at least consider
18   that.  We can talk about that Monday morning if there's any
19   issues there, but I've seen that enough times.  And then
20   afterwards you talk to them and if they didn't get the list,
21   they're still not understanding why they couldn't get a list.
22   They're saying "You're just making it difficult for us." And
23   so I just wanted to throw that out.
24        Okay, is there anything we should discuss before we break
25   for the week?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1970**

```
 1              MR. MOOMAU:  Your Honor, yes. Sergeant Simms is
 2     still on the stand and we're not -- under the rule,
 3     cross-examination has started, we're not supposed to talk to
 4     him and I'm not going to. However, as far as like getting
 5     ready for closing and being able to get evidence and -- it
 6     causes a big problem for us. We would be on our honor not to
 7     discuss his testimony with him, but I think there have been
 8     six lawyers on this case. I was the third.  Sergeant Simms has
 9     been with it from the beginning.  And whenever we need to know
10     something for sure, we always go to him.
11              THE COURT:  No, I understand that. And Mr. Hawks,
12     anything on this?
13              MR. HAWKS:  Your Honor, Mr. William Moomau's
14     reputation and position as an officer of the court is enough
15     for Scott Williams if he needs to talk to him to prepare, but
16     not to respond to a cross-examination that he does know is
17     coming and I trust him to do that.
18              THE COURT:  Any issues with this from the Taeyan
19     Williams team?
20              MR. NIETO:  Your Honor, again.  Not to echo
21     necessarily the same sentiments, but yes, absolutely.  I trust
22     these prosecutors with their honor and respect.
23              THE COURT:  That's very generous of everyone, but
24     frankly it is -- the rule of not talking is about the
25     cross-examination. When you have someone who is effectively a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1971**

```
 1    party witness, whether it's a defendant or case agent who is,
 2    I mean, obviously it requires, you know, the lawyers to follow
 3    the rules, but when you're talking about things outside of the
 4    testimony, whether it's just logistics for closing or anything
 5    else, it's not -- we're not making an exception by allowing
 6    those discussions, we're just all understanding that it is as
 7    you said, somewhat on the honor system that they follow that
 8    rule and only talk about things outside of the
 9    cross-examination. And I'm confident that the Government will
10    follow that rule and it sounds like defense counsel is too.
11         So Mr. Moomau and your team just again, stay away from
12    discussing cross-examination or even the redirect that might
13    come up, but if you need to talk to Sergeant Simms for other
14    parts of the case that still need to happen between now and
15    the end, you can do that.
16              MR. MOOMAU:  Thank you.
17              THE COURT:  Anything else from either side?  Okay,
18    so we will see you all back at 8:45 on Monday. Have a good
19    weekend.  Thank you.
20              (Proceeding concluded at 5:07 p.m.)
21
22
23
24
25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1972**

```
1              CERTIFICATE OF OFFICIAL REPORTER
2
3
4
5          I, Nadine M. Bachmann, Certified Realtime Reporter
6    and Registered Merit Reporter, in and for the United States
7    District Court for the District of Maryland, do hereby
8    certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
9    true and correct transcript of the stenographically-reported
10   proceedings held in the above-entitled matter and that the
11   transcript page format is in conformance with the regulations
12   of the Judicial Conference of the United States.
13
14                    Dated this 16th day of December, 2023.
15
16                         -S-
17          _____
18             NADINE M. BACHMANN, CRR, RMR
               FEDERAL OFFICIAL COURT REPORTER
19
20
21
22
23
24
25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA1973