## CASE NO. 23-4568(L), 23-4595

### IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TAEYAN RAYMOND WILLIAMS,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

---

### JOINT APPENDIX - VOLUME V OF VI
### (Pages 1974 - 2596)

---

Alfred Guillaume III
LAW OFFICES OF
ALFRED GUILLAUME III
6305 Ivy Lane
Suite 700
Greenbelt, MD 20770
202-321-0549
ag3law@gmail.com

Brent E. Newton
ATTORNEY AT LAW
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
brentevannewton@gmail.com

*Counsel for Appellant*
 *Taeyan Williams (23-4658)*

*Counsel for Appellant*
 *Scott Williams (23-4595)*

Counsel for Appellee on Inside Cover

LANTAGNE LEGAL PRINTING 1108 East Main Street, Suite 1201 • Richmond, VA 23219 • 804-644-0477

Leah B. Grossi
William Moomau
OFFICE OF THE UNITED STATES ATTORNEY
Southern Division
6406 Ivy Lane
Suite 800
Greenbelt, MD 20770
301-344-4433
leah.grossi@usdoj.gov
william.moomau@usdoj.gov

Thomas E. Booth
U.S. DEPARTMENT OF JUSTICE
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Room 1511
Washington, DC 20530
202-514-5201
thomas.booth@usdoj.gov

*Counsel for Appellee*

# **TABLE OF CONTENTS**

## **VOLUME V OF VI**

<u>JA Page</u>

Transcript of Proceedings Jury Trial Volume IX
Before The Honorable Theodore D. Chuang
    2023.05.08................................................................................... 1974

    KYLE SIMMS
        Continued Cross by Mr. Hawks ........................................... 2023
        Redirect by Mr. Moomau ..................................................... 2038
        Recross by Mr. Nieto........................................................... 2042
        Recross by Mr. Hawks ........................................................ 2043

    MATHEW WILDE
        Direct by Ms. Grossi........................................................... 2043
        Cross by Mr. Guillaume ...................................................... 2085
        Cross by Mr. Hawks ........................................................... 2091
        Redirect by Ms. Grossi ....................................................... 2091

Transcript of Proceedings Jury Trial Volume X
Before The Honorable Theodore D. Chuang
    2023.05.09................................................................................... 2199

Transcript of Proceedings Jury Trial Volume XI
Before The Honorable Theodore D. Chuang
    2023.05.10................................................................................... 2329

Transcript of Jury Trial Proceedings - Day 12
Before The Honorable Theodore D. Chuang
    2023.05.11................................................................................... 2446

Verdict Form
    2023.05.11 [ECF235] ................................................................. 2486

Transcript of Sentencing Hearing (Scott Williams)
Before The Honorable Theodore D. Chuang
    2023.08.22................................................................................... 2494

i

Judgment in a Criminal Case (Scott Williams)
　　2023.08.22 [ECF275] ................................................................. 2573

　　　　Att. 1:　Preliminary Order of Forfeiture [ECF275-1]............................ 2580

Notice of Appeal (Scott Williams)
　　2023.08.24 [ECF281] ................................................................. 2585

Judgment in a Criminal Case (Taeyan Williams)
　　2023.08.24 [ECF282] ................................................................. 2586

　　　　Att. 1:　Preliminary Order of Forfeiture [ECF281-1]............................ 2592

Notice of Appeal (Taeyan Williams)
　　2023.09.01 [ECF284] ................................................................. 2596

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
 2                   SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,     )
           Plaintiff,               )
 4                                  )
           vs.                      )   CRIMINAL CASE NUMBER:
 5                                  )        TDC-18-0631
      SCOTT ANTHONY WILLIAMS and    )        VOLUME IX
 6    and TAEYAN RAYMOND WILLIAMS,  )
           Defendants.              )
 7    _____)

 8
                   TRANSCRIPT OF PROCEEDINGS
 9                        JURY TRIAL
          BEFORE THE HONORABLE THEODORE D. CHUANG
10             UNITED STATES DISTRICT JUDGE
                  Monday, May 8, 2023
11                 Greenbelt, Maryland

12                  A P P E A R A N C E S

13
      FOR THE PLAINTIFF:
14        OFFICE OF THE UNITED STATES ATTORNEY
              BY: LEAH GROSSI, ESQUIRE
15            BY: WILLIAM MOOMAU, ESQUIRE
                  6406 Ivy Lane, Suite 800
16                Greenbelt, Maryland  20770

17            BY: MICHAEL HANLON, ESQUIRE
                  36 S. Charles Street, Fourth Floor
18                Baltimore, Maryland  21201

19    FOR THE DEFENDANTS:
          For Scott Anthony Williams:
20            BY: KWASI HAWKS, ESQUIRE
                  THE HAWKS FIRM
21                8705 Colesville Road
                  Suite 162
22                Silver Spring, MD  20910

23            BY: DWIGHT E. CRAWLEY, ESQUIRE
                  LAW OFFICE OF DWIGHT CRAWLEY
24                1300 I. Street, NW
                  Suite 400e
25                Washington, DC  20005
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1974**

```
1    (Appearances, Continued)

2       For Taeyan Raymond Williams:
            BY: ALFRED GUILLAUME, III
3               LAW OFFICES OF ALFRED GUILLAUME, III, LLC
                1350 Connecticut Avenue NW
4               Suite 308
                Washington, DC  20036
5
            BY: CHRISTOPHER NIETO, Esquire
6               LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
                1 North Charles Street, Suite 1301
7               Baltimore, Maryland  21201

8    _____

9       ***Proceedings Recorded by Mechanical Stenography***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1975**

```
 1                      I N D E X

 2   WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

 3   Kyle Simms (continued)

 4       By Mr. Hawks:              50                      70
         By Mr. Moomau:                      65
 5       By Mr. Nieto:                                      69

 6   Mathew Wilde

 7       By Ms. Grossi:      70                            118
         By Mr. Guillaume:        112
 8       By Mr. Hawks:            118

 9

10                                 PAGE

11   JURY INSTRUCTIONS:           138

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1976**

```
 1                    P R O C E E D I N G S
 2        (8:53 a.m.)
 3             THE COURTROOM DEPUTY:  The matter now pending before
 4        this Court is Criminal Action Number TDC-18-0631. United
 5        States of America v. Scott Anthony Williams and Taeyan Raymond
 6        Williams. We are here today for the purpose of a jury trial.
 7        Counsel, please identify yourselves for the record.
 8             MS. GROSSI:  Good morning, Your Honor.  Leah Grossi,
 9        Michael Hanlon, and William Moomau on behalf of the
10        Government.  Here with us at counsel table is Kyle Simms with
11        the Maryland State Police.
12             THE COURT:  Good morning.
13             MR. HAWKS:  Good morning, Your Honor.  Kwasi Hawks
14        and Dwight Crawley on behalf of Mr. Scott Williams, who is
15        seated between us.
16             THE COURT:  Good morning.
17             MR. GUILLAUME:  Good morning, Your Honor.  Alfred
18        Guillaume and Christopher Nieto on behalf of Mr. Taeyan
19        Williams seated to my left. Good morning to counsel, parties,
20        members of the audience. We're here to continue with the jury
21        trial. I had suggested we come a little early or actually have
22        the jury come back a little late so we can try to lock down
23        the jury instructions.  Before we do that, to get a sense of
24        what the timing will be, do we have a better sense on
25        witnesses?  Who is going to testify today?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1977**

```
1              MS. GROSSI:  Your Honor, I believe Sergeant Simms
2     still has to have his cross by Mr. Scott Williams' attorneys.
3     Then we have Mathew Wilde who is a special agent with FBI
4     doing location analysis. And that is our last witness, Your
5     Honor.
6              THE COURT:  Right.  And then Mr. Guillaume, you had
7     said no witnesses.  I don't know if that's changed.
8              MR. GUILLAUME:  No witnesses on behalf of Mr. Taeyan
9     Williams, Your Honor.
10             MR. HAWKS:  Your Honor, we have no witnesses.  And a
11    question on how to proceed.  The parties have agreed to a
12    stipulation of admissibility of three photos. Those three
13    photos were taken at the same time as Ms. Parslow, the New
14    York state investigator. There are three photos that were --
15             THE COURT:  Was this of the residence in
16    Pennsylvania or --
17             MR. HAWKS:  Yes, Your Honor, the Lomar Road in
18    Pennsylvania. The defense's position is that Mr. Nieto
19    actually laid a foundation for those photos. We're not really
20    concerned about whether we simply admit the photos or admit
21    them through a stipulation, we're prepared to do either, but
22    the defense would propose we simply stand up, offer them for
23    admission, there being no objection, they're received into
24    evidence.
25             THE COURT:  As part of your case.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1978**

```
 1            MR. HAWKS:  Absolutely, Your Honor.

 2            THE COURT:  Okay. And they're not going to come in

 3    before that through cross-examination or anything like that

 4    or, I mean --

 5            MR. HAWKS:  Your Honor, I would just to save time

 6    propose to do it at the beginning of my cross.  As frequently

 7    happens, the Government stands up and says, "We offer for

 8    admission these exhibits," there's no objection. And then --

 9            THE COURT:  Okay, but are you going to ask the

10    witness any questions about them or not necessarily?

11            MR. HAWKS:  I will not, Your Honor.

12            THE COURT:  Okay.  Well, does the Government have a

13    view on how to handle this?

14            MS. GROSSI:  Your Honor, the Government does not

15    object to having those pictures into evidence. They were part

16    of Ms. Parslow's pictures during her search of the house. And

17    so we don't object to having those in evidence.

18            THE COURT:  So I mean, we can have you offer them

19    when you're standing up. It will be clear it was your idea not

20    theirs, but even though it's technically still within the

21    Government's case. The only reason -- I mean, I'll leave it to

22    you as to whether you care whether it's done as part of that

23    case or as part of your own case. I am indifferent. So if you

24    want to do it that way, I'm fine with that.

25            MS. GROSSI:  Your Honor, I guess just to add to one
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1979**

```
 1    thing that I didn't mention, if it would be possible to
 2    explain what those photos are when we put them in, I think
 3    that would be helpful for the jury not to just have them in a
 4    vacuum.
 5              THE COURT:  Well, who does the explaining?  I mean,
 6    it's not in the written stipulation I take it?
 7              MS. GROSSI:  I believe it is, Your Honor. It's a
 8    stipulation that we actually just signed that says that those
 9    three photos were taken at that Pennsylvania residence.
10              THE COURT:  Well, sure. I mean, I think we can have
11    Mr. Hawks offer the stipulation and the photos and then read
12    the stipulation into evidence which we would admit. Then
13    they'd have everything. Will that work?
14              MS. GROSSI:  That does, Your Honor.
15              MR. HAWKS:  And we don't object to that way of
16    proceeding.
17              THE COURT:  Okay, so you can do that. Okay, so then
18    -- well, if there are no actual defense witnesses, again it
19    depends on how long the cross is and the last Government
20    witness, but I think there's a decent chance we get to finish
21    our -- all of our parts today.
22        I did want to ask you about the jury instructions. I
23    think we sent you a revised version that in my view only
24    changes technical things with the exception of adding
25    instruction 17 which is the transcripts instruction which I
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1980**

```
 1    know the Government said they wanted something like that.
 2    That's one I've used in the past. And then there are some
 3    additions that are not -- that are substantive, but they're
 4    based on the Government's submission as of Friday's submission
 5    regarding aiding and abetting in terms of 924(c), willfulness
 6    and -- and then also on a different instruction on the perjury
 7    issue.
 8         My thought was having checked it was that generally on
 9    the aiding and abetting, I don't see the willfulness
10    requirement in the Fourth Circuit with the exception of
11    perhaps there are cases where there's a higher mens rea
12    required generally for the underlying offense.  I think that's
13    one reason why you can get cases that differ on that point. On
14    the 924(c) I agree that under the *Rosemond* case we need to
15    make an adjustment and I think the language I have offered
16    there based on the Government's submission addresses that.
17         And then on the perjury issue, the way I saw it was that
18    there's been no court finding of perjury, but Mr. Musa did
19    effectively admit that he made some statements either in his
20    written submissions or in his plea hearing that were either
21    under oath or not truthful. I think it's sort of the same
22    difference.  We can quarrel over exact wording, but it makes
23    sense to have that instruction because he admitted that there
24    were false statements under oath. Whether we call them lies or
25    perjury, given that there's actually no court finding I don't
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1981**

1    think we have to use the word "perjury," but I think the

2    message is pretty clear as drafted in the current draft.

3      So I wanted to invite comments on any of the

4    instructions. I don't know where we want to start. Just

5    numerically in that order, does anyone have any issues with

6    the transcript instruction or any of the other technical edits

7    to basically everything up to the charges, instructions 1

8    through 30 or sorry, 1 through 36?

9        **MR. HANLON:** Your Honor, the Court is just looking

10    for any comments about the instructions at this point, just to

11    be clear?

12        **THE COURT:** Right, yeah.

13        **MR. HANLON:** So my only suggestion might be is that

14    the Government is not sure that we necessarily need

15    instruction 15.

16        **THE COURT:** There are a few things that maybe we

17    need to think about whether we need. So why don't we go in a

18    more granular level numerically. I'm just going to look up

19    until 15, is there anything anybody wants to discuss? Okay,

20    well hearing nothing.

21      So 14 and 15 are similar. Honestly in this case we don't

22    have any sort of very traditional looking charts in either

23    category. I'm taking some of these sort of PowerPoint things

24    as being in one category or the other, although since they're

25    in evidence they're probably covered by instruction 14, but

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1982**

```
 1   you're saying we don't have anything in the category of 15
 2   with the possible exceptions of the transcripts which we would
 3   cover separately.
 4          MR. HANLON:  That's the Government's view, Your
 5   Honor, yes.
 6          THE COURT:  Does anyone have a view on the defense
 7   side?
 8          MR. NIETO:  No.  That's consistent with our view.
 9          THE COURT:  Okay.
10          MR. HAWKS:  Us as well, Your Honor.
11          THE COURT:  Okay, so we'll take out 15. I think
12   that's actually good because honestly it's not super obvious
13   to the jury how to distinguish between those two. So, okay. So
14   16.
15       17, anybody have any issues with the recordings, the
16   transcript instruction?  Okay, hearing none. Now I'm going to
17   flip through, if anybody sees anything up to 36, just the
18   non-substantive ones let me know. The list of expert witnesses
19   is that accurate on page 27, instruction 25? Assuming Mr.
20   Wilde testifies.
21          MR. HANLON:  It is accurate, Your Honor.
22          THE COURT:  Is that how he spells his name?  I don't
23   know if that's my typo or yours or whether he just has a less
24   common spelling.
25          MR. NIETO:  I think Mathew may have two ts.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1983**

1               **MR. HANLON:**  Actually, in this instance it's one t.

2               **MR. NIETO:**  I stand corrected.

3             **THE COURT:**  Okay, well -- they took out Ms. Kelly

4  and that covers it would you say Mr. Hanlon in terms of the

5  other experts?

6               **MR. HANLON:**  We believe so, Your Honor, yes.

7             **THE COURT:**  Okay. So then 27, 28, 29, these are all

8  related to -- 30, 31, these all relate to the Government's

9  witnesses who had some arguable exposure. I don't think -- I

10  didn't offer anything substantive on any of those. How about

11  up to 31?  31 is the one the Government made a submission on.

12  Anybody see any issues with 31 as drafted now?

13               **MR. HANLON:**  Your Honor, on 31 the Government is

14  fine with the text. The Court mentioned that given the

15  context, it wasn't necessary to use the word "perjury." I

16  wonder if it would be possible -- I don't know if this is

17  going back to the jury.

18             **THE COURT:** Yeah, they usually get a copy of this

19  whole package.

20               **MR. HANLON:**  I wonder if we could perhaps change the

21  title to "prior false statements" or something like that in

22  light of the Court's comments a moment ago.

23              **THE COURT:**  How does the defense feel about that?

24               **MR. NIETO:**  Your Honor, respectfully on behalf of

25  Taeyan Williams, we're content with the proposed instruction

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1984**

```
 1    as written. I understand Your Honor's previous comments and I
 2    understand the Government's position. Our position with
 3    regards to Mr. Musa is a little less soft.  Again --
 4            THE COURT:  No, I understand.
 5            MR. NIETO:  So we think that that is an appropriate
 6    classification under the circumstances.
 7            MR. HAWKS:  Your Honor, Scott Williams adopts Taeyan
 8    Williams' counsel's position.
 9            THE COURT:  Okay.  So the way I'm going to look at
10    this, there's another instruction for which there's sometimes
11    a disconnect. The expert witness one, you may have noticed we
12    always call it "expert" witnesses. The word "expert" I don't
13    think appears in the instruction. I think the movement is
14    towards getting away from that terminology and so a lot of
15    standard instructions just talk about opinion witnesses. I
16    always keep the expert witness header because we actually use
17    the term "expert" in the courtroom otherwise it might be hard
18    for them to understand what's going on. I'm going to put this
19    in the same category for now. I think there's a gray area,
20    frankly, how we treat this. It's not that there's been a court
21    finding.  However, he effectively admitted to false statements
22    under oath and he may even have admitted depending on how
23    artful the cross-examination was to the term "perjury" at some
24    point or another. So just as a header I think I'll leave it
25    again, because that term came up. It may help the jury orient
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1985**

```
1    to this person. However, I will caution the defense that the
2    headers really are not instructions. They're there to guide.
3    And so again, if you're going to talk about this instruction,
4    you're going to quote it, there is no quote with the word
5    "perjury" in the instruction. So just keep that in mind. I
6    think I'm okay with you saying "Well, instruction 21 is called
7    prior perjury and it says X," but I wouldn't go around saying
8    there's the word "perjury" actually in the text of the
9    instruction. So just, again, given where we are now I think
10   that's sort of a happy medium where they can see why this is
11   here based on the way the testimony came in, but the
12   instruction itself doesn't have that language.  So why don't
13   we leave that the way it is.
14        For instruction 32, I had this in italics because I don't
15   know if either side thinks we need this anymore. Obviously
16   there are people who could have been called, but I haven't
17   heard cross-examination or testimony that really highlights
18   anybody in particular, but let me know if you think we still
19   need this.
20            MR. HANLON:  Your Honor, the Government would -- we
21   were in favor of keeping it in. We don't exactly know what the
22   defense is going to say during their closing argument at this
23   point and there's always other people. I'm not sure there's
24   been heavy cross-examination about it, but who knows what the
25   closing is going to bring.  And I don't think it does any
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1986**

```
1    harm.
2               THE COURT:   Okay. Any thoughts from the defense
3    side?
4               MR. NIETO:   Your Honor, with respect to Taeyan
5    Williams, we hadn't anticipated going down this potential path
6    in closing. We didn't really anticipate there being -- we
7    didn't really think there were uncalled witnesses that would
8    be of such import in our presentation. However, however, I
9    didn't want to tie Mr. Guillaume's hand behind his back in
10   terms of his presentation.
11              MR. GUILLAUME:   Court's brief indulgence, Your
12   Honor.
13              THE COURT:   Sure.
14              MR. NIETO:   Your Honor, again, from our perspective
15   this is not a path of argument that we were going to embark
16   upon, so we'll defer to the Court.
17              THE COURT:   Okay.  Mr. Hawks, Mr. Crawley?
18              MR. HAWKS:   Your Honor, just the anticipated
19   argument on behalf of Scott Williams certainly isn't going to
20   name some specific person. It will make a broader illusion to
21   things the jury doesn't know, but not in the sense of "if you
22   had only heard from so and so." So the Court's suggestion
23   seems appropriate to Scott Williams.
24              MR. HANLON:   I would just point out, Your Honor, the
25   jury knows names. They may be wondering EQ, Ricardo Carty,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1987**

```
 1    there are people who come up in the case that the jury may be
 2    wondering about. I think that the instruction creates a sense
 3    of just equipoise and neutrality on the issue. It's
 4    appropriate.
 5         THE COURT:  So I think I'm willing to include it.
 6    Again, just for that reason. I wonder if -- and I don't see
 7    why this would make a difference to you, Mr. Hanlon, what if I
 8    take out this line, "and one or more of the attorneys may
 9    refer to their absence from trial." Because it may sound like
10    I'm thinking I know what's going to happen and then it turns
11    out it doesn't happen, given that it's been represented it
12    won't happen. Obviously if they do do that you can still look
13    at this instruction and say look, how does that sound?
14         MR. HANLON:  That's reasonable, Your Honor.
15         THE COURT:  So we'll take out that last phrase there
16    in the first line, but we'll keep the overall instruction.
17      Okay. So then the rest of up to 36, you have 33, 34, 35
18    and 36. The only major change is turning 36 into one focused
19    on the defendant's right not to testify based on what I've
20    heard which is that neither defendant is planning to testify.
21    Anything up to 36?  Okay. Hearing nothing I will continue on
22    to the preliminaries for the charges.
23      37, 38. 40 is one I wanted to discuss with you. On the
24    one hand this is pretty standard to say look, we're only
25    talking about -- well actually, no. There's two of them I want
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1988**

```
 1    to discuss with you. One of them is 40, you know, the standard
 2    language is about evidence being limited to one defendant or
 3    another. I'm not sure I remember that coming up. There were a
 4    couple scenarios where it definitely could have come up. I
 5    think we were talking about the arguable statement against
 6    interest which I don't think has come in and I don't think is
 7    going to be offered, the conversation between Taeyan Williams
 8    and his mother.  I'm not sure if there's anything else so I
 9    guess the question is do we need this second paragraph?
10            MR. HANLON:  Your Honor, just a moment, please. Your
11    Honor, the Government is not opposed to the language
12    generally. What we're trying to make sure is that we have an
13    inventory mentally as to what items only came in as to one --
14            THE COURT:  Right.  And I'm not -- nothing is
15    jumping out now. I would and I will find that there's
16    sufficient evidence of a conspiracy involving both defendants
17    that I think things that would be admissible under
18    801(d)(2)(E) would be admissible. But yeah, I'm not sure --
19    one option is to take out that first part and just say "In
20    addition, any evidence admitted solely against one defendant
21    may be considered only as against that defendant" and continue
22    on from there because we're making the representation there
23    was some evidence limited to one defendant. I'm not sure there
24    was, but I'm not going to preclude that possibility that --
25            MR. HANLON:  So unless my colleagues correct me,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1989**

1   Your Honor, I think Scott Williams' statements to Sergeant

2   Simms at the time of the search warrant at Bristolwood I think

3   are only admissible against Scott Williams. Am I missing --

4   Your Honor, that's the only thing I can think of. And again,

5   to be clear, we're not -- it's not abundantly clear to the

6   Government that anything Scott Williams said was incriminating

7   which is why it was admissible against Scott Williams in this

8   case.

9        **THE COURT:**  Right. I mean, I guess the obvious

10   question then is does anyone want me to instruct on that

11   information being admissible only against Scott Williams?

12   Looking over at your table, Mr. Nieto.

13        **MR. NIETO:**  I felt that.  Yes, Your Honor. On this

14   particular instruction, Your Honor, we will defer to the

15   Court. I understand the Court's issues. I can see what Mr.

16   Hanlon is speaking. Obviously there was some pieces of

17   evidence, specifically that call. I think there might have

18   been some of the testimony with regards to -- involving Kerry

19   George and we acknowledged that would be admissible in a joint

20   trial. We didn't raise objections for limitations on that

21   because the drug conspiracy, as well, is a pretty overarching

22   umbrella under which many things fall. But we do acknowledge

23   that there is some evidence that I think was uniquely geared

24   towards one defendant as opposed to the other. And so for

25   those reasons, looking at the case in its totality, we think

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1990**

```
 1   some instruction would be appropriate, but maybe more akin to
 2   what Your Honor has suggested.
 3           THE COURT:  Well, so I think on the one hand, you
 4   know, whether it's Mr. George or otherwise, given it's a
 5   conspiracy and so forth, I think that is all both relevant to
 6   both defendants and there's no rule that would prevent it
 7   being admitted because he testified.  And to some degree I
 8   would say to the extent he talked about statements made by Mr.
 9   Scott Williams it was still while Mr. Scott Williams was still
10   at least in theory trying to advance a conspiracy.
11       I think what Mr. Hanlon is pointing out is that
12   statements to law enforcement after an arrest or a search
13   arguably are testimonial. And therefore, given that Scott
14   Williams is unavailable, there would be a problem admitting
15   them against Taeyan Williams unless they fall into one of
16   these other categories. As Mr. Hanlon said, I don't think
17   there was anything in there that pointed the finger at Taeyan
18   Williams.  So therefore, we don't have a Bruton problem and no
19   one has raised one.  So there's no problem having them
20   admitted against Scott Williams.  I guess the point is that if
21   you wanted an instruction saying that's only admissible
22   against Scott Williams, we can do that.  And then obviously
23   we'd have this instruction too.
24       If as a matter of just sort of trial strategy or how you
25   want to approach it you wanted to decline that, that's fine
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1991**

```
 1    with me too.  I just wanted to give you the option so the
 2    record is clear that you have that option.
 3             MR. NIETO:  Understood, Your Honor.  And if I may
 4    very briefly.
 5             THE COURT:  Okay, sure.
 6             (Counsel conferred privately off the record.)
 7             MR. NIETO:  Thank you so much, Your Honor. Yes,
 8    after speaking with co-counsel, we do think that some
 9    delineation should be made, at least specifically to that post
10    search and seizure warrant interview with Sergeant Simms. So
11    if the Court is inclined to provide that instruction, that is
12    what we would request.
13             THE COURT:  Okay, so how about this: I will -- I'll
14    keep in this instruction that we just referenced and after the
15    first sentence which is "Some of the evidence in this case was
16    limited to one defendant," I will say specifically, "The
17    statements made by Scott Williams to Sergeant Simms after or
18    during the execution of the search warrant at the Bristolwood
19    Court residence are admissible only against Scott Williams and
20    may not be considered as evidence against Taeyan Williams."
21    And I'll say, "Let me emphasize, any evidence admitted solely
22    against one defendant may be considered only" -- and put that
23    into the -- leave that sentence. It's a little redundant, but
24    just keep that. So I'll add that sentence in there directing
25    them to that one piece, at least.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1992**

```
 1          Any problems with that?

 2              MR. NIETO:  No, Your Honor.  Thank you.

 3              MR. HAWKS:  No, Your Honor.

 4              THE COURT:  Government?

 5              MR. HANLON:  I think the Government is fine with the

 6     language, Your Honor. We're all in agreement that this is

 7     strictly to the statements made at the time in connection with

 8     the search warrant, not the search warrant itself. I think

 9     we're clear on that issue. The Government is fine.

10              THE COURT:  Okay. Obviously the Government can

11     address those statements whichever way they're going to be

12     used or can focus everyone on that point.

13          So instruction 41, we have this line in here that says

14     "You've heard evidence of other acts allegedly committed by

15     the defendants."  And again, the broad point that they need to

16     only focus on the charged events make sense. It's something we

17     always say. Either depending on what other allegedly bad acts

18     may exist, we either expand on this, contract it, add some

19     very specific 404(b)-type language.

20          My recollection of the evidence is that there's no sort

21     of glaring other act out there that we need to have a very

22     formal instruction on under 404(b) or the like. There was

23     discussion about the West Virginia drug conviction and so

24     forth. I think having heard the evidence it was pretty clear

25     to me that whatever drugs -- and I think the parties reached
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1993**

1  an accommodation on this point effectively acknowledging that

2  the drugs found in West Virginia were effectively intrinsic to

3  this case and I don't think anybody is running away from that.

4       On the one hand I think it was kept out or there was no

5  -- everyone agreed that it wasn't necessary to talk about how

6  he was convicted, but then I think someone did raise that

7  probably as a matter of strategy to show that that piece has

8  already been addressed. So, I mean, that could be -- I think

9  that could warrant an instruction like this. I don't know if

10 we need to go into anything highly detailed. There were some

11 statements made or some evidence about not necessarily

12 criminal acts, but acts that could be viewed negatively by

13 Scott Williams in terms of the reasons why he might have been

14 deleting things on his phone and things like that.  Again, not

15 things that are crimes, at least ones that one might mistake

16 as a crime they need to opine on here, but they are other

17 acts.  So I wanted to get everyone's views on what we should

18 do with this instruction. Should we add anything to it,

19 subtract anything from it?  I took out the part that says

20 "When it was introduced I instructed you it was being

21 considered for a limited purpose" because I don't think I

22 actually did that, unless you can remind me of a situation.

23 But like we did with the last one, if someone wants that

24 instruction now we can add that back in and say "Well, this

25 was only used for some other purpose."  So I wanted to get

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1994**

```
 1    everyone's views on this instruction.

 2            MR. HANLON:  So Your Honor, the Government doesn't

 3    have any problem with instruction 41 generally. The Government

 4    doesn't think that the italicized language is really necessary

 5    here because there has been no 404(b) evidence in this case.

 6    The West Virginia matter was intrinsic. The closest we get is

 7    this other cell phone issue which I think the defense put as

 8    much evidence on as the Government did because they wanted to

 9    sort of put it in context.

10      I would suggest we take out the italicized language.  I

11    think it might be confusing to the jury if they are wondering

12    if they have to delineate things that are part of the offenses

13    or not.

14            THE COURT:  Okay, this is one that usually benefits

15    the defense, so I wanted to see what their view is.

16            MR. NIETO:  Your Honor, we would concur with the

17    Government's suggestion that the italicized sentence, it can

18    be confusing.

19            THE COURT:  Okay. Does the Scott Williams team have

20    a view on this?

21            MR. HAWKS:  Your Honor, we concur with the other two

22    parties.

23            THE COURT:  Well, right.  I think on the one hand I

24    think there are other things, it may draw attention to things

25    that may not seem like a big deal and might make them sound
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1995**

```
 1    like they're a bigger deal than they are. So we'll keep this
 2    in generally to instruct them that they can consider evidence
 3    for anything other than the charges, but I'll take out the
 4    italicized language there.  And everyone agrees as I'm hearing
 5    from the defense that there's no need for any kind of
 6    404(b)-type instruction regarding any other particular act in
 7    this case.
 8         Okay, so then 42, 43, 44 up to the charges I don't see
 9    any -- I didn't make any changes to those.
10         Once we get to the charges themselves, this Count Nine
11    there's a lot of different ways it's been called in terms of
12    what the statute says and what the instructions say. I
13    reverted back to the way it was in the proposed instruction
14    from the parties just because my assumption was the parties
15    were comfortable with destroying and concealing as to sort of
16    the title so-to-speak of that charge.
17         So as we go through these, let's start with -- well,
18    let's go count by count.  As I ordered it we have Count Three
19    first, the Hobbs Act instructions. This includes the extortion
20    and the robbery parts of it. We'll put in the cross-referenced
21    numbers as soon as we figure out exactly how many instructions
22    we have. Anything up until instruction 54 anyone wants to
23    change?
24         Okay, then kidnapping with death resulting.  This is 55
25    forward which I think takes us out to 62 which includes the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA1996**

```
 1   lesser included offense. Anybody have any proposals for those
 2   instructions?
 3            MR. HANLON:  Your Honor, I'm sorry.  The number
 4   we're up to, did I hear 52?  I apologize.
 5            THE COURT:  Well, Hobbs Act robbery took us up to --
 6   or Hobbs Act took us up to 54. And then kidnapping with death
 7   resulting was 55 to 62.
 8            MR. HANLON: Thank you, Your Honor.
 9            THE COURT:  That's how far we are now.
10            MR. HANLON:  The only thing I noticed, Your Honor,
11   is I think there might be a typo in instruction 58.
12            THE COURT:  Okay. Point it out for me if you can.
13            MR. HANLON:  In subsection B in the second paragraph
14   I think it should say, "avoid paying a debt owed by the
15   defendants," if memory serves.
16            THE COURT:  Yeah, that's probably right. We'll fix
17   that. Okay. So now let's see. 63 is Count Six and Seven. I
18   just wanted to make sure I'm clear on this. The indictment
19   charged 500 grams or more of methamphetamine. And remind me
20   again are we asking them to determine a quantity or not?  I
21   don't think we are anymore, are we?
22            MR. HANLON:  So Your Honor, I believe the verdict
23   sheet did ask for a verdict on quantity, if memory serves.
24            THE COURT:  Let me kind of flip through here again.
25   Yes, it does, but that's just on Count VII only, right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1997**

```
 1              MR. HANLON:  That's correct.

 2              THE COURT:  Not asking for quantities on the cocaine

 3    or marijuana.

 4              MR. HANLON:  That is correct.

 5              THE COURT:  So -- so anything on 63, 64, 65 all the

 6    way up to -- actually, on 73 I think we need to add an "a" --

 7    sorry, on instruction 66 we need to add an "a" after "drug

 8    was" "a" controlled substance in the very beginning there.

 9    Just noticing that. So anything up to 67 which is the Count

10    Six and Seven instruction before we get to conspiracy?

11              MR. HANLON:  Not from the Government, Your Honor.

12              MR. NIETO:  Nothing from the defense, Your Honor.

13              MR. HAWKS:  None, Your Honor.

14              THE COURT:  Okay, so now we get to conspiracy. 68,

15    69. Start with the drug conspiracy. Everything up until 72.

16    And then 73 and 74 are the Hobbs Act conspiracy. 75 I see we

17    need to -- "destroy," I think I left a letter out on "destroy"

18    on the header. But 75, 76, 77 other than changing the title,

19    it's really the same thing. Anything up to 78?

20              MR. HANLON: Not from the Government, Your Honor.

21              MR. NIETO:  Not for Taeyan Williams.

22              THE COURT:  And 79 is also part of the conspiracy

23    group. If anybody has anything there let me know, otherwise we

24    move onto these firearm counts. 80, 81, 82, 83, moving

25    quickly. On 83 I have a comma in the word "violence" in the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1998**

```
 1   last paragraph.  We need to fix that. And then 84, 85, 86,
 2   lesser included offense.  87, 88 which are Count Eight.
 3   Anything up to 91 which is the rest of the drug -- the rest of
 4   the 924(c) charge -- instructions?
 5            MR. HANLON:  Not from the Government, Your Honor.
 6            MR. HAWKS:  No, sir.
 7            THE COURT:  How about 92?  This is the one we did
 8   make some changes to. So what I did here was on the
 9   willfulness I took the language straight out of Wilson rather
10   than going to the model one even though I generally agree it's
11   the same point, but I figure we might as well use the language
12   that comes from our circuit more specifically than the generic
13   language. And then I added the Rosemond piece at the end.
14            MR. HANLON:  No objections from the Government, Your
15   Honor.
16            MR. NIETO:  None from Taeyan Williams either, Your
17   Honor.
18            MR. HAWKS:  None, Your Honor.
19            THE COURT:  Okay, then that just leaves the
20   Pinkerton instruction which is instruction 93.  And then 94 is
21   unanimity where it's just causing us all to work overtime, but
22   I think I didn't make any substantive changes to that. And 95
23   is punishment. And then I usually stop there.  So I would give
24   all the instructions except 96. I usually give 96 after the
25   closing arguments just to focus them just on the process
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA1999**

```
 1    they're going to follow.
 2         Anything on any of the rest of them?  Okay.
 3         So anything -- well, so I have the Government's proposed
 4    slides for closing argument. Admittedly I want to look at
 5    those now before we start the testimony again. Just does the
 6    defense have these or not in terms of whether they have any
 7    objections?
 8              MS. GROSSI:  Yes, Your Honor.  They were on the same
 9    e-mail.
10              THE COURT:  Okay.  So any issues from the defense on
11    this?
12              MR. GUILLAUME:  No, Your Honor.  I couldn't see any
13    and I provided a rough draft.  I'm still working through my
14    PowerPoint, but I provided a rough draft to the Government. I
15    don't know if they have any objections to mine, but this may
16    be the time to discuss it if they do. I hope not, but --
17              MR. HANLON:  So Your Honor, the only concerns the
18    Government has with the slides from Taeyan Williams' counsel
19    is that there's a couple of pieces of clipart of a marijuana
20    farm or something like that that I don't think are in
21    evidence.
22              THE COURT:  Clipart like B-roll-type stuff?
23              MR. HANLON:  That's how I read it, Your Honor.
24              MR. GUILLAUME:  Your Honor, that is correct. With
25    respect to Mr. Rayburn I did include some imagery for argument
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2000**

```
 1        purposes.  It's not an exhibit.  I'm not going to argue that
 2        it's an exhibit. I'll even say that to the jury.  But yes,
 3        specifically I included a picture of a marijuana farm and a
 4        wellness spa. He testified that he was --
 5                THE COURT:  Not his, just a generic one?
 6                MR. GUILLAUME:  Not his, just generic photos.
 7                THE COURT:  These are photos or sort of graphical
 8        representations?
 9                MR. GUILLAUME:  Photos, Your Honor, stock photos.
10        Also there's photos with respect to the testimony Mr. Cox gave
11        about Mr. Smothers having a storage facility and a money
12        counter and vacuum-sealed cash and large amounts of marijuana.
13        There's stock photos of those as well.  So those would be I
14        think the entirety of the--
15                THE COURT:  You mean like a money counter, a stock
16        photo of a money counter?
17                MR. GUILLAUME: Excuse me?
18                THE COURT: You mean a stock photo of a money
19        counter?
20                MR. GUILLAUME: Stock photo of a money counter, yes.
21                THE COURT:  Don't we have a photo of a money
22        counter?  I mean, it's not a great photo, it's probably while
23        it's still in place, but --
24                MR. GUILLAUME:  We may, Your Honor.  I can't recall
25        off the top of my head.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2001**

```
 1              MR. HAWKS:  Your Honor, we have a photo of a thing
 2     from the back that's mechanical that a witness had opined was
 3     a money counter, a witness who was not at the search.  So
 4     Scott Williams would say we do not have in evidence a photo of
 5     a money counter, but a --
 6              THE COURT:  Well, a conclusive photo of a money
 7     counter.
 8              MR. HAWKS:  Yes, Your Honor.
 9              MR. GUILLAUME:  My inclination was the photo was
10     based on the testimony of witnesses, particularly Mr. Cox and
11     Mr. Rayburn, Your Honor. And my take, I guess my term is
12     argument, artistic liberties if that's such a thing. I've done
13     it in other cases.  Not to say that it's whatever, just to say
14     that that's why I did it in this case.
15              THE COURT:  Okay, before we get to that, Mr. Hawks
16     and Mr. Crawley, do you have any visuals that you either
17     shared or haven't shared yet?
18              MR. HAWKS:  Your Honor, we haven't shared them.
19     Every single visual that we have is directly an exhibit or
20     it's a portion of an instruction. And then we have -- it's
21     notes and essentially it's a reference to exhibits that we
22     would suggest to the jury.
23              THE COURT:  Okay, well I would ask to at least at a
24     minimum let me see it. Obviously counsel showing it to each
25     other I think is a nice professional courtesy which frankly,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2002**

```
 1    makes everything more efficient, but I understand sometimes
 2    people don't want to do that. I've started to take the view
 3    that I at least should look at it for the reason Mr. Hanlon
 4    identified.  Sometimes there's stuff that's not in evidence
 5    and either I catch it and it was inadvertent or it was sort of
 6    there for a reason. And so that's why just to be fair since I
 7    did ask everyone else to let me look at it before you do it,
 8    but it sounds like it will be fine based on how you've
 9    described it.
10         So Mr. Hanlon, what's your view on what you've heard from
11    Mr. Guillaume on his artistic license?
12              MR. HANLON:  Well, Your Honor, I understand why the
13    defense wants to use it, I certainly get that, but we have
14    evidence in this case that the defense can use.  And showing
15    clipart and things from the internet I think can be -- and I'm
16    sure Mr. Guillaume is going to make it as clear as possible
17    during his argument, but showing photos of things that are not
18    in evidence and then talking about the evidence is going to be
19    confusing. We're a little confused about the money counter,
20    for example. There's been plenty of evidence that there was a
21    money counter in this case.
22         So the Government does object to these art forms coming
23    in of photos that I think the jury is going to go back there
24    and wonder "Oh, well this must be what so and so's business
25    looks like."
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2003**

```
 1                THE COURT:  I haven't seen it myself, have I?

 2                MR. GUILLAUME:  Actually, should I e-mail your

 3       chambers now?

 4                THE COURT:  Do you have a hardcopy right now or not?

 5                MR. GUILLAUME: I don't.

 6                THE COURT: I guess you can e-mail chambers. We'll

 7       try to print it out. I mean, I am skeptical, Mr. Guillaume.

 8       And I'll be honest with you. I understand there's different

 9       ways of looking at this. I mean, if you put on the screen the

10       word, you know, "marijuana farm," that probably was said, I

11       probably would be okay with that. The pictures I have some

12       concerns with.

13           Honestly, the reason why we're in this discussion where I

14       said maybe I should affirmatively look at these things is the

15       Government tried exactly what you did in an earlier case. One

16       of our prosecutors' colleagues had, you know, clip art of

17       gasoline cans and stuff from the internet that was not in

18       evidence and I was -- I thought it was a problem. And I didn't

19       object myself in the middle, but I was thinking about doing

20       that. And I also told the U.S. Attorney's Office they

21       shouldn't do that anymore.

22           So having done that, I don't know if it's fair to let a

23       defense counsel do what I've just told them they can't do.  So

24       that's the problem I would have in allowing it I think in

25       particular is I've told the Government not to do that.  And it
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2004**

```
 1    sounds like they're not going to do that in this case. So I
 2    don't know if there's a way to adjust your presentation.
 3           MR. GUILLAUME:  I'll let the Court see, Your Honor,
 4    and if the Court wants me to take it out, I'll take it out.
 5           THE COURT: Again, just to be fair, you know,
 6    admitted exhibits is one thing. Even something that was, you
 7    know, a demonstrative aid that was used in the trial, like if
 8    at some point in the trial you had said "Hey, did your farm
 9    look like this?"  I don't know. If there was a way that you
10    had it in front of them it would be a better argument. I don't
11    think it's going to harm anything. I don't disagree with you,
12    but at the same time, again I've tried to be, you know, your
13    colleagues in the defense bar will probably thank me for not
14    letting the Government do that, but I want to be fair to both
15    sides generally.
16       Mr. Hawks?
17           MR. HAWKS:  Your Honor, I have a hardcopy. However,
18    it's my only hardcopy and so --
19           THE COURT:  Okay, well we have a few minutes before
20    10 so I could probably peek at it before 10 and give it back
21    to you.
22       Any other issues with slides or anything like that?
23           MR. HANLON:  Your Honor, one other thing. So I think
24    it's the last slide in Taeyan Williams' set, uses words to the
25    effect, I'm paraphrasing, communicates to the jury words to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2005**

1  the effect of "Taeyan Williams' life is in your hands."

2  Something like that.

3        **MR. GUILLAUME:**  I said "fate," not "life" which I

4  typically say in all cases. I can take the word out and just

5  say it because I think it's an accurate assessment.

6        **THE COURT:**  So are you objecting to the slide, or

7  the statement, or both?

8        **MR. HANLON:**  Your Honor, let me make sure I've got

9  my facts straight.

10        **MR. GUILLAUME:**  Your Honor, while we're doing that

11  I'm just loading it. It's sort of large, so it's coming to

12  Your Honor but it's still loading on my computer. I'm

13  e-mailing to you the presentation.

14        **MR. HANLON:**  It does not bother the Government as

15  much as the clipart, Your Honor.  It does seem to ask the jury

16  to take into consideration punishment, which of course they're

17  not supposed to. But admittedly, it is less of a concern to

18  the Government than the clipart is.

19        **THE COURT:**  Okay, well let's take this step by step.

20  Not having seen it, I mean, I think you said it's "Taeyan

21  Williams' fate is in your hands"?

22        **MR. GUILLAUME:**  It's prefaced, Your Honor -- I'm

23  sorry it's taking so long to load up.  It's prefaced by

24  talking about the role of the jury and they, the people, the

25  Fathers envisioned, talking about the Fathers envisioning the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2006**

```
 1    people making the decision as to whether the Government met

 2    their burden of proof, not attorneys or judges or law

 3    enforcement. And so therefore the people, being the jury in

 4    this case, have the responsibility to weigh this evidence and

 5    assess whether it's proof beyond a reasonable doubt.  And then

 6    in the end, the last thing in the slide says that "Taeyan

 7    Williams' fate is in your hands." So I typically end with some

 8    sort of a --

 9              THE COURT:  Sure. I think I'm going to allow it. I

10    think "life" would have been a little harder. "Fate" I think

11    is a generic term that doesn't necessarily implicate a

12    sentence or how long the sentence would be. And I understand

13    the point which is fair that the jury makes these decisions,

14    not the Court or anyone else. So that's about right up to the

15    line, Mr. Guillaume.  So I wouldn't try any more language

16    other than what you've got there, but I think I'd be okay with

17    that.

18              MR. GUILLAUME:  No, Your Honor.  I would just use

19    the "fate."

20              THE COURT:  I'll be okay with that.

21              MR. GUILLAUME:  If I say that at all. It's there in

22    the slide, but I'm e-mailing Your Honor right now the

23    presentation.

24              MR. HAWKS:  Your Honor, to that end we don't have a

25    visual, but I intended to say something to the effect of "it's
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2007**

```
 1    a very serious charge and because of that it's imperative that
 2    you take it very seriously," that it's -- and so I would never
 3    characterize it with a number or something like that, but I
 4    think one could conclude from the emphasis that I'm saying
 5    that this is -- it has the potential to affect --
 6            THE COURT:  I think "serious" -- I mean, I have
 7    "serious" in the instructions somewhere in the early part so
 8    I'm okay with that if you're saying that these are very
 9    serious charges.
10        So admittedly, I don't know if I did this earlier on, Mr.
11    Hawks, I usually say it, but I think with our pretrial
12    conference I think it was truncated because of timing and so I
13    didn't cover this. Hold on one second. Well, they're not
14    numbered, but when you quote the jury instructions and I'm
15    assuming that they're accurate based on the latest version,
16    you just may want to check that.
17        Again, something I was really hard on the Government on
18    because they're the ones that do it a lot is I'm fine with
19    parties talking about the instructions. The two things I
20    always tell them, one is don't paraphrase, just quote because
21    then you're changing the instructions arguably, and that's
22    sort of oral or written. I also say when you quote the
23    instructions on a slide, I ask the parties not to emphasize or
24    leave out anything. So coloring in or underlining or bolding I
25    tell them not to do or leaving words out and putting an
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2008**

```
1    ellipsis in or putting in brackets around a word and changing
2    the word, even if it's a grammatical issue just because I
3    think the instructions are what they are. There's an
4    instruction saying that you should not -- the jury should
5    consider them as a whole.  So I think overemphasizing one word
6    or the other depending on how it's done I find it can be too
7    much. And so both sides, but often times it's the Government,
8    I'd caution them just to if you directly quote and you can use
9    your voice to emphasize words if you want, you can talk about
10   a word and not the others, but where I try to draw the line is
11   to say at least what they are seeing is at most just a direct
12   quote from the instructions without any emphasis.  So I'd ask
13   if you could take out the underlining and the color on that.
14            MR. HAWKS:  Yes, Your Honor.
15            THE COURT:  But otherwise you can leave that in
16   there. So assuming these are direct quotes which I'd have to
17   compare, but that's the only thing I notice in looking at
18   this, although admittedly there's some sort of --
19            MR. HAWKS:  And Your Honor, not everything in that
20   packet would be displayed to the jury. There are notes.
21            THE COURT:  I see. Yeah, it sort of seems that way.
22   That's fine. Okay, so assuming some of these notes, I mean,
23   again nothing jumps out as problematic other than the
24   instruction emphasis words.
25            MR. HAWKS:  Your Honor, in an abundance of caution,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2009**

```
 1    there's something you gave us that made it very clear we're
 2    not to characterize the beyond a reasonable doubt standard. I
 3    do intend to compare it and say that basically it's -- there's
 4    other legal standards and it is the highest and so in an
 5    abundance of caution.
 6         THE COURT:  Everybody is always doing that.  I think
 7    I'm okay with that. But the Fourth Circuit doesn't like us or
 8    doesn't allow us to give any sort of sub-definition of that
 9    term. So that's why the instructions don't have that and I
10    would ask you not to do that as well. But if you want to say
11    it's above preponderance or clear and convincing, I think
12    that's pretty standard things.
13         MR. GUILLAUME:  Your Honor, I want to be sure for
14    the record I'm clear that in light of the Court's instructions
15    to Mr. Hawks about underlining, I did have some of that direct
16    quotes underlined in mine as well that I did not edit before I
17    sent it to you, but I have edited just now.  So I took out for
18    the Government's purposes as well, took out the underlines in
19    those quotes.
20         THE COURT:  I take it the Government -- I'm just
21    flipping through the Government's right now. It's really long.
22    Any issues with that jury instruction issue?  Because again, I
23    don't know if I emphasized that with all of you up front as I
24    often do when we have more time in the pretrial conference.
25         MS. GROSSI:  No, Your Honor.  I don't quote the jury
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2010

```
 1    instructions in the PowerPoint.

 2            THE COURT:  And then it looks like the PowerPoint

 3    was sent as a Google Drive link which you're already

 4    challenging me as it is, but I'm told it's not opening.

 5            MR. GUILLAUME:  I'm sorry, Your Honor.  I don't --

 6    to just make these easier, I can take out the stock photos. I

 7    don't have any problem with that. I'm going to argue what's in

 8    evidence.  I'll just take out the stock photos to make it

 9    easier.

10            THE COURT:  That would be helpful.  Again, every

11    situation is different, but I think trying to have a bright

12    line for both sides on that makes sense.

13        Do we have any issues on timing?  I want to make sure

14    we're all on the same page. I think the Government asked for

15    additional time at the beginning.  I said I wanted to reserve

16    on that because I frankly didn't know what we were dealing

17    with or how complicated this case was going to be or not. I

18    haven't heard anything since, so my assumption is everyone

19    with varying degrees of happiness was going to work within the

20    original time constraints.  But I just want to make sure if

21    there's additional requests that we sort those out now. It's a

22    little late to sort of change course I suppose, but --

23            MR. HANLON:  So Your Honor, the Government would ask

24    this-- and I'm sorry for the flipping back. I'm supposed to do

25    the rebuttal, Ms. Grossi is doing the opening close, hence the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2011**

```
 1    flipping back and forth. I ask that the Government be given a
 2    total of an hour and 15 minutes. An hour for closing, 15
 3    minutes for a rebuttal. Partly because with two defendants, we
 4    will have two hours of defense closings. So there's likely
 5    going to be a bit to talk about in the rebuttal.  And it's a
 6    big case, Your Honor.  I think the Government needs an hour
 7    for a closing. I think that's a relatively modest request
 8    given the nature of the case and the amount of argument.
 9              THE COURT:  So what is the expected length of the
10    defense closings at this point?
11              MR. HAWKS:  Your Honor, it's 30 minutes, roughly.
12              MR. GUILLAUME:  I would say it's between 30 and 45
13    minutes, Your Honor. Depending on what Mr. Hawks says it may
14    be truncated a little bit because we probably hit some similar
15    points.
16              THE COURT:  Is the plan for Mr. Hawks to go first?
17              MR. GUILLAUME:  That's what I was thinking because
18    he went first --
19              THE COURT:  So again, I mean, obviously the
20    defendants are differently situated since as has been pointed
21    out there's no obligation.  And often in some cases there is
22    no overlap. Sometimes there is, sometimes there isn't, or a
23    need to cooperate or even a desire to cooperate. At the same
24    time, it sounds like the overall defense picture is going to
25    be over an hour. Again, not to say that you should have to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2012**

```
 1    coordinate, but just that there will be at least that much
 2    material for the Government to deal with.
 3         MR. GUILLAUME:  Your Honor, if I may, I think the
 4    longest I'll be is 45 minutes and I think the shortest is
 5    probably around 30. So no matter what Mr. Hawks does, I think
 6    I'll be at least 30 minutes.
 7         THE COURT:  Okay. Do either of you have a view on
 8    the Government's request?
 9         MR. HAWKS:  Your Honor, just in context, I feel like
10    I have strove to be courteous throughout this trial. That
11    being said, the issues between these two defendants are very,
12    very similar and so for that reason I would say that I think
13    the Government can address it all in an hour, including their
14    rebuttal time. And so I would object to them getting 75
15    minutes.
16         MR. GUILLAUME:  I've tried to be accommodating as
17    well, Your Honor, but the Government already has my argument.
18    I've given it to them.  So they know what I'm going to say.
19    They can address that however they choose. I just don't want a
20    situation where the Government is given too much time, but I
21    do want to be fair to them as well, of course.  But I want to
22    be of course 100 percent fair to my client, Your Honor.  So I
23    guess that's a long way of saying that I agree with Mr. Hawks,
24    but ultimately whatever decision the Court makes I'll abide
25    by.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2013**

```
 1              THE COURT:  Right. I think I'm going to allow it in
 2     this case for two reasons:  One is there are two defendants.
 3     There is overlap on some of the evidence, but I think there's
 4     no question that the two defendants are differently situated.
 5     This is one of the reasons why even without knowing the case I
 6     gave them additional strikes at the beginning. I think the
 7     defense conveyed pretty clearly that they are not in lockstep.
 8     They have different theories, both clients, the evidence that
 9     affects -- you know, some of the same evidence may exist but
10     it affects their clients in different ways.  And so I do think
11     there is some difference in terms of what we'll hear from the
12     two different defense counsel.
13          Secondly, as we said, I mean, collectively the defense is
14     going to present potentially more than an hour. Certainly I
15     don't think they want to be limited to less than that and so--
16     and then just in the evidence in this case having heard it,
17     there's just a lot of pieces of evidence. This is not one of
18     those cases where you have sort of direct evidence where the
19     only debate is whether you believe that one person or not.
20     There's a lot of small pieces of evidence that at least my
21     sense of it is they're at least relevant and worth discussing
22     even if the parties may disagree on how valuable they are to
23     the case.
24          And so I think just the complicated nature of the
25     evidence, number of witnesses, number of documents,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2014**

```
 1    recordings, et cetera, and the fact that the defendants are
 2    differently situated and they are going to need some separate
 3    discussion, one cannot I think fairly argue this case without
 4    having separate discussions of the two defendants. I'll allow
 5    it.  However, I will say this: I think I said this at the
 6    outset that first of all, I'll keep it pretty strict, the hour
 7    and 15. I will, you know, if opening argument goes past an
 8    hour I'm not going to stop that, but it's going to come out of
 9    the rebuttal time. And I am maxing out the rebuttal at 15
10    minutes.  I think that's a little generous.  Again, different
11    judges or different attorneys have philosophies on this.  I am
12    very much against the idea that the Government saves anything
13    for rebuttal that they could have said in the opening argument
14    because yes, they have the burden of proof, but they don't get
15    to just throw things out there without anybody having a chance
16    to respond to it.  So any more than the 15 minutes I think is
17    opening the door to that potentially even if it's not
18    intended.  So even if the opening argument comes in short of
19    an hour we're going to keep the rebuttal to 15 minutes one way
20    or the other. So that's how we'll handle it.
21        Okay. Anything else on the arguments?  So what I'll do is
22    why don't we -- sorry, Mr. Hawks?
23            MR. HAWKS:  Your Honor, would there be an
24    opportunity to after the Government argument, for the jury to
25    take a break?  And I would volunteer some of my hour to that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2015**

 1   end.

 2          **THE COURT:**  Here's what I'm thinking is a lot of it

 3   depends on how long the evidence will be. I mean, my hope

 4   would be -- particularly now you've told me we're not going to

 5   have specific defense witnesses.  I think I was told that the

 6   rest of the Government's case overall it sounded like it was

 7   about an hour-and-a-half max, I don't know, depending on the

 8   cross and the direct. That what we would probably do if that's

 9   all done let's say by like 11:30, we would do the jury

10   instructions before lunch. They're actually quite long and I

11   think it actually would be good for them to have a break from

12   that. And then we would pick this up after lunch. And then I

13   mean, I guess it just depends. I would ordinarily do -- I

14   don't think you can reasonably do with these three arguments

15   instead of just two, no break. So the logical place probably

16   would be the Government's opening and then the first closing,

17   and then take a break between the two defendants and then the

18   rebuttal. I think that's sort of the natural stopping point.

19   But does anyone think that's not going to work?  So then

20   you're talking like an hour-and-a-half, break, and then

21   another hour after that. Otherwise we're going probably well

22   over two hours which is pretty much the max I allow the jury

23   to deal with.

24          **MR. HAWKS:**  Your Honor, I may have misheard you. It

25   would be Government initial argument, then the first defense

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2016**

```
 1    argument, then break?  Or Government --
 2              THE COURT:  That's what I think is the natural way
 3    to do it just in terms of the time, but if anyone has a
 4    different view of how to do it, I mean, if -- I mean, I
 5    suppose one could do the two defendants and the rebuttal, that
 6    doesn't add up to more than two hours, so I don't know. Does
 7    the Government have a view on this?  I mean, my assumption,
 8    Mr. Hawks, just to be totally transparent is I think you're
 9    probably interested in having a little break just to think
10    about what was said?
11              MR. HAWKS:  Your Honor --
12              THE COURT:  There's nothing wrong with that. I
13    mean--
14              MR. HAWKS:  Honestly, Your Honor, it was the thought
15    that -- I got their slide back and I think there's 120 slides.
16              THE COURT:  You think they're going to need a rest.
17              MR. HAWKS:  I think they're right at that hour and
18    it was more kind of the mental palate of the jury I wanted
19    cleansed with a break.
20              THE COURT:  Well, I mean, I know both sides always
21    like to kind of have it -- nobody wants to be disadvantaged on
22    the sequence. I think the jury generally figures this out one
23    way or the other. The Government I don't think is at a
24    disadvantage by having a break because they have the rebuttal
25    at the end anyway, so I don't know.  Does anyone have a view
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2017**

```
1   on how we should do breaks if we have --

2              MS. GROSSI:  We defer to the Court, Your Honor.

3              MR. GUILLAUME:  Your Honor, I'll defer as well, but

4   I do think now that -- I think Mr. Hawks -- I would be fine

5   with his way as well because it gives a bit of the break, but

6   however it falls it falls, so I'm okay with whatever.

7              THE COURT:  Why don't we do this: Like I said, I

8   don't -- we'll definitely take a break. Like I said, I would

9   probably have assumed it would be -- I also didn't know the

10  Government's would be a full hour.  I thought it might be 45,

11  50 minutes with the rebuttal on the back side.  So having done

12  that I think that would have been too early with the full

13  hour, it could be the same difference. Let's just wait and see

14  when we're done with the evidence and I'll let you know just

15  based on where we are on the clock, how that will work.

16       Honestly, the jury instructions I have no idea how long

17  they're going to be. It's somewhat unprecedentedly long from

18  my perspective, but I also know that's not what they're here

19  for in terms of presentation.  So we'll move through that as

20  efficiently as we can, but we'll definitely take a break.

21  Let's just sort of see how things fall out with lunch and

22  everything and I'll let you know well in advance.

23       Okay, is the jury here?

24              MR. MOOMAU:  Your Honor, if I don't say it now I'll

25  forget about it.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2018**

```
 1              THE COURT:  Sure.
 2              MR. MOOMAU:  There's one other matter and I realized
 3   when we were going over exhibits after court with Ms. Solomon
 4   on Friday -- or Thursday. There was one exhibit and this was
 5   totally my fault because I made a mistake on the list. I
 6   intended to introduce or move in 175 through 184, but I think
 7   I just said 175 and 184. The Court realized during the
 8   testimony and then I moved it in. And then the Court asked me
 9   did I want to admit 184A. And I thought it was another exhibit
10   the Court was talking about and I said yes. We didn't refer to
11   184A. It was some geo Google location data. And I talked to
12   Mr. Nieto about it. He didn't have a problem with the
13   Government moving to withdraw that. I didn't get a chance to
14   talk to Mr. Hawks or Mr. Crawley because we were going over a
15   video before court this morning and I just forgot about it.
16   But I would move and we didn't refer to it any, to withdraw
17   184A.
18              THE COURT:  Okay. So I don't know if the defense,
19   who hasn't been asked about this yet, has any view on this?  I
20   mean, is there a problem with 184, Mr. Moomau, in terms of
21   184A? Is it sort of redundant or is it --
22              MR. MOOMAU:  It just wasn't mentioned any at all and
23   the jury might take it back and wonder what this is.
24              THE COURT:  It looks like it's something about a
25   location near Binghamton.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2019**

```
 1                    MR. MOOMAU:  Yeah.

 2                    THE COURT:  So it seems not particularly relevant

 3       although I don't know if Mr. Hawks, do you have a copy of this

 4       or do you have a view on this?

 5                    MR. HAWKS:  Your Honor, I do and we'd ask that it

 6       remain in evidence.

 7                    THE COURT:  Other than sort of in your view not

 8       being relevant, is there any problem with this being here, Mr.

 9       Moomau?

10                    MR. MOOMAU:  No, it just wasn't discussed on direct

11       with the witness. I mean, if the defense wants to bring it up

12       on --

13                    THE COURT:  Well, what is it by the way?

14                    MR. MOOMAU:  It was a Google location data on Noah

15       Smothers' Gmail account when his father was using a search

16       after that account remained logged in from the Binghamton

17       address. That's what it is.

18                    THE COURT:  But it just shows a location near his

19       family residence in Binghamton?

20                    MR. MOOMAU:  Yeah.

21                    THE COURT:  It doesn't jump out as being

22       particularly relevant, but I also don't hear sort of a 403

23       argument on why it can't stay in evidence.

24          Mr. Hawks, do you see value in this?  It sounds like you

25       do.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2020**

```
 1              MR. HAWKS:  I do, Your Honor. I can expound or I
 2  can--
 3              THE COURT:  Just give me some sense of why it's
 4  relevant.
 5              MR. HAWKS:  Your Honor, this establishes the idea
 6  that the use of an electronic device registered to one person
 7  by another person occurs. And that's of great relevance.
 8              THE COURT:  Say that again. Use of an electronic --
 9  say that again.
10              MR. HAWKS:  Your Honor, basically that I might have
11  this person's device, but I use it to search -- I'm a
12  different person than this person and I use it to search.
13              THE COURT:  Meaning Mr. Roger Smothers had access to
14  it?
15              MR. HAWKS:  Yes, Your Honor.
16              THE COURT:  Okay. Well, I think we'll leave it in.
17  Whatever value it is, it is.
18         Okay, I would suggest we take a very brief break just so
19  that everyone here doesn't go beyond the two hours I was just
20  laying out. Is the jury ready?
21              THE COURTROOM DEPUTY:  Almost.
22              THE COURT:  Let's take a five-minute break here so
23  everyone here doesn't go over the two hours.  And as soon as
24  they're ready and everyone else is ready, we'll restart. Okay.
25  Thank you.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2021**

```
 1              (Recess was taken from 10:03 to 10:09 a.m.)
 2              THE COURT:  Thank you, everyone.  Please be seated.
 3    We can have the witness come into the courtroom while we're
 4    waiting.
 5              MR. CRAWLEY:  Your Honor, there will be one issue
 6    concerning the Government's closing list of exhibits or
 7    slideshow for better --
 8              THE COURT:  Why don't we do that at the next break.
 9              MR. CRAWLEY:  Okay.
10              THE COURT:  Thank you.
11              (Jury entered the courtroom at 10:10 a.m.)
12              THE COURT:  Thank you.  Everyone please be seated.
13    Ladies and gentlemen, welcome back from our version of the
14    long weekend and we are ready to continue with the trial. The
15    Government can call its next witness.
16              MR. MOOMAU:  Your Honor, redirect or the
17    cross-examination?
18              THE COURT:  I'm sorry, we still have Sergeant Simms
19    on the stand, but -- and Sergeant Simms, I'll remind you
20    you're under oath based on the oath last week.
21              (Witness, Kyle Simms, having been previously sworn,
22    remained under oath and testified as follows:)
23              THE WITNESS:  Yes, sir.
24              THE COURT:  Thank you.
25         C O N T I N U E D   C R O S S - E X A M I N A T I O N
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2022**

```
1    BY MR. HAWKS:

2    Q.    Sergeant Simms, good morning.

3    A.    Good morning, sir.

4    Q.    Now Sergeant Simms, what we were talking about last

5    Thursday, you are the lead case agent in this case?

6    A.    Correct.

7    Q.    And as the lead case agent in this case, among other

8    things, it fell to you to draft the affidavit for the search

9    warrant of the Bristolwood property?

10   A.    Yes, sir.  That's correct.

11   Q.    And we talked briefly about this the last time you were

12   on the stand. It's very important that that affidavit be

13   correct?

14   A.    Yes, sir.

15   Q.    And its audience is a judge?

16   A.    Yes, sir.

17   Q.    Now in that search warrant affidavit, you wrote that the

18   information that you had about who Mr. Smothers was going to

19   meet was a, quote, "Tae and his uncle"?

20   A.    That's correct.

21   Q.    And you, in fact, repeated that, you repeated the facts

22   in different parts of the affidavit that you were looking for

23   Tae and his uncle?

24   A.    That's correct.

25   Q.    And that's -- that investigation is sort of a heavy one
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2023**

```
 1    because Tae has, in fact, seven uncles; isn't that true?
 2    A.   I'm not sure how many uncles he has.
 3    Q.   Are you aware of him having uncles?
 4    A.   Yes, I am.
 5    Q.   Now once you had drafted the affidavit, but before you
 6    executed the affidavit, there were coordinating tasks that
 7    fell to you; is that true?
 8    A.   Can you expound on that a little?
 9    Q.   Elaborate?  Sure.
10    A.   Yes, sir.
11    Q.   Among those coordinating tasks is, for example, the first
12    Maryland State Police who were going to be at the scene were
13    not going to be you and other investigators, but actually a
14    SWAT team basically?
15    A.   Yes, sir.  That's standard procedure that they would make
16    the initial contact at the residence.
17    Q.   Sure. And you conducted surveillance and then informed
18    the SWAT team about your surveillance?
19    A.   Yes, sir.
20    Q.   And the idea is they would know basically what they're
21    going into?
22    A.   Yes, sir.
23    Q.   And your surveillance noted that there were two Porsche
24    SUVs on that Bristolwood property? If you --
25    A.   I believe that's accurate, yes, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2024**

```
 1    Q.   And your belief at the time was that those two cars
 2    didn't work?
 3    A.   I don't recall whether I knew whether they worked or not.
 4    Q.   Okay. You also noted a Nissan Altima rental car?
 5    A.   Okay.
 6    Q.   Do you remember that?
 7    A.   I vaguely remember seeing one in the driveway.
 8    Q.   Okay. And again, if you remember, is it a 2018 Nissan
 9    Altima rental car?
10    A.   I don't recall the exact -- of that car that I saw during
11    that surveillance, it may have been.
12    Q.   Do you recall that you knew in your communication with
13    the SWAT commander that Taeyan Williams was driving that
14    rental car?
15    A.   You're saying that I communicated to the SWAT commander
16    that he was driving the vehicle?
17    Q.   You communicated to the SWAT commander that there's a
18    2018 Nissan Altima and that you, quote, "know that the driver,
19    the frequent driver was Taeyan Williams"?
20    A.   Okay, I don't believe that was accurate. I may have said
21    that, but --
22    Q.   Okay, so you --
23    A.   I wouldn't have had necessarily information to
24    corroborate that.
25    Q.   So you communicated that at the time, but you're saying
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2025**

```
1    it may have occurred later and it was not true?
2    A.   I don't know that it necessarily was not true, but I
3    don't recall having that information at that time.
4    Q.   Now do you recall last week we spoke before you took the
5    stand?
6    A.   Okay.
7    Q.   And do you recall that I gave you two pieces of
8    information to review before you testified?
9    A.   Yes, sir.
10   Q.   And one of those was your e-mail to that SWAT commander?
11   A.   Yes, sir.  I recall that.
12   Q.   And do you recall you returned that to me and you said,
13   "I don't need these anymore"?
14   A.   I remember returning them to you, yes, sir.
15   Q.   Okay. Now the handgun that was found in this case is a
16   Sig Sauer P228; is that true?
17   A.   That was one of the weapons, yes, sir.
18   Q.   And the Sig Sauer P228, would you agree with the
19   statement that a Sig Sauer is a very well regarded handgun,
20   the maker of Sig Sauer is very well regarded in the gun
21   industry?
22   A.   Yes, sir.
23   Q.   And in fact, the Sig Sauer makes standard issued side
24   arms for a number of police forces across the United States?
25   A.   Yes, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2026**

1   Q.   And, in fact, you received an exemplar six hour P228 from

2   the Bureau of Alcohol, Tobacco and Firearms; is that true?

3   A.   Yes, sir, it is.

4   Q.   And, in fact, that for years is their standard issue

5   firearm?

6   A.   I'm not familiar with that, but --

7   Q.   Okay. Now is it true that if you know, legally here in

8   the state of Maryland you can go to a gun store, a person can

9   go to a gun store and purchase a 9 millimeter handgun for

10  under $300?

11  A.   I'm sure there are, yes, sir.

12  Q.   And they're not highly regarded, basically they're cheap

13  handguns?

14  A.   If it's under $300 it would be regarded as a less

15  expensive, cheap handgun, yes, sir.

16  Q.   But the Sig Sauer P228 and Sig Sauers in general are much

17  more expensive than that?

18  A.   They can be, yes, sir.

19  Q.   Okay. Now showing -- I'm showing you what's been admitted

20  as Exhibit 458.  It's a black and white copy.  The original is

21  actually in color.  That's a Sig Sauer P228?

22  A.   It appears to be, yes, sir.

23  Q.   And now I'm showing you the Sig Sauer P228 in Exhibit 455

24  and that's the same weapon, but it's disassembled?

25  A.   Yes, sir.

**JA2027**

1    Q.    And now I'm showing you page 4 of Exhibit 450 which shows

2    a Sig Sauer P228, but it's in a different condition; is that

3    correct?

4    A.    Different condition how?

5    Q.    Specifically the slide is locked back in this weapon?

6    A.    Yes, sir.  That's accurate.

7    Q.    And now the slide being locked back -- and I'm going to

8    indicate this top metal piece of the firearm, the slide is

9    that metal piece on the top of the firearm; isn't that true?

10   A.    Yes, sir.

11   Q.    And you'll see a series of arrows in the diagram. The

12   third arrow up, that's the slide catch. Is that true?

13   A.    Can I circle it just to --

14   Q.    Oh, please.

15   A.    Yes, sir. So if that's the area you're referring to, yes,

16   sir.  That would be the slide catch.

17   Q.    And basically what that does is if you touch that, that

18   allows the slide to move forward?

19   A.    Once the slide is to the rear, yes, sir.  If you were to

20   press that down the slide would move forward, correct.

21   Q.    And would you agree that if you do that and you don't

22   slow the movement of the slide, the slide slips back into

23   place very, very quickly?

24   A.    Yes, sir.

25   Q.    Okay. Now there are two tubes at the front of this

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2028**

1    firearm. One is the barrel and it's the top tube and that's
2    the thing that basically the bullets come out of; is that
3    true?
4    A.    Yes, sir.
5    Q.    And then there's a lower tube and that tube, it's the
6    recoil spring guide.
7    A.    Yes, recoil spring tube or recoil spring guide, yes, sir.
8    Q.    Would you agree that both of those tubes are only exposed
9    when the slide is back?
10    A.    Um, you can see them when the slide is forward. They are
11    partially exposed.
12    Q.    And again, I'm going to show you Exhibit 458. That's what
13    the handgun looks like when the slide is forward?
14    A.    Yes, sir.  But it does not show the recoil spring tube or
15    the muzzle of the barrel.
16    Q.    And so to see either of those things essentially you'd
17    have to be looking down the barrel?
18    A.    Yes, sir.  If you look to the front of the gun you can
19    see both the barrel and the recoil spring tube.
20    Q.    Now that slide being locked back, it can be manually
21    locked back?  In other words, someone can grab the slide, pull
22    it back, engage the slide catch and then lock the slide back?
23    A.    Yes, sir.  That's correct.
24    Q.    Additionally, if I were to have cartridges in the
25    magazine and fired them all, that slide by operation of the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2029**

```
 1   handgun, it will lock back when I fire the last cartridge out
 2   of the magazine?
 3   A.   Yes, sir.  Out of an empty magazine it will automatically
 4   lock to the rear.
 5   Q.   Now when it's locked like that, if I pull the trigger,
 6   will it fire a cartridge?
 7   A.   You're saying with the slide locked to the rear will it
 8   fire a cartridge?
 9   Q.   Just to be clear, I'm going to show you Exhibit 450, page
10   4. When it's in that condition and the weapon in the Exhibit
11   450, clearly there's no magazine in, but if there was a
12   magazine in but the slide was still locked back, if I were to
13   press the trigger, would it fire?
14   A.   No, sir, not until the slide is forward.
15   Q.   And in fact, the way you chamber around, the way you put
16   a bullet in the position to be fired is that you let the slide
17   go forward and that chambers the round?
18   A.   Correct.
19   Q.   Okay.  We've got to talk about Alfred Musa. You were
20   present for two proffers with Alfred Musa; is that true?
21   A.   Yes, sir.
22   Q.   Okay. And when I say "proffer," I mean the kind of formal
23   place where one was by Zoom, one was in person, but he's
24   brought in front of you and representatives of the U.S.
25   Attorney's Office and he tells you what he knows?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2030**

```
 1   A.   Correct.  Yes, sir.

 2   Q.   And the first of those was back in October of 2020?

 3   A.   Yes, sir.

 4           MR. MOOMAU:  Objection.

 5           THE COURT:  What's the objection?

 6           MR. MOOMAU:  Scope.

 7           THE COURT:  Sustained.

 8           MR. HAWKS:  Yes, Your Honor.

 9   BY MR. HAWKS:

10   Q.   Now you spoke about -- you were asked questions earlier

11   about the early developing of this investigation. Is that

12   true? When I say "earlier," I mean both on direct and the

13   other examination.

14   A.   Yes, sir.

15   Q.   Okay. And sort of the start of this case was information

16   you received that Mr. Smothers had traveled to Baltimore.

17   A.   Yes, sir.

18   Q.   And you had information that Mr. Smothers had met with

19   people in Baltimore?

20   A.   I don't believe that's accurate. I just knew at the time

21   in the very early stages that he had traveled to Maryland and

22   Baltimore, particularly.

23   Q.   Well, at some point you understood that one, he was in

24   the business of dealing drugs?

25   A.   Yes, sir.  I was aware of that.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2031**

```
 1    Q.    And two, that his trip to Baltimore was a commercial one?
 2    He didn't come to see the waterfront, he came to engage in his
 3    drug business?
 4    A.    That was my understanding, yes, sir.
 5    Q.    And you were told there two people, some quote -- or
 6    two groups of people, some quote, "Jamaicans and a girl" were
 7    his biggest clients in Baltimore?
 8    A.    I don't know that it was phrased that way. I also don't
 9    know that that female is necessarily from Baltimore, just
10    maybe in the Maryland area.
11    Q.    Okay. That his trip to Baltimore, he could encounter her
12    even if she was not exactly from Baltimore?
13    A.    Potentially, yes, sir.
14    Q.    Okay. And that female was Monique Tobler?
15              MR. MOOMAU:  Objection.
16              THE COURT:  What's the objection?
17              MR. MOOMAU:  Same as before, Your Honor. The scope
18    of the direct.
19              THE COURT:  Why don't we approach on this for a
20    second.
21              (Counsel approached the bench.)
22              THE COURT:  So I guess the first question is is this
23    within the scope, Mr. Hawks?
24              MR. HAWKS:  I'm sorry?
25              THE COURT:  How is this within the scope of direct?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2032**

1          MR. HAWKS:  Your Honor, I think broadly speaking,

2     he's testified about his development of the early leads and

3     this goes to that.

4          THE COURT:  So I mean, as a practical matter, he's

5     the case agent. They can call him in their case in chief if

6     they want. So is there -- I mean --

7          MR. MOOMAU:  And Your Honor, that's correct.  And

8     then they couldn't lead him, but they're trying to get in a

9     bunch of hearsay, what other people said, information that

10    Sergeant Simms heard during the development of the

11    investigation.

12         THE COURT:  Okay, so I don't know anything about

13    this other drug dealer or whatever you want to call her. So

14    what do we expect him to say about this?

15         MR. HAWKS:  Your Honor, that Monique Tobler was not

16    a drug dealer.  Jacob Rayburn was the one who came up with

17    Monique Tobler. She's not a drug dealer.  So he was throwing

18    out names of people who he was exaggerating the drug dealing

19    nature of people in Baltimore to deflect suspicion from

20    himself.

21         THE COURT:  I'm sorry, Mr. Rayburn was?

22         MR. HAWKS:  Yes, Your Honor.

23         THE COURT:  In a discussion with Sergeant Simms?

24         MR. HAWKS:  He did.  Yes, Your Honor.

25         MR. MOOMAU:  I'm not sure if Rayburn was asked that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2033**

1   on cross-examination.

2         **THE COURT:**  I don't think he was. Did that come up

3   in the cross of Mr. Rayburn?

4         **MR. HAWKS:**  He was asked about the girl, not the

5   name Monique Tobler and he said he didn't recall what he had

6   told them.

7         **THE COURT:**  Well, I think there could be this issue

8   about hearsay because I don't know -- we're asking him to say

9   something that Mr. Rayburn said and decide whether it's true

10  or not?

11        **MR. HAWKS:**  No, Your Honor. To simply say that his

12  investigative pursuit of it yielded no results.

13        **THE COURT:**  Of this other person.

14        **MR. HAWKS:**  That's --

15        **THE COURT:**  You're saying this is a name that he got

16  from Mr. Rayburn and he didn't find any --

17        **MR. HAWKS:**  Yes, Your Honor.

18        **THE COURT:**  So other than scope, is there any

19  problem with that?

20        **MR. MOOMAU:**  No. I mean, it is giving into like

21  calling him as a witness going beyond, but I trust Mr. Hawks

22  and if he says he's going to stop at that --

23        **THE COURT:**  Again, be careful of the hearsay issue.

24  I'll certainly listen to any objections on that point. In

25  terms of -- I'll allow this in the sense just as a matter of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2034**

```
 1    efficiency because again, he could be recalled in your case in
 2    chief.  Are we going to have a lot of other areas that didn't
 3    connect back to --
 4           MR. HAWKS:  With regard to that Alfred Musa being
 5    beyond the scope, I would have requested permission, I have
 6    some other questions. I want to come back and just request
 7    permission to adopt them just for judicial economy.
 8           THE COURT:  What would you be getting into with him
 9    on Mr. Musa?
10           MR. HAWKS:  That I just want to get the dates of
11    these proffers with Mr. Musa and he literally on
12    cross-examination he's already answered some questions about
13    Mr. Musa.
14           THE COURT:  So you're not going to get into the
15    content of discussions, just the dates?
16           MR. HAWKS:  One content issue.  It's been addressed
17    already on cross. There's a phone that Mr. Musa discussed and
18    then they didn't find anything of investigative value, despite
19    Mr. Musa's promises.
20           THE COURT:  Right. Okay, so other than scope do you
21    have any issues with that?
22           MR. MOOMAU:  No, that was covered by Mr. Nieto's
23    cross and just the dates, asking him did you meet with him on
24    those dates.
25           THE COURT:  Well, you can do that just to save time
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2035**

```
 1    for later.
 2              MR. HAWKS:  May I proceed in the leading format?
 3              THE COURT:  As of now, yes. We'll see how it goes,
 4    thanks.
 5              (Counsel returned to their trial tables.)
 6    BY MR. HAWKS:
 7    Q.   Again, Sergeant Simms, if you remember, you were given a
 8    name of a girl, their words, in Baltimore who was a client
 9    along with the Jamaicans?
10    A.   A client of Mr. Smothers'?
11    Q.   Yes, a drug dealing associate of Mr. Smothers.
12    A.   Okay. Are you saying there's an association with the
13    Jamaicans?  You said "along with." I'm sorry, I just want to
14    clarify what you're asking.
15    Q.   Let me be more clear, I apologize. Jacob Rayburn told you
16    that there were two major sets of clients in Baltimore, quote,
17    "the Jamaicans" and then, quote, what he described as "a
18    girl." But actually older than Noah Smothers.
19    A.   I'm not sure that Jacob Rayburn necessarily relayed that
20    to me in the beginning stages, but yes, there was information
21    relayed that there was another female client of his in the
22    Maryland area.
23    Q.   And do you agree that after pursuing that investigative
24    lead she was not -- she may have recreationally used drugs,
25    but there was no evidence she was a drug distributor with Noah
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2036**

```
 1    Smothers?

 2    A.   Um, there was information that she was, yes, a drug user

 3    potentially, but that's all the information that we learned at

 4    the time.

 5    Q.   Now we had some questions about Alfred Musa. You met with

 6    him in October of 2020?

 7    A.   That sounds about right, yes, sir.

 8    Q.   And then in May of 2021?

 9    A.   Again, sounds about correct.

10    Q.   Okay. And he described in the May meeting that there was

11    a telephone?

12    A.   Yes, sir.  He did describe there was a cell phone

13    involved.

14    Q.   And just to be clear, cell phones in jail are contraband?

15    A.   Yes, sir.

16    Q.   And so he told you that this cell phone was being used by

17    Mr. Scott Williams?

18    A.   Yes, sir.

19    Q.   And he told you that Mr. Scott Williams was using his

20    phone repeatedly to contact the so-called third man in this

21    alleged conspiracy?

22    A.   Yes, sir.

23    Q.   And you coordinated with the guards at the Chesapeake

24    Detention Facility?

25    A.   Yes, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2037**

```
1    Q.   And you acquired and seized that phone?

2    A.   I received the records from that device, yes, sir.

3    Q.   And there was nothing of investigative value to this

4    investigation on that phone?

5    A.   There were a number of phone numbers that had been called

6    from that device. None that I necessarily could immediately

7    attribute to anybody being involved in this case.

8    Q.   Okay. And you've had now a couple of years to do that?

9    A.   Yes, sir.

10   Q.   Court's indulgence. Thank you, Sergeant Simms. Nothing

11   further.

12            THE COURT:  Okay. Any redirect, Mr. Moomau?

13            MR. MOOMAU:  Yes.  Briefly, Your Honor.

14            R E D I R E C T   E X A M I N A T I O N

15   BY MR. MOOMAU:

16   Q.   Sir, you were asked some questions about the search

17   warrant at Bristolwood Court. Do you remember what date that

18   was when that search warrant was done?

19   A.   June 6, 2018.

20   Q.   And as far as state charges filed against Mr. Scott

21   Williams as a result of that search, do you remember -- did

22   you file state charges?

23            MR. HAWKS:  Objection, scope.

24            THE COURT:  Sustained.

25   BY MR. MOOMAU:
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2038**

```
 1    Q.   Sir, you were asked on cross-examination by Mr. Nieto
 2    about the date of the first federal charges being filed in
 3    this case. Do you remember when that was?
 4    A.   I don't want to guess, but I believe it was in January of
 5    2019.
 6              MR. MOOMAU:   Court's indulgence. Your Honor, could I
 7    approach the witness and show him an identification exhibit?
 8              THE COURT:   Yes.
 9              MR. HAWKS:   Your Honor, I would say it's an improper
10    refreshed recollection. The witness has testified and given an
11    answer that was wrong.
12              THE COURT:   Okay, well, I mean, you can use it in a
13    number of different ways.  So if you have a basis to use it,
14    I'll allow you to show it to him. Just use it in the correct
15    way.
16              MR. MOOMAU:   I'll follow up.
17    BY MR. MOOMAU:
18    Q.   Sir, you had said the date that you thought it was?
19    A.   Yes, sir.
20    Q.   Are you sure on that?
21    A.   Not entirely, no.
22    Q.   And would anything assist you in refreshing your
23    recollection about the exact date?
24    A.   My report.
25    Q.   Okay. What about -- anything else?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2039**

1    A.    I guess a copy of the actual indictment or charges.

2            **MR. MOOMAU:**  Can I approach the witness, Your Honor,

3    just for the purposes of showing an identification only

4    exhibit?

5            **THE COURT:**  Yes.

6            **MR. MOOMAU:**  And I'm going to show the witness what

7    is marked for identification purposes only as ID 60.

8    **BY MR. MOOMAU:**

9    Q.    Do you recognize the exhibit, ID 60?

10   A.    Yes, sir.

11   Q.    And does that assist you in refreshing your recollection

12   about the date?

13   A.    Yes, sir.

14   Q.    And what is actually ID 60 without reading anything, just

15   describe what it is.

16   A.    Sure. This is the, I guess, a copy of the indictment

17   dated December 19, 2018.

18           **MR. MOOMAU:**  May I approach and retrieve the

19   exhibit?  Thank you.

20   **BY MR. MOOMAU:**

21   Q.    And sir, you were asked by Mr. Nieto on cross last week

22   about various electronic evidence that you had looked for, but

23   wasn't available. Do you remember that?  Such as surveillance

24   video footage around the Bristolwood Court?

25   A.    Yes, sir.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2040**

```
1    Q.   And even around -- in the vicinity of or I guess the Red
2    Roof Inn, correct?
3    A.   Yes, sir.
4    Q.   And was an attempt made to see if any of that information
5    was available?
6    A.   Yes, sir.
7    Q.   And what was the result there?
8    A.   None of the video surveillance was available at the time
9    that I looked for it.
10   Q.   Did that come up also with any other electronic evidence
11   in the case?
12   A.   Cell phone records as well.
13   Q.   Any one in particular?
14   A.   Yes, sir.  Location data and logs for a number ending in
15   6897.
16   Q.   And do you know what that phone was served under, a name?
17   A.   OG.
18   Q.   Okay. And when you attempted to obtain information about
19   that, what was the result?
20   A.   The phone company said that the number was a prepaid
21   number and my request was beyond their retention time for
22   those records and they were no longer available for me to
23   obtain.
24   Q.   I'd like to show you -- Mr. Hawks had asked you a few
25   questions about the firearm. I'd like to show you what's been
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2041**

Simms - redirect/recross                         IX-69

```
1    admitted as Exhibit 453. Do you recognize that document, sir?
2    A.   Yes, sir.
3    Q.   And you were asked some questions about, I guess,
4    location, various items on the firearm. Does this firearm
5    correctly show -- does this picture correctly show what the, I
6    guess, the replica firearm looked like and the end of it?
7    A.   Yes, sir.
8    Q.   All right. And are you able to indicate on there, on that
9    exhibit like where blood was -- or where -- yes, where blood
10   evidence was found on the actual firearm?
11   A.   Yes, sir.
12   Q.   And what are those areas called?
13   A.   That would be the muzzle end of the barrel on the
14   left-hand side.  On the right-hand side that would be the
15   recoil spring tube.
16   Q.   All right. That's all the questions I have. Thank you.
17            THE COURT:  Anything just on that?
18            MR. HAWKS:  Yes, Your Honor.
19            THE COURT:  Go ahead. Mr. Guillaume, anything or Mr.
20   Nieto, anything?
21            MR. NIETO:  Yes, Your Honor.
22            THE COURT:  Why don't we start with Mr. Nieto. Just
23   keep the same order.
24            R E C R O S S - E X A M I N A T I O N
25   BY MR. NIETO:
```

**JA2042**

```
 1    Q.    Sergeant Simms, in relation to exhibit for identification
 2    60, that was the indictment that you had looked at during Mr.
 3    Moomau's redirect?
 4    A.    Yes, sir.
 5    Q.    Ask just for purposes of clarification, I had asked you
 6    last week whether or not that indictment was from December of
 7    2018. It was, in fact, correct?
 8    A.    The actual indictment, yes, sir, it was.
 9    Q.    Yes, sir. And additionally, again, looking at the charges
10    there, again, Taeyan Williams in that indictment was only
11    facing drug charges. Is that your understanding as well?
12    A.    That's my understanding, yes, sir.
13    Q.    All right, thank you so much.
14              THE COURT:   Okay.  Mr. Hawks?
15              MR. HAWKS:   Thank you, Your Honor.
16                R E C R O S S - E X A M I N A T I O N
17    BY MR. HAWKS:
18    Q.    You were just asked some questions about how long ago the
19    search warrant was generated; is that true?
20    A.    Yes, sir.
21    Q.    And I had asked you various questions about your briefing
22    or your communication with the SWAT commander about your
23    surveillance and you indicated that you didn't remember.
24    A.    I remember the communications, I didn't necessarily
25    remember saying that it was a 2018 Nissan Altima. I recalled
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2043**

```
 1   seeing a Nissan Altima there, but not specifically the year.
 2   That's what I did not recall.
 3   Q.   Would looking at that e-mail perhaps refresh your
 4   recollection?
 5   A.   Yes, sir.
 6            MR. HAWKS:  Your Honor, may I?
 7            THE COURT:  Yes.
 8   BY MR. HAWKS:
 9   Q.   I'm showing you what's been marked as ID Exhibit 1155.
10   A.   Okay.
11   Q.   Sergeant Simms, you just review that and when you've had
12   an opportunity to review it, just look up at me.
13   A.   Yes, sir.
14   Q.   Now the SWAT commander outranks you?
15   A.   Yes, sir.
16   Q.   And so it's important to be truthful to him?
17   A.   Yes, sir.
18   Q.   And this is for an entry into an environment you're not
19   sure about. So again, it's important to be truthful?
20   A.   Yes, sir.
21   Q.   There were two SUVs?
22   A.   Yes, sir.
23   Q.   And at that point your belief is they didn't work?
24   A.   Can you repeat that?
25   Q.   At that point when you wrote this communication, this is
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2044**

```
 1    May 31st before the June 6th search --
 2    A.    Yes, sir.
 3    Q.    Your belief is that those two Porsches didn't work?
 4    A.    I stated that I was not confident that either were
 5    operational.
 6    Q.    And that's sort of a long way of saying you didn't think
 7    they would work; isn't that true?
 8    A.    Yes, sir.
 9    Q.    Okay. And then you noted that there was a 2018 Nissan
10    Altima?
11    A.    Yes, sir.
12    Q.    And you noted your belief at the time that it was Taeyan
13    who was its driver?
14    A.    That's what I said in the e-mail, yes, sir.
15    Q.    Okay. May I retrieve, Your Honor?
16    A.    Yes. Sergeant Simms, thank you. I have no further
17    questions, Your Honor.
18            THE COURT:  Okay, thank you. Sergeant Simms, you can
19    return back to your original seat.
20        And Ms. Grossi, who is next?
21            MS. GROSSI:  The Government calls Mathew Wilde to
22    the stand.
23            THE COURT:  Thank you.
24            THE COURTROOM DEPUTY:  Sir, please come forward to
25    the witness stand. Remain standing and please raise your right
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2045**

```
 1    hand.
 2                 (Witness, sworn.)
 3                 THE COURTROOM DEPUTY:  You may be seated, sir.
 4                 THE WITNESS:  Thank you.
 5                 THE COURTROOM DEPUTY:  Speak clearly into the
 6    microphone. Please state your first and last name.
 7                 THE WITNESS:  My name is Mathew Wilde.
 8                 THE COURTROOM DEPUTY:  Please spell your first and
 9    last name for the record.
10                 THE WITNESS:  M-a-t-h-e-w  W-i-l-d-e.
11                 THE COURTROOM DEPUTY:  Thank you, sir.
12                 D I R E C T   E X A M I N A T I O N
13    BY MS. GROSSI:
14    Q.   Good morning, Mr. Wilde.
15    A.   Good morning.
16    Q.   Mr. Wilde, where do you work?
17    A.   At the FBI.
18    Q.   What's your current title?
19    A.   Supervisory special agent.
20    Q.   How long have you been a supervisory special agent with
21    the FBI?
22    A.   Almost a year.
23    Q.   And what was your title before that?
24    A.   I was a national asset with the Cellular Analysis Survey
25    Team for about three years.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2046

1    Q.    And what is entailed with being a national asset for the
2    Cellular Analysis Survey Team with the FBI?
3    A.    Yeah, so the Cellular Analysis Survey Team is a group of
4    about 80 individuals. Special agents and task force officers
5    were located all around the country. Being a national asset, I
6    was one of 17 agents in the United States that focused
7    specially on analyzing historical phone records.
8    Q.    And the Cellular Analysis Survey Team, is that also
9    referred to as CAST?
10   A.    It is.
11   Q.    So prior to being assigned the CAST unit, where did you
12   work?
13   A.    I worked at the Baltimore Field Office working in violent
14   crime with the Baltimore City Police Department.
15   Q.    And how long did you work in that unit?
16   A.    About four years.
17   Q.    What were your responsibilities in that unit?
18   A.    To investigate bank robberies, homicides, commercial
19   robberies and kidnappings.
20   Q.    And where did you work before that?
21   A.    I worked in the Rockville office here in -- well, in
22   Montgomery County Maryland and there I investigated violent
23   crime and drugs and gangs.
24   Q.    And when you say "the Rockville office," do you mean the
25   Rockville office of the FBI?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2047**

```
 1    A.    Yes.
 2    Q.    And how long have you worked for the FBI?
 3    A.    Since 2010.
 4    Q.    In connection with your placement in the Rockville FBI
 5    office, what did you do there?
 6    A.    There I worked violent crime and gangs.
 7    Q.    So it would be safe to say that you're familiar with the
 8    Maryland geography; is that correct?
 9    A.    Yes.  I've worked in Montgomery County, Prince George's
10    County, crossing over into Washington DC and then basically
11    all the way up to Delaware.
12    Q.    Now going to your duties in the CAST unit, what type of
13    professional training have you received in connection with
14    your work in the CAST unit?
15    A.    So I have over 400 hours of training beginning with a
16    class I went to in 2012.  It was called Basic Project
17    Pinpoint. During that class we learned how to read historical
18    phone records, specifically the cell tower data associated
19    with those and then generate a very basic map. So I used that
20    technique in every one of my cases between 2012 and 2016, at
21    which time I was asked to go to the CAST Advanced Project
22    Pinpoint course. And that course was a week long. We took a
23    deeper dive into the different records we could get from the
24    carriers, so from T-Mobile, Verizon, AT&T and Sprint. And then
25    after I completed that course I took the CAST certification
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2048**

```
 1    course which was four weeks. The first week being
 2    radiofrequency theory, so learning how radio waves travel
 3    through the air. The second week meeting with the carriers,
 4    meeting with their network engineers and their records
 5    custodians. The third week focusing on using this piece of
 6    equipment that we have that we can take out and drive around a
 7    specific cell phone tower and figure out how far that tower
 8    reaches.  And then the fourth week we did a moot court
 9    exercise where we were given a real case that we had to read
10    the records, generate a map, go out, do a drive test and then
11    testify to it in court. And then after that I was certified.
12    And now every year since then from 2017 until 2023 I've
13    attended the CAST recertification course which is a week long,
14    we get together and we have updates on the different
15    technologies. We get updates from all the different carriers
16    and then because we're located in different parts of the
17    country, sometimes different parts of the world, we present
18    case presentations to each other on what we're seeing in our
19    respective areas.
20    Q.   Have you testified as an expert in court in the areas of
21    historical call detail records and cellular technology?
22    A.   Yes.
23    Q.   Approximately how many times?
24    A.   Over 140 times.
25    Q.   Has any Court ever found that you were not qualified as
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2049**

```
1    an expert?

2    A.    No.

3              MS. GROSSI:  Your Honor, the Government would like

4    to offer Mr. Wilde at this time as an expert in the areas of

5    cellular technology, cellular records analysis, cellular

6    mapping, and cellular locating and tracking.

7              MR. HAWKS:  No objection.

8              MR. GUILLAUME:  No objection.

9              THE COURT:  Okay, Mr. Wilde is qualified as an

10   expert in all of those areas:  Cellular technology, cellular

11   records and analysis, cellular mapping and cellular locating

12   and tracking.

13             MS. GROSSI:  Thank you, Your Honor. Your Honor, the

14   Government would like to move the following exhibits into

15   evidence at this time. Exhibits 445 through 447.

16             THE COURT:  Any issues?

17             MR. HAWKS:  No, Your Honor.

18             MR. GUILLAUME:  No, Your Honor.

19             THE COURT:  Okay, 445, 446 and 447 are in evidence.

20             BY MS. GROSSI: Thank you, Your Honor.

21   BY MS. GROSSI:

22   Q.    Agent Wilde, can you generally explain to the jury and to

23   us how cell phones work?

24   A.    Sure. So starting with if my cell phone were to be

25   powered on in this room or in my pocket here, once the phone
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2050**

```
 1    is powered on, it authenticates with the network.  So let's

 2    say I have an AT&T phone.  It recognizes that AT&T network is

 3    out there, it authenticates and then basically what happens is

 4    the phone as when it's powered on, it's constantly scanning

 5    around it. It's scanning its environment and it's trying to

 6    determine the tower, so that physical pole that we see all up

 7    and down the interstate or really anywhere.  And the sector or

 8    the side of that tower that the phone determines is the best

 9    signal.

10         That's very much like sitting in the airport waiting on

11    your flight and scrolling through your phone trying to find

12    the best WiFi to connect to. The difference is your phone does

13    that or a phone does that multiple times a second. It's just

14    constantly scanning for the best tower or sector or the side

15    of that tower. And what happens is when I pick up my phone and

16    press the green button and make a phone call, my phone already

17    knows which tower and sector it's going to use because it's

18    already scanned and it's determined which one it's going to

19    use. And then that signal is going to go from my phone to the

20    tower.  The tower is going to receive that signal. It's going

21    to go down the wires through a switching system.  And then

22    let's say that I'm calling my doctor's office, they have a

23    landline phone. That call is going to go out to the public

24    telephone network and then it's going to be routed to that

25    landline phone in my doctor's office so I can connect that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2051**

1    call.

2    Q.    Now how do those phone calls look in cellular records

3    that are provided by Verizon, T-Mobile, and other providers?

4    A.    They look very much like the old paper phone bill we all

5    got in the mail maybe 10 or 15 years ago. Those records have

6    the date and the time that the calls occurred, they have who

7    called who.  So if it's my phone number, they show who I

8    called or who called me. They have the duration, so how long

9    those calls are. The major difference between the paper phone

10   bill we all used to get in the mail and these records is that

11   they have the tower, the cell tower and the sector or the side

12   of that tower that was used to handle that call on those

13   records.

14   Q.    And you mentioned a phone call from a wireless phone to a

15   landline. How does it look from a wireless phone calling

16   another wireless phone?

17   A.    On the records it looks exactly the same. There's no

18   difference. Now what's going on in the background is if I'm

19   calling another AT&T phone, that phone doesn't have to go out

20   to the public -- that call doesn't have to go out through the

21   public network, it just goes through AT&T's network. If I'm

22   calling a T-Mobile phone, then it goes out to the public

23   telephone network, into the T-Mobile system and then it's

24   routed through on the receiving end.

25   Q.    In terms of the records that are provided by the wireless

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2052**

```
 1    carriers, you mentioned a few things like the phone number
 2    that's calling and the tower. Do you see those types of things
 3    in the cell phone that's receiving the call?
 4    A.   Yes, you'll see the same type of record on an incoming
 5    call.
 6    Q.   Now Agent Wilde, at some point were you asked to assist
 7    in this case?
 8    A.   Yes.
 9    Q.   What type of assistance were you asked to provide in this
10    case?
11    A.   I was asked to look at several sets of cell phone records
12    and then map them in comparison to multiple locations and
13    dates and times.
14    Q.   And were you also looking at call detail records and
15    putting those in context as well?
16    A.   Yes, ma'am.
17    Q.   I'd like to show you Exhibit 445. This is a four-page
18    exhibit. Agent Wilde, do you recognize this document?
19    A.   I do.  I created this document.
20    Q.   And is this a timeline of calls from April 4, 2018 to
21    April 7, 2018?
22    A.   Yes, it is.
23    Q.   Looking at the first column it says "operator name." What
24    does that mean?
25    A.   So that's the cell phone carrier that was being used in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2053**

1    that call.

2    Q.    And then looking at the second column, "phone number,"

3    what's that showing?

4    A.    The phone number is the phone number associated with that

5    line of record. So if you look at there, the phone number

6    associated with this line is 301-655-2283.

7    Q.    Okay. And now looking at the third column, "target name,"

8    what's that showing?

9    A.    So that is the name that the Government provided to me as

10    associated with that telephone number.

11    Q.    Now I'm showing you Exhibit 445 on the left side of the

12    screen. I'd like to show you on the right side of the screen

13    Exhibit 338 which has already been admitted into evidence.

14    Looking at the two numbers on Exhibit 445 on the left and

15    Exhibit 338 on the right, are those numbers the same?

16    A.    Yes, they are.

17    Q.    Staying on Exhibit 338 on the right and looking at the

18    green number that appears in Exhibit 445, are those the same

19    numbers?

20    A.    They are.

21    Q.    Looking at Exhibit 445 in the red font under OG and then

22    looking now on the right at Exhibit 338, are those the same

23    numbers?

24    A.    Yes, they are.

25    Q.    Now looking at the right side of the screen and focusing

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2054**

1    in on Exhibit 289 which has already been admitted into

2    evidence, is the number on Exhibit 289 the same as the blue

3    number shown in Exhibit 445?

4    A.   Yes, it is.

5    Q.   Now showing you Exhibit 326 on the right, Verizon

6    subscriber records. Is the black in black bold on the left in

7    Exhibit 445 the same phone number as the phone number shown in

8    Exhibit 326?

9    A.   Yes, it is.

10   Q.   And who is that under in Exhibit 326?

11   A.   Taeyan Williams.

12   Q.   Looking again at Exhibit 445, there is the next column to

13   the right is called "direction." What's that showing?

14   A.   So that shows which way the call was coming. So this call

15   is an incoming text message that means that the call, the text

16   message was received by the phone number ending in 2283 from

17   the phone number ending in 7198.

18   Q.   Now looking at the next column, "start date" and "time,"

19   what's that showing?

20   A.   That's the start date and time of that call. So that's

21   when that text was received and that's in local time.

22   Q.   Looking at the next column, "duration." What is that

23   showing?

24   A.   So the duration with a call like a regular phone call

25   it's going to show the duration of that call. With this text

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2055**

```
1    message because it's from T-Mobile, they show up as 60
2    seconds, the text messages do.
3    Q.   And are all the numbers in that column in seconds?
4    A.   Yes.
5    Q.   Now looking at the next column, "originating number,"
6    what's that showing?
7    A.   That's the number sending the text message.
8    Q.   And then "originating name"?
9    A.   I didn't have a name to associate with that number, so I
10   just put the number there.
11   Q.   And then the next column, "terminating number," what's
12   that showing?
13   A.   That's the number receiving the text message.
14   Q.   And then looking at "terminating name," what is that
15   showing?
16   A.   That's the name associated with the number ending in
17   2283.
18   Q.   And then looking at the last column, "call type." What's
19   that showing?
20   A.   SMS is a text message.
21   Q.   I've blown up a portion of this Exhibit 445. And looking
22   specifically at the red phone number that's listed as "OG" and
23   looking at who it is communicating with, do you see who it is
24   frequently communicating with on this screen?
25   A.   I do.  It's communicating with the green number ending in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2056**

```
 1    3782 associated with Patti Chaplin.
 2    Q.   And looking at this same time period, does Ms. Patti
 3    Chaplin communicate with the yellow phone number shown on
 4    Exhibit 445?
 5    A.   Yes.
 6    Q.   Where is that showing the communication?
 7    A.   I'm sorry, that's no. I don't see it on there.
 8    Q.   Okay. Turning to page 2 of this exhibit, I focused in on
 9    a time period of April 5, 2018 at 8:18:16 p.m. to April 6,
10    2018 at 2:45 a.m. Do you see that?
11    A.   Yes, ma'am.
12    Q.   The April 5, 2018, 8:32 p.m. call, who is that from and
13    to?
14    A.   That's from Taeyan Williams to the OG phone.
15    Q.   And what type of call was it?
16    A.   It's a voice call and it's 27 seconds long.
17    Q.   Now looking at the April 5, 2018, 10:45 p.m. call. Do you
18    see that?
19    A.   I do.
20    Q.   Who is that call to and from?
21    A.   That one is from the Noah Smothers phone ending in 9327
22    and it is to the 443-873-9427 number.
23    Q.   And then looking at the April 5, 2018, 11:19 p.m. call,
24    who is that call to and from?
25    A.   That one is from 443-562-1083 and to the Noah Smothers
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2057**

1    phone ending in 9327. I'm sorry, did I miss that one?  At 2:45
2    a.m. Is that what you're referring to?
3    Q.   That's the next call I was going to ask you about. So
4    looking at that call, who is that call to and from?
5    A.   That one is from the Noah Smothers phone ending in 9327
6    to 443-873-9427.
7    Q.   Blowing up another portion of this call, now looking at
8    the April 6, 3:19 a.m. call. Again, who is this to and from?
9    A.   So this one is from 443-562-1083 and to the Noah Smothers
10   phone ending in 9327.
11   Q.   Okay. Now looking in the middle of the screen, April 6,
12   2018 at 11:20 a.m., what's that -- who is that call to and
13   from?
14   A.   That one is from 607-725-3718 and it is to the Noah
15   Smothers phone ending in 9327.
16   Q.   What's the duration of that call?
17   A.   It's 19 seconds.
18   Q.   And looking at these records and the records you received
19   in this case, is there anything significant about this call?
20   A.   I believe that's the last -- that's one of the last
21   incoming calls with duration.
22   Q.   To who?
23   A.   To Noah Smothers.
24   Q.   Now looking on the last line there, April 6, 2018 at 1:37
25   p.m. Who is that call to and from?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2058**

1    A.    That one is from the OG phone ending in 6897 to the

2    Taeyan Williams phone ending in 1855.

3    Q.    Now looking at the third page and blowing up a portion of

4    Exhibit 445, on April 6, 2018 at 1:41 p.m. there's a number of

5    entries. There's four rows there. What's happening with these

6    calls?

7    A.    So the first one, it's an incoming call from 202-883-1393

8    to the Scott Williams phone. The next line is that same call

9    going to voicemail. Then after that there are three text

10   messages, one from 128 which is like a T-Mobile, it's like a

11   T-Mobile short message code, and then the other two are from

12   that same thing. So the phone is receiving some kind of

13   notification.

14   Q.    And so when you say a "short message code," what do you

15   mean by that?

16   A.    Well, the carrier leaves a short SMS code, like 128 or

17   there's some other ones out there.  All it's showing is when

18   the phone is receiving some kind of notification whether it be

19   from Facebook or some other application, or your voicemail

20   letting you know that you have a voicemail.

21   Q.    Now looking at the bottom two rows there, April 6, 2018

22   at 6:37 p.m., there's two entries for that exact same time.

23   Can you tell us what's happening on those calls?

24   A.    Yeah, so this is an incoming call to Noah Smothers' phone

25   at 9327. Likely it's routed, so it's being moved between two

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2059**

```
 1    switches and so it just shows up as a duplicate.
 2    Q.    And what's the duration of that call?
 3    A.    0 seconds.
 4    Q.    And so when it says "0 seconds," what does that mean?
 5    A.    It means it wasn't a connected call.
 6    Q.    I've blown up another portion of this Exhibit 445. So
 7    looking at April 6, 2018 at 6:46 p.m., who is that call to and
 8    from?
 9    A.    That call is from Patti Chaplin to the OG phone and the
10    duration is 65 seconds, so a minute and 5 seconds long.
11    Q.    And when there's a minute -- sorry, 65 seconds, what does
12    that mean to you?
13    A.    It means it was a connected call.
14    Q.    Looking at the next line there, who is that to and from
15    at April 6, 2018 at 7:06 p.m?
16    A.    That one is from Taeyan Williams to the OG phone and it's
17    16 seconds long.
18    Q.    Now looking at April 6, 2018 at 7:36 p.m., what is that
19    call to and from?
20    A.    Again, Taeyan Williams on the OG phone and it's 77
21    seconds long.
22    Q.    When you see 77 seconds, what does it mean to you?
23    A.    It shows to me that it was a connected call.
24    Q.    Looking at the next line, April 6, 2018 at 7:46 p.m.,
25    what's that call showing?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2060**

```
 1    A.    That one is from the OG phone to Taeyan Williams and it's
 2    12 seconds long.
 3    Q.    Going down to April 6, 2018 at 10:07 p.m., what's that
 4    call to and from?
 5    A.    The OG phone to Taeyan Williams and it's 31 seconds long.
 6    Q.    And looking at the 10:37 p.m. April 6th call, what's that
 7    call?
 8    A.    The OG phone to Taeyan Williams and it's 7 seconds long.
 9    Q.    And then looking at that last line there, it's an April
10    6, 2018 call at 11:56 p.m.  What's that call?
11    A.    That one is from the OG phone to Scott Williams ending in
12    2283 and it's zero seconds.
13    Q.    And what does that mean when there's zero seconds there
14    again?
15    A.    It's not completed.
16    Q.    I've blown up one call in particular here on the screen.
17    Can you tell us about this call?
18    A.    This one is at 2:27 a.m. on April 7, 2018. It's from
19    Patti Chaplin to the OG phone and it's five seconds long.
20    Q.    And when it's five seconds, what does that mean?
21    A.    It could just be the ring time is five seconds or it
22    could be a five second -- it could be answered and be five
23    seconds.
24    Q.    Now I've blown up another portion of this exhibit. Is
25    there a gap in activity -- I'm sorry, I'm going to go back
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2061**

1    here. Blowing up April 6, 2018 from 10:37 p.m. through April

2    7, 2018 through 4:07 p.m. and I'd like you to look

3    specifically at the time period from April 6, 2018, 10:37 p.m.

4    to April 7th at 12:58 p.m. Are there any calls between that

5    time period that were either from or to Taeyan Williams?

6    A.    Between 10:37 p.m? There's one at 10:37 p.m. on the 6th

7    that's seven seconds long to Taeyan Williams. And then the

8    next one after that is at 12:58 p.m. on the 7th, so the next

9    afternoon from Taeyan Williams to that 516 number.

10   Q.    Now focusing in on the Scott Williams phone ending in

11   2283, looking first at April 6, 2018 at 11:56 p.m., and then

12   looking again at April 7th at 12:54 p.m., are there any calls

13   between that time period on that phone?

14   A.    No, there are not.

15   Q.    I'd like to show you now Exhibit 446. Do you recognize

16   this exhibit?

17   A.    I do. This is the report I generated for this case.

18   Q.    And are these -- what's listed on this first slide?

19   A.    Listed on the first slide is my name, where I work, the

20   telephone numbers that I analyzed and the date that I

21   completed the last report.

22   Q.    And what did you do with these phone numbers?

23   A.    So what I do with the phone numbers is I take the

24   records, I put them in a Google based mapping system and I go

25   in and I map out where the towers and sectors are located that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2062**

1    the phone is using. And then I make an assessment of whether

2    that's consistent or inconsistent with being in the area of a

3    specific -- or being near a specific date at a date and time.

4    Q.    And did we just see these phone numbers on that prior

5    exhibit in the call timeline?

6    A.    Yes.

7    Q.    I'd like to show you page 2 of this exhibit. What's this

8    page 2 showing?

9    A.    So page 2 is the background. So the first one, first

10   point is that I was requested by the Maryland State Police to

11   assist with this case. My methodology is that I analyzed the

12   call detail records. They document the interaction between the

13   phone and the network. Then used in combination with a list of

14   cell towers I can come up with a general area where the phone

15   was located at the time that those calls occurred; the tower

16   list, cell site locations.  So I use a tower list in effect at

17   the time of the crime or the time of the incident and then my

18   conclusions are further down in my analysis.

19   Q.    Looking at page 3, what is this showing?

20   A.    Page 3 just shows some general cell tower examples.

21   Drawing your attention to the one on the top left-hand side,

22   that's a basic cell phone tower really you see anywhere in

23   America and there's a couple important things about that.

24   Number one, the speaker-looking devices that hang on that

25   tower, those are the antennas that transmit and receive the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2063**

1    signal to and from the phone. A phone is very similar to a car
2    radio. So as I drove here today I tuned to my favorite
3    frequency or my favorite station and somewhere in this area
4    there's a radio tower that emits a signal and my car radio can
5    receive that signal. The major difference between my car radio
6    and my cell phone is that my cell phone has to be able to
7    receive that signal, but I also have to be able to send that
8    information back to the tower. So those are the antennas that
9    transmit and receive the signal.
10        The second important thing about that tower is you'll
11   notice that those antennas hang on a triangular shaped
12   structure. So they're designed to cover 360 degrees and put
13   coverage out or signal out in 360 degrees. And the way they do
14   that is by breaking that tower into three sides.
15   Q.   Now looking at page 4 of your report, what is this
16   showing?
17   A.   So this shows how -- this is about sectors and
18   orientation. So you might hear me say something like "azimuth"
19   or "orientation." Those are just two big scary words for
20   direction. The way I know which way a sector faces is by
21   looking at the records and looking at the tower list. It will
22   tell me "Hey, tower number 2, sector 1 faces at zero degrees."
23   What that means is that tower, that side of the triangle faces
24   north. It's as simple as that.
25   Q.   Now looking at page 5, what's this showing?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2064

```
 1    A.   So here, this is how I display the -- this is how I
 2    display the sector on a map. I use this wedge shape. So again,
 3    I'm trying to display one-third of that circle because there's
 4    usually three sectors on each tower. So what I do is if the
 5    azimuth is zero, I draw a line at zero or north. Then I go 60
 6    degrees in one direction, 60 degrees in the other direction
 7    and that gives me one-third of that circle. And then I use
 8    this little shaded area kind of in the middle. That shaded
 9    area, the phone can be within that shaded area, but it doesn't
10    have to be. That's just demonstrating which way the energy is
11    being emitted from that tower. It is like me sitting on the
12    stand and shining a flashlight towards the back of the room.
13    Somebody could be right in the front using that light or
14    somebody could be in the back of the room using that light as
15    well.
16    Q.   Now looking at page 6.  What's that showing?
17    A.   Page 6 shows how I display the sector on the page. So
18    those little green dots, those are the towers that are in the
19    area.  And then again, the red wedge shows the tower and the
20    sector that's being used at that time.
21    Q.   Now looking at page 7, what is this showing?
22    A.   So there's two types of records in this case. One are
23    just regular call detail records. Those are going to show the
24    -- they give me the tower and the sector that's being used to
25    handle the call. The other type of records are called RTT
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2065**

1    records or timing advance records. And what they provide is

2    the tower, the sector, and then an estimated distance between

3    the phone and the tower. And so the way they do that is the

4    phone carriers, they know how fast the signals travel. They

5    travel with the speed of light. So what they do is they time

6    the time it takes for that signal to go from the tower, to the

7    phone, and then back to the tower. And there they can because

8    they know the time and they know the speed, they can estimate

9    the distance. And so they provide us these records and it

10   gives you an estimated area of where the phone is located.

11   Q.   So to be clear, what is this red circle here?  And I'm

12   circling it on the exhibit.

13   A.   So that band or that arc, that represents the estimated

14   distance to the phone from the tower.

15   Q.   Now looking at page 8, what is this showing?

16   A.   So page 8 is an overview. This is showing the Verizon

17   cell phone towers which are all those red dots all over the

18   page and then it shows all the relevant addresses in the case.

19   So starting with the red address is 10301 Bristolwood Court,

20   that's down on the bottom left-hand side of the page. And the

21   red Google pin.

22        Next is 8522 Washington Boulevard in Jessup which is

23   represented by that green pin there kind of in the center

24   bottom of the map.

25        Next is 5006 Windsor Mill Road in Baltimore which is

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2066**

1    represented by that dark blue pin in the top left and side or

2    top center of the map.

3        Next is 651 Bankard Lane in Baltimore which is the orange

4    pin in the center kind of top of the map near Baltimore City.

5        And then finally, the 12525 Laurel Bowie Road is the

6    light blue pin down there by the red pin in Laurel.

7    Q.   Now showing you page 9, it looks like it's the same

8    locations, but what is this showing?

9    A.   This is the same locations.  The only difference is I'm

10   showing the difference between the Verizon network and the

11   T-Mobile network which is represented by those green dots.

12   Q.   And so does T-Mobile and Verizon have different towers?

13   A.   Yes.  Sometimes they share -- they might share a pole on

14   a tower, they might share equipment, they might share a tower

15   and sometimes they might have their own tower, so I just like

16   to show both.

17   Q.   Now looking at page 10, what is this showing?

18   A.   So this is showing activity on this 607-725-9327 phone

19   which is the Noah Smothers phone on March 27, 2018 between

20   9:42 and 11:01 a.m.  And during those times that phone made

21   and received telephone calls using towers in the area of

22   Morgantown, West Virginia.

23   Q.   And now looking at page 11, what is this showing?

24   A.   So page 11 shows travel between Morgantown, West Virginia

25   and Binghamton, New York starting on March 27, 2018 at 11:01

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2067**

1      a.m. and winding back in Binghamton on 11:02 p.m. on March
2      29th.
3      Q.   Looking at page 12 which has the same date, March 29,
4      2018, what is this showing?
5      A.   This is showing the activity on the Scott Williams phone
6      ending 2238. At 12:44 p.m. on March 29th that phone is using a
7      tower and sector consistent with being in the area of
8      Bristolwood Court in Laurel.
9      Q.   Now looking at page 13 which is staying on the same date,
10     March 29, 2018, what is this showing?
11     A.   This is showing travel between 12:44 p.m. and 7:19 p.m.
12     between Laurel, Maryland and Morgantown, West Virginia.
13     Q.   Now showing you page 14, what is this showing?
14     A.   This is showing activity on the Taeyan Williams phone and
15     the Scott Williams phone on March 29th in the area of
16     Morgantown, West Virginia. Taeyan has a call at 5:00 over
17     there kind of on the left side of the page in black and then
18     the Scott Williams phone has calls at 7:19 p.m. on the right
19     side of the page.
20     Q.   Now looking at page 15, what is this showing?
21     A.   This is showing March 30th or I'm sorry, March 29th,
22     10:55 p.m. through March 30th at 9:10 a.m. And now both of
23     those phones are back in the area of Bristolwood Court.
24     Q.   Now turning to page 16, back at the other phone number,
25     what is this showing?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2068**

1   A.   So this one is showing travel from Binghamton, New York

2   on April 5th between 12:43 a.m. and 10:45 p.m. This phone,

3   Noah Smothers' phone travels between Binghamton, New York and

4   Baltimore, Maryland arriving around 10:45 p.m.

5   Q.   Looking at page 17, what is this showing?

6   A.   So first off looking at the calls, there's calls on April

7   5th at 10:45 and 11:19 p.m., and then April 6th at 11:20 a.m.

8   and that phone is using a tower and sector facing towards the

9   651 Bankard Lane address. And then those little blue pins, so

10  GS-1, 2 and 3, those represent searches that were made on Noah

11  Smothers' Google account between 7:42 p.m. on April 5th and

12  6:49 a.m. on April 6th.

13  Q.   And what was the text of those searches?

14  A.   "Food near me," "Forno," "food near me," "food near me"

15  and then "breakfast near me."

16  Q.   Now showing you page 18 of this exhibit, what's this

17  showing?

18  A.   So this is showing on April 6th between 12:54 p.m. and

19  1:05 p.m., these are Google history locations from Noah

20  Smothers' phone. Starting at 12:54 p.m. and 1:00 p.m. at GS4

21  which is down there just north of the Bristolwood Court

22  address there's searches for "food near me" and "Pupuseria

23  near me." Then at 1:00 on GS5 there's searches for "Pupuseria

24  Taqueria food truck," "Pupuseria Taqueria" and then at 1:05 on

25  GS6 which is kind of up there towards the green pin, "Martin's

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2069**

```
 1    Total Seasoning."  And then on GS7, "Martin's Total Seasoning
 2    food truck" which is very close to the 8522 Washington
 3    Boulevard address.
 4    Q.   And do you know what that 8522 Washington Boulevard,
 5    Jessup, Maryland address is?
 6    A.   I do.  It's the EZ Storage.
 7    Q.   And where is that EZ Storage facility located in terms of
 8    the street that it's on on this map?
 9    A.   It's located on the right -- on the right side, so on the
10    east side of Highway 1.
11    Q.   Now looking at page 19, what is this showing?
12    A.   This is showing a camera or photo stills from the EZ
13    Storage at 1:07:58 and 1:21:27 p.m.  And you can see that dark
14    gray or the gray sedan pulling into the gate on the left-hand
15    side at 1:07:58 and then pulling out of the gate at 1:21:27.
16    Q.   Now looking at page 20, what's this showing?
17    A.   So this is showing 1:21:55 and 1:21:56.  And you can see
18    that same gray sedan has come out of the gate and is making a
19    left turn, which would place it going southbound on Highway 1.
20    Q.   Now looking at page 21, what's this showing?
21    A.   So this is showing, again, Noah Smothers' phone activity.
22    This is showing those RTT records. So it's showing those
23    records at 2:03 p.m. and 3:12 p.m. So at 2:03 p.m. that phone
24    is using that tower 106251, at an access, its distance of 2.8
25    miles. So the phone I would expect it would be somewhere in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2070**

1    that band during that time or just slightly inward. And then

2    at 3:12 p.m. that phone is using tower 106003 which is the one

3    that faces to the east and it's using that at 1.45 miles. So

4    if the phone was stationary during that time I would expect to

5    find it right where those arcs overlap which is consistent

6    with being in the area of Bristolwood Court during that time.

7    Q.   Can you circle on the exhibit in front of you where they

8    overlap?

9    A.   (Indicating.)

10   Q.   Also on this exhibit is this GS8. What's that?

11   A.   That's another search for "food near me" at 1:32 p.m.

12   which is the GS8 which is right next to the 12525 Laurel Bowie

13   Road in Laurel, Maryland.

14   Q.   There's also a note at the bottom of this screen above

15   that GS8 and I'm going to circle it on the screen. What is

16   this?

17   A.   So that's a note, that's a note that was in -- I believe

18   in Noah Smothers' phone at -- or from his Google search at

19   4/6/2018 at 1:52 p.m. and it says "Tae gave 59 plus four WGS."

20   Q.   Now does that slide include Taeyan Williams' phone or

21   Scott Williams' phone?

22   A.   It does not.

23   Q.   So is this just related to Noah Smothers' phone?

24   A.   Yes.

25   Q.   And can you explain this RTT data that we're seeing in

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2071**

 1    this band, does that mean that Noah Smothers was using his
 2    phone at that time?
 3    A.    It means his phone was on. It doesn't -- the phone
 4    doesn't -- he doesn't have to be making any phone calls or
 5    sending any text messages. This is just data that's being
 6    collected in the background for engineering purposes. So the
 7    phone has to be powered on for this information to be
 8    received, but nobody has to be actively making phone calls or
 9    receiving phone calls for this data to be generated.
10    Q.    And, in fact, is this phone call making any active calls
11    or receiving any active calls?
12    A.    No, it is not.
13    Q.    Now looking at slide 22, what's this showing?
14    A.    So this is showing activity on Taeyan Williams' phone
15    between March 29th and April 8th and it's showing the most
16    commonly used towers during that time period. So the most
17    commonly used tower during that time period was 106254 which
18    is this tower that's closest to Bristolwood Court.  And then
19    the second most common tower used is this one at the top
20    facing down towards Bristolwood Court, and there's 12 calls on
21    that tower and sector.
22    Q.    And if someone was at this Bristolwood Court address
23    would they be using both towers or just one?
24    A.    I'd expect them to use the one closest to it, but it's
25    not -- depending on where the person is in the house or in the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2072**

```
1    residence, it's not impossible.  I wouldn't say it's
2    impossible for it to use the one that's slightly further away.
3    Q.   Now looking at slide 23, what's this showing?
4    A.   So this is showing Scott Williams' and Taeyan Williams'
5    -- or Taeyan Williams' phone on April 5th between 3:00 and
6    6:27 p.m. and then 6:13 and 10:33 p.m. So between 3:00 and
7    6:27, Scott Williams has three calls using the tower and
8    sector closest to the Bristolwood Court address. Between 6:13
9    and 8:32 p.m., Taeyan Williams has a call on tower 106254,
10   three calls, again using the tower and sector consistent with
11   being in Bristolwood Court.  And then at 10:33 p.m. there's
12   one call on 106255 which is this top tower which is further up
13   into Laurel.
14   Q.   Now looking at slide 24, what's this showing?
15   A.   This is showing April 6th on Taeyan Williams' phone
16   between 6:13 and 8:26 using the tower and sector consistent
17   with being in the area of Bristolwood Court.
18   Q.   Now showing you page 25. What is this showing?
19   A.   This is combining Taeyan Williams, Scott Williams, and
20   then the Google search history from Noah Smothers. So going to
21   -- starting with Taeyan Williams, there are calls at 11:24,
22   1:24 p.m. and 1:37 p.m. on these two towers up here at the top
23   of the page. And then Scott Williams, he's got calls at
24   between 12:21, I think it goes 12:21 which is at the bottom of
25   the page facing Bristolwood Court, then it goes to 1:41 and
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2073**

```
 1    1:42 which are using these two towers I'm circling here that
 2    are close to this GSA point, and then back to the bottom tower
 3    at 2:04 to 3:27 p.m.
 4    Q.    And using the screen in front of you, can you show the
 5    movement of Scott Williams' phone during this time period?
 6    A.    Yeah. So it starts, it starts down here at this tower
 7    near Bristolwood.  Then it goes up into this area probably
 8    between these two towers at 1:41 and 1:42 and then it comes
 9    back down into the area around Bristolwood.
10    Q.    Now looking at the 1:37 p.m. call that was happening on
11    Taeyan Williams' phone at the top up here, who is that call
12    from?
13    A.    That call is from 929-290-6897, and that 1:37 that's up
14    at the top of the screen.
15    Q.    And was that the OG phone that we saw in the prior
16    exhibit?
17    A.    Yes, it was.
18    Q.    Now looking at slide 26 or page 26, what's this showing?
19    A.    So this is combining all of those previous calls, the
20    previous calls we just talked about with Scott Williams and
21    Taeyan Williams. And then adding in the RTT data from the Noah
22    Smothers phone, as well as the GS it looks like the GS4
23    activity there in the center of the page at 1:32 p.m.--
24    sorry, GS8 at 1:32 p.m.
25    Q.    Also in this slide there's another additional location in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2074**

```
1    teal. Do you see that?

2    A.    I do.

3    Q.    Where is that?

4    A.    That is at 12525 Laurel Bowie Road which I believe is the

5    Red Roof Inn.

6    Q.    And that teal pin mark, is that close to the Google

7    search at GS8?

8    A.    Yes, it's basically right on top of it.

9    Q.    And is it also close to the 1:41 p.m. activity that's

10   happening on Scott Williams' phone?

11   A.    It is.

12   Q.    Now looking at slide 27 or page 27, what's this a picture

13   of?

14   A.    So this picture is showing -- this is a snip from an Uber

15   trip by Taeyan Williams between 3:59 and 4:37 p.m.  That Uber

16   trip is from 10303 Bristolwood Court to 10400 Cross Fox Lane

17   in Columbia, Maryland.

18   Q.    And focusing on what appears to be text messages at the

19   bottle of the screen and I'm circling it on the screen, what's

20   that showing?

21   A.    It's a text message that says, "got your pens." The time

22   there is 4/6/2018 at 8:04 p.m., but that's UTC time so we have

23   to subtract four hours.  So this actually happened at 4:04

24   p.m.

25   Q.    And is that happening during this Uber ride according to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2075**

1    the Uber records?

2    A.    Yes, ma'am.

3    Q.    Now looking at slide 28. What's this showing?

4    A.    This is showing travel on the Taeyan Williams phone

5    between 7:06 and 9:10 p.m. During that time the phone moves

6    south from Jessup, down towards Greenbelt and basically around

7    the Beltway ending up in Tysons Corner.

8    Q.    Okay. And there's something at the top of this page

9    that's in blue. What's that showing?

10   A.    It's showing a note.  And the body of the note is so

11   again, this is at 11:17:25 p.m. in UTC, so 7:17 p.m. And it's

12   showing that the title and the body of the note is 8255

13   Washington Boulevard which again, is the EZ Storage in Jessup.

14   Q.    And showing us on the exhibit, what's the direction that

15   this phone is going starting at 7:06 p.m?

16   A.    So it travels south down here to Baltimore Washington

17   Parkway and 495, then around the Beltway and then winding up

18   down on the bottom left-hand side of the page.

19   Q.    Can you circle on this screen when this phone received

20   calls from the 929 OG number?

21   A.    Yep, so 7:06, 7:36:50 and 7:46:48.

22   Q.    Now looking at slide 29, what's this showing?

23   A.    This is the Taeyan Williams phone between 8:57 p.m. and

24   9:10 p.m. on the 6th.  And all that activity is consistent

25   with being in the area of Tysons Corner, Virginia.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2076**

Wilde - direct                                              IX-104

1    Q.   Now showing you page 30. What's this showing?

2    A.   9:16 p.m. through 9:53 p.m.  There's another Uber trip

3    going from 1707 International Drive in Tysons, Virginia to

4    4603 Knox Road in College Park.

5    Q.   Now showing you page 31. What's this showing?

6    A.   So page 31 shows activity at 10:07 and 10:37 on the

7    Taeyan Williams phone. In the blue, the dark blue pin there

8    represents 4603 Knox Road in College Park. And then both of

9    those calls were from the OG phone to Taeyan Williams' phone.

10   Q.   And looking at this map and I'm just circling a portion

11   of this map, where is this phone generally located?

12   A.   Near the University of Maryland.

13   Q.   Now looking at page 32. What's this showing?

14   A.   Page 32 shows the Scott Williams phone ending in 2283 at

15   4:46 p.m. on April 6th. During that time that phone is down

16   off the Baltimore Washington Parkway near Bladensburg,

17   Maryland.

18   Q.   Now looking at page 33. What's this showing?

19   A.   So this is showing activity on Scott Williams' phone

20   between 7:15 p.m. and 11:56 p.m. There it's using a tower and

21   sector consistent with being in the area of Bristolwood Court

22   and then there's also an internet search that was done on the

23   computer at 7:59 p.m. for "EZ Storage Jessup." And then at the

24   top there's notes again with a series of numbers ending in

25   kiphone 64171.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2077**

1    Q.   And when is that note created?

2    A.   That noted created at 11:57 p.m. on April 6th.

3    Q.   Now looking at page 34, what's this showing?

4    A.   So page 34 starting on the left-hand side is showing that

5    gray four-door small SUV sedan. Looks to be the same one from

6    the EZ Storage pulling into the parking lot of 5006 Windsor

7    Mill Road in Baltimore, the Windsor Mill Apartment complex at

8    4:38 a.m. on April 7, 2018. And it's followed by a four-door

9    silver sedan, four-door car. And then at 4:44 a.m. that silver

10    sedan is pulling out of the apartment complex and then at the

11    bottom I believe that's a license plate reader at 4:44:47.

12    Q.   Now looking at page 35, what's this showing?

13    A.   This is showing April 6th at 11:57 p.m. through April 7th

14    at 12:53 p.m.  And there's no cell site activity on either the

15    Taeyan Williams phone or the Scott Williams phone during that

16    time period.

17    Q.   And if there's no cell site activity can you make any

18    conclusions about what's happening with those phones?

19    A.   Well, either the phones did not receive, make or receive

20    any incoming or outgoing calls or the phones were off the

21    network.

22    Q.   What does it mean to be "off the network"?

23    A.   Well, they could be powered off, the phones could be in

24    airplane mode, or they could be somewhere where they're not

25    receiving service.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2078

```
 1      Q.    Now looking at slide 36, what's this showing?

 2      A.    Slide 36 shows the Scott Williams and Taeyan Williams

 3      phones on April 7th between 12:58 and 7:11 p.m. for Taeyan

 4      Williams. Basically he's all around the Laurel address near

 5      Bristolwood Court.  And then Scott Williams between 12:54 and

 6      2:03 p.m. he's using the tower and sector consistent with

 7      being in the area of Bristolwood Court.

 8      Q.    Now showing you page 37, what's this showing?

 9      A.    Page 37 shows another Uber trip for Taeyan Williams

10      between 7:15 p.m. and 8 p.m. on April 7th between Bristolwood

11      Court and Tysons Corner, Virginia.

12      Q.    Now looking at slide 38. What's this showing?

13      A.    10:00 p.m. on the Taeyan Williams phone in the area of

14      Tysons Corner, Virginia.

15      Q.    Now looking at page 39, what's that showing?

16      A.    This is showing another Uber trip for Taeyan Williams

17      between 10:07 p.m. and 10:44 p.m. on April 7th. During the

18      time that account moved from Tysons Corner, Virginia towards

19      Bristolwood Court in Maryland.

20      Q.    Now looking at page 40, what's that showing?

21      A.    11:14 p.m. on April 7th through 12:19 a.m. on April 8th

22      and this is the Taeyan Williams phone showing activations in

23      the area of Bristolwood Court.

24      Q.    And I am circling a call at 11:14 p.m. What's that call?

25      Who is that call to and from?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2079**

1    A.    That's a call from the OG phone to the Taeyan Williams

2    phone and it's 57 seconds long.

3    Q.    Now looking at page 41. What's this showing?

4    A.    So page 41 looks like a cancelled Uber trip from

5    Baltimore Washington Parkway in Laurel, to Bristolwood Court

6    in Laurel at 12:10 a.m. on the 8th.

7    Q.    Now looking at page 42, what's this showing?

8    A.    Page 42 shows another Uber ride on the Taeyan Williams

9    account between 12:41 a.m. leaving Bristolwood Court and at

10   12:59 a.m. arriving at 5007 Jackson Street in Hyattsville,

11   Maryland.

12   Q.    Now looking at page 43, what's this showing?

13   A.    This is showing the activity at 2:30 a.m. on April 8th on

14   the Taeyan Williams phone showing activity.  It's just using a

15   tower just to the west of Jackson Street in Hyattsville.

16   Q.    And that address, was that the same address as the Uber

17   receipt on page 42?

18   A.    Yes, ma'am.

19   Q.    Now showing page 44, what's this showing?

20   A.     2:31 a.m. to 2:49 a.m., the Taeyan Williams Uber account

21   shows travel from Jackson Street in Hyattsville to Bristolwood

22   Court in Laurel.

23   Q.    Now looking at page 45.  What's this showing?

24   A.    So page 45 is showing the Scott Williams phone on the 7th

25   of April at 9:53:19 p.m. During that time that phone is using

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2080**

```
 1   a tower and sector near Cheverly, Bladensburg, Maryland and
 2   then at the top there's an excerpt from the EZ Storage entry
 3   logs showing that at 9:05 p.m., Noah Smothers, I think his pin
 4   or his code was used to access that area.
 5   Q.   And do you know how long it would take to drive from this
 6   location in Jessup, Maryland to the location down in Cheverly?
 7               MR. HAWKS:  Objection.
 8               THE COURT:  Sustained as to foundation.
 9   BY MS. GROSSI:
10   Q.   Agent Wilde, how long were you a special agent in the
11   Maryland area?
12   A.   10 years.
13   Q.   And during your time in the Maryland area, did you become
14   familiar with the areas of Maryland close to the DC border?
15   A.   I used to work right there where it says "Cheverly." We
16   have an office there near Prince George's Hospital. I used to
17   work right there and then I used to live in Columbia, Maryland
18   so north of Jessup.
19   Q.   And are you familiar with this area and the route you
20   would take from Jessup, Maryland down to Cheverly?
21   A.   Yes, ma'am.
22   Q.   And when you say you have an office, does the FBI have an
23   office down in Cheverly?
24   A.   Yes.
25   Q.   So looking at these two locations up here in Jessup,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2081**

1    Maryland and down in Cheverly, do you know how long it would
2    take to drive between those two?
3    A.   Probably 25 to 30 minutes.
4    Q.   Does that depends on traffic?
5    A.   Of course it does. But at 9:00, 10:00 at night there's
6    usually not too much traffic between those two points.
7    Q.   Now looking at page 46, what is this showing?
8    A.   So this is showing activity on Scott Williams' phone
9    between 1:44 p.m. and 6:49 p.m. on April 8th. During that time
10   that phone is using a tower and sector consistent with being
11   in the area of Bristolwood Court. Also up at the top there's
12   the excerpt from the logs at the EZ Storage showing activity
13   between 8:33 -- 8:30 and 8:33 p.m. on that same date.
14   Q.   And the location of the phone, what's the timeline for
15   where the location of the phone was?
16   A.   So there's a call at 1:44 p.m., 1:51 p.m., and 6:49 p.m.
17   Q.   Now looking at page 47. What's this showing?
18   A.   This shows the activity on the Taeyan Williams phone on
19   April 8, 2018 between 5 p.m. and 11:22 p.m. So at 5:10 p.m.
20   that phone is in the area of Laurel, Maryland.  And then
21   around 11:22 p.m. it's near Morgantown, West Virginia.
22   Q.   And as part of this case were you also asked to plot the
23   location data associated with Ms. Chaplin?
24   A.   Yes.
25   Q.   I'd like to show you page 48. What's this page show, page

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2082

1  48?

2  A.   This is showing April 5th, 11:12 p.m. through April 6th

3  at 10:05 a.m. for Ms. Chaplin's number.  And during that time

4  that phone is using towers first up in the main part of Laurel

5  down where 1 and 198 intersect, and then at 11:12 p.m. using a

6  tower and sector more towards the Bristolwood Court, but not

7  one that covers Bristolwood Court.

8  Q.   And looking specifically at this 11:12 call as well as

9  the 10:05 call up here, who is that call to and from?

10  A.   Those calls are both with the OG phone, that 929 number.

11  The 10:05 call was not -- has zero duration, so I don't

12  believe it was connected, but the other one had a 32 seconds

13  duration so it was probably a short call.

14  Q.   Now looking at page 49, what's this showing?

15  A.   This shows April 6th between 12:16 p.m. and 6:32 p.m.

16  the Patti Chaplin phone is in the area of Fed Ex field and the

17  Prince George's Sports Complex during that time.

18  Q.   And is that in Laurel, Maryland?

19  A.   It is not.  This is down by Largo or Landover, Maryland.

20  Q.   Now looking at the 6:32 p.m. call here shown on the

21  screen that I've circled, who is that call to and from?

22  A.   That call is from this number, so from the Patti Chaplin

23  phone to the OG phone and it's nine seconds long.

24  Q.   Now looking at page 50. What's this showing?

25  A.   Page 50 is showing the 3782 phone, again at 6:46 p.m.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2083**

```
1    That phone there is near Lanham and Seabrook. So just outside
2    the Beltway there in Prince George's County. And that call at
3    6:46 is from Patti Chaplin's phone to the OG phone and it's 65
4    seconds long, so about a minute and five seconds.
5    Q.   And now looking at Page 51. What's this showing?
6    A.   Page 51 shows the activity between April 6th at 8:19 p.m.
7    to April 7th at 10:00 p.m. Starting with April 6th, the calls
8    at 8:19 and 10:11 p.m., that phone is using a tower and sector
9    consistent with being near Bristolwood Court.  And then going
10   on to 2:27 a.m., again using the same tower and sector.  Then
11   moving over to the tower on the top left at 2:09 and 4:07
12   p.m., and then back to the tower in the area of Bristolwood
13   Court between 5:30 p.m. and 10:00 p.m. And then we have
14   multiple calls at 2:27, 4:07 and 10:06 between this phone and
15   the OG phone. One being at 2:27, five seconds long; at 4:07,
16   57 seconds long; and 10:00 at 22 seconds long.
17   Q.   Now focusing in at that 2:27 p.m. call, is that a 2:27
18   p.m. or 2:27 a.m. in looking at this screen and then looking
19   at this?
20   A.   It looks to be 2:27 a.m.
21   Q.   So it's accurate as to the tower?
22   A.   Yes.
23   Q.   Now did you prepare another slide deck associated with
24   another phone number in this case?
25   A.   I did.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2084**

1    Q.    Showing you Exhibit 447. Do you recognize this?

2    A.    I do. This is the report I generated for 301-538-5546

3    which is service by T-Mobile.

4    Q.    Now looking at Exhibit 447 and then comparing it to

5    Exhibit 395. And specifically, contact 8 on that, are those

6    the same phone numbers between Exhibit 447 and 395?

7    A.    Yes.

8    Q.    And who is the contact listed there for record 8?

9    A.    It says Ricky Carty, C-a-r-t-y.

10   Q.    Looking back at Exhibit 447, it's a seven-page exhibit.

11   And do the first few pages relate to the same slides we talked

12   about in the prior exhibit?

13   A.    Yes, ma'am, they do.

14   Q.    So forwarding to page 7 of this exhibit, what's this

15   showing?

16   A.    This is showing activity on that device between April 5,

17   2018 between 10:20 p.m. and 10:53 p.m. showing that the device

18   is in New Jersey.  And then I did an analysis of all the data

19   on those records and between all activity between April 5,

20   2018, 10:56 p.m. through April 8, 2018 at 5:03 p.m.  All that

21   activity within that device was in the state of New Jersey.

22        MS. GROSSI:  Thank you.  No further questions.

23        THE COURT:  Okay. Cross-examination?

24        MR. GUILLAUME:  Yes, Your Honor.

25        C R O S S - E X A M I N A T I O N

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2085

```
 1    BY MR. GUILLAUME:

 2    Q.   Good morning, Agent Wilde.

 3    A.   Good morning.  How are you?

 4    Q.   Thank you. Court's brief indulgence, Your Honor?

 5          THE COURT:  Sure.

 6    BY MR. GUILLAUME:

 7    Q.   Agent Wilde, I just want to ask you a couple questions to

 8    make sure I'm understanding things correctly. With respect to

 9    any cell phone use in general, if you have a cell phone on an

10    established network such as T-Mobile, Verizon, AT&T, that

11    phone is going to use a particular cell tower, correct?

12    A.   Correct.

13    Q.   Okay. And there's a record of that use on -- that's left

14    behind I guess; is that right?

15    A.   There is. It's kept for billing purposes and engineering

16    purposes.  But yeah, there's a record of that created so they

17    know how much to bill us all at the end of the month.

18    Q.   So my example I gave I guess is from one phone calling

19    another phone, but what about if I'm using an application to

20    make a call such as WhatsApp. Are you familiar with WhatsApp?

21    A.   Oh, yeah.

22    Q.   That doesn't leave a record on the cell tower, does it?

23    A.   Not in the same way. So applications like WhatsApp,

24    iMessaging, any other kind of like app-based messaging

25    service, Android Messenger, while you need a cell signal to be
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2086**

1    able to complete that transaction, it doesn't go over the
2    network as a telephone call or as a text message so it's not
3    going to be recorded on these records. If we had a data record
4    it might be recorded on the data record, but looking at those
5    records I can't tell you if somebody is using WhatsApp,
6    YouTube, Facebook, Netflix, I can't tell the difference. All I
7    can see is that there was a data transaction that occurred, a
8    timestamp for that and that's pretty much it.
9    Q.   So are you familiar with the application Wickr?
10   A.   I'm not sure I know that one.
11   Q.   Okay. It's an encrypted application which we've heard
12   testimony that disguises or leaves no record. I shouldn't say
13   "disguises," but leaves no record of calls?
14   A.   Yes, sir.
15   Q.   Similar to WhatsApp, but a little bit more secure. So an
16   application like that, I know you're not familiar with it, but
17   if such an application were to exist that would not leave the
18   record on the cell tower as well, correct?
19   A.   Correct.  It's not going to leave a cell site record or a
20   call detail record in the same way that again, me calling my
21   doctor's office from my cell phone, it's not going to leave
22   that same footprint on the record.
23   Q.   If I could have Exhibit 445 up please.  Thank you, Ms.
24   Grossi. This is an exhibit that you looked at on direct
25   examination, a four-page exhibit. I'm not going to go through

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2087**

```
 1   it with you, but I just want to clarify a couple of things.
 2   You made this exhibit, correct?
 3   A.   Yes, sir, I did.
 4   Q.   And the numbers in the exhibit were provided -- actually
 5   let me ask you this question a better way. With some -- for
 6   example, there's the color-coded green numbers are associated
 7   with a name Patti Chaplin; is that right?
 8   A.   Yes, sir.
 9   Q.   You see that on your screen?
10   A.   Yes, sir, I do.
11   Q.   And that name was provided to you by law enforcement or
12   you confirmed it through subscriber records?  Or which one of
13   the two ways or is there another way that you confirmed that?
14   A.   It was provided to me by the Government.  I don't know
15   her.
16   Q.   So that's my question is that this is a case that you --
17   you did not participate in the investigation, but were brought
18   in for your expertise to interpret the records; is that right?
19   A.   That's the case in every case I've worked basically for
20   the last seven or eight years, yes, sir.
21   Q.   So all of these -- am I to assume then that all of the
22   color-coded numbers and names were provided to you by the
23   Government; is that right?
24   A.   Yes, sir.
25   Q.   Okay. And when there's not a color-coded name with a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2088**

1    number, that means that you weren't provided any information,

2    name or otherwise for that number?

3    A.    That's correct.

4    Q.    And there's lots of numbers in there with no names; is

5    that right?

6    A.    There are, yes.

7    Q.    Let me ask you a couple more questions, sir. Court's

8    brief indulgence.

9         With respect to making phone calls on your cell phone

10   just not through an application, but through the normal way, I

11   understand you're going to ping off of a tower.  Is that the

12   right term, "ping"?

13   A.    It's not really the right term because the ping describes

14   sending a signal to that phone to have that phone locate

15   itself to the carrier. So it connects to the tower. That's the

16   best way to say it.

17   Q.    It's connecting to a tower. I think I heard you say that

18   most of the time, but not all of the time a phone is going to

19   connect to a tower that's geographically closest to it?

20   A.    That's correct.

21   Q.    But when you connect to a tower and your job in

22   interpreting the records -- and I'll go through it with you in

23   a minute in the other exhibit which is 446 -- that encompasses

24   a particular area, correct, as opposed to an exact location;

25   is that right?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2089**

```
1    A.   Correct. I can't tell you -- I could not use that --
2    using the regular cell phone records I cannot pinpoint, I
3    can't tell you that the phone is on the steps of this
4    courthouse. What I can tell you is it's using a tower on top
5    of this courthouse and that tower faces north, so that phone
6    is going to be somewhere between here and I don't know, the
7    Beltway, just generally. It's going to give me a general area
8    of where the phone is.
9    Q.   So if I'm at the Chipotle that's close to the courthouse,
10   for example, I like Chipotle, then you may not be able to tell
11   where I am, but I'm close by?
12   A.   You're close by, yes, sir.
13   Q.   Okay. And in this case -- actually, I don't need to see
14   it, thank you. In the exhibit that you provided, 446, plotting
15   the different calls and where they were I just want to be
16   clear that those things that appeared with respect to the
17   connections of towers were all general areas, right?  Nowhere
18   specific?
19   A.   Correct, they're general areas. They're just showing the
20   tower that's being used, the side of that tower that's being
21   used, and just like I stated in my testimony is those using --
22   when, for instance, when the phone is using a tower near
23   Bristolwood Court, that's consistent with being there. What
24   that means is if somebody were to be at Bristolwood Court
25   using their phone, that is the tower and sector that I'd
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2090**

```
 1   expect them to use.
 2   Q.   Okay. And sir, I don't have any other questions for you.
 3   Thank you very much.
 4   A.   Thank you.
 5           THE COURT:  Thank you.  Mr. Hawks?
 6           MR. HAWKS:  Thank you, Your Honor.
 7               C R O S S - E X A M I N A T I O N
 8   BY MR. HAWKS:
 9   Q.   Good morning, Agent Wilde.
10   A.   Good morning, sir.
11   Q.   You had talked about in Exhibit 445 the duration and it
12   was measured in seconds, basically?
13   A.   That's correct.
14   Q.   And you said that included the ring time?
15   A.   Yes, sir.
16   Q.   Okay. And that's all I have. Thank you, Your Honor.
17           THE COURT:  Anything else just on that?
18           MS. GROSSI:  Your Honor, can I have a brief moment
19   to talk to counsel?
20           THE COURT:  Okay.
21           (Counsel conferred privately off the record.)
22           MS. GROSSI:  Just a few questions, Your Honor.
23           THE COURT:  Okay.
24           R E D I R E C T   E X A M I N A T I O N
25   BY MS. GROSSI:
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2091**

```
1    Q.   Agent Wilde, you mentioned a minute ago about the general
2    area with which a phone is located by a normal call, correct?
3    A.   Yes, ma'am.
4    Q.   And is that different or the same as the RTT data that we
5    saw in Exhibit 446?
6    A.   That is different.
7    Q.   And can you explain the difference between the RTT data
8    and the normal call data?
9    A.   Sure. So again, the RTT data is kind of running in the
10   background. There's no call needed. It's used to set up the
11   call or it's used to set up the connection between the phone
12   and the network. And so what happens is again, they measure
13   the time it takes for the signal to be able to go from the
14   tower to the phone and back to the tower. So on its own, that
15   phone has to be somewhere within that arc at that time period.
16   So on its own, in one -- one tower, one sector, and one arc.
17   What that can tell me is that phone is somewhere maybe at the
18   front of the jury box. It gives me that arc. So on its own,
19   great, the phone is somewhere in the front of the jury box.
20   Okay?  Now adding in a second tower, or a third tower, or a
21   fourth tower and doing that same thing, say the second tower,
22   the second tower is at the back of the courtroom, but it faces
23   towards the front of the courtroom and it's about I don't
24   know, three or four people up the distance, now where those
25   arcs intersect, that's where that phone should be located.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2092**

Wilde - redirect                                          IX-120

1          So we were talking about Chipotle earlier, but again,

2     using the courthouse as an example, if the phone -- if the

3     tower is on top of this courthouse and it's facing toward the

4     parking garage in the back and that distance is at about .15,

5     .1 miles and then there's another one that intersects, I can

6     put that phone basically in the parking garage. That's where I

7     would go look for that phone and that's what -- we've used

8     that technique, I've used that technique hundreds of times to

9     find people, to find cars, to find missing phones and all

10    kinds of crazy stuff.

11    Q.   So looking specifically at Exhibit 446, and this is page

12    21, is this showing that RTT data that you're talking about?

13    A.   Yes, ma'am.  It is.

14    Q.   And when you're saying you know where the phone is

15    located and it's different than that normal call, you're

16    talking about where on this map is the phone located?

17    A.   So here, again, if the phone is stationary at 2:03 and at

18    3:12 p.m., so if that phone is staying in the same place where

19    I'd expect to find that phone is right where these arcs

20    intersect, which is consistent with being in the area of the

21    Bristolwood Court address, specifically. If the phone is not

22    stationary, that phone could be anywhere in these arcs. It

23    could be anywhere in either one of these arcs during that time

24    period.

25    Q.   Now in preparing this exhibit, Exhibit 446, did we notice

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2093**

```
 1    in preparing for today a typo in the prior Exhibit 446?

 2    A.   Yes, ma'am.

 3    Q.   And was that typo related to the EZ Storage address shown

 4    on this screen?

 5    A.   Yes, it was.

 6    Q.   And was it later corrected?

 7    A.   It was.

 8         MS. GROSSI: Thank you.  No further questions, Your

 9    Honor.

10         THE COURT:  Okay.  Anything just on that?

11         MR. GUILLAUME:  No, Your Honor.

12         MR. HAWKS:  No, Your Honor.

13         THE COURT:  Okay, thank you very much, Agent Wilde.

14    You can step down. Thank you for your testimony.

15         (Witness excused.)

16         THE COURT:  What's next, if anything, for the

17    Government?

18         MS. GROSSI:  Your Honor, the United States rests,

19    subject to an examination of the exhibits that are in

20    evidence.

21         THE COURT:  Okay, thank you.

22      Mr. Guillaume, who would be first for the defense?  Or

23    who wants to announce their situation?

24         MR. GUILLAUME:  I'm not sure, Your Honor, but if we

25    could confer.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2094**

```
 1              THE COURT:  Okay. What I'm going to do, ladies and
 2     gentlemen, obviously we started a little later than usual, but
 3     it's about time for the morning break.  I think what we should
 4     do, as you heard the Government has rested meaning that they
 5     are complete with their evidence. That's a point at which
 6     there's a few things I need to discuss with the attorneys.  So
 7     I think we should take the lunch break now a little earlier
 8     than usual. We'll see you back here at 1:00 or 1:05 and we'll
 9     continue. Thank you very much.
10        Again, you've only heard one side of the case. Or you've
11     only heard evidence from one party. You have not heard the
12     full case yet, including arguments and so forth.  So keep an
13     open mind.  Don't discuss the case among yourselves.  We'll
14     see you back here in an hour.  Thank you.
15              (The jury exited the courtroom at 12:06 p.m.)
16              THE COURT:  Thank you. Please be seated. So just as
17     I understood it, I know there's at least -- I don't think we
18     did the issue with the exhibits and so forth, so we're not
19     done with the evidence, are we?  Or did I miss that?
20              MR. HAWKS:  You're correct, Your Honor.
21              THE COURT:  Yeah, okay. So in terms of how we
22     proceed after lunch, who should I call on next to state
23     whether they have evidence or they're resting or how do you
24     want to handle that?
25              MR. GUILLAUME:  Your Honor, I would probably think
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2095**

```
1    that Mr. Hawks would go and then we would go because we don't

2    have any affirmative evidence to put on.

3            THE COURT:  So you would just announce those

4    stipulations and put those photos up?

5            MR. HAWKS:  Yes, Your Honor.

6            THE COURT:  Okay. So we're right on the cusp of

7    whether we can do all this today. Part of it is I actually

8    don't know how long the jury instructions will take. Again,

9    they're longer than usual. I do -- I was trying to do the math

10   on this. We'll be coming in right around 5:00 plus or minus if

11   we do everything today. It would probably mean given where we

12   are now is we would do the jury instructions and the

13   Government's case before the break, and then do a break and

14   everything else as Mr. Hawks had suggested.

15       A lot of it depends to some degree on where we are and

16   length of closing. I know the Government has kind of -- we

17   know what they're doing. You had said 45 minutes, Mr.

18   Guillaume, and you had said 30 minutes, Mr. Hawks.  Is that

19   still where you stand would you say?

20           MR. GUILLAUME:  I would say so for Mr. Taeyan

21   Williams, yes.  Around that time, Your Honor.

22           THE COURT:  The 45?

23           MR. GUILLAUME:  Around 40 to 45 minutes.

24           MR. HAWKS:  Your Honor, I want to give myself maybe

25   35, 37 minutes, but around there.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2096**

```
 1              THE COURT:  Sure. Okay, I just don't have a good
 2     sense of how long these instructions will take. We're going to
 3     take it right up to 5.  There was an issue Mr. Crawley had.
 4     Tell me what that was.
 5              MR. CRAWLEY:  Yes, Your Honor. In looking back
 6     through the Government's slides concerning their closing
 7     statement, and I had brought this to the Government's
 8     attention, they have a particular slide that states call from
 9     Patti Chaplin to Scott Williams', quote, "OG phone at 2:27
10     a.m. because Scott Williams was not at home." And then it
11     shows the transcript. Let me just state not transcript, but it
12     highlights the extraction from the call log. And it appears on
13     page 108 based on my understanding of these slides and it says
14     Exhibit 445 at the bottom, if the Court wants to take a look
15     at it.
16              THE COURT:  I'm not seeing page numbers on the
17     version I have.
18              MR. CRAWLEY:  I think if you just start to scroll
19     through, Your Honor, I'm not sure. Are you looking at a
20     hardcopy?
21              THE COURT:  I'm looking at a hardcopy.  In their
22     infinite wisdom the Government didn't number the pages.
23              MR. CRAWLEY: I'm sorry.
24              THE COURT:  So do you want to give me something
25     that's kind of close to?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2097**

```
 1              MR. CRAWLEY:  It starts around the timeline of the
 2    call activity, April 6th through April 8th and it's pretty
 3    much midway through all of the exhibits, Your Honor. So on my
 4    list of slides or whatnot, there appears to be 196 and this is
 5    going to be around 108, Your Honor. So if that helps you put
 6    your finger on it. There are other -- if you get to pictures
 7    of the interior of the vehicle, then you've gone too far, if
 8    that helps the Court.
 9              THE COURT:  I don't know if the Government can help
10    me find this, your presentation.
11              MR. CRAWLEY:  If the Court --
12              THE COURT:  There's sort of a chronological.  What
13    date is this associated with this?
14              MR. CRAWLEY:  This is associated with April 6th,
15    into the early morning hours of April 7th.
16              MS. GROSSI:  Your Honor, if you would like me to
17    publish it to you, I can.
18              THE COURT:  Okay, I got it. It's right before April
19    7, 2018.
20              MR. CRAWLEY:  Yes, sir, Your Honor.  And so my
21    concern with that is that I didn't recall the testimony of Ms.
22    Patti Chaplin to specifically say that Scott was not at home
23    so I asked the court reporter to look back through the record.
24    And what it says was -- and the Government can correct me as
25    well as the prosecutor, Ms. Chaplin was asked and she said she
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2098**

1    did not know. And then the Government attempted to lead her by

2    saying, "But if you were to call him at that time of the

3    morning it would be because you didn't know where he was?"

4    And then she gave somewhat of a vague answer, Your Honor.

5        So I don't think this is 100 percent accurate. And to the

6    extent that the Court has already addressed counsel not trying

7    to paraphrase jury instructions and things of that sort, I

8    would just ask the Court -- I mean, clearly the witness just

9    testified concerning this call, the expert, and the fact that

10   the call could have been a call that didn't occur, it could

11   have been a five-second call. The person's phone could have

12   been on airplane mode, it could have been off.  He gave a

13   number of reasons as the Court may recall. But I would just

14   ask the Court not to allow the Government to give testimony

15   that says that Ms. Chaplin specifically said it was because he

16   was not at home. And the Court can look back through the

17   record too. When I looked at it, her initial response was she

18   didn't know. And so that would be my point, Your Honor.

19           MS. GROSSI:  Your Honor, we are happy to change the

20   text of this slide. It wasn't my intention to quote her on

21   this slide and I can leave it for argument.

22           THE COURT:  So taking out, for example, everything

23   after 2:27 a.m?

24           MS. GROSSI:  Correct.

25           THE COURT:  Is that okay with you, Mr. Crawley?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2099**

```
 1                    MR. CRAWLEY:  That's fine, Your Honor.

 2              THE COURT:  Call at 2:27 a.m?

 3              MR. CRAWLEY:  Yes, sir.

 4              THE COURT:  Okay.  Anything else we need to address

 5      regarding the defense case?  I take it there's no rebuttal to

 6      the stipulation -- Mr. Guillaume?

 7                    MR. GUILLAUME:  Your Honor, before you were kind of

 8      going down the path of what do we do with the instructions

 9      today, the closing, we're prepared to do whatever is

10      necessary, either close today or tomorrow.  But to the extent

11      that the Court is concerned that the instructions -- my last

12      trial I had with Judge Xinis which was not too long ago, we

13      had shorter instructions and it took close to an

14      hour-and-a-half, close to two hours for her to read

15      everything, if that's any guide for the Court.

16              THE COURT:  How much shorter was it would you say?

17              MR. GUILLAUME:  How much shorter?

18              THE COURT:  You said it was a lot shorter than this?

19              MR. GUILLAUME:  Not a lot shorter, but there's more

20      layers, there's two people here. I just -- I'm going last, so

21      I just don't want to be in a position where it's 5:00 and I'm

22      just starting and the jury is looking at me with the evil eye.

23      I wouldn't want to prejudice my client.

24              THE COURT:  I understand.  I actually think -- so on

25      the one hand, Judge Xinis may talk slower than me if that's
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2100**

```
 1    the math, and maybe the court reporters are usually the best
 2    judge of speed, but I tend to agree with you that again, most
 3    of our jury instructions are based on number of counts and as
 4    we know in this case, the Government has -- there's either
 5    ors, there's a lot of different moving parts around that leads
 6    to longer instructions.  So I would anticipate this would take
 7    at least an hour I would say, probably more. Usually mine are
 8    like under an hour, but they're usually a lot shorter than
 9    this.
10        And so what I would propose even though again, I know
11    some judges like to keep the instructions together, I also
12    think given the length of them, it's not going to be easy to
13    do them all in a morning and then Mr. Guillaume will be sort
14    of bumping up against the lunch hour. So I'm comfortable,
15    given the length of this and given how much the jury probably
16    needs some breaks between various steps, that we call the jury
17    back, we finish the case, we give them the jury instructions
18    and then we send them home a little early.  It will probably
19    be in the neighborhood of 2:30 or something like that. But I
20    think without starting by 2:00 on the dot I don't think we
21    finish by 5.  And even then we might not. I have some final
22    instructions as you know for the jury.
23        So I think just in terms of the better part of valor and
24    not trying to rush us all through this or say that we have to
25    take really short breaks, I think we should do that. It also
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2101**

```
 1    gives everyone a chance to adjust their slides. We have this
 2    one that Mr. Crawley just pointed out.
 3         I would just note for everybody, I do have what I think
 4    are the final instructions. At least the ones I'm prepared to
 5    provide to the jury today at least orally. Obviously I often
 6    find little typos here and there that I miss myself and then
 7    we give them the final version that's slightly different.  But
 8    the numbers have shifted a little because we took out one
 9    instruction and so I think some of these slides refer to
10    instruction numbers. You may want to take the afternoon to
11    just make sure you're all up to date on that because that can
12    happen as well.
13         So I think it gives both sides the opportunity just to be
14    completely locked down on what they're saying in the closing.
15    So unless anybody objects to that I think that's probably the
16    best course.  And then what would happen is first thing in the
17    morning we would start at 9:00 with the arguments.  We'd have
18    it all done certainly before lunch, probably around noon. But
19    in plenty of time for them to have lunch and start
20    deliberating right after that.
21         Any concerns with that approach?
22              MS. GROSSI:  That works from the Government.
23              MR. HAWKS:  No objection from Scott Williams.
24              MR. GUILLAUME:  Thank you, Your Honor.
25              THE COURT:  Okay.  So we'll see you back here --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2102

1    sorry, Mr. Nieto?

2              **MR. NIETO:**  My apologies, Your Honor.  Just a quick

3    question in terms of timing.  With regards to the Rule 29

4    motions as well as the voir dire of the defendants' right to

5    testify --

6              **THE COURT:**  Honestly, we should be doing that now,

7    you're right. The motions, that's frankly in your alls hands,

8    but you're raising it now, and the voir dire.  So I guess

9    we'll do that now and maybe let the jury wait five minutes and

10   give us a slightly longer break.

11        So in terms of -- well, why don't we start with the

12   defendants then, how about that?

13             **MR. NIETO:**  Your Honor, as is our understanding that

14   the Government's case has rested, then on behalf of Taeyan

15   Williams we would make a motion pursuant to Rule 29, but we

16   will submit on that motion.

17             **THE COURT:**  Okay. Mr. Hawks, anything in that

18   regard?

19             **MR. HAWKS:**  Your Honor, we do as well.

20             **THE COURT:**  Okay.  You know what we can do, I think

21   this makes the most sense.  If there's anything else anybody

22   wants to add on those motions we can do that after the jury

23   instructions. Obviously you preserve your rights, but if we

24   want to talk about that we can do that after the jury has left

25   after the jury instructions. And then in terms of testifying

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2103**

```
 1      though, why don't we start with Scott Williams. My
 2      understanding, Mr. Hawks, is he's not planning to testify; is
 3      that correct?
 4              MR. HAWKS:  Yes, Your Honor, that's correct.
 5              THE COURT:  And what I would typically do, I'd like
 6      to perhaps just engage with a brief colloquy with Mr. Williams
 7      and obviously Mr. Hawks, if there's anything you want to
 8      confer with him or Mr. Crawley during that, you're welcome to
 9      do that. Is that okay?
10              THE DEFENDANT:  Yes, sir.
11              THE COURT:  Mr. Williams, as you know -- well, as I
12      mentioned to the jury at the beginning, you have -- the
13      Government has the burden to prove guilt beyond a reasonable
14      doubt and you have no burden or obligation to present any
15      evidence and not to testify at all. In fact, you have a
16      constitutional right to decline to testify if you choose to.
17      Do you understand that?
18              DEFENDANT S. WILLIAMS:  Yes, Your Honor.
19              THE COURT:  Now you also have the right if you
20      choose to to take the stand and testify in your own defense.
21      Do you understand that?
22              DEFENDANT S. WILLIAMS:  Yes, Your Honor.
23              THE COURT:  Now the decision on whether to testify
24      or not is an important one in a trial like this. And I want to
25      make sure that you've had the opportunity to fully discuss
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2104**

 1  that decision with your counsel. Have you had those

 2  discussions and do you believe you've received adequate advice

 3  on that issue?

 4          **DEFENDANT S. WILLIAMS:**  Yes, Your Honor.

 5          **THE COURT:**  Now regardless of what recommendations

 6  your counsel or anyone else may have made to you, or even

 7  directions that you or anyone else may have tried to give to

 8  you, the decision on whether to testify is a personal one to

 9  the defendant and so it is your decision and your decision

10  only. Do you understand that?

11          **DEFENDANT S. WILLIAMS:**  Yes, Your Honor.

12          **THE COURT:**  And understanding that, have you made

13  this decision personally with whatever advice you've received,

14  but is it your decision and not the decision of someone else

15  to choose not to testify?

16          **DEFENDANT S. WILLIAMS:**  No, this is my decision. I

17  choose not to testify.

18          **THE COURT:**  Okay. Anything else that anyone would

19  like me to raise with Mr. Scott Williams?

20          **MS. GROSSI:**  Not from the Government, Your Honor.

21          **THE COURT:**  Okay. So then can we move to Mr. Taeyan

22  Williams.  So although I know you heard all that I'm going to

23  say it specifically for you, Mr. Williams. Do you understand

24  that the Government has the burden to prove guilt beyond a

25  reasonable doubt and a defendant in a criminal case has no

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2105**

1   burden or obligation to present any evidence or to testify?

2   Do you understand that?

3           **DEFENDANT T. WILLIAMS:**  Yes, sir.

4           **THE COURT:**  And you have no burden to prove your own

5   innocence or anything like that. Do you understand that?

6           **DEFENDANT T. WILLIAMS:**  Yes, sir.

7           **THE COURT:**  Now the decision on whether to testify

8   or not, you have the right if you choose to, to testify as

9   well on your own behalf. Do you understand that?

10          **DEFENDANT T. WILLIAMS:**  Yes, sir.

11          **THE COURT:**  And the decision on whether to testify

12  is one that you need to get advice of counsel on. Have you had

13  the opportunity to discuss that issue with your attorneys and

14  you believe you've received sufficient advice on that issue?

15          **DEFENDANT T. WILLIAMS:**  Yes, I have.

16          **THE COURT:**  And are you choosing to testify or not

17  today?

18          **DEFENDANT T. WILLIAMS:**  Not to testify.

19          **THE COURT:**  Okay. And as I said to Mr. Scott

20  Williams, the decision on whether to testify is a personal

21  decision. Regardless of whether your attorneys or anyone else

22  may have given you specific recommendations, the decision has

23  to be yours and yours alone. Do you understand that?

24          **DEFENDANT T. WILLIAMS:**  Yes, I do.

25          **THE COURT:**  And is it your personal decision to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2106**

1    choose not to testify in this trial?

2          **DEFENDANT T. WILLIAMS:** Yes, it is.

3          **THE COURT:** Anything from the Government that you'd

4    like me to offer or anything like that?

5          **MS. GROSSI:** No, Your Honor.

6          **THE COURT:** Okay, thank you.

7       Okay, so we've completed that. We'll discuss those

8    motions after the jury instructions. We'll see you back here

9    at 1:05.  We can start a few minutes after that with the jury

10   instructions. Thank you very much.

11         **(Luncheon recess was taken from 12:21 to 1:05 p.m.)**

12         **THE COURT:** Anything we need to discuss before we

13   bring in the jury?

14         **MS. GROSSI:** Not from the Government, Your Honor.

15         **THE COURT:** I should note although we can talk about

16   this later, that I realize we haven't updated the verdict form

17   since I moved us to the lesser included offense concept. I

18   started doing that during the lunch break. We'll probably send

19   that to you this afternoon for comment first thing in the

20   morning. It should just be ministerial, but we do need to fix

21   that.

22      Okay, so we'll start with going to Mr. Hawks, then going

23   to Mr. Guillaume, then going to the instructions, correct?

24         **MR. HAWKS:** Yes, Your Honor.

25         **THE COURT:** Okay, we're ready.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2107**

```
 1                (Jury reentered the courtroom at 1:13 p.m.)
 2           THE COURT:  Thank you, everyone. Please be seated.
 3      Welcome back from lunch, ladies and gentlemen. As you heard
 4      right before lunch, the Government has rested, meaning that
 5      they have completed their presentation of evidence. The
 6      defendants if they choose to, have the opportunity to present
 7      evidence.  As I mentioned before, they have no burden to prove
 8      anything, but they have that opportunity if they would like
 9      to.
10           So I'd like to turn to Mr. Hawks on behalf of Mr. Scott
11      Williams, as to whether you have any additional evidence to
12      offer.
13               MR. HAWKS:  We do, Your Honor.
14           THE COURT:  Okay. Go ahead.
15               MR. HAWKS:  Your Honor, the defense offers Exhibit
16      525C, 1051 -- pardon me, 1052, 1053, and 1054.
17           THE COURT:  Hold on a second. Let me make sure I
18      have this all marked down. Okay, and 525C is the stipulation;
19      is that correct?
20               MR. HAWKS:  It is, Your Honor.
21           THE COURT:  Okay, so I take it there's no objection,
22      correct?
23               MS. GROSSI:  That's correct, Your Honor.
24           THE COURT:  So Exhibits 525C, 1052, 1053 and 1054
25      are in evidence. And perhaps you should read the stipulation.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2108**

```
 1    You can put it up on the screen and that will be part of the
 2    evidence.
 3            MR. HAWKS:  Will do, Your Honor. And Your Honor, I
 4    note there is a typographical error. The Exhibit 1051 should
 5    reflect Exhibit 1054.
 6            THE COURT:  Okay. Any problem with that, Ms. Grossi?
 7            MS. GROSSI:  Your Honor, can we just mark it on the
 8    stipulation?
 9            THE COURT:  I think if you handwrite it in and
10    initial it or --
11            MR. HAWKS:  Your Honor, a stipulation of additional
12    photographs. The Government and the defendants, Scott Anthony
13    Williams and Taeyan Raymond Williams, do hereby stipulate and
14    agree that the photographs to be admitted as Exhibits 1054,
15    1052, and 1053 were taken at 348 Lomar Road, Susquehanna,
16    Pennsylvania during the same time that the photographs
17    admitted as Exhibits 11 through 32 were taken. Signed by the
18    counsel for the parties.
19            THE COURT:  Okay. Would you like to show those
20    photos to the jury or --
21            MR. HAWKS:  Yes, Your Honor.
22            THE COURT:  Okay, you can put them on the screen.
23            MR. HAWKS:  And Exhibit 1052, Exhibit 1053, and
24    Exhibit 1054.
25            THE COURT:  Okay.  Thank you, Mr. Hawks. Any further
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2109**

```
 1    evidence Mr. Scott Williams would like to offer?
 2              MR. HAWKS:  Your Honor, on behalf of the defendant,
 3    Scott Williams, the defense rests.
 4          THE COURT:  Okay, so that's all the additional
 5    evidence that Mr. Scott Williams is going to put into the
 6    trial. And we'll have those handed up.
 7         Mr. Guillaume, on behalf of Mr. Taeyan Williams?
 8              MR. GUILLAUME:  Thank you, Your Honor.  On behalf of
 9    Mr. Taeyan Williams, the defense rests as well.
10          THE COURT:  Okay, so we have no further evidence to
11    be presented in the case.
12         I take it, Ms. Grossi, there's nothing further from the
13    Government, just for the record?
14              MS. GROSSI:  That's correct, Your Honor.
15          THE COURT:  So ladies and gentlemen, what that means
16    is you've heard all of the evidence that you're going to hear
17    in this case.
18         Now if you recall from the beginning when I had the
19    preliminary jury instructions, that doesn't mean we're done
20    here. There's a number of additional steps. And to recap, what
21    happens next is I will give you the instructions, the jury
22    instructions on what the applicable law is and the information
23    you need to understand how to do your job as jurors. And then
24    you'll hear the closing arguments from counsel which are not
25    evidence, but like the opening statements they're designed to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2110**

1    allow the attorneys to give you their perspective or to put

2    the evidence in context so that you can understand at least

3    from their perspective, how it fits together or doesn't fit

4    together. And then you get to deliberate on the case.

5         Now given where we are in the day, although it's still

6    relatively early in our trial day, it's 1:20, the closing

7    arguments will take several hours and I promise you as always

8    that we'll be done by 5:00.

9         So what we're going to do is I'm going to give you the

10   jury instructions which are actually quite lengthy. We'll do

11   that this afternoon. But once we're done with that, we will

12   stop for the day rather than start the closing arguments

13   because we always think it's better to do those all in one

14   session. It wouldn't make sense to start, have one attorney go

15   today and have the other go in the morning.  So those will all

16   come to you first thing in the morning so you'll have a fresh

17   start with those.

18        But given the length of the argument and the jury

19   instructions, while we're all here I will give you the jury

20   instructions first and then we will conclude for the day and

21   have you hear closing arguments in the morning.

22        So as to the jury instructions, now that all the evidence

23   has been presented, let me thank you for your promptness in

24   following our schedule, for your attention throughout this

25   case, and for your patience when it has been necessary to have

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2111

1    discussions out of your presence.

2        Before the attorneys deliver their closing arguments, I

3    will now instruct you on the law that applies in this case.

4    The instructions should assist you in following the arguments

5    that will be your guide as you conduct deliberations.

6        It has been clear that up until now you have faithfully

7    discharged your duty to listen carefully and observe each

8    witness who testified. I ask you to give me that same careful

9    attention as I instruct you on the law.

10       You will receive a written version of these instructions

11   to take into the jury room, so you do not need to take notes

12   if you do not want to.

13       As I mentioned at the outset of the trial, the functions

14   of the judge and the jury are different. During the trial, it

15   was my duty to decide what testimony and evidence is relevant

16   under the law for your consideration. Now that you've heard

17   all of the evidence in the case, it is my duty as the trial

18   judge to instruct you as to the law that applies in this case.

19   It is your duty to accept these instructions of law and apply

20   them to the facts as you determine them.

21       You are required to follow the law as I define it for

22   you. If any attorney has stated or states a legal principle

23   different from any that I state to you in my instructions, it

24   is my instructions that you must follow. You should not single

25   out any instruction as alone stating the law. But you should

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2112**

1    consider my instructions as a whole when you retire to

2    deliberate to the jury room.

3        You should not be concerned about the wisdom of any rule

4    that I state. Regardless of any opinion that you may have as

5    to what the law may be or ought to be, it would violate your

6    sworn duty to base a verdict upon any other view of the law

7    than that which I give you.

8        Since you are the sole and exclusive judges of the facts,

9    I do not have and do not mean to convey any opinion as to the

10   facts or what your verdict should be. Anything I have said

11   during the trial, including the rulings I've made during the

12   trial, are not a sign of any view of what your decision should

13   be. I have not expressed and have not intended to convey any

14   opinion as to which witnesses are or are not worthy of belief,

15   what facts are or are not established, or what inference or

16   inferences should be drawn from the evidence. If any

17   expression of mine has seemed to convey an opinion relating to

18   any of these matters, I instruct you to disregard it.

19       As members of the jury, it is your duty to pass upon and

20   decide the factual issues in this case. You are the sole and

21   exclusive judges of the facts. You will consider and weigh the

22   evidence. You determine the credibility of the witnesses. You

23   resolve such conflicts as there may be in the testimony. You

24   draw whatever reasonable inferences you decide to draw from

25   the facts as you have determined them.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2113

```
 1        You are to perform the duty of finding the facts in this
 2   case without bias or prejudice to any party. I remind you that
 3   before you were accepted and sworn to serve as a juror, you
 4   were asked questions that related to your ability to be fair
 5   and impartial, and to be free from bias and prejudice. On the
 6   basis of those answers you were accepted as jurors by the
 7   Court and the parties. Those answers are as binding on each of
 8   you now as they were then and will remain so until you are
 9   discharged at the conclusion of the case.
10        Now in this case the parties are the United States
11   Government and the defendants, Scott Anthony Williams and
12   Taeyan Raymond Williams. This case is important to the
13   Government because the enforcement of criminal laws is a
14   matter of prime concern to the community. It is also important
15   to the defendants who are charged with serious crimes.
16        The fact that the prosecution is brought in the name of
17   the United States of America entitles the Government to no
18   greater consideration than any other party in a trial. By the
19   same token, the Government is entitled to no less
20   consideration. All parties, whether the Government or an
21   individual defendant, stand as equals in this courtroom.
22        Your verdict must be based solely upon the evidence
23   developed at trial or the lack of evidence. In reaching your
24   verdict, it would be improper for you to consider any personal
25   feelings you may have about the defendants' race, religion,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2114**

```
 1    national origin, sex, or age.  All persons are entitled to the
 2    presumption of innocence and the Government has the burden of
 3    proof as I will discuss in a moment.
 4         It would be equally improper for you to allow any
 5    feelings you might have about the nature of the crimes charged
 6    to interfere with your decision-making process. You may not be
 7    swayed by sympathy. You are to be guided solely by the
 8    evidence in this case.  And the crucial question that you must
 9    ask yourselves as you sift through the evidence is: Has the
10    Government proven the guilt of the defendants beyond a
11    reasonable doubt?  It is for you alone to decide whether the
12    Government has proven that either defendant is guilty of the
13    crimes charged solely on the basis of the evidence and subject
14    to the law as I instruct you. It must be clear to you that
15    once you let fear, or prejudice, or bias, or sympathy
16    interfere with your thinking there is a risk that you will not
17    arrive at a true and just verdict. Again, your verdict must be
18    based exclusively upon the evidence or lack of evidence in the
19    case.
20         You may not allow any views you may have about the
21    conduct of the attorneys in this case to have any impact on
22    your consideration of this case. It is the duty of the
23    attorney for each side of a case to object when the other side
24    offers testimony or other evidence which the attorney believes
25    is not properly admissible.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2115**

1    The attorneys also have the right and duty to ask me to

2    make rulings of law and to request conferences at the bench

3    out of the hearing of the jury. You may not allow the fact

4    that an attorney objected to the admissibility of evidence,

5    asked for a conference out of the hearing of the jury, or

6    asked the Court for a ruling on the law to affect your

7    consideration of this case.

8    Your verdict must be based solely on the evidence

9    presented in this courtroom and in accordance with my

10   instructions. You must completely disregard any report that

11   you have read or heard in the media or seen on television or

12   the internet. It would be unfair to consider such reports

13   since they are not evidence and the parties have no

14   opportunity to explain or contradict them. It would be a

15   violation of your oath as jurors to allow yourselves to be

16   influenced in any manner by such publicity.

17   As the finders of fact it is your role to consider

18   whether based on the evidence admitted in this case the

19   Government has proven that the defendants are guilty of the

20   crimes with which they are charged. Although the defendant has

21   been indicted -- although the defendants have been indicted,

22   you must remember that an indictment is only an accusation. It

23   is not evidence.

24   The defendants have pleaded not guilty to the indictment

25   in this case. As a result of the defendants' pleas of not

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2116**

1    guilty, the burden is on the prosecution to prove guilt beyond

2    a reasonable doubt. This burden never shifts to the defendants

3    because the law never imposes upon the defendant in a criminal

4    case the burden or duty of calling any witness or producing

5    any evidence. The law presumes a defendant to be innocent of

6    all the charges against him. I therefore instruct you that

7    each defendant is to be presumed by you to be innocent

8    throughout your deliberations until such time, if ever, that

9    you as a jury are satisfied that the Government has proven

10   that defendant guilty beyond a reasonable doubt.

11        The defendants began the trial with a clean slate. This

12   presumption of innocence alone is sufficient to acquit the

13   defendants unless you as jurors are unanimously convinced

14   beyond a reasonable doubt of the defendants' guilt after a

15   careful and impartial consideration of all of the evidence in

16   this case. If the Government fails to sustain its burden on

17   any charge as to a defendant you must find that defendant not

18   guilty as to that charge.

19        This presumption was with the defendants when the trial

20   began, remains with them even now, and will continue with them

21   into your deliberations until such time, if ever, that you are

22   convinced that the Government has proven the defendants' guilt

23   beyond a reasonable doubt.

24        Now in determining the facts you must rely upon your own

25   recollection of the evidence. You may consider not only the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2117**

1    evidence referred to by the attorneys in their arguments, but
2    you may also consider any evidence in this case which you may
3    believe to be material even if not referred to by the
4    attorneys.
5        The evidence in this case consists of the sworn testimony
6    of the witnesses, all exhibits received in evidence, and all
7    facts which may have been admitted by stipulation. Exhibits
8    which have been marked for identification but were not
9    admitted may not be considered by you as evidence. Only those
10   exhibits admitted may be considered as evidence.
11       You are to consider only the evidence presented and you
12   may not guess or speculate as to any fact not presented as
13   evidence.
14       Let me remind you what is not evidence. The fact that
15   there was an indictment bringing charges in this case is not
16   evidence and you may draw no inference from that fact. What I
17   may have said during the trial or what I may say in these
18   instructions is not evidence. What the lawyers have said in
19   their opening statements and their closing arguments is not
20   evidence, although you may give consideration to those
21   arguments in making up your mind on what inferences to draw
22   from the facts which are in evidence.
23       Anything you may have seen or heard about this case
24   outside of the courtroom is not evidence and must be entirely
25   disregarded. Statements of the attorneys, including their

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2118**

1    objections and their questions, are not evidence. A question

2    put to a witness is never evidence.  It is only the answer

3    which is evidence.

4         At times, a lawyer may have incorporated into a question

5    a statement which assumes certain facts to be true and asked

6    the witness if the statement was true. If the witness denied

7    the truth of the statement or if the question was not answered

8    or an objection to a question was sustained, then you may not

9    consider the fact to be true simply because it was contained

10   in a lawyer's question. Any answer that I directed you to

11   disregard or any evidence I directed to be struck from the

12   record is not evidence and you must dismiss it from your mind

13   completely and entirely. If I instructed you that certain

14   evidence was admitted for one purpose only you may not

15   consider it for any other purpose.

16        From time to time I have called upon you to pass -- I

17   have been called upon to pass upon the admissibility of

18   evidence -- certain evidence, such as by ruling on objections

19   to questions. You should not be concerned with my rulings or

20   the reasons for those rulings and you are not to draw any

21   inferences from them.

22        In admitting evidence to which an objection has been

23   made, I did not determine what weight should be given to such

24   evidence, nor did I pass judgment on the credibility of the

25   evidence. For any question to which I sustained an objection,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2119

1   you must not guess what the answer might have been and you

2   must not speculate as to the reason the question was asked or

3   the reason for the objection. You should not speculate about

4   the nature or effect of any discussions I had with counsel

5   outside of your hearing or sight.

6       I will now discuss some specific forms of evidence that

7   have been admitted in this case and some other issues relating

8   to evidence not offered in this case.

9       A stipulation of fact is an agreement among the parties

10  that a certain fact is true. You should regard such agreed

11  facts as true. A stipulation of testimony is an agreement

12  among the parties that if called, a witness would have given

13  certain testimony. You must accept as true the fact that the

14  witness would have given that testimony in court. However, it

15  is for you to determine the effect to be given to that

16  testimony.

17      Certain exhibits have been presented in the form of

18  charts and summaries. I decided to admit these charts and

19  summaries in place of the underlying evidence that they

20  represent in order to save time and avoid unnecessary

21  inconvenience. You should consider these charts and summaries

22  as you would any other evidence.

23      The Government has offered evidence in the form of

24  recordings of telephone calls. There is, however, no agreement

25  or stipulation as to identity of speakers on any other

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2120**

1    recording so that you will have to determine for yourselves

2    the identity of the parties in each conversation based on the

3    testimony you heard and the evidence produced at trial.

4        The Government was permitted to provide you documents

5    that are prepared which contain the Government's

6    interpretation of what is said on the recordings which have

7    been received as evidence. Those transcripts were provided to

8    you as an aid or guide to assist you in listening to the

9    recordings. However, they are not in and of themselves

10   evidence. You will not have the transcripts with you during

11   your deliberations. Therefore, when the recordings were played

12   I advised you to listen carefully to the recordings

13   themselves. You alone should make your own interpretation of

14   the content of the recordings based on what you heard. If you

15   think you heard something different from what appeared on the

16   transcript, then what you heard is controlling.

17       You've also heard testimony in this case regarding

18   evidence seized by the Government during the execution of

19   search warrants. You are instructed that it is the

20   responsibility of the Court alone to determine the validity

21   and legality of these search warrants. It is up to you to

22   decide what significance, if any, the evidence seized may have

23   in this case.

24       You may hear argument by counsel that the Government did

25   not utilize specific investigative techniques. You may

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2121

1    consider that fact in deciding whether the Government has met
2    its burden of proof because as I told you, you should look to
3    all of the evidence or lack of evidence in deciding whether
4    the defendants are guilty. However, you are also instructed
5    that there is no legal requirement for the Government to use
6    -- that the Government use any specific investigative
7    techniques to prove its case. The law does not require the
8    prosecution to call as witnesses all persons who have been
9    present at any time or place involved in the case or who may
10   appear to have some knowledge of the matters at issue in this
11   trial. Nor does the law require the prosecution to produce as
12   exhibits all papers and things mentioned in the evidence. Your
13   task as I've said is to determine whether or not on the
14   evidence or lack of evidence, the guilt of the defendants has
15   been proven beyond a reasonable doubt.

16       In deciding whether or not the Government has met its
17   burden of proof you may consider both direct evidence and
18   circumstantial evidence. The law makes no distinction between
19   direct and circumstantial evidence. Circumstantial evidence is
20   of no more or less value than direct evidence and you may
21   consider either or both and may give them such weight as you
22   conclude is warranted. A case may be proven by direct evidence
23   alone, circumstantial evidence alone, or a combination of the
24   two.

25       Direct evidence is direct proof of a fact such as

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2122**

1    testimony of an eyewitness as to what he or she saw, heard or

2    observed. For example, if a witness came into this courtroom

3    and testified that she had just been outside and saw that it

4    was raining, that would be direct evidence that it was

5    raining.

6        Circumstantial evidence is proof of facts from which you

7    may infer or conclude that other facts exist. To give an

8    example, suppose that when you came into the courthouse today

9    the sun was shining and it was a nice day. Then later as you

10   were sitting here someone walked in with a dripping wet

11   umbrella and a wet raincoat. Because you cannot look outside

12   of the courtroom and cannot see whether or not it is raining,

13   you have no direct evidence of that fact. But from the

14   combination of the facts you observed about the umbrella and

15   the raincoat, it would be reasonable for you to infer that it

16   had begun to rain. That is all there is to circumstantial

17   evidence; using your reason and experience you infer from

18   established facts the existence or the nonexistence of some

19   other fact.

20       Please note that using circumstantial evidence is not a

21   matter of guesswork or speculation. It is a matter of making a

22   logical inference. In drawing inferences, you should exercise

23   your common sense and everyday experience.

24       In discussing circumstantial evidence, I've highlighted

25   the fact that in your consideration of the evidence you are

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2123**

1    not limited to the statements of the witnesses or the words in

2    an exhibit. You are not limited to what you see and hear as

3    the witnesses testify. You are permitted to draw, from facts

4    which you find have been proved, such reasonable inferences as

5    you can find to be justified in light of your own experience.

6          Inferences are deductions or conclusions which you are

7    permitted to draw, but not required to draw from the facts

8    which have been established by either direct or circumstantial

9    evidence. In drawing inferences you should use your common

10    sense and everyday experience. An inference is not a suspicion

11    or a guess. It is a reasoned, logical decision to conclude

12    that a disputed fact exists on the basis of another fact which

13    you know exists.

14          There are times when different inferences may be drawn

15    from the facts. The Government asks you to draw one set of

16    inferences while the defendants' counsel asks you to draw

17    another. It is for you and you alone to decide what inferences

18    you will draw.

19          Let me remind you that whether based on direct or

20    circumstantial evidence, or upon the logical, reasonable

21    inferences drawn from such evidence, you must be satisfied of

22    the guilt of the defendants beyond a reasonable doubt before

23    you may convict.

24          You should also use your common sense and everyday

25    experience for another important part of your consideration of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2124

1    the evidence, determining how believable each witness was in

2    his or her testimony. In order to find the facts in this case

3    you will need to make judgments about the testimony of the

4    witnesses you have listened to and observed. You are the sole

5    judges of the credibility of each witness and of the

6    importance of his or her testimony.

7        In making these judgments you should carefully scrutinize

8    all of the testimony of each witness, the circumstances under

9    which each witness testified, and any other matter in evidence

10   which may help you decide the truth and the importance of each

11   witness' testimony.

12       You watched each witness testify.  Everything a witness

13   said or did on the witness stand counts in your determination.

14   You should use all of the tests for truthfulness that you

15   would use in determining matters of importance to you in your

16   everyday life. Among the factors you should consider are the

17   witness' opportunity to see, hear, or know the facts about

18   which he or she testified; the witness' memory and level of

19   recall of the events; whether the witness' recollection of the

20   facts stands up in light of the other evidence in the case;

21   whether it was consistent with or contradicted by other

22   evidence; whether the witness' testimony was consistent with

23   other statements he or she made during testimony or at an

24   earlier time; the witness' demeanor in testifying; any

25   relationship the witness may have with the Government or the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2125**

1    defendants that may affect how he or she testified; any

2    interest, financial or otherwise that the witness may have in

3    the outcome of the case; and any bias, prejudice, or hostility

4    the witness may have for or against any party. In summary,

5    what you must try to do in deciding credibility is to size up

6    a person just as you would in any important matter when you

7    are trying to decide if a person is truthful, straightforward,

8    and accurate in his or her recollection. Always remember that

9    you should use your common sense, your good judgment, and your

10   own life experience.

11        You need not believe a witness even though the testimony

12   is uncontradicted. You may believe all, part, or none of the

13   testimony of any witness.

14        I will now discuss some specific issues related to

15   witness testimony.  You have heard evidence that witnesses may

16   have made statements on earlier occasions that counsel argues

17   are inconsistent with their trial testimony. If the earlier

18   statement was made under penalty of perjury during a trial,

19   hearing, or other court proceeding or deposition, you may

20   consider that earlier statement as evidence of the fact to

21   which the witness testified on that earlier occasion. If the

22   earlier statement was not made under penalty of perjury during

23   a trial, hearing, or other court proceeding or deposition, the

24   evidence of a prior inconsistent statement is not to be

25   considered by you as evidence of the fact stated on that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2126**

1   earlier occasion, or as affirmative evidence bearing on the

2   defendant's guilt. Evidence of the prior inconsistent

3   statement was placed before you for the more limited purpose

4   of helping you decide whether to believe the trial testimony

5   of the witness who contradicted himself. If you find that the

6   witness made an earlier statement that conflicts with the

7   witness' trial testimony, you may consider that fact in

8   deciding how much of the witness' trial testimony, if any, to

9   believe.

10       In making this determination, you may consider whether

11  the witness purposely made a false statement or whether it was

12  an innocent mistake; whether the inconsistency relates to an

13  important fact or whether it had to do with a small detail;

14  whether the witness has an explanation for the inconsistency

15  and whether the explanation -- that explanation appealed to

16  your common sense. It is exclusively your duty based upon all

17  of the evidence and your own good judgment to determine

18  whether the prior statement was inconsistent and if so, how

19  much, if any weight to give to the inconsistent statement in

20  determining whether to believe all or part of the witness'

21  testimony.

22       In evaluating the credibility of the witnesses you should

23  take into account any evidence that the witness who testified

24  may benefit in some way from the outcome of this case. Such an

25  interest in the outcome creates a motive to testify falsely

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2127**

1    and may sway the witness to testify in a way that advances his

2    or her own interest. Therefore, if you find that any witness

3    whose testimony you are considering may have an interest in

4    the outcome of this trial, then you should bear that factor in

5    mind when evaluating the credibility of his or her testimony

6    and accept it with great care. This is not to suggest that

7    every witness who has an interest in the outcome of a case

8    will testify falsely. It is for you to decide to what extent,

9    if at all, the witness' interest has affected or colored his

10   or her testimony.

11       In this case I have permitted multiple witnesses

12   including Amber Burns, Christopher Bush, Christopher Iber,

13   Brandon Moroney, Mitchell Dinterman, Julie Kempton, Romy

14   Franco, and Mathew Wilde to express their opinions about

15   matters that are in issue. A witness may be permitted to

16   testify to an opinion on those matters about which he or she

17   has special knowledge, skill, experience, and training. Such

18   testimony is presented to you on the theory that someone who

19   is experienced and knowledgeable in the field can assist you

20   in understanding the evidence or reaching an independent

21   decision on the facts.

22       In weighing this opinion testimony you may consider the

23   witness' qualifications, opinions, the reasons for testifying,

24   as well as all of the other considerations that ordinarily

25   apply when you are deciding whether or not to belive a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2128**

1    witness' testimony. You may give the opinion testimony

2    whatever weight, if any, you find it deserves in light of all

3    of the evidence in this case. You should not, however, accept

4    opinion testimony merely because they allowed the witness to

5    testify to an opinion. Nor should you substitute it for your

6    own reason, judgment, and common sense. The determination of

7    the facts in this case rest solely with you.

8         You've heard the testimony of law enforcement officers.

9    The fact that a witness may be employed by the federal or

10   state government as a law enforcement officer does not mean

11   that his or her testimony is necessarily deserving of more or

12   less consideration, or greater or lesser weight than an

13   ordinary witness. At the same time, it is quite legitimate for

14   defense counsel to try to attack the credibility of a law

15   enforcement witness on the grounds that his or her testimony

16   may be colored by a personal or professional interest in the

17   outcome of the case. It is your decision after reviewing all

18   of the evidence, whether to accept the testimony of a law

19   enforcement witness and to give that testimony whatever

20   weight, if any, you find it deserves.

21        The Government has called as witnesses individuals who

22   are alleged by the Government to be co-conspirators but who

23   are not charged as defendants. The Government may argue as it

24   is permitted to do that it must take the witnesses as it find

25   them and that only people who themselves take part in criminal

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2129**

 1    activity have the knowledge required to show criminal behavior

 2    by others. For these reasons, the law allows the use of

 3    co-conspirator testimony. The testimony of co-conspirators may

 4    be enough in itself for a conviction if the jury finds that

 5    the testimony establishes guilt beyond a reasonable doubt.

 6    However, it is also the case that co-conspirator testimony is

 7    of such nature that it must be scrutinized with great care and

 8    viewed with particular caution when you decide how much of

 9    that testimony to believe. You should consider whether the

10    witnesses have an interest in the outcome of this trial and

11    whether they have a motive to testify falsely. You may accept

12    their testimony if you believe it to be true, but it is up to

13    you, the jury, to decide what weight, if any, to give to the

14    testimony.

15        You have heard the testimony of certain witnesses who

16    have been promised that in exchange for testifying truthfully,

17    completely, and fully, they will not be prosecuted for any

18    crimes that may have been admitted -- that they may have

19    admitted either here in court or in interviews with the

20    prosecutors. This promise was not a formal order of immunity

21    by the Court, but was arranged directly between the witness

22    and the Government. The Government is permitted to make these

23    kinds of promises and may call as witnesses individuals to

24    whom such promises have been given. You may convict a

25    defendant on the basis of such a witness' testimony alone if

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2130**

1    you find that his testimony proves the defendant guilty beyond

2    a reasonable doubt. However, the testimony of a witness who

3    has been promised that he will not be prosecuted should be

4    examined by you with greater care than the testimony of an

5    ordinary witness and should be received with suspicion. You

6    should scrutinize it closely to determine whether or not it is

7    colored in such a way as to place guilt upon the defendant in

8    order to further the witness' own interest. Such a witness

9    when confronted with the realization that he can win his own

10   freedom by helping to convict another has a motive to falsify

11   his testimony. Ultimately, you may give the testimony of such

12   a witness such weight, if any, that you believe it deserves.

13       You've heard testimony from Government witnesses who have

14   pleaded or will plead guilty after entering into an agreement

15   with the Government to testify. There's evidence that the

16   Government promised to bring these witnesses' cooperation to

17   the attention of the sentencing Court in exchange for the

18   witness' agreement to plead guilty and testify on behalf of

19   the Government. The Government is permitted to enter into this

20   kind of plea agreement. You may accept the testimony of such a

21   witness and convict the defendants on the basis of this

22   testimony alone if it convinces you of the defendant's guilt

23   beyond a reasonable doubt.

24       However, you should bear in mind that a witness who has

25   entered into such an agreement has an interest in this case

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2131

 1    different than an ordinary witness.  A witness who realizes

 2    that he may be able to obtain his freedom or get a lighter

 3    sentence by giving testimony favorable to the prosecution has

 4    a motive to testify falsely. Therefore, you must examine his

 5    testimony with caution and with great care. If after

 6    scrutinizing his testimony you decide to accept it, you may

 7    give it whatever weight, if any, you find it deserves.

 8         You've heard the testimony of a witness who was

 9    previously convicted of a crime punishable by more than one

10    year of imprisonment. This prior conviction was brought into

11    evidence for you to consider in evaluating the witness'

12    credibility. You may consider the fact that the witness who

13    testified is a convicted felon in deciding how much of his

14    testimony to accept and what weight, if any, it should be

15    given.

16         There has been evidence that a witness who testified at

17    this trial made false statements under oath in court

18    proceedings in another case. If you find that the witness lied

19    under oath in another case, the testimony of this witness

20    should be viewed cautiously and weighed with great care. It

21    is, however, for you to decide how much of his testimony, if

22    any, you wish to believe.

23         There are several persons whose names you heard during

24    the course of the trial, but who did not appear to testify.

25    Each party had an equal opportunity or lack of opportunity to

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2132**

```
 1    call any of these witnesses. Therefore, you should not draw
 2    any inferences or reach any conclusions as to what their
 3    testimony would have been had they been called to testify.
 4    Their absence should not affect your judgment in any way. You
 5    should, however, remember that the law does not impose on a
 6    defendant in a criminal case the burden or duty of calling any
 7    witnesses or producing any evidence.
 8         The Government has introduced evidence that the
 9    defendants made certain statements in which according to the
10    Government, they admitted certain facts charged in the
11    indictment in this case. In deciding what weight to give to
12    the defendants' statements, you should first examine with
13    great care whether each statement was made and whether in fact
14    it was knowingly and voluntarily made. You are to give the
15    statements such weight as you believe they deserve in light of
16    all of the evidence. I instruct you, however, that the
17    evidence of one defendant's statement to law enforcement about
18    his own conduct may not be considered by you in any way
19    against any defendant on trial other than the defendant who
20    made the statement.
21         You've heard testimony that the defendants made certain
22    statements outside the courtroom to law enforcement
23    authorities and witnesses in which the defendants claimed that
24    their conduct was consistent with innocence and not with
25    guilt. The Government claims that these statements in which
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2133**

1    they exonerated or exculpated themselves are false. If you

2    find that a defendant gave a false statement or false

3    statements in order to divert suspicion from himself, you may

4    but are not required to infer that the defendant believed that

5    he was guilty. You may not, however, infer on the basis of

6    this alone that the defendant is, in fact, guilty of the crime

7    for which he is charged.

8         Whether the evidence as to a defendant's statements shows

9    that the defendant believed that he was guilty and the

10   significance, if any, to be attached to such evidence are

11   matters for you, the jury, to decide.

12        You've heard testimony that one of the defendants

13   knowingly attempted to destroy evidence in this case. If you

14   find that the defendant attempted to destroy evidence in order

15   to mislead investigating authorities, you may, but need not,

16   infer that the defendant believed that he was guilty. You may

17   not, however, infer on the basis of this alone that the

18   defendant is in fact guilty of the crime for which he is

19   charged. Whether evidence that the defendant destroyed

20   evidence shows that the defendant believed that he was guilty

21   and the significance, if any, to be given to such evidence are

22   matters for you, the jury, to decide.

23        Now the defendants did not testify in this case. Under

24   our constitution, a defendant has no obligation to testify or

25   to present any other evidence because it is the Government's

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2134

1    burden to prove the defendants guilty beyond a reasonable

2    doubt. That burden remains with the Government throughout the

3    entire trial and never shifts to the defendants. A defendant

4    is never required to prove that he or she is innocent. You may

5    not attach any significance to the fact that the defendants

6    did not testify. No adverse inference against the defendants

7    may be drawn by you because they did not take the witness

8    stand. You may not consider this against the defendants in any

9    way in your deliberations in the jury room.

10        Now with these general instructions in mind, I will now

11   turn to the charges against the defendants as contained in the

12   second superseding indictment which I will refer to as "the

13   indictment" for short. I emphasize to you that an indictment

14   itself is not evidence and merely describes the charges made

15   against the defendant. It is an accusation and may not be

16   considered by you in any way as evidence of the guilt of that

17   defendant.

18        In reaching your determination as to whether the

19   Government has proved that the defendants are guilty beyond a

20   reasonable doubt, you may consider only the evidence

21   introduced or the lack of evidence. Your role is to decide

22   whether or not the Government has proven beyond a reasonable

23   doubt that the defendants, Scott Anthony Williams and Taeyan

24   Raymond Williams, are guilty of one or more of the charged

25   crimes. You are not being asked whether any other person has

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2135**

1    been proven guilty. Your verdict should be based solely upon

2    the evidence or lack of evidence as to the defendants in

3    accordance with my instructions, and without regard as to

4    whether the guilt of any other person has or has not been

5    proven. You may not draw any inferences, favorable or

6    unfavorable towards the Government or the defendants on trial

7    from the fact that certain persons were not named as

8    defendants in the indictment or identified as co-conspirators

9    but not charged. The fact that such persons are not defendants

10    in this trial must play no part in your deliberations. Whether

11    a person should be named as a co-conspirator in a matter is a

12    matter within the sole discretion of the United States

13    Attorney and the grand jury. Therefore, you may not consider

14    it in any way in reaching your verdict as to the defendants on

15    trial.

16        The indictment names two defendants who are on trial

17    together. In reaching a verdict, however, you must bear in

18    mind that guilt is individual. Your verdict as to each

19    defendant must be determined separately with respect to him,

20    solely on the evidence or lack of evidence presented against

21    him without regard to the guilt or innocence of anyone else.

22    In addition, some of the evidence in this case was limited to

23    one defendant. Specifically, the statements made by Scott

24    Williams to Sergeant Simms during the execution of the search

25    warrant at the Bristolwood Court residence are admissible only

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2136**

1    against Scott Williams and may not be considered as evidence

2    against Taeyan Williams. Let me emphasize that any evidence

3    admitted solely against one defendant may be considered only

4    against that defendant and may not in any respect enter into

5    your deliberations on any other defendant.

6         The defendants are not charged with committing any crimes

7    other than the offenses contained in the indictment. I

8    emphasize to you now that you are not to consider that

9    evidence for any other purpose and you are to return a verdict

10   only as to the charges contained in the indictment.

11        The indictment contains a total of nine counts. Each

12   count charges a defendant with a different crime. You must as

13   a matter of law consider each count of the indictment and each

14   defendant's involvement in that count separately and you must

15   return a separate verdict on each defendant for each count on

16   which he is charged. The case against each defendant or on

17   each count stands or falls upon the proof or lack of proof

18   against the defendant alone -- that defendant alone. And your

19   verdict as to any defendant on any count should not control

20   your decision as to any other defendant or any other count.

21        The indictment alleges that the offenses occurred on

22   certain dates or at certain times. It does not matter if that

23   indictment charges that a specific act occurred on or about a

24   certain date or time and the evidence shows that in fact it

25   was on another date or time. The law only requires a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2137

1    substantial similarity between the dates alleged in the

2    indictment and the dates established by testimony or exhibits.

3        Although the indictment may charge the defendants with

4    committing an offense in several ways, that is, by using the

5    word "and" between the multiple means of committing the

6    offense, it's not necessary for the Government to prove that a

7    defendant did each of the facts named in a particular count of

8    the indictment. It is sufficient for the Government if the

9    Government proves beyond a reasonable doubt that a defendant

10   did one of the alternative acts as charged, as long as you all

11   agree that the same particular alternative act was committed

12   by the defendant and that every element of the offense has

13   been proven beyond a reasonable doubt.

14       So the indictment contains nine counts against the

15   defendants as follows: Count One charges both defendants with

16   conspiracy to distribute and possess with intent to distribute

17   controlled substances; Count Two charges both defendants with

18   conspiracy to interfere with interstate commerce by robbery or

19   extortion; Count Three charges both defendants with

20   interference with interstate commerce by robbery or extortion;

21   Count Four charges both defendants with kidnapping with death

22   resulting; Count Five charges both defendants with possessing,

23   using, carrying and brandishing a firearm during and in

24   relation to and in furtherance of a crime of violence or a

25   drug trafficking crime; Count Six charges both defendants with

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2138

```
 1    possession with intent to distribute controlled substances;
 2    Count Seven charges defendant, Scott Anthony Williams, with
 3    possession with intent to distribute controlled substances;
 4    Count Eight charges defendant, Scott Anthony Williams, with
 5    possession of a firearm in furtherance of a drug trafficking
 6    crime; and Count Nine charges defendant, Scott Anthony
 7    Williams, with conspiracy to destroy or conceal evidence.
 8         The defendants have pleaded not guilty to these charges.
 9    In order to help you understand the charges, I will discuss
10    these nine counts in three groups. First, there are Counts
11    Three, Four, Six and Seven which I will refer to as the
12    substantive counts which are specific federal crimes.
13         Second, there are Counts One, Two and Nine which I will
14    refer to as the conspiracy counts because they all involve a
15    charge of conspiracy to commit other crimes, including some of
16    the substantive offenses.
17         Third, there are Counts Five and Eight which I will refer
18    to as the firearms counts because they each involve a charge
19    relating to firearms possessed or used in connection with one
20    or more of the substantive or conspiracy counts.
21         Because an understanding of the substantive counts is
22    necessary in order to understand the conspiracy counts and the
23    firearms counts, I will discuss the substantive counts first,
24    then the conspiracy counts, and finally the firearms counts.
25         Count Three -- I'll start with Count Three.  The
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2139**

```
 1   indictment charges the defendants, Scott Anthony Williams and
 2   Taeyan Raymond Williams, with interference with interstate
 3   commerce by robbery or extortion. The indictment reads as
 4   follows: On or about April 6, 2018 in the District of
 5   Maryland, the defendants, Scott Anthony Williams and Taeyan
 6   Raymond Williams, did knowingly and unlawfully obstruct,
 7   delay, and affect and attempt to obstruct, delay, and affect
 8   commerce by robbery and extortion as those terms are defined
 9   in 18 United States Code § 1951 by (a), the unlawful taking
10   and obtaining of personal property from the person and in the
11   presence of Noah Smothers, including marijuana, marijuana
12   products, money, a cellular device, a PIN for Smothers'
13   storage unit, Smothers' Kia Sportage, and other items that
14   were in Smothers' possession against Smothers' will by means
15   of actual and threatened force and violence and fear of
16   injury, immediate and future, to Noah Smothers' person and
17   property.
18       And (b), the obtaining of property from Smothers
19   including marijuana, marijuana products, money, a cellular
20   device, a PIN for Smothers' storage unit, Smothers' Kia
21   Sportage and other items that were in Smothers' possession and
22   stored at the Jessup storage facility without Smothers'
23   consent induced by wrongful use of actual and threatened
24   force, violence, and fear.
25       In order to find the defendant guilty of Count Three you
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2140**

1    must find that the defendant committed either 1) interference

2    with interstate commerce by robbery; or 2) interference with

3    interstate commerce by extortion.

4        Robbery is the unlawful taking or obtaining of personal

5    property of another against his will by threatening or

6    actually using force, violence, or fear of injury, immediately

7    or in the future, to person or property. In order to prove

8    that a defendant interfered with interstate commerce by

9    robbery, the Government must prove each of the following

10    elements beyond a reasonable doubt: First, that the defendant

11    knowingly obtained or took the personal property of another

12    person or from the presence of another person; second, that

13    the defendant took this property against the victim's will by

14    actual or threatened force, violence, or fear of injury,

15    whether immediately or in the future; and third, that as a

16    result of the defendant's actions interstate commerce or an

17    item moving in interstate commerce was delayed, obstructed, or

18    affected in any way or degree.

19        The first element the Government must prove beyond a

20    reasonable doubt is that the defendant knowingly obtained or

21    took the personal property of another person, or from the

22    presence of another person. A person acts knowingly if he acts

23    intentionally and voluntarily, not because of ignorance,

24    mistake, accident, or carelessness. The term "property"

25    includes money or other tangible and intangible things of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2141**

1    value that are capable of being transferred from one person to

2    another. Specifically, the defendants are alleged to have

3    taken the personal property of Noah Smothers, including

4    marijuana, marijuana products, money, a cellular device, a PIN

5    for his storage unit, his Kia Sportage, and other items that

6    were in his possession and stored at the Jessup storage

7    facility.

8        The second element the Government must prove beyond a

9    reasonable doubt is that the defendant unlawfully took this

10   property against the victim's will by actual or threatened

11   force, violence, or fear of injury whether immediately or in

12   the future. In considering whether the defendant used or

13   threatened to use force, violence, or fear, you should give

14   those words their common and ordinary meaning and understand

15   them as you normally would. The use or threat of violence does

16   not have to be directed at the person whose property was

17   taken. The use or threat of violence does not have to be

18   directed at the -- the use or threat of force might be aimed

19   at a third person or causing economic rather than physical

20   injury. A threat may be made verbally or by a physical

21   gesture. Whether a statement or physical gesture was a threat

22   depends upon the surrounding facts.

23       Fear exists if a victim experiences anxiety, concern, or

24   worry over expected personal harm or business loss or over

25   financial or job security. The existence of fear must be

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2142**

 1    determined by the facts existing at the time of the

 2    defendant's actions. Whether a defendant used or threatened

 3    fear of injury involves a decision about the victim's state of

 4    mind at the time of the offense. Although it is impossible to

 5    ascertain or prove directly a person's subjective feeling, a

 6    careful consideration of the circumstances and evidence should

 7    enable you to decide whether fear would reasonably have been

 8    the victim's state of mind. Looking at the situation and the

 9    actions of people involved may help you to determine what

10    their state of mind was. You can consider such circumstantial

11    evidence in deciding whether the property was obtained by the

12    use or threat of fear.

13        You may also consider the relationship between the

14    defendant and the alleged victim in deciding whether the

15    elements of fear exists. However, a friendly relationship

16    between the parties does not mean that you cannot find that

17    fear exists.

18        The third element that the Government must prove beyond a

19    reasonable doubt is that the defendant's actions affected

20    interstate commerce in any way or degree. You must determine

21    whether there's an actual or potential effect on commerce

22    between any two or more states, or between one state and the

23    District of Columbia, or between a state and a U.S. territory

24    or possession, or on commerce within one state that goes

25    through anyplace outside that state.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2143

1    The effect can be minimal. If you decide that interstate

2    commerce would potentially or probably be affected if the

3    defendant had successfully and fully completed his actions,

4    then the element of affecting interstate commerce is

5    satisfied. However, if the defendant has finished his actions

6    and done all he intended to do and you find there has been no

7    effect on interstate commerce, then you cannot find that this

8    element has been established.

9    You do not have to decide whether the effect on

10   interstate commerce was harmful or beneficial to a particular

11   business or to commerce in general. The Government satisfied

12   his burden of proving an effect on interstate commerce if it

13   proved beyond a reasonable doubt any effect, whether it was

14   harmful or not. The defendant need not have intended or

15   anticipated an effect on interstate commerce. If you find that

16   the defendant intended to take certain actions, that is, he

17   did the acts charged in the indictment in order to obtain

18   property, and you find those actions have either caused or

19   would probably cause an effect on interstate commerce, then

20   you may find the requirements of this element have been

21   satisfied.

22   The distribution and trafficking of controlled substances

23   affects interstate commerce. If you find that the defendant

24   took controlled substances from Noah Smothers, including

25   marijuana or illegal proceeds derived from controlled

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2144**

1  substances including marijuana, that is sufficient to find

2  that the offense had an effect on interstate commerce.

3      Extortion is the obtaining of another person's property

4  or money with his consent. This consent is induced or brought

5  upon through the use or threatened use of force, violence, or

6  fear. In order to prove that a defendant interfered with

7  interstate commerce by extortion, the Government must prove

8  each of the following elements beyond a reasonable doubt.

9  First, that the defendant wrongfully obtained the property of

10  another person; second, that the defendant obtained this

11  property with the victim's consent, but that this consent was

12  compelled by the wrongful use or threat of force, violence, or

13  fear; and third, that as a result of the defendant's actions,

14  interstate commerce or an item moving in interstate commerce

15  was delayed, obstructed, or affected in any way or degree.

16      The first element that the Government must prove beyond a

17  reasonable doubt is that the defendant wrongfully obtained or

18  took the personal property of another person or from the

19  presence of another person. The term "property" includes money

20  and other tangible and intangible things of value that are

21  capable of being transferred from one person to another.

22  Specifically, the defendants are alleged to have taken the

23  personal property of Noah Smothers including marijuana,

24  marijuana products, money, a cellular device, a PIN for a

25  storage unit, his Kia Sportage, and other items that were in

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2145**

1    his possession and stored at the Jessup storage facility.

2         If you decide that force or violence used or threatened

3    to -- was used or threatened to obtain the property, then that

4    is wrongful. If you do -- you do not have to consider whether

5    the defendant believed that the property is rightfully his.

6    Using force or violence, or threats of force or violence to

7    obtain property is wrongful.

8         The second element that the Government must prove beyond

9    a reasonable doubt is that the defendant wrongfully took the

10   property by actual or threatened force, violence, or fear of

11   injury, or economic harm whether immediately or in the future.

12   In considering whether the defendant used or threatened to use

13   force, violence, or fear, you should give those words their

14   common and ordinary meaning and understand them as you

15   normally would. The use or threat of violence does not have to

16   be directed at the person whose property was taken. The use or

17   threat of force or violence might be aimed at a third person

18   or causing economic, rather than physical injury.

19        A threat may be made verbally or by a physical gesture.

20   Whether a statement or physical gesture was a threat depends

21   upon the surrounding circumstances -- upon the surrounding

22   facts.

23        As to fear of injury, you should apply instruction number

24   48 which I just described which relates to this issue for the

25   crime of interference with interstate commerce by robbery.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2146**

```
 1          The third element that the Government must prove beyond a
 2     reasonable doubt is that the defendant's actions affected
 3     interstate commerce in any way or degree. In considering this
 4     element, you should apply instruction number 49 relating to
 5     the crime of interference with interstate commerce by robbery.
 6          So next is Count Four of the indictment which charges the
 7     defendants, Scott Anthony Williams and Taeyan Raymond
 8     Williams, with kidnapping resulting in death. The indictment
 9     reads as follows: On or about April 6, 2018 in the District of
10     Maryland and elsewhere, the defendants, Scott Anthony Williams
11     and Taeyan Raymond Williams, did unlawfully seize, confine,
12     inveigle, decoy, kidnap, abduct, and carry away Noah Smothers
13     and held Smothers for ransom and reward and otherwise for any
14     reason that was of benefit to the defendants, including but
15     not limited to gain access to Smothers' storage unit, to avoid
16     paying a debt owed by the defendants to Smothers, and to
17     become the local intermediary for shipments of marijuana from
18     Jacob Rayburn in California when a defendant used a means,
19     facility, and instrumentality of interstate commerce. That is
20     a cell phone, the internet, and a rental vehicle in committing
21     and in furtherance of the commission of the offense which
22     conduct resulted in the death of Smothers.
23          In order to prove that a defendant committed the crime of
24     kidnapping with death resulting, the Government must prove
25     each of the following elements beyond a reasonable doubt:
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2147**

```
 1    First, that the defendant seized, confined, inveigled,
 2    decoyed, kidnapped, or carried away Noah Smothers; second,
 3    that the defendant held Mr. Smothers for ransom, reward, or
 4    for any other reason; third, that the defendant used a means,
 5    facility, or instrumentality of interstate commerce in
 6    committing or in furtherance of the commission of the offense;
 7    fourth, that the defendant acted unlawfully, knowingly, and
 8    willfully; and fifth, that the defendant's acts resulted in
 9    the death of Mr. Smothers.
10        The first element that the Government must prove beyond a
11    reasonable doubt is that the defendant seized, confined,
12    inveigled, decoyed, kidnapped, abducted, or carried away Noah
13    Smothers. Kidnap means to take and carry away a person by
14    force and against his or her will. Seize, confine, abduct, and
15    carry away all mean the physical or bodily taking and carrying
16    away of a person, or the holding or restricting of someone by
17    force or without that person's consent. Inveigle means the
18    enticement, cajoling, or tempting of a victim, usually through
19    some deceitful means such as false promises or
20    representations.  Decoy means the enticement or luring of a
21    victim by means of some fraud, trick, or temptation.
22    Inveigling and decoying involve the non-forceful takings of a
23    victim by which a kidnapper lures or entices the victim into
24    accompanying him.
25        To find the defendant inveigled or decoyed Noah Smothers
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2148**

1  into accompanying them, you must find beyond a reasonable

2  doubt that the defendant had the willingness and intent to use

3  physical or psychological force to complete the kidnapping in

4  the event that the deception failed.

5      The second element that the Government must prove beyond

6  a reasonable doubt is that the defendant held Noah Smothers

7  for ransom, reward, or some other reason. In this count the

8  Government charges that the defendant held Noah Smothers in

9  order to gain access to Noah Smothers' storage unit, avoid

10  paying a debt owed by the defendants to Mr. Smothers, and

11  become the local intermediary for shipments of marijuana from

12  Jacob Rayburn in California. This element is satisfied if the

13  Government proves that at the time that a defendant seized,

14  confined, or kidnapped Noah Smothers, the defendant did so for

15  any of the purposes or reasons charged in the indictment. If

16  you find the defendant did not hold Noah Smothers for the

17  reasons charged in the indictment or if you have a reasonable

18  doubt as to this element, then you must find that defendant

19  not guilty.

20      The third element that the Government must prove beyond a

21  reasonable doubt is that the defendant used a means, facility,

22  or instrumentality of interstate or foreign commerce in

23  committing or in furtherance of the commission of the offense.

24  The term means, facility, or instrumentality of interstate or

25  foreign commerce includes the use of a telephone, the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2149**

     1   internet, or a rental vehicle in furtherance of the commission

     2   of the offense.

     3        The fourth element that the Government must prove beyond

     4   a reasonable doubt is that the defendant acted unlawfully,

     5   knowingly, and willfully. Unlawfully means contrary to law. An

     6   act is done knowingly if it is done purposely and

     7   intentionally as opposed to mistakenly or inadvertently. An

     8   act is done willfully if it is done knowingly and with the

     9   intent to do something the law forbids or with a bad purpose

    10   either to disobey or disregard the law.

    11        In order to satisfy this element, the Government must

    12   show that the defendant knew that Noah Smothers was not

    13   accompanying him voluntarily, but instead was forced, coerced,

    14   or tricked to come along.

    15        The fifth element that the Government must prove beyond a

    16   reasonable doubt is that Noah Smothers is dead and that his

    17   death resulted from the willful and intentional conduct of the

    18   defendant. In order to establish that a defendant's conduct

    19   resulted in the death of Noah Smothers, the Government must

    20   prove beyond a reasonable doubt that but for the defendant's

    21   actions, Noah Smothers would not have died.

    22        Now if after careful consideration of all of the evidence

    23   you find that as to a particular defendant the Government has

    24   not proven each of the elements of kidnapping with death

    25   resulting beyond a reasonable doubt, then you must find that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2150**

```
 1    defendant not guilty on that charge. In that instance you must
 2    then consider whether the defendant is guilty of the lesser
 3    included offense of kidnapping. Kidnapping has the same first
 4    four elements as kidnapping with death resulting, but does not
 5    include the fifth element of death resulting. Thus to prove
 6    the charge of kidnapping, the Government must establish each
 7    of the following elements beyond a reasonable doubt: First,
 8    that the defendant seized, confined, inveigled, decoyed,
 9    kidnapped, abducted, or carried away Noah Smothers; second,
10    that the defendant held Mr. Smothers for ransom, reward, or
11    for any other reason; third, the defendant used a means,
12    facility, or instrumentality of interstate commerce in
13    committing or in furtherance of the commission of the offense;
14    and fourth, that the defendant acted unlawfully, knowingly and
15    willfully.
16        If you find that the Government has proven all of these
17    elements beyond a reasonable doubt then you must find the
18    defendant guilty of the lesser included offense to Count Four,
19    kidnapping.
20        Count Six and Seven of the indictment charge both
21    defendants, Scott Anthony Williams and Taeyan Williams -- I'm
22    sorry, Count Six of the indictment charges both defendants,
23    Scott Anthony Williams and Taeyan Raymond Williams with
24    possession with intent to distribute a controlled substance.
25    The indictment reads as follows: On or about June 6, 2018 in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2151**

```
 1    the District of Maryland, the defendants, Scott Anthony
 2    Williams and Taeyan Raymond Williams, did knowingly possess
 3    with the intent to distribute a mixture and substance
 4    containing a detectable amount of cocaine, a Schedule II
 5    controlled substance, and a mixture and substance containing a
 6    detectable amount of marijuana, a Schedule I controlled
 7    substance.
 8        Count Seven of the indictment charges defendant Scott
 9    Anthony Williams with possession with intent to distribute
10    controlled substances. The indictment reads as follows: On or
11    about June 6, 2018 in the District of Maryland, the defendant,
12    Scott Anthony Williams, did knowingly possess with the intent
13    to distribute 500 grams or more of a mixture and substance
14    containing a detectable amount of methamphetamine, its salts,
15    isomers, and salts of its isomers, a Schedule II controlled
16    substance.
17        In order to prove that a defendant committed the crime of
18    possession with intent to distribute a controlled substance,
19    the Government must prove each of the following elements
20    beyond a reasonable doubt: First, that the defendant possessed
21    a controlled substance; second, that the defendant knew that
22    he possessed the controlled substance; and third, that the
23    defendant possessed the controlled substance with the intent
24    to distribute it.
25        The first element that the Government must prove beyond a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2152**

1    reasonable doubt is that the defendant possessed a controlled

2    substance. For purposes of Count Six, I instruct you that

3    cocaine and marijuana are controlled substances. For purposes

4    of Count Seven, I instruct you that methamphetamine is a

5    controlled substance.

6         Possession of a controlled substance may be actual or

7    constructive. Actual possession is what most of us think of as

8    possession, that is, having physical custody or control of an

9    object. For example, if you find that the defendant had the

10    drugs on his person, you may find that he had possession of

11    the drugs. However, a person may need not have actual physical

12    custody of an object in order to be in legal possession of

13    that item. Constructive possession occurs when an individual

14    has the ability and intent to exercise substantial control

15    over an object that he does not have in his physical custody.

16         An example of this from everyday experience is a person's

17    possession of items kept in the safe deposit box of his bank.

18    Although the person does not have physical custody of those

19    items, he exercises substantial control over them and so has

20    legal possession of them.

21         Possession may be sole or joint. If one person alone

22    possesses something, that is sole possession. However, it is

23    possible that more than one person has the power and intention

24    to exercise control over the drugs. This is called joint

25    possession. If you find that the individual had such power and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2153

1    intention that he possessed the drugs under this element, then
2    he possessed the drug under this element even if he possessed
3    the drugs jointly with another person. Possession of drugs
4    cannot be found solely on the ground that the defendant was
5    near or close to the drugs, nor can be found merely because
6    the defendant was present at a scene where drugs were involved
7    or solely because the defendant associated with a person who
8    did control drugs or the property at which they were found.
9    However, you may consider these factors in connection with all
10   the other evidence in making your decision whether a defendant
11   possessed the drugs.
12       To establish that a defendant knew that the drug was a
13   controlled substance the Government must prove that the
14   defendant knew that he possessed a controlled substance and
15   that his possession was not due to carelessness, negligence,
16   or mistake.  If you find that the defendant did not know that
17   he had controlled substances in his possession or he did not
18   know that what he possessed was, in fact, controlled
19   substances, then you must find the defendant not guilty.
20       Although the Government must prove that the defendant
21   knew that he possessed a controlled substance, the Government
22   does not have to prove that the defendant knew the exact
23   nature of the controlled substance in his possession. It is
24   enough that the Government prove that the defendant knew that
25   he possessed some kind of controlled substance.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2154

1    The third element that the Government must prove beyond a
2    reasonable doubt is that the defendant intended to distribute
3    the controlled substance. To distribute a controlled substance
4    means to deliver a controlled substance. Deliver is defined as
5    the actual, constructive, or attempted transfer of a
6    controlled substance. Distribute and deliver mean to pass on
7    or to hand over to another, or to cause to be passed on or
8    handed over to another, or to try to pass on or hand over to
9    another. For example, if A tells or orders B to hand over the
10   controlled substance to C, then A has caused the controlled
11   substance to be handed over and therefore has distributed it.

12   Distribution does not require a sale. Activities in
13   furtherance of the ultimate sale such as vouching for the
14   quality of controlled substance, negotiating for or receiving
15   the price, and supplying or delivering the controlled
16   substance may constitute distribution. In short, distribution
17   requires a concrete involvement in the transfer of the
18   controlled substance.

19   To establish intent to distribute, the Government must
20   prove that the defendant had control over the controlled
21   substance with a state of mind or purpose to transfer it to
22   another person. You need not find the defendant intended
23   personally to distribute or deliver the controlled substance.
24   It is sufficient if you find that the defendant intended to
25   cause or assist in the distribution of the controlled

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2155**

 1    substance.

 2         Since you cannot read the defendant's mind, you may make

 3    inferences from the defendant's behavior. However, you may not

 4    convict the defendant unless these inferences convince you

 5    beyond a reasonable doubt that the defendant intended to

 6    distribute the drugs. The same considerations that apply to

 7    your determination whether the defendant knew he possessed

 8    drugs apply to your decision concerning the defendant's

 9    intention to distribute them.

10         In assessing intent to distribute, what you are

11    determining is whether the drugs possessed by the defendant

12    were for the defendant's personal use or for the purpose of

13    distribution. Often it is possible to make this determination

14    from the quantity of drugs involved in the offense. For

15    example, it would be highly unlikely that a person with 50,000

16    doses of a drug possessed them all for personal consumption.

17    The presence of a large quantity of drugs does not necessarily

18    mean that the defendant intended to distribute them. On the

19    other hand, a defendant may have intended to distribute drugs

20    even if he did not possess large amounts of them. Other

21    physical evidence such as paraphernalia for the packaging or

22    processing of drugs can show such an intent. There might also

23    be evidence of a plan to distribute.

24         Next I will discuss the conspiracy counts which are

25    Counts One, Two, and Nine. In each of these counts, the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2156**

1    defendants are charged with having been members of a

2    conspiracy to violate certain federal laws. A conspiracy is a

3    kind of criminal partnership, a combination or agreement of

4    two or more persons to join together to accomplish an unlawful

5    purpose. The crime of conspiracy to violate a federal law is

6    an independent offense. It is separate and distinct from the

7    actual violation of any substantive crime such as those

8    charged in Counts Three, Four, Six, and Seven. Thus, you may

9    find a defendant guilty of the crime of conspiracy to commit

10   an offense even though the substantive crime that was the

11   object of the conspiracy was not actually committed. You may

12   also find a defendant guilty of conspiracy even if he was

13   incapable of committing the substantive offense. Congress has

14   deemed it appropriate to make conspiracy standing alone a

15   separate crime even if the conspiracy is not successful.  That

16   is because collective criminal activity poses a greater threat

17   to the public safety and welfare than individual conduct and

18   increases the likelihood of success of a particular criminal

19   venture.

20       Count One of the indictment charges the defendants, Scott

21   Anthony Williams and Taeyan Raymond Williams, with conspiracy

22   to distribute and possess with intent to distribute controlled

23   substances. The indictment reads as follows: Beginning no

24   later than August 2016 and continuing through at least on or

25   about June 6, 2018, in the District of Maryland and elsewhere,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2157

1    the defendants, Scott Anthony Williams and Taeyan Raymond

2    Williams did knowingly combine, conspire, confederate and

3    agree with each other, Noah Smothers and others known and

4    unknown to the grand jury, to distribute and possess with the

5    intent to distribute controlled substances including a mixture

6    and substance containing a detectable amount of cocaine, a

7    Schedule II controlled substance; and a mixture and substance

8    containing a detectable amount of marijuana, a Schedule I

9    controlled substance, all in violation of 21 United States §

10   841(a)(1).

11        In order to establish that a defendant is guilty of

12   conspiracy to distribute and possess with intent to distribute

13   controlled substances, the Government must prove each of the

14   following elements beyond a reasonable doubt: First, that two

15   or more persons entered into the unlawful agreement charged in

16   Count One of the indictment, specifically an unlawful

17   agreement to distribute and possess with the intent to

18   distribute controlled substances including cocaine and

19   marijuana; and second, that the defendant knowingly and

20   willfully became a member of the conspiracy with the intent to

21   further its unlawful purpose.

22        I've already provided you with instructions on

23   distribution of and possession with intent to distribute

24   controlled substances in instructions number 62 through 66.

25   You should consider those instructions in determining whether

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2158**

1    the commission of the crime of distribution or possession with

2    intent to distribute controlled substances was the object of

3    the conspiracy. However, you may find the defendant guilty of

4    the crime of conspiracy to distribute or possess with intent

5    to distribute controlled substances even if it was not

6    actually committed.

7         The first element that the Government must prove beyond a

8    reasonable doubt to establish the offense of conspiracy is

9    that two or more persons entered the unlawful agreement

10   charged in the relevant count of the indictment. In order for

11   the Government to satisfy this element, you need not find that

12   the alleged members of the conspiracy met together and entered

13   into any express or formal agreement. Similarly, you need not

14   find that the alleged co-conspirator stated in words or in

15   writing what the scheme was, its object or purpose, or every

16   precise detail of the scheme or the means by which its object

17   or purpose was to be accomplished. What the Government must

18   prove is that there was a mutual understanding, either spoken

19   or unspoken, between two or more persons -- two or more people

20   to cooperate with each other to accomplish an unlawful act.

21        You may find that the existence of an agreement to

22   disobey or disregard the law has been established by direct

23   proof. However, since conspiracy is by its very nature

24   characterized by secrecy, you may also infer its existence

25   from the circumstances of this case and the conduct of the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2159**

1    parties involved. In the context of conspiracy cases, actions

2    often speak louder than words. You may in determining whether

3    an agreement existed here, consider the actions and statements

4    of all of those you find to be participants as proof that a

5    common design existed on the part of the persons charged to

6    act together to accomplish an unlawful purpose.

7        The second element that the Government must prove beyond

8    a reasonable doubt to establish the offense of conspiracy is

9    that the defendant knowingly, willfully, and voluntarily

10   became a member of the conspiracy with the intent to further

11   its unlawful purpose. In deciding whether a particular

12   defendant was in fact a member of the conspiracy, you should

13   consider whether the defendant knowingly and willfully joined

14   the conspiracy. Did he participate in it with the knowledge of

15   its unlawful purpose and with the specific intention of

16   furthering its objective as an associate or worker.

17       A person acts knowingly if he acts intentionally and

18   voluntarily and not because of ignorance, mistake, accident,

19   or carelessness. Whether the defendant acted knowingly may be

20   proven by the defendant's conduct and by all of the facts and

21   circumstances surrounding the case.

22       A person acts willfully if he acts with knowledge that

23   his conduct is unlawful and with the intent to do something

24   the law forbids. That is to say with the bad purpose to

25   disobey or to disregard the law. A defendant's conduct was not

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2160**

 1      willful if it was due to negligence, inadvertence, or mistake.

 2          In order for a defendant to be deemed a participant in a

 3      conspiracy he must have had a stake in the venture or its

 4      outcome. While proof of a financial interest in the outcome of

 5      a scheme is not essential, if you find that a defendant had

 6      such an interest, that is a factor that you may properly

 7      consider in determining whether or not the defendant was a

 8      member of the conspiracy charged in this count.

 9          Before a defendant can be found to have been a

10      conspirator, you must first find that he knowingly joined in

11      the unlawful agreement or plan. The key question therefore is

12      whether the defendant joined the conspiracy with an awareness

13      of at least some of the basic aims and purposes of the

14      unlawful agreement.

15          A defendant's participation in the conspiracy must be

16      established by independent evidence of his own acts or

17      statements, as well as those of the other alleged

18      co-conspirators and the reasonable inferences that may be

19      drawn from them.

20          A defendant's knowledge is a matter of inference from the

21      facts proved. To become a member of the conspiracy, a

22      defendant need not have known the identities of each and every

23      other member, nor need he have been apprised of all of their

24      activities. Moreover, a defendant need not have been fully

25      informed as to all of the details or the scope of the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2161**

1    conspiracy in order to justify an inference of knowledge on

2    his part. The defendant need not have joined in all of the

3    conspiracy's unlawful objectives.

4        The extent of a defendant's participation has no bearing

5    on the issue of a defendant's guilt. A conspirator's liability

6    is not measured by the extent or duration of his

7    participation. Indeed, each member may perform separate and

8    distinct acts and may perform them at different times. Some

9    conspirators play major roles, while others play minor parts

10   in the scheme. An equal role is not what the law requires.

11   Even a single act may be sufficient to draw the defendant

12   within the ambit of the conspiracy.

13       A defendant's mere presence at the scene of the alleged

14   crime does not by itself make him a member of the conspiracy.

15   Likewise, association with one or more members of the

16   conspiracy does not automatically make a defendant a member. A

17   person may know or be friendly with a criminal without being a

18   criminal himself. Similarity of conduct or the fact that they

19   may have assembled together and discussed common aims and

20   interest does not necessarily establish membership in the

21   conspiracy.

22       Mere knowledge or acquiescence without participation in

23   the unlawful plan is not sufficient. The fact that the acts of

24   a defendant without knowledge merely happened to further the

25   purposes or objectives of the conspiracy does not make a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2162

1    defendant a member. More is required under the law. What is
2    necessary is that a defendant must have participated with
3    knowledge of at least some of the purposes or objectives of
4    the conspiracy and with the intention of aiding in the
5    accomplishment of those unlawful ends.
6        In sum, a defendant with an understanding of the unlawful
7    character of the conspiracy must have intentionally engaged,
8    advised, or assisted in it for the purpose of furthering the
9    illegal undertaking. He thereby becomes a knowing and willful
10   participant in the unlawful agreement, that is to say, a
11   conspirator.
12       Count Two of the indictment charges the defendants, Scott
13   Anthony Williams and Taeyan Raymond Williams, with conspiracy
14   to interfere with interstate commerce by robbery or extortion.
15   The indictment reads as follows: From on or about April 3rd to
16   or on about April 8, 2018 in the District of Maryland and
17   elsewhere, the defendants, Scott Anthony Williams and Taeyan
18   Raymond Williams, did knowingly combine, conspire,
19   confederate, and agree between each other and with other
20   persons known and unknown to the grand jury, to obstruct,
21   delay, and affect commerce and the movement of an article and
22   commodity in commerce by robbery and extortion as those terms
23   are defined in Title 18 United States Code § 1951 by (a) the
24   unlawful taking and obtaining of personal property from the
25   person and in the presence of Noah Smothers including

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2163**

1  marijuana, marijuana products, money, a cellular device, a PIN

2  for Smothers' storage unit, Smothers' Kia Sportage and other

3  items that were in Smothers' possession against Smothers' will

4  by means of actual and threatened force of violence and fear

5  of injury, immediate and future to Smothers' person and

6  property. And (b), the obtaining of property from Smothers

7  including marijuana, marijuana products, money, a cellular

8  device, a PIN for Smothers' storage unit, Smothers' Kia

9  Sportage, and other items that were in Smothers' possession

10 and stored at the Jessup storage facility with Smothers'

11 consent induced by wrongful use of actual threatened force,

12 violence, and fear.

13       In order to prove that a defendant conspired to interfere

14 with interstate commerce by robbery or extortion, the

15 Government must prove each of the following elements beyond a

16 reasonable doubt: First, that two or more persons entered into

17 the unlawful agreement charged in Count Two which was an

18 agreement to commit the crime of interference with interstate

19 commerce by robbery or extortion; and second, that the

20 defendant knowingly and willfully became members of that

21 conspiracy.

22       As to the first element, instruction number 70 on the

23 existence of an agreement applies except that the unlawful

24 agreement at issue in this count is an agreement to commit the

25 crime of interference with interstate commerce by robbery or

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2164

 1    extortion. I've already provided you with instruction on the
 2    elements of this crime in instructions numbers 45 through 53
 3    relating to Count Three. You should consider those
 4    instructions in determining whether the commission of the
 5    crime of interference with interstate commerce by robbery or
 6    extortion was the object of the conspiracy. However, you need
 7    not find that the crime of interference with interstate
 8    commerce by robbery or extortion was actually committed in
 9    order to find that a defendant committed the crime of
10    conspiracy to interfere with interstate commerce by robbery or
11    extortion.

12        As to the second element, membership of the conspiracy,
13    you should apply instruction number 71.

14        Count Nine of the indictment charges the defendant, Scott
15    Anthony Williams with destroying or concealing evidence in an
16    official proceeding. The indictment reads as follows: Between
17    in or about June 6, 2018 and January 24, 2019 in the District
18    of Maryland and elsewhere, the defendant, Scott Anthony
19    Williams, did knowingly combine, conspire, confederate, and
20    agree with at least one other person, known and unknown to the
21    grand jury to attempt to corruptly alter, destroy, mutilate
22    and conceal records, documents, and objects, that is,
23    methamphetamine pills, iCloud data, electronic data and
24    internet data and data stored on cellular telephones with the
25    intent to impair the records, documents, and objects'

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2165**

 1    integrity and availability for use in an official proceeding.

 2        In order to establish that the defendant, Scott Anthony

 3    Williams is guilty of conspiracy to destroy or conceal

 4    evidence in an official proceeding, the Government must prove

 5    each of the following elements beyond a reasonable doubt:

 6    First, that two or more persons entered into an unlawful

 7    agreement to commit the crime of destroying or concealing

 8    evidence in an official proceeding; and second, that the

 9    defendant knowingly and willfully became a member of that

10    conspiracy.

11        The first element that the Government must prove beyond a

12    reasonable doubt is that two or more persons entered into an

13    unlawful agreement set forth in Count Nine, that is, to commit

14    the crime of destroying or concealing evidence in an official

15    proceeding. The objects at issue in Count Nine are first,

16    methamphetamine pills; second, iCloud data, electronic data

17    and internet data; or third, data stored on cellular

18    telephones.

19        In determining whether two or more persons entered into

20    this unlawful agreement, you should apply instruction number

21    70 which I discussed in relation to the conspiracy charge in

22    Count One. In this instance, however, the object of the

23    conspiracy is the crime of destroying or concealing evidence

24    in an official proceeding as referenced in Count Nine.

25        To assist you in determining whether the commission of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2166

```
 1    this crime was the object of the conspiracy, I will provide
 2    you with instructions on the elements of destroying or
 3    concealing evidence in an official proceeding, which are as
 4    follows: First, that the defendant altered, destroyed,
 5    mutilated, or concealed any record, document, or tangible
 6    object as alleged in the indictment; second, that the
 7    defendant acted with the intent to impair the object's
 8    integrity and availability in an official proceeding; and
 9    third, that the defendant acted corruptly.
10        An official proceeding means a proceeding before a court,
11    judge, or federal agency. The proceeding may be civil or
12    criminal. You are instructed that a federal criminal trial is
13    an official proceeding. The law does not require that the
14    federal proceeding be ongoing at the time of the defendant's
15    actions, as long as the proceeding was foreseeable such that
16    the defendant knew that his or her -- that his actions were
17    likely to affect the proceeding. In addition, the Government
18    does not have to prove that the defendant knew that the
19    proceeding would be in federal court.
20        To act corruptly means to act with an improper purpose
21    and to engage in conduct knowingly and dishonestly and with
22    the intent to obstruct, impede, or influence the
23    administration of justice.  You should consider these
24    instructions in determining whether the commission of the
25    crime of destroying or concealing evidence in an official
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2167**

1    proceeding was the object of the conspiracy. However, you need

2    not find that this crime was actually committed in order to

3    find that a defendant committed the crime of conspiracy to

4    destroy or conceal evidence in an official proceeding.

5        For the second element, knowing and willful membership in

6    the conspiracy, you should apply instruction number 71.

7        Now I have admitted into evidence against the defendants

8    the action and statements of others because these acts and

9    statements were committed by persons who the Government

10   charges were co-conspirators of the defendants. The reason for

11   allowing this evidence to be received against the defendants

12   has to do with the nature of the crime of conspiracy. A

13   conspiracy is often referred to as a partnership in crime.

14   Thus, as in other types of partnerships, when people enter

15   into a conspiracy to accomplish an unlawful end, each and

16   every member becomes an agent for the other conspirators in

17   carrying out the conspiracy. Accordingly, the reasonably

18   foreseeable acts, declarations, statements, and omissions of

19   any member of the conspiracy that were in furtherance of the

20   common purpose of the conspiracy are deemed under the law to

21   be the acts of all of the members and all of the members are

22   responsible for such acts, declarations, statements, and

23   omissions.

24       If you find beyond a reasonable doubt that either

25   defendant was a member of the conspiracy to distribute and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2168**

 1    possess with intent to distribute controlled substances as

 2    charged in Count One of the indictment; the conspiracy to

 3    interfere with interstate commerce by robbery or extortion as

 4    charged in Count Two of the indictment; or that defendant,

 5    Scott Anthony Williams, was a member of the conspiracy to

 6    destroy or conceal evidence as charged in Count Nine of the

 7    indictment, that any acts done or statements made in

 8    furtherance of the conspiracy by persons you have found to

 9    have been members of that conspiracy may be considered against

10    that defendant. This rule applies even if such acts were done

11    and statements were made in the defendant's absence and

12    without his knowledge.

13        However, before you may consider the statements or acts

14    of a co-conspirator in deciding the issue of a defendant's

15    guilt, you must first determine that the acts and statements

16    were made during the existence and in furtherance of -- during

17    the existence and in furtherance of the unlawful scheme.

18        If the acts were done or the statements made by someone

19    whom you do not find to have been a member of the conspiracy

20    or if they were not done or said in furtherance of the

21    conspiracy, then you may not consider them as evidence against

22    that defendant.

23        Count Five of the indictment -- I'm now discussing the

24    firearms counts, the last two. Count Five of the indictment

25    charges the defendants, Scott Anthony Williams and Taeyan

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2169**

```
 1      Raymond Williams with first using, carrying, or brandishing a
 2      firearm during and in relation to a crime of violence or drug
 3      trafficking crime; and second, possessing or brandishing a
 4      firearm in furtherance of a crime of violence or a drug
 5      trafficking crime. The indictment reads as follows: On or
 6      about April 6, 2018 in the District of Maryland, the
 7      defendants, Scott Anthony Williams and Taeyan Raymond
 8      Williams, did knowingly use, carry, and brandish a firearm,
 9      that is a Sig Sauer model P-228 9 millimeter handgun bearing
10      serial number B188194 during and in relation to a crime of
11      violence and a drug trafficking crime, namely conspiracy to
12      distribute and possess with intent to distribute controlled
13      substances as charged in Count One; interference with
14      interstate commerce by robbery as charged in Count Three; and
15      kidnapping with death resulting as charged in Count Four. And
16      did knowingly possess and brandish said firearm in furtherance
17      of a crime of violence and a drug trafficking crime, namely
18      conspiracy to distribute and possess with intent to distribute
19      controlled substances as charged in Count One; interference
20      with interstate commerce by robbery as charged in Count Three;
21      and kidnapping with death resulting as charged in Count Four.
22          In Count Five, the defendants are charged with firearms
23      offenses that are based on other crimes referenced in other
24      counts of the indictment, specifically Count One, Count Three,
25      and Count Four. As a result you should consider Count Five as
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2170**

1    to either defendant only if you find that defendant guilty of

2    one of the following counts: Count One for conspiracy to

3    distribute and possess with intent to distribute controlled

4    substances; Count Three for interference with interstate

5    commerce by robbery, but not for interference with interstate

6    commerce by extortion; or Count Four which is kidnapping with

7    death resulting.

8         Count Five is to be considered only if you first find the

9    defendants guilty of Counts One, Three, or Four as charged. It

10   is sufficient to consider Count Five if you find the defendant

11   guilty as to any one of these counts. You need not find the

12   defendant guilty of all of these counts to consider Count

13   Five. If upon consideration of all of the evidence you find

14   that the Government has failed to prove Counts One, Three, and

15   Four beyond a reasonable doubt, then you must find the

16   defendant not guilty -- then you must find the defendant not

17   guilty on Count Five.

18        In reaching your verdict on Count Five you may consider

19   the evidence of Counts One, Three, and Four only for the

20   purpose of determining whether the elements of Count Five have

21   been satisfied. In considering Count Five, you may not

22   consider any evidence that relates to any count other than

23   Counts One, Three, or Four.

24        In order to prove that a defendant used, carried, and

25   brandished a firearm during and in relation to, or possessed

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2171

1    and brandished a firearm in furtherance of a crime of violence

2    or a drug trafficking crime, the Government must establish

3    each of the following elements beyond a reasonable doubt:

4    First, that the defendant committed a crime of violence or

5    drug trafficking crime for which he might be prosecuted in a

6    court of the United States, specifically Count One for

7    conspiracy to distribute and possess with intent to distribute

8    controlled substances; Count Three for interference with

9    interstate commerce by robbery; or Count Four, kidnapping with

10   death resulting.  Second, that the defendant knowingly used or

11   carried a firearm during and in relation to the commission of

12   that crime or possessed a firearm in furtherance of that

13   crime.  And third, that the defendant brandished the firearm.

14       The first element that the Government must prove beyond a

15   reasonable doubt is that the defendant committed a crime of

16   violence or drug trafficking crime for which they might be

17   prosecuted in a court of the United States. The defendants are

18   charged in the indictment with Count One, conspiracy to

19   distribute and possess with intent to distribute a controlled

20   substance; Count Two, interference with interstate commerce by

21   robbery; and Count Four, kidnapping with death resulting. I

22   instruct you that interference with interstate commerce by

23   robbery in Count Three, and kidnapping with death resulting,

24   Count Four, are crimes of violence and that conspiracy to

25   distribute or possess with intent to distribute controlled

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2172**

1    substances as charged in Count One is a drug trafficking

2    crime. However, it is for you to determine whether the

3    Government has proven beyond a reasonable doubt that the

4    defendant committed at least one of the crimes charged in

5    Counts One, Three, or Four.

6        The second element that the Government must prove beyond

7    a reasonable doubt is that the defendant knowingly possessed,

8    used, or carried a firearm in furtherance of or during and in

9    relation to one of the crimes charged in Count One, Count

10   Three, or Count Four.

11       A firearm is any weapon that will or is designed to or

12   may readily be converted to expel a projectile by the action

13   of an explosive. In order to prove that a defendant used a

14   firearm during and in relation to a crime, the Government must

15   prove beyond a reasonable doubt an active employment of the

16   firearm by the defendant during and in relation to the

17   commission of the crime of violence or drug trafficking crime.

18   This element does not require that the defendant must have

19   actually fired or attempted to fire the weapon, although these

20   actions would constitute use of the weapon. Brandishing,

21   displaying, or even referring to the weapon so that others

22   present knew that the defendant had the firearm available, if

23   needed, all constitute use of the firearm. However, the mere

24   possession of a firearm at or near the site of the crime

25   without active employment is not sufficient to constitute a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2173**

1    use of the firearm.

2         In order to prove that the defendant carried a firearm

3    during and in relation to the crime the Government must prove

4    beyond a reasonable doubt that the defendant had the weapon

5    within his control in such a way that it furthered the

6    commission of the crime of violence or drug trafficking crime,

7    or was an integral part of the commission of the crime. The

8    defendant did not have -- not necessarily have to hold the

9    firearm physically, that is, have actual possession of it on

10   his person. If you find that the defendant had dominion and

11   control over the place where the firearm was located and had

12   the power and intention to exercise control over the firearm

13   in such a way that it furthered the commission of the crime of

14   violence or drug trafficking crime, you may find that the

15   Government has proven that the defendant carried the weapon.

16        To prove that the defendant possessed the firearm in

17   furtherance of the crime the Government must prove that the

18   defendant had possession of the firearm and that such

19   possession was in furtherance of that crime. Possession means

20   that the defendant either had physical possession of the

21   firearm on his person or that he had dominion and control over

22   the place where the firearm was located and had the power and

23   intention to exercise control over the firearm.

24        To possess a firearm in furtherance of the crime means

25   that the firearm helped forward, advance, or promote the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2174**

 1   commission of the crime. The mere possession of the firearm at
 2   the scene of the crime is not sufficient under this
 3   definition. The firearm must have played some part in
 4   furthering the crime in order for this element to be
 5   satisfied.
 6        To satisfy this element you must also find that the
 7   defendant possessed, used, or carried the firearm knowingly.
 8   This means that the defendant possessed, used, or carried the
 9   firearm purposely and voluntarily and not by accident or
10   mistake. It also means that the defendant knew that the weapon
11   was a firearm as we commonly use the word. However, the
12   Government is not required to prove that the defendant knew
13   that he was breaking the law.
14        The third element that the Government must prove beyond a
15   reasonable doubt is that the defendant brandished the firearm.
16   To brandish a firearm means to display all or part of the
17   firearm or otherwise make the presence of the firearm known to
18   another person in order to intimidate that person, regardless
19   of whether the firearm is directly visible to that person.
20        Now if after consideration of all of the evidence you
21   find that as to a particular defendant the Government has not
22   proven each of the elements of possessing, using, carrying,
23   and brandishing a firearm in furtherance of or during and in
24   relation to a crime of violence or a drug trafficking crime,
25   then you must find that defendant not guilty on that charge.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2175**

```
 1    In that instance you must then consider whether that defendant
 2    is guilty of the lesser included offense of possessing, using,
 3    and carrying a firearm in furtherance of or during and in
 4    relation to a crime of violence or a drug trafficking crime.
 5    Possessing, using, and carrying a firearm in furtherance of or
 6    during and in relation to a crime of violence and drug
 7    trafficking crime has the same first two elements as
 8    possessing, using, carrying, and brandishing a firearm in
 9    furtherance of or during and in relation to a crime of
10    violence or drug trafficking crime. But it does not include
11    the third element of brandishing the firearm. Thus to prove
12    the lesser included offense of possessing, using, and carrying
13    a firearm in furtherance of or during and in relation to a
14    crime of violence or drug trafficking crime, the Government
15    must establish each of the following elements beyond a
16    reasonable doubt: First, that the defendant committed a crime
17    of violence or drug trafficking crime for which he might be
18    prosecuted in a court of the United States; specifically Count
19    One, conspiracy to distribute and possess with intent to
20    distribute controlled substances; Count Three, interferes with
21    interstate commerce by robbery; or Count Four, kidnapping with
22    death resulting. And second, that the defendant knowingly used
23    or carried a firearm during and in relation to the commission
24    of that crime or possessed a firearm in furtherance of that
25    crime. If you find that the Government has proven both of
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2176**

1  these elements beyond a reasonable doubt then you must find

2  the defendant guilty of the lesser included offense to Count

3  Five.

4      Count Eight of the indictment charges the defendant,

5  Scott Anthony Williams, with possession of firearms in

6  furtherance of a drug trafficking crime. The indictment reads

7  as follows: On or about June 6, 2018 in the District of

8  Maryland the defendant, Scott Anthony Williams, did knowingly

9  possess, that is -- possess firearms, that is a Sig Sauer

10  model P-228 9 millimeter handgun bearing serial number

11  B188194; a Century Arms model VV2008 Sporter 7.62 caliber

12  rifle bearing serial number V08PM013368; a Bryco Arms model

13  J25 .38 caliber handgun bearing serial number 371085; and a

14  Beretta model 21A .25 caliber handgun bearing serial number

15  DAA047571, all in furtherance of a drug trafficking crime for

16  which he may be prosecuted in a court of the United States.

17  That is, possession with the intent to distribute controlled

18  substances as charged in Count Six and Count Seven.

19      The crime charged in Count Eight is the same as the crime

20  charged in Count Five except that this count charges only

21  possession of a firearm in furtherance of a drug trafficking

22  crime. It does not charge use, carrying, or brandishing of a

23  firearm during and in relation to a drug trafficking crime.

24      In addition, the drug trafficking crimes at issue are the

25  crimes charged in Count Six and Seven of the indictment rather

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2177

```
 1    than the crime charged in Count One of the indictment.

 2         Now in Count Eight the defendant, Scott Anthony Williams,

 3    is charged with firearms offenses that are based on other

 4    crimes of the indictment, specifically Count Six and Count

 5    Seven. As a result, you may consider Count Eight only if you

 6    find the defendant guilty of one of the following counts:

 7    Count Six, possession with intent to distribute controlled

 8    substances, meaning cocaine or marijuana, or Count Seven,

 9    possession with the intent to distribute controlled

10    substances, that is methamphetamines. Count Eight is to be

11    considered only if you first find the defendant guilty of

12    Count Six or Seven as charged. It is sufficient to consider

13    Count Eight if you find the defendant guilty as to either one

14    of these counts. You need not find the defendant guilty of

15    both of these counts to consider Count Eight.

16         If upon consideration of all of the evidence you find

17    that the Government has failed to prove Counts Six and Seven

18    beyond a reasonable doubt, then you must find the defendant

19    not guilty on Count Eight.

20         In reaching your verdict on Count Eight you may consider

21    the evidence of Counts Six and Seven only for the purpose of

22    determining whether the elements of Count Eight have been

23    satisfied. In considering Count Eight you may not consider any

24    evidence that relates to any other count other than Counts Six

25    or Seven.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2178**

```
 1          In order to prove that the defendant, Scott Anthony
 2    Williams knowingly possessed a firearm in furtherance of a
 3    drug trafficking crime as charged in Count Eight, the
 4    Government must prove each of the following elements beyond a
 5    reasonable doubt: First, that the defendant committed a drug
 6    trafficking crime for which he might be prosecuted in a court
 7    of the United States, specifically the crime charged in Count
 8    Six or Seven of the indictment for possession with intent to
 9    distribute controlled substances; and second, that the
10    defendant knowingly possessed a firearm in furtherance of the
11    commission of the crimes charged in Count Six or Seven.
12          The first element that the Government must prove beyond a
13    reasonable doubt is that the defendant, Scott Anthony
14    Williams, committed a drug trafficking crime for which he
15    might be prosecuted in a court of the United States. The
16    defendant is charged in the indictment with possession with
17    intent to distribute a controlled substance, that is cocaine
18    or marijuana in Count Six, and possession with intent to
19    distribute a controlled substance, methamphetamines, in Count
20    Seven. I instruct you that possession with the intent to
21    distribute a controlled substance as charged in Counts Six and
22    Seven is a drug trafficking crime. However, it is for you to
23    determine whether the Government has proven beyond a
24    reasonable doubt that the defendant committed at least one of
25    the crimes charged in Count Six or Seven.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2179**

1    On the second element, knowing possession of a firearm in

2    furtherance of the predicate crime, you should apply

3    instruction number 83 relating to Count Five.

4    Now Counts Three, Four, Five, Six and Seven of the

5    indictment charge the defendants with crimes as a principal. A

6    principal is the person who actually committed the offense

7    charged. In addition, as to these counts, the Government has

8    also alleged that the defendants committed the charged

9    offenses under the aiding and abetting statute. This aiding

10   and abetting instruction applies to Counts Three, Four, Five,

11   Six and Seven.  The aiding and abetting statute provides that

12   whoever commits an offense against the United States or aids

13   or abets or counsels, commands, or induces or procures its

14   commission is punishable as a principal.

15   Under the aiding and abetting statute it is not necessary

16   for the Government to show that a defendant physically

17   committed the crime with which he is charged as a principal in

18   order for the Government to sustain its burden of proof. A

19   person who aids and abets another to commit an offense is just

20   as guilty of that offense as if he committed it himself.

21   Accordingly, you may find a defendant guilty of the offense

22   charged if you find beyond a reasonable doubt that the

23   Government has proven that another person actually committed

24   the offense with which the defendant is charged and that the

25   defendant aided or abetted that person in the commission of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2180**

```
 1    the offense.

 2          The first requirement is that you find that another

 3    person has committed the crime charged. No one can be

 4    convicted of aiding or abetting the criminal acts of another

 5    if no crime was committed by the other person in the first

 6    place. But, if you do find that a crime was committed, then

 7    you must consider whether the defendant aided or abetted the

 8    commission of the crime.

 9          In order to aid or abet another to commit a crime it is

10    necessary that the defendant knowingly associate himself in

11    some way with the crime and that he participate in the crime

12    by doing some act to help make the crime succeed. To establish

13    that the defendant knowingly associated himself with the

14    crime, the Government must prove that the defendant engaged in

15    some affirmative conduct or overt act with knowledge of the

16    intended result of the crime and the intent to bring about

17    that result. The mere presence of a defendant where a crime is

18    being committed, even coupled with knowledge by the defendant

19    that a crime is being committed, or merely associating with

20    others who were committing a crime is not sufficient to

21    establish aiding and abetting. One who has no knowledge that a

22    crime is being committed or is about to be committed but

23    inadvertently does something that aids in the commission of

24    that crime is not an aider and abetter.  And aider and abetter

25    must know that the crime is being committed and act in a way
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2181**

1    that is intended to bring about the success of the criminal

2    venture.

3        To determine whether the defendant aided or abetted the

4    commission of a crime ask yourself these questions:  Did he

5    participate in the crime charged as something he wished to

6    bring about?  Did he associate himself with the criminal

7    venture?  Did he seek by his actions to make the criminal

8    venture succeed?  If he did, then he is an aider and abetter

9    and therefore, guilty of the offense. If on the other hand

10   your answer to any one of these questions is no, then he is

11   not an aider and abetter and you must find him not guilty as

12   an aider and abetter.

13       With respect to Count Five and Count Eight, the firearms

14   counts, in order to find the defendant aided and abetted one

15   of those offenses, you must also find beyond a reasonable

16   doubt that the defendant acted with advanced knowledge that

17   another participant would commit the charged offense with a

18   firearm.

19       Now in light of the conspiracy charges in Counts One and

20   Two, there is another method by which you may evaluate the

21   possible guilt of the defendants on Count Three, interference

22   with interstate commerce by robbery or extortion; and Count

23   Six, possession with intent to distribute controlled

24   substances, even if you do not find that the defendant has

25   satisfied its burden of proof with respect to each element of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2182

```
 1    those crimes as to the defendants.
 2         If you find that the Government has proven beyond a
 3    reasonable doubt that a defendant was a member of the
 4    conspiracy charged in Count One, conspiracy to distribute and
 5    possess with intent to distribute controlled substances, and
 6    thus is guilty on that conspiracy count, then you may also,
 7    but you are not required to find him guilty of the crime
 8    charged against him in Count Six, provided that you find
 9    beyond a reasonable doubt each of the following elements:
10    First, that the crime charged in Count Six was committed;
11    second, that the person or persons you find actually committed
12    the crime charged in Count Six were members of the conspiracy
13    in Count One you found to have existed; third, that the crime
14    charged in Count Six was committed pursuant to the common plan
15    and understanding you found to exist among the
16    co-conspirators; fourth, that the defendant was a member of
17    the conspiracy in Count One at the time the crime charged in
18    Count Six was committed; fifth, that the defendant could have
19    reasonably foreseen that the crime charged in Count Six might
20    be committed by his co-conspirators -- I'm sorry, fourth, that
21    the defendant was a member of the conspiracy in Count One at
22    the time the crime was charged in Count Six was committed; and
23    fifth, that the defendant could have reasonably foreseen that
24    the crime charged in Count Six might be committed by his
25    co-conspirators.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2183**

```
 1          If you find all five of these elements to exist beyond a
 2    reasonable doubt, then you may find the defendant guilty of
 3    the crime charged against him in Count Six, even if he did not
 4    personally participate in the acts constituting the crime or
 5    did not have actual knowledge of it.
 6          In addition, if you find that the Government has proven
 7    beyond a reasonable doubt that a defendant was a member of the
 8    conspiracy charged in Count Two, conspiracy to interfere with
 9    interstate commerce by robbery or extortion, and thus is
10    guilty on that conspiracy count, then you may also, but are
11    not required to find him guilty of the crime charged against
12    him in Count Three, provided that you find each of the
13    following elements beyond a reasonable doubt: First, that the
14    crime charged in Count Three was committed; second, that the
15    person or persons you find actually committed the crime
16    charged in Count Three were members of the conspiracy you
17    found to have existed; third, that the crime charged in Count
18    Three was committed pursuant to the common plan and
19    understanding you found to exist among the co-conspirators;
20    fourth, that the defendant was a member of that conspiracy at
21    the time the crime charged in Count Three was committed; and
22    fifth, that the defendant could have reasonably foreseen that
23    the crime charged in Count Three might be committed by his
24    co-conspirators. If you find all five of these elements to
25    exist beyond a reasonable doubt, then you may find the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2184**

1    defendant guilty of the crime charged against him in Count

2    Three, even though he did not personally participate in the

3    acts constituting the crime, or did not have actual knowledge

4    of it. The reason for this rule is that a co-conspirator who

5    commits a crime pursuant to a conspiracy is deemed to be the

6    agent of the other conspirators. Therefore, all of the

7    co-conspirators must bear criminal responsibility for the

8    commission of the crimes committed by its members. If,

9    however, you are not satisfied as to the existence of any of

10   these five elements, then you may not find the defendant

11   guilty of the substantive crime at issue on this basis.

12         Now as I stated earlier, Count Three of the indictment

13   charges the defendant -- that the defendants interfered with

14   interstate commerce in either one of two ways:  The first is

15   the defendant interfered with interstate commerce by robbery;

16   the second is that the defendant interfered with interstate

17   commerce by extortion. In order for you to find a defendant

18   guilty on Count Three, the Government need not prove that the

19   defendant committed the crime of interference with interstate

20   commerce in both of these ways. It is sufficient if you find

21   beyond a reasonable doubt that the defendant committed

22   interference with interstate commerce in one of these two ways

23   to convict the defendant on Count Three. However, in order to

24   convict a defendant on this count all of you must agree on the

25   manner in which that defendant interfered with interstate

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2185**

1    commerce.  Either all of you must agree that the defendant
2    interfered with interstate commerce by robbery, or all of you
3    must agree that the defendant interfered with interstate
4    commerce by extortion. Similarly, Count Two of the indictment
5    charges that the defendants committed the crime of conspiracy
6    to interfere with interstate commerce in either one of two
7    ways, by robbery or extortion. The same instruction that
8    applies to Count Three applies here. The Government need not
9    prove both of these crimes were objectives of the conspiracy
10   for you to find a defendant guilty of the conspiracy count. It
11   is sufficient if you find beyond a reasonable doubt that a
12   defendant joined the conspiracy with one of these objectives
13   or the other in order to convict that defendant on Count One.

14        However, in order to convict a defendant on this count,
15   all of you must agree on the specific objective that the
16   defendant agreed to try to accomplish. Either all of you must
17   agree that the defendant conspired to interfere with
18   interstate commerce by robbery, or all of you must agree that
19   the defendant conspired to interfere with interstate commerce
20   by extortion.

21        Count Five charges that the defendant possessed, used,
22   carried, and brandished a firearm in furtherance of or during
23   and in relation to a crime of violence and drug trafficking
24   crime. The Government charges that the defendants possessed,
25   used, carried, and brandished a firearm in three crimes of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2186**

1    violence or drug trafficking crimes.  Count One, conspiracy to

2    distribute and possess with intent to distribute controlled

3    substances; Count Three, interference with interstate commerce

4    by robbery; and Count Four, kidnapping resulting in death.

5        The Government need not prove that a defendant committed

6    each of these crimes for you to find him guilty of Count Five.

7    It is sufficient to convict on Count Five if you find beyond a

8    reasonable doubt that a defendant committed one of these

9    crimes and the Government has proven all of the elements of

10    Count Five. However, in order to convict a defendant on this

11    count, all of you must agree on the specific predicate crime

12    that the defendant committed. Either all of you must agree

13    that the defendant committed the crime of conspiracy to

14    distribute and possess with intent to distribute controlled

15    substances, all of you must agree that the defendant committed

16    the crime of interference with interstate commerce by robbery,

17    or all of you must agree that the defendant committed the

18    crime of kidnapping with death resulting.

19        Similarly, Count Eight charges the defendant, Scott

20    Anthony Williams, with possession of firearms in furtherance

21    of a drug trafficking crime. The Government charged that the

22    defendant possessed firearms in furtherance of both of the

23    counts of possession with intent to distribute a controlled

24    substance as charged in Counts Six and Seven. The Government

25    need not prove that a defendant committed both of these crimes

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2187**

1      for you to find the defendant guilty of Count Eight. It is
2      sufficient to convict on Count Eight if you find beyond a
3      reasonable doubt that the defendant committed one of these
4      crimes, and that the Government has proven all the elements of
5      Count Eight. However, in order to convict a defendant on this
6      count, all of you must agree on the specific predicate crime
7      that the defendant committed. Either all of you must agree
8      that the defendant committed possession with intent to
9      distribute controlled substances as charged in Count Six, or
10     all of you must agree that he committed possession with intent
11     to distribute a controlled substance as charged in Count
12     Seven.

13         The question of possible punishment of the defendants is
14     of no concern to the jury and should not in any sense enter
15     into or influence your deliberations.  The duty of imposing a
16     sentence rests exclusively upon the judge.  Your function is
17     to weigh the evidence in the case and to determine whether or
18     not each defendant is guilty beyond a reasonable doubt, solely
19     upon the basis of such evidence.

20         Under your oath as jurors you cannot allow consideration
21     of the punishment that may be imposed upon a defendant if he
22     is convicted to influence your verdict in any way or in any
23     sense to enter into your deliberations.

24         So that completes the jury instructions in this case with
25     one exception.  I have one last instruction which I will save

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2188

```
 1    for tomorrow. Not because of the length of the jury
 2    instructions, that has nothing to do with it. I typically save
 3    the last instructions which provides guidance on the specific
 4    mechanics of how you go about deliberating and returning a
 5    verdict until after you've heard the closing arguments so you
 6    hear that right before you begin those tasks. So that is to
 7    come hopefully -- well, that will come tomorrow.
 8         So with that then you have heard the jury instructions.
 9    You will get a written copy of those jury instructions to take
10    with you in case you didn't remember all of it.  And as I
11    promised you, we will suspend for the day. Right now it is too
12    late for us to complete all the closing arguments before 5:00
13    and it's always better to have you hear them all as close
14    together as possible. You'll certainly want to remember the
15    jury instructions and of course refer to the written ones
16    later as you listen to the closing arguments, but for now we
17    will let you go with the expectation that beginning tomorrow
18    morning at 9:00 you'll start hearing the closing arguments. My
19    expectation is you'll hear them all and have the case to
20    deliberate upon before lunchtime.  So just please try to come
21    on time tomorrow.
22         Again, you've heard the evidence in the case. You've
23    heard the jury instructions. You haven't heard the closing
24    arguments and we haven't started deliberations.  So even with
25    all the information you have, you must remain following the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2189**

1   instructions not to discuss the case among yourselves or with

2   anyone else. Don't do any outside research. And keep an open

3   mind throughout the time period between now and tomorrow

4   morning when we meet again.

5       Now we are letting you leave here about 3:00. Again, it's

6   up to you whether you discuss the early departure with anyone

7   else who may be wondering where you are, that's totally up to

8   you, but we will give you the rest of the afternoon off.  We

9   will see you tomorrow morning ready to go at 9:00.  Thank you

10   very much.

11               **(Jury was excused at 3:05 p.m.)**

12          **THE COURT:**  Okay, thank you.  Everyone please be

13   seated. So as I mentioned to you, I mean, I always find little

14   nits here and there. I actually was making notes along the

15   way.  So they will get a written version that comports with

16   what I said, not what was written on the page exactly. None of

17   it is substantive.  And we'll give you a final copy of that

18   tomorrow morning.

19       The verdict form, as I said, does need to be adjusted to

20   a certain degree primarily on the lesser included offense

21   instructions. I don't think it will be controversial, but I

22   hope to send you a Track Changes on that later today.  So take

23   a look at it and we should plan again to meet at 8:45 just to

24   discuss those, make sure that the verdict form is in order and

25   there's nothing else to deal with in that regard.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2190**

```
 1        I did want to ask whether either side wants to be heard
 2   further on the Rule 29 motions that the defense has filed. Is
 3   there more you want to offer from the defense side?  And once
 4   you've had your chance, I'll give the Government a chance if
 5   they want to weigh in.
 6        MR. NIETO:  Your Honor, on behalf of Taeyan
 7   Williams, no.  We will submit on the motion.
 8        Additionally, for the purposes of the record being clear,
 9   we are also renewing said motion at the conclusion of the
10   defense case.
11        THE COURT:  Of course.
12        Mr. Hawks, anything you want to add on this front?
13        MR. HAWKS:  No, Your Honor.  We concur with that.
14        THE COURT:  Okay.  Anyone from the Government want
15   to address the motions?
16        MS. GROSSI:  Your Honor, the Government submits that
17   there is sufficient evidence on all nine counts and the
18   Government is prepared to argue it if you want to hear more.
19        THE COURT:  Well, I would tell you to respond to
20   whatever was said, but I don't know if they created a specific
21   target. I mean, I don't know if there's anything specific to
22   add at this point. I mean, I do find -- let me just kind of --
23   quickly going through the indictment at this stage based on
24   what I have now, I mean, I do find sufficient evidence to
25   proceed to the jury on these counts.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2191**

 1           On Count One, the conspiracy, I think there was ample
 2    evidence of a drug conspiracy to distribute marijuana and also
 3    the presence of the cocaine in the residence. Now certainly
 4    there's evidence from the electronic records of Taeyan
 5    Williams' involvement in this.  The fact that it was in Scott
 6    Williams' residence certainly ties him to it as well, some of
 7    the electronic connections that we saw in the text messages
 8    and other electronic communications. And also the testimony of
 9    several of the witnesses, including Mr. Cox -- well, the
10    combination of the co-conspirators:  Cox, Diaz, and Mr.
11    Drummond, some or all of them addressed both defendants being
12    involved in the conspiracy.  And certainly the connections
13    back to the involvement of Noah Smothers with him, some of
14    that, again, is mostly from the electronic record.

15           In terms of the interference with interstate commerce by
16    robbery or extortion, although I know the Government didn't
17    focus upon this, certainly Mr. Musa's testimony, if accepted
18    which at this stage under the highly deferential standard to
19    the Government would help to support that count, but in
20    addition to that there's significant circumstantial evidence
21    regarding the connection between the defendants and Mr.
22    Smothers in terms of the fact that items were taken,
23    apparently taken from the storage unit that ended up in Mr.
24    Williams' house, in particular the invoice sheet or other
25    record of what was delivered to Mr. Smothers at the storage

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2192**

```
 1    unit was found in Scott Williams' home under his mattress, and
 2    also the drugs found there appear to be quite consistent with
 3    the same drugs that were delivered to the storage unit. And
 4    then the presence of the firearm in that residence with the
 5    DNA of the defendant on it helps to support the evidence with
 6    respect to robbery or extortion in terms of violence or threat
 7    of violence or actual use of violence. And that relatedly --
 8    that addresses both Count Two, conspiracy and also Count
 9    Three, the substantive count.
10        The kidnapping, again, the same evidence in that
11    starting -- including Mr. Musa's direct evidence, but also the
12    same circumstantial evidence also bringing in the presence of
13    Scott Williams' rental car with the drop-off of the vehicle
14    with the defendant's DNA in the back with the blood.
15        And then the firearms offenses, Count Five, again that
16    same testimony about the use of the firearm by Mr. Musa, as
17    well as the circumstantial evidence with the DNA is supportive
18    of that count.
19        Count Six and Seven we have the drugs found in the
20    residence where Scott Williams lived and where Taeyan Williams
21    lived at times. We have some of the phone calls in which there
22    were references to materials that were either in the crawl
23    space or otherwise which reflected knowledge of its presence
24    in the residence.  And obviously the firearms found there,
25    although it's circumstantial, their presence in general
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2193**

```
 1    proximity to the drugs at least would support an inference
 2    that the firearms were there to further the drug activity
 3    which would be what is necessary to establish Count Eight.
 4        And then finally on Count Nine with the conspiracy to
 5    destroy and conceal evidence, we have the evidence that the
 6    methamphetamine pills were in the toilet about to be flushed
 7    and that the only person there was Scott Williams given that
 8    Ms. Chaplin was denied having anything to do with that. The
 9    conversations in which there was direction from Scott Williams
10    to Mr. George or others through Ms. Chaplin to destroy
11    electronic data which at least there would be an inference
12    that the data both in the cloud and on the phones were records
13    that could be used as part of a prosecution are sufficient to
14    show -- to have the jury decide Count Nine as well.
15        Okay, anything else that we need to discuss before
16    tomorrow?
17            MS. GROSSI:  Not from the Government, Your Honor.
18            MR. HAWKS:  No, Your Honor.
19            MR. GUILLAUME:  No, Your Honor.
20            MR. NIETO:  Thank you.
21            THE COURT:  So we will, again, 8:45 we'll go over
22    the verdict form.  Take a look at it when you get it. I'll
23    give you a clean copy of the instructions. I would invite you
24    again just to -- I don't know if you have it handy now or --
25    again, the numbering shifted slightly so update your slides so
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2194**

```
 1    the numbers of the jury instructions match up. I'm expecting
 2    everyone will have adjusted the slides on the points that we
 3    raised:  Mr. Crawley asking for something out of the
 4    Government's slide; my request that we remove the emphasis on
 5    words in the jury instructions; the Government's request which
 6    I approved to remove the photographs that are not actually
 7    pieces of evidence. I think that covers all of that, but we
 8    look forward to everyone's arguments tomorrow.
 9            MR. CRAWLEY:  Quick question, Your Honor.
10            THE COURT:  Yes.
11            MR. CRAWLEY:  Your Honor, logistically and just for
12    me as far as scheduling, I spoke with Mr. Williams and I'm
13    going to basically ask the Court politely once the jury gets
14    the case for deliberations, I know generally the Court wishes
15    to have the attorney within five to ten minutes of the
16    courthouse. If it's okay with the Court, Mr. Hawks and I had
17    discussed this with Mr. Williams, I have another matter that I
18    could deal with tomorrow. Obviously I won't if the Court
19    requires me to be here, but if it's just for the purpose of
20    answering a question or taking a verdict, would the Court be
21    inclined to excuse me tomorrow for that purpose once the jury
22    gets the -- I plan to be here throughout the entire closing on
23    all parts, from both sides, but I just wanted to know the
24    Court's position with respect to that.
25            THE COURT:  You're talking about in the afternoon?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2195**

```
 1    I'm projecting as I told them, we'll finish before lunch, but
 2    not -- probably right like around 12 or thereabouts.  So what
 3    time were you planning to be absent?
 4            MR. CRAWLEY:  Your Honor, I was thinking more around
 5    2:00 I would be asking to leave, but I don't have --
 6            THE COURT:  For another proceeding in this court or
 7    different court?
 8            MR. CRAWLEY:  No, other matters generally.  Not even
 9    in a courthouse, just some other things, personal matters.
10            THE COURT:  Well, you know, obviously if Mr.
11    Williams had no other counsel you would absolutely have to be
12    here. Mr. Hawks obviously is here.
13        So Mr. Hawks, you're going to be available the whole
14    time?
15            MR. HAWKS:  Yes, Your Honor.
16            MR. CRAWLEY:  It would just be for tomorrow, Your
17    Honor.  I don't expect that to be for Wednesday or any other
18    day.
19            THE COURT:  Right. I mean, first of all does either
20    side have any view on this, any of the other two sides have a
21    view on this?
22            MR. GUILLAUME:  Your Honor, I'll defer to the Court.
23    It's fine with Mr. Taeyan Williams.
24            MS. GROSSI:  We defer to the Court too, Your Honor.
25            THE COURT:  Okay. Mr. Hawks, if you're prepared to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2196**

1    handle this and if Mr. Williams is prepared to agree to this,

2    I'm okay with it. Obviously it's up to you all how you want to

3    handle it.  So long as you are available and can speak

4    entirely for Mr. Williams, I'm okay with that. Is that -- from

5    your perspective are you prepared to do that and are you also

6    able to represent Mr. Williams is consenting to this?

7         **MR. HAWKS:**  Yes, Your Honor. I'm prepared for that

8    and we had the opportunity to discuss this with Mr. Williams

9    and he had no objection.

10         **THE COURT:**  Okay. I mean, as a practical matter

11   given the volume of evidence and so forth I would be -- just

12   in terms of historical paths I think we might get a question,

13   I think it's enough information that I would think that it

14   would need at least the afternoon before they come back with

15   any kind of result.  So if you're lucky you won't miss

16   anything, Mr. Crawley.  But again, so long as Mr. Hawks is

17   here and we can keep moving forward and that's agreeable to

18   Mr. Williams, then I can move forward this way. Okay.

19         **MR. CRAWLEY:**  Thank you, Your Honor.

20         **THE COURT:**  Thank you. Okay, so we will see you

21   ready to go first thing in the morning and the Government, you

22   can start setting up even before I get here just to be as

23   ready as possible. Thank you very much.

24         **(Proceeding concluded at 3:16 p.m.)**

25

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2197**

```
 1                   CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5            I, Nadine M. Bachmann, Certified Realtime Reporter

 6    and Registered Merit Reporter, in and for the United States

 7    District Court for the District of Maryland, do hereby

 8    certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

 9    true and correct transcript of the stenographically-reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the regulations

12    of the Judicial Conference of the United States.

13

14                         Dated this 17th day of December, 2023.

15

16                         -S-

17            _____

18                         NADINE M. BACHMANN, CRR, RMR
                           FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2198

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                     SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,    )
           Plaintiff,             )
 4                                )
           vs.                    )   CRIMINAL CASE NUMBER:
 5                                )       TDC-18-0631
      SCOTT ANTHONY WILLIAMS and  )        VOLUME X
 6    and TAEYAN RAYMOND WILLIAMS, )
           Defendants.            )
 7    _____)

 8

 9                   TRANSCRIPT OF PROCEEDINGS
                          JURY TRIAL
10       BEFORE THE HONORABLE THEODORE D. CHUANG
              UNITED STATES DISTRICT JUDGE
11               Tuesday, May 9, 2023
                   Greenbelt, Maryland

12
                    A P P E A R A N C E S
13
      FOR THE PLAINTIFF:
14         OFFICE OF THE UNITED STATES ATTORNEY
              BY: LEAH GROSSI, ESQUIRE
15            BY: WILLIAM MOOMAU, ESQUIRE
                  6406 Ivy Lane, Suite 800
16                Greenbelt, Maryland  20770

17            BY: MICHAEL HANLON, ESQUIRE
                   36 S. Charles Street, Fourth Floor
18                 Baltimore, Maryland  21201

19    FOR THE DEFENDANTS:
           For Scott Anthony Williams:
20            BY: KWASI HAWKS, ESQUIRE
                  THE HAWKS FIRM
21                8705 Colesville Road
                  Suite 162
22                Silver Spring, MD  20910

23            BY: DWIGHT E. CRAWLEY, ESQUIRE
                  LAW OFFICE OF DWIGHT CRAWLEY
24                1300 I. Street, NW
                  Suite 400e
25                Washington, DC  20005
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2199**

```
 1    (Appearances, Continued)

 2         For Taeyan Raymond Williams:
                BY: ALFRED GUILLAUME, III
 3                   LAW OFFICES OF ALFRED GUILLAUME, III, LLC
                     1350 Connecticut Avenue NW
 4                   Suite 308
                     Washington, DC  20036
 5
                BY: CHRISTOPHER NIETO, Esquire
 6                   LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
                     1 North Charles Street, Suite 1301
 7                   Baltimore, Maryland  21201

 8    _____

 9         ***Proceedings Recorded by Mechanical Stenography***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA2200**

```
 1                    I N D E X

 2    CLOSING ARGUMENTS                            PAGE

 3    On behalf of the Government

 4         By Ms. Grossi:                           10
           By Mr. Hanlon:                          108
 5
      On behalf of Scott Williams
 6
           By Mr. Hawks:                            39
 7
      On behalf of Taeyan Williams
 8
           By Mr. Guillaume:                        70
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA2201**

```
 1                    P R O C E E D I N G S
 2     (8:55 a.m.)
 3            THE COURTROOM DEPUTY:  The matter now pending before
 4     this Court is Criminal Action Number TDC-18-0631, United
 5     States of America v. Scott Anthony Williams and Taeyan Raymond
 6     Williams. We are here today for the purpose of a jury trial.
 7     Counsel, please identify yourselves for the record.
 8            MS. GROSSI:  Good morning, Your Honor.  Leah Grossi,
 9     Michael Hanlon, and William Moomau on behalf of the
10     Government. Here with us at counsel's table is Kyle Simms with
11     the Maryland State Police.
12            THE COURT:  Good morning.
13            MR. HAWKS:  Good morning, Your Honor.  Kwasi Hawks
14     and Dwight Crawley on behalf of Mr. Scott Williams, seated
15     between us.
16            MR. GUILLAUME:  Good morning, Your Honor.  For the
17     record, Alfred Guillaume and Christopher Nieto on behalf of
18     Mr. Taeyan Williams, seated to my left.
19            MR. NIETO:  Good morning.
20            THE COURT:  Good morning to counsel and all the
21     parties and members of the audience.
22         So before we get to closing arguments, I just wanted to
23     check in with you on the other documents. I did give you the
24     final version of the jury instructions we'll give to the jury.
25     As you can see I take out the citations that we've been
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2202**

```
 1    working under and there were some minor technical corrections.
 2    I think the Government caught one and there were a few others,
 3    but most of them I caught along the way so they basically
 4    match what I said for the most part. And then -- well, they
 5    match what I said other than I think some of those numbers
 6    that we had to change.
 7        The verdict form, we hadn't really adjusted it since we
 8    moved the jury instructions to the lesser included offense
 9    concept and so that's why I wanted to just make sure having
10    adjusted that that everyone was comfortable with the form.
11        Has everyone had a chance to look at that and does anyone
12    have any proposed changes?
13        MR. HANLON: Your Honor, I had one -- a couple
14    suggestions about the 924(c). Structurally I think the form is
15    good. In going through the form last evening I noticed
16    something that probably we should have noticed earlier and
17    it's not a massive change. In terms of how we describe the
18    924(c) count, in Count Five I wonder if it would make sense to
19    separate out the possession in furtherance prong and the use,
20    carry, during in relation prong as they are separate and the
21    jury is instructed that they're sort of separate in the jury
22    instructions. Not into separate verdicts, but just in the
23    title I was going to suggest that we describe Count Five as
24    "possessing and brandishing a firearm in furtherance of or
25    using, carrying, and brandishing during and in relation to a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2203**

1    crime of violence and a drug trafficking crime."  Something

2    along those lines.

3        **THE COURT:**  Well, let me look again at the statute

4    because this is kind of messy, as you can tell. So

5    924(c)(1)(A), during and in relation to any crime of violence

6    or drug trafficking crime, uses or carries a firearm or who in

7    furtherance of such crime possesses a firearm. So, I mean, I

8    think we usually see it in -- so I mean, I think the way it's

9    structured is possession is in furtherance, and the other

10   three are during and in relation to. I'm not sure it makes any

11   functional difference, but I think that's the way it's written

12   in the statute.

13       I think what we typically see just because of the types

14   of charges we get is that "during and in relation" tends to

15   match with the crime of violence and the "in furtherance of"

16   tends to match with the drug trafficking crime, but I'm not

17   sure that the statute requires it that way. It's more about

18   whether you're talking about possession or the other three

19   activities.

20       So really if we wanted to get very specific about it, it

21   should just be "possessing in furtherance of the" -- or

22   "using, carrying, and brandishing during and in relation to,"

23   the problem being that the Government has tried to argue --

24   well, I'm not sure. Throughout the case there's been

25   possessing and brandishing in furtherance, but the brandishing

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2204**

```
 1    I think is during and in relation the way the statute --
 2    remind me during the course of this case why haven't there
 3    been efforts to link possession and brandishing together?
 4             MR. HANLON:  Well, Your Honor, I think that the
 5    evidence has always supported the proposition that the firearm
 6    used in connection with the kidnapping and robbery was
 7    possessed, as well as used and carried and that it was
 8    brandishing. Now brandishing can be both with the "in
 9    furtherance" prong and the "during and in relation to" prong.
10    I think the reason we've talked about the use of the gun is
11    because it was used in all of the ways that 924(c) allows it
12    to be used.
13        I think functionally the only thing -- to the extent that
14    this is a concern at all and if I'm being hypertechnical I'm
15    perfectly happy to leave this alone, is that the title of the
16    count in the verdict might separate the possession and
17    brandishing in furtherance, or using, carrying, and
18    brandishing during and in relation to a firearm. But it is a
19    somewhat technical matter, Your Honor. And the evidence shows
20    that there was a single course of conduct.
21             THE COURT:  I mean, the way we instructed it and the
22    way the -- I see.  Well, the way we did the jury instructions,
23    maybe they should match the jury instructions. The jury
24    instructions -- I did tinker with the headline because I just
25    thought it was complicated, but "possessing, using and
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2205**

```
1    carrying and brandishing a firearm in furtherance of or during
2    and in relation to a crime of violence, drug trafficking
3    crime" is kind of how we have it in the jury instructions.  So
4    what was your proposal again, Mr. Hanlon?
5         MR. HANLON:  I'm sure it won't be particularly
6    articulate, Your Honor, I apologize. Let me -- give me a quick
7    moment. We would just change the title to Count Five,
8    "possessing and brandishing a firearm in furtherance of, or
9    using, carrying and brandishing a firearm during and in
10   relation to a crime of violence or a drug trafficking crime."
11        THE COURT:  So I guess brandishing is not
12   technically listed there, but I just don't see how -- well, I
13   guess I have two ideas. One is we leave it the way it is
14   because I think it really doesn't make any real substantive
15   difference, however I am open to the idea, given the way that
16   the jury instruction headings read to say -- let me just go
17   back to this again -- "possessing, using, carrying and
18   brandishing a firearm" -- I'm sorry. Just the phraseology we
19   used in the jury instructions which is "possessing, using,
20   carrying and brandishing a firearm in furtherance of or during
21   and in relation to a crime of violence or drug trafficking
22   crime." I'm willing to do that because the way it is set up
23   now, the "in furtherance" relates only to the drug trafficking
24   crime which isn't totally accurate. Again, I don't think the
25   "in furtherance" and "during and in relation" is going to make
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2206**

```
 1    any difference.
 2        I don't think there's a basis to lump possessing and
 3    brandishing together separately, so we could go with the
 4    header we have on 79 or we could just leave it the way it is.
 5    Does anyone have a preference between those two?
 6            MR. HANLON:  I'm sorry, Your Honor.  The Government
 7    is content to leave it the way it is if the defense doesn't--
 8            THE COURT:  Any problem with that from the defense?
 9            MR. NIETO:  No, Your Honor.
10            MR. CRAWLEY:  No, sir.
11            THE COURT:  Okay, why don't we just do that, then.
12    It's probably a little easier.
13            MR. HANLON:  That's fine, Your Honor.  I'm sorry for
14    wasting time.
15            THE COURT:  No, no.  Everyone is trying to get it
16    right. Is the jury ready?
17            THE COURTROOM DEPUTY:  Yes, sir.
18            THE COURT:  So is the Government all set up?
19            MS. GROSSI:  Yes.
20            THE COURT:  Okay, so we'll call the jury in and
21    we'll go to the closing arguments.  Thank you.
22            (Jury entered the courtroom at 9:06 a.m.)
23            THE COURT:  Thank you, everyone. Please be seated.
24    Ladies and gentlemen, welcome back and as I had promised you,
25    we would move to the closing arguments next. As I mentioned to
```

1    you yesterday during the jury instructions, the closing
2    arguments are not evidence, but they may be considered by you
3    in helping you to interpret the actual evidence. The
4    Government has the burden of proof so they go first. The two
5    defendants will give closing arguments. I think the sequence
6    is we'll start with the Government, then we'll go to counsel
7    for Scott Williams, then we'll go to counsel for Taeyan
8    Williams.  And then because the Government has the burden of
9    proof, they are afforded the opportunity to have a brief
10   rebuttal argument, meaning to respond to what the defense
11   counsel have said.
12       We will have you all -- this will all be done before
13   lunch, but we'll try to keep it moving. We will take a break
14   as we often do in the middle. But as we're changing counsel
15   even if we're not taking a break, you can stand up and stretch
16   because it's going to take them a couple minutes to change the
17   microphones and things like that.
18       So with that we're going to begin with the Government.
19   Ms. Grossi.
20           MS. GROSSI:  This case is about two men, Scott
21   Williams and Taeyan Williams, a father/son team who decided to
22   cut Noah Smothers out of their drug dealing business. They
23   wanted his marijuana, his money, and his California supplier.
24   They wanted to take his place and they didn't want to owe him
25   anything. So they kidnapped, robbed, tortured, killed, and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2208

```
 1    buried Noah Smothers, leaving Noah Smothers in an unmarked
 2    grave.
 3        Over the last two weeks you've heard a lot of evidence in
 4    this case. Let's discuss what that evidence has shown
 5    throughout this trial. While we're discussing the evidence,
 6    you'll see exhibit numbers on the screen on the slides. Feel
 7    free to take notes on those exhibit numbers because you're not
 8    going to get this slide deck back when you deliberate.
 9        You learned that Noah Smothers and Jacob Rayburn were in
10    California together when they decided to get into the illegal
11    marijuana business. Jacob Rayburn stayed in California and
12    Noah Smothers moved back to the east coast to start their
13    business. Jacob Rayburn was in charge of finding the marijuana
14    and getting it shipped to the east coast. Noah Smothers was in
15    charge of finding clients and distributing that marijuana to
16    buyers. Noah Smothers and Jacob Rayburn communicated with each
17    other on encrypted platforms. Jacob Rayburn purchased
18    encrypted or jail broken iPhones from KryptAll for himself and
19    Noah Smothers, which came pre-installed with the Wickr
20    application, an end-to-end encrypted platform that deletes
21    messages after a certain period of time. You learned that Noah
22    Smothers had the KryptAll account 127999 which was on a
23    laminated business card in his house in Pennsylvania.
24        When Noah Smothers first moved back to the east coast, he
25    was living with his parents in Binghamton, New York. While he
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2209**

```
 1    was staying with his parents he would bring large cardboard
 2    boxes of marijuana and marijuana products into their home.
 3    Eventually his parents had enough and he found a place of his
 4    own at 348 Lomar Road in Susquehanna, Pennsylvania.
 5        Now when Noah Smothers and Jacob Rayburn were getting
 6    their business off the ground, there were some other already
 7    established marijuana traffickers on the east coast. In
 8    Morgantown, West Virginia, Taeyan Williams was the local
 9    cocaine and marijuana dealer for fraternities at West Virginia
10    University. Taeyan Williams distributed his cocaine and
11    marijuana through Connor Cox, a member of the Kappa Alpha
12    fraternity at West Virginia University.
13        Connor Cox began selling marijuana and cocaine for Taeyan
14    Williams in the fall of 2017. The nature of their business
15    relationship can be seen in text messages that were recovered
16    from Taeyan Williams' phone. You learned that Connor Cox would
17    sell ounces of cocaine and pounds of marijuana for Taeyan
18    Williams. Connor Cox would sometimes drive up to Maryland to
19    get drugs or money from Taeyan Williams to sell at West
20    Virginia University. In fact, you learned that one of the
21    places that Connor Cox would pick up drugs and money was from
22    a house on a cul-de-sac in Laurel, Maryland. Connor Cox told
23    you about a time in which he hung out in Taeyan Williams'
24    basement bedroom within that house and Mr. Cox heard a woman's
25    voice with a Jamaican accent.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2210**

```
 1            Eventually Connor Cox's friend introduced him to Noah
 2     Smothers in the fall of 2017 and the two went into business
 3     together. Noah Smothers would sell his California marijuana to
 4     Connor Cox, and Connor Cox would then distribute that
 5     marijuana and provide Noah Smothers in cash. Connor Cox told
 6     you about how Noah Smothers would carry his marijuana in large
 7     black tent bags, similar to the bag that was found in Taeyan
 8     Williams' and Scott Williams' home in Laurel, Maryland.
 9            Now once Noah Smothers came onto the scene at West
10     Virginia University, Connor Cox stopped selling for Taeyan
11     Williams. He preferred Noah Smothers' marijuana to Taeyan
12     Williams' marijuana. And as a result, Taeyan Williams was
13     unhappy. Connor Cox introduced Noah Smothers to Taeyan
14     Williams in an effort to lower the tension. And as a result of
15     that introduction, Noah Smothers began selling his California
16     marijuana to Taeyan Williams and in exchange, Taeyan Williams
17     would sell him cocaine and cash, give him cash.
18            You learned that Noah Smothers' and Taeyan Williams'
19     business relationship was seen in text messages that were
20     found on Taeyan Williams' phone. On October 27, 2017, Taeyan
21     Williams texted Connor Cox, "When is Noah getting here?"  On
22     October 31, 2017 Taeyan Williams texts Connor Cox, "You can
23     send you boy to come down."  And Connor Cox writes back "Come
24     through because he wants to know exactly what you want him to
25     bring."
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2211**

```
 1          You also learned about Noah Smothers' and Taeyan
 2   Williams' business relationship from screenshots of Wickr text
 3   message communications that were found on Taeyan Williams'
 4   phone between Taeyan Williams and Noah Smothers. Noah Smothers
 5   lets Taeyan Williams know when he's getting into town and what
 6   type of products he has to sell.
 7          Now at the same time you see these Wickr communications,
 8   you see text messages between Taeyan Williams and Connor Cox
 9   asking when Noah Smothers is coming to town. On November 26,
10   2017 you see another screenshot of Wickr text message
11   communications between Taeyan Williams and Noah Smothers,
12   their coordination of this marijuana business.
13          But starting on November 28, 2017 there appears to be
14   some disagreements as seen in these text messages. There's a
15   disagreement about who Connor Cox is working for, Taeyan
16   Williams or Noah Smothers. Taeyan Williams writes to Connor
17   Cox, "Don't sell anything until Noah gets here." Taeyan
18   Williams is jealous. He wants to be the sole supplier at West
19   Virginia University.
20          Starting in late November 2017, Taeyan Williams
21   introduces Noah Smothers to his father, Scott Williams. And
22   Noah Smothers starts selling marijuana to Scott Williams in
23   Laurel, Maryland. You learned that Noah Smothers had Scott
24   Williams' phone number, 929-290-6897 in his contact list for
25   his encrypted KryptAll phone under the contact name "MW."
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2212

```
1         We know this is Scott Williams' number because it was on
2    one of the phones recovered during the search warrant on Scott
3    Williams' side of the bed. The extraction from that phone
4    shows that Scott Williams -- shows Scott Williams' Apple ID
5    and his user account with that number. The extraction of that
6    phone also shows that one of the contacts is "Taeyan son" and
7    "Shelly" which was Scott Williams' partner at the time and who
8    he shares children with. The extraction of that phone also
9    revealed multiple pictures of Scott Williams as seen here,
10   here, and here. The extraction of that phone also revealed an
11   Enterprise picture with Scott Williams' name on it and an
12   e-mail which showed Scott Williams' e-mail address and that
13   same phone number.
14        An extraction of one of Taeyan Williams' phones revealed
15   a text message between Scott Williams at that number and
16   Taeyan Williams. Taeyan Williams had that number in his phone
17   as "OG." The text message asked OG if his date of birth is
18   ████████ 1976 which is the same birthdate as Scott
19   Williams. You also see an e-mail that was found on that same
20   phone, Scott Williams' phone, his OG phone containing an
21   e-mail saying "Happy Birthday from Allstate Insurance" on
22   ████████
23        Noah Smothers' encrypted KryptAll iPhone also saved
24   Taeyan Williams' phone number as "TA." According to Verizon
25   Wireless, that phone number is subscribed to Taeyan Williams.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2213**

1   Also, an extraction of one of Taeyan Williams' phones that was

2   seized in connection with this investigation contained that

3   same number.

4         Now you learned starting around November 2017 that Noah

5   Smothers started delivering marijuana to Scott Williams in

6   Maryland. A screenshot of a Wickr text message communication

7   that was found on Taeyan Williams' phone that was dated

8   November 29, 2017 reveals the details of a deal that happened

9   in Maryland and in West Virginia. Text message communications

10  between Taeyan Williams and Scott Williams from Taeyan

11  Williams' phone shows Scott Williams asking Taeyan Williams to

12  send him the list of marijuana strains that Noah Smothers had

13  dropped off. And, in fact, Noah Smothers -- the extraction of

14  the phone -- whoops. The Wickr text message and the text

15  messages reveal the same marijuana strains sold by Noah

16  Smothers. And, in fact, Noah Smothers creates a note on his

17  AOL account with a list of the same strains on the same day as

18  the text messages between Taeyan Williams and Scott Williams.

19        Now according to the Wickr message between Taeyan

20  Williams and Noah Smothers, as of November 29, 2017, Taeyan

21  Williams begins running up a debt with Noah Smothers. At this

22  time it's $6,200.

23        Now a few days later on December 9, 2017, there's a text

24  message string which was recovered from Taeyan Williams' phone

25  talking about another delivery by Noah Smothers. And records

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2214

1  from Aibnb show Noah Smothers staying in Baltimore on that

2  same date.

3      The next day, text messages between Taeyan Williams and

4  Connor Cox show Taeyan Williams getting increasingly jealous

5  about how Noah Smothers is taking business away from him at

6  West Virginia University. Taeyan Williams writes, "It's not

7  Cox's decision it's mine. Noah is not going to make a move to

8  anyone here without consulting me first." Again, Taeyan

9  Williams is jealous. He doesn't like sharing territory with

10 Noah Smothers.

11      On December 14, 2017 Wickr messages show another

12 marijuana deal between the two. And on that same date, text

13 communications between Taeyan Williams and Scott Williams are

14 about the same deal. Again, both messages have the same

15 marijuana strains that Noah Smothers was selling from

16 California. And, in fact, Noah Smothers modifies an AOL note

17 with a list of the same strains and writes "Tae" next to it.

18      Another message from that same date shows Taeyan Williams

19 telling Noah Smothers that he can meet up with him. And

20 records from Airbnb show Noah Smothers staying in Columbia,

21 Maryland on the same date.

22      Now this Wickr message from December 14, 2017 shows that

23 Taeyan Williams now owes Noah Smothers over $88,000 for that

24 newest shipment.  And a few days later, Noah Smothers modifies

25 an AOL note about Taeyan Williams and Scott Williams' debt.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2215**

1    The note talks about what Taeyan Williams stole, and his tab,

2    and what he owes him, and what he didn't pay him for.

3        The parties stipulated in Exhibit 573 that on January 8,

4    2018, law enforcement seized five vacuum sealed bags of

5    marijuana and over $4,000 in currency which belonged to Taeyan

6    Williams. What was one of the things that was seized?  One of

7    Noah Smothers' California bags of marijuana.

8        Now you learned on January 19, 2018 that Noah Smothers

9    rented unit A207 at the EZ Storage facility at 8255 Washington

10   Boulevard in Jessup, Maryland. You learned that the reason he

11   rented that facility was to receive large shipments of

12   marijuana that were being transported from California to

13   Jessup, Maryland. Continuing into February 2017, Taeyan

14   Williams and Noah Smothers continued to discuss business. And

15   Noah Smothers was continuing to meet with Taeyan Williams'

16   guy, Scott Williams in Maryland.

17       On February 16, 2018, text message communications from

18   Taeyan Williams' phone show him and Scott Williams talking

19   about Noah's visit to Maryland and how Scott Williams gave

20   Noah Smothers Taeyan Williams' half, and that Noah Smothers

21   was then traveling to West Virginia. Noah Smothers' Capital

22   One records show him paying a DC ticket on February 16, 2018,

23   and then the next day paying for parking in Morgantown, West

24   Virginia. Now on the same day Noah Smothers arrives in West

25   Virginia and the day after he left Scott Williams in Maryland,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2216**

1    there's a picture of Noah Smothers' gummies that was taken by
2    Scott Williams on his OG phone.
3         On February 22, 2018 Taeyan Williams continues to get
4    jealous. They discuss the money that Connor Cox gave to Noah
5    Smothers and Taeyan Williams is upset. "I don't know why you
6    want to do that without telling me that." He's jealous. Again,
7    he wants to be the sole supplier at West Virginia University.
8         Now on March 20, 2018 Wickr screenshots of text messages
9    between Taeyan Williams and Noah Smothers discuss additional
10   marijuana products and the fact that "the Maryland dude may
11   want to wait on the new load coming in." You know about this
12   new load. This is the largest load that Jacob Rayburn and Noah
13   Smothers had done during their business relationship. It was
14   worth more than $300,000.
15        Scott Williams and Taeyan Williams knew that their time
16   was now to make their move. Taeyan Williams and Scott Williams
17   were in debt to Noah Smothers. They also knew that Noah
18   Smothers was coming in to over $300,000 worth of marijuana
19   products. It was now or never to cut Noah Smothers from their
20   team once and for all.
21        Now in March, Noah Smothers travels to Morgantown, West
22   Virginia for the last time. Noah Smothers' phone puts him in
23   Morgantown, West Virginia on March 27, 2018 and he eventually
24   goes back to Binghamton, New York. You learned how Noah
25   Smothers' last trip to Morgantown, West Virginia, he met with

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2217**

1    Connor Cox. Connor Cox told you that Noah Smothers had told
2    him he was planning to meet Taeyan Williams and his family to
3    settle their debt. And Noah Smothers was nervous. Connor Cox
4    described Noah Smothers as pale, as nervous, and Noah Smothers
5    asked Connor Cox should he trust Taeyan Williams and his
6    family to which Connor Cox said rightfully, "No." Noah
7    Smothers was so nervous about that meeting he left Connor Cox
8    with approximately 11 pounds of marijuana before leaving.
9        Now you learned investigators were able to get location
10   records associated with Scott Williams' other phone, the
11   301-655-2283 phone number. That phone number is associated
12   with the second phone that was found on Scott Williams' side
13   of the bed and an extraction from that phone shows the same --
14   that phone number and the same contacts, Taeyan Son and
15   Shelly. Now that same phone number appears on Scott Williams'
16   Google records and his Enterprise records. Location data shows
17   that Scott Williams' phone traveled from Laurel, Maryland to
18   West Virginia on March 29, 2018. Location records associated
19   with Taeyan Williams and Scott Williams show them together in
20   Morgantown on March 29, 2018 and then back at Bristolwood
21   Court that same day.
22       Now on April 3, 2018 Jacob Rayburn and Noah Smothers are
23   preparing for that large shipment of marijuana. Jacob Rayburn
24   had arranged for that $300,000 worth of products to be shipped
25   through a transportation service from California to Noah

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2218**

1    Smothers' EZ Storage facility in Jessup, Maryland. A
2    screenshot from Noah Smothers' encrypted KryptAll iPhone
3    reveals a spreadsheet that Jacob Rayburn had prepared
4    regarding that shipment of marijuana which was over $300,000.
5         April 5, 2018, the date of the delivery. Location records
6    show that Noah Smothers traveled down from Binghamton, New
7    York to Baltimore, Maryland. A Wickr screenshot from that same
8    day from Noah Smothers' encrypted KryptAll phone shows a text
9    message communication between Jacob Rayburn and Noah Smothers
10   in which they're confirming which clients to get which
11   products of that $300,000 of marijuana.  Another Wickr
12   screenshot from that same day show a text communication from
13   Jacob Rayburn and Noah Smothers talking about the box they're
14   receiving.  And Jacob Rayburn writes that he will send Noah
15   Smothers "the full manifest."
16        Another Wickr screenshot shows a text message
17   communication between Jacob Rayburn and Noah Smothers and at
18   1:07 p.m. that day he told Noah Smothers, "It's here." The
19   shipment had arrived. Surveillance footage from EZ Storage
20   shows the delivery van pulling up to the gates at
21   approximately 1:09 p.m. Surveillance footage shows Cesar
22   Flores Gomez unloading the truck and delivering 15 boxes into
23   the storage unit. Now later that day at 5:36 p.m.,
24   surveillance footage shows Noah Smothers' rented 2018 Kia
25   Sportage pulling up to the gates at EZ Storage. And

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2219**

1    surveillance footage shows Noah Smothers coming out of the
2    storage unit with five boxes and a bag.
3        That same day, the manifest that Jacob Rayburn had texted
4    Noah Smothers about is saved on Noah Smothers' encrypted
5    KryptAll iPhone listing the boxes and the marijuana strains
6    that had just been dropped off in his unit.
7        Location records from Noah Smothers' iPhone show him at
8    the Airbnb he rented in Baltimore, Maryland at 651 Bankard
9    Lane at 10:54 p.m. and 11:18 p.m.  And Google records show him
10   searching for food around 7:42 p.m. and 10:44 p.m.
11       The next day, April 6, 2018, there are other Google
12   searches, "food near me," "breakfast near me," again near Noah
13   Smothers' Airbnb rental.  And that day, on April 6, 2018 at
14   7:51 a.m., Noah Smothers' rented 2018 Kia Sportage is again
15   seen at the EZ Storage facility. Noah Smothers is seen taking
16   out two cardboard boxes on EZ Storage surveillance footage.
17   That same day on April 6, 2018 at 11:20 a.m., Noah Smothers'
18   phone location data put him back near his Airbnb.
19       Now later that day on April 6, 2018 between 12:54 p.m.
20   and 1:05 p.m., Noah Smothers' Google search history shows him
21   searching for food near the EZ Storage facility in Jessup,
22   Maryland at 12:54 p.m., at 1:00 p.m. and 1:05 p.m. And that
23   same day at 1:07 p.m., Noah Smothers' 2018 Kia Sportage is
24   seen again at EZ Storage. Noah Smothers is seen taking out two
25   cardboard boxes and then Noah Smothers' rented 2018 Kia

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2220

```
1    Sportage is seen leaving the facility at 1:21 p.m. and driving
2    southbound on Route 1.
3         At 1:32 p.m. Noah Smothers does a Google search for "food
4    near me."  And the location of that Google search is on this
5    exhibit. It's right next to the Red Roof Inn in Laurel,
6    Maryland. Alfred Musa told you about Scott Williams'
7    confession to him. He told you about how Scott Williams' son
8    owed the victim, Noah Smothers, money. And so together they
9    had decided to rob the victim.
10        You learned from Alfred Musa that Scott Williams and
11   Taeyan Williams planned to meet Noah Smothers at this Red Roof
12   Inn. And they wanted to rob him, but they also wanted to
13   torture him for information about his source of supply of
14   marijuana in California. This is the last Google search Noah
15   Smothers does and it puts him right where Scott Williams and
16   Taeyan Williams planned to meet him. In fact, location records
17   for Scott Williams put him at that same location at that same
18   time. And Noah Smothers enters a note at 1:52 p.m. on his AOL
19   account about the deal he thought he was doing with Tae. That
20   same note contains a breakdown of the Williams' debt which
21   totals $30,000, the same amount Noah Smothers had told Connor
22   Cox about before leaving on his fateful trip. You learned that
23   data associated with Noah Smothers' cell phone shows him
24   directly at Bristolwood Court at 2:03 p.m. and 3:12 p.m.
25   Location records from Scott Williams' cell phone puts him
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2221**

1    there as well. And Uber records for Taeyan Williams puts him

2    also at Bristolwood Court.

3         Ladies and gentlemen, after that, Noah Smothers is never

4    seen again. All activity on Noah Smothers' electronic accounts

5    go dead. Noah Smothers' phone stops. Noah Smothers' Wickr

6    stops. Noah Smothers' iCloud stops and Noah Smothers' Capital

7    One account stops. Noah Smothers is never seen again. And

8    evidence shows in the hours and days after Noah Smothers

9    disappears, the defendants, Scott Williams and Taeyan Williams

10   carried out their plan of kidnapping, robbing, torturing and

11   killing Noah Smothers for his marijuana, his money, and his

12   supplier. The evidence will show that they tried to bury the

13   evidence of their crimes just like they did Noah Smothers.

14        Now what does the evidence show?  Well, on the same day

15   Noah Smothers disappears at 7:06 p.m. to 7:17 p.m., Taeyan

16   Williams' phone is near the EZ Storage facility where that

17   $300,000 worth of marijuana is. While he's near that facility,

18   he enters a note on his phone with that same address of the EZ

19   Storage. And the phone call that Taeyan Williams receives

20   putting him right near that EZ Storage, that call is from

21   Scott Williams on his OG phone. Taeyan Williams' phone is then

22   located traveling the Beltway around Tysons Corner.  And at

23   two of these locations he received a call from Scott Williams

24   on the OG phone. Location data from Scott Williams' phone show

25   him at Bristolwood Court at 7:15 p.m. And one of the laptops

```
 1    that was found at Bristolwood Court revealed a search that was
 2    done for EZ Storage Jessup at 7:59 p.m. that same day.  Patti
 3    Chaplin told you she didn't do that search, Scott Williams
 4    did. Because about a half-hour later on April 6, 2018 at 8:37
 5    p.m., EZ Storage surveillance footage and records show a
 6    Nissan Altima arriving at the EZ Storage facility and entering
 7    Noah Smothers' PIN. EZ records show that Noah Smothers' unit
 8    was never accessed despite his PIN being entered at the front
 9    gate. EZ Storage surveillance shows a person in a red shirt
10    driving a Nissan Altima.
11         And later that night Scott Williams is back at
12    Bristolwood Court. He's there at 11:56 p.m. and one minute
13    later, Taeyan Williams creates a note on his phone. Ladies and
14    gentlemen, this note is important. It contains a six digit
15    number. 15, 21 and 42. You learned about those numbers during
16    this trial. The Government and defense stipulated that Noah
17    Smothers wore jerseys when he was a teenager with the numbers
18    15, 21 and 42. You also learned about notes on his AOL account
19    where he listed his usernames and passwords.  All of those had
20    the numbers 15, 21 and 42. We submit to you this six digit
21    number is Noah Smothers' password for his encrypted KryptAll
22    iPhone which Taeyan Williams and Scott Williams desperately
23    wanted access to because they wanted to obtain the contact for
24    his marijuana supplier in California.
25         Now under those digits in this note there's something
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2223

```
 1    else that's important. Kipphone 164171. Kipphone 164171 is a
 2    KryptAll encrypted iPhone and it has an accompanying Wickr
 3    screen name for that same username. The only people that you
 4    heard about who had KryptAll phones in this case is Noah
 5    Smothers and his west coast suppliers. Scott Williams and
 6    Taeyan Williams got into Noah Smothers' encrypted phone
 7    because you see that KryptAll number in Noah Smothers'
 8    contacts as "P."
 9         Now during the critical time in this case you learned
10    there's no cell phone activity or location data for Scott
11    Williams or Taeyan Williams for more than 12 hours, from April
12    6, 2018 at 11:57 p.m. through April 7, 2018 at 12:53 p.m. You
13    also learned that during that time Patti Chaplin, Scott
14    Williams' partner, called Scott Williams in the middle of the
15    night at 2:27 a.m. Patti Chaplin told you she would not have
16    called him if he was home. Scott Williams was not home that
17    night. He was up in Baltimore because on April 7, 2018 at
18    4:38, a.m., Noah Smothers' rented 2018 Kia Sportage was
19    dropped off at Windsor Forest Apartments in Baltimore at a
20    parking lot off of Dickey Hill Road. Surveillance footage
21    showed -- from that parking lot shows Noah Smothers' 2018 Kia
22    Sportage driving into the parking lot followed by a Nissan
23    Altima, identical to the Nissan Altima that was seen at the EZ
24    Storage facility. The person driving Noah Smothers' rented
25    2018 Kia Sportage was in a red sweatshirt, the same color and
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2224**

```
 1    clothing that was worn by the person seen in the Nissan Altima
 2    at the EZ Storage facility. In the video you can see the
 3    person getting out of the 2018 Kia Sportage with a rag in his
 4    hand.  Our FBI expert told you that the person in the red
 5    sweatshirt is under 6 feet tall. You also see a second male
 6    wearing a gray sweatshirt getting out of the Nissan Altima and
 7    he appeared to be shorter than the person in the red
 8    sweatshirt. You also learned that Scott Williams' MVA records
 9    show him as being under 6 feet; 5 feet, 11 inches. Taeyan
10    Williams, 5'9".
11        Now after the Kia Sportage was dropped off, the person in
12    the red hooded sweatshirt and the gray hooded sweatshirt get
13    into the Nissan Altima, turn off their lights and drive away
14    at 4:44 a.m. in the morning.  The Nissan Altima drove away
15    from the parking lot towards the license plate reader at
16    Dickey Hill Road where it was caught on camera with a
17    Massachusetts license plate of 5XY974. Enterprise records show
18    Scott Williams renting a gray Nissan Altima with Massachusetts
19    plates 5XY974.
20        Noah Smothers' rented 2018 Kia Sportage was later towed
21    back to Enterprise at BWI where it was photographed. Those
22    photographs show blood stains on the rear bumper that later
23    tested positive for blood. The back gate also had apparent
24    blood stains that tested positive for blood; black boots, size
25    15, the same size as Noah Smothers were found in the vehicle;
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2225**

```
 1    and a Dunkin' Donuts gift card made out to Noah was also
 2    found. A water bottle with Noah Smothers' DNA on it and blood
 3    stains on the top back frame of the vehicle were also
 4    apparent. Those blood stains matched the blood on the frame of
 5    the back door which tested positive for blood and Noah
 6    Smothers' DNA. The car door had whites on it -- white marks on
 7    it, and its rear passenger side seats were down at the time
 8    that it was towed to Enterprise at BWI.
 9         The back trunk area was later tested and it came back
10    positive for blood in multiple areas. It also contained Noah
11    Smothers' DNA. There was so much blood it had seeped through
12    the carpet on the back trunk and you could see it on this
13    metal. Swabs taken from this metal came back positive for
14    blood and again, Noah Smothers' DNA. This large amount of
15    blood is consistent with Scott Williams' confession to Alfred
16    Musa that Scott Williams stabbed Noah Smothers to death in the
17    back trunk of the car.
18         Now what were the defendants doing after they dropped off
19    Noah Smothers' car in Baltimore?  They were together at
20    Bristolwood Court. The next day on April 7, 2018 at 9:05 p.m.,
21    that same Nissan Altima is seen entering Noah Smothers' PIN at
22    the EZ Storage facility with its back trunk opened. Because it
23    was past 9 p.m. they couldn't get in. So the next night on
24    April 8, 2018 a Nissan Altima is seen entering Noah Smothers'
25    PIN at the EZ Storage facility.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2226

```
 1          Now this time it got onto the property and Noah Smothers'
 2    storage unit is accessed. A Nissan Altima is then seen driving
 3    away from the area with a car full of cardboard boxes and
 4    bags, and bags of marijuana. You heard that Kyle Simms later
 5    rented that exact same vehicle that Scott Williams rented and
 6    performed the same drive. And you learned the cars are
 7    identical.
 8          Scott Williams and Taeyan Williams thought they got away.
 9    They thought they buried Noah Smothers and all the evidence of
10    their involvement in his murder. But on April 11, 2018 Noah
11    Smothers' family started search efforts. They couldn't get a
12    hold of him. On April 12, 2018 EZ Storage discovers a bunch of
13    empty cardboard boxes in Noah Smothers' storage unit. Those
14    boxes contained the same markings as those on the manifest
15    that Jacob Rayburn had sent to Noah Smothers regarding the
16    shipment of $300,000 worth of marijuana.
17          Three days later, on April 15, 2018, Connor Cox texts
18    Taeyan Williams about Noah Smothers. Connor Cox writes to
19    Taeyan Williams, "Yo have you heard from Noah recently?"
20    Taeyan Williams writes back, "No, I been trying to hit him up
21    too." In response Connor Cox writes back, "His people said he
22    was last heard when he was in Balt about a week ago.  You care
23    if I give you this dude's number?  He's one of Noah's people
24    trying to find him because he's been MIA for a little." Taeyan
25    Williams doesn't respond.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2227**

1          Ladies and gentlemen, you know who that person was that
2     reached out to Connor Cox. It was Jacob Rayburn. Jacob Rayburn
3     told you how he had gotten the Wickr name "Taesowavey" from
4     one of Noah Smothers' clients. Jacob Rayburn told you that he
5     had spoken to and communicated with Taeyan Williams. He wanted
6     to know where Noah was. In response, Taesowavey asked Jacob
7     Rayburn could they continue doing business if Noah Smothers
8     was out of the picture, just like Scott Williams and Taeyan
9     Williams had planned. They wanted to take the place of Noah
10    Smothers and be the direct contact with the person in
11    California.
12         The same day that Connor Cox reached out to Taeyan
13    Williams, Taeyan Williams created a note with Jacob Rayburn's
14    Wickr handle, Larrybird50 in his phone.
15         Connor Cox also told you about the last time he saw
16    Taeyan Williams and how Taeyan Williams -- when Connor Cox
17    asked about Noah Smothers, Taeyan Williams said he was asking
18    too many questions.
19         Now with not much information to go on, Noah Smothers'
20    family hired a private investigator to track down Noah
21    Smothers. And on April 26, 2018, the private investigator
22    called Taeyan Williams to ask him about Noah Smothers. Jared
23    Stern, the private investigator told you that when he asked
24    Taeyan Williams where Noah Smothers was or if he knew Noah
25    Smothers, Taeyan Williams' response, "I don't know him."

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2228**

1      Quickly got off the phone. The private investigator later

2      texted Taeyan Williams a photograph of Noah Smothers and asked

3      for more information. But the investigator never heard back.

4          You also learned about a search warrant that was done on

5      Bristolwood Court on June 6, 2018. In the basement closet

6      investigators found a bag of cocaine and methamphetamine

7      pills. They also found a Sig Sauer handgun on the same shelf.

8      Under that shelf they found a crawl space which contained 16

9      bags of Noah Smothers' California marijuana. And in Taeyan

10     Williams' basement bedroom, law enforcement found more

11     marijuana, including a bag of Noah Smothers' California

12     marijuana.

13         Investigators also searched the shed in the back of the

14     house which contained 35 more bags of Noah Smothers'

15     California marijuana. A search of the Nissan Altima parked

16     outside revealed another bag of Noah Smothers' California

17     marijuana.

18         Now in the primary bedroom where Scott Williams shared --

19     which Scott Williams shared with Patti Chaplin, investigators

20     found three guns:  A Bryco/Jennings 38 handgun found in the

21     dresser drawer; an AK-style Century Arms Sporter found in the

22     shelf in the closet, and a Beretta 21A handgun found on the

23     same shelf in the closet.

24         Also in the primary bedroom were marijuana products,

25     including a bag of Noah Smothers' California marijuana, two

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2229**

```
 1    bags of Noah Smothers' marijuana gummies, and three bags of
 2    Noah Smothers' vape cartridges. In total, investigators found
 3    approximately 72 pounds of Noah Smothers' California
 4    marijuana. You saw that marijuana in court. Investigators also
 5    found a bag of methamphetamines that had tried to be flushed
 6    down the toilet in the bathroom next to the primary bedroom.
 7          Under Scott Williams' side of the bed investigators found
 8    a black tackle box with $190,000 in cash. And finally, under
 9    the mattress on Scott Williams' side of the bed was a
10    four-page manifest that had been left in Noah Smothers'
11    storage facility by the transportation service. However,
12    something was different about this manifest than what the
13    transportation service had left. The manifest on the right
14    side had lettering:  "Me," "Tae" and "Team" written on the
15    right side.
16          Now you saw evidence of Scott Williams' handwriting on a
17    check that he wrote on his business account at Exhibit 155.
18    You should just compare that handwriting to the handwriting on
19    the ledger:  "Me," "Tae" and "Team" at Exhibit 91. The same
20    capital lettering appears on both.
21          You also saw evidence of Scott Williams' handwriting on a
22    business card he gave Kerry George with instructions to get
23    his phone and then wipe it of evidence at Exhibit 417B. You
24    should compare that handwriting to the handwriting on the
25    ledger, "me," "Tae" and "Team." Again, same capital lettering
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2230**

1    appears on both.

2        Now let's talk about the Sig Sauer handgun that was found

3    in the basement closet near Taeyan Williams' bedroom at

4    Bristolwood Court. You learned how on multiple parts of this

5    firearm it came back positive for blood. You also learned how

6    Noah Smothers' DNA was all over this handgun. Noah Smothers'

7    DNA was not just found on the outside of the firearm, it was

8    found inside of the firearm in the inner workings of the

9    firearm and in the inner slide of the firearm.

10       Now to get into the inner parts of the firearm, Noah

11   Smothers' DNA had to go through the tiny space on the muzzle

12   of the firearm. The fact that Noah Smothers' DNA ended up

13   inside the firearm, that's consistent with Scott Williams'

14   confession to Alfred Musa that he stuck a firearm down Noah

15   Smothers' throat when he was torturing him.

16       Now you also heard information from Scott Williams

17   himself during an interview when law enforcement showed him a

18   picture of Noah Smothers and asked if he had ever seen him

19   before.  His response, "Never seen that guy before." When law

20   enforcement asked him about the Nissan Altima, Scott Williams'

21   answer, "The only person who ever drove that car was me and D,

22   that's it." When law enforcement asked him about the EZ

23   Storage, his answer, "Never been there." And on the topic of

24   Taeyan Williams, Scott Williams' answer, "He's my cousin who

25   hasn't been here since March."

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2231**

1      You also heard Scott Williams on jail calls with his
2   partner, Patti Chaplin. On June 8, 2018 Scott Williams tells
3   Patti Chaplin to "call Big Boy," or Taeyan and tell him to
4   "stay low, change numbers because they're going to get that
5   junk." Now on that same call you heard Scott Williams tell
6   Patti Chaplin that she needs to "look by the Lightning junk."
7   Lightning was their dog and his crate was in that basement
8   closet. Scott Williams was scared what investigators would
9   find if they looked in that closet by the Christmas
10  decorations. They would find 16 bags of Noah Smothers'
11  California marijuana, a bag of cocaine and methamphetamines,
12  and that Sig Sauer handgun with Noah Smothers' blood and DNA
13  on it.
14      On a call the next day on June 9, 2018 you heard Scott
15  Williams talk about how he was concerned that law enforcement
16  had gotten in the shed and how "we thought they would never go
17  into that crawl joint." On another call on June 9, 2018 you
18  heard Scott Williams talk about how he was "concerned law
19  enforcement had pulled up the mattress." What was under that
20  mattress?  That manifest, that four-page manifest of Noah
21  Smothers' marijuana shipment of over $300,000 of marijuana
22  products.
23      On July 23, 2018, Taeyan Williams was placed in jail and
24  two of his phones were seized. You heard Taeyan Williams and
25  Scott Williams on a jail call from August 8, 2018. And in that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2232

1    jail call they discussed how to obtain Taeyan Williams'

2    phones. They were nervous that the police were going to get

3    them. They're nervous about what's on those phones and how it

4    will incriminate them. Let's take a listen.

5              **(Audiotape was played.)**

6              **MS. GROSSI:**  And on this next clip, Taeyan Williams

7    is trying to explain to his father, Scott Williams, what's on

8    that phone, and how they can prove their crimes based on the

9    photos on that phone. Taeyan Williams also blames Scott

10   Williams for the mess they're in because in his words, Scott

11   Williams still left all that shit at the house after he told

12   Scott Williams that the private investigator was onto them.

13   Let's take a listen.

14             **(Audiotape was played.)**

15             **MS. GROSSI:**  In this next clip, Taeyan Williams is

16   trying to explain to his father what's on his phone, "The

17   social media photos are the problem." Now as you've seen in

18   this case, Wickr screenshots on Taeyan Williams' phone are the

19   problem for them. It shows a connection between Taeyan

20   Williams, Scott Williams, and Noah Smothers. Let's take a

21   listen.

22             **(Audiotape was played.)**

23             **MS. GROSSI:**  In this final clip on the same call,

24   Taeyan Williams is expressing worry about these impending

25   charges that he and Scott Williams are facing about Noah

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2233**

```
 1    Smothers. He knows they're coming, but Scott Williams keeps
 2    telling him to stop incriminating himself. Let's take a
 3    listen.
 4              (Audiotape was played.)
 5         MS. GROSSI:  Now as the judge explained to you
 6    yesterday, the defendants are charged with nine counts. The
 7    first six counts are against both defendants. Count One is
 8    conspiracy to distribute or possess with intent to distribute
 9    controlled substances. Now this charge relates to the
10    defendants; conspiracy to distribute marijuana and cocaine.
11    You learned about this conspiracy through text messages,
12    testimony, and pictures. You heard from Brandon Drummond,
13    Oscar Diaz, and Connor Cox. They all told you about their
14    involvement in the conspiracy and the defendant's involvement
15    in distributing cocaine and marijuana.
16         Count Two is conspiracy to interfere with interstate
17    commerce by robbery or extortion. This charge alleges that the
18    defendants conspired to physically rob Noah Smothers of his
19    marijuana, his phone, EZ Storage PIN number and his 2018 Kia
20    Sportage. The defendants are also alleged to have extorted
21    that information and those products by torturing Noah Smothers
22    to obtain those same things.
23         Count Three is interference with interstate commerce by
24    robbery or extortion. Here the defendants are alleged to have
25    not just conspired to rob and extort Noah Smothers, but to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2234**

```
 1    actually carry through on that conspiracy.
 2         Count Four is kidnapping with death resulting. The
 3    defendants are alleged to have kidnapped and caused the death
 4    of Noah Smothers.
 5         Count Five is possessing, using, carrying, and
 6    brandishing a firearm during and in relation to and in
 7    furtherance of a crime of violence or a drug trafficking
 8    crime. This count relates to the possession and use and
 9    brandishing of that Sig Sauer firearm we've been talking about
10    that was found in the basement closet of the Bristolwood Court
11    home next to Taeyan Williams' bedroom. This relates to Count
12    One, conspiracy to distribute marijuana and cocaine; Count
13    Three, interference with interstate commerce by robbery; and
14    Count Four, kidnapping with death resulting.
15         They're also charged with Count Six, possession with
16    intent to distribute controlled substances. And this charge
17    relates to the defendant's possession with intent to
18    distribute marijuana and cocaine.
19         Now the last three counts are only against Scott Williams
20    and these crimes relate to the methamphetamines and the
21    firearms that were recovered from the Bristolwood Court
22    address on June 6, 2018, as well as Scott Williams' efforts to
23    destroy and conceal evidence.
24         Count Seven was possession with intent to distribute
25    controlled substances and this is the methamphetamines that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2235**

1    were discovered during the search at Bristolwood Court. You
2    learned from the Maryland State Police chemist that those two
3    bags found in the Bristolwood Court address together weighed a
4    total of 546.93 grams.
5         Now Count Eight is possession of a firearm in furtherance
6    of a drug trafficking crime. And this count relates to those
7    four firearms and the drugs found therein. It relates to Count
8    Six, possession with intent to distribute marijuana and
9    cocaine; and Count Seven, possession with intent to distribute
10   meth.
11        Now Count Nine is conspiracy to destroy and conceal
12   evidence. This count relates to Scott Williams and his attempt
13   to flush those methamphetamine pills down the toilet when law
14   enforcement got to his house. It talks about how he directed
15   Kerry George to wipe his iCloud data and to get his phone and
16   wipe that data too. It also talks about how Scott Williams
17   attempted to get Taeyan Williams' phone and to conceal and
18   destroy evidence.
19        Now Judge Chuang instructed you on conspiracy. I'd ask
20   that you pay close attention to these instruction numbers:
21   71, 78, and 92. Those instructions talk about conspiracy, but
22   they also talk about additional ways in which you can find the
23   defendants guilty because of that conspiracy.
24        Judge Chuang also instructed you on aiding and abetting.
25   I'd ask that you pay close attention to that instruction which

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2236

```
1    is at 91.
2         Ladies and gentlemen, Scott Williams and Taeyan Williams
3    buried Noah Smothers in an unmarked grave. They did that
4    successfully. But they couldn't bury the evidence of their
5    crimes. The evidence proves beyond any reasonable doubt that
6    Scott Williams and Taeyan Williams are guilty of the crimes
7    they've been charged with and the United States asks that you
8    find them guilty. Thank you.
9              THE COURT:   Thank you, Ms. Grossi.
10        Okay, next we will hear from defense counsel for Scott
11   Williams and that is Mr. Hawks. Again, if you'd like to
12   stretch while he's getting organized you're welcome to do
13   that. We'll take a break after this presentation. Just make
14   sure your microphone is working.
15             MR. HAWKS:   Your Honor, may it please the Court.
16             THE WITNESS:  Yes, of course.
17             MR. HAWKS:   May it show due regard to my learned
18   counsel, ladies and gentlemen of the jury, good morning. Now
19   at the beginning of this case, the defense team for Scott
20   Williams and me specifically, I stood right here and I told
21   you that at the bottom, the case against Scott Williams is a
22   weak, circumstantial case and as we start our third week of
23   trial after all the evidence is in, nothing has changed. This
24   is a weak, circumstantial case.
25        The case against Scott Williams is based basically on two
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2237**

```
 1    groups of facts. Fact number one:  A bunch of drugs, 72
 2    pounds, that's a lot of drugs, were found in his house. Fact
 3    number two, a car that he had rented was found in two places
 4    that were linked to a missing person, Mr. Noah Smothers. There
 5    is no scientific evidence, not a fingerprint, not a speck of
 6    DNA which connects him to the disappearance of Mr. Noah
 7    Smothers. There is not an eyewitness who connects him to the
 8    disappearance of Noah Smothers.
 9        Now there's somebody out there that we're going to talk
10    about at length. His name is Alfred Musa. He claims he heard a
11    confession. That's as close as this Government gets to
12    actually linking Mr. Scott Williams to the disappearance of
13    Noah Smothers. Everything else requires you to make a leap.
14        Now you would be justified in asking, "Okay, but how did
15    it get in his house?  Why did his car get connected to this
16    disappearance?"  You've heard all the instructions from the
17    judge. You've heard about conspiracy, you've heard about
18    aiding and abetting, and you've heard about liability as a
19    principal. Liability as a principal is the idea that you did
20    it. Aiding and abetting is the idea that you helped somebody
21    do it. Conspiracy is you agreed to do it. Given all the
22    instructions that you've heard, this much is clear: To be
23    guilty of any of those things, you have to help in time. What
24    I mean by that "in time" is that if a person commits a crime
25    and then they go to another person and they say, "I made a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2238**

1   mistake. I need your car.  I need your help." And you help at
2   that point after the event is done, you have committed a
3   serious crime. You've committed the crime of obstruction of
4   justice. You have not committed the crime that that person who
5   you're helping did.
6        I hope it wasn't lost on anyone this weird parallel that
7   we had in this case. The very first witness who testified in
8   this case was a father whose son was wrapped up in something
9   illegal, and something dangerous.  And when that illegal,
10  dangerous thing kind of exploded, that father lied to the
11  police. He reached out to his son's drug connect and he
12  conspired with him to remove evidence and then he didn't tell
13  the police about that for years. All of those acts never made
14  him a drug dealer because that help that he offered wasn't in
15  time. He wasn't helping with the drug dealing, he was helping
16  cover it up. And so if Mr. Taeyan Williams came to his father
17  and he said, "Me and some people did something with a guy and
18  it all went sideways and I need your help." If he helped, he
19  doesn't get a citizenship award. He has violated the law, but
20  he has not kidnapped anyone, he has not robbed anyone, he has
21  not extorted anyone and he's not guilty of those offenses.
22       The truth leaves clues. There's a reason why with all the
23  fingerprints, with all of the DNA, with all the pictures and
24  close -- this text phone, this Wickr message and this, there's
25  a reason why they still can't connect him to the disappearance

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2239

1    of Noah Smothers, and that's because he had no part in it.

2         I'm going to ask my colleague to play the second -- it's

3    the 530 at five minutes and 53 or ID 29, either one. And

4    members of the jury, I've talked with her and I'm going in a

5    little different order, so she has to --

6              **(Audiotape was played.)**

7         **MR. HAWKS:**  Okay, "Did you see the warrant?  It was

8    for that. It was for Tae." This is the first conversation that

9    Scott Williams has with Ms. Patti Chaplin, his partner, right

10   after he's put into jail. "Did you see the warrant?  It was

11   for that. It was for Tae." That's significant because the

12   warrant that they're talking about, you don't get the

13   affidavit. You don't get what Sergeant Simms wrote to a judge,

14   you just get a piece of paper that says "We have the right to

15   search your house." So when he says that statement, he's not

16   basing it -- he never saw the warrant. He's pulled out of the

17   house in the beginning, he's put into a police car and he's

18   taken to jail. He never sees the paper. But he talks to

19   Sergeant Simms.  And Sergeant Simms first says, "Oh, it's

20   about stealing cars or whatever," but Sergeant Simms works his

21   way over to "There's this guy, Noah Smothers. Do you know

22   anything about it?"  And immediately the light goes off and

23   this is his own guarded thought talking to Patti Chaplin. He's

24   not setting something up, he's talking to Patti Chaplin about

25   what this is about. "It's not me, this is that thing for Tae."

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2240**

```
 1          841 for Exhibit 535.

 2               (Audiotape was played.)

 3          MR. HAWKS:  Now you just heard this clip in the

 4     prosecutor's opening. "Once again I have to clean up your

 5     mess." Again, if you thought perhaps he was trying to set

 6     something up with Patti Chaplin, he was trying to blame his

 7     son when he's talking to Patti, now he's talking directly to

 8     Taeyan and he tells him once again, "I have to clean up your

 9     mess." You have this entire jail call. You can listen to the

10     whole thing. You'll hear Taeyan doesn't push back and say,

11     "What are you talking about?  This thing was your idea."  What

12     he says is "No, basically it's your mess because I told you to

13     get rid of the stuff after the fact." He doesn't push back on

14     the idea of "Hey, it's my mess."  He pushes back on the idea

15     of "Had you listened to me and gotten a better job of getting

16     rid of things that were created with my mess, we wouldn't be

17     in this predicament."

18          So the point is these are the unguarded conversations

19     between the people who are involved. It's his mess.

20          Now you might have the question, "Well, then why are we

21     here?  Why didn't he just go to the police years ago?  He's

22     been in jail for nearly five years. Why are we here facing all

23     these charges?"  And it's clear to understand, I speak on

24     behalf of Scott Williams. He doesn't tell me what to say. He

25     is protective. You can listen to that interview that he gives
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2241**

1    to Sergeant Simms and he's playing dumb. "Who is that guy in
2    your house?"  It's his brother, Rico Carty. He says, "I don't
3    know who that is.  You're going to have to ask me." "Do you
4    know this?  Do you know that?"  "I don't know anything." Until
5    Sergeant Simms says "Look, we got a lot of drugs in your
6    house. There's only a few adults. I can put it on your
7    brother, I can put it on Ms. Chaplin, or I can put it on you."
8    He says, "It's all mine. Don't put anything on anybody else.
9    It's all mine." This guy is protective.
10        And as you'll hear, not only does he not want to
11    implicate his son, not only does he not want to implicate his
12    brothers, but he doesn't want to implicate any possible
13    brothers-in-law.
14        Now before I go any further, I should make it clear this
15    is not a contest. And what I mean by that is this isn't a case
16    where the prosecution tells you a story and you listen to them
17    and you go "Hmm, okay."  And then the defense, one defendant
18    tells you a story, you listen to them you go "Hmm."  And the
19    other defendant tells you a story, you go "Hmm" and you weigh
20    the stories and you say, "I like theirs best" or "I like
21    theirs best." That is not how this process works. They tell
22    you what the evidence is supposed to show happened. And then
23    we sit back and we poke holes in that story. Both sides. And
24    at the end of that process you listen to their story and you
25    say, "After I've considered all of it, is that true beyond a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2242**

1    reasonable doubt?  Did that convince me?"  So it's not a does

2    their story make more sense than the version that we tell,

3    it's are you so convinced by their story that you know it's

4    true.

5        You've heard this before, but in a case like this, an

6    important case, essentially this is a murder case, I've just

7    got to say it. Beyond a reasonable doubt, there are all kinds

8    of standards of the law. There's a standard called mere

9    suspicion. There's a standard referenced in the Constitution

10   called probable cause. In civil juries there's a standard

11   called preponderance of the evidence. There's even a standard

12   called clear and convincing evidence. Clear and convincing

13   evidence. All of those standards are below proof beyond a

14   reasonable doubt. It's an extremely high standard. You've

15   heard it before. It's the highest standard in law.

16       Essentially what both defendants are going to ask is that

17   you give these defendants and you give the evidence and the

18   arguments they advance, the benefit of the doubt. And in a

19   case particularly like the case against Scott Williams and

20   frankly, the case against Mr. Taeyan Williams, it's a

21   circumstantial case. You're going to have to make a leap.

22   You're going to have to trust and prove things or believe in

23   things you cannot see to get there to a conviction on the most

24   serious charges in this case. And at the end of this process

25   we're going to beg you, do not make that leap because they

1    don't have it.

2        In fact, the only thing that they do have in this case to

3    try to encourage you to make that leap is Alfred Musa. So

4    let's talk about Alfred Musa. Now we never know, we're not in

5    your chair. We never know how things that we see, how you guys

6    see them. But I stood here at the beginning of this trial and

7    I said, "He is a professional liar." And I feel like I

8    delivered. The only thing that surprised me, we saw him for

9    the first time that you did. We read all about him, but we had

10   never seen him before. The only thing that surprised me about

11   Alfred Musa is frankly, I thought he'd be better at lying.

12       There are a couple of key areas that you can look to to

13   decide whether somebody is honest. One is their background.

14   Are they the type of person who has done dishonest things in

15   the past?  And that's an area where you evaluate, "should I

16   trust this person?"  And I hope it's clear to you that Alfred

17   Musa is not normal. There are people who come to court and 11

18   years ago they had something with their taxes and it was kind

19   of fishy. Three years ago they got caught with some kind of

20   lies. Alfred Musa is probably not an exaggeration to say 50

21   percent of all the official things he said, things that change

22   his legal status, things that affect an interest in money.

23   They were lies. That's remarkable. It's mind blowing. There

24   are plenty of people who have told a lie, even a lie under

25   oath who you might be able to trust.  But on just the basis of

```
 1    his background alone I would urge you you cannot trust. You
 2    cannot believe anything advanced by Alfred Musa.
 3        But there's more.  Alfred Musa has a motive. He currently
 4    is under a ten-year sentence and he has another charge for the
 5    same thing where he's going to be sentenced again. He has
 6    every reason to say whatever he can to reduce the amount of
 7    time he's going to spend in jail. And what would he do to get
 8    out of jail?  Well, he would blame AT&T without any evidence
 9    and he signed an affidavit. He swore to the Court that AT&T, a
10    major American corporation picked him and framed him. That's
11    what he's willing to do to get out of trouble. Then he sued
12    the prosecutors in his case and the agents in his case, but
13    that wasn't enough.  When all of that was failing, then he
14    reached out to the people he just sued, he just accused them
15    of being frauds and liars and he went to them and said "Hey,
16    I've got information on a murder." And so again, his motives.
17    You can't trust his motives.
18        But there's more. You look at his story and let's -- I
19    would urge you please, take a step back. The facts that are
20    missing in this case are pretty much obvious. Any lawyer
21    looking at this case will say, "Okay, they've got this
22    circumstantial case, but the thing that's missing is the
23    direct proof." Every lawyer he's met with, five minutes after
24    they open the case file, that's the conclusion they came to.
25        And make no mistake about Alfred Musa, I know he got his
```

**JA2245**

1    GED later, that's a smart guy. You heard the letters he wrote.
2    They sounded like old law books, flowery language. He's a
3    bright guy and he figured out what was missing in this case.
4    He figured out what they needed to solve their problem. And he
5    gave it to them. You need a body.  You need to explain what
6    happened to the body because you never found it and you need
7    to put him in the middle of it. You need to get it out of the
8    circumstantial "maybe he knew, maybe he didn't" into "I knew
9    he did it." He delivered that.
10        We had these questions about, you know, he took a selfie
11   in a trash chute and there was objections and ultimately
12   that's very relevant because it shows who Alfred Musa is. He
13   is audacious. He's willing to take a gamble, he's willing to
14   show off and so he invents things hoping it pays off. He
15   invents a cell phone.  "Oh, he talked to a third man on the
16   cell phone." He knew there was a cell phone in jail. Maybe he
17   heard that Scott Williams was on it and he put two and two
18   together and thought, "This will be a jackpot. If that cell
19   phone had something on it for Scott, then that would prove I'm
20   telling the truth." He took a gamble, they found the cell
21   phone.  There was nothing on there.
22        He talked about Red Roof Inn. Now we know he stays in a
23   Red Roof Inn about a mile-and-a-half, two miles from his
24   house. He was there about three weeks before this, he was
25   there about three weeks after this. There are two people

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2246

X-49

```
 1    checked into that Red Roof Inn on those two occasions:  One of
 2    them was Scott Williams, the other one wasn't Patti Chaplin.
 3    Guys are in jail, guys talk. "I go to Red Roof Inn to do my
 4    dirt." He knows there's a Red Roof Inn through his house.
 5    Again, Alfred Musa takes a chance. Doesn't pay off. There's no
 6    evidence that anything happened at a Red Roof Inn.  And if you
 7    step back and think about it, it's pretty absurd that you
 8    would -- the Government said he was tortured and beaten and
 9    you're doing that in a Red Roof Inn?  It's going to be messy,
10    people are walking by. He's a very, very tall person. Noah
11    Smothers is very tall. He stands out. You're going to do that
12    all in a Red Roof Inn?
13        You heard that Alfred Musa changed his story and he
14    explained on the stand, "Well, the reason why I changed my
15    story is that Scott Williams changed his story." Wait a
16    minute, the whole point of what he's saying is that Scott
17    Williams did it.  So why would Scott Williams change his
18    story?  Scott Williams did it. He's not reacting to new
19    evidence as it's coming in. If he did it, he did it. There's
20    only one story. Why would he change his story?  It's just
21    another way that what Alfred Musa is telling you doesn't make
22    sense.
23        Just please keep in mind, everything that he told you
24    that could be independently verified turned out to be false.
25    There was no phone, there was nothing that proves anything
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2247**

```
 1   happened at a Red Roof Inn. They never found a body. And I
 2   hope it's clear to you how thorough the Government is. It came
 3   up in like a minute or five minutes they said, "What efforts
 4   did you make?"  They canvassed Baltimore.  That means they
 5   sent a team of officers in Baltimore with pictures asking
 6   questions.  Nothing. They had fraud men in bodies of water
 7   around here.  They called every morgue and hospital in five or
 8   six states. They were thorough. If there was something that
 9   happened at a Red Roof Inn, somebody would have said "Yeah, I
10   remember a 6 foot 6 guy getting into a trunk." Somebody --
11   that would have turned up.
12        The U.S. Attorney's Office anywhere, but particularly
13   here near the nation's capital is a difficult job to get. To
14   work in that job you can be sure these are experienced
15   prosecutors.  These are good lawyers who have done well.  They
16   understand Alfred Musa is a terrible witness. They understand.
17   So why would they put him on in this kind of case?  It's
18   because they need him. They need him. They need him to have
19   you make that leap. And you see these and I'll just call them
20   what they are, they're silly efforts to bolster Alfred Musa.
21        They had the captain from the guard come down and say
22   that Alfred Musa pushed the meal cart and he got a special
23   meal, so that was a place where they interacted. They said
24   that "Oh, they met in the Islamic religious services and that
25   was a place where they met." I asked him questions and
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2248**

```
 1    throughout this you may have wondered, what are the point of
 2    some of the questions I asked?  I asked about the dates that
 3    they met with Alfred Musa. They met with him in October of
 4    2020 and then again in May of 2021. All the evidence about
 5    those -- the things that they need, you know, that there was
 6    location data that put it in the vicinity of that Red Roof Inn
 7    and the house, all of that was -- he knew that. His lawyers
 8    knew it and he knew it long before that. But the evidence that
 9    they put in -- and you'll have a chance to see it, those
10    records of the religious services, they start in 2022, a year
11    after they met him. If the whole point of putting that in was
12    to prove that he had a chance to talk to Alfred Musa, that
13    doesn't prove that. They're just trying to make a point to you
14    that doesn't -- it doesn't make that point.

15        And it brings up something that you may have noticed in
16    this case. This team is very, very good at over-proving things
17    that are obvious, perhaps to cover for the fact that they
18    can't prove things that are necessary. So in this case we had
19    an expert who felt like he was testifying for an hour to
20    explain that a 2018 Altima is a 2018 Altima. I mean, he talked
21    about how the diagram went and Mr. Crawley said, "Just look at
22    the VIN." They put that in. They flew the director of some DNA
23    research facility up from Texas to establish that parents' DNA
24    is similar to their children's DNA, as if 23 And Me and
25    ancestry.com or high school biology class, as if we all missed
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2249**

1    that. They put all this evidence in to prove that, but then

2    they showed you "me and Tae" and "me and Tae" and "me and Tae"

3    and then they said "Look at this," you know, "something he

4    filled out ten years ago." There are handwriting experts in

5    the world.  We got an expert on an Altima is an Altima, but we

6    can't get a handwriting expert?  They're fingerprints.  We

7    can't pull a fingerprint from that?

8        I also hope it's clear, I talked about them being very

9    thorough, they're putting their best foot forward. They've

10   gone through a lot of evidence and they've called out the one

11   or two pieces that establish their point. And I want to be

12   clear, I'm not accusing them of doing anything wrong, but they

13   are advocates. And so they are -- there's a pull on all the

14   evidence in this case.

15       You've seen a series of witnesses take the stand and they

16   say to them, you know, "What were you instructed to do?"  "Oh,

17   we just have to tell the truth. As long as we tell the truth

18   we're okay. We have immunity. Just tell the truth."  I promise

19   you there is no means by which Scott Williams or Taeyan

20   Williams can file something with the Court or anybody else and

21   say "Hey, that person lied" and then they face charges. That

22   will never happen. You've heard all the substantive

23   instructions in this case. You're going to get a few more.

24   Listen carefully. You will not hear any method where you can

25   inform them and that person will be prosecuted for not telling

```
 1    the truth. Even the Court cannot begin charges. The only
 2    people in this room that can start charges against someone are
 3    sitting at that table. And so when they say "All we have to do
 4    is tell the truth," no, all they have to do is tell their
 5    truth. And again, I want to be clear, I'm not saying that
 6    they've purposely put in perjury or anything like that, but
 7    they exert pressure and people respond to that pressure.
 8         And so you saw Connor Cox. Connor Cox was one of the drug
 9    buddies of Taeyan Williams. And he took the stand and he
10    included something he had never said before in all the things,
11    all the times that he's interacted with this case. He said, "I
12    actually went in the house at Bristolwood." Never said that
13    before. And they got up and they said, "Well you were looking
14    at pictures and you remembered from the pictures that" -- and
15    again, that fact doesn't hurt us, but it just shows you that
16    pull. It shows you that pull that they exert. If they keep
17    asking a witness, "Are you sure you don't know Scott Williams?
18    Are you sure you didn't deal with Scott Williams?"  These
19    witnesses are likely to say "Actually, yeah, maybe I did."
20    And all of a sudden he's pulled into this.
21         Now to believe what Alfred Musa says, you have to -- you
22    have to believe what you've been told throughout this entire
23    trial about that gun, about that Sig Sauer P228. And their
24    theory is pretty straightforward. Somebody had that gun and
25    they pistol whip Mr. Smothers. And in pistol whipping him they
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2251**

1  get blood on it.  And then counsel today said, "shoved it down

2  his throat," the witness said "put in his mouth."  But the

3  point is this pistol whipping got blood and DNA all over the

4  weapon.  But then there's only blood on the tip of that weapon

5  because it was wiped off. Kind of like a Sherlock Holmes thing

6  like they wiped off the weapon, but they forgot to wipe out

7  the middle of the weapon.  "Aha, that's how we caught you."

8  That's a good theory.  The problem is, it's wrong. It's wrong.

9  And I want to be clear to you, you're going to see Exhibit

10  449A and that is not something that some defense expert kicked

11  up, that's from the Maryland State Police.

12      Let's take a look at that. So this is the first lab

13  report completed by the Maryland State Police regarding DNA

14  and you'll see here where it says "Exhibits," Exhibits 8

15  through 12 and Exhibits 14 through 16 were from that Sig Sauer

16  P228 handgun.  And you'll see here it talks about where these

17  exhibits come from. From the back of the gun, from the spring

18  recoil tube.  That's one of the things I had asked Sergeant

19  Simms about. From the inside of the barrel. From the back of

20  the magazine. And so I want you to pay attention to 14 which

21  is the side of the gun.  And then 9 and 10, those are those

22  interior parts of the gun.  The last day when Sergeant

23  Simms -- those are the interior parts of the gun. If you

24  recall, Sergeant Simms, one of the last things he did was they

25  put up a picture of a gun where it looked like it was facing

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2252

```
1    right towards you and they said, "circle where you found the
2    blood on the gun" and he circled that end of the gun.  And
3    again, that's their theory that "aha" he put it in his mouth,
4    beat him, they didn't wipe that part off.  That was their
5    fatal mistake. Again, this was their lab. We didn't do this.
6        Exhibit 9 from spring recoil tube swab, presence of blood
7    negative. There's no blood on that interior part of the gun.
8    Exhibit 10, inside of the barrel. A test for the presence of
9    blood was negative.
10        Now you have access to Exhibit 450. That's a summary that
11    was made by Sergeant Simms. And in that summary you'll see
12    phenolphthalein positive, phenolphthalein positive.  And you
13    heard testimony that phenolphthalein is a, quote, "presumptive
14    test for blood." And a few of you might be old enough to
15    remember old TV shows with the police where the police would
16    do a drug bust and there would be some drugs there and
17    somebody would put their finger in there and go, "It's
18    cocaine." That's not a lab test. That's sort of a field test.
19    Phenolphthalein, that's a field test. This is the lab test and
20    the lab test is clear, there was no blood on that gun. You
21    have Exhibit 449A, you can review it.  There's no blood
22    anywhere on that gun.
23        Exhibit 14 is the magazine catch, slide catch and
24    decocking levers.  Those are the things that I had asked
25    Sergeant Simms to go over. Those things are necessary to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2253**

```
 1    operate a gun as a gun. It's the bullet -- the button that
 2    allows you to put the magazine back in and the spring that
 3    allows you to cock the gun and get it ready to fire.
 4        Exhibit 14, very last line.  It's about the middle of the
 5    page.  Scott Williams is excluded as the person who handled
 6    that gun. Now there's two things that I would ask you to
 7    consider in reviewing this exhibit. Number one, that whole
 8    Government theory about "Oh, he was pistol whipped and the
 9    blood," that can't be true. It's inconsistent with the
10    evidence, that's number one. Number two, how did his DNA get
11    all over the gun if it's not blood?  And particularly, how did
12    it get inside the gun if it's not blood?  Now I guess there's
13    some theory that when it went in his mouth it went all the way
14    in his mouth, but I hope you consider that that's farfetched.
15    No gun got put so far in his mouth that the back of the gun
16    which had his DNA on it got DNA on it.
17        Another theory that is consistent with this evidence to
18    include the inside of that gun is that he handled that gun and
19    disassembled that gun. In other words, Noah Smothers had an
20    opportunity to put his hands all over that gun, including on
21    pieces in the inside which would suggest that was Noah
22    Smothers' gun.
23        Now let me be clear, I wasn't there.  No one on the
24    defense team was there when the gun was recovered. We don't
25    know. But if we're looking at the evidence, if we're looking
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2254**

1  at the facts, it's actually more consistent with the evidence

2  in this case that that gun belonged to Noah Smothers than it

3  did to some person who was pistol whipping him and torturing

4  him.

5      Now I said this is a circumstantial case; the house, the

6  car. And it's a weak circumstantial case because plenty of

7  people had access to the house. Connor Cox dealt with Mr.

8  Taeyan Williams, said he knew the house, said he dealt with

9  people related to Taeyan Williams, said very clearly never

10  dealt with Scott Williams.

11      Oscar Diaz dealt with Taeyan Williams. Knows the house,

12  dealt with, quote, "people" or "uncle," never dealt with Scott

13  Williams.

14      Brandon Drummond dealt with Taeyan.  Now he did say that

15  one time Scott Williams delivered something to him.  And I

16  challenged him and the comeback on direct, he had never said

17  that before, the comeback was "Yeah, but you did, you said you

18  dealt with him" and he said "Yeah, there was something in a

19  text about coming to the house." All of these people testified

20  at one point or the other that they had this drop system at

21  the house, that they would come to the house, pick up drugs or

22  leave money, sometimes outside in a car. So they all are

23  familiar with the house and they may know who Scott Williams

24  is, but they didn't deal with Scott Williams.

25      All right, you heard the charges, the prosecutor ran

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2255**

1   through them for you. And again, we just underline, Count Two,
2   conspiracy to commit robbery and extortion.  What they have
3   proven is that he knew when they talked about those jail
4   calls, he knew what was in his house. He knew when he's saying
5   "Oh, did they look where Lightning," he knew there was drugs
6   in his house. Of course he knew, everybody who lived there
7   knew. Robbery and extortion, kidnapping and murder,
8   conspiracy, there's zero evidence that actually establishes
9   any of that.
10       Now there are a bunch of conspiracy, conspiracy with
11   drugs and this is where it's a tougher case for us.  Now the
12   judge will give you this instruction about conspiracy, and
13   this instruction, and this instruction. There's evidence in
14   the record that he possessed drugs and that he sold drugs. But
15   there's not a lot of evidence that he did it with Taeyan. And
16   it is possible that his drug dealing, limited as it is, is not
17   lined up with Taeyan's drug dealing. So please carefully
18   consider the instructions you've seen and all the instructions
19   you hear when you're trying to see what exactly was the
20   agreement that they had. Because there's -- there's pieces in
21   the record and I told you this in the opening statement.
22   There's going to be these little pieces that you have to find.
23   One of those -- this is Exhibit 340 and I'm going to zoom
24   here, hopefully make it a little easier to see.  So he's
25   having a text conversation with Connor Cox. Connor Cox says,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2256**

```
 1      "Hey, I'm in northern Maryland. I want to buy some drugs. Can
 2      I do it?"  And they're kind of going back and forth.  And
 3      finally he says, "I'm at the place on the highway where either
 4      I have to decide I'm going to come and see you or I'm going to
 5      go somewhere else, so can I come?"  His answer, "No, I'm with
 6      my dad." That doesn't sound like a drug conspiracy. If these
 7      two are co-conspirators in a drug conspiracy, why would it
 8      matter "I'm with my dad, I can't do that now"?
 9          One of the charges in this case is called 924(c).  It's
10      the idea that it is illegal if you're selling drugs to carry a
11      gun, or brandish a gun, or use a gun in furtherance of a drug
12      conspiracy. It is illegal to have those things in furtherance
13      of a drug conspiracy. The Government wants you to treat that
14      as automatic. We know there's drugs in his house, we know
15      there's guns in his house.  That's it.  We'll kick our feet
16      up, we're done.  But that's not the law.  The law is in
17      furtherance of a drug conspiracy.  Ask yourself, what evidence
18      have you heard throughout this entire trial that even
19      addresses that?  What evidence have you heard throughout this
20      entire trial that he brandished a gun at somebody in selling
21      drugs, or carried a gun while selling drugs, or used a gun
22      while selling drugs?
23          Now there's one big piece out here, it's the Alfred Musa
24      where there's the pistol whipping and all of that. Defense
25      submits to you that didn't happen. So outside of that, we know
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2257**

1    about the three guns that were found in his upstairs. What

2    evidence do you have that he ever used those in any connection

3    to any drug crime?  I submit to you you don't have that

4    evidence and the finding on this count should be not guilty.

5        There's a kind of current that's been running through

6    this trial that's popped up in a couple places and it's the

7    idea that I guess the best way to sum it up, Jacob Rayburn

8    sold drugs illegally and he made millions of dollars and now

9    he's got a farm, he's got an organic spa.

10       Mr. Flores Gomez drove his drugs around and he's got

11   potentially a 20-year jail sentence, he's waived just about

12   all of his rights, and he's very likely to be deported.  And

13   he did that driving the drugs that made Jacob Rayburn rich.

14   And I guess there could be a concern that what we're asking

15   you to do quietly is please ignore the law and cut them a

16   break because the system is not fair. It couldn't be further

17   from the truth. What we're asking you to do, particularly the

18   team of Scott Williams, is to follow the law. Is to follow the

19   law but please, follow it scrupulously.

20       Historically people like this don't get the full benefit

21   of the doubt that the law entitles them to. They get you

22   close.  He had drugs in his house, his car. Look at him, it's

23   enough. In this case, demand more. Demand the actual proof

24   that he broke the law. You'd have to show some agreement

25   before the fact that he had some interest in kidnapping

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2258**

1   anyone, in robbing or extorting anyone. Demand where is that
2   evidence?  Not what the Government has proven here today which
3   is there are these gaps which if you view them suspiciously
4   then "Aha."
5       One of the things the prosecutor just said is there's a
6   12-hour gap where they don't talk and it's in this critical
7   point in the trial. We only have fundamentally a week worth of
8   phone calls. And in that week's worth of phone calls, right up
9   at the beginning, April 4th when we know Mr. Smothers was
10  alive and well, he was coming from New York down to Baltimore,
11  these two don't talk for something like 16 hours. So all of a
12  sudden the fact that they don't talk is proof that they're
13  breaking the law. No, it's not. It's proof that a grown son
14  and his grown father don't talk all that often.
15      You heard about this 2:27 a.m. 2:27 a.m. Pattiann Chaplin
16  called at 2:27 a.m. and that's proof that he wasn't home and
17  that he had somehow disabled or turned off his phone. You have
18  those phone records. You'll see in there that there's a phone
19  record, several phone records where that -- someone makes a
20  call to someone, it's one of those zero, you know, the call
21  doesn't register it, including several between Ms. Chaplin and
22  Scott Williams. Including one -- and including the OG phone.
23  Including one where Scott Williams calls Patti Chaplin and
24  then immediately thereafter Patti Chaplin calls Scott Williams
25  and they're both zero zero calls. How is that possible?  The

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2259**

```
 1    whole point is if it goes to zero it means you've disabled
 2    your phone.
 3        There's even a call from Scott Williams' line to the OG
 4    phone. Is he split personality?  So please, understand those
 5    records for what they are. They are  imperfect records of
 6    activity of a machine. There are butt dials. There are people
 7    who are in a dead coverage area in their house. Proof that he
 8    was there would be proof that he was there. A camera, one of
 9    those little diagrams that actually shows he was there
10    dropping off a car, or he was there up in Jessup. The fact
11    that there's space in his schedule where he could be there,
12    that's not proof.
13        Just to be clear, Patti Chaplin didn't say he wasn't at
14    home. They asked her a hypothetical question, "Well, would it
15    make sense to call if he was at home?"  "Well no, it wouldn't
16    make sense to call." She didn't say -- she didn't testify that
17    he was not in his house at 2 in the morning.
18        They're very thorough. They looked for a red shirt. They
19    looked for a red hoodie. "Aha, we got you." If they had found
20    that they would be over the moon. You keep the gun, but you
21    get rid of the shirt?  Does that make sense?  I mean, that's
22    what you'd have to believe, that he said, "I'm going to
23    destroy the shirt, but I'll keep the gun."
24        Again, there's this pull of evidence where they say
25    things that really aren't supported by the facts. Government
```

1  counsel said "Taeyan Williams wanted to be the sole supplier
2  for all of West Virginia University." There's zero evidence of
3  that. There's zero evidence that there were two suppliers
4  before this and then he wanted to make it one.
5      They put up this what they call the invoice where it's
6  "me, Tae, team, me, Tae, team" and it shows they're in a
7  conspiracy. First of all, as I said earlier, handwriting
8  expert, it's block letters. Anyone could write that. But even
9  if it was him, that would prove the opposite of their point.
10  If there's a "team," then why is there a "me" and why is there
11  a "Tae"?  If this is a conspiracy then it wouldn't say "me Tae
12  team" it would just say "team" or it would just say "me" or
13  just say "Tae."  It wouldn't say "me Tae team" as if those are
14  three different things. So what they claim proves one thing,
15  actually proves another.
16      Please look closely at -- the Government counsel put up
17  one of her slides and it said, "See how there's the same
18  strains."  And on the Government's slide there were -- on the
19  Noah Smothers' Wickr handle slide it had like seven lines. And
20  on the text from Taeyan it had like three lines. So the idea
21  that they're trying to prove that clearly he took everything,
22  there's no proof of that.
23      And please remember, it's not like Noah Smothers was the
24  only person on earth selling these strains. It would be like
25  saying that if someone had Granny Smith apples then you know

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2261

```
1    who they bought them from because he had Granny Smith apples
2    and now he has Granny Smith apples.  Everybody in the world
3    sells Granny Smith apples.  These are common forms of
4    marijuana.
5         That rental car.  Government counsel talked about there
6    was so much blood it even seeped all the way to the bottom of
7    the -- please remember what the evidence was in this case. The
8    car was left. The Kia Sportage was left in this parking lot.
9    Enterprise got wind of it that the transit police officer
10   came.  He took pictures of that.  And he told you "When I was
11   taking pictures of that I didn't notice this stuff." Then they
12   send it to Enterprise and Enterprise processed it normally.
13   And then they rented it out and a lady who had flown up for a
14   baby shower drove that car for a weekend and she didn't go
15   back to Enterprise and say, "What in the heck?  You sent me a
16   bloody crime scene car." She just said it seemed dirty, but
17   she turned it back in to Enterprise. They cleaned it a second
18   time and then the police said "Hey, put a hold on it." So two
19   Enterprise people and a consumer, they had access to that car
20   before all this police processing happened.
21        And so one of the slides you have is you may recall they
22   had a blood spatter expert and he said, "If you look here it's
23   consistent with dragging. Somebody dragged a heavy object
24   across it." That's the body. That's what they're trying to
25   tell you. Except someone cleaned that car, maybe with a vacuum
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2262

```
 1    cleaner, at Enterprise, twice. And so maybe those lines aren't
 2    someone dragging a heavy object, but the evidence that
 3    Enterprise actually follows through and cleans the car as the
 4    representative said, bumper to bumper.
 5        That drug shipment was 280 pounds. They had 72 pounds.
 6    The only proof that it was emptied and it was emptied by them
 7    comes not even from Jacob Rayburn, it comes from the people
 8    that Jacob Rayburn sent to clear out the storage locker. We're
 9    trusting someone we don't know who potentially works for a
10    cartel.
11        The thing I would ask you to take away from this is two
12    things: One, this whole story of pistol whipping is just
13    false. The evidence doesn't support that. Second, you have no
14    way to establish that he joined anything before Noah Smothers
15    disappeared, which means there's no way to prove that he was
16    involved in a robbery or extortion, there's no way to prove
17    that he was involved in a conspiracy or actual kidnapping at
18    all.
19        But I also want you to consider -- as I said earlier,
20    we're in the poking holes business. Just consider some things.
21    The search warrant is for Tae and his uncle or uncles. Tae and
22    his uncles. Those are the people we're looking for. You have
23    an exhibit, Exhibit 340A. If you would look through that
24    exhibit and the last thing I'm going to do is put a note page
25    up there where it directs you exactly to it.  Look at the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2263**

1    tenor of the comments. Basically there's a drug deal going on
2    and Connor Cox is supposed to make a payment at Walmart and
3    it's just going slow. The lady messes up the name and she puts
4    "Fox" instead of "Cox." There's a person who it's in text
5    messages, they lose their cool in text messages. If we're
6    looking for somebody who might be working for Taeyan and
7    something goes sideways, somebody loses their temper and
8    something goes wrong, it's not Scott Williams.

9        You heard testimony that Noah Smothers at one point
10   snorted an 8-ball of cocaine in 20 to 25 minutes. We had Task
11   Force Officer Bush, to just remind you he's the police officer
12   who had kind of the Mohawk hair cut. And he said an 8-ball is
13   usually where you consider that's a dealer. If you're carrying
14   an 8-ball, that's a dealer. And he said a heavy user can use
15   an 8-ball like in a day. Noah Smothers snorted an 8-ball of
16   cocaine in front of Connor Cox in 20 to 25 minutes. The idea
17   that we can completely discount some medical emergency, we
18   can't.

19       You've heard all about these encrypted phones. And
20   please just take a minute to consider all the things we'll
21   never know about who else they were dealing with. Jacob
22   Rayburn, he minimized. He testified on his direct that "I sell
23   drugs." I said, "Where do you sell drugs?" And he said "In
24   Maryland." And these tables, we were all leaning forward like
25   "And? And?" He didn't say anything. And then while he

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2264

1  started testifying he talked about in Pennsylvania, and West

2  Virginia, and New York, and North Carolina. And these people

3  were connected to a lot of people in a very bad business.

4      Remember what he said about this courier service, he

5  would put a trash bag filled with drugs in his car and he

6  would drive it and park it.  And then he'd go get a sandwich.

7  And when he came back it was gone.  And four days later, poof,

8  it was in New Jersey. It's like from a movie. Who does that?

9      And what I'm trying to get up to is is if this was a

10 7-Eleven robbery and we said "Yeah, but what if a cartel did

11 it," that's not reasonable doubt. But in this case where one

12 of the people they dealt with was EQ, a gangster who had been

13 robbed of $4 million or had $4 million seized weeks earlier,

14 what can you do with $4 million?  There are people who do hits

15 for $10,000, for $1,000. One shipment in this case was

16 $60,000.

17     What do we know about whether Jacob Rayburn and Noah

18 Smothers, Noah Smothers had the cocaine problem, maybe made

19 the mistake and somebody said, "That guy has got to go." What

20 do we know about whether that happened or didn't?  I'd submit

21 to you you know nothing because it's hidden in encrypted

22 phones that Noah Smothers -- I mean, Jacob Rayburn he said as

23 soon as this happened, he broke his encrypted phone and threw

24 it in the water.

25     There's so much we'll never know. Everything they tell

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2265

```
 1    you about this case is the peek-a-boo that Jacob Rayburn chose
 2    to share with them. So what's not there?  That laptop.  The
 3    laptop that the Smothers family worked with Jacob Rayburn to
 4    get it to them. He told you, "I couldn't get into the laptop."
 5    Now first of all, the encryption on that laptop was so amazing
 6    that a Maryland state employee was like, "It's the highlight
 7    of my career. I broke through this super encrypted laptop."
 8    And if you remember, the password he finally discovered, it
 9    was "Noah." We know Jacob Rayburn set up the laptop. He's the
10    one who bought all those phones, he set up that encrypted
11    laptop.  So that alone should tell you he absolutely could get
12    into the laptop.  But number two, the password was "Noah."
13    He's like, "I just couldn't figure it out." What was on that
14    laptop that was so important he flew across the country just
15    to make sure it was in his hands.
16         I promised you notes. Please don't take my word for it.
17    Please review.  You're going to have all this evidence. Please
18    review this evidence. And when you consider it and when you
19    consider the law, please consider it the way the law was
20    intended for everyone in this country, just that Scott
21    Williams and Taeyan Williams get the benefit of the doubt.
22    And if you do that, if you give them the benefit of the doubt,
23    no special favors, no -- just the benefit of the doubt, Count
24    Two, Count Three, Count Four, Count Five and Count Eight
25    there's no way, there's no way you can find them guilty.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2266

1        **THE COURT:** Mr. Hawks, we're down to two minutes.

2        **MR. HAWKS:** Okay. Members of the jury, I appreciate

3    your service and your kind attention throughout this process.

4    Thank you.

5        **THE COURT:** Okay, ladies and gentlemen, thank you

6    very much for your close attention. I promised you a break

7    after the first two arguments and we will do that now. Again,

8    keep an open mind. Don't discuss the case among yourselves.

9    You've heard a lot of information. You haven't heard from

10   Taeyan Williams, you haven't heard rebuttal. You're not in

11   deliberations so again, just enjoy the break. We'll see you

12   back here in 15 minutes. Thank you.

13       **(Jury exited the courtroom at 11:04 a.m.)**

14       **THE COURT:** We'll see everyone in 15 minutes. Mr.

15   Guillaume, you can set up as best you would like.

16       **(Recess was taken from 11:04 to 11:21 a.m.)**

17       **THE COURT:** Before we call in the jury I just wanted

18   to report that based on the earlier discussion and wanting to

19   make sure we do this absolutely as best we can, I did elect to

20   make some technical edits to the verdict form. We'll hand out

21   copies, one for each team. Basically I'm trying to track what

22   I think is both the language in the jury instructions and also

23   what's the best way to characterize the Count Five and the

24   statute. So now both in the header and in questions 9 and 9A,

25   10 and 10A, it reads: "Possessing, using, carrying, and

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2267**

```
 1    brandishing a firearm in furtherance of or during and in
 2    relation to a crime of violence or a drug trafficking crime"
 3    is the way I described the count. And no other changes, but I
 4    just wanted to let everybody know that. And we'll give you
 5    copies before the jury deliberates.
 6         Okay, I think we're ready for the jury then. We'll just
 7    wait for them to come in.
 8              (Jury reentered the courtroom at 11:23 a.m.)
 9         THE COURT:  Thank you, everyone.  Please be seated.
10    Welcome back, ladies and gentlemen.  We're going to continue
11    with the closing arguments. We'll next hear from Mr. Guillaume
12    who is counsel for Mr. Taeyan Williams.
13         MR. GUILLAUME:  Thank you, Your Honor. Good morning,
14    ladies and gentlemen. Before I get started, I want to just
15    thank you for your time and for your service in this case. I
16    know it's been a long three weeks and I've watched you all
17    throughout the trial take diligent notes, pay attention to all
18    the witnesses and I just ask that you -- now we're at the
19    final part of this case, the final argument from the defense
20    in this case, that you give that same attention that you've
21    been giving throughout the case. I really appreciate it, my
22    client would appreciate it and my co-counsel, Christopher
23    Nieto truly appreciates all the time that you put in thus far.
24    I also would like to address something a bit of a --
25         THE COURT:  Hold on a second.  I'm sorry.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2268**

1              **MR. GUILLAUME:**  --a unique circumstance that our

2      team finds ourselves in, Taeyan Williams and my co-counsel,

3      that you just heard the argument of Mr. Scott Williams.  And

4      I'll just say, I'll put it like this:  Normally I'm used to

5      rebutting what the prosecution says in their opening

6      statements and in their arguments, I'm going to do this in

7      this case as well, but it's disappointing, I'll just leave it

8      at that, that that type of argument was put forward. I intend

9      to argue from the evidence as I told you in my opening

10     statements and you'll be hearing things that are in evidence,

11     exhibits that are in evidence, and my analysis of those

12     exhibits. And I'm going to ask you to find my client not

13     guilty now, and at the conclusion of this case.

14          Ladies and gentlemen, as you may recall, as I just

15     alluded to a moment ago, my opening statement I made certain

16     promises to you. One, that I would argue from the evidence.

17     But more importantly, that my client, Taeyan Williams, had

18     nothing to do with the disappearance of Mr. Noah Smothers. And

19     what's even more acute, what's more obvious in this moment now

20     is that Mr. Taeyan Williams needs to be judged individually

21     from his co-defendant; his father, Scott Williams.

22          There's a jury instruction that you have been given to

23     tell you just that, that the judgment of guilt must be based

24     on the evidence against the particular person, against Taeyan

25     Williams.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2269**

1    I also told you and it's no secret from the time you
2    first heard my voice, from the time I first met you that
3    Taeyan Williams was a customer of Noah Smothers, not a rival.
4    He was friendly with him. He was not a rival. There was no
5    animosity there. And as I said a moment ago and I will
6    continue to say, I plan to argue from the evidence in the
7    case, the evidence in the case. Evidence are exhibits,
8    evidence are testimony, things that you have been presented
9    that hopefully you remember.
10    As Judge Chuang alluded to in the beginning part of this
11    trial, there's no transcript that you're going to be given.
12    There's no reading back of what witnesses say. So I'm going to
13    reference some witness testimony and I hope that you remember
14    it the same way I do because I took pretty scrupulous notes
15    and I hope even if you didn't take the notes, that you
16    remember that this was said in court.
17    The prosecution on the other hand in their opening
18    statement they made three very specific claims which they've
19    kind of alluded to here and I want to focus on those
20    throughout the course of my argument. But I want to remind you
21    as to what they are.
22    First, that there was a conflict about money between my
23    client and Noah Smothers. There was not. And we'll get into
24    that; two, that Mr. Taeyan Williams lives or has a bedroom in
25    the basement of Bristolwood Court. He does not. He doesn't

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2270**

```
1    live there.  He doesn't have a bedroom there; and lastly, that
2    location data shows you that Mr. Smothers is in the area of
3    the residence at Bristolwood between 1 and 3 p.m. They
4    forecasted all of this for you in the beginning of their
5    trial. They've argued some of it here in closing. The only
6    point that I sort of agree with is the last one and we're
7    going to get into that in a moment.
8        But before we do, I want to remind you that the
9    prosecution, the Government, United States Government has the
10   absolute burden of proof in this case, in any case. Defendants
11   charged in criminal cases are not required to prove their
12   innocence. They're not required to call witnesses. The
13   Constitution is very clear. You've received an instruction on
14   that. So I know because we're all human beings, some people
15   will wonder, well, why didn't so and so put on witnesses or
16   put on a case, et cetera et cetera. That is not for you to
17   determine. The law has been given to you and you must follow
18   the law.
19       We sat here yesterday for a very long time and listened
20   to the law. It was dense, it was extensive, but it's
21   important. It's fundamental. It's a part of our justice system
22   that you -- the judge read to you so he knows you hear,
23   listen, and then will have with you when you make these
24   decisions, these very important decisions, the law in your
25   hands, literally in your hands to use and apply that law.  In
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2271**

```
 1    law school, I was in law school a while ago, that's the first
 2    thing you learn. You apply the law to the facts. In this
 3    context if the law and the facts don't match up which they
 4    don't, then you must find my client, Taeyan Williams, not
 5    guilty.
 6         There's also another instruction that talks about
 7    inferences, about looking at the evidence from a common sense
 8    point of view. And sometimes that's easy to do in certain
 9    cases. Other times it's not. This is a case that has I'm sure
10    presented an unfamiliar world for many of you. Me too, and I
11    do this for a living. You've heard about encrypted phones,
12    you've heard about large drug shipments across the country.
13    Many of you probably I'm going to be safe to assume have never
14    heard this stuff before outside of some fiction, a movie, or
15    TV show or a book, but this is not fiction.  It's real life.
16    And it may be hard for you to relate to some of these things,
17    but I just ask you again, to be hypertechnical in your
18    application of the law and the facts.
19         And there are times when you say, you know, you're going
20    to have to, of course, use your common sense on certain
21    matters, but it is an unfamiliar world for all of us. So when
22    that happens, all we have is the law. And the law is what the
23    law is.
24         My client is charged in a variety of charges. Not all of
25    the charges on the indictment, but he's charged in these
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2272**

1    different counts. He's charged with being a member of a drug
2    conspiracy; he's charged with possessing with intent to
3    distribute certain narcotics; he's charged with certain gun
4    crimes; he's charged with conspiracy and the actual robbery of
5    Mr. Noah Smothers; and most importantly, most importantly,
6    he's charged in the kidnapping with the death resulting of Mr.
7    Noah Smothers.
8        I'm going to review each of these charges and explain and
9    apply the law to you. I'm going to reference testimony and
10   exhibits that you've heard when I make my argument. My
11   argument is going to be based in what you've heard in this
12   case. I'm not bringing in outside conspiracy theories, I'm
13   talking about what you have been given these last three weeks
14   to make your decision.
15       I'm going to go a little bit out of order, though. I'm
16   going to start first with the Count Five which is the use of a
17   firearm for a crime of violence or a drug crime.  The firearm,
18   there's been lots of talk about the firearms in this case so I
19   want to be clear as to which firearm we're talking about.
20   We're talking about the firearm found at Bristolwood which is
21   the Sig Sauer 9 millimeter handgun. This is the only relevant
22   gun for purposes of this count that you need to consider. And
23   again, you have the instructions. So I'm not going to repeat
24   the instructions.  I'm going to give you like I guess the
25   condensed version of what is required.  But what you are going

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2273

```
1    to do, of course, is go back and look at the actual law, apply
2    it for yourselves, make your own determinations. For purposes
3    of my discussion here today, I'm going to explain to you that
4    basically the Government must prove beyond a reasonable doubt
5    that that gun, that gun was used in one of these three things:
6    The drug conspiracy, the alleged robbery, and the alleged
7    kidnapping. Okay?
8         I'm going to start off with a common sense argument.
9    There has been no picture, text, video whatsoever of my client
10   with that gun or any gun whatsoever. You may remember a couple
11   days ago Sergeant Simms testified that there were over 50,000
12   pictures in my client's phone. If they had a picture of a gun,
13   you would have seen a picture of a gun.
14        Of course there's also no testimony from any witness that
15   my client -- there's a number of witnesses that know my client
16   that have testified, some of whom he's known a long time, some
17   of whom he's known a shorter amount of time.  But they were
18   all consistent about one thing:  No one ever saw him with a
19   gun ever at any point for recreation or otherwise, lawfully or
20   unlawfully. Okay?  So there's no testimony about my client
21   with a gun. He doesn't own guns, he doesn't possess guns, he
22   doesn't touch guns. And this particular gun that's found at
23   Bristolwood doesn't have any sort of physical link to him. His
24   DNA is not on there, his fingerprints are not on there.  Why?
25   It's not his.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2274

```
 1          So there's a lot of discussion about where my client
 2     lives and I think that this has been clearly established
 3     through the evidence in the case. Again, the evidence is the
 4     testimony that you've heard. Starting first with Oscar Diaz.
 5     He testified and there's no reason to not believe him, that he
 6     visited my client, his friend in Morgantown, West Virginia at
 7     his apartment. He, in fact, mentioned that it was a very nice
 8     apartment. He said he went there four or five times and they
 9     partied together.
10          Okay. Now we know from Brandon Drummond, his other
11     friend, that -- well, they're all from Howard County,
12     Maryland.  All three went to Oakland Mills High School.
13     That's how they know each other. Columbia, Maryland I think
14     most of you know is in Howard County, Maryland. My client's
15     mother lives in Columbia, Maryland. Brandon Drummond confirmed
16     that when he testified. His father lives in Laurel, Maryland.
17     But you don't have to believe me, Brandon Drummond, or Oscar
18     Diaz. Look at the exhibit that was given to you, that was
19     presented that's in front of you right now with -- my client's
20     Maryland driving record which shows an address in Columbia,
21     Maryland. He's never lived at Bristolwood. He doesn't live at
22     Bristolwood. He didn't live there in 2018, he never lived
23     there.  That's plain and simple. So ergo anything in the house
24     is not his.
25          But we take it one step further.  There's a lot of talk
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2275**

1    about the basement at Bristolwood. I have two exhibits here on

2    this next slide which you may remember the first of which

3    showed some women's shoes. We know from testimony that

4    Pattiann Chaplin, a woman, lives in that house. She testified

5    that when asked by Mr. Moomau, were the shoes hers, she said

6    "No," they weren't. Okay?  But let's take it one step farther,

7    okay?  We know Pattiann Chaplin testified that Taeyan does not

8    live at Bristolwood. She does with two small children that she

9    shares with Scott Williams, but she said Taeyan stays --

10   "visits, but doesn't stay there." That's an exact quote. I

11   hope you remember that quote. "Visits, but doesn't stay

12   there."  And "visit" could mean, okay, spending the night

13   every once in a while, of course, at your parent's house.

14   That's not totally out of the realm of possibility, but

15   spending the night or spending time does not -- is not the

16   same as living with someone. Especially someone who has their

17   own apartment in another state who is a grown man, albeit a

18   young man in his twenties at the time in 2018.

19        Now we know that the police come to the house on June

20   6th. They kick the door in. There's a whole SWAT team that

21   comes in and searches the house. My client is not there that

22   day. Someone by the name of Ricardo Carty was there who is

23   visiting. So that tells me, again, using the common sense

24   approach is that that room in the basement is used by whoever

25   is in town, whoever visits, not exclusively my client. It

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2276**

 1    could be anyone, friend, family member that could be in that
 2    particular basement.
 3        But again, looking at the other photo in the exhibit --
 4    and also, before you do that, just -- it also could include
 5    that person's lady friend, girlfriend, whomever. Someone who
 6    which we have reason why Shelly, Pattiann Chaplin says, "Well,
 7    those women shoes aren't mine." And as a matter of fact, she
 8    also testified that she did not even know that Mr. Carty was
 9    in the house. Which to me means that there is obviously things
10    going on in her house that she doesn't know about, especially
11    when someone could just come in and out. It's a room that sees
12    a lot of foot traffic as they say.
13        But look no further than the picture that the Government
14    presented of the basement when they found it. Now in June
15    there's no -- there's no warning that the law enforcement gave
16    as to when they were coming.  It was a total surprise. It's
17    6:00 in the morning. There's young kids and a couple sleeping
18    in the house. The door is busted in. But look in the closet.
19    Look. Nothing is there. It's a pretty empty closet. It's not
20    lived in. My client's clothes aren't there. There's no shoes,
21    shirts, anything that would indicate that he lives there. No
22    personal effects. Even if you believe he lives there and he
23    spent the night somewhere else, the majority of his things
24    would still be there. There's nothing to indicate that he
25    lives there.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2277

```
 1              And for me, what's most indicative of when someone lives
 2       in a residence is that they would receive mail there or
 3       something. No mail has been presented, nothing of the sort to
 4       show that he lives there. So he doesn't live at Bristolwood.
 5       Whatever is in Bristolwood doesn't belong to him. So as far as
 6       going to Count Five, the handgun charge in this case, that
 7       should be enough proof beyond a reasonable doubt that there's
 8       no connection with that gun, my client, no physical evidence,
 9       no picture of him with it, no indication that he lives there
10       at any time, to find him not guilty of that charge. And you
11       can apply that to all three crimes of which it can apply to.
12       And I'll get into that more so here in a second.
13              There's also a theory that's been floated by the
14       Government about aiding and abetting.  In other words, you not
15       doing something yourself -- and this is my layman's talk right
16       now, not the legal definition -- but helping someone do it, to
17       create it. Now the most -- and I put a little quote here to
18       kind of summarize it and you'll have it in your instructions,
19       but the most important part of this whole quote is that the
20       person who is aiding and abetting, in this case my client,
21       must have advanced knowledge that he's doing so. Okay?  They
22       haven't proven their case under that theory either.
23              Now referencing -- going to the next count that I want to
24       talk about, Count Six which is the possession with intent to
25       distribute, to be clear, this count refers to the items found
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2278**

```
 1    on June 6th of 2018. And there's a lot of talk about this
 2    ledger that was found during that search. A couple things
 3    about the ledger. One, my client never possessed this ledger,
 4    didn't write on this ledger. There has been no argument that
 5    he ever did. So whatever someone else writes on a ledger and
 6    tries to attribute it to my client, it doesn't mean that he
 7    knew about it or doesn't mean that he had any knowledge
 8    whatsoever or that he even benefited from it.  But you could
 9    say "Well, why is a person with the name Tae" -- and my
10    client's name is Taeyan -- "on the ledger in the house with
11    this marijuana?"  It's a good question. The answer is, I don't
12    know the answer, but I'm just going to use my common sense.  I
13    would assume that somebody wrote it there, right, but I want
14    you look closely at the ledger and there's been lots of talk
15    and you may not remember all these different strains of
16    marijuana: Cush, Sours, OG, all these kind of different names
17    that have been thrown out there. But on this ledger what's
18    attributed to him is the Lemon Ice and the Blue Goo. There's
19    not one phone text message, not one screenshot, anything
20    referencing these strains of marijuana and my client. In other
21    words, he doesn't buy it, he doesn't sell it, he doesn't use
22    it as far as we know.
23        If you look when he's arrested in West Virginia and you
24    see the video, I think you saw that in the Government's
25    presentation, you had Mr. Nice, you have other things but you
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2279**

1    don't have these things. These things are not in West
2    Virginia. They don't -- there's nothing to indicate that my
3    client has them, that either actually has them or you believe
4    that they've proven it circumstantially. They just haven't. So
5    these counts reference these items, but the items that are in
6    the home, they don't belong to him. It's just that simple. He
7    doesn't live there. He didn't possess them. They're not his.

8        Now there's been talk both on the prosecution's
9    presentation and in co-defendant's presentation about this
10   call in West Virginia. Let's be clear about one thing.  When
11   Mr. Taeyan Williams is under arrest in Virginia, he was not
12   charged with murder, kidnapping, anything of the sort.

13       We established through Sergeant Simms and it was I think
14   yesterday or the day before, that at this time of this call,
15   there was a pending drug charge. I told you when I first met
16   you that my client supported himself by selling drugs. We
17   never ran from that because we knew what the evidence was in
18   the case. It would be very silly of me to get up here and say
19   that my client has nothing to do with drugs, I don't know
20   what's going on. You would laugh at me after you had been here
21   for three weeks and I said that.

22       So clearly, if you look at -- if you go back and listen
23   to this call, if it's something that you desire to do in your
24   deliberation, you'll hear certain key things that my client
25   says. First of all, the first impression that you get is that

```
 1    he's not built for jail, one, because he says "a group of
 2    racists jumped me" and he's really upset and he's calling his
 3    dad saying "You need to get me out of here. These racists in
 4    West Virginia are jumping me," et cetera, et cetera.  So the
 5    two of them are arguing, they're going back and forth. It
 6    would also be silly of me to argue to you that my client
 7    didn't know that his dad may sell drugs. Of course he knew.
 8    And the reverse is also true. But knowing someone sells drugs
 9    and selling drugs with someone are two different things.  And
10    the law distinguishes between the two, so that's important.
11        But as you may recall -- and this is not a funny case.
12    It's a serious case as all cases are, but this is especially
13    serious. There was a moment in that call when he -- when Mr.
14    Scott Williams curses at -- uses a Jamaican term, a derogatory
15    term because his son is not understanding what he's saying.
16    It's clear to me listening to this call, again, using my
17    common sense, that my client is clueless as to what his father
18    is talking about in that moment, other than my client being
19    worried about the fact that there is ample evidence on his
20    phone which this picture is taken right from his phone, with
21    drug activity.
22        Now we know and I'll talk about this throughout, that
23    Wickr is an application that doesn't save communications. They
24    disappear. But my client for whatever reason screenshotted.  I
25    think everyone knows here what a screenshot is, when you save
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2281**

```
 1    it, take a picture on your phone of the screen at the time and
 2    there's lots of screenshots, but only because he took them
 3    himself, presumably and there's evidence of drugs. He's in
 4    jail on a drug case. There have been drugs found in West
 5    Virginia in a place where he was, where they can try to tie it
 6    to him. He's worried about it. And one of the things in the
 7    call you may not have heard it because Mr. Scott Williams has
 8    a Jamaican accent, is that he says something about "it's a
 9    misdemeanor" towards the end of the call. And my client
10    repeats -- it's not in the transcript of the call, it's not in
11    the captions, but what I hear and you can tell me if you want
12    to listen to it, he says, "It's a misdemeanor."  Like
13    basically what are you worried about?  It's a misdemeanor.
14    And let's be clear that the drug business, the drug amounts in
15    this case are not misdemeanors. My client knows that. He knows
16    as he sits there that, you know, they find this stuff I might
17    be cooked on this drug stuff. But there's also no conversation
18    about a dead person, a dead body, are you going to go --
19    because his father is out of jail. So there's no conversation
20    of "You need to go to the place where so and so is buried, you
21    know."  And we'll talk about the Government's theory in a
22    little bit, but there's no talk about that. "We need to -- we
23    need to go and take care of that," nothing. It's like, the
24    suggestion is that quite frankly the father is saying to him
25    "You need to wipe your phone" and my client is like "I'm not
```

X-85

```
 1      doing that" because Frank, the lawyer, said don't do it. Go
 2      back and listen. That's what they talking about. They talking
 3      about drugs. Okay?  He's in jail for drugs and he's not really
 4      built for it, my client.  And his dad is like, no big deal,
 5      you're being a baby -- basically, I'm paraphrasing.  He didn't
 6      say that exactly, he used a vulgar term that I'm not going to
 7      repeat.  But the bottom line is that this call is much ado
 8      about nothing. It has nothing to do with Noah Smothers'
 9      disappearance.
10           And yes, as far as the investigator calling and the
11      Government saying "Well, you know, he didn't talk to this
12      person."  As you remember, Mr. Nieto I believe had that
13      cross-examination and he established that a stranger, to my
14      client, calls at -- early, in the early morning hours and says
15      "Hey, I'm talking about this person that you had a pretty big
16      drug business with.  What do you know about it?"  Who wouldn't
17      hang up?  Again, using your common sense. He knows he's been
18      doing something illegal. "He" being my client.  So he doesn't
19      know if this is the police calling or who it is calling him.
20      And at some point -- and he's also not stupid because he's --
21      other people in the community are talking about Noah Smothers
22      not being around. So he's very well aware of that. It doesn't
23      mean that he participated in his disappearance or he killed
24      him in some way. That's not what it means.
25           And for us -- and again, the Government in its
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2283**

1  presentation had lots of text messages in which they are
2  interpreting the intent and the motive of certain people. I
3  say to you, ladies and gentlemen, that's a very dangerous game
4  to play. One cannot interpret unless it says "I hate this
5  person, I'm going to kill this person," do this.  Unless it's
6  abundantly clear as to what is being said, to say there was
7  some sort of a rivalry or anything else through a select
8  interpretation of text messages, it just doesn't get you there
9  and it's a dangerous game to play. It's not proof beyond a
10  reasonable doubt, which is what's required. But I'll continue.
11      The law also talks about mere knowledge, right?  So the
12  thing I just finished mentioning was that of course Taeyan
13  knows what his dad is doing and vice versa, but it doesn't
14  mean that they're necessarily doing it together. You make your
15  own decisions on the evidence based on that, but just as a
16  general proposition, this can be used for anything, including
17  a kidnapping, okay?  So if I know you did a crime, no matter
18  how heinous the crime is, as long as I didn't participate in
19  it that is not a crime. This is in your instructions. This
20  could be applied across the board as a general legal
21  principle, it could be applied across the board to anything,
22  any crime.
23      The Government's case as it was alluded to by Mr. Hawks a
24  moment ago, you heard from a lot of witnesses, some of whom
25  were more memorable than others. I think everybody remembers

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2284

```
 1    the witness about the Nissan Altima and how long that took,
 2    but in my mind from our position, it comes down to these
 3    witnesses. It comes down to two sets, civilian witnesses and
 4    law enforcement witnesses that are important in what they
 5    bring to pull this Government theory together.
 6         To be clear, the Government believes as you've heard that
 7    there was a debt owed, that my client didn't want to pay the
 8    debt, and that he decided to just go ahead and kill Mr.
 9    Smothers as opposed to paying that debt. And that essentially,
10    it's a very straightforward theory, but it doesn't add up and
11    there's a lot of things in the background in this case that
12    are relevant and you're going to hear me talk about some of
13    these folks and their testimony and how even with the
14    testimony of the Government witnesses, it doesn't always add
15    up to make the complete circle of -- to get to their theory.
16         So I'll start off with Mr. Rayburn who is a very
17    memorable witness to me. Mr. Rayburn we know was business
18    partners with Mr. Smothers. They shipped marijuana across the
19    country. He's now taken that money presumably and he's the
20    owner of a marijuana farm. He's the owner of a wellness spa
21    and he's received immunity everywhere. And that is relevant
22    and I'll explain why as you'll see in my presentation. He's
23    never had to answer for any criminal activity whatsoever and
24    that's very relevant in a case like this. Because it's not
25    only that he just did that, he did lots of other things as
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2285**

1    this case was going on, some of which were talked about by Mr.
2    Hawks.
3         Before we talk about him too much, we know that he was
4    partners with Mr. Smothers and Mr. Smothers and he had
5    multiple storage facilities.  And he's testified, the
6    testimony was in New York, in Maryland, and they were looking
7    to expand to other places. That typical shipments, typical
8    shipments just between the two of them were around 100 pounds
9    a shipment.  And we know that the price of a pound for Mr.
10   Connor Cox testified and I think Mr. Rayburn may have touched
11   on it as well, but these numbers were from Connor Cox that it
12   would be from the low end, $1,100 a pound to $3,500 on the
13   higher end and Mr. Cox testified that he liked the higher end,
14   $3,500 variety.
15        And we know that Mr. Smothers had business according to
16   Mr. Cox, in University of Alabama, University of West
17   Virginia, Gettysburg College, West Virginia University and
18   Penn State University, at least. And those were his clients.
19   Also he dealt with people in Maryland that you've heard
20   collectively referred to as "the Jamaicans" and there's at
21   least one other potential big client. I think Rayburn
22   testified to that as well. That's a lot of business.  And
23   you've got the idea of the scope of the operation. And Mr. Cox
24   testified that in fact there was so much cash that they used
25   to have to use money counters and vacuum seal the cash because

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2286

1    there was so much of it. And Mr. Cox testified -- this is

2    something that's extremely important, that when Mr. Smothers

3    would come to West Virginia University he would have between

4    50 to 150 pounds every time he came that he saw him.  And he

5    said he saw him approximately ten times I believe was his

6    testimony.

7        So as far as the business structure is concerned, we know

8    that those 100-pound shipments were going every two weeks or

9    twice a month or sometimes once a month.  That's what Mr.

10   Rayburn testified to. We know that the two, Rayburn and

11   Smothers, communicated with each other exclusively on Wickr

12   which is an app which we all learned in this case is a super

13   secure, at least it was at the time, method of communication

14   that can make voice calls, as well as send messages.  And

15   nothing is safe, it doesn't use cell site technology.  So you

16   can't -- it doesn't implicate the towers and the messages

17   disappear after a while. And this is all very relevant in this

18   case because we know not only did the two of them use Wickr,

19   my client used it as well. And Connor Cox used it as well was

20   the testimony. And I believe Mr. Diaz may have said he used it

21   as well. I'm not 100 percent sure about Diaz. But you

22   understand my point that there's a lot of information that we

23   don't know, that we won't know as far as potential suspects,

24   who is dealing with whom. What debt is owed to whom which is

25   really the important part. That goes to the heart of the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2287

```
 1    Government's theory, okay?

 2        And as far as -- before I get to that I actually want to

 3    just say too that Mr. Smothers, which is important to note for

 4    purposes of what I want to tell you, as Mr. Rayburn said, Mr.

 5    Rayburn sounded like he was just a stockbroker at times, not

 6    like an elicit drug dealer. He talked about supply in demand,

 7    consumer side.  Mr. Smothers is on the consumer side. He would

 8    send back information about what clients like, what strains

 9    that they liked. And this was a regular ongoing thing so they

10    could provide the best quality for what their clients wanted.

11    And also that the two of them were privy to one another's debt

12    sheets. They had an ongoing list.

13        And this next example is -- this is from Exhibit 486.

14    This is just one example of one spreadsheet that was saved.

15    Remember, many of them weren't saved. If you just look at the

16    two numbers at the bottom, it equals almost $2 million. That's

17    one transaction. This is -- this was and Mr. Rayburn

18    confirmed, I mean, routinely the transactions would be from

19    $200,000, $300,000.  Mr. Rayburn had clients outside of Mr.

20    Smothers as well. So when we say "millions of dollars," it is

21    no exaggeration. And it is all relevant. And we're not just

22    saying, "Oh, look at Mr. Rayburn.  He makes millions of

23    dollars.  It's not fair," that's not it at all. Again, it's

24    setting the stage to show you who this person is and how you

25    should view their credibility as a witness, right?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2288**

```
 1          What do we know about Jacob Rayburn?  We know -- this is
 2     a man who is supposed to be friends with Noah Smothers. He was
 3     friends with his brother, he's met his parents. But did he go
 4     to the police?  No, he did not. Not only did he not go to the
 5     police, he's never to date revealed the source of his
 6     marijuana. And when challenged on cross-examination, he even
 7     admitted that he sold marijuana after Mr. Smothers lost
 8     communication with him. Right?  Not "I gave it up, I went to
 9     the police, I did everything.  I didn't care what happened to
10     me, I wanted to help my friend." No, "I kept selling." He kept
11     selling. And we know that he didn't contact the police.
12          But not only that, is that the law enforcement in
13     Maryland, Sergeant Simms and others had to go to Santa Monica,
14     California approximately -- well, it's across the country,
15     six-hour flight to sit with him in his lawyer's office where
16     he basically told them nothing and said hey, other than say "I
17     know him, we did business together, but that's it." He didn't
18     reveal the source of supply which may have been very relevant,
19     which still may be relevant to all of this, but he also says
20     -- he doesn't say, rather, what he's done at that point.
21          And we know that Mr. Rayburn in the days and weeks after
22     Mr. Smothers isn't heard from, he travels to New York. He gets
23     on a plane and travels from California to New York. And he
24     gets possession of Noah Smothers' laptop. How he knew Noah
25     Smothers has a laptop is a question you should ask and why
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2289

```
 1    he's concerned about it is another question you should ask.
 2    Takes possession of it along with drugs from Mr. Smothers'
 3    home in Pennsylvania, along with money which is -- and it's a
 4    little murky as to who gave him the money and to how he got it
 5    which I'll talk about it in a second, but this is all relevant
 6    to who he is as a witness.
 7         But leaving that aside for a moment, we know that Mr.
 8    Rayburn was compelled to testify here in this courthouse when
 9    I asked him in front of the grand jury and he did not say to
10    that grand jury even with a letter of immunity, because he had
11    met with law enforcement prior to that, he still didn't reveal
12    the truth about what he did. The only reason, the only reason
13    we know that things happened in the home of Mr. Smothers, Noah
14    Smothers after all this is going on is because his father, Mr.
15    Roger Smothers testified that he, in fact, gave access to that
16    home, five years later. And he said, I remember very
17    memorable, he says, "I shouldn't have done it, but I would do
18    it again because I thought I was helping my son." Okay?  And
19    be that as it may, leaving that aside for a moment, Mr.
20    Rayburn knew what he did and he never revealed that
21    information to officers, to anyone. Why?  It is extremely
22    relevant in assessing his credibility and assessing this case
23    as a whole.
24         Again, with respect to that issue, we've heard from Cesar
25    Flores Gomez who as Mr. Hawks said, faces deportation to a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2290**

```
 1    country he hasn't lived since he was nine years old and who
 2    was the driver. He got a salary. I think he said about
 3    $200,000 a year to be the driver and be the manager in New
 4    York, the operations of this operation, this drug delivery
 5    service. He was able to tell you who EQ is in that ledger. He
 6    said EQ is his words, "Armenian Mafia," Mafioso or Mafia that
 7    he met one time in Southern California. Okay. Mr. Smothers --
 8    excuse me, Mr. Rayburn when asked that question, he says that
 9    he opined that EQ meant it's some sort of a number, SKU
10    number.  And then when later asked in testimony says, "I don't
11    know." Clearly he knows. Clearly he doesn't want to share it,
12    but there's no way that a person of Mr. Flores Gomez's status
13    on the food chain in that operation would know that
14    information and Rayburn wouldn't know that information. Okay?
15        Mr. Rayburn also testified that he sent the drug delivery
16    service to go into the home to get the laptop and the other
17    things. Mr. Smothers, Roger Smothers testified that he just
18    unlocked the door.  He didn't interact with anybody. I believe
19    both of them. But what I don't believe is the fact that Mr.
20    Rayburn is saying that he said the drug delivery service
21    because Mr. Flores Gomez testified that he wouldn't have done
22    that, that's basically not good business to do that. They
23    didn't do that.
24        So who, in fact, went into this home?  Who took these
25    items and what did they do with this information in the early
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2291

```
 1    days of Mr. Smothers' disappearance?  All relevant
 2    information.
 3         We know that the only way that law enforcement is drawn
 4    to -- at least that's what has been presented here -- is that
 5    Mr. Cox puts Mr. Rayburn on to my client. He says "Hey, this
 6    is a guy, he deals with them.  Reach out to him." And as I
 7    recall from my asking the questions, my client didn't say
 8    "Don't give him the information." He spoke with Mr. Rayburn.
 9    And the Government tries to flip it and say, "He wants to be
10    the supplier." So the person, Rayburn, is calling and
11    identifying himself as the source of supply. Okay?  There's no
12    secret about that. And my client is like "Well" -- according
13    to Rayburn my client says, "Well, if he's not around, do you
14    want to deal with me?"  Who wouldn't say that in his position
15    at that time?  That's just a normal thing to say.
16         But taking it one step further, as far as, you know,
17    Rayburn is concerned, he's got that information now,
18    presumably, my client, because he's been contacted by Rayburn
19    on Wickr, again which we have no record of, but my client
20    never calls him back. There's no -- I asked him, we said, "Did
21    he ever contact you again to follow up on that?"  He did not.
22    So if he really wanted to be the supplier for whatever or get
23    -- he had the connection. He never contacted him before or
24    after those series -- there was a series of conversations.
25    Those series of conversations.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2292**

```
 1          Again, Mr. Flores Gomez, I just talked about him, but I
 2    think he's a very important witness because he's got criminal
 3    exposure. He pled guilty to a federal crime. He may be
 4    deported.  He's testified honestly about his role, about what
 5    he did and the fact that he didn't come face-to-face with a
 6    lot of people.  But the most important thing about all his
 7    testimony is that he didn't go in that locker the second time
 8    around and he didn't go in that house at all.
 9          So Mr. Cox is another one who basically -- Mr. Cox is
10    involved in the same business as my client and Mr. Smothers,
11    but on a smaller scale. He's basically my client's connection
12    to his particular fraternity in West Virginia. The most
13    important thing about Mr. Cox to me, again, there are no
14    transcripts and I don't think the Government is going to get
15    up here and dispute me because I know because he said it four
16    times.  He said the last time he saw him was in February of
17    2018.  And I don't know if you remember that, but I asked him.
18    I said, so in February of 2018 -- he gives this story about
19    how he saw Noah and that was this debt, we're talking about
20    April, 2018 not February, 2018. Right?  So either Mr. Cox is
21    lying or he's talking about something else that's totally not
22    relevant to what we're talking about here.
23          Another thing about Cox is the reason the Government even
24    has this theory about a debt, it comes from him. Mr. Rayburn
25    when asked by me, "Were you aware of any debt that he owed any
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2293**

1    particular person, any client?"  He says, "No." That was very
2    clear, "No." He says "No."  He says, "We typically would run
3    debts between each other, but I wasn't aware of any debt."
4    This is a man who is his business partner.  They are in
5    lockstep. They share spreadsheets, they share information.
6    And if you don't think they share information, why is Mr.
7    Rayburn flying across the country to get a laptop?  They share
8    information. They are in business together. He is not aware of
9    any big debt.
10       And we'll talk about the debt in a moment, but the
11   biggest amount of debt that's alleged is $30,000 by my client
12   to Noah Smothers, not even saying that that's true.  But even
13   if that was true, you just saw a $1.8 million transaction.
14   You've heard testimony from Rayburn that they basically wrote
15   off the $300,000 of this shipment. There's no way Mr. Smothers
16   was sweating to the point of being really worried about
17   $30,000. It's just not -- it just doesn't make any sense.
18       But also, my thing is that Mr. Cox testified that he
19   wasn't privy to the business dealings between my client and
20   Mr. Smothers. He testified, Cox testified that my client would
21   get all the good stuff.  I don't know if you remember that,
22   and he would be left with the bad stuff. He didn't use those
23   words, but the marijuana that -- basically the leftovers is
24   what he was left with.
25       And again, Mr. Cox is the person that provides Jacob

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2294

1    Rayburn this information that starts this whole -- the focus
2    on my client. And yes, my client was involved in the business
3    with Connor Cox.  Again, we're not running from that.  That's
4    clear.
5        So I want to just focus your attention to the date of
6    April 6, 2018. We know that there's a big shipment coming in.
7    Ms. Grossi said in her presentation that they knew this was
8    coming in, "they" being my client and others, and it was going
9    to be a big one. There's no evidence that he knew anything of
10   the size of the shipment other than it was normal.
11       But I want to go ahead and just tell you a big secret
12   which is not a big secret. My client bought marijuana from
13   Noah Smothers in April in the time that he was here in
14   Maryland. That's not a secret. That's clearly obvious. But it
15   doesn't mean that he had anything to do with his
16   disappearance. So remember, and the evidence supports what I'm
17   saying. The evidence supports what I'm saying.
18       So again, there's this testimony about a debt from Mr.
19   Cox is the only one, and Mr. Rayburn confirmed that he
20   received a text on an encrypted phone through Wickr from Mr.
21   Smothers that "The meeting went well." He said he's "Going to
22   see the Jamaicans," and then he said, "The meeting went well."
23   And then he says, "I'm going to see other people and I'll get
24   back to you." And then he testified, this is in his testimony,
25   that Mr. Rayburn said on April the 7th he received a second

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2295

```
 1    text on the encrypted phone from Mr. Smothers which said,
 2    "Family issue has me down." That's an exact quote best as I
 3    can remember from the testimony. Right?
 4         So again, we know that using an encrypted phone you are
 5    not going to appear in any cell tower.  So there's going to be
 6    no record of that.  No call, no log of that.  But Rayburn
 7    confirmed these texts.  And he confirmed that -- and I asked
 8    him, I said representing the consumer side of things, I said
 9    "Well, if you were to receive a text that the Jamaican liked
10    the Sours" would that be normal?  He said "Yes" because they
11    would have these conversations. So while Rayburn didn't
12    necessarily remember the communication -- he remembered the
13    communication, but the fact that he said "sours," he still
14    confirmed that that was normal in their course of business,
15    that he would be talking about that.
16         So we know that on this day Mr. Williams, my client,
17    Taeyan Williams, is a customer of Mr. Smothers. We know -- Mr.
18    Nieto did a wonderful job with Sergeant Simms establishing the
19    fact that this Google searching and this Red Roof Inn stuff,
20    it just doesn't add up because he's not from Maryland. It
21    would make sense that he's Googling where the Red Roof Inn is.
22    He wasn't. We know that there were restaurants there of the
23    type, of the type that he liked. There was a Salvadorian
24    restaurant there, there's also a Dunkin' Donuts there. The
25    Dunkin' Donuts gift card is in his car and Sergeant Simms said
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2296**

1   that he doesn't check to see whether that was used there or

2   investigate those restaurants, the very same restaurants, the

3   type of restaurants he's looking for to see if he frequented

4   those restaurants.

5        And again, this, this text that Rayburn receives on the

6   encrypted phone is that the meeting went well. And there is no

7   dispute, none whatsoever from any side that at 1:52 p.m. --

8   and Ms. Grossi referenced it in her opening -- Mr. Smothers

9   makes a modification to a note of which I will show you in a

10  moment.  And the note -- and you see it in this exhibit. The

11  note begins with "Tae gave $5,900 plus four WGS." The first

12  thing I'll say is that "gave" is the past tense which means

13  that that's what someone gave them as opposed to what someone

14  is going to give, but I will get to that in a moment.

15       But at 1:52 p.m. we know Mr. Smothers writes that note.

16  So take that piece of evidence, take the piece of evidence

17  that Rayburn says he gets a text after the meeting and

18  everything went well, and take that as evidence that my client

19  met with Mr. Smothers, got what he needed to get, and went his

20  separate way. It's the most simple, plausible, logical

21  explanation.

22       But don't believe me. Let's look at what Oscar Diaz says.

23  Okay?  We know that Oscar Diaz, childhood friend of my client,

24  also was selling drugs with my client, right?  He references

25  in his testimony "Sour Diesel, OG, Cush" -- again, not brands

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2297**

```
 1    that are on that list by his name.  He testified that he
 2    dropped my client off at Tysons Corner. This is supported by
 3    the Government evidence of the cell phone tracking towers. My
 4    client does not have an encrypted phone. He uses Wickr, but he
 5    does not have an encrypted phone.  So every time he uses the
 6    phone for whatever purpose, a call, whatnot, it's going to be
 7    going off of a cell tower, connected to a cell tower.
 8        There's no testimony from Mr. Diaz that the two of them
 9    went by, stopped by, talked about, passed an EZ Storage. If
10    you look at the evidence, you'll see the Government just made
11    an argument that he was looking for -- that he was writing
12    things that had to do with the storage at that time. He's in
13    the car with Oscar Diaz and he's going to Tysons Corner. It's
14    as simple as that. Okay?
15        Again, Brandon Drummond is another person and again, all
16    this is supported by the evidence. All of this.  The times,
17    the locations, it's supported by the evidence and the evidence
18    is when you use a particular device, the phone call, it's
19    going to be connecting.
20        Brandon Drummond, my client sees him that same day, later
21    in the day, at night.  So he's with Oscar Diaz for a few
22    hours, they smoke marijuana in his home. He then drives a very
23    long roundabout way.  And Mr. Moomau asked him, "Why did you
24    drive this way?"  He gave the explanation as to why they drove
25    that way because he didn't want to go this way and that way or
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2298

```
 1    whatever, but we know that my client's phone is in Tysons
 2    Corner.  And from Tysons he goes to College Park. But again,
 3    what Brandon Drummond says is that Taeyan -- he doesn't
 4    remember the day.  It's a long time ago. He says he testified
 5    truthfully, "I don't remember the day but it wouldn't be
 6    uncommon for Taeyan to come and hang out at the house." He
 7    said that a lot of the brothers at the house like to buy drugs
 8    and Taeyan had just received drugs. He had just received them.
 9    Okay?  So infer what you will from that.
10        And as a matter of fact, I'll show you in a minute here,
11    there's an Uber ride.  Thank goodness that we have Uber. Thank
12    goodness these record exist.  Because imagine if they didn't.
13    Imagine if these record didn't exist, the Government would say
14    "Well, they met at 1:52 and that's when everything went
15    wrong."  But we know that my client is traveling through Uber.
16    He takes two trips, one to Oscar's house in Columbia and then
17    another from Tysons Corner to College Park because my client
18    doesn't have a car. He doesn't drive. Okay?  These are
19    supported by the Uber records.
20        So even though Brandon doesn't remember it, the records
21    support the fact that he was there, that my client was at the
22    Theta Chi house. And Sergeant Simms confirmed that the
23    location on the Uber record is, in fact, right next to the
24    Theta Chi fraternity house in College Park. And he never
25    stops, he never takes an Uber to the EZ Storage or anything
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2299**

```
 1    like that. Again, he leaves and that's it. He leaves Mr.
 2    Smothers and that's it.
 3        For the Government's theory of kidnapping, it's very,
 4    very specific. And Mr. Hawks, I agree with one thing he said.
 5    It comes 100 percent from Mr. Musa. There's no other way that
 6    they can get to kidnapping as opposed to anything else other
 7    than that particular story.
 8        So I'm not going to go through all of Mr. Musa's misdeeds
 9    because I think that's been done to death, but I do think it's
10    relevant that I remind you that this is a person who doesn't
11    just find himself in jail on a particular case and happens to
12    come across this information. This is a person who is facing,
13    now facing for his crimes, his new crime and he's serving a
14    ten-year sentence.  He committed a crime while he was
15    incarcerated in federal prison, facing a potential exposure of
16    32 years. 32 years on top of the 10 that he's already serving.
17        And Mr. Nieto, again, did a masterful job of establishing
18    all of these factors that just lead up to -- you see when all
19    of Mr. Musa 's appeals, post convictions, all these things run
20    out, that he is then, then and only then, he reaches out to
21    the prosecutor. He accuses the prosecution of lying,
22    fabricating evidence and all this stuff, but then he reaches
23    out to the prosecution and says, "Hey, I got some information.
24    And I want" -- and the language was very flowery and he's no
25    dummy, for sure. And at that point he says that he gets into
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2300**

 1    the story, the story which he tells you here in court.

 2        And just to kind of recap the story, he claims there's a

 3    debt. He claims that there's -- that the persons can't get

 4    into the storage facility. And that Taeyan Williams lures him

 5    to the Red Roof Inn to -- with the promise of a potential new

 6    client or a client of some sort. He testifies that they

 7    assault him inside -- that three people assault him inside of

 8    the hotel at the Red Roof Inn, that at that point he's walked

 9    outside and forced -- at gunpoint, and forced to get into the

10    trunk of his own car. The story, even if you believe it, it

11    doesn't add up with the evidence that's been presented to you.

12    There's been no cell site technology, anything, anything,

13    nothing, nothing can corroborate this story. So then you just

14    have to start using your common sense that -- in daytime,

15    because we assume it's daytime because that's when my client

16    and Mr. Smothers' phones are right next to each other at about

17    1:30 in the afternoon that all of this happens, that they can

18    -- and apparently Mr. Smothers was very tall. He had a size 15

19    shoe, he was a big guy.  And there was even testimony that Mr.

20    Scott Williams allegedly wanted to bring a third person in

21    because he was so big, that all this was able to happen and

22    nobody sees it.  And it's like okay, sometimes I guess that

23    could happen, but come on. I mean, with all the other stuff

24    that Musa has going on in the background, with all the stuff

25    going on in this case -- and again, forget about the witness

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2301**

```
 1    credibility issues for a minute.  The records don't support
 2    it. They just don't. And then he gets this version of someone
 3    is dropped off at the house and he didn't go to the storage
 4    locker. Taeyan Williams, we know where he is. He's at his
 5    friend's house. He's at Tysons Corner. He's at -- on a Friday
 6    night, he goes to a fraternity house. They're partying at the
 7    fraternity house. And the Government has made a big deal about
 8    the fact that there's no activity on Taeyan Williams' phone
 9    from midnight basically, 11:57 p.m. of April the 6th until the
10    next afternoon around 12:30, maybe closer to 1:00. Well, first
11    of all we know that he's at a fraternity house, one, on a
12    Friday night. He's been smoking marijuana with Oscar Diaz,
13    copious amounts, apparently. And we know that Brandon liked to
14    smoke marijuana as well and do drugs. So it's not beyond the
15    realm of possibility that he's passed out, right?  He's
16    20-something years old. He's passed out from -- normally most
17    people are not using their phones from midnight to at least
18    the next morning.  And maybe he slept in.  Maybe he's partied,
19    who knows?  We don't know.  We can't guess.  There's a lot of
20    guessing.  But if they're going to guess, I'm going to guess,
21    right? But that's not unusual in and of itself.
22         And we also know that there are -- he doesn't just use --
23    I think Brandon Drummond testified that they used to
24    communicate via Snapchat, via Wickr.  Like he's not -- even if
25    he is using his phone, it's not necessarily through
```

**JA2302**

1    traditional means. If you go back, you have his phone records,

2    they're in evidence.  Go back and look.  Look at his phone

3    usage. You'll see that there's not a lot of consistency of

4    long conversations with anybody which would imply that he's

5    using other means to communicate via text or whatever.

6         So as far as the law enforcement witnesses are concerned

7    in this case, there's a couple of folks that are pretty

8    important. Starting with Officer -- Task Force Officer Bush.

9    He testified in great detail. You may remember me asking him

10   questions about the Sinaloa cartel and Cartel de Jalisco Nueva

11   Generacion.  Both of those are Mexican drug cartels.  And he

12   gave very detailed information about their abilities to ship

13   marijuana in large quantities. And Mr. Hawks kind of touched

14   on it, but basically we have a lot of players in the

15   background here who are not 9 to 5 guys.  And providing

16   copious, large amounts of drugs is something that a cartel can

17   do.  And his testimony is that violence is a method of

18   enforcement.  And again, I don't want to run away with

19   conspiracy theories, but this is not a conspiracy theory case.

20   These are actual facts.  So you have to take yourself -- this

21   is their witness and they presented them.  And this is the

22   question that he was asked and answered. So he must be

23   relevant for something.

24        The other witness was the height witness, Chris Iber.

25   And I give Mr. Crawley credit for the great question that he

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2303**

 1    asked which was it's impossible to determine someone's
 2    identity by their height, so really why are we here?  The
 3    Government -- I mean, a lot of people in the world are 5'10",
 4    5'11", 5'9". To argue that my client was present at that place
 5    at that time is just not consistent. This doesn't prove it.
 6    Put it like that.
 7         And the clothing, Mr. Nieto established again,
 8    masterfully, that the clothing that he wore, that Mr. Williams
 9    wore in the photos that were in the Government's exhibit, the
10    hooded sweatshirt and the red shirt, they're not seen in this
11    video. Sergeant Simms definitively said "No, that's not it."
12    So to think otherwise, it makes you wonder why those pictures
13    were even in there.  But we established that fact.
14         Again, Sergeant Simms testified about certain steps he
15    took in this investigation. And this is a challenging case so
16    I'm not -- I'm not here to beat up on law enforcement, but I
17    have an obligation to protect my client and to represent my
18    client to the best of my ability, me and my trial partner's
19    ability.  And there were just certain steps that were not
20    taken in this case that could have been, or were not taken
21    because they were impossible such as this world of encrypted
22    communications that existed that there's just so little
23    evidence of by design.
24         We know that in addition to the encrypted phone, the
25    Wickr, that Mr. Smothers had a Hide.me account which even

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2304**

1  further insulates you from detection by whomever. There is
2  absolutely no surveillance footage of my client in Laurel at
3  the Red Roof Inn.  There's lots of different missing pieces of
4  which I've talked about that were not or could not be
5  addressed in this case.
6          THE COURT:  Mr. Guillaume, you're down to two
7  minutes.
8          MR. GUILLAUME:  Thank you. The last thing I would
9  like to present to you, this exhibit. The Government has
10 presented Exhibit 174 which is the alleged ledger of the debt
11 between Mr. Smothers and my client. If you look closely at the
12 ledger, the Government stops right around where it's 11,000 on
13 the document. If you continue to go down further -- and again,
14 I went to law school.  I didn't go to math school.  But if you
15 continue to go down further, you can see that there's large
16 amounts that are deducted and subtracted from this ledger
17 which eventually gets you to a point of about $5,000. The
18 Government is focused on a $30,000 debt that they say was
19 owed.  But if you go down and you plug these numbers into that
20 debt and just do it in the back, you'll get to that number and
21 it will be consistent with basically with the re-up that he
22 received, that my client received from Mr. Smothers on April
23 the 6th. It would indicate that the debt was paid at that
24 point and he got more drugs and that is now the new debt. We
25 write notes from top to bottom. April 6, 2018 that note was

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2305**

```
 1    written by Mr. Noah Smothers at 1:52 p.m. that shows you why
 2    would my client give him all that money and all this just to
 3    kill him?  It makes no sense. It didn't happen.
 4         Ladies and gentlemen, thank you for your time and for
 5    your service. I ask you to find Mr. Taeyan Williams not guilty
 6    of these charges. Thank you again for your time and service.
 7         THE COURT:  Thank you, Mr. Guillaume. As I
 8    mentioned, ladies and gentlemen, the Government has a brief
 9    opportunity for rebuttal. I think Mr. Hanlon is going to do
10    that. Again, you can stretch while we're switching counsel and
11    then we can jump right into that and that will be the last
12    part of the closing arguments.
13         MR. HANLON:  I'm ready any time, Your Honor.
14         THE COURT:  Go ahead.
15         MR. HANLON:  Ladies and gentlemen, good afternoon.
16    Good afternoon, ladies and gentlemen. The last question my
17    colleague asked before sitting down was why would --
18         THE COURT:  Mr. Hanlon, I'm sorry.  Move it up here.
19    I think it's not quite where we can hear you as well as we'd
20    like.
21         MR. HANLON:  Testing. All right, ladies and
22    gentlemen.  So the last thing that my colleague asked before
23    sitting down was why would anyone want to kill Noah Smothers
24    if the debt had been paid off, if they had just given him a
25    bunch of money or done a large drug deal?  Well, that would be
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2306**

 1    the reason to kill Noah Smothers, because they had just given
 2    him a lot of money, were interested in getting it back and not
 3    having to pay for the drugs that they had done business on
 4    that day, to say nothing of what might be left in the storage
 5    locker.
 6         That is what this case is about, ladies and gentlemen. It
 7    is about the decision that the defendants made to cut Noah
 8    Smothers out of their business, to get what he had on hand and
 9    to get a hold of his suppliers.  And that's what the evidence
10    has shown.
11         During the course of this morning we've heard a lot of
12    discussion from the lawyers, forgive me -- beginning with the
13    nature of the business between Scott Williams and Taeyan
14    Williams. We've heard a lot about what the nature of the
15    business was, whether they were in business together. Ladies
16    and gentlemen, you don't have to look just to the evidence
17    that came from the witnesses who testified and the
18    prosecution's case. The defendants themselves had names for
19    how they carried on this business. They referred to it as a
20    "team." This was the word of Scott Williams in the notes he
21    made to the ledger that was found on his mattress, in his
22    bedroom, in his house. "Me, Tae, team." This is how they saw
23    each other. They were a team when it was profitable to be.
24         You've heard a great deal about this phone call that was
25    played, recorded call in which Scott Williams and Taeyan

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2307**

```
 1    Williams talked about what was going on, about their concerns
 2    about the investigation. Again, you heard Scott Williams'
 3    description of what this organization was like. It was a team.
 4    Taeyan Williams says, during the same call, "It's as simple as
 5    that.  I ain't trying to argue with you all no more.  We need
 6    to be more of a team right now. You all got these n-words
 7    splitting themselves, fighting one another over shit we don't
 8    even know yet." They were a team when it was profitable, when
 9    it made sense, they're a team. When it makes sense to point
10    fingers at each other, they separate.
11         And the attempt to separate, ladies and gentlemen, is
12    what we heard throughout the defenses' closings today.
13    Separating the counts, separating the conduct, separating the
14    defendants. In looking at the evidence, resist the temptation
15    to take one piece of evidence, put it on the scale, look at it
16    whether it's enough and then take it away. That's what the
17    defense has done, but that's not how you should view the
18    evidence during your deliberations. Look at all of it in its
19    totality. How does the evidence fit together?  How does one
20    peace of evidence corroborate another piece of evidence?  That
21    is how the guilt of the defendants has been proven in this
22    case, by the totality of the evidence. Witness testimony,
23    electronic records, their texts with each other, their
24    connects with their distributor customers and ultimately all
25    of the events that happened on April 6th and April 7th and
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2308**

1    April 8th of 2018.

2        There are two things or three things rather, that have

3    not been mentioned since Ms. Grossi talked to you earlier.

4    And these particular electronic communications, not witnesses

5    or anything like that, these three themes are three pieces of

6    information that cannot be explained away.

7        Number one at 7:59 p.m. from the laptop seized in the

8    Bristolwood Court house, at a time when the evidence shows

9    that Scott Williams was at that house, Pattiann Chaplin is not

10   there, Taeyan Williams is not there, and this is the laptop

11   found next to his bed during the June 6th search.  We have a

12   search, 7:59 p.m. on April 6th, for "EZ Storage Jessup." So we

13   know what the defendants are thinking about. We know what

14   they're planning based on that laptop search.

15       At 7:08 p.m., a little while earlier, Taeyan Williams at

16   a time when his cell site data puts him in the vicinity of the

17   Jessup storage facility, makes a note to his phone of the EZ

18   Storage address on Washington Boulevard. Again, we know what

19   they're thinking, we know what they're doing.

20       At 11:57 p.m. on the same night, Taeyan Williams makes a

21   note to his phone with the code information. Now you've heard

22   about the passcodes and the information here about how Noah

23   Smothers had information in his iCloud account about how he

24   kept his passcodes and how many of those passcodes were used

25   on jerseys used in high school. 11:57 p.m. that evening,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2309**

```
1    Taeyan Williams is making a note to himself, 15-21-42.

2    15-21-42.  Taeyan Williams is making that note, along with a

3    kipphone, a kipphone address. This is the defendants in

4    possession of the electronic information about Noah Smothers,

5    in possession of the address information about EZ Storage, and

6    in possession of passcode information about Noah Smothers at a

7    time when they're also talking to each other on the phone.

8    This shows what the defendants are doing, it shows what

9    they're thinking about, and ultimately it shows the motive and

10   the plan for what they were doing that day. And none of this

11   is evidence that is consistent with any of the defense

12   theories you've heard today such as the notion that some sort

13   of California mystery person did this, or that there's some

14   situation that there was some situation that Noah Smothers may

15   have had some sort of a medical emergency.  That's completely

16   contrary to the evidence in this case.

17        What the evidence shows is that Scott Williams and Taeyan

18   Williams were working as a team to take over Noah Smothers'

19   business, to cut him out, to take over the storage unit, to

20   get a hold of whatever data they could get on his phones and

21   then seize the marijuana that was actually in that storage

22   unit. And that, of course, is what we see over the course of

23   the next three days. Three separate visits from a Nissan

24   Altima rented to Scott Williams, on video.  The Nissan Altima

25   dumping the Kia Sportage, on video. This is what we see
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2310**

```
 1    playing out over the course of the next several days.
 2         There was discussion over the fact that Jacob Rayburn
 3    testified about communications with Noah Smothers' encrypted
 4    phone either late on April 6th and into April 7th.  And that
 5    was his testimony, ladies and gentlemen.  But consider who is
 6    in possession of Noah Smothers' encrypted cell phone at that
 7    time.
 8         Noah Smothers is gone. No one has ever seen or heard from
 9    him since April 6th.  And on the evening of April 6th we have
10    the defendant, Taeyan Williams, making notes about passcodes
11    and kipphone information for Noah Smothers. The defendants are
12    in possession of that phone. The defendants are in possession
13    of the business.  And for all intents and purposes they are in
14    possession of Noah Smothers' identity at that point in time.
15    If there are any communications going on it is the defendants,
16    Taeyan Williams in particular, in possession of that encrypted
17    cell phone. And that's exactly what they had planned. That is
18    exactly what the team had attempted to do.
19         You also heard nothing, ladies and gentlemen, on the
20    subject of "team" about the money box. The $200,000 in cash
21    taken from the Bristolwood home on June 6th. Now there were
22    $300,000 worth of marijuana in the storage unit, according to
23    the testimony, about 200 pounds. There's about 70, 72 pounds
24    found in the Bristolwood house during the search warrant.
25    There's about $200,000 cash in the search warrant and there's
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2311**

```
 1   about six weeks in between the disappearance of Noah Smothers
 2   and the search of the house. Maybe closer to two months. My
 3   math is a little off. $200,000 less marijuana that was
 4   actually seized, but a huge portion of the load still
 5   remaining. The defendants had two months, April 6th, 7th and
 6   8th until June 6th to move as much of that marijuana as they
 7   could. That was the whole purpose of the robbery. And they had
 8   $200,000 in cash to show for it.
 9        There's a suggestion and some discussion about whether or
10   not Taeyan Williams lived at the Bristolwood house. He
11   certainly had a bedroom there. He certainly stayed there. His
12   birth certificate was there. Marijuana and the tools of the
13   marijuana distributor were found inside that downstairs
14   bedroom.  And you heard witness testimony about Taeyan
15   Williams arranging drug deals at the house, deliveries of
16   money, drugs, things like that. And most importantly, ladies
17   and gentlemen, because it's clear that Taeyan Williams spent
18   time in West Virginia, that's where most of his customer base
19   was, but it's also clear that he spent time at the Bristolwood
20   house. It was a family home. His Uber records link him to the
21   house.  But most importantly, his cell site records, his Uber
22   records, and all of the evidence in the case, including his
23   notes to himself on his cell phone, show that he was at
24   Bristolwood and the EZ Storage facility during the critical
25   moments of April 6th and 7th, 2018. That is what matters with
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2312**

1  respect to Taeyan Williams and that residence. And the tools
2  of the robbery, the fruits of the conspiracy, the team's
3  benefits were still at Bristolwood at that time. Marijuana
4  that had labeling consistent with the business that we've
5  heard about, the firearm used to torture and beat Noah
6  Smothers, I'm going to talk about that in a moment. The
7  business of the conspiracy, its commodities, its products were
8  in that house.

9      Taeyan Williams may not have been there all the time.
10  There's not a shred of evidence that he was ever at this
11  Columbia house that he put on his driver's license.  But the
12  fruits of his business with his father, the team's products
13  were certainly at Bristolwood.  And Taeyan Williams was at
14  Bristolwood and EZ Storage and visiting his customers during
15  the critical days of April 6th, 7th and 8th of 2018.

16      Let's discuss the DNA evidence.  Mr. Hawks talked about
17  the DNA evidence from the gun. There's one point I want to
18  make. His focus was on Exhibits 9, 10 and 14 if memory serves.
19  One thing that did not come up, ladies and gentlemen, was
20  Exhibit 28 which was one of the swabs taken from the gun.  And
21  by that I mean DNA Exhibit 28. It was not in the report that
22  you saw earlier today, but it is one of the swabs that came
23  from the Sig Sauer.  And this is Exhibit 449B. Exhibit 28,
24  swab of stain from inner slide. The DNA profile from one minor
25  contributor was obtained. The DNA profile from Noah Smothers'

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2313

```
 1    deduced known is consistent with this DNA profile. Law
 2    enforcement elimination for Scott Williams and Taeyan Williams
 3    are excluded from the DNA profile.
 4         So this is one exhibit you didn't hear about earlier
 5    today, Exhibit 28 from the Sig Sauer. The DNA of Noah Smothers
 6    is found there, not the defendants. The Government doesn't
 7    suggest otherwise.
 8         The inner slide of the weapon, Exhibit 450. This is the
 9    Sig Sauer, ladies and gentlemen. The actual one.  You see this
10    piece of the barrel and there's some inner workings inside the
11    weapon. Here we see where the barrel is moving in and out when
12    it's in operation. This is the weapon as it's partially being
13    sort of disassembled for the swabs. There was talk about this
14    part earlier today and this part earlier today. You've heard
15    about it. I'm focusing on this part right here, inside the
16    sliding barrel as it moves in and out of the weapon, inside
17    the inner workings of the weapon. It is from there -- and we
18    see it here in this photo, all of this is from Exhibit 450 I
19    believe, the slide is taken out and we see the interior part
20    of the slide.  This is where Exhibit 28 came from, the DNA of
21    Noah Smothers. Blood is indicated on this portion of the
22    weapon. Blood and the DNA of Noah Smothers well inside this
23    weapon. It has to be practically disassembled in order to get
24    there.
25         Now it's perfectly reasonable that non-blood DNA would
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2314**

```
 1    have been found on the weapon in various parts. When you beat
 2    someone with a firearm, skin cells, saliva, other pieces of
 3    DNA end up getting on the weapon.  So it's not surprising that
 4    there would be other DNA on the weapon.  But have no doubt,
 5    the DNA of Noah Smothers was found inside that gun, well
 6    inside the gun and blood was indicated in that portion of the
 7    gun. Suggestion that this is Noah Smothers' gun is
 8    contradicted by all of the evidence in this case. This was the
 9    gun used to kidnap, rob, and ultimately terrorize Noah
10    Smothers to force him to give up the information, and the
11    marijuana, and the storage unit access that the defendants
12    were interested in. The DNA evidence supports that.
13        Alfred Musa's testimony is corroborated on point, after
14    point, after point, ladies and gentlemen, but there is almost
15    nothing he said in this case that is not backed up by DNA
16    evidence, forensic evidence, video evidence, storage records,
17    and everything else that you've seen in this case. Particular
18    pieces of information such as whether or not he would have
19    known that there was a Red Roof Inn, the particular manner in
20    which the gun was used to terrorize Noah Smothers adds to the
21    detail of his information and is beyond what you would have
22    expected to hear from casual conversations about allegations.
23    But even without Alfred Musa's testimony, the evidence in this
24    case, the forensics including what I just showed you, is proof
25    beyond a reasonable doubt as to what happened. That is, again,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2315**

1  in addition to the text message and electronic notes
2  information that also shows what the defendants were doing and
3  were planning.
4          **THE COURT:**  One minute, Mr. Hanlon.
5          **MR. HANLON:**  Thank you, Your Honor. The jail calls
6  you heard, ladies and gentlemen, it's clear that the
7  defendants are worried. It's clear that they were reminding
8  each other they want to be a team, and it's clear that they
9  are upset with each other for what each one of them perceives
10  as a mistake that they've made. But what is absolutely clear
11  is that Scott Williams and Taeyan Williams were not worried
12  about a marijuana case being put on them. They were worried
13  about a private investigator who had called. That private
14  investigator called about Noah Smothers. They were worried
15  about contacts between them and Noah Smothers. They were
16  worried about being caught on something a lot bigger than a
17  misdemeanor marijuana case.
18      Remember, Taeyan Williams had had some of his drugs
19  stolen in January of 2018 just a few months earlier and he
20  kept right on with the business. Marijuana was not their
21  concern. Their concern was a murder case being built on them
22  and their concern was distancing themselves from Noah
23  Smothers. They had buried Noah Smothers, but their panic as
24  heard during that jail call was that the evidence they had not
25  buried was coming back on them. And they had to be a team in

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2316**

```
 1    order to beat it. And that is ultimately what this case is
 2    about and why, ladies and gentlemen, you should find the
 3    defendants guilty.  Thank you.
 4              THE COURT:  Thank you.
 5              MR. HANLON:  Thank you, Your Honor.
 6              THE COURT:  Okay, ladies and gentlemen, we've heard
 7    all of the closing arguments. I did promise you one last jury
 8    instruction, however, before we get to the deliberations.
 9         So members of the jury, thank you for your attention
10    today during my instructions on the law or yesterday during my
11    instructions on the law and today during the closing
12    arguments. We've now reached the time for you to begin your
13    deliberations in this case. My warnings not to discuss the
14    case among yourselves will no longer apply once you begin your
15    deliberations. At that time it will be your job to discuss the
16    case and to reach a verdict. However, my preliminary
17    instructions that you are not to discuss the case with family
18    members, friends, coworkers, the media, or anyone else and
19    that you are not to do any independent research about this
20    case still applies during your deliberations.
21         Specifically, during your deliberations you should not
22    discuss the case with or provide any information about the
23    case to anyone other than your fellow jurors. This includes
24    discussing the case in person, in writing, by phone, or by any
25    electronic means, via text messaging, e-mail, Facebook,
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2317**

1  LinkedIn, Twitter, blogging, internet chatroom or any other

2  website.  You may not talk to anyone on the phone or in person

3  or correspond with anyone or communicate by electronic means

4  about this case with anyone except your fellow jurors and then

5  only while you're in the jury room conducting deliberations.

6      If you are asked or approached in any way about your jury

7  service or anything about this case you should respond that

8  you've been ordered by the judge not to discuss the matter and

9  you should report the contact to the Court as soon as

10  possible.

11     You should not try to access any information about this

12  case or do research on any issue that arose during the trial

13  from any outside source, including dictionaries, reference

14  books, or anything on the internet. Information that you may

15  find on the internet or in a printed reference might be

16  incorrect or incomplete. In our court system it is important

17  that you not be influenced by anything -- anyone or anything

18  outside the courtroom. Your sworn duty is to decide this case

19  solely and wholly on the evidence that was presented to you in

20  this courtroom.

21     And when you retire to the jury room, your first order of

22  business will be to select one member of the jury to serve as

23  your foreperson. The foreperson will sign all communications

24  with the Court, including the verdict form and be your

25  spokesperson here in court. If you need to communicate with me

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2318**

```
 1    during your deliberations, such communication must be made in
 2    writing in a note signed by your foreperson or one or more
 3    members of the jury. You should give the note to the bailiff
 4    who is the security officer who will be sitting outside the
 5    jury room. I will respond to any notes as promptly as possible
 6    either in writing or by having you return to the courtroom so
 7    I can speak to you in person. I usually must consult with the
 8    attorneys before responding and because that may take some
 9    time, you should continue to deliberate as you await a
10    response.
11         No member of the jury should ever attempt to communicate
12    with me by any means other than a signed writing. I will never
13    communicate with any member of the jury on any subject
14    relating to the merits of the case other than in writing or
15    orally here in open court.
16         You are never to reveal to any person and must not
17    include in any note to me how the jury stands, numerically or
18    otherwise until after you have reached a unanimous verdict.
19         You will note from the oath that the bailiff -- to be
20    taken by the bailiff that he too, as well as all other
21    persons, is forbidden to communicate in any way or manner with
22    any members of the jury on any subject relating to the merits
23    of the case.
24         Now as I explained earlier, the Government must prove
25    each of the essential elements of the charged crimes beyond a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2319

```
 1   reasonable doubt. Your function during your deliberations is
 2   to weigh the evidence in the case and determine whether or not
 3   one or both defendants is guilty solely on the basis of such
 4   evidence. If the Government succeeds in meeting its burden,
 5   your verdict should be guilty.  If it fails, it should be not
 6   guilty.
 7       To report a verdict, it must be unanimous. Each of you as
 8   a juror is entitled to your opinion. You should, however,
 9   exchange views with your fellow jurors. That is the very
10   purpose of jury deliberations, to discuss and consider the
11   evidence, to listen to the arguments of fellow jurors, and to
12   present your individual views.
13       In reaching a unanimous verdict, it is your duty as
14   jurors to consult with one another and to deliberate with a
15   view to reaching an agreement if you can do so without
16   violence to individual judgment. Each of you must decide the
17   case for yourself, but do so only after an impartial
18   consideration of the evidence in the case with your fellow
19   jurors.
20       In the course of your deliberations, do not hesitate to
21   reexamine your own views and change your opinion if you are
22   convinced that it is erroneous.  But, if after carefully
23   considering all the evidence and the arguments of your fellow
24   jurors you have a conscientious view that differs from the
25   others, do not surrender your honest conviction solely because
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2320**

```
 1    of the opinion of your fellow jurors, because you are

 2    outnumbered, or for the mere purpose of returning a verdict.

 3    Your final vote must reflect your conscientious conviction as

 4    to how the issue should be decided. Your verdict, whether

 5    guilty or not guilty, must be unanimous, reflecting the

 6    considered judgment of each and every one of you.

 7        You will return your verdict by marking answers to the

 8    written questions in the verdict form which will be provided

 9    to you. Each answer is to be marked in the space provided

10    after each question. It is your duty to answer each of the

11    questions in accordance with the evidence in the case. And

12    please follow the instructions on the verdict form carefully.

13    As you heard, there are nine different counts. There are some

14    additional subquestions that either need to or need not to be

15    answered depending on your earlier answers.  So please follow

16    the instructions very carefully. And the foreperson should

17    mark the answers and sign and date the verdict form.

18        When you reach a unanimous verdict, send a note to me

19    through the bailiff stating that you have reached a verdict

20    without stating the verdict itself.  Do not send the verdict

21    form.  When asked to do so, return to the courtroom and have

22    your foreperson bring the verdict form with him or her.

23        There's one last piece I just want to talk about in terms

24    of schedule. We will -- once you begin your deliberations

25    presumably you'll have lunch at that point.  The clerk will
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2321**

1    direct you, give you instructions on how that's going to work.

2    Generally speaking in a trial of this length it's not at all

3    uncommon to have the deliberations stretch over multiple days

4    or sessions. I do request for purposes of the schedules that

5    your fellow jurors probably set up at the beginning of the

6    trial, as well as for the staff and the attorneys who need to

7    be on standby whenever you're deliberating, that you plan to

8    end any deliberations if they're not completed by 5 p.m. on

9    any given day. I ask you to send me a note reporting on when

10    you plan to leave and I will either respond back either

11    directly by note or through a communication through the clerk

12    that you can then leave.

13        For any given day we ask you to return to start at 9:00

14    along the same lines as you've been doing. I will not require

15    you to come back into the courtroom for a formal session at

16    the beginning or end of the day, but you should send a note

17    when you're all ready and beginning to deliberate and the

18    foreperson should make sure that there's no discussion of

19    deliberations ongoing once jurors start to leave at the end of

20    the day or before everyone has started to arrive at the

21    beginning of the day and that the discussions only occur when

22    everyone is together and you are formally beginning or

23    continuing with your deliberations.

24        And finally, I do need to have the pleasant task of

25    addressing alternate jurors. As I believe you heard me allude

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2322**

```
 1    to earlier in the trial, we have more jurors here than we
 2    needed which is why when we lost a juror because of medical
 3    issues we could continue. A deliberating jury consists of 12
 4    jurors.  Currently we still have 15 of you.  We did better
 5    than we sometimes do in terms of maintaining our jurors. We've
 6    had that many because it's good practice to have the alternate
 7    jurors in the event that during the trial one or more jurors
 8    can no longer sit on the jury as you've seen happen. So at
 9    this time I need to tell our last three jurors, Juror No. 14,
10    15, and 16 in the back row to my right that you are the
11    designated alternates and so you will not join in the
12    deliberations that are about to begin.
13         Now let me say two things to the alternate jurors.
14    First, your service is not yet complete. In the event that
15    during the deliberations a juror for whatever reason could not
16    continue with the deliberations, we will call you off the
17    bench so-to-speak and send you in to substitute for that
18    juror. Now if that happens, you will not join in the middle.
19    The rules require that the jury start the deliberations all
20    over again so that the new deliberating juror is not at a
21    disadvantage. So while that can happen, obviously it's
22    incumbent on the rest of the jury to try to stick together as
23    a group so that we don't have to restart the process unless it
24    becomes absolutely necessary.
25         So as of now, you're free to leave the courthouse and go
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2323**

1    back to your regular life, but because -- but please leave
2    your contact information with the courtroom clerk so that we
3    can reach you if we do need to call you back for
4    deliberations.
5         Also, because there remains the possibility that you may
6    be pressed into service in deliberations, you must continue to
7    follow my previous instructions that you not discuss the case
8    with any other juror on this case, that you not discuss it
9    with anyone else in person or electronically, that you not
10   read anything about this case, and that you not conduct any
11   research about the case. Once the verdict has been returned
12   the courtroom clerk will contact you to inform you of the
13   verdict and remove that restriction.
14        The second thing I want to say to our alternate jurors is
15   thank you. Assuming that this is the end of your jury service,
16   I know some alternates are disappointed, others are relieved
17   that they do not participate in the deliberations. Either way,
18   your service throughout this trial has been a crucial part of
19   our ability to fill the Constitution's guarantee of a trial by
20   jury and to ensure that our system of justice remains in the
21   hands of the people.  So before you leave if you don't mind
22   waiting briefly, I would like the opportunity to personally
23   thank you for your service.
24        And then finally, I just want to state for the record, we
25   do have that empty seat in the jury box and I'm going to ask

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2324**

```
 1    Juror No. 13 who is the last person before the alternates to
 2    occupy that seat in any further visits here to the courtroom.
 3    We will redesignate you as Juror No. 10 for the record and
 4    those jurors numbers 1 through 12 will be the deliberating
 5    jury at least at this point.
 6          So with that, I'm going to ask the bailiff to come
 7    forward to take the oath.
 8                THE COURTROOM DEPUTY:  Please raise your right hand.
 9                (Courtroom Security Officer, sworn.)
10                THE COURTROOM DEPUTY:  Please state your name for
11    the record.
12                THE COURTROOM SECURITY OFFICER: CSO Michael
13    Dornberger.
14                THE COURTROOM DEPUTY:  Thank you.
15          THE COURT:  Thank you. Mr. Bailiff, you can lead the
16    jury out to deliberations.
17                (The jury exited the courtroom to begin
18    deliberations at 12:55 p.m.)
19          THE COURT:  Thank you very much.  Please be seated.
20    Just briefly, I want to confirm that counsel has left contact
21    information with Ms. Solomon; is that correct?
22          MR. GUILLAUME:  Yes, Your Honor.
23          MS. GROSSI:  Yes, Your Honor.
24          MR. HAWKS:  Yes, Your Honor.
25          THE COURT:  And we will hope to have you here within
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2325**

```
 1    five minutes, if possible, if there's a question or a verdict.

 2         I understand that between Mr. Crawley and Mr. Hanlon we

 3    may not see you if there's a need this afternoon.  Just so

 4    long as one member of your team is available and has full

 5    authority to act on behalf of your side, I think that will be

 6    okay.

 7         As you heard me say, I'm not going to require you all to

 8    come at the end of the day or the beginning of the day to

 9    convene the jury, but I do ask you to be on standby until you

10    hear from the clerk and she'll let you know when the jury has

11    left for the day and when they've arrived in the morning so

12    that you know when to be on standby.

13         And then finally I just want to make sure that the

14    parties have conferred or do confer with Ms. Solomon or each

15    other to confirm that the exhibits that are going back to the

16    jury, or that everyone agrees on what's going back to the

17    jury. Obviously I would assume the guns and the drugs are not

18    going back to the jury. I didn't mention it now, but the

19    procedure would be if there's a question and they want to see

20    one, we may need to have it available to bring them back into

21    the courtroom to let them look at something again.  So I'd ask

22    the Government to be prepared to facilitate that if for some

23    reason that were to happen.

24         Anything else we should discuss -- oh, and then did we

25    give out the verdict forms yet?  Why don't you hand out one to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2326**

```
1    each team. Again, I only just changed the headers, but just so
2    you have those verdict forms. The language on Count Five just
3    using the same language for each description of that charge,
4    so we'll give you each a copy of that so you have that going
5    into any verdict that we receive.
6         Well, with that we'll just -- I'll stay close by and
7    we'll see where things go. Thank you very much.
8                   (Recess was taken while jury deliberated.)
9                   (Proceeding concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2327**

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, Nadine M. Bachmann, Certified Realtime Reporter

 6     and Registered Merit Reporter, in and for the United States

 7     District Court for the District of Maryland, do hereby

 8     certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

 9     true and correct transcript of the stenographically-reported

10     proceedings held in the above-entitled matter and that the

11     transcript page format is in conformance with the regulations

12     of the Judicial Conference of the United States.

13

14                           Dated this 18th day of December, 2023.

15

16                                -S-

17                         _____

18                           NADINE M. BACHMANN, CRR, RMR
                             FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25
```

**JA2328**

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                       SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,      )
            Plaintiff,               )
 4                                   )
            vs.                      )   CRIMINAL CASE NUMBER:
 5                                   )       TDC-18-0631
      SCOTT ANTHONY WILLIAMS and     )        VOLUME XI
 6    and TAEYAN RAYMOND WILLIAMS,   )
            Defendants.              )
 7    _____ )

 8
                      TRANSCRIPT OF PROCEEDINGS
 9                         JURY TRIAL
             BEFORE THE HONORABLE THEODORE D. CHUANG
10                UNITED STATES DISTRICT JUDGE
                   Wednesday, May 10, 2023
11                   Greenbelt, Maryland

12                   A P P E A R A N C E S

13
      FOR THE PLAINTIFF:
14        OFFICE OF THE UNITED STATES ATTORNEY
               BY: LEAH GROSSI, ESQUIRE
15             BY: WILLIAM MOOMAU, ESQUIRE
                   6406 Ivy Lane, Suite 800
16                 Greenbelt, Maryland  20770

17             BY: MICHAEL HANLON, ESQUIRE
                   36 S. Charles Street, Fourth Floor
18                 Baltimore, Maryland  21201

19    FOR THE DEFENDANTS:
          For Scott Anthony Williams:
20             BY: KWASI HAWKS, ESQUIRE
                   THE HAWKS FIRM
21                 8705 Colesville Road
                   Suite 162
22                 Silver Spring, MD  20910

23             BY: DWIGHT E. CRAWLEY, ESQUIRE
                   LAW OFFICE OF DWIGHT CRAWLEY
24                 1300 I. Street, NW
                   Suite 400e
25                 Washington, DC  20005
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2329**

```
 1    (Appearances, Continued)

 2        For Taeyan Raymond Williams:
              BY: ALFRED GUILLAUME, III
 3                 LAW OFFICES OF ALFRED GUILLAUME, III, LLC
                   1350 Connecticut Avenue NW
 4                 Suite 308
                   Washington, DC  20036
 5
              BY: CHRISTOPHER NIETO, Esquire
 6                 LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
                   1 North Charles Street, Suite 1301
 7                 Baltimore, Maryland  21201
        _____
 8
           ***Proceedings Recorded by Mechanical Stenography***
 9

10                           I N D E X

11
                                                    PAGE
12
     Juror No. 3 was excused from service           103
13
     Juror No. 14 was renumbered to Juror No. 3     107
14

15

16

17

18

19

20

21

22

23

24

25
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2330**

```
 1                    P R O C E E D I N G S
 2         (11:08 a.m.)
 3              THE COURTROOM DEPUTY:  The matter now pending before
 4    this Court is Criminal Action Number TDC-18-0631, United
 5    States of America v. Scott Anthony Williams and Taeyan Raymond
 6    Williams.  We are here today for the purpose of a jury trial.
 7    Counsel, please identify yourselves for the record.
 8              MS. GROSSI:  Good morning, Your Honor.  Leah Grossi,
 9    Michael Hanlon, and William Moomau on behalf of the United
10    States. Here with us at the counsel table is Kyle Simms with
11    the Maryland State Police.
12              THE COURT:  Good morning.
13              MR. HAWKS:  Good morning, Your Honor.  Kwasi Hawks
14    and Mr. Dwight Crawley on behalf of Mr. Scott Williams, seated
15    between us.
16              THE COURT:  Good morning.
17              MR. GUILLAUME:  Good morning, Your Honor.  For the
18    record, Alfred Guillaume and Christopher Nieto on behalf of
19    Mr. Taeyan Williams, seated to my left.
20              MR. NIETO:  Good morning, Your Honor.
21              THE COURT:  Good morning.  Good morning to all the
22    parties and the members of the audience. I am here to report
23    on some notes we've received from the jury and to seek the
24    views of counsel on them.
25         Just to recap, if I get something entirely ministerial
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2331**

1   like particularly we're leaving at the beginning or end of the
2   day I'm not going to call you in for that. Last night the jury
3   did report they were ready to break around 5:10 p.m. They
4   included in with that a note or as part of their note they
5   said there has been difficulty with agreeing with verdicts on
6   many counts and some jurors verbally stating their opinion is
7   their opinion and unwilling to hear other views/evidence. I
8   didn't respond to that issue. It wasn't really a question. I
9   did send a note saying you may leave and come back tomorrow at
10  9:00. I just wanted to report that that note was received,
11  just for everyone's information in case there's anything you
12  want me to do about that.

13      Then this morning we got a note saying they were arriving
14  and ready to start deliberating and that was fine. I did not
15  actually respond to that. I think that was -- but there was
16  nothing substantive about that.

17      Then at -- they didn't write the time down, but the next
18  note stated, "The folder for Exhibit 417B is empty. Are we
19  able to get this piece of evidence?" So I'm assuming that was
20  just an oversight and I actually did not check. In light of
21  the other notes I was looking at other issues. But to the
22  extent 417B is in evidence can we provide that copy, make sure
23  everyone agrees that it's the right document?

24              **MS. GROSSI:** Yes, Your Honor.

25              **THE COURT:** Okay. And so you can provide that to the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2332**

1   clerk once both sides, all three sides have agreed on what the

2   document is.

3       As part of that same note they stated, "The Wickr

4   messages between NSmothers account and Larrybird50 cannot be

5   located in the evidence. Can we get a copy of such or the

6   exhibit number to better locate it?"  My thought on that would

7   be if we can agree on what exhibits they're referring to, it

8   would make sense for me in a note to tell them what the

9   exhibit numbers are because they specifically asked for it.

10  But the issue then is can we agree on what we think or we

11  believe they are referring to.

12      I know there were Wickr messages between the NSmothers

13  account and Larrybird50 . I don't know whether it was a single

14  exhibit or multiple numbers. I think just as a process, does

15  anyone have a problem with that if the parties meet and confer

16  and decide or at least see if they can agree on which exhibits

17  those are?

18          **MS. GROSSI:**  Yes.  We don't have a problem from the

19  Government's side.

20          **MR. HAWKS:**  No objection, Your Honor.

21          **MR. NIETO:** That's fine, Your Honor.

22          **THE COURT:**  So just off the top of your head, Ms.

23  Grossi, do you have a sense of whether that's one exhibit with

24  a lot of different messages or whether it's spread out across

25  multiple messages?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2333**

1          **MS. GROSSI:**  I believe it's spread out across
2    multiple, Your Honor. I just have to look back because I think
3    his Wickr screen name might have changed occasionally, so I
4    need to look back and identify this.
5          **THE COURT:**  Okay. I mean, the note refers to
6    Larrybird50 so I would take the view that if there was some
7    other name used by Mr. Rayburn as part of Wickr that we had a
8    screenshot for it, that's not what they're asking for.  Even
9    though maybe they were thinking that, but it's not what they
10   asked for.  But it also says "NSmothers account" so to the
11   extent Mr. Smothers had more than one I think it's clear
12   they're asking for the ones that involved anything that was
13   from -- or to or from Mr. Smothers. So that's how I would
14   interpret it.
15       So what I would suggest is after this session, perhaps
16   the parties can meet and confer.  If you can agree on certain
17   numbers and provide those to me and agree that I would send a
18   note giving them the numbers, that's great. If there's a
19   disagreement we can have a discussion about that. And so
20   that's how I would handle the second note.
21       The third note is more challenging. And you all have
22   copies of these; is that correct?
23          **MS. GROSSI:**  That's correct, Your Honor.
24          **MR. HAWKS:**  Yes, Your Honor.
25          **THE COURT:**  Although at least for now my procedure

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2334**

```
 1    during the trial is I'd like to take the notes back after we
 2    use them. You can ask to see them again at some point, but I
 3    don't want them out of the courtroom until at the end of the
 4    trial we'll make a determination as to whether anything is
 5    under seal or not.  But certainly feel free to look at them
 6    now and if you need to see them again after the hearing the
 7    clerk will give you an opportunity to do that.
 8        So the note reads, "The jury is in a compromising
 9    position.  There is one juror who is unwilling to hear others'
10    stance.  The juror is expressing great bias in the case based
11    on culture and refuses to cooperate and communicate with
12    others without aggression and raising their voice. This is
13    creating unrest with the jury. Example, quote, 'this is my
14    opinion, you cannot change it.  I said what I said.'  Unquote.
15    Can this juror be removed and replaced with an alternate?  How
16    should we proceed?"
17        Those are both questions. And then it says at the bottom,
18    "Cultural bias statement:  Quote, 'We all know about the
19    Jamaicans, they chop people up.'"  Unquote.
20        So in looking at this note, my initial reaction of the
21    top part was there's nothing unusual about jurors having
22    differing views. Someone saying "This is my opinion, you
23    cannot change it.  I said what I said." This is what jurors
24    deal with. They have to convince each other. Sometimes there
25    are stubborn jurors who don't want to change their mind at the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2335**

```
 1    beginning and we see how it goes, whether they end up coming
 2    to a meeting of the minds at some point. So that part I don't
 3    see a major issue with, certainly just this shortly into
 4    deliberations.  And if that was all we were dealing with I
 5    would clearly answer the questions about whether they should
 6    be removed and replaced with "No, keep trying."
 7         There was in the first part, though, a reference which
 8    was not specific, but said "He's expressing great bias in the
 9    case based on culture."  And the example of that apparently at
10    the bottom was the statement I just read about what they
11    called the "cultural bias statement." So that creates a
12    different issue, obviously.
13         And my initial -- well, I'm going to invite both sides to
14    provide their views on this, but in just the short amount of
15    time since we got this, I was trying to remember the case from
16    the Supreme Court that is at least in the same realm. I did
17    find it with the help of my law clerk, Pena-Rodriguez v.
18    Colorado, 137 S.Ct. 855 2017. This is not directly on point,
19    but what the Court held in that case was that post verdict, it
20    was appropriate as an exception to the broad, general
21    proposition that we never look behind jury verdicts, but when
22    there was evidence presented that there was racial bias or
23    national origin bias in the jury verdict based on in that case
24    I think somehow there were some affidavits provided by jurors
25    stating that a statement was made in deliberations which
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2336**

```
 1    exhibited some bias, that the Court could open up an inquiry
 2    into -- certainly could consider whether the verdict needed to
 3    be set aside, but also could take additional evidence through
 4    seeing if the jurors would be willing to talk about it to find
 5    out more. So in that instance, again, it was all post-verdict,
 6    but the Court made it clear that racial bias in a jury verdict
 7    is a Sixth Amendment violation and could be grounds under the
 8    certain facts to set aside the verdict.
 9        It did not deal with the exact situation we're dealing
10    with here which is we still have a deliberating jury. But I
11    think the principle is clear that we're not in a position to
12    just let this go and say that everything just goes forward. We
13    have to deal with it in some fashion.
14        Couple of ideas, but I'm open -- first off, does anybody
15    have any specific views on this issue or already have any
16    proposals on what we should do or --
17        MS. GROSSI:  Yes, Your Honor. The Government is
18    concerned about that last statement and spoke with defense
19    counsel about the issue.  We came up with a potential solution
20    which would be to send a note back to the jury asking them to
21    identify the juror by number and then potentially having a
22    voir dire with just the judge and the juror to ask if they did
23    say this statement.  And if we identify that person, then the
24    Government and defense counsel would be in agreement to excuse
25    that person and replace them with the next alternate.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2337

```
 1              THE COURT:  Mr. Hawks, anyone from either defense
 2    team?
 3              MR. HAWKS:  Your Honor, we certainly believe that
 4    some effort should be undertaken to verify that the juror is
 5    identified, but we believe that person should be removed and
 6    we believe that -- and this is Scott Williams, we believe that
 7    there's a statement, "we all know."  And so some effort to
 8    determine whether another juror has shared that anti-Jamaican
 9    sentiment.
10              THE COURT:  Okay. Do you have a proposal on what
11    that process be?
12              MR. HAWKS:  Your Honor, our initial thought would be
13    an in camera voir dire.
14              THE COURT:  Okay, I understand.
15         Mr. Nieto?
16              MR. NIETO:  Yes, Your Honor. On behalf of Taeyan
17    Williams, the cultural bias statement we believe,
18    respectfully, is grounds for excusal, removal from the jury
19    based on that particular bias. That's contrary to the voir
20    dire process that Your Honor so painstakingly went through at
21    the beginning of this trial.
22         In the same vein as what Ms. Grossi and what Mr. Hawks
23    was saying, we simply want to be able to identify the correct
24    juror who allegedly made this statement and we did not wish --
25    from our perspective we didn't want to get too involved in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2338**

1    that process because they are in the deliberations. And so if

2    Your Honor felt comfortable voir diring or getting some

3    confirmation in a capacity in which that juror could speak

4    more freely with Your Honor in lieu of speaking in front of us

5    to give us some insight as to what may be going on behind

6    those doors, we felt that to be appropriate.  But again, Your

7    Honor, respectfully, this bias statement is beyond the pale

8    from our perspective as coming from a sitting juror

9    deliberating on this case.

10        **THE COURT:**  I understand. I thought what I heard you

11    saying was not doing this in court on the record. Or -- I'm

12    not sure what your proposal was in terms of what should be

13    asked or not asked.

14        **MR. CRAWLEY:**  Court's indulgence. Your Honor, on

15    behalf of Mr. Williams, my client does not wish to have this

16    individual continue to serve. To the extent that the Court

17    needs to verify whether or not the person expressed these

18    views, we do not have an objection to the Court simply

19    verifying that information to see if this, in fact, was

20    expressed. But based on what was written here, I don't believe

21    that it can be cured. And if for some reason it was written in

22    a way to misrepresent what the juror actually did express, I

23    think we have a larger problem. So to save the Court time I

24    think everyone is in agreement that if the person did express

25    these views they should no longer serve on this jury. I think

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2339**

```
 1    the Government would agree with me. But if it is reported back
 2    to the Court through that juror that that's not what he or she
 3    expressed, I think the Court should advise us and I think at
 4    that point we may have a different issue as to why that was
 5    communicated in such an inflammatory way if that's not, in
 6    fact, what that person says.
 7                  THE COURT:  Ms. Grossi?
 8            MS. GROSSI:  Yes.  The Government is in agreement
 9    that this is an inappropriate statement and this juror should
10    be removed. I guess the Government is concerned about trying
11    to figure out which juror it is.  And so we thought that it
12    would be more easy to identify the juror if the parties
13    weren't here, but the judge just asked the questions and that
14    could be done on or off the record.
15        As to Mr. Hawks' statement about this being a larger jury
16    problem, I read this note as talking about one juror.  And so
17    at this point, we don't think that there's multiple jurors
18    with this cultural bias statement here. And we want to be very
19    careful obviously not to pierce the deliberation process.
20            MR. CRAWLEY:  And Your Honor, just to clarify a
21    little bit where I'm coming from with this, in order to
22    protect the sanctity of the jury, I don't want there to be a
23    feeling of mistrust between jurors. So what I'm concerned
24    about is that if we were to get into some kind of open back
25    and forth even with the Court, that it could create this
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2340**

```
 1    notion that there is some misrepresentation. I think this
 2    juror -- and I'm not going to call this juror the foreperson,
 3    but let's just assume that that's who it is at this point,
 4    they're taking this position, the Court inquires of that
 5    person, "Is this what you heard?"  The Court then examines the
 6    person to whom they've identified as the person and say "Hey,
 7    this is what I'm understanding was expressed" and it's left
 8    mainly between those two individuals, unless the Court feels
 9    it's appropriate to verify through others.
10        If the alleged perpetrator or the person who said this
11    confirms to the Court that that was uttered, then I think it's
12    self-evident that that person can no longer serve. I think
13    that bias has been established.  So I just don't want to lose
14    the jury in the notion that now we're in a tit for tat,
15    somebody saying one thing and another person saying another
16    thing and the jury then starts to lose faith in one another. I
17    think that needs to be curtailed as much as possible.
18            THE COURT:  Okay, well, these are all good thoughts.
19    The question is, how do we proceed. My initial thought is to
20    ask them to suspend deliberations while -- and then to have
21    the author of the note come in for some, you know, a colloquy
22    to confirm what was said, identify who said it, and perhaps
23    give us some context as to what we're talking about. And then,
24    I mean, the other option which the Government suggested was
25    perhaps sending a note asking for that. It's not clear to me
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2341**

1    from our note whether everybody on the jury saw this note and

2    agreed with it. I mean, usually that's the idea is the jury

3    all agrees on what they want to send to us, but it's not

4    always the case. This could have been written by just one

5    person. I said that the notes have to be signed either by the

6    foreperson or one or more members of the jury.  So it could

7    just be one member of the jury saying this. And so I think by

8    asking to see that person, perhaps it's different than sending

9    a note which presumably everyone would have to get to see,

10   which is who we are talking about.

11       And then based on that, we would then likely if --

12   assuming this person can confirm what is already written, we

13   would call in the juror who is identified, have that

14   discussion and I think what I would say is at least as a

15   technical matter, I would not just inquire whether the

16   statement was made, but also whether -- what they meant by

17   that.  Do they have a long-standing bias of any kind?  Does it

18   affect their ability to be a fair and impartial juror?  Can

19   they set aside those views?

20       My strong view would be that it would have to be

21   something quite extraordinary -- if they made this

22   statement -- for whatever the answers of that to be a reason

23   to keep the juror.  But I think I need to ask all those

24   questions just to be fair, particularly if the statement that

25   they admit to is slightly different or refers to something

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2342**

```
 1    else. But I would have a colloquy along the lines of what we
 2    have in voir dire generally saying, "Did you say this?  Does
 3    it -- do you have a bias?  And if so, can you be fair?"  But I
 4    agree with the sentiment in the room from counsel that if he
 5    actually said this or she actually said this, this would be
 6    grounds for striking and I would be highly inclined to do
 7    that, again, depending on what the answers are.
 8         So for those first two steps I think one of the issues is
 9    we're in a trial here. The defendants have a constitutional
10    right to be present for all relevant portions or all parts of
11    the trial and that's where we are right now. So do I hear the
12    parties saying they want -- affirmatively want to waive the
13    right to be present for this or do you want to be present for
14    this?  Because I think the default is you have a right to be
15    here and you should be here. To the extent the parties think
16    -- certainly in a normal voir dire we'd have counsel asking
17    questions too. That might not be the best idea, but we can
18    discuss how to do that, whether it runs through me or
19    otherwise.  But certainly being present you have the right to
20    be present.  If everyone agrees they don't want to be present
21    just to kind of get a more candid answer I think I could live
22    with that if it's very clear on the record that that was
23    everyone's decision. Either way it will be on the record in
24    the sense the court reporter will be taking everything down so
25    one could look at the record later.  But again, I don't want
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

JA2343

```
 1    -- I wouldn't want a situation where everyone said, "Well, why
 2    don't you talk to them yourself" and then it turns out later
 3    on you say, "Well, actually we wanted to be there."  And that
 4    would be a problem.
 5              MR. GUILLAUME:  Your Honor, if I may, I think that
 6    perhaps a happy medium would be after identifying the person,
 7    the husher could be on.  I don't necessarily want to waive my
 8    client's presence.  I think the Court is right, he has a
 9    constitutional right to be present.  I don't want anything to
10    come up later where something else, you never know what may
11    happen, and what issues may be raised on appeal. So as far as
12    that's concerned, perhaps something with the husher that if
13    the court reporter takes it, that he's present for, that we
14    don't necessarily hear at the time, then that person could be
15    excused and then the Court could relay back to us what was
16    said, the decision the Court makes.  That potentially could be
17    a happy medium, but I think I would like my client to be
18    present. Any time we're waiving a constitutional right it's
19    always very problematic, I would say especially --
20              THE COURT:  Right.  And I wasn't even suggesting you
21    do that, just it sounded like there was at least some sense
22    that it could be -- someone was proposing perhaps trying to do
23    this in as small a group as possible.
24              MR. GUILLAUME:  One last point if I may, that as Mr.
25    Nieto just reminded me, I think the person if they admit to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2344**

```
 1    making the statement, there's no need for the Court to really
 2    have an in-depth colloquy because they've identified their
 3    cultural bias and I think all three parties would agree that
 4    we don't want that person as part of our jury. That's from our
 5    point.
 6          THE COURT:  No, I understand that.  And I'm largely
 7    in agreement with you.  I think I would still ask other
 8    questions for thoroughness, but we'll see where we are at that
 9    point.
10       Mr. Crawley, you wanted to say something?
11          MR. CRAWLEY:  Your Honor, we would on behalf of Mr.
12    Scott Williams, we will not waive.  He wishes to be here. He
13    wishes to hear everything. He does not want the husher on.  I
14    think he's entitled to hear just as he was able to hear the
15    voir dire, he's able to hear about this. These are people who
16    are essentially deciding his freedom, as the Court is aware.
17          THE COURT:  Well, you don't need to argue with me on
18    that. That was my presumption.
19          MR. CRAWLEY:  I understand.
20          THE COURT:  There was some sentiment, including from
21    the defense side that maybe we don't have this this way, but
22    if upon reflection you want to do it that way, then I have no
23    problem with that.
24          MR. CRAWLEY:  Yes, Your Honor.  Thank you.
25          THE COURT:  Okay.  So any objection to taking it
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2345**

```
 1    starting with the juror who wrote the note and then going to

 2    the juror who is the subject of the note and then seeing where

 3    we are at that point?

 4             MS. GROSSI:  No, Your Honor.  I think that's a good

 5    course of action.

 6             MR. GUILLAUME:  No, Your Honor.

 7             MR. CRAWLEY:  No, sir.

 8             MR. NIETO:  And forgive me, I'm so sorry, Your

 9    Honor.  As part of that is Your Honor going to instruct the

10    jury to suspend their deliberations as well?

11             THE COURT:  Yeah, I'm going to have to do that.

12             MR. NIETO:  There's no objection from our

13    perspective on that point.

14             THE COURT:  Thanks. I think the way we would handle

15    it, perhaps, I think this makes sense just again, not knowing

16    -- or trying to follow the sentiment that started this whole

17    discussion about who is involved is we have the juror come in,

18    but then I would ask questions and then if counsel want to

19    propose additional questions, maybe we either through the

20    headsets or come up here with the husher, discuss what those

21    questions are before we ask them further.  And I think it may

22    make sense for me to continue to ask the questions rather than

23    having different attorneys asking the questions.

24        If for some reason one of these jurors -- well, the first

25    one we hope would, but if the jurors stay on the jury I think
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2346**

```
 1    additional questions on this page just how they feel about who
 2    is asking them or how it's phrased, I don't want to give them
 3    any sort of further positive or negative reason to have a view
 4    about what either side is saying.  So if you can funnel it
 5    through me, I think that makes the most sense.
 6         Hold on one second.  I just want to take a look. Someone
 7    just gave me a new case to see if we're doing anything that's
 8    consistent or inconsistent with that.
 9          So let's start with this. I'm going to send a note to
10    the jury.  So I'm going to send a note that says, "Please
11    suspend deliberations until further notice." And then I think
12    the way to do this is I would start by having the clerk summon
13    the author of the note to come in here first so it's not part
14    of a note that everybody shares. We'll talk to that juror and
15    then likely we would talk to the juror who allegedly made the
16    statement and we'll go from there. I think some of this
17    depends to some degree on what we hear as to what we do beyond
18    that. So why don't we just take it step by step.  And I do
19    think that, again, we can see -- well, we'll see how it goes
20    in terms of what additional questions counsel have. At least
21    at the outset let me know if you have questions up here at
22    sidebar.  If it makes sense to have you ask them, we will. If
23    not, then I'll ask them. Okay.
24              MR. CRAWLEY:  Your Honor, I just had one quick
25    question. Before we --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2347**

```
 1              THE COURT:  Yes.

 2              MR. CRAWLEY:  Is the Court going to inquire of that

 3     juror at this time if that juror presented this note to the

 4     entire jury panel or was this just his or her own --

 5              THE COURT:  Yeah.  Part of the reason to do this is

 6     to find out the scope of what we're dealing with. I think it

 7     could be that this is the sentiment of a lot of jurors because

 8     they all heard this, it was stated in full deliberations. It's

 9     also possible this statement was made in a side conversation

10     before or, you know, before the day began or sort of, you

11     know, I don't know whether -- I do want to know this juror's

12     view on how many people heard this statement and the

13     circumstances because I think it is certainly a possibility

14     that if others heard it, we might need to inquire further. I

15     understand your point about let's start with these two, but if

16     there's more to it than that, then we may need to inquire

17     further. I think in many of these cases if it's said to

18     everybody there is inquiry to all the jurors.  So we'll just

19     have to take it step by step.

20          So I will ask how this person knows the statement, who

21     else has heard it, et cetera. And we can use that information

22     as we go along. Okay?  So we'll send that note in and then

23     we'll also ask that other juror to come in here.

24              MS. GROSSI:  Your Honor?  I'm sorry, just one

25     question. When you ask them to suspend deliberations, are you
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2348**

1    going to ask them to stay close by or is it going to be for

2    the remainder of the day?

3            **THE COURT:**  Oh, well it's not for the remainder of

4    the day, but I'm hoping we can get through this and they can

5    continue.  But maybe I would -- maybe I need to be clear about

6    that. I don't want anybody to misunderstand me. So the note

7    now reads, "Please suspend deliberations until further notice.

8    You are to remain in the jury room until further instructions

9    are provided."  Which could include calling people in, but

10   also tells them they shouldn't just go home either.

11           **(Juror No. 4 enters the courtroom.)**

12           **THE COURT:**  Good morning, ma'am.  Thank you for

13   being here. You can stay seated, if you can make sure that the

14   microphone is close to you because I'm going to ask some

15   questions of you.

16           **JUROR NO. 4:**  Okay.

17           **THE COURT:**  And I wanted to inquire because I

18   received your note. I believe you sent the note that referred

19   to bias in this case based on culture. Is that the note that

20   you sent?

21           **JUROR NO. 4:**  Correct.

22           **THE COURT:**  And for the record, this is Juror No. 4,

23   correct?

24           **JUROR NO. 4:**  Yes.

25           **THE COURT:**  Okay, so I wanted to get more detail on

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2349**

1    the circumstances of this statement or statements. So first

2    off, do you know the number of the juror who allegedly made

3    this statement?

4            **JUROR NO. 4:**  Three.

5        **THE COURT:**  And can you tell me sort of the

6    circumstances under which you heard it?  Was it in front of

7    everyone, during a certain time of deliberations, was it

8    before or at the end of the day when it was just the two of

9    you or somewhere in between?

10           **JUROR NO. 4:**  No, it was during deliberations there

11   were just comments being made, side comments within

12   conversations on the side while we were deliberating. And the

13   juror has just not been cooperative.

14           **THE COURT:**  So when you say -- so the one statement

15   I want to start with is the one you put in quotes. "We all

16   know about the Jamaicans.  They chop people up." So you heard

17   him say that?

18           **JUROR NO. 4:**  Yes, several people have heard him say

19   that.

20           **THE COURT:**  And when you said it was in

21   deliberations but there were some side conversations, was this

22   something in front of all 12 or was it something that was

23   primarily amongst a smaller group?

24           **JUROR NO. 4:**  Everyone was together, we were all

25   talking, but he was making side conversations and then

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2350**

```
1    everyone kind of stopped when he made this comment.
2              THE COURT:  So your perception was that everyone
3    heard it?
4              JUROR NO. 4:  Yes.
5              THE COURT:  And did he make -- other than -- and
6    this was just -- so he says, "We all know about the Jamaicans.
7    They chop people up."  That's as close to a direct quote as
8    you can give me?
9              JUROR NO. 4:  Yes.
10             THE COURT:  Did anyone else make any statements that
11   indicated they agreed with that view?
12             JUROR NO. 4:  No.
13             THE COURT:  Did anyone make any statements that
14   indicated they were familiar with that concept or that
15   viewpoint?
16             JUROR NO. 4:  Not to my knowledge.
17             THE COURT:  Okay. In addition to that statement,
18   were there any other statements made by this juror that you
19   viewed as being culturally biased in some fashion?
20             JUROR NO. 4:  That was the only one specific to
21   cultural bias.
22             THE COURT:  Did anyone ask him or did he further
23   clarify what he meant by that in any fashion?
24             JUROR NO. 4:  He's been unwilling to communicate
25   with us any further. I've kind of stopped deliberations and I
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2351**

```
 1    told him, I said, "You know, this is what we're working on.
 2    This is what we're discussing. We understand that you feel
 3    this way."  And his response was, "I told you my opinion and
 4    that's my opinion.  You can't change it." And so my response
 5    was, I said, "I understand this is how you feel, but where is
 6    your evidence to support how you feel so that someone else may
 7    be able to better understand your perspective and your point
 8    of view?"  And he just looked at me and won't respond. He
 9    said, "I'm not repeating myself anymore."
10         THE COURT:  Okay, so was that discussion about this
11    statement or about something else?
12         JUROR NO. 4:  That was in general with the
13    deliberations.
14         THE COURT:  Okay. But in terms of the culturally
15    biased statements, this is the one that you heard and there
16    aren't any others that relate to Jamaicans or otherwise?
17         JUROR NO. 4:  No.
18         THE COURT:  Okay. And the note that you sent me just
19    to clarify, did all jurors see this note before it came to me
20    or is this a smaller group that saw it?  This is the note in
21    which you quoted that statement.
22         JUROR NO. 4:  A smaller group saw it.  The others
23    they just -- everyone was just like, "Well, we're not going to
24    get anywhere if you're not willing to cooperate" and he's
25    become very aggressive and yelling and just aggressive with
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2352**

```
1    everyone when they would try to understand.
2              THE COURT:  Does he know that you sent this note?
3              JUROR NO. 4:  No, he's not -- he won't cooperate, he
4    won't engage with anyone anything regarding to the case or any
5    kind of deliberation.  He just wants to do his own thing.
6              THE COURT:  So in terms of you said there were
7    several jurors who are familiar with the note and presumably
8    agreed with what you said in the note?
9              JUROR NO. 4:  Yes.
10             THE COURT:  About particularly that the statement
11   was made?
12             JUROR NO. 4:  Correct.
13             THE COURT:  But it's your understanding that
14   everyone heard this statement?
15             JUROR NO. 4:  Yes.
16             THE COURT:  Now let me ask you personally, having
17   heard this statement, does it affect your ability to be fair
18   and impartial in any way to hear this viewpoint expressed in
19   the jury room by a fellow juror?
20             JUROR NO. 4:  No.
21             THE COURT:  So having heard this viewpoint, is there
22   any reason that that affects -- would create any potential
23   unfairness or bias in your own deliberations having just heard
24   this statement by someone else expressing their own viewpoint?
25             JUROR NO. 4:  No.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2353**

```
 1              THE COURT:  Do you believe that you can continue as
 2    a fair and impartial juror in this case?
 3              JUROR NO. 4:  Yes.
 4              THE COURT:  Okay. Does counsel want to discuss
 5    whether there are any further questions I should ask?
 6              MR. CRAWLEY:  No questions on behalf of Mr. Scott
 7    Williams.
 8              MR. GUILLAUME:  No questions on behalf of Taeyan
 9    Williams, Your Honor.
10              MS. GROSSI:  No questions on behalf of the
11    Government.
12              THE COURT:  Okay. So thank you, ma'am, for your
13    participation up to this point. I'm not sure whether we'll
14    need to ask you any follow-up questions, but we might call you
15    back or we may call other jurors back. I think you saw we had
16    a note saying to suspend deliberations until further notice,
17    having everyone stay close because we hope to resume them once
18    we're done with this process.  But thank you for bringing this
19    to my attention.
20              JUROR NO. 4:  I have one question for you. This one
21    juror in particular said at the beginning of deliberations
22    that they didn't want to participate, so I don't know how that
23    would also affect what you all need to discuss.  But he made
24    it clear initially when we first went into the room before we
25    even chose a foreperson to speak he said, "I told them I did
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2354**

1    not want to be here and I didn't want to participate." So I

2    think he's just unwilling.

3            THE COURT:  We're still referring to Juror No. 3,

4    correct?

5            JUROR NO. 4:  Correct.

6            THE COURT:  Thank you, ma'am. You can step back to

7    the jury room. Oh ma'am, one thing before you -- I think it

8    would be helpful if you could refrain from discussing with

9    your fellow jurors our discussion now. I think that just keeps

10   everybody in a more independent place, depending on if we need

11   to talk to anyone else.  So can I ask you to do that?

12           JUROR NO. 4:  Yeah.

13           (Juror No. 4 returns to the jury room.)

14        THE COURT:  Okay, so our next step I believe -- you can

15   all be seated, was to in this instance call in Juror No. 3.

16   Based on what you've heard is there anything you would propose

17   I ask that we can sort of agree on in advance?  My plan would

18   be to ask him if he made this statement, try to get any

19   clarification, if there's circumstances that are different

20   than what was described. And as I said, I would likely still

21   ask even -- certainly if he says he said something different

22   I'll try to clarify what that is. I'll certainly ask to the

23   extent that this affects his ability to be fair and impartial

24   and those types of questions just to have a clear record as to

25   any argument he had or basis to conclude that he can be fair

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2355**

```
 1    and impartial even if I understand that everyone's view is
 2    that that is likely impossible if he made this statement.  But
 3    particularly if the statement is a little different than what
 4    we heard, I think all those questions need to be put on the
 5    record.  But is there anything in particular you want me to
 6    ask?
 7              MR. CRAWLEY:  Your Honor, on behalf of Scott
 8    Williams we just would like the Court to stick with the exact
 9    language that was provided. I understand the Court has a lot
10    of leeway in trying to clarify what was actually said, but
11    also Your Honor as the Court may recall during the initial
12    voir dire, we had a lot of strikes for cause where the Court
13    basically expressed being consistent with people who came into
14    the case with these preconceived notions. I think a lot of
15    those centered around law enforcement. In this particular case
16    I think the threshold has been exacerbated by the fact that
17    this is race and culturally based in my opinion.  And so
18    therefore I don't believe -- and this is not directed at the
19    Court personally -- I don't believe that attempts to try to
20    rehabilitate such a profound statement can be made.  If he
21    said it, he should be excused and I think that's supported by
22    all the parties.  So I'm not telling the Court how to handle
23    its business, but it may save us some time.
24              THE COURT:  I understand and I don't disagree with
25    your view, I just want to make a thorough record. I would not
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2356**

```
1    view it as an attempt to rehabilitate him by any stretch.
2    That's not what I'm trying to do.  I'm just trying to get a
3    thorough record, that's all.
4         Anything the Government or Mr. Taeyan Williams' team
5    wants to add?
6              MR. GUILLAUME:  No, nothing to add.
7              MS. GROSSI:  Nothing else from the Government.
8              THE COURT:  So why don't we call in Juror No. 3.
9              (Juror No. 3 entered the courtroom.)
10             THE COURT:  For the record, this is Juror No. 3?
11             JUROR NO. 3:  Yes.
12             THE COURT:  And I wanted to call you in just to get
13   some clarification. It was brought to my attention that there
14   may have been a statement that you made as part of
15   deliberations that I wanted to inquire about.
16             JUROR NO. 3:  Yes.
17             THE COURT:  The statement was -- and again, this may
18   or may not be a direct quote, but along the lines of "We all
19   know about the Jamaicans.  They chop people up." Did you say
20   anything like that during deliberations, even if it was a side
21   conversation with someone else?
22             JUROR NO. 3:  Not necessarily like that, Your Honor.
23             THE COURT:  Can you just move closer to the
24   microphone?
25             JUROR NO. 3:  No, no.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2357**

1    **THE COURT:** When you say "not necessarily," was

2    there something that this might relate to if you didn't say it

3    exactly that way?

4    **JUROR NO. 3:** I was referencing something that I

5    heard during the testimony about the word "saw." I think it

6    came from Musa, the person that testified.

7    **THE COURT:** Okay, so you were referencing that. To

8    the best of your recollection, what did you say?

9    **JUROR NO. 3:** I was saying what he said, basically

10   what he was repeating that in the testimony that what he said

11   that Scott said, Mr. Williams said to him.

12   **THE COURT:** So you recall that Mr. Musa said

13   something like that?

14   **JUROR NO. 3:** Yes.

15   **THE COURT:** So is it your view that to the extent

16   you said it you were just referring to what Mr. Musa said? It

17   wasn't your own viewpoint?

18   **JUROR NO. 3:** No, it wasn't my viewpoint, no.

19   **THE COURT:** Have you ever heard of that concept in

20   the past?

21   **JUROR NO. 3:** No.

22   **THE COURT:** Do you believe that to be true, that

23   Jamaicans tend to do a certain thing or --

24   **JUROR NO. 3:** I can't testify to anything like that,

25   no. I can't say that anybody does something like that.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2358**

```
 1              THE COURT:  So whether it's from the testimony or
 2    otherwise or from your own prior experience, do you have any
 3    viewpoints or understandings about the Jamaican culture that
 4    you understand to be true about people from that background?
 5              JUROR NO. 3:  No.
 6              THE COURT:  Do you have any views about Jamaicans,
 7    positive or negative, that you can say are your beliefs about
 8    how Jamaicans are or how they act?
 9              JUROR NO. 3:  Positive views, yes.  They are great
10    artists when they're carving stuff with wood.  I've bought
11    several of their pieces.  But I've been to Jamaica several
12    times and I've had good relationships with the people from
13    Jamaica.
14              THE COURT:  Okay. So to the extent that someone said
15    that you said to someone "We all know about the Jamaicans,
16    they chop people up."  That was not an expression of your
17    viewpoint?
18              JUROR NO. 3:  No, it was not.
19              THE COURT:  Okay. Is there anything you've heard
20    about Jamaicans or experience that would prevent you from
21    being fair and impartial in judging this case going forward?
22              JUROR NO. 3:  Not at all.
23              THE COURT:  Does the fact that we've had to have
24    this discussion or that fellow jurors may have heard this and
25    reported it, does that prevent you from being fair and
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2359**

```
 1    impartial in this case?
 2              JUROR NO. 3:  No, it does not.
 3              THE COURT:  Other than that statement is there
 4    anything else that you said in the jury room that related to
 5    Jamaicans that could have been viewed as relating -- being
 6    specific about views about Jamaicans?
 7              JUROR NO. 3:  No.
 8              THE COURT:  Okay.
 9              JUROR NO. 3:  And just to your point, I am quiet,
10    okay?  I listen to the evidence presented and I take my notes
11    and I refer to my notes, okay?  And if you are one that's not
12    in agreement with many, you know, you want to find a reason,
13    you know, I mean, then they will come up with one. But I've
14    been questioning everything that's presented in this
15    courtroom. I don't follow judgment, I follow my own facts, I
16    follow my own views and I listen to the directions that was
17    given to me by the judge.
18              THE COURT:  Okay.
19              JUROR NO. 3:  Now in that process, if I have my
20    verdict that's different from others, don't look for reasons
21    to try to discredit me because I don't go along with you, and
22    that seems to be the case here.
23              THE COURT:  Okay. So to the extent people are
24    reporting you made this statement, do you view it as a
25    misunderstanding or something else?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2360**

```
 1              JUROR NO. 3:  I view it as me not wanting to go
 2     along with everything that they want me to go along with.
 3     Okay?
 4              THE COURT:  Okay.
 5              JUROR NO. 3:  And we all have a slip. Whatever I
 6     chose on that slip, that's what I chose.
 7              THE COURT:  Okay, you don't need to tell me what
 8     that is.
 9              JUROR NO. 3:  I wasn't going to tell you.
10              THE COURT:  I understand your point. No, I
11     understand.  Okay, is there anything else that came up in
12     deliberations that related to Jamaicans or anything else that
13     you said that might have been viewed as along the lines of the
14     statement I referred to?
15              JUROR NO. 3:  Nothing else.
16              THE COURT:  And again, maybe I've already asked
17     this, but having heard this statement what you're saying came
18     from a witness, and also the fact that people are reporting it
19     to you, do you believe you can be fair and impartial going
20     forward?
21              JUROR NO. 3:  Yes, I do.
22              THE COURT:  Okay. And do you have any ill will or
23     negative views about Jamaicans in any way?
24              JUROR NO. 3:  None whatsoever.
25              THE COURT:  Okay. Okay, does counsel want to --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2361**

```
 1              MR. CRAWLEY:  May we approach, Your Honor?

 2              THE COURT:  Yes, go ahead.

 3              (Counsel approached the bench.)

 4              THE COURT:  Go ahead.

 5              MR. CRAWLEY:  Your Honor, on behalf of Mr. Scott

 6    Williams, I don't want to tell the Court the questions that I

 7    think it should ask, but maybe the Court should inquire as to

 8    the jury deliberation process for him. I know the first juror

 9    that came out talked about him being unwilling to engage and

10    seemed to indicate to us that he was not willing to go through

11    -- there's a lot of evidence in this case, as you know. It

12    seems like he may have even just suggested that he has checked

13    some boxes in the verdict and made a decision without engaging

14    the jury when they are attempting to say "Well, let's just go

15    over each count, let's go over each piece of evidence, let's

16    really try to decipher what this means," that he's already

17    coming to this with a preconceived notion as to guilt or

18    innocence. I think the Court and everyone involved would hope

19    that each juror would give careful attention.  They have not

20    been out but for several hours as this Court is aware.  So I

21    would ask the Court to ask questions along those lines to see

22    if that's more consistent with what the first juror mentioned

23    to the Court. I don't know if any of my colleagues have

24    anything else.

25              MS. GROSSI:  Your Honor, I think that I heard
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2362**

1    something a little bit different.  He said that he was quiet

2    and he was listening and I'm a little concerned that he would

3    get into the deliberation process of like did they first all

4    go through the verdict sheet and that's what they're coming to

5    determine. I heard him talking about the fact that he was

6    quiet and he was looking at the evidence.  And so the

7    Government doesn't have any further questions. I think we need

8    to figure out what we would like to do. We are not at this

9    point consenting to have him removed, but we'd like to discuss

10   it a little bit further, based on his comments.

11        **THE COURT:**  Mr. Guillaume, anything from your side?

12        **MR. GUILLAUME:**  Your Honor, on behalf of Mr. Taeyan

13   Williams I agree with Mr. Crawley. It also seems to me that

14   the first juror who I find a little more credible than this

15   juror, indicated that he is unwilling to engage.  And he kind

16   of indicated that himself, that checked boxes which would

17   indicate an attempt, an unwillingness to engage as well.

18        I also believe to be quite frank with the Court, I just

19   don't believe his statement to the Court about the Jamaican

20   comment based on his demeanor and other non-- other facts that

21   can be put on the record later.

22        **THE COURT:**  I understand. I agree with the

23   Government to the extent that it is a different issue whether

24   he's willing to engage in deliberations. I don't think that's

25   the reason why we're doing an inquiry. We're focused on racial

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2363**

1    bias.  But I will ask one or more questions along the lines of

2    what Mr. Crawley suggested more to the idea of just trying to

3    get a better sense of how it may affect my determination who

4    is telling the truth here.  So I'll ask questions that may

5    relate to that only to help me determine maybe what is going

6    on with this statement, not trying to decide whether he's

7    deliberating as well as others.  Because as I said at the

8    outset, it's not unusual for jurors not to fully engage and

9    frankly, sometimes they end up engaging later on. It just

10   takes time.

11       But is there a specific question you would like me to

12   ask, Mr. Crawley?

13           **MR. CRAWLEY:**  I would leave it to the Court's

14   discretion. I don't want to influence the Court's position.

15       One other thing I would make mention of is that he

16   indicated that he was relying on the testimony of Mr. Musa. I

17   don't recall Mr. Musa referencing "Jamaicans" per se. So I

18   still don't understand to my colleague's point, how that term,

19   if used, would have come up. Even if you accept that he was

20   relying on Mr. Musa's statement regarding that something was

21   done with the body, et cetera, et cetera, the notion that the

22   word "Jamaican" or "Jamaicans" would have come up seems to me

23   to be kind of farfetched, but --

24           **MS. GROSSI:**  Your Honor, I do disagree with that. I

25   know that Mr. Musa said that he knew he was Jamaican. I don't

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2364**

```
 1      think he said the statement that "Jamaicans cut people up,"
 2      but at one point Mr. Musa said that he knew he was Jamaican.
 3      At another point he said that he bragged about being Saw,
 4      S-a-w. So I think there were statements by Mr. Musa that would
 5      have come out based on that statement, but I agree that that
 6      statement in full was not said by Mr. Musa.  But there were
 7      pieces of Mr. Musa's testimony that do support what he is
 8      saying.
 9                THE COURT:  Okay, thank you.
10                MR. GUILLAUME:  Your Honor, if I could make one last
11      comment.  Mr. Nieto suggested this to me that we perhaps if
12      the juror is unable or willing to admit that he made the
13      comment, perhaps voir diring other jurors only as to that
14      comment.
15                THE COURT:  No, I mean, that's frankly what I was
16      planning to do. So we'll take it step by step, but I agree
17      with the suggestion.
18                MR. GUILLAUME:  Thank you, Your Honor.
19                MS. GROSSI:  Thank you, Your Honor.
20                (Counsel returned to their trial tables.)
21                THE COURT:  Okay, just a couple more questions, sir.
22      I just wanted to clarify.  I think you said earlier that you
23      tend to be kind of quiet, you're listening. Have you been
24      willing and able to participate in the review of the evidence
25      itself and to look at the evidence and the materials to help
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2365**

```
 1   inform your decision?
 2              JUROR NO. 3:  Yes, I have.
 3              THE COURT:  And you would be willing to discuss the
 4   case with your fellow jurors?
 5              JUROR NO. 3:  Yes, I do.
 6              THE COURT:  Okay. Well, thank you very much, sir.
 7   We're going to send you back to the jury room. I appreciate
 8   you coming out to have this discussion.  Thank you.
 9              JUROR NO. 3:  Not a problem.
10              (Juror No. 3 returned to the jury room.)
11              THE COURT: Thank you, everyone.  Please be seated.
12   So among other things, this isn't exactly what we anticipated,
13   but I am going to try to check as best I can what Mr. Musa
14   said on this topic, so we're looking for that now. But -- I
15   think the cases generally, I wasn't -- again, I wanted to take
16   it step by step, but various cases including U.S. v.
17   McClinton, 135 F.3d 1178 from the Seventh Circuit 1998 which
18   dealt with a similar situation, I think even in a very clear
19   situation where this statement was made, we would likely need
20   to voir dire other jurors, if only based on Juror No. 4's
21   statement that everyone heard this statement or at least her
22   understanding was, we would need to at a minimum check with
23   them to confirm that it didn't influence their views in any
24   other way.
25        I credit Juror No. 4's statement that she is not
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2366

```
 1   negatively influenced from having heard this statement. I
 2   think the fact that she reported it probably further supports
 3   the view that this is not going to affect her ability to be
 4   fair and impartial.  But I think in general in cases like this
 5   the Court often inquires of the other jurors to make that
 6   determination for all of them as well.  And here we have the
 7   added question of I think there's still at least a dispute
 8   presented by the two jurors as to exactly what was said or how
 9   it was said or what it meant. So I think we're going to need
10   to inquire of some, if not all of the other jurors first to
11   make a determination on whether this statement was made and
12   then secondly, if it was made or they've understood it to be
13   made, how it affects them.
14        Now the tricky part is if someone did not hear the
15   statement which is a possibility.  I think Juror No. 4 thought
16   everyone heard it, but I don't know if that will prove to be
17   true.  I don't want to unnecessarily taint the juror or raise
18   the concern of a taint by sort of quoting back the statement
19   to them unless -- I mean, if they say -- look, if it's clear
20   that they didn't hear anything like this, but we're just going
21   to have to take it step by step.  Because obviously if they
22   heard anything like this, what they heard is going to be
23   important to help determine whether we agree with what Juror
24   No. 4 said or whether we agree with what Juror No. 3 said in
25   terms of exactly what was said and what was meant by it. So
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2367**

```
 1    the only caution I would have is I think it is still helpful
 2    to perhaps have a discussion if there's further questions
 3    because I don't want to unnecessarily inject anything into a
 4    juror's mind if at least it appears that they didn't hear any
 5    of this. Obviously if they've heard something we're going to
 6    dig into it and find out what was said.  So my plan would be
 7    to find out if they heard this statement, to understand how it
 8    was made to help determine whether it was a culturally biased
 9    statement or whether it was an interpretation of what was said
10    by a witness.  And then also to the extent that they had any
11    understanding this statement was made, whether it has any
12    impact on their ability to be fair and impartial.
13         Does anyone have any views on that approach?
14         MR. CRAWLEY:  I guess, Your Honor, I'm trying to
15    understand better.  Would the Court be inclined to just
16    inquire again of Juror 4 maybe as to who she heard?  I mean,
17    who she may know heard the statement to maybe narrow down the
18    pool or is the Court more inclined to ask one by one, each
19    juror "Did you hear anything like this?"  I think our concern
20    is that to your earlier point, we would want to narrow it down
21    and maybe see if there are like three or four people that she
22    definitely could say they were present, they heard it, maybe
23    there was even a discussion about it that they were kind of
24    taken aback by it.  And that would kind of condense this
25    process a little bit.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2368**

```
 1        And then as Mr. Hawks has indicated, would it make sense
 2   to in the alternative, have all of the jurors, just point
 3   blank ask the question. My only hesitation with that is I
 4   think the Court touched upon -- Mr. Hawks maintains that maybe
 5   a conversation or a question about were there any comments
 6   made in reference to generalizations about Jamaicans and
 7   perceptions about Jamaicans, but I just don't want to open up
 8   Pandora's box.  I would want to kind of narrowly deal with
 9   this and try to examine maybe two or three people that she
10   says "Hey" -- because I don't know if the Court agrees with
11   me, but I think if there are two or three at least that
12   support her position, that's enough. I don't think we need all
13   12 to understand that at that point if you believe those three
14   or four additional individuals, that that's a significant
15   number of people corroborating her statement.
16        THE COURT:  Well, does anyone agree or disagree with
17   my view that if someone heard the statement, we need to make
18   an inquiry to confirm that it's not adversely affected them?
19        MR. CRAWLEY:  We agree.
20        THE COURT:  So part of it is determining who those
21   people are.
22        MR. CRAWLEY:  Exactly.
23        THE COURT:  And again, based on what Juror No. 4
24   said, she thought everyone heard it.  Although again, it
25   wasn't clear -- it sounded like it was perhaps made in passing
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2369**

```
 1      to someone else, but still in deliberations.  So there is the
 2      question of how many people actually heard it.
 3           Does the Government have a view on this?
 4           MS. GROSSI:  Your Honor, I believe the Government
 5      thinks that we should poll every juror because of that
 6      statement and make sure that they are able to be fair and
 7      impartial in this jury process and not just try to limit it to
 8      a certain amount of people that Juror No. 4 said.  As the
 9      Court just reminded us, she did say that everyone stopped
10      talking and heard that comment.
11           THE COURT:  Here's what I think I'll do. It's a
12      little more cumbersome. Mr. Nieto, anything you want to add?
13           MR. NIETO:  Yes, Your Honor. Naturally I'm going to
14      suggest a hybrid of resolutions.
15           THE COURT:  Of course.
16           MR. NIETO: If Your Honor were inclined to voir dire
17      a few of the jurors to get confirmation as to whether this
18      statement was made, if Your Honor believes that this statement
19      was, in fact, made, it is the position of Taeyan Williams that
20      that juror then be excused.  If the Court wished to do that,
21      then perhaps the voir diring of the jurors, the remaining
22      jurors to ensure that that statement did not negatively
23      influence their ability to be fair and impartial seems wholly
24      appropriate. That was just our suggestion, for whatever that's
25      worth to the Court.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2370**

```
 1            MR. CRAWLEY:  And we concur on behalf of Scott
 2    Williams.  And to again restate this, Your Honor, my earlier
 3    concern was that if we get into too much of this back and
 4    forth, we may cause the jurors to feel as if they can't trust
 5    one another and then not be honest. If this was actually said,
 6    as painful as it may be, it may be an honest reflection of
 7    this individual which is something that is good. That's the
 8    positive that came out is that we learned about this because
 9    we could have had a scenario where we went through a verdict
10    and as the Court just touched upon, we learned about it six
11    weeks after trial. So I just don't want them to feel uneasy
12    about having the ability to express one another.

13            THE COURT:  Well, I think there's going to be some
14    uneasiness one way or the other now.  That's kind of where we
15    are.

16        What I was going to suggest, though, which I think is
17    perhaps a little bit in line with what Mr. Nieto said, is I'm
18    going to ask Juror No. 4 to come back briefly to tell us who
19    specifically knows about this.  Because I think my questions
20    to those individuals might be a little bit different if my
21    understanding is that they heard the statement as opposed to
22    having no sense. I also want to just ask her if there's any
23    possibility there's a misunderstanding here in her mind as to
24    effectively the explanation we got from Juror No. 3, whether
25    that's a possibility. I'm not assuming that's the case, in
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2371**

```
 1    fact I-- but I just want to have that on the record, her view
 2    of what is that.  Because that's the kind of question I might
 3    ask other jurors now that I know that that's at least one
 4    interpretation of what was going on.
 5         So I'm going to bring Juror No. 4 back to ask about that
 6    and then also try and get more detail on who heard this and
 7    that may affect the order and what I say to these individuals.
 8    I think on the one hand I think there's something clean about
 9    going in numerical order so it doesn't look like the jurors
10    are being singled out for any reason.  At the same time, the
11    questions might be different.  So if there's a very clear
12    sense that there's several people we should start with, then I
13    might do that along the lines of what the defense is
14    suggesting.
15         So why don't we call back Juror No. 4.
16              (Juror No. 4 reentered the courtroom.)
17              THE COURT:  Ma'am, sorry to bring you back again,
18    but I had a couple follow-up questions to get clarification
19    on. First off, I think what you told us was this statement,
20    the culturally biased statement that was allegedly made, I
21    think you said you thought everyone heard it.  But were there
22    several people who you know for certain heard it and that
23    you've discussed it with them, either the writing of the note
24    or otherwise?
25              JUROR NO. 4:  There was others that brought it up
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2372**

```
 1    today, and even said something to Juror No. 3 in the room.
 2              THE COURT:  Okay. And which jurors are those by
 3    number, if you can recall?
 4              JUROR NO. 4:  I don't know their numbers.
 5              THE COURT:  You don't recall just looking here where
 6    they sat?
 7              JUROR NO. 4:  The two that sat here and here.
 8              THE COURT:  7 and 8, okay.
 9              JUROR NO. 4:  And then several that were on the back
10    row.
11              THE COURT:  7 and 8, okay.
12              JUROR NO. 4:  I know 1 heard it, 7 and 8.  I'm not
13    sure if 5 heard it, but I know several in the back row also
14    heard it.
15         THE COURT:  Okay, but you can't pinpoint exactly
16    which ones. The ones who actually may have brought it up and
17    said something about it, who were those?
18              JUROR NO. 4:  7, 8.  I believe he may be No. 10 or
19    11.
20              THE COURT:  It's a little unprecise. 10 is the
21    person who had to move seats.
22              JUROR NO. 4:  So it was 11 then.
23              THE COURT:  11, okay. And my other question is, it's
24    been suggested that to the extent the juror made a statement
25    along the lines of "We all know about the Jamaicans, they chop
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2373**

1    people up," that it's been suggested that that may have been a

2    reference even if it was not an exact reference, but a

3    reference to what Mr. Musa said as opposed to his own views.

4    Is there any -- in your view, is that a possible explanation

5    for what was said or is it not possible?

6         **JUROR NO. 4:**  I believe when someone brought it up

7    to him he tried to relate it to that, but in the context of it

8    being said initially, that's not how it was brought up.

9         **THE COURT:**  Okay. So he did say that he was trying

10   to refer back to the witness, but you weren't convinced by

11   that explanation?

12        **JUROR NO. 4:**  That was after a couple people brought

13   it up and said, you know, "That's not fair for you to use

14   that" and then he was like, "Well, that's what they said."

15   So--

16        **THE COURT:**  Okay. And you didn't take that as a

17   convincing explanation?

18        **JUROR NO. 4:**  No, due to the other -- other ways

19   he's carrying himself, his demeanor and other issues that have

20   arose in deliberations, I don't --

21        **THE COURT:**  Well, I just want to make sure that

22   we're separating out people who are uncooperative which is one

23   thing, or actions that are uncooperative, from actions or

24   statements that reflect some sort of cultural bias. So does

25   the fact that in your view this person has been uncooperative,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2374**

```
 1    does that affect your interpretation of his statement or do
 2    you just understand from the context of the statement --
 3             JUROR NO. 4:  From the context of the statement.  So
 4    the uncooperativeness, that was discussed.  And as a jury as a
 5    whole, we have discussed that and tried to come to an
 6    agreement on how we should further handle things and that has
 7    been set aside.
 8             THE COURT:  So if it was suggested that perhaps the
 9    statement is being reported and/or being interpreted in a way
10    because people don't find him to be cooperative and would like
11    to get him replaced, do you agree with that statement or not?
12             JUROR NO. 4:  I don't believe they want him replaced
13    because he's uncooperative, no. I believe people have
14    expressed that they would like him replaced because his bias,
15    he's -- there has been other statements that I can't quote
16    directly that have suggested, but it was like smaller things
17    in side conversation that weren't directly in deliberations.
18             THE COURT:  As best you can tell, what were those
19    statements?
20             JUROR NO. 4:  It was just -- it was -- the best I
21    could say without just going into what we discussed in
22    deliberations would be "I feel how I feel."
23             THE COURT:  But were these other statements related
24    to Jamaicans or other groups?
25             JUROR NO. 4:  Yes, yes.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2375**

```
 1            THE COURT:  Okay. And then given your -- you've said
 2    that you don't believe a statement was made just as a
 3    paraphrase of a witness, but was actually an expression of a
 4    viewpoint.  Is there anything else you can tell me about what
 5    makes you reach that conclusion, anything he either said or
 6    how it was said?
 7            JUROR NO. 4:  I guess I would say other comments
 8    that were made outside of deliberations that were made in
 9    independent conversations prior to us deliberating.
10            THE COURT:  That relate to Jamaicans or something
11    else?
12            JUROR NO. 4:  Yes.
13            THE COURT:  But you can't give me any detail as to
14    what those statements were?
15            JUROR NO. 4:  Not without going into, I guess,
16    opinions and what people would like to --
17            THE COURT:  Well, I mean, I think on the one hand I
18    think it is helpful not to reveal the specifics of
19    deliberations, but if there were specific statements made like
20    the one you reported where just exhibits of viewpoint, that is
21    something that you can and should tell us about.
22            JUROR NO. 4:  I guess Juror No. 3 just feels like
23    due to a specific person's culture, that impacts the way they
24    -- their actions or how they would react in a situation.
25    That's just their view and they don't want to --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2376**

```
 1              THE COURT:  Okay, so that's what you at least think
 2    the other statements reference, even if you can't specifically
 3    tell me -- is it that you can't recall exactly what was said
 4    or that you think what was said is going to provide more
 5    information about the actual deliberations?
 6              JUROR NO. 4:  I think it's going to provide more
 7    information about the deliberations.
 8              THE COURT:  Why don't we do this: Anything else from
 9    counsel on this?
10              MR. CRAWLEY:  Nothing on behalf of Mr. Scott
11    Williams.
12              MR. GUILLAUME:  Nothing for Taeyan Williams, Your
13    Honor.
14              MS. GROSSI:  Nothing from the Government.
15              THE COURT:  Okay. Thank you, ma'am, again, for
16    coming back. Hopefully this is the last time for you, but
17    again, I'd ask you just to try to keep our discussions --
18    don't discuss them with the jury while we're potentially
19    talking to other jurors. Thank you very much.
20              (Juror No. 4 returned to the jury room.)
21              THE COURT:  Okay, thank you.  Everyone please be
22    seated. I mean, based on that and the fact that there may be
23    other statements, I think it's obviously a stronger case for
24    what Juror No. 4 originally said. At the same time, I do think
25    for the record we need to talk to some other jurors, partly to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2377**

```
 1    just, again, get a better handle on exactly what was said and
 2    what it meant, but also given that she's identified at least
 3    three or four others who she thinks heard the statement I
 4    think I at least need to inquire of them how it impacts their
 5    ability to be fair and impartial.
 6         Does anyone disagree with that or do you have any sense
 7    of what the order should be or do you have a preference?
 8              MR. CRAWLEY:  Your Honor, my recollection was 1, 7,
 9    8 and 11.  So I would just suggest we go in that order.
10              MS. GROSSI:  Your Honor, the Government is a little
11    concerned about singling out certain jurors and not others and
12    the jurors seeing that only certain people are coming out
13    here. So the Government recommends voir diring, unfortunately,
14    everyone.  I know that will be time consuming, but to try to
15    keep the jurors -- the potential for their deliberations to
16    continue intact.
17              THE COURT:  Okay. Well, I'm going to, again, take
18    this step by step. I think we have the happy circumstance that
19    one of the people on the list is Juror No. 1, so I'm going to
20    start with Juror No. 1 which could mean a lot of things.  It
21    could also mean that we're just going in numerical order.  So
22    why don't we call in Juror No. 1.
23              (Juror No. 1 entered the courtroom.)
24              THE COURT:  So ma'am, we've been calling some jurors
25    in here now.  I just wanted to ask you some additional
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2378**

```
 1    questions just to get some clarification on some things. So
 2    first off, my understanding, I've been informed through a note
 3    that there was a juror who may have made a statement that
 4    could be viewed as culturally biased. Have you heard any
 5    statements like that as a juror in the deliberations or within
 6    among the jury?
 7              JUROR NO. 1:  In that sense I guess you can
 8    interpret it that way.
 9              THE COURT:  Why don't you move the microphone a
10    little closer to you.  Thank you.
11              JUROR NO. 1:  I did hear something in that range
12    from a juror.
13              THE COURT:  What did you hear?
14              JUROR NO. 1:  How can I say it -- basically what I
15    heard was basically we were talking, of course, and basically
16    they said "You know, that's how they are.  That's how they
17    act. You should expect that" basically.
18              THE COURT:  And do you know who the "they" was that
19    was being referenced, to your understanding?
20              JUROR NO. 1:  It was in regards to -- because we
21    were, of course, deliberating and there was a couple in
22    evidence that was going back and forth and they said, "That's
23    how Jamaicans act." That was it.
24              THE COURT:  And which juror said this, do you know?
25    Not by name, but by number, or where they sit in the jury box?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2379**

```
 1                    JUROR NO. 1:  I think it was 3.
 2               THE COURT:  Okay, so you were 1, you sat at the far
 3      end so the person who was two next to you?
 4               JUROR NO. 1:  It was 3.
 5               THE COURT:  The one two away from you?
 6               JUROR NO. 1:  Yes.
 7               THE COURT:  Okay.  Did you hear any other statements
 8      along those lines?
 9                    JUROR NO. 1:  Along -- no, that was the only one.
10               THE COURT:  Okay.  So you mentioned Jamaicans.  Did
11      he or anyone else make any statements that exhibited a
12      particular viewpoint about Jamaicans or how they act?
13               JUROR NO. 1:  No, that was the only one.
14               THE COURT:  Okay. Now having heard that statement,
15      does that affect your ability to be fair and impartial in this
16      case?
17               JUROR NO. 1:  Did it affect?  No.
18               THE COURT:  So to the extent that someone had that
19      viewpoint or had that viewpoint about people from Jamaica
20      generally, does that create any negative view in your mind
21      about people from Jamaica, based on the fact that someone said
22      that?
23               JUROR NO. 1:  No, no, sir.
24               THE COURT:  Do you believe that you can fairly and
25      impartially judge the evidence in this case even having heard
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2380

1  that statement?

2          **JUROR NO. 1:**  Yes, sir.

3          **THE COURT:**  Okay.  It's been suggested that to the

4  extent certain statements were made about Jamaicans, that they

5  may have just been sort of a reference back to what a witness

6  may have said during the trial, but not actually that person's

7  viewpoint. When you heard that statement, did you understand

8  that to be an expression of the juror's viewpoint, personal

9  viewpoint, or an expression of something that was said during

10 the trial by somebody else?

11         **JUROR NO. 1:**  I think it was something personally,

12 but I'm not 100 percent sure because of the way it was told is

13 basically "that's how they act." You know, "that's basically

14 what they're supposed to do."

15         **THE COURT:**  Did you or any other jurors talk about

16 this statement at any point?

17         **JUROR NO. 1:**  Did I speak to anybody?  First thing

18 no, I just heard it because I was sitting right next to them.

19         **THE COURT:**  Okay.  Any follow-up?

20         **MR. CRAWLEY:**  Not on behalf of Mr. Scott Williams.

21         **MR. GUILLAUME:**  Not on behalf of Taeyan Williams,

22 Your Honor.

23         **MS. GROSSI:**  Nothing from the Government. Thank you.

24         **THE COURT:**  Okay. Thank you, ma'am. You can return

25 back to your -- ma'am, before you go just I would appreciate

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2381**

```
 1     it if you not discuss the questions and answers here with
 2     other jurors.
 3                     JUROR NO. 1:  Okay.
 4             THE COURT:  Thank you.
 5             (Juror No. 1 returned to the jury room.)
 6             THE COURT:  So my thought is that I think at this
 7     point we should voir dire all the jurors because we heard a
 8     second statement. Now it's probably something that Juror No. 4
 9     may have also heard, it was consistent with her statement that
10     there were other things that she couldn't really pinpoint, but
11     I think Juror No. 1 has clearly identified there may be other
12     statements that were made that we need to hear about and
13     verify who heard them and whether there was any impact on
14     them. So I think we should go in numerical order. Obviously
15     with Jurors No. 7, 8 and 11 I can perhaps be a little more
16     forward leaning in terms of the statement, but even this one I
17     don't believe she heard it come out the same way Juror 4 did.
18     And I didn't want to give her that language just because it
19     just injects another piece of information. I did ask if there
20     was anything else that was said and she said "No."
21          So does anyone object to that approach, the more
22     open-ended approach rather than giving them a direct quote
23     unless they clearly indicate that that statement was made?
24             MR. NIETO:  And Your Honor, this is prior to making
25     the determination as to what to do with Juror No. 3?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2382**

```
 1              THE COURT:  Well, I mean, we could do this in two
 2     rounds.  I sort of feel like once we have them here we should
 3     also ask what impact any statements had on them. I think based
 4     on Juror No. 4 and No. 1, I'm highly inclined to strike Juror
 5     No. 3.  But again, I think since I think I need to inquire of
 6     others as well because there may have been other statements
 7     that I'm not going to make a final decision right now.
 8              MR. NIETO:  Absolutely, Your Honor. From our
 9     perspective if the Court felt that excusing Juror 3 made sense
10     at this point it would allow Your Honor's voir dire to perhaps
11     be more pointed with regards to the remaining jurors to make
12     sure that any statements made in that context with regards to
13     their ability to be fair and impartial, but what Your Honor is
14     suggesting makes sense as well.
15              THE COURT:  Okay.  Anybody have any other thoughts?
16              MS. GROSSI:  Your Honor, the Government is inclined
17     to dismiss number 3 based on hearing from Juror No. 1, but we
18     do think going through in numerical order to voir dire the
19     jury makes sense.  And I just wanted to ask Your Honor, are
20     you planning to do the same thing with the remaining jurors,
21     not quote back what was said, but ask just generally?
22              THE COURT:  I think that's the right approach.
23              MS. GROSSI:  The Government agrees.
24              THE COURT:  I'm also going to be very clear I want
25     to hear all statements like that, so that they're not just
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2383**

```
 1    forgetting to talk about that one if they heard it. But I
 2    don't know -- I don't want to quote a statement that they may
 3    not have actually heard and inject yet another piece into
 4    that.
 5              MS. GROSSI:  Yeah, the Government agrees with that,
 6    Your Honor.
 7              THE COURT:  Mr. Crawley, do you agree or disagree
 8    with that?
 9              MR. CRAWLEY:  We generally agree, Your Honor, with
10    the Court's approach.  We would just simply add to the
11    Government's position and I think Mr. Taeyan Williams'
12    counsel, we think at this point that Juror No. 3 should be
13    just excused for cause at this point.
14              THE COURT:  I understand. Okay, why don't we call in
15    Juror No. 2.
16              (Juror No. 2 entered the courtroom.)
17              THE COURT:  Thank you, everyone.  Please be seated.
18    For the record, this is Juror No. 2. Sir, thank you very much
19    for coming in here. If you don't mind moving closer to the
20    microphone or moving that microphone closer to you. I did want
21    to ask because there's been some reports of a statement or one
22    or more statements made among jurors that could be viewed as
23    culturally biased in some fashion. I want to ask if you heard
24    any such statements during the time that you've been in the
25    jury room with the other jurors.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2384**

1          **JUROR NO. 2:**  I think one was made.

2          **THE COURT:**  And what -- to the best of your

3    recollection, what was the statement?

4          **JUROR NO. 2:**  That was made?  "That's what the

5    Jamaicans does."

6          **THE COURT:**  And when you say that, what were they

7    referring to?

8          **JUROR NO. 2:**  As far as cutting people up.

9          **THE COURT:**  I see. Now it's been suggested that to

10    the extent something like that was said it might have been --

11    did you perceive that to be the personal viewpoint of the

12    juror?

13          **JUROR NO. 2:**  I mean, I heard it, but I really

14    didn't like really hear the whole conversation.  I wasn't

15    paying attention to it really.

16          **THE COURT:**  Okay. It's been suggested that to the

17    extent something like that was said it might have just been a

18    reference to something that was said during the trial by a

19    witness. Does that sound like it could be a fair explanation

20    or does it sound like that's not what was going on?

21          **JUROR NO. 2:**  It kind of sounds like he said "That's

22    what they do."

23          **THE COURT:**  And was there any way as hearing that

24    that it sounded like it might have been a reference to what a

25    witness might have said?  I'm not saying any witness said that

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2385**

```
1    exact word, but --
2              JUROR NO. 2:  I'm not sure.
3         THE COURT:  You're what?
4              JUROR NO. 2:  I said I'm not for sure.
5         THE COURT:  I mean, between the two possible
6    explanations that it's a personal viewpoint versus something a
7    witness said, do you have a sense?
8              JUROR NO. 2:  I would say personal viewpoint.
9         THE COURT:  Okay.  And just for the record to be
10   clear, I mean, do you know which juror this was by where they
11   sat in the box?
12             JUROR NO. 2:  Juror 3.
13        THE COURT:  Okay. Any other statements by him or
14   anyone else along the lines of a statement about the culture
15   of Jamaicans or anyone else?
16             JUROR NO. 2:  No.
17        THE COURT:  Okay.  Do you know who else heard that?
18   Was it the entire jury or a small group?
19             JUROR NO. 2:  Maybe, I can't think of the juror that
20   sat beside me in there in the room there. But I know one sat
21   across the table.
22        THE COURT:  Okay.
23             JUROR NO. 2:  I can't give their numbers.
24        THE COURT:  But others did, you just can't pinpoint
25   who?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2386**

```
 1                    JUROR NO. 2:  Yes.
 2            THE COURT:  Having heard that statement, do you
 3     agree with any of the views as to this understanding of how
 4     Jamaicans --
 5            JUROR NO. 2:  I don't -- I don't let their opinion
 6     affect my opinion.
 7            THE COURT:  So do you share that opinion?  I sort of
 8     need to ask, do you share the opinion of Juror No. 3 on that
 9     point, to the extent it was his opinion?
10            JUROR NO. 2:  No.
11            THE COURT:  Having heard it discussed, does that
12     give you any negative view of Jamaicans?
13            JUROR NO. 2:  No, no.
14            THE COURT:  Does that statement having been made
15     affect your ability to be fair and impartial as a juror in
16     this case?
17            JUROR NO. 2:  No, no.
18            THE COURT:  Okay. Anything else?
19            MR. CRAWLEY:  Not on behalf of Mr. Scott Williams.
20            MR. GUILLAUME:  Not on behalf of Taeyan Williams.
21     Thank you.
22            MS. GROSSI:  Not from the Government.
23            THE COURT:  Okay. Thank you very much, sir. I'd ask
24     you if you could just refrain from discussing our conversation
25     with the jurors, the content of it just because we may talk to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2387**

```
 1   other jurors and we just want to make sure they're just giving
 2   us their own viewpoint and not something they heard here, if
 3   that's okay. Thank you very much.
 4              (Juror No. 2 returned to the jury room.)
 5              THE COURT:  Okay, I think I would move to Juror No.
 6   5, unless everyone -- does anyone want me to approach it
 7   differently with Juror No. 5 than I did with Juror No. 2?
 8              MS. GROSSI:  No.  I thought that was the correct way
 9   to handle it, Your Honor.
10              MR. CRAWLEY:  Your Honor, on behalf of Mr. Scott
11   Williams the only concern we do have is at this point I think
12   everyone has expressed to the Court that we're in agreement
13   with removing Juror No. 3 and we would just ask the Court to
14   the extent that the statement was heard, does it impact your
15   ability to sit here fairly and whatever questions the Court
16   wishes to ask in that vein.
17              MR. GUILLAUME:  I have no objection to the way it's
18   been done, Your Honor.
19              THE COURT:  Well, you're not concerned, Mr. Crawley,
20   that there might be other statements that we need to make
21   sure?  Because I'm not convinced those are the only statements
22   we've heard, unfortunately.
23              MR. CRAWLEY:  I thought the Court was asking about
24   that particular juror.  But if the Court is asking in general
25   about other bias-related statements, no.  We have no objection
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2388**

```
 1    to that. But if it's just focusing on number 3 since we seem
 2    to all be in agreement, I don't think we need to put more time
 3    and energy in that related to number 3. If the Court is
 4    inquiring as to whether or not there may have been other
 5    statements of bias made --
 6         THE COURT:  Well, true, but I think I need to
 7    understand what they heard from Juror No. 3, what their
 8    perception is to be able to confirm that if they can say that
 9    they are not affected by it. So I think -- so I don't think
10    we're on different pages.
11         MR. CRAWLEY:  I understand.
12         THE COURT:  Why don't we go to Juror No. 5 then.
13         (Juror No. 5 entered the courtroom.)
14         THE COURT:  Thank you.  Please be seated.  Thank you
15    for joining us, sir. This is Juror No. 5. I need to ask you
16    some questions just to get some clarification of a few things.
17    So it's been brought to my attention that there may have been
18    one or more statements made among the jury that could be
19    viewed as exhibiting a cultural bias and I wanted to ask if
20    you believe you've heard any such statements.
21         JUROR NO. 5:  I have heard what I would call that.
22    However, I will say it was within -- there was -- I can't
23    remember, sorry, I can't remember exactly what the context was
24    but it was in relation to someone's testimony where someone
25    took a statement that a witness had made and then extrapolated
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2389**

```
 1    it out to an entire cultural group, if that makes sense.
 2              THE COURT:  Okay, so just generally or can you tell
 3    us what was the statement you're referring to, just as best
 4    you can quote it even though I know it's not going to be
 5    precise.
 6              JUROR NO. 5:  That the witness made?
 7              THE COURT:  What the juror said.
 8              JUROR NO. 5:  It was something to the effect of
 9    "Jamaicans chop people up, it's what they do."  Something
10    along those lines.
11              THE COURT:  And then when you said it was related to
12    a witness' testimony, are you saying that that was a
13    recounting of what the juror recalled the testimony to be or
14    was it taking the testimony and making -- adding an additional
15    statement to that, as you perceived it?
16              JUROR NO. 5:  As I perceived it it was adding to the
17    original statement. It was to the effect of I think it was --
18    if I'm allowed to say the witness' name --
19              THE COURT:  The witness?  The witness, yes.
20              JUROR NO. 5:  It was during Alfred Musa's testimony
21    said something to the effect of "That's why they call me Saw,
22    I chop up bodies."  Something like that.  So he heard that and
23    said, "You guys heard that" and then he added the statement
24    about the Jamaicans.
25              THE COURT:  Okay. So to the extent it might have
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2390**

1   been suggested that that was just a recap of what the juror

2   heard the witness say, do you agree with that possible

3   explanation or do you believe it was more along the lines of

4   adding an additional viewpoint on top of what a witness said?

5          **JUROR NO. 5:**  From my understanding of what was said

6   it sounded more like an addition, rather than just a pure

7   recap.

8          **THE COURT:**  Beyond that statement -- and just for

9   the -- which juror was this?  Where did they sit in the box?

10         **JUROR NO. 5:**  Juror 3.  So he would sit one over

11  from the lady next to me.

12         **THE COURT:**  Okay.  Did you hear any other statements

13  that might relate to a cultural viewpoint or bias other than

14  that one from anyone?

15         **JUROR NO. 5:**  No, not that I can recall from anyone

16  else.

17         **THE COURT:**  So having heard that statement, does

18  that affect your ability to be fair and impartial as a juror

19  in this case?

20         **JUROR NO. 5:**  Does it affect my ability?  No,

21  because like if I see something like that as an addition, I

22  see that as a potential bias on their part and I don't -- I

23  very much try to not let that factor.  Because again, I am

24  trying to be impartial and I would say that I've succeeded in

25  doing that in all other deliberations that we have done.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2391**

```
 1                    THE COURT:  Okay. So that's your attempt to do that,
 2      but do you believe based on what you heard there that you can
 3      and will be fair and impartial going forward?
 4                    JUROR NO. 5:  I believe I will be, yes.
 5                    THE COURT:  Okay. Anything else for this juror?
 6              MS. GROSSI:  Not from the Government.
 7              MR. CRAWLEY:  Not on behalf of Mr. Scott Williams.
 8              MR. GUILLAUME:  Not on behalf of Mr. Taeyan
 9      Williams.
10          THE COURT:  Thank you, sir.  And I'd ask if you
11      could just not discuss what we discussed just so we can keep
12      all conversations individual. Thank you very much.
13              JUROR NO. 5:  Of course.
14              (Juror No. 5 returned to the jury room.)
15          THE COURT:  Thank you, everyone.  Please be seated.
16      I think we'll next call Juror No. 6 in.
17              (Juror No. 6 entered the courtroom.)
18          THE COURT:  Good morning or good afternoon, ma'am.
19      Thank you for joining us.  I just have a few questions I want
20      to ask you about if you could move to the microphone or move
21      it closer to you.
22          It was brought to my attention there may have been a
23      statement, one or more statements made among the jury that
24      could be viewed as exhibiting some kind of cultural bias or
25      viewpoint. Did you hear any statement that you viewed in that
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2392**

1    way?

2         **JUROR NO. 6:**  I did not hear the statement itself,

3    but I heard it being repeated by others who heard it. So I did

4    not hear it.

5         **THE COURT:**  Okay. And just to make sure we're

6    talking about the same thing, what did you hear being

7    repeated?

8         **JUROR NO. 6:**  What was repeated was about how a

9    certain culture of people are. Should I state?

10        **THE COURT:**  To the extent you recall what people

11   have said.

12        **JUROR NO. 6:**  The statement that was repeated was

13   "You know how Jamaicans are." That's what was repeated by

14   those whom were closest and heard it.

15        **THE COURT:**  And who did they hear it from, to your

16   recollection?

17        **JUROR NO. 6:**  They heard it from I believe number 3.

18        **THE COURT:**  Okay. Did anyone who repeated it, did

19   they indicate that they agreed with it or they were just

20   repeating it?

21        **JUROR NO. 6:**  It was brought up once the juror was

22   confronted about that.

23        **THE COURT:**  Okay.

24        **JUROR NO. 6:**  And multiple people confirmed that

25   they heard it.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2393**

```
 1              THE COURT:  Okay. Now you only heard it secondhand
 2     it sounds like.
 3              JUROR NO. 6:  Secondhand.
 4              THE COURT:  Based on as it was characterized to you
 5     -- first of all, when you said that people brought it up, did
 6     you hear any explanation from Juror No. 3 as to this statement
 7     or not?
 8              JUROR NO. 6:  It was -- Juror No. 3 attempted to say
 9     that he was going off of what had been presented in court and
10     we asked to provide evidence, but that wasn't provided. So it
11     appeared more as an opinion, a personal opinion.
12              THE COURT:  Okay. And that's what people were saying
13     about it or that's what you perceived it to be based on what
14     you heard?
15              JUROR NO. 6:  That's what I perceived it to be.
16              THE COURT:  So having heard this opinion, do you
17     share any of those views yourself?
18              JUROR NO. 6:  Absolutely not.
19              THE COURT:  Does the fact that they were discussed
20     and that a juror raised this viewpoint, does that affect your
21     ability to be fair and impartial in judging the evidence?
22              JUROR NO. 6:  No.
23              THE COURT:  Do you have a sense of whether it had
24     any impact on any other juror's ability to be fair and
25     impartial?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2394**

1   **JUROR NO. 6:**  No, I believe that the juror who
2   confronted number 3 was upset that that was actually brought
3   up because it implies a bias.
4       **THE COURT:**  I see, okay. Anything else for this
5   juror?
6       **MR. GUILLAUME:**  Not on behalf of Taeyan Williams,
7   Your Honor.
8       **MS. GROSSI:**  Not from the Government.
9       **MR. HAWKS:**  Not on behalf of Scott Williams, Your
10  Honor.
11      **THE COURT:**  Thank you.  I'd ask you not to discuss
12  our conversation with any of the jurors just so we can have
13  individualized conversations. Thank you very much.
14      **(Juror No. 6 returned to the jury room.)**
15      **THE COURT:**  Thank you.  Everyone please be seated.
16  We'll move to Juror No. 7.
17      **(Juror No. 7 entered the courtroom.)**
18      **THE COURT:**  Thank you, everyone.  Please be seated.
19  This is Juror No. 7. You can be seated as well.  I'm going to
20  ask you some questions, so if you don't mind moving closer to
21  the microphone, I think that is your regular seat. Sir, there
22  are some questions I need to ask you because it was brought to
23  my attention or at least it was suggested that there may have
24  been a statement made or more than one statement made in the
25  jury room that arguably could be viewed as a culturally biased

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2395**

1    statement.  I wanted to ask if you heard anything that you

2    understood to be potentially culturally biased.

3          **JUROR NO. 7:**  Yes, sir.

4          **THE COURT:**  And can you tell me to the best of your

5    recollection what was the statement?

6          **JUROR NO. 7:**  "You know how those Jamaicans act."

7          **THE COURT:**  And which juror, by number, if you

8    recall the number, made the statement?

9          **JUROR NO. 7:**  It might be number 2, the older

10   gentleman. 2 or 3.  He sits on this side.

11         **THE COURT:**  The older one?

12         **JUROR NO. 7:**  Yes.

13         **THE COURT:**  So now when you heard that statement, did

14   you understand that to be a personal viewpoint?  It was

15   suggested it might have been a reference to something said

16   during the trial. Can you tell us how you perceived it?

17         **JUROR NO. 7:**  I understood it to be very biased.

18         **THE COURT:**  Very biased you said?

19         **JUROR NO. 7:**  Very biased.

20         **THE COURT:**  So to the extent someone would have

21   suggested that it could have just been paraphrasing what a

22   witness said, do you agree with that?

23         **JUROR NO. 7:**  No, no.

24         **THE COURT:**  So do you share that viewpoint?

25         **JUROR NO. 7:**  No.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2396**

```
 1              THE COURT:  Having heard that statement or the
 2    suggestion about Jamaicans, does that affect your ability to
 3    be fair and impartial in judging this case?
 4              JUROR NO. 7:  Doesn't affect mine, no.
 5              THE COURT:  Okay. There was also a suggestion made
 6    that people may have raised this point because that juror has
 7    not been cooperative. Do you believe that anyone would raise
 8    that because of the lack of cooperation or do you think it's
 9    because the statement was actually made and reflected a
10    personal viewpoint?
11              JUROR NO. 7:  His statement shows complete bias and
12    he's not being cooperative.
13              THE COURT:  Okay. Anything else for this juror?
14              MR. HAWKS:  No, Your Honor.
15              MR. GUILLAUME:  No, Your Honor.
16              MS. GROSSI:  No, Your Honor.
17              THE COURT:  Thank you, sir. I'd ask you just to
18    avoid discussing our conversation with the rest of the jurors
19    so I can have a specific conversation directly with particular
20    jurors.
21              JUROR NO. 7:  Yes, sir.
22              THE COURT:  Thank you.
23              (Juror No. 7 returned to the jury room.)
24              THE COURT: Juror No. 8.
25              (Juror No. 8 entered the courtroom.)
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2397**

```
 1              THE COURT: Thank you. Everyone could be seated. You
 2    can sit right there in seat No. 7, one over from your regular
 3    seat.  I'm going to ask you a series of questions, ma'am, so
 4    if you don't mind getting closer to the microphone. It's been
 5    suggested to me that there may have been a statement made or
 6    one or more statements made that reflected some kind of
 7    arguable cultural bias. Did you hear any statements like that
 8    among the jurors?
 9              JUROR NO. 8:  Yes, sir.  I did.
10              THE COURT:  And what to your recollection did you
11    hear?
12              JUROR NO. 8:  So we were all discussing the phone
13    call that Mr. Scott had on the phone. I can't remember who it
14    was with or he was -- he was talking to Musa and they said
15    something about "That's why they call me Saw."  And then the
16    juror -- I don't want to say this, this is rude, but the juror
17    then says that "You know, we know Jamaicans, like they're
18    known for cutting people up" or something along those lines.
19    That's what was said.
20              THE COURT:  So besides that statement, did you hear
21    anything else that you could view as culturally biased?
22              JUROR NO 8:  I don't know if I'm allowed to divulge
23    this, but as we're trying to go over answers or come to an
24    agreement because -- it's not supposed to be our opinion, it's
25    supposed to be based off facts.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2398**

1           **THE COURT:**  Right. And let me just ask you to focus

2  on whatever the statement was and then if I need more context,

3  I'll ask you for the context.

4           **JUROR NO. 8:**  So then no, no.  If it's just on that

5  statement, then no.

6           **THE COURT:**  But was there something else that was

7  another statement that indicated cultural bias in some fashion

8  besides the one you referenced?

9           **JUROR NO. 8:**  No, no.

10           **THE COURT:**  So having heard that statement -- first

11  of all, had you ever heard that thought before?

12           **JUROR NO. 8:**  Me?  No.

13           **THE COURT:**  Do you agree with it?

14           **JUROR NO. 8:**  No, absolutely not.

15           **THE COURT:**  Does the fact that you heard this

16  statement impact your ability to be fair and impartial?

17           **JUROR NO. 8:**  Absolutely not.

18           **THE COURT:**  It was suggested perhaps that that

19  statement was not a personal opinion, but more of a recounting

20  of what the juror thought the witness said. Does that sound

21  like a possible explanation?

22           **JUROR NO. 8:**  No, no.  That's why I wanted to give

23  more context, but --

24           **THE COURT:**  I see, okay.  Anything else for this

25  juror?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2399**

```
1                 MR. HAWKS:  No, Your Honor.  Thank you.

2                 MS. GROSSI:  No, Your Honor.

3                 MR. GUILLAUME:  No, Your Honor.

4             THE COURT:  Thank you. Thank you, ma'am. You can go

5    back.  I'd ask you to just please refrain from discussing our

6    conversation with the other jurors.

7             (Juror No. 8 returned to the jury room.)

8             THE COURT:  Thank you, everyone.  Please be seated.

9    So much as everyone has been making suggestions on exactly how

10   to do this, I'm not planning to make a ruling on Juror No. 3

11   until we're done with the voir dire.  However, I'm going to

12   take a short moment because I'm asking the clerk to call the

13   next alternate and see how quickly they can get here, just to

14   let you know what's going on. It might be more efficient to do

15   that before we continue with this because this is going to

16   take a few minutes.

17            MR. CRAWLEY:  Can I take a quick bathroom break?

18            THE COURT:  You probably could.  I'm not sure if

19   she's calling or getting the next one in here.

20            MR. CRAWLEY:  I'll wait, Your Honor.  It's not a

21   problem. Although I think Mr. Hawks can handle this.

22            THE COURT:  If everyone on your team is willing to

23   have Mr. Hawks handle it, I don't have a problem with that. I

24   know this is a longer than expected process.

25            (Juror No. 9 entered the courtroom.)
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2400**

```
 1          THE COURT:  This is Juror No. 9.  And sir, thank you
 2   for joining us. I ask you to speak into the microphone. I have
 3   a few questions for you.
 4          JUROR NO. 9:  Yes, sir.
 5          THE COURT:  It's been suggested to me that there may
 6   have been a statement made in the jury room, or one or more
 7   statements that reflected some kind of cultural bias or
 8   viewpoint. Did you hear any kind of statement that you think
 9   might fall into that category?
10          JUROR NO. 9:  Yes, sir.
11          THE COURT:  And can you tell me to the best of your
12   recollection what the statement was?
13          JUROR NO. 9:  It was as I recall about Jamaicans
14   butchering up people or something along that line.
15          THE COURT:  Okay, if you could just move a little
16   closer to the microphone.
17          JUROR NO. 9:  Yes, sir.
18          THE COURT:  Now when you heard that statement --
19   first of all, do you recall which juror made the statement by
20   number, if you know the numbers or can point out what seat
21   they seat in?
22          JUROR NO. 9:  Juror -- I'm trying to remember -- No.
23   3.
24          THE COURT:  Okay. And it's been suggested that that
25   statement might have been more of a reflection of what he
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2401**

1  understood a witness' statement to be as opposed to a personal
2  viewpoint. How did you perceive it?  Did you perceive it as a
3  personal viewpoint of the juror or a recap of what was said
4  during the testimony?
5          **JUROR NO. 9:**  It was recapped, but in my opinion I
6  thought he actually might have -- it was bringing some of his
7  opinion.  And that, to me, wasn't clearly determined from the
8  evidence that was presented or -- yes.
9          **THE COURT:**  Was there -- first of all, this
10  viewpoint that you heard, do you share that viewpoint in any
11  way?
12          **JUROR NO. 9:**  No, sir.  No, sir.
13          **THE COURT:**  Having heard it discussed in some
14  fashion, does that affect your ability to be fair and
15  impartial in judging the evidence in this case?
16          **JUROR NO. 9:**  No.
17          **THE COURT:**  Okay. Any follow-up from any of the
18  counsel?
19          **MR. GUILLAUME:**  No, Your Honor.
20          **MR. HAWKS:**  No, Your Honor, thank you.
21          **MS. GROSSI:**  No, Your Honor.
22          **THE COURT:**  Thank you, sir. You can go back. I'm
23  going to ask you if you can to refrain from discussing our
24  conversation with the other jurors.
25          **JUROR NO. 9:**  Yes, sir.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2402**

```
 1                    (Juror No. 9 returned to the jury room.)

 2              THE COURT:  So we'll move to Juror No. 10 who was

 3       originally Juror No. 13.

 4                    (Juror No. 10 entered the courtroom.)

 5              THE COURT: Sir, thank you for joining us.  I'm going

 6       to ask you a few questions, if you don't mind getting close to

 7       the microphone and speaking up.

 8          It has been suggested to me that there may have been a

 9       culturally biased statement or something that may have been

10       perceived as such made among the jurors and I wanted to ask

11       you if you heard anything that falls into that category.

12              JUROR NO. 10:  I don't believe I heard the exact

13       statement that was made by the actual juror, but I did hear

14       the references and that particular juror didn't dispute it.

15              THE COURT:  Did not dispute it you said?

16              JUROR NO. 10:  Yeah, did not dispute it.

17              THE COURT:  When you say "the references," I'm

18       sorry, go ahead.

19              JUROR NO. 10:  I was just saying it didn't seem like

20       it was disputed that it wasn't said. So --

21              THE COURT:  So you heard other jurors referring back

22       to him about that?

23              JUROR NO. 10:  Yes.

24              THE COURT:  And to your recollection what was the

25       statement?  Just to make sure we're talking about the same
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2403**

```
 1    thing.
 2              JUROR NO. 10:  It had to do with Jamaicans.
 3              THE COURT:  Okay. Do you remember any other details
 4    of that or not?
 5              JUROR NO. 10:  Basically that they were known for
 6    doing certain things, "cutting up people" or something like
 7    that.
 8              THE COURT:  Okay. Now it's been suggested that this
 9    possibly could have just been a recounting of what a witness
10    may have said as opposed to a personal viewpoint. How did you
11    understand it based on what you've heard?
12              JUROR NO. 10:  Again, not that I heard the actual
13    statement come out of that juror's mouth so I can't really say
14    what their mindset was when they were saying it, but there was
15    a defense that it was just being repeated because it was said
16    by the defendant.
17              THE COURT:  Okay. And you heard the juror say that
18    in response?
19              JUROR NO. 10:  Yes, I did hear the juror.
20              THE COURT:  And based on what you heard, did you
21    agree or disagree with that interpretation, or you don't know?
22              JUROR NO. 10:  I don't really have an opinion either
23    way, because I didn't hear the original statement.
24              THE COURT:  Okay.
25              JUROR NO. 10:  So I can't tell you like what
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2404**

1  prompted it or what their mindset was for what that person

2  said.

3          THE COURT: And this was which juror, numerically?

4          JUROR NO. 10:  This was Juror -- between Juror No. 3

5  or 4 and Juror No. --

6          THE COURT:  3 was a man, 4 is a woman.

7          JUROR NO. 10:  Okay, the woman 4 and then I believe

8  Juror No. 2 or 3 --

9          THE COURT: When you said "the woman," she's the one

10 who made the statement or she's the one who confronted him

11 about the statement?

12         JUROR NO. 10:  She's the one that confronted him

13 about it.

14         THE COURT:  And the person who actually made the

15 statement?

16         JUROR NO. 10:  Was the older gentleman.

17         THE COURT:  Okay.  Having heard this statement even

18 just recounted, does having heard that viewpoint, is that a

19 viewpoint that you share in any way?

20         JUROR NO. 10:  I do not express that viewpoint, Your

21 Honor.

22         THE COURT:  Does having heard it expressed, does

23 that affect your ability to be fair and impartial in judging

24 the evidence in this case?

25         JUROR NO. 10:  Um, I don't believe so, no.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2405**

```
 1                    THE COURT:  Okay. Any uncertainty about that?
 2                    JUROR NO. 10:  About being fair and impartial, based
 3          on that statement?
 4                    THE COURT:  Yes.
 5                    JUROR NO. 10:  No, I don't have any answer about
 6          that.
 7                    THE COURT:  Anything else for this juror?
 8                    MR. GUILLAUME:  No, Your Honor.
 9                    MR. HAWKS:  No, Your Honor.
10                    MS. GROSSI:  No, Your Honor.
11                    THE COURT:  Okay.  Thank you, sir. If you could just
12          refrain from discussing our conversation with the other jurors
13          I'd appreciate it.
14                    (Juror No. 10 returned to the jury room.)
15                    THE COURT:  Please be seated. I will move to Juror
16          No. 11.
17                    (Juror No. 11 entered the courtroom.)
18                    THE COURT:  Everyone please be seated. Welcome back.
19          Sorry, I wanted to ask you a few questions if you don't mind
20          trying to speak into the microphone and loudly, if you can.
21              It's been suggested there may have been a statement made
22          in the jury room that reflects or could reflect some kind of
23          cultural bias. Is there any statement that you recall hearing
24          along those lines?
25                    JUROR NO. 11:  Yes, sir. I don't know, like, how
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2406**

 1    detailed you want me --

 2              **THE COURT:**  Tell me as best you can what the

 3    statement itself was.

 4              **JUROR NO. 11:**  So what was said from what I

 5    overheard is that "This is what Jamaicans do, you know, they

 6    chop people up and stuff like that." It was very, like, biased

 7    and so that's why he -- it was along the lines of that. I

 8    don't want to with hearsay or nothing like that, but when I

 9    was sitting and I was kind of, like, to myself, I heard him

10    conversating with another juror. And it was along the lines

11    of, "you know, that's just what they do.  This is what

12    Jamaicans do all the time. They chop people up and throw them

13    away, hide them," stuff along the lines of that.

14              **THE COURT:**  And just to be clear, by number, do you

15    recall which juror it was who made the statement?

16              **JUROR NO. 11:**  Yes, sir.

17              **THE COURT:**  Which number or which seat in the jury

18    box here?

19              **JUROR NO. 11:**  The one that made the statement?

20              **THE COURT:**  Yes.

21              **JUROR NO. 11:**  Juror No. 3.

22              **THE COURT:**  3?  Okay. And it's been suggested that

23    perhaps that might have just been a statement whether accurate

24    or not, of what a witness said as opposed to his own

25    viewpoint. Do you have -- having heard it, do you perceive it

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2407**

```
1    one way or the other?
2              JUROR NO. 11:  It was a very general, like,
3    statement that was coming from him. He wasn't stating what
4    someone else -- that was, like, his personal bias.
5              THE COURT:  Okay. That viewpoint, do you share that
6    viewpoint in any way?
7              JUROR NO. 11:  What, about what he said?
8              THE COURT:  Yes.
9              JUROR NO. 11:  Absolutely not.
10             THE COURT:  Having heard it said in the context of
11   the jury room, does that affect your ability to be fair and
12   impartial in judging the evidence in this case?
13             JUROR NO. 11:  Like in terms of, like, my viewpoint?
14             THE COURT:  Yes.  Will it impact you in a way that
15   will make it harder to be fair and impartial?
16             JUROR NO. 11:  No, absolutely. Again, I stand
17   completely objective to the whole thing. It was just that was
18   just what I overheard and I didn't -- that, to me, is on the
19   more biased standpoint of it. That's mere subjective and not
20   objective so that to me it was just unacceptable to hear that.
21             THE COURT:  Okay. Any follow-up from any of the
22   counsel?
23             MR. GUILLAUME:  No questions.
24             MR. HAWKS:  No, sir.
25             MS. GROSSI:  No, sir.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2408**

```
 1              THE COURT:  Okay. Thank you very much, sir. If you
 2       could just refrain from discussing our conversation with the
 3       other jurors I'd appreciate it. Thank you very much.
 4              (Juror No. 11 returned to the jury room.)
 5              THE COURT:  Everyone please be seated. We'll get
 6       Juror No. 12, who is the last one.
 7              (Juror No. 12 entered the courtroom.)
 8              THE COURT: Sir, thank you for joining us here. If
 9       you don't mind trying to speak into the microphone, I just
10       have a few questions for you.
11          It's been suggested that there may have been a statement,
12       or one or more statements made in the jury room that could be
13       interpreted as reflecting some kind of cultural bias. Did you
14       hear any statements like that?
15              JUROR NO. 12:  Yes.
16              THE COURT:  And could you just tell us as best you
17       recall what the statement was, specifically?
18              JUROR NO. 12:  It was kind of biased towards
19       Jamaicans and assumptions and what they're associated in
20       doing.
21              THE COURT:  And do you recall what the bias -- what
22       the assumption was?
23              JUROR NO. 12:  It was going back to the testimony
24       about -- that Alfred Musa did -- or had.  The discussion was
25       conclusions made off of that.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2409**

```
 1              THE COURT:  Okay. And do you recall which juror made
 2     the statement, if by number or by where they sit in the jury
 3     box?
 4              JUROR NO. 12:  I don't recall the number. It's the
 5     older gentleman. I think it's 3.
 6              THE COURT:  Okay.
 7              JUROR NO. 12:  Yeah.
 8              THE COURT:  Front row?
 9              JUROR NO. 12:  Yeah.
10              THE COURT:  Okay, so any other statements that you
11     thought reflect some kind of cultural bias besides that one?
12              JUROR NO. 12:  No, it was just along those lines and
13     kind of reiterated throughout the --
14              THE COURT:  There was some suggestion that it might
15     -- that statement might just be a repetition or a recounting
16     of what the juror thought the witness said. Do you think
17     that's possible or do you think it was a statement of his own
18     personal view, the way you understood it?
19              JUROR NO. 12:  The way I understood was it was their
20     personal view about kind of pre, like pre-assumptions or
21     pre-notions that they made on their own.
22              THE COURT:  Is that a viewpoint that you share in
23     any way?
24              JUROR NO. 12:  No, it's not.
25              THE COURT:  Does the fact that it was discussed or
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2410**

```
1    said in the jury room, does that affect your ability to be
2    fair and impartial in judging the evidence in this case?
3              JUROR NO. 12:  No.  I create my own opinions.
4              THE COURT:  Okay. So that doesn't make it more
5    difficult for you to fairly judge the evidence?
6              JUROR NO. 12:  No.
7              THE COURT:  Okay. Any follow-up for this juror?
8              MS. GROSSI:  Not from the Government.
9              MR. HAWKS:  No, Your Honor.
10             MR. GUILLAUME:  No, Your Honor.
11             THE COURT:  Thank you, sir. You can go back to the
12   jury room. If you can just refrain from discussing our
13   conversation with the other jurors, I'd appreciate it.  Thank
14   you.
15             (Juror No. 12 returned to the jury room.)
16             THE COURT: So we have heard from all 12 of the
17   jurors. I am prepared to make a finding that this statement
18   was made by Juror No. 3 along the lines of -- well, the
19   original quote from the letter was "We all know about
20   Jamaicans.  They chop people up."  Whatever the specific
21   language was, we had several jurors giving the same or similar
22   statement or account of the statement. Others had less detail
23   or heard it secondhand, but no other juror, and frankly
24   including Juror No. 3, really disputes that a statement like
25   that was made.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2411**

1        Juror No. 3 offered the interpretation that he was just

2    recounting what a witness, Mr. Musa, had said. I don't find

3    that explanation to be credible for two reasons: One is no

4    other juror agreed with that, even though they on the one hand

5    can't get into his head, but they were there, heard the

6    context. I think Juror No. 5 in particular perhaps put it best

7    in that even if there was a reference to a witness' statement,

8    it was injecting a personal viewpoint on top of what some

9    testimony was, at best. It was not according to the jurors, a

10   statement that was purely just a recounting, even an imperfect

11   recounting of witness testimony.

12       And the second reason why I make that finding is that

13   having looked at the rough transcript of Mr. Musa's testimony,

14   there's no point at which he makes a statement like that. I

15   think he references that he heard from I believe Scott

16   Williams that Scott Williams was from Jamaica, otherwise

17   there's no reference to Jamaica or Jamaicans in the rest of

18   his account on this topic. He did refer to his account of what

19   happened to Mr. Smothers, but at no point does he say -- does

20   Mr. Musa say that he understood that Jamaicans had a tendency

21   to do anything in particular, much less what was alleged to

22   have happened to Mr. Smothers. So even assuming that the juror

23   was imperfectly recounting the testimony, it's really not

24   close to what the testimony was. As I said, at most it's an

25   add on as Juror No. 5 said to that statement to inject a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2412**

 1    personal viewpoint.

 2         And I would add, even if he honestly believed that he had

 3    heard that, given that he's so far off from the statement,

 4    that I think raises questions about whether he injected a

 5    cultural bias into what he heard.  So even if he didn't intend

 6    to make a biased statement, I think the fact that he

 7    interpreted a witness' statement in this fashion, made a leap

 8    of a viewpoint that even the witness didn't express, raises

 9    questions about whether he has a bias that would prevent him

10    from continuing to serve.

11         So I do find the statement was made. It is one that

12    reflects a cultural bias on the part of the juror against

13    Jamaicans, an assumption that they engaged in the type of

14    behavior referenced in the statement as a general matter.

15         As I said, under *Peña-Rodriguez v. Colorado* and other

16    cases, including *McClinton* from the 7th Circuit which I

17    referenced, the Constitution doesn't permit a jury verdict

18    based on any kind of cultural bias like this or racial bias,

19    national origin bias. And so on that basis and based on

20    *McClinton* -- well, it wasn't done exactly the same way in that

21    case, but it's clear that one option that the Court has is to

22    strike that juror and replace that juror with the alternate.

23    So I am planning to do that subject to any objections from the

24    parties.

25         I will note that the alternate has been contacted. She's

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2413**

 1    apparently on her way and probably will be here by around

 2    2:00. Luckily the jury is or was having lunch during some of

 3    this so they didn't lose as much time as they otherwise would.

 4    So my plan would be to again, they obviously can't deliberate

 5    until the eleventh juror arrives. The other finding I'm going

 6    to make -- or the twelfth juror arrives.

 7         The other finding I'm going to make although I'll hear

 8    any objections to it, is based on the voir dire of the other

 9    11 jurors, I find that all of them, even though most heard

10    some version of this statement first or secondhand, I credit

11    their testimony that they can continue to be fair and

12    impartial in judging this case, even having heard the

13    statement.  Several frankly whether it's what they said or how

14    they said it, were clearly offended by the statement and

15    didn't agree with it in any fashion at all.  And no one agreed

16    with it in any fashion as all, but several were clearly

17    offended by the statement.  So I credit all their statements

18    that they can continue as jurors fairly and impartially even

19    though the statement was made in their presence first or

20    secondhand.

21         Does anyone have any objection to that approach?

22              **MS. GROSSI:**  No objection, Your Honor.

23              **MR. GUILLAUME:**  No objection, Your Honor.

24              **MR. HAWKS:**  No objection, Your Honor.

25              **THE COURT:**  So what will happen is we will wait for

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2414**

 1    what was originally Juror No. 14 to arrive. Well first, sorry,
 2    two steps. I'll invite Juror No. 3 back in and excuse Juror
 3    No. 3 in a relatively polite way. I think I've made the
 4    findings I need to make on the record now. And then the jury
 5    is suspended from their deliberations.
 6         We will have Juror No. 14 arrive. When she arrives we
 7    will seat her as Juror No. 3. I believe I should call them in
 8    as a group and instruct them as is in the original
 9    instructions, but really it's just in the alternate
10    instruction so it's not actually written down in anything they
11    have that they need to restart their deliberations as much as
12    they would prefer not to perhaps, that they need to start from
13    the beginning, give the new juror the opportunity to fully
14    deliberate with them from the start.  And with that
15    instruction, they'll get started again and continue or start
16    that new process over again. But I think I do need to instruct
17    them on that. I think the easiest way to do it is to have them
18    come in the courtroom. So when we know that they're all here
19    I'll ask everybody to come in to do that.
20         I'll leave it to counsel.  It's a little bit ministerial.
21    If you have at least one person per team and are comfortable
22    with that I'm okay with that, but obviously everyone who has
23    been here certainly there's nothing wrong with you all being
24    here, in fact that's preferable, but certainly not required
25    given that it's an unusual circumstance.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2415**

1          Ms. Grossi?

2          **MS. GROSSI:**  Yes, Your Honor.  As to the notes that

3    we've received so far, it's the Government's understanding

4    we're going to start from scratch with regard to the notes as

5    well. There is one note that talks about one of the folders,

6    Exhibit 417B being empty. Can we provide a copy pursuant to

7    counsel's consent as to that particular exhibit?

8          There's another question about Wickr messages, but I

9    think the Government's view is that we not respond to that

10   note just because they need to start afresh.

11         And the other piece I just wanted to mention when you say

12   that they have to start deliberating again, I don't know if

13   you want to tell them that the notes also are starting fresh

14   again.  Just in case they do have that question, they need to

15   write it again in a note.

16         **THE COURT:**  Okay. Any thoughts on that from the

17   defense?

18         **MR. HAWKS:**  Your Honor, Scott Williams wouldn't

19   object to responding to the Wickr messages, the exhibit number

20   understanding they're going to deliberate again, but it

21   doesn't seem to address any substantive matter of deliberation

22   that they know what the number is.

23         **MR. NIETO:**  And Your Honor, we concur with the

24   Government's position. We had been in communications about if

25   they were to pose the same question again precisely the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2416**

```
 1    exhibit number, so we can provide that to the Court if the
 2    Court wishes to --
 3              THE COURT:  Has everyone agreed on those numbers?
 4              MS. GROSSI:  Yes.  All the parties agree on those
 5    numbers, Your Honor.
 6              THE WITNESS:  So your suggestion is we give them a
 7    copy of Exhibit 417B and then in terms of the Wickr questions,
 8    do we agree on what the exhibit numbers are?
 9              MS. GROSSI:  We do have an agreement as to the Wickr
10    -- the exhibit numbers, Your Honor.
11              THE COURT:  What numbers are those?
12              MS. GROSSI:  504, 507, 511, 512 and 515.
13              THE COURT:  Okay. Well, without -- if no one objects
14    to this, it's all going to kind of happen in the same
15    timeframe anyways that I would send a note back saying "You'll
16    be provided 417B and then the messages you referenced are
17    those exhibits." And then again, whether it's before or after
18    we excuse Juror No. 3 I'm not sure it makes a difference, but
19    on the one hand I do think the notes start over technically.
20    But given that these are not particularly substantive and my
21    guess is they would ask for it anyways, that if we can speed
22    up the process, again without anyone's objection given that
23    technically maybe we should wait for that, but I think this is
24    a practical matter.  If everyone agrees we can give them this
25    information, I think we should.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2417**

```
 1              MR. HAWKS:  No objection from Scott Williams.
 2              MR. NIETO:  No objection.
 3              MS. GROSSI:  No objection from the Government.
 4              THE COURT:  So we'll do that and we'll send that
 5   note back.
 6              MR. NIETO:  Your Honor?
 7              THE COURT:  Yes.
 8              MR. NIETO:  Forgive me.  In the abundance of
 9   caution, would the Court consider it appropriate upon the
10   arrival of what would be juror -- the new Juror 3 to voir dire
11   her as to ensure she has complied with the Court's
12   instructions when they were dismissed?  I'll defer to the
13   Court.  I just wanted to raise that if the Court found it
14   appropriate.
15              THE COURT:  What do you think from the Government's
16   side?
17              MS. GROSSI:  We defer to the Court, Your Honor.
18              THE COURT:  Does Mr. Hawks or Mr. Crawley --
19              MR. HAWKS:  Your Honor, we wouldn't object to that
20   voir dire.
21              THE COURT:  Okay. I mean, I think we can do that.
22   What we will do is is we would bring her in first and then
23   bring in the whole jury after that to instruct on the
24   deliberation process. It occurs to me that -- it occurs to me
25   there might be some value in somehow communicating to the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2418**

```
 1   jurors that they shouldn't discuss this whole episode with the
 2   new juror. I'm just trying to understand -- trying to think
 3   about how to do that. Because she's naturally going to want to
 4   know why she's here.
 5             MR. NIETO:  I'm sorry, Your Honor, and I'm sure when
 6   she comes in Your Honor could just explain precisely the
 7   reason why we have alternates, sometimes things arise and
 8   jurors can't continue to serve.
 9             THE COURT:  Well, she knows that.  I'm more worried
10   about the other jurors sort of saying "Hey" --  if she says
11   "Well, what happened?"  they might -- absent anything else
12   they might say, "Well here's what happened because" --
13             MS. GROSSI:  Your Honor, the Government agrees there
14   is a concern for that.  And perhaps when we're instructing the
15   jury to say that "You are not permitted to talk about anything
16   that happened in deliberations prior to this juror arriving,
17   including the reasons for Juror No. 3 being dismissed."
18             THE COURT:  I'm okay with that. Anybody have any
19   concern with that?
20             MR. HAWKS:  Your Honor, I understand the
21   Government's concern. I guess Scott Williams, we don't share
22   it and I defer to the Court, Your Honor.
23             THE COURT:  Does anybody object if once we excuse
24   Juror No. 3 that I bring the other 11 in and just tell them
25   that?  Ordinarily we speak to a jury as a whole, but this is
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2419**

```
 1    part of the voir dire process. We've been doing the voir dire
 2    process so I think if I were to tell them "We're going to
 3    bring in the alternate, she'll be here relatively soon, don't
 4    talk about the reasons for this with the alternate," anybody
 5    have any problem with that?
 6             MS. GROSSI:  No objection from the Government.
 7             MR. NIETO:  Thank you, Your Honor.
 8             THE COURT:  Why don't we do that. So we'll start
 9    first with Juror No. 3.
10             MR. CRAWLEY:  On another matter, Your Honor, what
11    are we doing Friday?  Are they expected to be here Friday?
12    I'm not sure I understand the schedule.
13             THE COURT:  So we only gave them a schedule up to
14    Thursday.  So at that point they're in overtime in terms of --
15    I mean --
16             (Juror No. 3 entered the courtroom.)
17             THE COURT:  Thank you.  Everyone please be seated.
18    So sir, Juror No. 3, just for the record?
19             JUROR NO. 3:  Yes, sir.
20             THE COURT:  As you understand, we had an inquiry
21    about this statement that was made and the issue that that
22    might raise.  And having discussed it with or having had some
23    discussion with certain jurors and then also having discussion
24    with counsel, I'm going to excuse you from the jury.
25         Now I understand you've given me an explanation for the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2420

```
 1    statement and I'm not -- to you I'm not saying one way or the
 2    other what to make of it, but I think just the fact that this
 3    statement was made and there was a conversation about it puts
 4    us in a position where I think the best course of action is to
 5    excuse you from the jury just to avoid any concerns that
 6    anyone might have about how we're operating here. And so the
 7    fact that -- I know you've given me an explanation, but I
 8    think what was said was such that certain jurors could
 9    interpret it in a certain way and everyone on the outside can
10    interpret it in a certain way that could raise some questions
11    about how fair and impartial this whole process has been and I
12    don't want to take that chance.  So I'm going to excuse you
13    from the jury. I want to thank you for all your efforts in
14    this trial. I know it was a very long trial to sit through and
15    I don't know if you're relieved or disappointed in this, but I
16    assure you that we appreciate your service in this trial and
17    I'd ask you to leave your notes with the court reporter -- or
18    with the courtroom deputy.  And we wish you well.
19        Now I would like to take the opportunity if you're
20    willing to after we're done with this session to just briefly
21    meet with you to thank you in person. So with that, I'm going
22    to excuse you.
23            JUROR NO. 3:  You haven't listened to where that
24    comment came from in context, okay?  Because it was made in
25    reference to what another juror said, but you didn't give me
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2421**

1     the opportunity to explain that to you. But that's okay.

2     Okay?  And it's sad that it's come to this because I'm not

3     going to agree under pressure. I have what I looked at as the

4     evidence and I came to my decision of what the verdict was.

5     And just because it wasn't what they want, if they want to

6     come in and make up stuff -- that's what was said, but it was

7     made in a different context.  Okay?

8              **THE COURT:**  No, I understand.  And again, regardless

9     of whether I find what the specific context was, I think we're

10    in a situation where it's necessary to excuse you just again,

11    if for no other reason just to make sure everyone understands

12    and considers the trial to be fair and impartial. So I'm not

13    -- again, I know you've done your best here as best you can as

14    a juror and so I credit you for that and understand where

15    you're coming from on this, but it's a decision I have to make

16    in this case.

17             **JUROR NO. 3:**  Sure.

18             **THE COURT:**  Thank you very much. So again, I will --

19    if you want to meet briefly we can.

20        Now I did want to ask -- I think you said something along

21    the lines of there was --the statement came from some other

22    person, from the witness?

23             **JUROR NO. 3:**  Yes, there was.

24             **THE COURT:**  From the witness or from someone else?

25             **JUROR NO. 3:**  What, the statement?  The context?

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2422**

```
 1              THE COURT:  Yes.
 2              JUROR NO. 3:  The context came from another juror,
 3     and that's what I'm saying.
 4              THE COURT:  Okay, tell me what the context was.
 5              JUROR NO. 3:  Okay, just to make it clear, okay,
 6     during the deliberations, what we're talking about right now
 7     is one of the charges in the case, okay, where that context --
 8              MR. CRAWLEY:  Your Honor, may we approach?
 9              THE COURT:  Okay.
10              (Counsel approached the bench.)
11              MR. CRAWLEY:  Your Honor, I guess on behalf of Mr.
12     Scott Williams we're concerned that we're going to start to go
13     down a rabbit hole that may open up more discussions about the
14     jury deliberations and what certain jurors are thinking about
15     the evidence. And I don't believe that's what we're intending
16     to do. I think what we were trying to limit this to was just a
17     very narrow inquiry into whether or not there was some bias.
18     But keeping perceptions of the evidence, how they were
19     intending to vote potentially, how that was met with some
20     resistance by others potentially I don't think that's
21     appropriate at this time, Your Honor.
22              MR. GUILLAUME:  I would agree, Your Honor,
23     respectfully. I would respectfully agree.
24              THE COURT:  So you do not want further inquiry on
25     what the juror --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2423**

 1              **MR. GUILLAUME:**  Correct.

 2              **MS. GROSSI:**  Your Honor, I think we would -- I

 3      understand the defense point, but I think we do need to figure

 4      out if there is another juror with bias. So I don't know if

 5      there's like -- because it seemed like there might be another

 6      juror. And I understand your point.  I don't want to hear the

 7      deliberations, but I think that's what the Court was trying to

 8      do is trying to figure out if there's another juror with bias.

 9              **THE COURT:**  Well, I do think -- I do think there is

10      a record upon which I can and have made the -- well,

11      implicitly made the finding when I referred to the other

12      jurors being able to stay that there were no other statements

13      offered by any other jurors. I mean, when I asked the jurors,

14      I asked about anybody's bias and not simply statements made by

15      this juror, Juror No. 3.  And nobody identified anything other

16      than this statement or one similar to by juror No. 3. So I

17      think we have questioned all the jurors on whether any other

18      juror made a statement that was biased and they're all

19      answering in the negative. So I have that on the record

20      already.

21          So are you saying then that with that record you still

22      want me to inquire further as to whether this juror has any

23      other information he wants to offer on this point?  And again,

24      it's not clear to me whether he's talking about a biased juror

25      or just the context that led him to make the statement which

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2424**

```
 1    could have nothing to do with bias, but just a position that
 2    may have triggered him to make the statement.
 3             MR. CRAWLEY:  I think the Court -- on behalf of Mr.
 4    Scott Williams, I think the Court has made its decision. He's
 5    been excused. I don't think that there's anything meaningful
 6    that can be gained from him sharing with us more information
 7    at this point, specifically because the Court addressed each
 8    juror as to their perception of this particular statement, the
 9    impact that it had on each juror and whether or not the
10    statement was, in fact, made. And to the extent that by my
11    recollection, at least nine of the eleven that were asked
12    confirmed that they heard the statement and maybe two said
13    that the statement was relayed to them and that they heard the
14    confrontation concerning the statement, all of them
15    essentially said that there was some reference to a statement
16    that was culturally biased in their perception and it was
17    based on this gentleman's opinion, not the evidence that was
18    given.
19         So I don't know what other context could be a benefit to
20    this Court, especially since there were independent
21    individuals. When I say "independent," meaning other jurors
22    beyond the one that wrote the note that basically did not give
23    any background information to suggest that there was some
24    other animus or some other factor that was at work here. So I
25    just don't want us to get into trying to read into a lot of
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2425**

```
 1   different narratives and especially not trying to gauge now
 2   where the jury is in this deliberation process, how they feel
 3   about the evidence. I think that just creates more problems
 4   than we need to deal with.
 5          THE COURT:  Okay, so you're of the viewpoint that
 6   we've identified all potentially biased jurors. You're content
 7   that we don't need further inquiry to identify that?
 8          MR. CRAWLEY:  And I think this is a very astute jury
 9   that basically if there were issues, because I think one of
10   the questions Your Honor asked was were there other things of
11   that sort that could have raised an issue and they said pretty
12   much even as it relates to this juror that there wasn't. It
13   was just that comment that they were dealing with and they
14   were all somewhat taken aback, the ones that heard it.  And
15   the ones that didn't hear it, they were more concerned with
16   the impression that it was more personal opinion based on his
17   views, not the actual testimony.
18          THE COURT:  So you are affirmatively requesting and
19   would waive any further questioning to try to uncover any
20   additional potential biased statements or --
21          MR. CRAWLEY:  At this time, Your Honor.
22          MR. GUILLAUME:  I am as well, Your Honor, on behalf
23   of Taeyan Williams.
24          THE COURT:  Does the Government still want me to
25   proceed?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2426**

```
 1              MS. GROSSI:  Your Honor, I just think that there--
 2      and I understand not going into deliberations, there does seem
 3      like there's not a closing of the loop. I don't think we asked
 4      this juror, in particular, if he knew about any other
 5      culturally biased statements.  And so maybe making the
 6      question very specific as to cultural bias, as opposed to any
 7      type of jury deliberation.
 8              MR. CRAWLEY:  May I have the Court's indulgence to
 9      speak with the Government real quickly, Your Honor?
10              THE COURT:  Okay.
11              (Counsel conferred off the record.)
12              THE COURT:  Go ahead.
13              MS. GROSSI:  Your Honor, I think the Government is
14      still in a position to just ask a very specific question as to
15      cultural bias and that doesn't mean that we have to then poll
16      the jury again, but like as to the credibility finding of the
17      other jurors and this juror, I think we can make that finding
18      after asking this particular juror that question. The
19      Government just wants to make a clear record as to what he's
20      talking about with regard to the context of another juror
21      saying something and whether that was something that they
22      should not have said with regard to cultural bias.
23              THE COURT:  Okay. I am concerned about opening the
24      door to other parts of the deliberations and it's not totally
25      clear from what he's saying whether he's referring to a
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2427**

```
 1    culturally biased statement or whether he's just referring to
 2    some portion of deliberations that led him to make the
 3    statement.
 4         I will -- I will ask one question as to whether he is
 5    aware of any culturally biased statements by any members of
 6    the jury. I did get the -- I'm not completely confident that I
 7    asked him that question beginning in a broad open ended way
 8    given that he was the focus of the questions. Does anyone
 9    recall if I did?
10         MS. GROSSI:  I don't believe so, Your Honor. I don't
11    think that was asked. I think we were specifically focused on
12    the question or the statement that was in the jury note,
13    rather than like if he heard anybody else say anything.
14         THE COURT:  Okay. Well that's what I'll try to do.
15    I'm going to try to keep it as limited as possible. Thank you.
16         MS. GROSSI:  Thank you, Your Honor.
17         (Counsel returned to their trial tables.)
18         THE COURT:  Sorry, sir for the delay. I think I need
19    to stay away from the specific sort of positions on the
20    evidence and information that the jurors may have taken. I did
21    just want to confirm though, because you started to refer to
22    something, are you aware of any specific statements by any of
23    the other jurors that reflected a cultural bias of some kind?
24         JUROR NO. 3:  Yes.
25         THE COURT:  Okay, what did you hear?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2428**

```
 1              JUROR NO. 3:  What I heard was when we were at the
 2    point where it came up to a point of where Mr. Smothers' body
 3    may have been, another juror came out with a comment which
 4    prompted my comment that, "You know, there is a pig farm and
 5    they eat meat and bones."  And it just, it just took me by
 6    surprise.  And that's what prompted me, "Are you telling me
 7    that you're expecting that?"  And that was my comment that
 8    "Jamaicans are cutting people up."  And then it was like
 9    "Well, you know, you know, there's no body." And they're
10    speculating where the body might be.  And I thought that was
11    inappropriate in itself.
12          THE COURT:  So I'm sorry, this "pig farm" comment,
13    can you give that to me a little more specifically?
14          JUROR NO. 3:  There's a reserve that's close where
15    they breed pig farms for agriculture.
16              THE COURT:  In this area?
17          JUROR NO. 3:  No, in the area of Laurel, close to
18    where the motel is and all the other information that was
19    gathered about the positions of the people.
20          THE COURT:  So you're saying another juror referred
21    to that in terms of trying to assess what might have happened
22    to the body, that you said there's a pig farm that they do
23    what at?
24          JUROR NO. 3:  They implied that they might have
25    taken his body up there because pigs eat the meat and the bone
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2429**

```
 1    when they say they couldn't find the body.
 2             THE COURT:  Did he refer to that as something that
 3    Jamaicans might do or he just referred to that's what might
 4    have happened?
 5             JUROR NO. 3:  That came up and to the point whereas
 6    the word "Saw" came in. And that was the comment that was made
 7    by Mr. Mercer at that time.  And I just felt it was just
 8    improper.  Like I said, I sit there and I listen to the
 9    evidence. I listen to them present the evidence. And they're
10    the ones -- I'm not the jury foreman, she's the one that's
11    presenting the evidence and I make my decision based on that.
12             THE COURT:  Okay. So just by number, do you know
13    which juror made this comment or which seat in the box here?
14             JUROR NO. 3:  It would be the one you had just --
15    heavyset gentleman.  I can't remember what juror number he is,
16    but with the --
17             THE COURT:  Front row or back row, do you recall?
18             JUROR NO. 3:  I think he sits in the back row. The
19    heavyset gentleman with the tattoos on his arm. I can't
20    remember.
21             THE COURT:  There's a larger individual who sat
22    where you sit right now.
23             JUROR NO. 3:  Is that where he is?
24             THE COURT:  Well, there's one person there, but I
25    don't recall whether there's someone in the back row who --
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2430**

1          **JUROR NO. 3:** I wasn't paying attention to where

2     everybody was sitting at.

3          **THE COURT:** Okay.

4          **JUROR NO. 3:** But like I said, you just can't make

5     comments like that. You know, and I made the reference to is

6     that what you're implying? Not so much as that's what I was

7     saying. And as I stated before, what was said then has

8     nothing to do with the issue of what they're complaining about

9     now where I won't agree with them on.

10          **THE COURT:** Okay, I understand.

11          **JUROR NO. 3:** Totally separate.

12          **THE COURT:** I understand. I understand. Well again,

13    thank you for your service. Again, I never am excited to

14    change course in the middle, but again, based on where we are

15    now I am going to have to excuse you. So I appreciate you --

16          **JUROR NO. 3:** I don't have a problem with that.

17          **THE COURT:** No, I understand that. And thank you

18    very much for your service.

19          **JUROR NO. 3:** You're welcome.

20          **(Juror No. 3 exited the courtroom and was excused.)**

21          **THE COURT:** Thank you. Everyone please be seated.

22    So just to close a loop, as I heard that statement that he's

23    attributing to a juror, I did not perceive that to inject any

24    kind of cultural or racial bias into this, it was actually

25    more just a statement about the geography of the area. To the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2431**

```
 1    extent anybody did at that point based on our prior
 2    discussions with the jurors would have been Juror No. 3 then
 3    injecting a cultural bias into this issue. So I am not of the
 4    view that I need to inquire further of jurors about that
 5    particular statement.
 6         Does anyone agree or disagree with that?
 7              MS. GROSSI:  The Government agrees, Your Honor.
 8              MR. GUILLAUME:  Taeyan Williams agrees, Your Honor.
 9              MR. CRAWLEY:  We agree. Thank you, Your Honor.
10              THE COURT:  Okay. So my understanding is the
11    alternate juror is in the building. I think what we will do is
12    -- I'll wait for Ms. Solomon to come back in terms of
13    logistically how we can make this work. Our options are -- I
14    asked her not to have her join the other jurors yet and so
15    there may be a way we can have the other 11 jurors come in and
16    then bring in Juror No. -- the new Juror No. 3 separately and
17    have them all sit here and I can just sort of more generally
18    say "Look, you know, we're starting fresh here. There should
19    be no discussion of sort of what led to the replacement of the
20    alternate."
21         Does anybody have any problem with that approach or
22    should we do it in two steps, one with the alternate and one
23    with the rest of the jury?
24              MS. GROSSI:  I'm sorry, Your Honor.  What was the
25    question?
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2432**

```
 1              THE COURT:  The question was whether we should call
 2     in the other 11 jurors first as I had suggested just to tell
 3     them not to talk about this issue with the new juror, or now
 4     that they're all in the building, we bring them all in
 5     together. Not necessarily bring them in as a group, but having
 6     the 11 come in and then bring the other person come in to join
 7     them and more generally say we're not going to talk about how
 8     we got here.
 9              MS. GROSSI:  I think the Government would prefer the
10     first option, putting the 11 here and then bringing the 12th
11     one in, but we defer to the Court.
12              THE COURT:  Okay.
13              MR. HAWKS:  Your Honor, Scott Williams has no
14     position on either course.
15              MR. NIETO:  Your Honor, we will defer to the Court.
16     If the Court is concerned that the new juror may inquire of
17     the other jurors as to what happened, addressing everyone at
18     the same time to say we're just starting afresh may be the
19     cleanest way to ensure they move forward cleanly.
20              THE COURT:  Okay, thank you.
21         Okay, so we will do that process, but I promised Juror
22     No. 3 I would thank him in person for his service. I'm going
23     to do that first. Don't go far.  Do a bathroom break if you'd
24     like, then we'll bring in the 11, I'll tell them what happened
25     in the sense that we've excused 3 and we're not going to
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2433**

1    discuss when the alternate gets here why we got here.  Then

2    I'll bring in the 12th who will be in the next room over and

3    then I'll say, "You're deliberating from the beginning."  And

4    I'll say in a more general way, but the others will have it

5    more explicitly I'll say for her benefit that we're not going

6    to discuss how we got to the new alternate arriving.  So I'll

7    be back in a few minutes.

8              **(Recess was taken from 1:47 to 1:59 p.m.)**

9              **THE COURT:**  As I understand it, we're ready for the

10   11 jurors first, and then once we've had a brief colloquy with

11   them we'll bring in the 12th. Is that right?  Okay. So I'm

12   sending back a note that says, "A copy of Exhibit 417B will be

13   provided and the Wickr messages requested are at Exhibits 504,

14   507, 511, 512 and 515."

15             **MS. GROSSI:**  That's correct, Your Honor.  Thank you.

16             **(Jurors 1-2 and 4-12 reentered the courtroom.)**

17             **THE COURT:**  Thank you.  Everyone please be seated.

18   Ladies and gentlemen, I wanted to just check in with all of

19   you and report on where we are.  As you know, we've had

20   colloquies with you and based on all that, the note I

21   received, as well as the colloquy, I have decided to excuse

22   Juror No. 3 from the remainder of the service in this case.

23       What that means is our alternate, the original Juror No.

24   14 will be joining us. We did make a request for her to get

25   here, so she's actually in the building.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2434**

```
 1        Before we bring her in, though -- and I'll give you some
 2   instructions to you as a new group with the new alternate, but
 3   I wanted to instruct you all to refrain from discussing with
 4   the new juror, former Juror 14, new Juror No. 3, the
 5   circumstances which led to her returning to be a juror.
 6        As you know from my individualized questions, there are a
 7   lot of questions about what statements you heard and how they
 8   may have impacted you. Obviously if she were to hear these
 9   statements even second or third hand, I would need to have
10   that inquiry of her as well. And so as a result, I'm directing
11   you not to discuss -- well, really any of the prior
12   deliberations, but particularly the statement that was made
13   and also the fact that we had a discussion in colloquy about
14   that and the reasons for Juror No. 3's being excused.
15        So that's the instruction I wanted to give you first and
16   then I think we can bring the new Juror No. 3 in.  Thank you.
17   Actually, I will also state on the record that I did receive
18   and will return a note to you very shortly on the note about
19   the exhibits, Exhibits 417B and the Wickr messages which you
20   can then include in the evidence.  Thank you.
21            (Previous Alternate Juror No. 14, new Juror No. 3
22   entered the courtroom.)
23            THE COURT:  Thank you.  Everyone please be seated.
24   So for the record, Juror No. 14 has now returned to us. She is
25   now seated as Juror No. 3 and will be referred to such the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2435**

1     rest of the way. So welcome back to Juror No. -- new Juror No.

2     3. I did just want to confirm with you that since you left,

3     you have not discussed this case with others, have not done

4     any outside research, have not looked up or read any

5     information about this case anywhere; is that correct?

6              **NEW JUROR NO. 3:**  Correct.

7              **THE COURT:**  Okay. So we are now reassembled as the

8     jury in this case. Now you may have heard me say when I was

9     dismissing the alternates in the first instance that if we

10    needed an alternate for whatever reason, we would bring that

11    alternate back.  And I do want to instruct everyone, both the

12    new juror and the -- the returning juror and the others that

13    we -- I am going to instruct you not to discuss the reasons

14    why we needed a new -- an alternate to come back or the

15    circumstances that led to that. That is not relevant to the

16    discussion.  So I'd ask both the new juror not to ask about it

17    and the prior jurors not to provide any information about that

18    to the extent they know anything.

19       Now as I said when the alternates were first excused, on

20    the one hand it's terrific that we have alternates available,

21    but the other rule that we have though is when we have to

22    change the composition of the jury by adding an alternate, we

23    need to restart the deliberations from the beginning. We

24    cannot just have her come in and just assume that everything

25    that was said was known and so forth. So I am directing the

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2436**

1    jury again to restart the deliberations from the beginning.

2    That means choosing a foreperson if you need to do anything

3    different than was done before, it means reviewing all the

4    testimony and exhibits again as a group.  To the extent you've

5    done anything you'll redo that again so that Juror No. 3 is

6    not at a disadvantage. And so any -- you know, you cannot rely

7    on prior discussions or reviews of the evidence as part of

8    your deliberations, you need to start again with that afresh

9    with this new juror.

10        That also means -- although I just mentioned to you that

11   I am returning a note on the exhibits, the question about

12   exhibits that you had, I believe that's the only other note

13   that was outstanding. To the extent there were other requests

14   that were outstanding, you need to reassert anything new that

15   you are waiting for other than that one about the exhibits. I

16   think I've covered it, but if you did, again, because it's a

17   new set of deliberations you need to make those requests

18   again.

19        Anything from counsel before we send the jury off to

20   deliberate?

21             MS. GROSSI:  Not from the Government.

22             MR. HAWKS:  No, Your Honor.

23             MR. GUILLAUME:  No, Your Honor.

24             THE COURT:  Okay, so thank you again, ladies and

25   gentlemen, for your service. I know this was a little bit of a

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2437**

```
 1    disruption to the schedule, but you still have a pretty full
 2    afternoon ahead of you and we will look forward to hearing
 3    from you again.
 4        If you're not done by 5:00, please send a note letting me
 5    know you're going to leave. I think if it's just a note that
 6    you're going to leave or just a note that you arrived I may
 7    not respond to it.  I may just have the clerk informally tell
 8    you that we got it and you're good. If there's any substance
 9    to it beyond that, of course I would respond. Thank you very
10    much and we'll see you the next time.  Thank you.
11            (Jury exited the courtroom to continue their
12    deliberations at 2:08 p.m.)
13            THE COURT:  Okay, anything else?  Please be seated.
14    Anything else from anyone before we --
15            MR. GUILLAUME:  Your Honor, I just had a brief
16    scheduling issue.  Mr. Crawley raised it a little bit before.
17    We don't know where the jury deliberations will take us, but
18    assuming we are still going Friday morning, I have -- it's a
19    personal matter, it's a thing at my daughter's school.  I
20    don't have to go, but I've requested my client's permission to
21    allow me to attend in the morning.  I'll be here in the
22    afternoon, if necessary. But if the Court wants me here, I'm
23    here.  It's not a huge deal, but I just wanted to make the
24    request to the Court and tell you that I have the consent of
25    my client, if necessary.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2438**

```
 1                 THE COURT:  Sure. Mr. Crawley, was there another
 2      issue on schedule?
 3                 MR. CRAWLEY:  My schedule is just so bad right now,
 4      Your Honor.  I could go on and on. I was hoping we wouldn't be
 5      here Friday because I do have another matter with an
 6      out-of-state client that's scheduled to go to trial soon and I
 7      really wanted to try to deal with that.
 8                 THE COURT:  Is that an all-day activity or a
 9      partial-day activity?
10                 MR. CRAWLEY:  The bigger problem is it may require
11      me to travel, Your Honor. The client is indigent as well, but
12      they're within driving distance. I have the ability to go
13      there and meet with them. That's probably better for all
14      parties, but we're in this trial so if I have to be here, I
15      just have to be here. It's not a -- you know, my first duty is
16      to Mr. Scott Williams.  So I just say that to say that if Mr.
17      Williams, as well as Mr. Hawks and the other parties consent
18      to it, I could be available by phone to help Mr. Hawks with
19      any questions.  But if it's just a matter of taking up a
20      verdict it may be with the Court 's permission I'll be allowed
21      to deal with that matter. But again, if the Court as Mr.
22      Guillaume has suggested, prefers to have us here, I will be
23      here. That was my concern. I just didn't know.  I thought we
24      said no Fridays.
25                 THE COURT:  Well, no.  I understand.  And maybe it
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2439**

1    was a little ambiguous once we get past the Thursday which is

2    the dates that we gave the jury.

3        Does the Government have either a view on this or your

4    own request?  Because I know that everyone seems to have these

5    requests.

6            **MS. GROSSI:**  Your Honor, I can speak for myself.  I

7    do have a sentencing on Friday before another judge in this

8    courthouse. But I believe my co-counsel can cover for me, if

9    needed.

10           **THE COURT:**  Can cover the sentencing or can cover

11   this matter?

12           **MS. GROSSI:**  I can do both, Your Honor.

13           **THE COURT:**  At the same time?  Well, if it's in the

14   building we can always work it out. I mean, we can either ask

15   the other judge for a slight delay if there's a note or

16   verdict, they would generally understand that.  So I'm not

17   concerned about that, in particular.

18           **MS. GROSSI:**  We don't have any objections to defense

19   counsel leaving.

20           **THE COURT:**  I mean, I think this is, like we said

21   about the first afternoon or yesterday, whichever day it was,

22   I mean, I'm going to follow the same policy which is I'll

23   leave it in the hands of the defense teams. Again, obviously

24   if you were sole counsel you would have to be here for sure.

25   This is one of those cases where all sides are represented by

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2440**

```
 1    multiple counsel. All sides have experienced counsel in every
 2    position. This is not a case where we have an experienced
 3    attorney and somebody brand new who is just kind of helping
 4    out. So I will leave it to each team, including the Government
 5    team because this has come up before with the Government to
 6    make sure that you have one counsel who speaks for the entire
 7    -- for the client.  And if you have that, then I'm okay with
 8    it.
 9        From the defense side obviously I would like to have it
10    on the record that the defendant consents to it. But other
11    than that, I'm willing to abide by whatever approach you all
12    want to abide by at that point.  And obviously we can do that
13    now or we can do that at a later point.
14            MR. GUILLAUME:  Could we do it now, Your Honor?
15    Could we do it now?  Could I get my client's consent?
16            THE COURT:  True.  I'm not sure if we're going to
17    meet again.
18            MR. GUILLAUME:  Right. If I may.
19            THE COURT: Yes.
20            MR. GUILLAUME:  Your Honor, I have made the request
21    of this Court to attend an event, a personal event on Friday
22    related to my children.  And with the Court's permission and
23    my client's consent, my client has consented me to be at that
24    event and I would be here in the courthouse no later than 1:30
25    p.m. on Friday, if necessary. And I'll ask my client on the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2441**

 1    record.

 2         Mr. Williams, Taeyan Williams -- and Mr. Nieto will be

 3    here all day for the record purposes.

 4         You've heard me ask this Honorable Court to attend an

 5    event on Friday and not be present for the first half of the

 6    day, if necessary; is that correct?

 7              **DEFENDANT T. WILLIAMS:**  Yes, sir.

 8              **MR. GUILLAUME:**  And are you okay with excusing me

 9    for the half-day on Friday from approximately 9 a.m. to 1:30

10    p.m., knowing that Mr. Nieto will be here the entire time and

11    I am available by phone in case there's an emergency, Mr.

12    Nieto could always call me. Are you okay with me not being

13    present in the building until about 1:30 on Friday?

14              **DEFENDANT T. WILLIAMS:**  I have no problem excusing

15    you.

16              **THE COURT:**  Thank you.

17              **MR. GUILLAUME:**  Thank you.

18              **THE COURT:**  Thank you, Mr. Williams.

19         Mr. Crawley, I don't know if you want to do this now or

20    at some later point.

21              **DEFENDANT S. WILLIAMS:** We can do it now.

22              **MR. CRAWLEY:**  Yes, Your Honor.  On behalf of Mr.

23    Scott Williams, Mr. Williams and I have discussed my schedule.

24    I expect that this Friday I will not be available to attend

25    court here in Greenbelt. Mr. Williams has given me his

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2442**

1    permission to be excused on that day and Mr. Hawks has agreed

2    to be here on behalf of Mr. Scott Williams in regard to any

3    questions or possible return of a jury verdict.

4         With that being said, I would just ask Mr. Williams:  Mr.

5    Williams, having heard what was just stated, do you concur, do

6    you agree to waiving my appearance and rely on the

7    representation of Mr. Kwasi Hawks in my stead, as well as your

8    lead attorney in this case?

9                  **DEFENDANT S. WILLIAMS:**  Yeah, I sure do concur.

10                 **THE COURT:**  Okay, thank you. Thank you, Mr.

11   Williams.

12        Just from a scheduling standpoint, I honestly have not

13   locked in on what's going to happen on Friday. I certainly had

14   hoped particularly when we got to the point where the jury got

15   the case, that we would be done by Friday. Obviously with this

16   restart that makes it less likely. So I think you are right to

17   raise this issue.

18        Ordinarily when we set a schedule during the trial itself

19   when we say we're not going to sit on Fridays, I try to honor

20   that for the jury because they've obviously made plans. At

21   this point though once we get past Thursday, we didn't

22   schedule anything past Thursday for them.  So whatever they're

23   here for is beyond what their original schedule was. So I

24   think I'm going to take my cues from the jury on that. If for

25   some reason they were to say "We were thinking no Fridays, we

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

**JA2443**

1 would like to take the weekend and come back on Monday," I'd

2 probably agree with that, in part because of the way it was

3 set up and that would obviously alleviate the issue you're

4 raising.

5     On the other hand, I think if they plan to keep going, I

6 don't think I would stand in their way either.  And obviously

7 there's arrangements for each team.  Particularly given that

8 they're restarting, they may well choose to stay the whole day

9 Friday or be here on Friday so that they don't extend into

10 next week any longer than they would need to if it got to that

11 point. So we'll just see what their inclinations are, but I

12 think we're equipped to handle it either way.

13     Anything else from anybody?  We can talk about Monday's

14 schedule later. I don't think we need to talk about it right

15 now, but if we need to, we'll deal with that.

16         **MS. GROSSI:**  That works for the Government, Your

17 Honor.

18         **MR. GUILLAUME:**  Nothing further, Your Honor.  Thank

19 you.

20         **MR. HAWKS:**  Nothing further, Your Honor.  Thank you.

21         **THE COURT:**  Thank you.  We will see you the next

22 time.  Thank you very much.

23         **(The parties exited the courtroom at 2:17 p.m. and**

24 **no other communication was received from the jury for the**

25 **remainder of the day.  Proceeding was concluded.)**

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland  21201 nadine_bachmann@mdd.uscourts.gov

**JA2444**

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, Nadine M. Bachmann, Certified Realtime Reporter

6    and Registered Merit Reporter, in and for the United States

7    District Court for the District of Maryland, do hereby

8    certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

9    true and correct transcript of the stenographically-reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the regulations

12   of the Judicial Conference of the United States.

13

14                    Dated this 18th day of December, 2023.

15

16                    -S-

17          _____

18          NADINE M. BACHMANN, CRR, RMR
            FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter 101 W. Lombard Street, Baltimore, Maryland 21201 nadine_bachmann@mdd.uscourts.gov

JA2445

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF MARYLAND

 3                          SOUTHERN DIVISION

 4  UNITED STATES OF AMERICA,      ) CRIMINAL
                                   ) NO. TDC-18-631
 5            Plaintiff,           )
                                   )
 6  v.                             )
                                   )
 7  SCOTT ANTHONY WILLIAMS and     )
    TAEYAN RAYMOND WILLIAMS,       )
 8                                 )
              Defendants.          )
 9
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 12
10            BEFORE THE HONORABLE THEODORE D. CHUANG,
            UNITED STATES DISTRICT JUDGE, AND A JURY
11               THURSDAY, MAY 11, 2023; 12:55 P.M.
                     GREENBELT, MARYLAND
12  APPEARANCES:

13  FOR THE PLAINTIFF:

14            OFFICE OF THE UNITED STATES ATTORNEY
              BY:  WILLIAM D. MOOMAU, ESQUIRE
15            BY:  LEAH B. GROSSI, ESQUIRE
              6406 Ivy Lane, Suite 800
16            Greenbelt, Maryland  20770
              (301) 344-4433
17                 -and-
              OFFICE OF THE UNITED STATES ATTORNEY
18            BY:  MICHAEL C. HANLON, ESQUIRE
              36 S. Charles Street, Fourth Floor
19            Baltimore, Maryland  21201
              (410) 209-4800
20

21
    OFFICIAL COURT REPORTER:
22  Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

23      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

24

25
```

**JA2446**

```
 1   APPEARANCES (Continued):

 2   FOR THE DEFENDANT SCOTT A. WILLIAMS:

 3            THE HAWKS FIRM
              BY:  KWASI L. HAWKS, ESQUIRE
 4            8705 Colesville Road, Suite 162
              Silver Spring, Maryland  20910
 5            (310) 430-5577
                   -and-
 6            LAW OFFICE OF DWIGHT CRAWLEY
              BY:  DWIGHT E. CRAWLEY, ESQUIRE
 7            1300 I. Street, NW, Suite 400e
              Washington, DC  20005
 8            (202) 580-9794

 9   FOR THE DEFENDANT TAEYAN RAYMOND WILLIAMS:

10            LAW OFFICES OF ALFRED GUILLAUME III LLC
              BY:  ALFRED GUILLAUME, III, ESQUIRE
11            1350 Connecticut Avenue NW, Suite 308
              Washington, DC  20036
12            (202) 321-0549
                   -and-
13            LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
              BY:  CHRISTOPHER C. NIETO, ESQUIRE
14            1 North Charles Street, Suite 1301
              Baltimore, Maryland  21201
15            (410) 863-8189

16

17

18

19

20

21

22

23

24

25
```

**JA2447**

```
 1          (Call to order of the Court.)
 2               THE COURT:  Thank you, everyone.  Please be seated.
 3               THE DEPUTY CLERK:  The matter now pending before this
 4     Court is Criminal Action No. TDC-18-0631, United States of
 5     America vs. Scott Anthony Williams and Taeyan Raymond Williams.
 6     We are here today for the purpose of a jury trial.
 7          Counsel, please identify yourselves for the record.
 8               MS. GROSSI:  Good afternoon, Your Honor.  Leah
 9     Grossi, Michael Hanlon, and William Moomau on behalf of the
10     United States.  Here with us at counsel's table is Kyle Simms
11     with the Maryland State Police.
12               THE COURT:  Good afternoon.
13               MR. HAWKS:  Good afternoon, Your Honor.  Kwasi Hawks
14     and Dwight Crawley on behalf of Mr. Scott Williams, seated
15     between us.
16               MR. CRAWLEY:  Good afternoon, Your Honor.
17               THE COURT:  Good afternoon.
18               MR. GUILLAUME:  Good afternoon, Your Honor.  For the
19     record, Alfred Guillaume and Christopher Nieto on behalf of
20     Mr. Taeyan Williams, seated to my left.
21               THE COURT:  Good afternoon to counsel.  Mr. Hawks.
22               MR. HAWKS:  Yes, Your Honor.  I apologize for
23     interrupting you.  In our haste to make it back to the
24     courtroom, we have left a full copy of our instructions
25     downstairs in the attorney conference area, and I ask that I be
```

 1  momentarily excused to retrieve that quickly.  Mr. Crawley will

 2  remain with the permission of Mr. Williams.

 3          THE COURT:  I am not sure there is a better way, but

 4  okay.  Yeah.  You can do that if you'd like.

 5          MR. HAWKS:  Thank you.

 6          THE COURT:  So welcome to the parties and members of

 7  the audience.

 8      So we have two questions that we have received from the

 9  jury in close succession.  The first one is:  What exhibit

10  shows or expresses the net weight of the Schedule II

11  methamphetamine?

12      To me, this is a similar question to the one about what

13  exhibit number is the -- were the Wickr messages.  I do not

14  specifically recall if there is one exhibit that handles this

15  issue or whether it was just testimony.

16      So just as a factual matter, do you know, Ms. Grossi?

17          MS. GROSSI:  Yes, Your Honor.  It was just testimony

18  of Ms. Amber Burns.  There is no exhibit.

19          THE COURT:  And there is no, like, report that was

20  entered as evidence, just --

21          MS. GROSSI:  That's correct, Your Honor, yes.  Just

22  testimony.

23          THE COURT:  Okay.  So, given that, does anyone have a

24  proposal on how we respond to this question?

25          MS. GROSSI:  Your Honor --

1          MR. CRAWLEY:  Sorry.

2          MS. GROSSI:  Your Honor, the government suggests

3    referring them to Ms. Burns' testimony as a response.

4          THE COURT:  Mr. Crawley.

5          MR. CRAWLEY:  Your Honor, I would just say the

6    appropriate response would be:  There is no exhibit and your

7    recollection controls.  They were the fact finders in this case

8    so their recollection controls.

9          THE COURT:  Does the Taeyan Williams team have

10   another viewpoint?

11         MR. GUILLAUME:  We don't have another viewpoint, Your

12   Honor, but if we did, we would go with Mr. Crawley's

13   suggestion.

14         THE COURT:  So, it's interesting.  We don't usually

15   get questions like this even though it seems like they totally

16   are -- could be predicted.  As I mentioned to you before, I was

17   somewhat concerned, given the volume of exhibits, that

18   sometimes it's hard for the juries to find things because they

19   don't have the same indexing system that we all have.  So if

20   there had been an exhibit, I think I would, as we did with the

21   -- with the Wickr messages, would have considered doing that.

22       I think there is some difference, perhaps, between saying

23   we know there is an exhibit, just give us the number, versus

24   where in the evidence this piece of information is.  This

25   really falls more in the latter category, so I actually think

1   it would be a little bit tougher argument to say we should give
2   an exhibit number when they don't seem to have a description
3   they can give us and just asked for a number.
4       But then when we move to the layer of it being witness
5   testimony, which I think is more difficult, I think I would
6   probably -- I think the -- giving them a witness name is more
7   than I have done in the past in this scenario even though I
8   can't admit this comes up very often.
9       I think -- so I think perhaps a happy medium might be
10  something like:  No exhibit provides this information.  Your
11  recollection of the witness testimony, or you -- well,
12  something along the lines of what Mr. Crawley said, either just
13  noting that there is witness testimony out there but not saying
14  that it covers this or saying who it is, but just -- I think if
15  we say no exhibit, there is a risk they think that there is no
16  evidence of that, which obviously is -- it's up to them to
17  remember everything, but I think that might be a little unfair.
18  I think if we just say we are not going to tell you the number,
19  they might go sifting through for hours and not find anything,
20  and that's probably not productive.
21      So what if we said:  No exhibit provides this
22  information.  Your collective memory of the witness testimony
23  -- or, I mean, for lack of a better phrase right now, I could
24  say, Your collective memory of the witness testimony controls,
25  which is similar to what Mr. Crawley says.

```
 1        Does anybody have a better or different phraseology they
 2   would prefer?
 3             MS. GROSSI:  Yes, Your Honor.  The government submits
 4   that something to the effect of what Your Honor said -- maybe
 5   not naming Ms. Burns -- but saying, The collective memory of
 6   the testimony related to this subject controls.  To this -- I
 7   mean, this subject was covered by her testimony, and so to not
 8   address the subject, it kind of seems as though it wasn't
 9   addressed in the testimony.
10             THE COURT:  Does anybody have any thoughts on that
11   from the defense side?
12             MR. CRAWLEY:  Your Honor, for simplicity reasons, I
13   would maintain the earlier position I took on behalf of
14   Mr. Scott Williams.  I think it's straightforward and direct
15   and it addresses everything that they have asked in this
16   particular question.  They asked specifically what exhibit.
17   There is no exhibit.  And to the extent that they need to rely
18   on their memory, that's all they can rely on, the information
19   that was presented to them.  So that's where we would stand on
20   that.
21             THE COURT:  Anything different from that,
22   Mr. Guillaume?
23             MR. GUILLAUME:  No, Your Honor.  I was going to say
24   we don't have anything to add.
25             THE COURT:  I think I am going to go with what I have
```

**JA2452**

8

1  because, as Mr. Crawley said, the specific question was about

2  the exhibit.  If we really want to just strictly answer the

3  question only, we would just say there is no exhibit.  As I

4  said, that could be misleading or at least give them an

5  inference that maybe isn't accurate.  So I am willing to add

6  something else about testimony, but I don't think I want to go

7  any further.

8      As a practical matter, I think if we say, Your collective

9  memory of the witness testimony controls, they are going to

10  think about, Was there a witness who said this?  I don't think

11  -- and, obviously, they are going to focus on witnesses who

12  might have been in this range, so I don't think the addition

13  proposed by the government is necessary, and, again, trying to

14  keep it as limited as possible, I think I will stick with that.

15  So I will say, No exhibit provides this information.  Your

16  collective memory of the witness testimony controls.

17      As for the other note, it states, "The jury needs further

18  clarification on the law that states possession of a firearm(s)

19  [sic] combined with the possession of drugs over a certain

20  quantity of drugs automatically infers that the firearm is

21  being used in the furtherance of drug trafficking."

22      It's not really a question, but it does say they need

23  further clarification, and I think there is two issues in

24  there.  On the one hand, they are -- they are looking at the

25  question of whether possession of a firearm can -- you know,

**JA2453**

1    whether there is -- the government has proven that the

2    possession of the firearm is in furtherance of drug trafficking

3    -- of the drug trafficking crime.

4         On the one hand, they are asking if there is additional

5    law to be brought to bear on this topic, and my initial

6    inclination is just to refer them back to the instruction that

7    covers the issue of in furtherance of a crime because while we

8    could get into sort of nuance situations, I don't think we have

9    -- first of all, I am not sure we have reached an agreement on

10   what the situation is that we need to address, but that the --

11   to the extent there is sort of specific doctrines relating to

12   this, nobody argued those, nobody really tried to assert that

13   there was a connection or asked for an instruction to show how

14   there might be a connection beyond just what we have in the

15   instruction, so I would tend to lean towards just saying, Look

16   at the instruction, I think it's on page 94, on this issue.

17        There is this other statement here about whether drugs

18   over a certain quantity automatically infer that the firearm

19   was being used in furtherance of the drug trafficking.  That

20   raises, to some degree, the possibility that they think there

21   is an automatic inference to be drawn.  I don't think anybody

22   would argue that there is anything automatic, although I think

23   we can still address both those issues in a balanced way by

24   just referring them back to the instructions, and the

25   instructions in no way infer that there is anything automatic.

1　　　So I think that's the cleanest thing to do, but I am

2　inviting both sides to weigh in.

3　　　　　MS. GROSSI:　Your Honor, the government agrees.　We

4　came up with four instructions to potentially refer them to:

5　Instruction No. 64, which talks about possession of a

6　controlled substance; Instruction 66, which talks about intent

7　to distribute; Instruction 83, which I believe is the one that

8　Your Honor has already mentioned, which is knowing possession,

9　use or carrying of a firearm --

10　　　　　THE COURT:　Sorry.　Give me the first two numbers

11　again.

12　　　　　MS. GROSSI:　Yeah.　Sure.　Instruction No. 64, which

13　is on page 69.

14　　　　　THE COURT:　Okay.　And then?

15　　　　　MS. GROSSI:　And then Instruction 66, which is on

16　page 72.

17　　　　　THE COURT:　Mm-hmm.

18　　　　　MS. GROSSI:　And then Instruction 83, which you

19　already referred to, which is page 94.

20　　　　　THE COURT:　Mm-hmm.

21　　　　　MS. GROSSI:　And then, just to be complete,

22　Instruction 90, which deals with the other 924(c) count and it

23　just really refers back, and that's at page 103.

24　　　　　THE COURT:　So you are suggesting that I say that --

25　in response to this, Please refer to or consult those

1   instructions?

2            MS. GROSSI:  Yes, Your Honor.

3            THE COURT:  Okay.  Any view from the defense on that

4   proposal or any other proposal?

5            MR. CRAWLEY:  Yes, Your Honor.  On behalf of

6   Mr. Scott Williams, we would take the position that the Court

7   not go beyond just merely referencing them back to the general

8   instructions as a whole and instruct them that they should read

9   the instructions as written; that meaning we would take the

10  position that there should not be any inferences drawn that are

11  not in the instruction.

12       I think what's happening here, and to your point, Your

13  Honor, as the Court touched upon earlier to the latter half of

14  this question, that doesn't even exist, so there is no

15  inference there.  So I think what they are doing is maybe some

16  people are -- and I don't want to disparage the jury -- but

17  some people may be acting as if they are somewhat experts in

18  this particular area of law and may be trying to inject some

19  theory that doesn't exist.  So if we limit it to just advising

20  them to stick with the instructions as written, it takes out

21  all of the ambiguity or lack of information that they believe

22  they may not have.

23           THE COURT:  So are you agreeing or disagreeing with

24  the government that we should reference particular instructions

25  as part of that, or do you just not want to reference any of

 1  them?

 2        MR. CRAWLEY:  I don't think we should focus any

 3  attention on any specific instruction.  I just think we should

 4  take the broad approach:  You have been provided with the

 5  instructions.  The instructions are designed to provide you

 6  with how you should look at the case and apply the law and that

 7  there is nothing else here that would suggest that there is an

 8  inference, so there is nothing in the law that supports that.

 9        But if the Court didn't want to get into the latter part

10  of what I just stated, I would just say focus them on the

11  notion that you have the instructions, you should read the

12  instructions as they are written, and leave it at that, Your

13  Honor.

14        THE COURT:  So -- okay.  Mr. Guillaume, anything to

15  add to that?

16        MR. GUILLAUME:  No.  I think the cleanest way, I

17  agree with Mr. Crawley, is to just say, You have the

18  instructions, the law has been provided to you, and their job

19  is to interpret it.  I don't want to -- I don't think we should

20  be telling them where they should focus because who knows what

21  effect it may have on all three sides, for all three parties.

22        THE COURT:  Well, I mean, I wonder, just on that

23  point, I mean, I think particularly Instruction 83, which deals

24  with in furtherance, I mean, to some degree, if your point is

25  you want them to get the message that there is nothing

automatic, I think if you read 83, there is nothing in there
that's automatic. If we don't focus them on at least that one,
then they are reading the whole thing looking for the
automatic, and, yeah, they probably won't find it, but, you
know, the more words they read, the more possibility that they
are like, Well, maybe there is something in here.

So if we focus them on the one that really is about this
issue and they can see what's there and what's not there,
wouldn't that be better, or do you still prefer the broad
approach?

MR. GUILLAUME: I think -- I see the Court's point,
and I don't think you are wrong, Your Honor. I just get very
nervous when we point to specific instructions over others
because who knows what emphasis is being given by whatever
factions are in the room in there. But I do -- I see your
point. I do think that answers the question more directly. I
don't think we should even tell them there is no automatic --
nothing automatic for that same reason. I just -- I am very
cautious when it comes to these things.

THE COURT: So even though they have asked about
automatic, you don't -- you are not asking me to tell them that
there is nothing automatic here?

MR. GUILLAUME: May I have the Court's brief
indulgence, Your Honor?

THE COURT: Sure.

1           MR. CRAWLEY:  On behalf of Mr. Scott Williams, I am

2    just looking back over that instruction again, Your Honor.

3           MR. GUILLAUME:  I guess I am kind of caught between a

4    rock and a hard place here, Your Honor, on behalf of Taeyan

5    Williams.  I think that if you do tell them there is nothing

6    automatic, that stops that line of inquiry, but then if you

7    focus them on a particular instruction, that could potentially,

8    but not necessarily, be problematic, so I would want to consult

9    with my co-counsel before I make a definitive --

10           THE COURT:  Okay.  I mean, as I am reading the

11    instruction -- or the note again, it says, The jury needs

12    further clarification on the law that states possession of a

13    firearm combined with possession of drugs over a certain

14    quantity of drugs automatically infers, and one way to read

15    this is that that's their understanding is that there is an

16    automatic inference.  They just don't know where it is or how

17    that's defined.

18           MR. CRAWLEY:  And so the most direct answer from our

19    position is that there is no law that supports that.  If that's

20    our intent, to be as honest and direct with them, then that's

21    the appropriate response.

22        To the extent that the Court may not want to engage in

23    that kind of dialogue, then I don't think we should single out

24    other instructions because it still, to your point, doesn't

25    answer their question.  They are not going to get, from reading

1   these instructions, any law that speaks to this particular

2   question.

3          MS. GROSSI:  Your Honor --

4          THE COURT:  So I think I understand your position.

5      Ms. Grossi.

6          MS. GROSSI:  Your Honor, I just think this is a

7   simple question where we point them to the law that they are

8   supposed to follow which is in the instructions, and providing

9   them with a legal answer outside of the instructions is

10  potentially problematic.  So if we refer them to four different

11  instructions where they see the automatic is not listed, that's

12  going to be their -- you know, their interpretation of the law

13  is going to be based on these instructions.

14         THE COURT:  But what's wrong with saying there is

15  nothing automatic here?  Because they are not asking is there

16  an automatic inference.  They are saying, We want clarification

17  on the law that states that there is, you know, possession

18  combined with -- firearms combined with drugs over a certain

19  quantity automatically infers that's being used.

20         MS. GROSSI:  Your Honor, I think we are potentially

21  parsing out this note in an unfair way.  They are asking for

22  further clarification on the law with regard to possession of

23  firearms.  We don't know if they are, like, using this

24  automatically in the way that we are thinking automatic, and so

25  I think it's important to send them a note back to refer them

1    to the instructions both parties have agreed to.  That is the

2    law in this circuit on this particular count.

3         And Your Honor, just another point.  I don't know if they

4    are also talking about Chris Bush's testimony about weights

5    being over a certain amount and that being drug trafficking,

6    and so I think, you know, we could also add the point of also

7    testimony -- your collective understanding of testimony also

8    should be considered.

9         THE COURT:  Well, they are asking for a -- the legal

10   definitions.  They are not asking for guidance on the facts in

11   this question.  They were in the other question.

12        Mr. Crawley, you wanted to add something else?

13        MR. CRAWLEY:  Yes, Your Honor.  Again, if we take it

14   at its face value, it seems to be, in my opinion, asking for

15   something that doesn't exist.  If we just read it on its face

16   value, they are saying specifically, We need clarification on

17   the law that states these things.  There is no law that states

18   those things, so we don't have to make this complicated

19   because, to cut to the chase, the answer is there is no law

20   that states those things.

21        To the extent that the Court wishes to suggest that you

22   have the jury instructions and you should follow the jury

23   instructions, I believe, on behalf of Mr. Williams, that that's

24   the appropriate response.

25        MS. GROSSI:  Your Honor, I am also looking at

1  Instruction 83 where it is talking about quantity of drugs, and

2  so that's why we were -- I think it's important to refer them

3  to that instruction -- I'm sorry, Instruction No. 66, and then

4  in conjunction with Instruction 83, which are to be read

5  together with regard to possession and distribution.

6           THE COURT:  Mr. Guillaume.

7           MR. GUILLAUME:  Your Honor, just to clarify our

8  position, it's somewhat of a -- something very similar to

9  Mr. Crawley's.  Simply saying that there is no law that states

10 this proposition and then you have the instructions to follow,

11 without naming specific instructions, I think is the cleanest

12 and most safe way for us.  But I understand everything the

13 Court has said.  And I understand the government is saying what

14 they are saying, but I think it just makes it way more

15 confusing potentially to their deliberation.  Thank you.

16          MS. GROSSI:  Your Honor, I think we are of the view

17 that we should not be adding to the instructions at this point.

18 We gave these instructions, we agreed to these instructions,

19 and so pointing them back to these instructions would be

20 consistent with that.

21          THE COURT:  Well, I am definitely going to point them

22 back to the instructions.  I think what I am weighing now is

23 whether we should state -- because, again, they don't ask

24 whether there is an automatic inference.  They state that there

25 is and they want further clarification on the parameters of

**JA2462**

1   that.  And while we often, again, try to stay within the

2   confines of the instructions, I guess I am not sure whether we

3   need to disabuse them of that notion.

4           MR. CRAWLEY:  Counsel for Mr. Scott Williams believes

5   we should, Your Honor.

6           MS. GROSSI:  And the government -- you know, I think

7   we might be taking the automatically out of context, but we

8   understand the Court's position.

9           THE COURT:  Give me your interpretation, when you are

10  saying it takes it out of context, what do you mean by that?

11          MS. GROSSI:  I think it could be just that the

12  quantity of drugs and, you know, that it's a large quantity of

13  drugs infers that the firearm is being used in furtherance of

14  drug trafficking and not necessarily meaning automatically

15  because if you think about -- I think in the instructions, it

16  says it would be highly unlikely that a person with 50,000

17  doses of a drug possessed them all for personal consumption,

18  and so I think that their interpretation of automatically could

19  be, yeah, it's obvious someone doesn't have 50,000 doses of a

20  drug for their own personal consumption.

21          THE COURT:  Well, I think the problem is as you have

22  -- I mean, what you are referring to is the instruction on what

23  is intent to distribute.  And the agent's testimony, I think it

24  was -- they said Agent Bush, was talking about how a certain

25  drug quantity basically means possession in his expert opinion

1   -- or intent to distribute.  And if someone said that's
2   automatic, that's not that far off, although it's clearly not
3   required, but that could be what they are talking about.  But
4   the idea that possession of a certain quantity, even a
5   distribution quantity, combined with possession automatically
6   infers use in furtherance, that's a different concept, which I
7   don't think the instructions bear out, and I don't think the
8   agent was trying to say that, and the government didn't even
9   try to argue that because it's certainly not automatic.
10         I mean, you could argue that under these facts, you can
11  reach that inference, but certainly not automatically.  And so
12  I think there is some concern that this is a misinterpretation
13  of the instruction, and so I think anything we say needs to
14  make pretty clear, either explicitly or implicitly, that that's
15  not accurate.  And I do think the primary instruction on this
16  is 83.
17         So I am going to suggest this, we say -- how does this
18  sound:  The law does not require an automatic inference as
19  described in the note.  You should consider the jury
20  instructions as a whole, including Instructions No. 83 and 90.
21  And I could sort of rewrite the exact language of the note.  I
22  just think that's probably not necessary, so that's why I say
23  "as described in the note."  And then referring to 83 and 90,
24  which is the in furtherance, I think it's helpful to direct
25  them to those because I think those are the ones that they

1  really want to look at.  This question really is about in

2  furtherance of drug trafficking.

3      I am telling them to look at all the instructions

4  entirely so that they still need to do that, but I think

5  without giving them any guidance when you are talking about 120

6  pages of instructions is not productive particularly since they

7  have to look at that one to get to this even if they are going

8  to look at other ones.  So that's my suggestion.

9      Any views on that?

10      MS. GROSSI:  Your Honor, I think it's important to

11  add 64 and 66 because the counts deal with drug trafficking,

12  the 924(c)s, and since the note is asking about the quantity of

13  the drugs, pointing to 64 and 66 I think is really important.

14      THE COURT:  I guess what I am wondering is -- I mean,

15  if we are talking about a drug trafficking crime, it's implicit

16  that they are finding there is intent to distribute.  They know

17  that.  There is a couple of instructions that say you can't

18  even get to these counts unless you find that there was a drug

19  trafficking crime.  So at that point, they have established

20  possession and intent to distribute.

21      I am not saying that they are not relevant.  I am

22  thinking about whether they should be emphasized or whether we

23  are pushing them off into another direction, but I don't know.

24      Any views from the defense on that?

25      MR. CRAWLEY:  Your Honor, on behalf of Mr. Scott

1  Williams, my position on behalf of Mr. Williams would be that

2  the Court, in instructing them to follow Instruction 90, is

3  actually instructing them to follow 83?

4          THE COURT:  Yeah.  It's just to be complete.

5          MR. CRAWLEY:  And I understand.  We are not taking

6  exception with that.  But we believe if that is the Court's

7  intent to do that, that then that's where it should stop.

8  That's all I was going to say, Your Honor, then that's where it

9  should stop because, as the Court just touched upon, if you

10  read 90, 90 directs you to 83, so merely having you restate

11  that is not going to offer anything additional to that

12  proposition.  It tells them to do it as well.

13      But that being said, we disagree with the government as

14  to the other two instructions because, as the Court just

15  touched upon, it's inherent in the particular charges that if

16  that's what you are doing, that's what you are doing.

17      So we would just leave it at there is no law that goes to

18  that particular point that you asked the question about, and if

19  the Court is inclined to instruct on anything else, we would

20  ask the Court to limit it to what you just proposed, Your

21  Honor.

22          MR. GUILLAUME:  And Your Honor, on behalf of

23  Mr. Taeyan Williams, we share the view of co-counsel, but we --

24  and we do want to make clear for the record that we do object

25  to any additional instructions other than the I think it's 83

1  --

2        THE COURT:  83 and maybe 90, which is redundant.

3        MR. GUILLAUME:  Thank you.

4        THE COURT:  So, Ms. Grossi, this first half I have,

5  The law does not require an automatic inference as described in

6  the note.  I understand why you might not want it.  Do you

7  think there is anything incorrect about that statement?

8        MS. GROSSI:  No, Your Honor.  Are you putting that in

9  quotes, automatically infers, or --

10        THE COURT:  Well, as drafted, it says, "automatic

11  inference," so it's not a direct quote.

12        MS. GROSSI:  The government is fine with that, Your

13  Honor.  It is stating the law correctly.

14        THE COURT:  Okay.  Okay.  So what I will say is:  The

15  law does not require an automatic inference as described in the

16  note -- or in your note.  Maybe I will say that.  You should

17  consider the jury instructions as a whole, including

18  Instructions No. 83 and 90.

19        Any further objections?  Okay.  So we will send responses

20  back to those two notes and we will see where we are.  I noted,

21  although one never knows the ways of the jury, but these

22  questions are about -- the most likely interpretation is we are

23  talking about Counts Seven and Eight, so if, for some reason,

24  they are going in chronological order, they are moving along.

25  If they are not going in chronological order, I don't know, but

 1   it may mean that we might hear further information this

 2   afternoon.

 3         Thank you very much.

 4         (Recess taken from 1:32 p.m. until 3:38 p.m.)

 5         THE COURT:  Thank you, everyone.  Please be seated.

 6         So, welcome back, everyone.  We received a note stating,

 7   "We, the jury, have concluded deliberations and have determined

 8   a verdict on all counts for both Defendants Scott Anthony

 9   Williams and Taeyan Raymond Williams."  So I believe we are

10   ready, then, to bring the jury in for the verdict.

11         Is there anything we need to discuss before that?

12         MS. GROSSI:  Not from the government.

13         MR. HAWKS:  No, Your Honor.

14         MR. GUILLAUME:  No, Your Honor.

15         THE COURT:  Okay.  So the only thing I would say

16   before we do that, because I think it's sometimes a little

17   difficult to say it after the verdict under whatever the

18   circumstances are, I just wanted to thank counsel for a well

19   tried case from both sides.  In my view, both sides were -- all

20   three sides, really, were well represented.  There was strong

21   advocacy on all sides, but fair advocacy, and the cooperation

22   among counsel was very favorable in a way that was good for the

23   efficiency of the Court but in no way impacted the strength of

24   everyone's position.  And I think that's something that good

25   counsel are always able to do, and these counsel did that, and

 1    so I just want to thank counsel for a well tried case and let

 2    you know I am happy to work with you again in the future.

 3            And with that, we will bring in the jury.

 4            MR. CRAWLEY:  Thank you, Your Honor.

 5        (The jury panel enter the courtroom at 3:41 p.m.)

 6            THE COURT:  Thank you, everyone.  Please be seated.

 7        So I understand that the jury has reached a verdict in

 8    this case.  Madam Clerk, you may begin with the roll call.

 9            THE DEPUTY CLERK:  We are here to receive the verdict

10    in Criminal Action No. TDC-18-0631, United States of America

11    vs. Scott Anthony Williams and Taeyan Raymond Williams.

12        Members of the jury panel, when I call your juror number,

13    would you please stand and answer "present."

14    Juror No. 1.

15            A JUROR:  Present.

16            THE DEPUTY CLERK:  Juror No. 2.

17            A JUROR:  Present.

18            THE DEPUTY CLERK:  Juror No. 3.

19            A JUROR:  Present.

20            THE DEPUTY CLERK:  Juror No. 4.

21            A JUROR:  Present.

22            THE DEPUTY CLERK:  Juror No. 5.

23            A JUROR:  Present.

24            THE DEPUTY CLERK:  Juror No. 6.

25            A JUROR:  Present.

```
 1            THE DEPUTY CLERK:  Juror No. 7.

 2            A JUROR:  Present.

 3            THE DEPUTY CLERK:  Juror No. 8.

 4            A JUROR:  Present.

 5            THE DEPUTY CLERK:  Juror No. 9.

 6            A JUROR:  Present.

 7            THE DEPUTY CLERK:  Juror No. 10.

 8            A JUROR:  Present.

 9            THE DEPUTY CLERK:  Juror No. 11.

10            A JUROR:  Present.

11            THE DEPUTY CLERK:  Juror No. 12.

12            A JUROR:  Present.

13            THE DEPUTY CLERK:  Members of the jury, have you

14  agreed on your verdict?

15        (The jury panel reply, "Yes.")

16            THE DEPUTY CLERK:  Who shall speak for you?

17            JURY FOREPERSON:  I will.

18            THE DEPUTY CLERK:  Will the foreperson please rise.

19        Has the verdict sheet which was submitted to the jury

20  been answered?

21            JURY FOREPERSON:  Yes.

22            THE DEPUTY CLERK:  Is the form signed and dated by

23  you?

24            JURY FOREPERSON:  Yes.

25            THE DEPUTY CLERK:  Please hand the verdict sheet to
```

 1  me so I may present it to the judge.

 2         THE COURT:  The verdict form is in order, so I will

 3  ask you, Madam Clerk, to inquire.

 4         THE DEPUTY CLERK:  As I read the questions, please

 5  provide the answers.  Will the defendants please rise.

 6      United States of America vs. Scott Anthony Williams and

 7  Taeyan Raymond Williams, Criminal Action No. TDC-18-0631.

 8  Verdict Form.  Count One:  Conspiracy to distribute and possess

 9  with intent to distribute controlled substances.  Question 1:

10  As to Count One, conspiracy to distribute and possess with

11  intent to distribute controlled substances, how do you find the

12  defendant, Scott Anthony Williams?

13         JURY FOREPERSON:  Guilty.

14         THE DEPUTY CLERK:  As to defendant, Scott Anthony

15  Williams, do you find that the offense involved a mixture or

16  substance containing cocaine, a Schedule II controlled

17  substance?

18         JURY FOREPERSON:  Yes.

19         THE DEPUTY CLERK:  As to defendant, Scott Anthony

20  Williams, do you find that the offense involved a mixture or

21  substance containing marijuana, a Schedule I controlled

22  substance?

23         JURY FOREPERSON:  Yes.

24         THE DEPUTY CLERK:  As to Count One, conspiracy to

25  distribute and possess with intent to distribute controlled

1  substances, how do you find the defendant, Taeyan Raymond

2  Williams?

3          JURY FOREPERSON:  Guilty.

4          THE DEPUTY CLERK:  As to defendant -- excuse me.  As

5  to the defendant, Taeyan Raymond Williams, do you find that the

6  offense involved a mixture or substance containing cocaine, a

7  Schedule II controlled substance?

8          JURY FOREPERSON:  Yes.

9          THE DEPUTY CLERK:  As to the defendant, Taeyan

10 Raymond Williams, do you find that the offense involved a

11 mixture or substance containing marijuana, a Schedule --

12         JURY FOREPERSON:  Yes.

13         THE DEPUTY CLERK:  -- I controlled substance?

14         JURY FOREPERSON:  Yes.

15         THE DEPUTY CLERK:  Count Two:  Conspiracy to

16 interfere with interstate commerce by robbery or extortion.

17     As to Count Two, conspiracy to interfere with interstate

18 commerce by robbery or extortion, how do you find the

19 defendant, Scott Anthony Williams?

20         JURY FOREPERSON:  Not guilty.

21         THE DEPUTY CLERK:  As to Count Two, conspiracy to

22 interfere with interstate commerce by robbery or extortion, how

23 do you find the defendant, Taeyan Raymond Williams?

24         JURY FOREPERSON:  Not guilty.

25         THE DEPUTY CLERK:  Count Three, Question Five:  As to

```
 1   Count Three, interference with interstate commerce by robbery
 2   or extortion, how do you find the defendant, Scott Anthony
 3   Williams?
 4          JURY FOREPERSON:  Not guilty.
 5          THE DEPUTY CLERK:  As to Count Three of the
 6   indictment, interference with interstate commerce by robbery or
 7   extortion, how do you find the defendant, Taeyan Raymond
 8   Williams?
 9          JURY FOREPERSON:  Not guilty.
10          THE DEPUTY CLERK:  Count Four:  Kidnapping with death
11   resulting.  As to Count Four, kidnapping with death resulting,
12   how do you find the defendant, Scott Anthony Williams?
13          JURY FOREPERSON:  Not guilty.
14          THE DEPUTY CLERK:  As to the lesser-included offense
15   to Count Four, kidnapping, how do you find the defendant, Scott
16   Anthony Williams?
17          JURY FOREPERSON:  Not guilty.
18          THE DEPUTY CLERK:  As to Count Four, kidnapping with
19   death resulting, how do you find the defendant, Taeyan Raymond
20   Williams?
21          JURY FOREPERSON:  Not guilty.
22          THE DEPUTY CLERK:  As to the lesser-included offense
23   to Count Four, kidnapping, how do you find the defendant,
24   Taeyan Raymond Williams?
25          JURY FOREPERSON:  Not guilty.
```

```
 1          THE DEPUTY CLERK:  Count Five:  Possessing, using,
 2   carrying, and brandishing a firearm in furtherance of or during
 3   and in relation to a crime of violence or a drug trafficking
 4   crime.
 5        As to Count Five, possessing, using, carrying, and
 6   brandishing a firearm in furtherance of or during and in
 7   relation to a crime of violence or a drug trafficking crime,
 8   how do you find the defendant, Scott Anthony Williams?
 9          JURY FOREPERSON:  Not guilty.
10          THE DEPUTY CLERK:  As to the lesser-included offense
11   to Count Five of possessing, using, or carrying a firearm in
12   furtherance of or during and in relation to a crime of violence
13   or a drug trafficking crime, how do you find the defendant,
14   Scott Anthony Williams?
15          JURY FOREPERSON:  Not guilty.
16          THE DEPUTY CLERK:  Question 10:  As to Count Five,
17   possessing, using, carrying, and brandishing a firearm in
18   furtherance of or during and in relation to a crime of violence
19   or a drug trafficking crime, how do you find the defendant,
20   Taeyan Raymond Williams?
21          JURY FOREPERSON:  Not guilty.
22          THE DEPUTY CLERK:  As to the lesser-included offense
23   to Count Five of possessing, using, or carrying a firearm in
24   furtherance of or during and in relation to a crime of violence
25   or a drug trafficking crime, how do you find the defendant,
```

1  Taeyan Raymond Williams?

2          JURY FOREPERSON:  Not guilty.

3          THE DEPUTY CLERK:  Count Six:  Possession with intent

4  to distribute controlled substances.

5      Question 11:  As to Count Six, possession with intent to

6  distribute controlled substances, how do you find the

7  defendant, Scott Anthony Williams?

8          JURY FOREPERSON:  Guilty.

9          THE DEPUTY CLERK:  As to the defendant, Scott Anthony

10  Williams, do you find that the offense involved a mixture or

11  substance containing cocaine, a Schedule II controlled

12  substance?

13          JURY FOREPERSON:  Yes.

14          THE DEPUTY CLERK:  As to the defendant, Scott Anthony

15  Williams, do you find that the offense involved a mixture or

16  substance containing marijuana, a Schedule I controlled

17  substance?

18          JURY FOREPERSON:  Yes.

19          THE DEPUTY CLERK:  As to Count Six, possession with

20  intent to distribute controlled substances, how do you find the

21  defendant, Taeyan Raymond Williams?

22          JURY FOREPERSON:  Guilty.

23          THE DEPUTY CLERK:  As to the defendant, Taeyan

24  Raymond Williams, do you find that the offense involved a

25  mixture or substance containing cocaine, a Schedule II

1  controlled substance?

2          JURY FOREPERSON:  Yes.

3          THE DEPUTY CLERK:  As to the defendant, Taeyan

4  Raymond Williams, do you find that the offense involved a

5  mixture or substance containing marijuana, a Schedule I

6  controlled substance?

7          JURY FOREPERSON:  Yes.

8          THE DEPUTY CLERK:  Count Seven:  Possession with

9  intent to distribute controlled substances.

10      As to Count Seven, possession with intent to distribute

11  controlled substances, how do you find the defendant, Scott

12  Anthony Williams?

13          JURY FOREPERSON:  Guilty.

14          THE DEPUTY CLERK:  What amount of a mixture or

15  substance containing a detectable amount of methamphetamine, a

16  Schedule II controlled substance, do you find that Scott

17  Anthony Williams possessed with the intent to distribute?

18          JURY FOREPERSON:  500 grams or more.

19          THE DEPUTY CLERK:  Count Eight:  Possession of a

20  firearm in furtherance of a drug trafficking crime.

21      As to Count Eight, possession of a firearm in furtherance

22  of a drug trafficking crime, how do you find the defendant,

23  Scott Anthony Williams?

24          JURY FOREPERSON:  Not guilty.

25          THE DEPUTY CLERK:  Count Nine:  Conspiracy to destroy

1   or conceal evidence.

2       As to Count Nine, conspiracy to destroy or conceal

3   evidence, how do you find the defendant, Scott Anthony

4   Williams?

5           JURY FOREPERSON:  Guilty.

6           THE COURT:  Thank you, Madam Foreperson.

7       Does any party request that the jury be polled?

8           MR. HAWKS:  No, Your Honor.

9           MR. GUILLAUME:  No, Your Honor.

10          MS. GROSSI:  No, Your Honor.

11          THE COURT:  Thank you.

12      Madam Clerk.

13          THE DEPUTY CLERK:  Members of the jury, you have

14  heard the verdict and answers thereto as delivered by your

15  foreperson and the verdict has been recorded, and do each of

16  you agree?  Please respond, "We do."

17      (The jury panel reply, "We do.")

18          THE DEPUTY CLERK:  Verdict recorded, Your Honor.

19          THE COURT:  The defendants may be seated.

20      So, ladies and gentlemen of the jury, this concludes your

21  jury service.  The last instruction I will give you is that you

22  are no longer instructed not to talk about the case.

23          Now, under our local rules, the parties and their

24  attorneys are not permitted to contact you to discuss the case.

25  You will not be asked to explain your verdict to them.  But if

you want to discuss your jury experience with your friends, family, and others, you are free to do so.  I do ask that if you choose to discuss the case, that you consider your fellow jurors and the confidentiality of the jury deliberation process and the need for jurors to feel comfortable stating their views on a case in the jury room without concern that their views will be broadcast to others or to the general public.

So one suggestion I have is that if you do discuss the case with others, you refrain from repeating specific statements made during deliberations or attributing statements or views to your fellow jurors.

We do ask that you leave your notes and other materials from the case behind you in the jury room.

And let me offer a final thank you on behalf of our court.  As I stated at the outset of our trial, our Constitution and our democratic system depend on citizens like you serving as jurors to ensure that our justice system remains in the hands of the people.

Interestingly enough, today, while you were deliberating, I presided over a naturalization ceremony in the building for new citizens, and I made the point that it's one of their duties as new citizens to serve on juries if called upon, and there is no better example of that than what you all have done today.  So I want to thank you for that.  You have helped to ensure that this important American tradition endures, and I

 1  can't thank you enough on behalf of our court.

 2       Because of the importance of your service to our court

 3  and our justice system, I would like to have the opportunity to

 4  thank you in person.  You are not required to wait for me, but

 5  if you don't mind waiting a few minutes while I finish any

 6  remaining business with the parties or the attorneys, I will

 7  come by the jury room to thank you.

 8       With that, the jury is discharged.

 9       (The jury panel exit the courtroom at 3:56 p.m.)

10            THE COURT:  Thank you, everyone.  Please be seated.

11       I do need to -- wait just a moment.  Make sure that the

12  government and both sides work with the clerk to make sure the

13  exhibits get returned.

14       And we are just looking to see if we can get some

15  sentencing dates.

16            THE DEPUTY CLERK:  Sure.  August 10th, nine a.m.

17            MR. GUILLAUME:  I'm sorry.  Is this for both or just

18  --

19            THE DEPUTY CLERK:  For both.

20            MR. GUILLAUME:  Your Honor, I am in a month-long

21  trial starting August 9th.  I am available the 7th and 8th if

22  the Court is available.

23            MR. CRAWLEY:  Your Honor, on behalf of Mr. Scott

24  Williams, I don't know that both counsel are necessary.  I

25  start a trial in the Eastern District of Virginia the first

 1  week of August, and I have a plea that's -- I think it's going
 2  to resolve itself, so I will do my best to be here on that date
 3  if the Court wishes to sign it.  But if the Court is inclined
 4  to let Mr. Hawks appear without me -- he was the lead attorney,
 5  the first attorney -- I think he can handle it, I think he
 6  would handle it without me, but I just wanted to let the Court
 7  know my schedule.
 8      I hope to have that case resolved with a signed plea
 9  document by tomorrow.  The Court understands that I said I had
10  some other matters that I was trying to deal with tomorrow.
11  That is one of the matters.  So hopefully I will have a
12  signature on that document.
13          THE COURT:  So, first of all, I think one way to
14  possibly sort this out is we don't need to necessarily have to
15  do them on the same day, so does that help in terms of,
16  Mr. Guillaume, your schedule?
17          MR. GUILLAUME:  Yes, Your Honor.  I do -- like I
18  said, the month of August is completely booked.  Other than the
19  7th -- actually, the 8th may be booked as well.  I have a
20  pretrial that may go a while.  But in the same vein as
21  Mr. Crawley, if Mr. Nieto -- I'd like to be here, but if -- I
22  don't want to hold things up, so if Mr. Nieto can handle it by
23  himself --
24          THE COURT:  Well, I mean, I'd like to get a date
25  where all of you can be here, partly because you were

1  participants in the trial, but also since everyone seems to be

2  willing to just have one attorney, it's sort of more likely not

3  to create an issue if we have a date that initially both sides

4  -- all attorneys can make, and then if something comes up, we

5  can still go forward.  If we are relying just on one attorney,

6  then --

7        MR. GUILLAUME:  Is the Court available on the 7th,

8  Your Honor?

9        THE COURT:  You tell me.  Well, let's do Monday,

10  August 7th, at 2:00.

11        MR. GUILLAUME:  Thank you, Your Honor.

12        THE COURT:  That will be for Taeyan Williams.  Does

13  that work for you, Mr. Nieto?

14        MR. NIETO:  Yes.  Thank you.

15        THE COURT:  The government?

16        MS. GROSSI:  Your Honor, our case agent is not

17  available that day.  He's been on the case for five years, so

18  we would like to have him there.

19        THE COURT:  Okay.  Would the -- was the 9th an option

20  for the other team, for the Scott Williams team?

21        MR. HAWKS:  That should work.

22        THE COURT:  Is that the day that you were talking

23  about?

24        MR. CRAWLEY:  No, the first week of August.  I

25  couldn't remember what date you were saying.  I expect to be

 1  done in Virginia, even if we have a trial, by the 9th.  I

 2  apologize if I misunderstood.

 3          MR. HAWKS:  Your Honor, I am also available on the

 4  9th.

 5          THE COURT:  Is that any different or is it the same?

 6          MS. GROSSI:  Your Honor, our case agent is scheduled

 7  for a trial that whole week, the 7th through the 11th.

 8          THE COURT:  Well, what about after the 11th?

 9          MS. GROSSI:  We are available the week of the 21st,

10  Your Honor, of August.

11          THE COURT:  The 21st, that week -- no.  How does

12  August 22nd work?

13          MS. GROSSI:  That works for the government.

14          MR. GUILLAUME:  Your Honor, I am supposed to be in

15  trial, but this trial is scheduled for a month.  I don't know

16  that it will really go a month.  If I may have the Court's

17  permission to have Mr. Nieto appear?  If I am still in trial, I

18  wouldn't appear, although I do want to be here for my client.

19          THE COURT:  Well, what if we did the 23rd, would that

20  help?

21          MR. GUILLAUME:  The trial is scheduled to last from

22  August 8th to September 8th.  It's a five co-defendant trial in

23  D.C. federal court.  I don't think it's going to last that

24  long, but, again, I have been wrong.

25          THE COURT:  What if we did the 22nd for Scott

1  Williams and the 23rd for Taeyan Williams, does that work?

2           MR. NIETO:  Forgive me, Your Honor.  I have

3  sentencing in Baltimore on the 23rd.  In fairness, that's at

4  ten a.m., so if Your Honor had availability in the afternoon,

5  I can be here.

6           THE COURT:  How does that week work for the

7  government?

8           MS. GROSSI:  Those dates work, Your Honor.

9           THE COURT:  Why don't we do 9:30 on the 22nd for

10 Mr. Scott Williams and 2:00 on -- or 2:30 on the 23rd for

11 Taeyan Williams.  That gives Mr. Guillaume an extra day, if

12 necessary.  And Mr. Nieto, that's okay for you?

13          MR. NIETO:  Absolutely, Your Honor.

14          THE COURT:  And the government is okay with that?

15          MS. GROSSI:  That works, Your Honor.

16          MR. GUILLAUME:  Thank you, Your Honor.

17          THE COURT:  Any other business we need to discuss

18 today?

19          MR. HAWKS:  Your Honor, as the -- the charges with

20 the most significant punitive exposure are no longer before

21 defendant, Scott Williams, he wanted to inquire whether or not

22 the government seeks his continued detention before sentencing.

23          MS. GROSSI:  We do, Your Honor.

24          THE COURT:  Well, I mean, the conviction includes

25 possession with intent to distribute controlled substances,

1  including cocaine.  Under 18, U.S.C., 3143, there is not just a

2  presumption, but the Court shall detain, absent exceptional

3  circumstances which could be found under 18, U.S.C., 3145, but

4  I am not going to find exceptional circumstances in this case

5  on that basis.  And I think there is also -- is there a

6  mandatory minimum for 500 grams?

7        MS. GROSSI:  There is.  There is a ten-year mandatory

8  minimum, Your Honor.

9        THE COURT:  But even without that, I think just the

10  statute doesn't permit me to release on this type of conviction

11  absent exceptional circumstances, and I am not going to find

12  those under these circumstances, but I certainly understand the

13  request.

14        MR. HAWKS:  Thank you, Your Honor.

15        THE COURT:  So the defendants will be remanded back

16  to the custody of the marshals pending sentencing.

17     Anything else we should discuss while we are here today?

18        MS. GROSSI:  Nothing further, Your Honor.

19        MR. GUILLAUME:  Nothing further, Your Honor.

20        THE COURT:  Thank you all very much.

21        MR. CRAWLEY:  Thank you, Your Honor.

22     (The proceedings were concluded at 4:05 p.m.)

23

24

25

**JA2484**

1                    C E R T I F I C A T E

2

3          I, Renee A. Ewing, an Official Court Reporter

4   for the United States District Court for the District of

5   Maryland, do hereby certify that the foregoing is a true and

6   correct transcript of the stenographically reported proceedings

7   taken on the date and time previously stated in the above

8   matter; that the testimony of witnesses and statements of the

9   parties were correctly recorded in machine shorthand by me and

10  thereafter transcribed under my supervision with computer-aided

11  transcription to the best of my ability; and that I am neither

12  of counsel nor kin to any party in said action, nor interested

13  in the outcome thereof.

14

15          /s/ Renee A. Ewing

16

17          Renee A. Ewing, RPR, RMR, CRR
            Official Court Reporter
            September 29, 2023

18

19

20

21

22

23

24

25

**JA2485**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

FILED —— ENTERED
—— LOGGED —— RECEIVED

MAY 1 1 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

UNITED STATES OF AMERICA

v.

SCOTT ANTHONY WILLIAMS and
TAEYAN RAYMOND WILLIAMS,

Defendants.

Criminal Action No. TDC-18-0631

**VERDICT FORM**

### Count 1: Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances

1. As to **Count 1**, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, how do you find the defendant, Scott Anthony Williams?

    Guilty_____ ✓_____          Not Guilty_____

    *If your answer to Question 1 is "guilty," then proceed to answer Questions 1a and 1b. If your answer to Question 1 is "not guilty," then do not answer Questions 1a and 1b and proceed directly to Question 2.*

    a. As to the defendant, Scott Anthony Williams, do you find that the offense involved a mixture or substance containing cocaine, a Schedule II controlled substance?

        Yes_____ ✓_____          No_____

    b. As to the defendant, Scott Anthony Williams, do you find that the offense involved a mixture or substance containing marijuana, a Schedule I controlled substance?

        Yes_____ ✓_____          No_____

2. As to **Count 1**, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, how do you find the defendant, Taeyan Raymond Williams?

    Guilty_____ ✓_____          Not Guilty_____

**JA2486**

*If your answer to Question 2 is "guilty," then proceed to answer Questions 2a and 2b. If your answer to Question 2 is "not guilty," then do not answer Questions 2a and 2b and proceed directly to Question 3.*

a.  As to the defendant, Taeyan Raymond Williams, do you find that the offense involved a mixture or substance containing cocaine, a Schedule II controlled substance?

Yes___✓___                    No_____

b.  As to the defendant, Taeyan Raymond Williams, do you find that the offense involved a mixture or substance containing marijuana, a Schedule I controlled substance?

Yes___✓___                    No_____

**Count 2:  Conspiracy to Interfere with Interstate Commerce by Robbery or Extortion**

3.    As to **Count 2**, Conspiracy to Interfere with Interstate Commerce by Robbery or Extortion, how do you find the defendant, Scott Anthony Williams?

Guilty_____                    Not Guilty___✓___

*If your answer to Question 3 is "guilty," then proceed to answer Questions 3a and 3b. If your answer to Question 3 is "not guilty," then do not answer Questions 3a and 3b and proceed directly to Question 4.*

a.  As to Scott Anthony Williams, do you find that an object of the conspiracy was to commit the crime of Interference with Interstate Commerce by Robbery?

Yes_____                    No_____

b.  As to Scott Anthony Williams, do you find that an object of the conspiracy was to commit the crime of Interference with Interstate Commerce by Extortion?

Yes_____                    No_____

4.    As to **Count 2**, Conspiracy to Interfere with Interstate Commerce by Robbery or Extortion, how do you find the defendant, Taeyan Raymond Williams?

Guilty_____                    Not Guilty___✓___

2

**JA2487**

*If your answer to Question 4 is "guilty," then proceed to answer Questions 4a and 4b. If your answer to Question 4 is "not guilty," then do not answer Questions 4a and 4b and proceed directly to Question 5.*

a. As to Taeyan Raymond Williams, do you find that an object of the conspiracy was to commit the crime of Interference with Interstate Commerce by Robbery?

Yes_____                    No_____

b. As to Taeyan Raymond Williams, do you find that an object of the conspiracy was to commit the crime of Interference with Interstate Commerce by Extortion?

Yes_____                    No_____

**Count 3:  Interference with Interstate Commerce by Robbery or Extortion**

5. As to **Count 3,** Interference with Interstate Commerce by Robbery or Extortion, how do you find the defendant, Scott Anthony Williams?

Guilty_____                    Not Guilty ✓_____

*If your answer to Question 5 is "guilty," then proceed to answer Questions 5a and 5b. If your answer to Question 5 is "not guilty," then do not answer Questions 5a and 5b and proceed directly to Question 6.*

a. Did the Government prove beyond a reasonable doubt that the defendant, Scott Anthony Williams, committed the crime of Interference with Interstate Commerce by Robbery?

Yes_____                    No_____

b. Did the Government prove beyond a reasonable doubt that the defendant, Scott Anthony Williams, committed the crime of Interference with Interstate Commerce by Extortion?

Yes_____                    No_____

6. As to **Count 3** of the Indictment, Interference with Interstate Commerce by Robbery or Extortion, how do you find the defendant, Taeyan Raymond Williams?

Guilty_____                    Not Guilty ✓_____

*If your answer to Question 6 is "guilty," then proceed to answer Questions 6a and 6b. If your answer to Question 6 is "not guilty," then do not answer Questions 6a and 6b and proceed directly to Question 7.*

3

**JA2488**

a. Did the Government prove beyond a reasonable doubt that the defendant, Taeyan Raymond Williams, committed the crime of Interference with Interstate Commerce by Robbery?

Yes_____          No_____

b. Did the Government prove beyond a reasonable doubt that the defendant, Taeyan Raymond Williams, committed the crime of Interference with Interstate Commerce by Extortion?

Yes_____          No_____

### Count 4:  Kidnapping with Death Resulting

7.    As to **Count 4**, Kidnapping with Death Resulting, how do you find the defendant, Scott Anthony Williams?

Guilty_____          Not Guilty____✓____

*If your answer to Question 7 is "guilty," then do not answer Question 7a and proceed directly to Question 8. If your answer to Question 7 is "not guilty," then proceed to answer Question 7a.*

a. As to the lesser included offense to Count 4, Kidnapping, how do you find the defendant, Scott Anthony Williams?

Guilty_____          Not Guilty____✓____

8.    As to **Count 4**, Kidnapping with Death Resulting, how do you find the defendant, Taeyan Raymond Williams?

Guilty_____          Not Guilty____✓____

*If your answer to Question 8 is "guilty," then do not answer Question 8a and proceed directly to Question 8. If your answer to Question 8 is "not guilty," then proceed to answer Question 8a.*

a. As to the lesser included offense to Count 4, Kidnapping, how do you find the defendant, Taeyan Raymond Williams?

Guilty_____          Not Guilty____✓____

4

**JA2489**

**Count 5:**
**Possessing, Using, Carrying, and Brandishing a Firearm in Furtherance of or During and in Relation to a Crime of Violence or a Drug Trafficking Crime**

9.    As to **Count 5**, Possessing, Using, Carrying, and Brandishing a Firearm in Furtherance of or During and in Relation to a Crime of Violence or a Drug Trafficking Crime, how do you find the defendant, Scott Anthony Williams?

Guilty_____          Not Guilty ___✓___

*If your answer to Question 9 is "guilty," then do not answer Question 9a and proceed directly to Question 9b. If your answer to Question 9 is "not guilty," then answer Question 9a.*

a.    As to the lesser included offense to Count 5 of Possessing, Using, or Carrying a Firearm in Furtherance of or During and in Relation to a Crime of Violence or a Drug Trafficking Crime, how do you find the defendant, Scott Anthony Williams?

Guilty_____          Not Guilty ___✓___

*If your answer to Question 9a is "guilty," then proceed to answer Question 9b. If your answer to Question 9a is "not guilty," then do not answer Question 9b and proceed directly to Question 10.*

b.    As to Scott Anthony Williams, which of the following offenses do you find was a crime of violence or drug trafficking offense in furtherance of which, or during and relation to which, this offense was committed? (Check all that apply)

_____Count 1:  Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances

_____ Count 3:  Interference with Interstate Commerce by Robbery

_____ Count 4:  Kidnapping with Death Resulting

10.    As to **Count 5**, Possessing, Using, Carrying, and Brandishing a Firearm in Furtherance of or During and in Relation to a Crime of Violence or a Drug Trafficking Crime, how do you find the defendant, Taeyan Raymond Williams?

Guilty_____          Not Guilty ___✓___

*If your answer to Question 10 is "guilty," then do not answer Question 10a and proceed directly to Question 10b. If your answer to Question 10 is "not guilty," then answer Question 10a.*

5

**JA2490**

a. As to the lesser included offense to Count 5 of Possessing, Using, or Carrying a Firearm in Furtherance of or During and in Relation to a Crime of Violence or a Drug Trafficking Crime, how do you find the defendant, Taeyan Raymond Williams?

Guilty_____          Not Guilty____✓____

*If your answer to Question 10a is "guilty," then proceed to answer Question 10b. If your answer to Question 10a is "not guilty," then do not answer Question 10b and proceed directly to Question 11.*

b. As to Taeyan Raymond Williams, which of the following offenses do you find was a crime of violence or drug trafficking offense in furtherance of which, or during and relation to which, this offense was committed? (Check all that apply)

_____Count 1: Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances

_____Count 3: Interference with Interstate Commerce by Robbery

_____Count 4: Kidnapping with Death Resulting

**Count 6: Possession with Intent to Distribute Controlled Substances**

11.    As to **Count 6**, Possession with Intent to Distribute Controlled Substances, how do you find the defendant, Scott Anthony Williams?

Guilty___✓___          Not Guilty_____

*If your answer to Question 11 is "guilty," then proceed to answer Questions 11a and 11b. If your answer to Question 11 is "not guilty," then do not answer Questions 11a and 11b and proceed directly to Question 12.*

a. As to the defendant, Scott Anthony Williams, do you find that the offense involved a mixture or substance containing cocaine, a Schedule II controlled substance?

Yes___✓___          No_____

b. As to the defendant, Scott Anthony Williams, do you find that the offense involved a mixture or substance containing marijuana, a Schedule I controlled substance?

Yes___✓___          No_____

6

**JA2491**

12. As to **Count 6**, Possession with Intent to Distribute Controlled Substances, how do you find the defendant, Taeyan Raymond Williams?

Guilty ✓____    Not Guilty_____

*If your answer to Question 12 is "guilty," then proceed to answer Questions 12a and 12b. If your answer to Question 12 is "not guilty," then do not answer Questions 12a and 12b and proceed directly to Question 13.*

a. As to the defendant, Taeyan Raymond Williams, do you find that the offense involved a mixture or substance containing cocaine, a Schedule II controlled substance?

Yes ✓____    No_____

b. As to the defendant, Taeyan Raymond Williams, do you find that the offense involved a mixture or substance containing marijuana, a Schedule I controlled substance?

Yes ✓____    No_____

**Count 7:  Possession with Intent to Distribute Controlled Substances**

13. As to **Count 7**, Possession with Intent to Distribute Controlled Substances, how do you find the defendant, Scott Anthony Williams?

Guilty ✓____    Not Guilty_____

*If your answer to Question 13 is "guilty," then proceed to answer Question 13a.  If your answer to Question 13 is "not guilty," then do not answer Question 13a and proceed directly to Question 14.*

a. What amount of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, do you find that Scott Anthony Williams possessed with the intent to distribute? (Check only one of the options below)

✓____ 500 grams or more
_____ Between 50 grams and 499 grams
_____ Less than 50 grams

**Count 8:  Possession of a Firearm in Furtherance of a Drug Trafficking Crime**

14. As to **Count 8**, Possession of a Firearm in Furtherance of a Drug Trafficking Crime, how do you find the defendant, Scott Anthony Williams?

Guilty_____    Not Guilty ✓____

7

**JA2492**

*If your answer to Question 14 is "guilty," then proceed to answer Question 14a. If your answer to Question 14 is "not guilty," then do not answer Question 14a and proceed directly to Question 15.*

a.  Which of the following offenses do you find was a drug trafficking offense in furtherance of which the firearm was possessed, used, or carried? (Check all that apply)

_____Count 6:  Possession with Intent to Distribute Controlled Substances
_____Count 7:  Possession with Intent to Distribute Controlled Substances

**Count 9:  Conspiracy to Destroy or Conceal Evidence**

15.  As to Count 9, Conspiracy to Destroy or Conceal Evidence, how do you find the defendant, Scott Anthony Williams?

Guilty _____✓_____          Not Guilty _____

The foregoing constitutes the unanimous verdict of the jury.

_5. 11. 2023_
DATE

FOREPERSON

8

**JA2493**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      SOUTHERN DIVISION

 3  _____
                                    )
 4  UNITED STATES OF AMERICA        )
         v.                         )  Case No. 8:18-cr-00631-TDC-1
 5  SCOTT ANTHONY WILLIAMS,         )
                     Defendant.     )
 6  _____)

 7                                     Greenbelt, Maryland
                                       August 22, 2023
 8                                     9:31 a.m.

 9                      SENTENCING HEARING
             BEFORE THE HONORABLE THEODORE D. CHUANG
10
                     A P P E A R A N C E S
11
    ON BEHALF OF THE GOVERNMENT:
12
        U.S. ATTORNEY'S OFFICE
13      6406 Ivy Lane, Suite 800
        Greenbelt, Maryland  20770
14      BY:  LEAH BLOM GROSSI, ASSISTANT U.S. ATTORNEY
             (301) 344-4235
15           Leah.Grossi@usdoj.gov

16      OFFICE OF THE UNITED STATES ATTORNEY
        36 S. Charles Street, Fourth Floor
17      Baltimore, Maryland  21201
        BY:  MICHAEL CLAYTON HANLON, ASSISTANT U.S. ATTORNEY
18           (410) 209-4800
             michael.hanlon@usdoj.gov
19
        OFFICE OF THE UNITED STATES ATTORNEY
20      6500 Cherrywood Lane, Suite 200
        Greenbelt, Maryland  20770
21      BY:  WILLIAM DAVIS MOOMAU, ASSISTANT U.S. ATTORNEY
             (301) 344-0105
22           william.moomau@usdoj.gov

23                      (Continued)

24

25
```

**JA2494**

```
 1                A P P E A R A N C E S  (Cont'd)

 2   ON BEHALF OF THE DEFENDANT:

 3        THE HAWKS FIRM
          8705 Colesville Road, Suite 162
 4        Silver Spring, Maryland  20910
          (301) 430-5577
 5        BY:  KWASI L. HAWKS, ESQUIRE
               (310) 430-5577
 6             HawksFirmMD@gmail.com

 7        LAW OFFICE OF DWIGHT CRAWLEY
          1300 I. Street, N.W., Suite 400e
 8        Washington, DC  20005
          (202) 580-9794
 9        BY:  DWIGHT E. CRAWLEY, ESQUIRE
               (202) 580-9794
10             vadclawyer@gmail.com

11   ALSO PRESENT:

12        CASE AGENT SERGEANT KYLE SIMMS - MARYLAND STATE POLICE

13

14

15

16

17

18

19

20

21

22

23                 PATRICIA KLEPP, RMR
                  Official Court Reporter
24             6500 Cherrywood Lane, Suite 200
                Greenbelt, Maryland  20770
25
```

**JA2495**

```
 1                    P R O C E E D I N G S
 2       (Call to order of the Court.)
 3            THE COURTROOM DEPUTY:  All rise.  The United States
 4  District Court for the District of Maryland is now in session,
 5  the Honorable Theodore D. Chuang presiding.
 6            THE COURT:  Thank you, everyone.  Please be seated.
 7            THE COURTROOM DEPUTY:  The matter now pending before
 8  this Court is Criminal Action No. TDC-18-0631, United States of
 9  America v. Scott Anthony Williams.  We are here today for the
10  purpose of a sentencing hearing.  Counsel, please identify
11  yourselves for the record.
12            MS. GROSSI:  Good morning, Your Honor.  Leah Grossi,
13  Assistant U.S. Attorney on behalf of the United States.  Here
14  with me at counsel's table is Michael Hanlon and William Moomau,
15  also on behalf of the United States.
16            THE COURT:  Good morning.
17            MR. HAWKS:  Good morning, Your Honor.  Kwasi Hawks and
18  Mr. Dwight Crawley on behalf of Mr. Scott Williams, who is
19  seated between us.
20            THE COURT:  Good morning.  Hold on one second.
21            Okay.  So we are here for a sentencing in
22  United States v. Scott Williams.  On May 11, 2023, Mr. Williams
23  was found guilty after trial on Count One, conspiracy to
24  distribute and possess with intent to distribute controlled
25  substances, in violation of 21 United States Code, Section 846;
```

```
1   in Count Six of possession with intent to distribute controlled

2   substances, cocaine and marijuana, in violation of 21 U.S.C.,

3   Section 841(a)(1) and (b)(1)(c); also Count Seven, possession

4   with intent to distribute 500 grams or more of methamphetamine,

5   in violation of 21 U.S.C., Section 841(a)(1) and (b)(1)(a), and

6   then, Count Nine, conspiracy to destroy and conceal evidence, in

7   violation of 18 U.S.C., Section 1512(c)(1) and (k).

8           I have received and reviewed the following documents

9   in connection with today's proceedings:  First, the revised

10  presentence report, which is ECF 248; the government's

11  sentencing memorandum and attachments, which is ECF 253; the

12  victim impact statements and letters submitted by the

13  government, which is ECF 251; the defendant's sentencing

14  memorandum, which is with ECF 255; the defendant's motion to

15  exclude victim testimony, ECF 260; the defendant's letters,

16  which is ECF 261; the government's response to the defendant's

17  sentencing memorandum, which is ECF 263; the government's

18  opposition to the motion to exclude victim testimony, which is

19  ECF 264; the motion for an order of forfeiture, which is ECF

20  252; there is also a recent filing, ECF 260, seeking -- well,

21  no, I'm sorry, that's not it -- the more recent filing regarding

22  a motion for leave to make an untimely notice, ECF 266; as well

23  as some additional -- which included additional letters and a

24  request for additional testimony.

25          Is there anything else I should have received?
```

```
 1              MS. GROSSI:  Not from the government, Your Honor.
 2              MR. HAWKS:  No, Your Honor.
 3              THE COURT:  Okay.  Well, why don't we start with some
 4    of these more preliminary motions.  First off, we have the
 5    motion to exclude victim testimony.  Does anyone want to say
 6    anything further on that issue?
 7              MR. MOOMAU:  For the government, Your Honor, I think
 8    we said it all in the response that we filed in opposition.  No,
 9    unless the Court has specific questions, which we would attempt
10    to answer.  Thank you.
11              THE COURT:  Of course.
12              Mr. Hawks.
13              MR. HAWKS:  And the same, Your Honor.  Thank you.
14              THE COURT:  Okay.  So I understand the argument in the
15    motion basically is whether the family of Noah Smothers
16    qualifies as a victim, or Mr. Smothers qualifies as a victim
17    within the meaning of various federal statutes.  The government
18    has noted that regardless of whether they meet that definition,
19    there is certainly no limitation on hearing statements by
20    individuals with some relevance to the case regardless of that.
21              So the Court's not going to make a finding on whether
22    Noah Smothers specifically qualifies as victim within the
23    meaning of the various federal statutes.  I will in my
24    discretion permit the various proposed victim family members to
25    speak, as is customary.  Usually, anyone with an interest in the
```

1  case at least has -- certainly has the ability to make

2  statements at sentencing if either side is going to present

3  them.

4       So I will deny the motion, and I do find, in addition

5  to just that general discretion, that as has been noted in the

6  papers, both parties agree under the prevailing law, acquitted

7  conduct is not categorically excluded from consideration at

8  sentencing for various enhancements under 18 U.S.C. 3553(a), and

9  there are at least some arguments that the death of Mr. Smothers

10 is relevant conduct to some of the offenses of conviction.

11      So I do find some relevance of the testimony

12 regardless of whether there is a technical match with the victim

13 statutes.  So I will consider statements both in writing and in

14 person.  I will, of course, consider them only to the extent

15 that the Court makes findings that the death of Mr. Smothers is

16 connected in some ways to the convictions.  So that motion,

17 which I believe is ECF No. 260, will be denied.

18      There is also this motion for a late filing, and just

19 to understand, I mean, Mr. Hawks, I appreciate you acknowledging

20 that the order specifically gives deadlines.  There are letters

21 that came in, there is also a witness.  Maybe you can just give

22 me more clarity on why those were not available prior to the

23 deadline.

24      MR. HAWKS:  Your Honor, the letters were associated

25 with individuals who, while I greatly appreciate their candor in

1  the letters, they also have significant disagreements with

2  Mr. Williams.  Essentially, there is a lot of commonality

3  between the two Defendants.  However, there is not perfect

4  commonality between the two Defendants, and to the extent that

5  the authors of that those letters favored one of the parties, it

6  was not this Mr. Williams.  And so I didn't anticipate that they

7  would have positive things to say.  I'm very gratified to them

8  that I was wrong, but that's why, you know, they weren't

9  produced in time.

10         THE COURT:  Okay.  And then the witness you want to

11  bring with forward I think is Ms. Chaplin, who testified at the

12  trial.

13         MR. HAWKS:  Yes, Your Honor.

14         THE COURT:  And she's probably in a different

15  relationship category, so is she someone who could have been

16  identified earlier than the most recent filing?

17         MR. HAWKS:  That's certainly true, Your Honor.

18  Your Honor, she's not here, and we've had very uncertain

19  communications with her.  At this point, I'm not certain that

20  she will be available to testify, but that ruptured

21  communication is why it was a late filing, and ...

22         THE COURT:  So you're saying that the relationship is

23  a little bit -- well, maybe not a little bit, but there are some

24  difficulties in communication because of --

25         MR. HAWKS:  Yes, Your Honor.  And so earlier -- after

1    the trial, there was a belief that she would not participate --

2    very, very recently, on -- last Friday, there was an indication

3    that she would, and in an abundance of caution, I sought

4    permission of the Court.

5              THE COURT:  Okay.  Any issues on this from the

6    government, in terms of the late notice?

7              MS. GROSSI:  No, Your Honor.  We have the filing, and

8    we have read it.

9              THE COURT:  Okay.  Well, I often say, you know, just

10   to have things work smoothly, and frankly, in fairness to both

11   sides as well as the Court, I do ask that the parties meet these

12   deadlines if at all possible.  I do understand there are some

13   difficulties in communication, and there's also some individuals

14   who have -- are relevant to the case but for whom, perhaps, the

15   relationship between Mr. Williams and they are not ideal, so

16   based on Mr. Hawks' representations, I will allow the letters,

17   which I have reviewed.  And if Ms. Chaplin wants to make a

18   statement, we'll allow that as well; we'll see how that goes.

19             One other somewhat preliminary matter, but just so I

20   can get some clarity on this, the government's motion for a

21   preliminary order of forfeiture I don't believe was opposed.  In

22   a plea agreement case, it's usually clear if it's agreed to.  I

23   don't know what the defense's position is on that.  It seems as

24   if the items are, I think, firearms and so forth, so I don't

25   know if there's any opposition to that; is there?

```
1              MR. HAWKS:  There is no opposition, Your Honor.
2              THE COURT:  Okay.
3         Okay, so I guess the next step is the guidelines
4   calculation.  I have read and reviewed the presentence report.
5   Mr. Hawks and Mr. Crawley, have you had the opportunity to
6   review that with your client, and do you have any remaining
7   objections to it that are not already identified in the
8   presentence report?
9              MR. HAWKS:  No, Your Honor.
10             THE COURT:  And as I understand it, the primary issues
11  to decide on the guidelines are, first, whether there's an
12  enhancement based on first or second degree murder.  Then, to
13  the extent -- well, depending on that ruling, or maybe not
14  depending on that ruling, there's also potentially disagreements
15  on -- well, I don't believe there's a disagreement on the drug
16  quantity, if that comes up, nor is there a disagreement on
17  maintaining a premises for distributing controlled substances,
18  nor on obstruction of justice.
19             I think there is a disagreement on the enhancement for
20  using violence or directing the use of violence, is that right,
21  or is there some other --
22             MR. HAWKS:  Yes, Your Honor.  The disagreements we
23  have are on the maintenance as a drug trafficking -- maintenance
24  of the premises as a drug trafficking, the use of violence, so
25  that the only thing we are not disputing is the obstruction of
```

**JA2502**

1  justice.  In fact, we have a disagreement on the firearms.

2        So the only thing -- our contention is that it's a 32,

3  the drug quantity, which we agree with the category, and then

4  the two levels for the obstruction.

5        THE COURT:  Okay.  I thought I did not -- so there's

6  no disagreement if we're getting to the drug quantity on the

7  amount, correct?

8        MR. HAWKS:  Correct, Your Honor.

9        THE COURT:  And then, I thought there was no

10  disagreement on the maintaining premises, but I guess I'm

11  mistaken on that; there is a dispute?

12        MR. HAWKS:  Yes, Your Honor.

13        THE COURT:  Okay.  And then I knew there was a

14  disagreement on violence as well as the firearm, correct?

15        MR. HAWKS:  Yes, Your Honor.

16        THE COURT:  Okay.

17        Okay.  So now, on the death resulting -- rather, the

18  enhancements for first and second degree murder, possible

19  enhancements for that, I've read the briefs.  Does anybody have

20  anything else they want to add on that?  I might have a few

21  questions I might want to ask, but does anybody have anything

22  affirmatively to offer on those issues?

23        MS. GROSSI:  Your Honor, the government has put their

24  arguments in the sentencing memo, but I am ready for any

25  questions you might have.

**JA2503**

1           THE COURT:  Okay.  Why don't we start with the
2    government, since they're the ones who effectively are asking
3    for this enhancement.  Just so I understand, the government's
4    position is that the enhancement for first degree murder should
5    apply, not second.  Probation has proposed second.  And maybe
6    you can clarify for me, is there -- what is the theory you're
7    pursuing; is it that there is evidence of premeditation, and
8    what is that, is it felony murder only, and if so, what is that?
9    As I read it, you are arguing the kidnapping and the robbery
10   were the predicates for a felony murder theory, but which or
11   both of those theories are you pursuing?
12           MS. GROSSI:  Your Honor, we're pursuing both, that
13   there was premeditation and that there also was a felony murder.
14   The premeditation evidence was presented at trial and produced
15   through exhibits at trial.  There was testimony that it wasn't
16   just, you know, a moment of passion that he decided to stab
17   Mr. Smothers to death.  Mr. Musa testified that
18   Mr. Scott Williams decided that he didn't want to shoot the
19   victim, that would be too loud; he wanted to stab him and
20   prevent him from coming after him.
21           There was also exhibits that corroborated a lot of
22   what Mr. Musa testified to with regard to the location of the
23   defendant and the victim being near the Red Roof Inn and then
24   being back at Bristolwood.  There's also all of the
25   corroborating evidence that was shown through the surveillance

 1  footage, showing Mr. Scott Williams' vehicle being in the

 2  Baltimore parking lot, dropping off the rental car of

 3  Mr. Smothers, which contained a large amount of blood, similar

 4  to what Mr. Musa said was a stabbing of the body.

 5      THE COURT:  Can I just go back to the key point on --

 6  my first question is just premeditation.  So you said there was

 7  testimony.  Other than Mr. Musa's testimony, is there any

 8  testimony that supports a theory of premeditation?

 9      MS. GROSSI:  There was testimony from Mr. Cox,

10  Your Honor, that Mr. Smothers was going up to Baltimore to

11  settle this debt, and so the defendant -- both Mr. Taeyan

12  Williams and Mr. Scott Williams were planning to meet with

13  Noah Smothers to settle that debt.  And that was Mr. Cox's

14  testimony as well as Mr. Rayburn's testimony; he knew that there

15  was going to be this meeting in Baltimore between the defendants

16  and Mr. Smothers.

17      THE COURT:  Okay.  And then, besides Mr. Musa -- well,

18  Mr. Musa's testimony, if I recall correctly, though, even if one

19  were to accept that entirely, was that there was a plan to rob.

20  I don't recall him saying there was a plan to kill at the

21  outset, that at some point, there was a decision made.  Am I

22  correct about that, that it wasn't -- that that's how he framed

23  it?

24      MS. GROSSI:  I believe so, yes, Your Honor.  Mr. Musa

25  said that they had planned to -- they had a pretext to meet

1   Mr. Smothers, that they were going to say it was a drug deal,

2   but really, they were going to rob him of the marijuana.  And

3   then, when they robbed him, they were asking him questions, they

4   wanted information about the storage unit, they tortured him for

5   that information, they robbed him both physically of his phone

6   and other items and then also went to the storage unit, where

7   they also took all of those items from Mr. Smothers' storage

8   unit.

9        However, I do think that the premeditation doesn't

10  have to be a long period of premeditation, Your Honor; I believe

11  it doesn't have to be that they planned this for weeks.  There

12  was a conscious decision at one point that Mr. Scott Williams

13  made to kill Mr. Smothers, and -- sorry, there was a decision by

14  Mr. Scott Williams to make the decision to kill Mr. Smothers, it

15  wasn't a back and forth, and that was communicated to Mr. Musa,

16  who then testified about it in court.

17       THE COURT:  Well, but -- I mean, I don't think anybody

18  briefed this extensively, I'm not sure the guidelines cover it

19  greatly, but again, I understand premeditation, I understand the

20  felony murder theory, which is the robbery, I guess, or the

21  kidnapping, second degree, which I assume is your fallback

22  argument.  What is the distinction between the state of mind for

23  that versus, as you said, voluntary -- you know, sort of a crime

24  of passion, which is sometimes referred to as voluntary

25  manslaughter, which does not qualify for this enhancement?

1          So what's the difference between sort of a spur of the

2   moment because of an argument or so forth versus something else

3   that qualifies as second degree but not first degree?

4          MS. GROSSI:  Your Honor, under Sands in the model jury

5   instructions, it says that premeditation, the government must

6   prove that the defendant killed only after thinking the matter

7   over, deliberating whether to act before committing the crime,

8   and that's what we're saying here, Your Honor, is that he

9   consciously made the decision to kill Mr. Smothers.

10         It wasn't a fight or something where he --

11  Mr. Smothers acted first; Mr. Williams decided that he wanted to

12  end Mr. Smothers' life, and he also thought about the manner in

13  which he did it.  He didn't just, you know, do it without

14  thinking about it; he deliberated and thought, okay, I'm going

15  to use a knife instead of a firearm.

16         THE COURT:  But the evidence of that is Mr. Musa,

17  right?  There's no one else who said that or even other physical

18  evidence that shows this deliberation you're referring to,

19  whether it's enough for first or second degree?

20         MS. GROSSI:  Well, Your Honor, I believe there is

21  evidence, corroborating evidence in the amount of blood that was

22  in the rental car as well as the DNA that was found in the

23  firearm that was at Mr. Williams' residence.  So the DNA of

24  Mr. Smothers that was within the barrel of the firearm was

25  consistent with sticking it down his throat or in his mouth and

1  torturing him for information.

2          There wasn't -- oh, I think Mr. Musa testified that

3  Mr. Scott Williams attempted to clean the firearm on the

4  outside, but I think there is corroborating evidence in that

5  regard with regard to the amount of blood that was in the Kia

6  and then also with the DNA that was in the firearm.

7          THE COURT:  Let me ask you a different question, then.

8  Mr. Musa's testimony -- I mean, you may or may not want answer

9  this as a matter of trial strategy, but I am curious, and it is

10  helpful to me to understand.  It was pretty unusual in this case

11  that in the opening statement, I don't think there was any

12  reference to Mr. Musa by the government.  In the closing

13  argument, there were few references.  There was no real attempt

14  to try to argue his overall credibility.  There were some

15  arguments that there was some evidence consistent with his

16  testimony.

17          I mean, in my experience, that's a very limited sort

18  of -- efforts to use that testimony and focus the jury on that

19  testimony, and I don't know what the reason was for that.  Maybe

20  you can enlighten me, because right now, you're relying heavily

21  on his testimony for this enhancement, and you didn't -- you

22  almost ran away from it in trial, so maybe you can just explain

23  for me why -- how do I reconcile those two things?

24          MS. GROSSI:  Your Honor, I think we did acknowledge

25  that he had been convicted of crimes of dishonesty, and so we

1    were trying to beef up his testimony and corroborate it as much

2    as we could.  And so that's what we did.  When we first met with

3    him, we heard him out.  We weren't sure what we were going to

4    get when we proffered with him, but then we looked at the

5    evidence, and all of it was consistent with what he said.  So we

6    focused very strongly on the hard evidence that we had, and the

7    business records, and in the physical evidence at trial to show

8    that all of this combined with -- even without Mr. Musa's

9    testimony was consistent with the charges that we brought

10   against the defendant.

11          THE COURT:  Okay.  Let me ask you a different

12   question.  I think I'm right about this, but I want to make sure

13   I'm not missing something.  The enhancement you're seeking for

14   the -- let me make sure I have this right.

15          There is a potential enhancement just to basically use

16   2A1.1. or 2A1.2, which -- that enhancement is covered in 2D1.1

17   as a possibility if the facts show first degree murder or second

18   degree murder.  I am aware from 2D1.1 that there are

19   enhancements -- other enhance- -- well, there's at least one

20   other type of enhancement for a death resulting from a drug

21   trafficking conspiracy where the death resulted from the use of

22   the substance.

23          And that usually comes up in these cases where someone

24   overdoses on the drugs at issue, and that leads to a very

25   significant enhancement, frankly, comparable to the ones that

1    we're referring to now.  I don't think there's any argument, am

2    I correct, that that applies, because there's no claim that the

3    victim died as a result of taking the substance, correct?

4          MS. GROSSI:  That's correct, Your Honor.

5          THE COURT:  Are you aware of any other form of

6    enhancement for a death resulting -- other than the three we're

7    talking about, the first degree murder, second degree murder, a

8    death resulting from the use of the substance?

9       (Conference among Ms. Grossi, Mr. Hanlon, and Mr. Moomau.)

10          MS. GROSSI:  Sorry, Your Honor; I was just consulting

11    with my co-counsel.

12          THE COURT:  Sure, mm-hmm.

13          MS. GROSSI:  We're not aware of any other.  We thought

14    maybe manslaughter, but I don't know if that actually is

15    applicable, because this didn't happen on government land.  So

16    under the 2D1.1 cross-reference, I believe that that is the only

17    one, as well as the taking of the substance, Your Honor.

18          THE COURT:  Okay, thank you.

19          Okay.  Mr. Hawks, anything you want to add?

20          MR. HAWKS:  Yes, Your Honor, briefly.  Just to ensure

21    that the record is clear, government counsel has indicated that

22    the statements of Mr. Musa were corroborated.  That's not true.

23          THE COURT:  Well, I think she was referring to the --

24    the firearm with the DNA corroborates some parts of his

25    testimony, as well as the testimony about, you know, the blood

1  in the back of the vehicles, so I think that's what she was

2  referring to, but you're referring to somebody else?

3          MR. HAWKS:  Yes, Your Honor.  I guess, I would go

4  further; I think she also was referring to, for example,

5  geolocation data, which also indicated that you can -- you can

6  draw a circle about a quarter to a half mile wide and put both

7  gentlemen within that circle within a 20- or a 30-minute period,

8  and that's not corroboration.  I mean, that's -- that provides

9  an opportunity -- essentially, it doesn't exclude the

10  possibility that his statement could be true, but it certainly

11  doesn't corroborate it or confirm that it is true.

12          She talked about business records just now.  I think

13  she's referring to the records -- we had the guard captain from

14  CDF come down and essentially confirm, and at least half of the

15  records are after, at least a year after the time that Mr. Musa

16  made his proffer, but they confirm that Mr. Williams and

17  Mr. Musa were in the same place at CDF jail.  So they really

18  proved nothing, because long after he had talked to them, then

19  they can put these two together.

20          In fact, the place where Mr. Williams and Mr. Musa met

21  was in the law library, where Mr. Musa pored over the case

22  records of Mr. Williams at Mr. Williams' behest, and it was

23  there that he saw the physical evidence that had they're arguing

24  now has been corroborated and had ample opportunity to provide

25  essentially a fill-in-the-gap.

1          And so it's sort of like if I were to say, last

2   weekend, I went to the moon, and I can tell you, it's gray, it's

3   roughly a quarter million miles away, and there's no air there,

4   and then later, someone says, he must have gone, because

5   everything he says is corroborated by astronomical data.  It's

6   not; I had the opportunity to look up those facts and then feed

7   them to someone who was looking for an answer.

8          THE COURT:  I'm not sure Mr. Musa testified to all

9   that.  I think that's been your argument, but I don't know if he

10  laid out in specific detail how much paper he reviewed and what

11  he didn't review, correct?

12         MR. HAWKS:  Your Honor, he agreed that he met with

13  Mr. Williams, that he had an opportunity to review discovery,

14  and that --

15         MS. GROSSI:  No.

16         MR. HAWKS:  -- that he was -- that Mr. Williams was

17  seeking advice from him legally.

18         THE COURT:  Okay.  Well, I guess the record will

19  control that.  Anything else you want to offer?

20         MR. HAWKS:  Your Honor, there's nothing that the

21  government presented in the trial or today which -- you asked a

22  number of questions about premeditation.  Not only can they not

23  establish premeditation; all of the corroboration that they're

24  looking at does a very good job of establishing that

25  Mr. Williams, after the death or disappearance of Mr. Smothers,

1  was involved.

2        He allowed drugs to be stored in his home, he allowed

3  his car to be used.  None of those things, not only don't they

4  establish premeditation, none of those things establish prior

5  knowledge or participation in the event, whatever it was, that

6  led to the injury or death of Mr. Smothers.

7        And so -- for example, the blood in the car.  This is

8  a car that's been seized by a Baltimore policeman, who visually

9  inspected it and turned it over to Enterprise Rental Car, who

10 then rented it to a pregnant woman.  And I highlight that she's

11 pregnant, that she probably is a little bit more aware of,

12 for example, blood than a normal person would be.  She's

13 probably even thinking, I don't want to get in a car that maybe

14 had a murder committed in it.

15       If it was apparent to someone that that's what had

16 happened in that car, it would have been apparent to a policeman

17 who inspected it, to a cleaning team at Enterprise Rental Car

18 who cleaned it, and then to a renter.  It -- you know, this idea

19 that there was blood all over the car is not reflective of the

20 evidence.  In fact, the best evidence of that was this photo

21 that they admitted was enhanced, after they poured luminol, a

22 specific chemical, and it showed a large pattern of blood.

23       And that, you know might seem shocking, but if I were

24 to take a can of soda and pour it on this table, it would cover

25 the table, and that's a can of soda.  The idea that chemically

1    enhanced blood in the back of the car is visible can clearly
2    establish that there's been a murder does not follow.
3            And so Your Honor, the government, sort of like an old
4    detective show, has provided means, they found a gun;
5    opportunity, we can draw this circle and we can have this period
6    of time where we can put these two gentlemen roughly in the same
7    geographical area; and motive, robbing drug dealers is
8    lucrative.  So means, opportunity, motive.  We're done.  But
9    that's the beginning of the inquiry, not the end, Your Honor.
10           THE COURT:  Well, would you agree that under the
11   felony murder theory, though, one does not need to show
12   premeditation, one just needs to show he was involved in a
13   robbery, or a kidnapping, and that someone died as a result of
14   all that, and that would be enough, correct?
15           MR. HAWKS:  I absolutely agree with that, Your Honor;
16   that's why I stress, not only do they not show premeditation,
17   they don't show prior participation.  There is nothing in this
18   case that would establish that this scenario not only is false
19   but is preponderantly not false.  Taeyan Williams walks in on
20   the night of the 7th or the 6th of April, and he says, An uncle
21   of mine and I were engaged in a drug deal with that guy from
22   California, and something went very wrong, and he's hurt, and we
23   need your help.  And he uses a car, he uses --
24           THE COURT:  There is no evidence of any of that, is
25   there?  I mean, I don't remember Taeyan Williams saying anything

1    like that.

2          MR. HAWKS:  No, Your Honor, that's -- I'm just saying,

3    the burden of proof in this case rests with the government, and

4    there's nothing that they can say that can tell us that didn't

5    happen.  That's as consistent with all the evidence that they

6    talk about as any other scenario, and I would submit that, you

7    know, outside of Alfred Musa, who is comically unreliable,

8    no one said anything about what happened at any point; all we

9    have is coincidences of location between a various number of

10   people.

11         And so yes, Your Honor, I don't have any evidence that

12   Taeyan said that, but they don't have any evidence that Taeyan

13   didn't say that, or never said that at all, that he knew where

14   the keys were and took them and a friend and drove and dropped

15   off the car.  And so Your Honor, for all those reasons, this

16   idea that they have established, on the basis of Alfred Musa,

17   preponderant proof that he has any involvement in any injury or

18   death of Mr. Smothers is false.

19         And Your Honor, one last point; they said -- this is

20   also corroborated by Connor Cox.  Connor Cox never said anything

21   about Scott Williams; he said, Taeyan Williams and some

22   Jamaicans, he's going to meet Taeyan Williams and some

23   Jamaicans.  Later, he said he's going to meet some Jamaicans.

24   We know that Connor Cox, in Exhibit 340A, had a meeting with

25   Taeyan Williams and another uncle, a maternal uncle, who is

1  Jamaican.  The idea that Connor Cox ever implicated Scott

2  Williams, again, Your Honor, is false.

3      THE COURT:  Okay.  Well, Mr. --

4      MR. HAWKS:  May I briefly --

5      THE COURT:  Sure.  I'm going to ask Ms. Grossi a

6  question; she has a comment anyways.

7      (Conference among Mr. Hawks, Mr. Crawley, and defendant.)

8      THE COURT:  I'll just make sure that he can hear what

9  we're saying, so just give us a moment.

10     (Pause.)

11     MR. HAWKS:  Your Honor, and just to the extent that a

12  neutral arbiter has reviewed this, the jury clearly understood

13  the value of Mr. Musa's testimony, and they clearly rejected him

14  outright; every single charge that relied on him was not only

15  rejected but rejected summarily.  And so Your Honor, we would

16  just argue that it's not that they just missed; it's -- they're

17  not even in preponderant standard.

18     THE COURT:  Okay.  Ms. Grossi, one thing that

19  Mr. Hawks' argument reminded me I should ask you about, just to

20  get your interpretation of the evidence on this, is that since I

21  do believe that the enhancement relies heavily on Mr. Musa in

22  terms of the premeditation, in terms of the fact that it was a

23  robbery or kidnapping as opposed to some other interaction, one

24  thing that I read the record to be inconsistent on is that

25  Mr. Musa -- and I don't -- I'm not going to assume that he has

1    to have every fact correct.

2            I mean, under your theory, he's getting this from

3    Scott Williams, who's telling him whatever he's willing to tell

4    him and so forth, there's memory issues, but even so, his

5    argument was that Taeyan Williams and Scott Williams had this

6    plan to rob, they did the robbery.  When they got the

7    information they needed, then they go off to the storage

8    facility, leave Mr. Smothers in his car with this third person

9    who is unnamed, and get the drugs and so forth.

10           Now, two things that we heard, two pieces of evidence

11   or lack of evidence that I would like to get your take on.  One

12   is that it seemed undisputed from the forensic data and the

13   testimony that Mr. Taeyan Williams, that evening, at 7:00, he's

14   off to Tysons Corner, then he's going to University of Maryland.

15   How do you square that with your theory of how this all

16   happened?

17           And then relatedly, even though -- I mean, your theory

18   relies on a third person.  We didn't hear anything about a third

19   person, other than I think Mr. Carty was not present in the

20   state, so it wasn't him, according to your evidence.  But what

21   can I infer from this third person piece of who that could be or

22   how that's -- how Mr. Musa can be believed when we don't even

23   have any idea who this third person could be?

24           So those are the two things that I was wondering.

25           MS. GROSSI:  Yes, Your Honor.  This third person I

believe Mr. Musa had testified at trial or has told the
government was not detained at the time that he was speaking to
Mr. Williams, so Mr. Williams told Mr. Musa that that third
person was out and hadn't been found.  We tried every avenue to
try to obtain the identity of that person.

They have brought up this other maternal uncle in
their papers, here, but never brought it up at trial.  We also
got the cell site records for that person.  That person was also
not in Maryland.  And so we honestly, Your Honor, do not know
exactly who that third person is.

However, with regard to the location of Mr. Taeyan
Williams, there is cell site location showing that he was near
the storage facility at the time -- at Mr. Noah Smothers'
storage facility at the time he entered the address of that
storage facility.  He then went to Tysons Corner, that's
correct, and then back to College Park, and then back to I
believe Bristolwood, but the time period for which that car was
dropped off in Baltimore, there is no cell site information for
either Mr. Taeyan Williams or Mr. Scott Williams, presumably
because their phones were turned off at that point.

We do have the testimony of Ms. Chaplin saying that
she had called -- or that she -- if she had called
Mr. Scott Williams at 2:00 a.m. in the morning, it would have
been that he would not have been home, and so we believe that
Mr. Scott Williams and Mr. Taeyan Williams drove the victims and

1  Mr. Scott Williams' rental car to that Baltimore parking lot,

2  dropped off the vehicle, and went home.

3           They both show cell site the next day, at I think like

4  12:00, much later in the day than -- anyone normally would have

5  turned on their phone earlier, but the phone wasn't on at that

6  point.  I just also want to bring up, Your Honor, the fact that

7  it wasn't just Mr. Musa, as I mentioned, it was -- all of the

8  fruits of the robbery were at Mr. Williams' residence, including

9  that manifest that was found under his mattress, as well as all

10 of the marijuana from Mr. Smothers.

11          There were jail calls talking about the fact that

12 there was a private investigators onto them, he should have

13 destroyed all the evidence, and they didn't when they should

14 have.

15          There's all these computer -- there's computer records

16 showing that Mr. Scott Williams searched for the EZ Storage

17 facility that night, and then, there is also --

18          THE COURT:  What time were those again, remind me, the

19 searches?

20          MS. GROSSI:  I just have to look, Your Honor.

21          THE COURT:  Right.

22          MS. GROSSI:  So at 7:55 p.m., Your Honor,

23 Mr. Williams' phone was near Bristolwood Court, and at

24 7:59 p.m., a Google search for EZ Storage, Jessup was performed

25 on a computer that was later seized at that residence.  About a

```
 1  half hour later, at 8:37 p.m., EZ Storage surveillance footage
 2  shows Mr. Williams' Nissan at the location and someone entering
 3  Mr. Smothers' password to get into the facility.
 4          THE COURT:  Okay.  But it's not part of your theory
 5  that Mr. Taeyan Williams was actually going into the facility,
 6  because we didn't see the car go there on the videos until after
 7  he was at Tysons Corner, correct?
 8          MS. GROSSI:  Correct, Your Honor.
 9          THE COURT:  And am I correct that Mr. Musa's testimony
10  did not place Mr. Taeyan Williams -- I mean, you said there was
11  no evidence that he wasn't in the car going to Baltimore, but
12  that's not the story that Mr. Musa told; it was that it was
13  Mr. Smothers -- Mr. Scott Williams and someone else, the uncle.
14          MS. GROSSI:  Correct, Your Honor.
15          THE COURT:  Okay.
16          MS. GROSSI:  Yes, that was his testimony.
17          THE COURT:  But are you trying to argue that
18  Taeyan Williams was in this vehicle, contrary to Mr. Musa's
19  testimony?
20          MS. GROSSI:  I believe Mr. Musa's testimony was about
21  the murder and not necessarily about bringing the car up to
22  Baltimore.  So I think Mr. Musa testified that Mr. Taeyan
23  Williams was at Bristolwood while Mr. Scott Williams and this
24  third party went back and unfortunately, like, dismembered
25  Mr. Smothers and killed Mr. Smothers, but I don't believe there
```

1  was testimony about who actually drove up to Baltimore.

2       Your Honor, I do want to note that I didn't read the

3  whole section of the Sands for the premeditation.  It does say

4  that there's no requirement for a particular period of time to

5  show the premeditation; it's just that the person becomes fully

6  aware of what he intended to do and to think it over before he

7  acted.

8       THE COURT:  Am I correct, though, that the standard

9  you're asking me to make a finding by -- and admittedly, it's

10  under preponderance, but the elements I need to find are more

11  stringent than the jury was asked to find on the char- -- the

12  only charge involving the death was kidnapping with death

13  resulting.

14       And so it was really almost sort of a felony murder

15  type thing, that there was a kidnapping and there was a

16  causation element.  There's nothing about state of mind,

17  premeditation, pre-deliberation.  So not only are you asking me

18  basically to say that just because of the lower standard of

19  proof, the jury's -- basically, to reach the conclusion you

20  wanted the jury to reach, without having the jury reach it,

21  based on the lower standard, but you're also asking me to make a

22  finding of, frankly, a more difficult element to prove than was

23  presented to the jury, correct?

24       MS. GROSSI:  Your Honor, we're advocating that we

25  believe there was premeditation, but there also was a felony

1  murder, Your Honor.

2       THE COURT:  But you didn't even charge anything about

3  premeditation in front of the jury, you didn't even ask them to

4  consider that fact; you asked them only to show causation from

5  this other offense, and they didn't find that.

6       So again, you're asking me not only to, based on a

7  lower standard of proof, reach a conclusion contrary to the

8  jury -- which I understand is legally permissible -- but you're

9  also asking me to make a finding as to an element that you

10  didn't even present to the jury, which is a much higher

11  standard -- much harder element to prove, that they weren't even

12  asked to opine on, because it was -- I mean, I think we can

13  infer they wouldn't have found that, because they didn't find

14  the other conviction, but even so, you're asking me to go even

15  beyond what you presented to the jury, correct?

16       MS. GROSSI:  Yes, Your Honor.  There is the

17  alternative, the felony murder, which is different, but yes.

18       THE COURT:  Okay.

19       Okay.  Well -- so on this issue -- thank you for the

20  argument, and obviously, the written papers as well were very

21  helpful.  I'll state at the outset -- and I think I've said this

22  in other sentencings -- I'm generally troubled by the notion

23  that a defendant acquitted of a crime may then be sentenced in a

24  manner that effectively gives him the exact same sentence that

25  he would have received had he been convicted.

1    I recognize the law requires me to consider whether

2  certain acquitted conduct has been proven by a preponderance of

3  the evidence -- which is lower standard -- and then apply

4  enhancements accordingly, and I certainly understand the logic

5  behind that.  So that is what I'll do, I'll apply that standard.

6    In doing so, based on the law, I cannot and will not

7  dismiss the conduct that the government is advocating I consider

8  here just because the jury acquitted on that conduct, because of

9  this different burden of proof, and also because there are

10  specific elements that have to be proven for a conviction that

11  may not be the same elements that we're looking at here.

12    For example, the charges on which there were

13  acquittals generally require not just a death of a victim but

14  also a robbery, or an extortion, or a kidnapping have been

15  proven as well.  So in the one sense, there are elements that

16  had to be proven there that I don't necessarily need to find to

17  make this enhancement.  On the other hand, the government is

18  also asking me to make findings on elements weren't presented to

19  the jury that are harder to prove, as I just stated, such as

20  things like premeditation.

21    So it is to some degree an independent review -- or it

22  is an independent review, but I -- in situations like this --

23  because as I said, I think there's a real issue -- in some cases

24  there may be scenarios where, you know, we're taking about a

25  slight enhancement because of a certain amount of drugs that was

1  not presented at trial but that we're now trying add on to it to

2  go up a level, or maybe in the presence of a firearm, but when

3  you're talking about trying to say that someone who was not

4  convicted of a crime involving killing somebody is going to be

5  sentenced in the same way because of this lower standard,

6  I think we have to be very careful about how we do that.

7        Again, so I will look at that new standard that I need

8  to apply here, but I also consider the jury's verdict to the

9  extent -- not that I am going to choose to apply their standard,

10 the standard presented to them, the burden of proof, but the

11 jury's verdict is instructive, and it causes me to consider

12 arguments and ways of looking at the evidence that need to be

13 considered that may have been the way that they looked at them

14 but I may not -- I have not otherwise focused on.

15        So that verdict is relevant, but as we said, it's not

16 dispositive.  But it does require me to consider very seriously

17 counterarguments that may have convinced the jury in looking at

18 this evidence and to make the determination, again, on a

19 preponderance of the stand- -- evidence basis but within mind of

20 all the various arguments that can be made, some of which were

21 apparently convincing at least in some fashion.

22        So when I consider all the evidence, I reach three

23 primary conclusions.  First, I do find that Mr. Smothers' death

24 was connected to the drug conspiracy as the charge of conviction

25 in Count One.  The forensic evidence from the vehicle,

**JA2524**

1    Mr. Smothers' disappearance makes it clear that he has died.

2            The timing and locations of Mr. Smothers' phone makes

3    it clear that his death was connected to the drug conspiracy in

4    some way.  The phone records show that he went to meet -- or at

5    least they support a fair inference by a preponderance of the

6    evidence that he went to meet Scott Williams and Taeyan Williams

7    on the day of his disappearance.  And the fact that Scott

8    Williams' car is later seen at the storage facility and the drug

9    manifest ends up in his house, along with some of the drugs,

10   supports the inference that somehow, he was killed or died in

11   relation to the drug conspiracy.

12           Second, I find that Mr. Scott Williams, at a minimum,

13   helped to cover up this killing by either using or allowing the

14   use of his car to help dispose of Mr. Smothers' car.  That's

15   pretty apparent from the video evidence, the license plate

16   reader, and so forth.

17           Third, I do find that Mr. Williams, at a minimum, took

18   advantage of the situation by taking control of Mr. Smothers'

19   drugs after his death.

20           But I'm not going to make a finding that the death was

21   either first degree murder or second degree murder for which

22   Mr. Williams should receive the sentencing enhancement, whether

23   because it was premeditated or intentional or because it

24   occurred in the course of a robbery or kidnapping.

25           The facts on exactly what happened, who did what, and

what the circumstances were have not been proven to the requisite level.  The only coherent account of specifically what happened that night is of Mr. Musa, and that suffers from various flaws, first in light of Mr. Musa's fraud history and false statement history, including making statements in filings that were made under penalty of perjury that proved to be false.

Some corroboration was necessary, but the government did not explain how the key facts for this enhancement were corroborated in a way that demonstrates that Mr. Smothers died in the manner described.

I found it telling that unlike in most trials involving cooperators, where the government goes to great lengths to try to support the testimony of the cooperator, the government made little effort to explain why the jury should believe Mr. Musa; it didn't even mention him in the opening statement, barely mentioned him in the closing argument, and the jury clearly did not believe him, for better or for worse, perhaps because it was pretty clear the government was not willing to stand behind his testimony.

So I do find that more was required.  And unfortunately for the government, there remain unanswered questions.  The timeline as described by Mr. Musa does not fully match up with the visits by Mr. Williams' car to the storage facility, and Taeyan Williams' activities on April 6, 2018, and with the lack of other evidence there was violence at the Red

1   Roof Inn.

2          His account involves a third individual, but there's

3   no evidence about that person.  And then, the fact that there

4   was a third person, under the government's theory, opens -- even

5   under government's theory opens the possibility that the killing

6   was the responsibility of that third person, including that the

7   firearm found in Mr. Williams' house was the responsibility of

8   someone other than one of the two defendants.

9          So it's not exactly clear how Mr. Smothers died,

10  whether there was a robbery or a kidnapping before he died as

11  described by Mr. Musa, who was directly responsible, what was

12  the state of mind of everyone involved at the time, was it even,

13  as we said, a crime of passion versus a premeditated murder,

14  which would qualify as voluntary manslaughter and therefore

15  would not qualify for the enhancement.  It's also not clear how

16  reasonably foreseeable this was as part of the drug conspiracy,

17  to the extent that that would be a pact-less enhancement.

18         So I'm not going to apply the enhancement, but I do

19  conclude that Mr. Smothers' death makes the nature and

20  circumstances of this drug conspiracy significantly more

21  serious, because it was not an ordinary marijuana conspiracy.

22  And I will consider that fact under 18 U.S.C. 3553(a).  I also

23  find that Mr. Williams had -- clearly had some role in covering

24  up the killing, based on the fact that his vehicle was used to

25  help get rid of Mr. Smothers' car, and at a minimum, he

1    deliberately took advantage of the situation by taking over Mr.

2    Smothers' drug shipment for himself and for Taeyan Williams,

3    knowing that Mr. Smothers was dead.  Those are significantly

4    aggravating factors, and they will be considered under 18 U.S.C.

5    3553(a).

6         Now, as for the remaining guidelines calculations, I

7    do find and the parties agree that the drug quantity involved is

8    at least 1,000 kilograms of converted drug weight, including as

9    outlined in the government's sentencing memorandum the cocaine

10   and methamphetamine found at Mr. Williams residence, the

11   marijuana and cocaine sold as part of the regular transactions

12   to Mr. Diaz, the marijuana seized from Taeyan Williams' hotel

13   room in West Virginia, and the remaining drugs shipped by

14   Mr. Rayburn in April 2018, even factoring the possibility of

15   some double-counting in there.  It does not include other

16   shipments by Mr. Rayburn, so that is a conservative number,

17   which leads to a base offense level of 30, for which the

18   methamphetamine alone is sufficient.

19        Does anyone want to offer anything else on any of the

20   other enhancements, or ...

21        MS. GROSSI:  Your Honor, with regard to the

22   enhancement with the drug residence, the majority of these drugs

23   were found at his residence.  There was testimony from Mr. Diaz

24   and Mr. Drummond about the fact that they had done pickups and

25   drop-offs of money and drugs at that residence.  There was

1  testimony from Mr. Cox saying that he had gone to that residence
2  with Mr. Taeyan Williams for the purpose of resupplying their --
3  all of the trial evidence, Your Honor, points to the fact that
4  this was a drug residence.
5          THE COURT:  Okay.  Anyone -- Mr. Hawks on that or any
6  other enhancement that is still on the table?
7          MR. HAWKS:  Thank you, Your Honor.  Your Honor, with
8  regard to that, Mr. Cox, for the first time -- pardon me -- for
9  the first time in the trial said that he had entered the home.
10         In his grand jury testimony, he said he never entered
11 the home.  Every other witness said they hadn't entered the
12 home, they walked up.  Obviously, there was a massive --
13 you know, connected to the facts of this case, there was a
14 massive amount of drugs on June 6th.  I think it's clear to
15 everyone that that was certainly not indicative of the way that
16 the home was maintained.  There was this event, and as
17 Your Honor just said it, he took advantage of that, he stored
18 drugs there.  That --
19         THE COURT:  But they were with there for two months,
20 correct, at least, under this theory, if they got them in April
21 and still -- a lot of it is still there in June?
22         MR. HAWKS:  It was.  I think that also, Your Honor,
23 says a lot about the level of drug dealer that Mr. Williams was,
24 or wasn't, more to the point, and so --
25         THE COURT:  Meaning that it wasn't sold that quickly.

37

```
1              MR. HAWKS:  Exactly.
2              THE COURT:  Okay, well ...
3              MR. HAWKS:  And there was testimony is from Ms.
4   Chaplin that he from time to time sold drugs from an orange
5   bucket, an orange Home Depot bucket in the bedroom, and so
6   that's his normal amount, and this was -- he was really --
7   Your Honor, I use the term, "a bailee," and so, you know,
8   obviously -- Your Honor will take notice of the amount of drugs,
9   but that was just very far out of the character of the way
10  Mr. Williams normally conducted that home.
11             THE COURT:  Okay.  So --
12             MS. GROSSI:  Yes, Your Honor.  I was just going to add
13  that Ms. Chaplin also said that she knew he was in the business
14  of drug-selling and that she knew that -- where some of the
15  marijuana was.  With regard to the amount of drugs that were in
16  the residence, that also included the methamphetamines.  That
17  was not part of the robbery related to Mr. Smothers, and the
18  standard really is with regard to whether the defendant
19  maintained a premises, not whether someone had to go in and out
20  of that premises for the purpose of distributing a controlled
21  substance.
22             The government also submits that there's the
23  enhancement for the firearms that were possessed as well, which
24  I believe they're also objecting to.  There were firearms next
25  to the methamphetamines and cocaine in that shelf up there, and
```

**JA2530**

```
 1   there is Fourth Circuit testimony saying that the proximity of
 2   guns to drugs is indicative of using them in drug trafficking.
 3   There were also firearms found in the closet, where there was
 4   also drugs as well, and the government submits that that
 5   two-level enhancement should also be applied.
 6           THE COURT:  Okay, last word on enhancements generally.
 7           MR. HAWKS:  Thank you, Your Honor, and Your Honor,
 8   I'll try to be brief.  The premises was maintained as a -- it
 9   was a home, for two children, an adult who had no connection to
10   this, was aware of it but had no connection to it.  That's what
11   this place was.  Someone showed up with a lot of drugs.  Some of
12   those drugs were stored in the shed, some of those drugs were
13   stored in a crawl space, in the basement, a few of those drugs
14   were stored upstairs, in the basement, but that was a family
15   home that had this imposition into it.
16           And with regard to the firearms, I believe the
17   government's position is, if there are drugs somewhere and
18   there's a handgun somewhere, then they're connected.  The only
19   thing I can offer Your Honor is, that's not the law; the law is
20   that there's supposed to be some showing that they work.  And I
21   understand the Fourth Circuit said, one of the things that a
22   fact-finder can look at is, are they stored in proximity
23   together?  Sure.  That's not the only thing they can look at;
24   they can look at the dearth of evidence that there was ever any
25   connection between the two.
```

1       Again, this issue was squarely presented to the jury,

2  and they rejected it.  And Your Honor, I understand that's not

3  controlling, but it -- the law really isn't that if there's guns

4  and there's drugs, then there's a, you know, 924(c) or two-level

5  enhancement.  That's not the law.  The gun has to support the

6  drug trade, and honest to goodness, in this case, there's no

7  evidence of that.

8       Thank you, Your Honor.

9       THE COURT:  Okay, thank you.

10      So here's what I'll do with the rest of the

11  enhancements.  I will apply the two-level enhancement under

12  2D1.1(b)(1) because firearms were possessed.  Now, as has been

13  pointed out, there were acquittals on the charges under 18

14  U.S.C., 924(c), and even though it's a different standard of

15  proof, as I said, I need to think carefully about the arguments

16  that may have been persuasive to the jury and see whether they

17  apply under this standard of proof.

18      I do find, though, that at least one firearm was

19  possessed, because the standard for applying that enhancement,

20  under 2D1.1(b)(1), Application Note 11, is that the enhancement

21  applies if the firearm is "present, unless it is clearly

22  improbable that the weapon was connected with the offense,"

23  which I read that as lower standard than possession in

24  furtherance of a drug trafficking crime, which is what was

25  required 18 U.S.C., 924(c).

1    So finding the enhancement is not inconsistent with

2  the jury verdict, even under the same standard of proof.  In

3  particular, I find that the SIG Sauer that was found in the

4  closet area outside the drug stash in the crawl space meets that

5  standard of being present and not clearly improbable that it was

6  connected with the offense.

7    There were discussions I believe in the recordings

8  about the crawl space.  It was clearly a place that

9  Scott Williams did not want investigators to be searching or was

10  concerned when he found out they found that area.  The fact that

11  the firearm was in that vicinity, at the entrance to that area

12  supports an inference that it's connected in some ways as a way

13  to protect that stash.  So I find at least with that firearm,

14  there's enough for this enhancement to apply.

15    I am also going to apply the two-level increase under

16  2D1.1(b)(12) for maintaining a premises for distributing a

17  controlled substance, which is the Bristolwood Court residence.

18  The defense is correct that there's nothing automatic about

19  this.  The fact that it is also another residence may count in

20  his favor.  The fact -- that was used for other purposes.  The

21  law doesn't require it to be a fully separate freestanding

22  location only for drug use; it could be where the person lives,

23  it could also be where other things are occurring.

24    To me, what I find most compelling, but it's certainly

25  not required, is this crawl space area, which clearly was being

1   used primarily to hold the drugs -- and we can infer they were

2   there for two months, at least, from the time in April until the

3   search in June.  There was also a storage shed, which was used

4   for that purpose as well.  So it wasn't just drugs showing up

5   there one day for a couple of hours; this was -- and we also

6   heard multiple people who visited the location, even if they

7   didn't go inside, which inferred that there were drugs stored

8   there, so I do find that that enhancement applies.

9         And I do find the two-level increase under 3C1.1 for

10  obstruction of justice, which is the charge of conviction in

11  Count Nine.  That's not really opposed.  I'm not going apply the

12  enhancement for using violence or directing the use of violence,

13  for the same reasons I'm not applying the murder enhancement, in

14  terms of exactly whether that was established as opposed to some

15  other means by which the death resulted through other people.

16        So I find, when you add up all those enhancements, the

17  final adjusted offense level is 36, the criminal offense

18  category -- criminal history category of I, the guideline range

19  is 188 to 235 months.  There is a ten-year mandatory minimum on

20  Count Seven.  The guideline range for supervised release is at

21  least three years on Counts One and Six, at least five years on

22  Count Seven, and one to three years on Count Nine.  The

23  guideline range for a fine is $40,000 to $10 million.  The

24  special assessment is $400.

25        Anything else to say about the guidelines?

1      MS. GROSSI:  Not from the government, Your Honor.

2      MR. HAWKS:  No, Your Honor, thank you.

3      THE COURT:  Okay.  So now, I would like to move to

4  statements by witnesses or individuals other than counsel.  I

5  usually like to hear from any witnesses first, and then we go to

6  counsel, first the government, then the defense, and then

7  Mr. Williams, if he would like to speak.  So to begin with,

8  should we bring forth the individuals that the government would

9  like to offer?

10      MS. GROSSI:  Yes, Your Honor.  Ms. Kerrie Doyle will

11  be speaking, Your Honor, Mr. Noah Smothers' mother.

12      THE COURT:  Good morning, ma'am, thank you.  Just

13  state your name for the record and let me know what you'd like

14  to say.

15      MS. DOYLE:  My name is Kerrie Doyle.  I'm

16  Noah Smothers' mother.  This is why we're here (indicating).

17  This is my son.  He murdered him.  You know it, you know it, we

18  all know what happened.  And I understand, you have to go by

19  whatever guidelines you go by, but it's pretty basic to me.

20      My son was a good person.  He got involved in

21  something that he shouldn't have.  They robbed him -- they could

22  have just robbed him; that's all they had to do, was rob him,

23  take the money, take the drugs, and go on their way.  But there

24  was an agenda for more of that -- than that, and they proceeded

25  to torture him, murder him, and dismember him, which shows me

1  what kind of individual this person is.

2          And I'm sorry for whatever his poor childhood,

3  environment, genetic combination -- whatever made you this is

4  pathetic, but you had free will, and you could have just taken

5  the drugs and run.  You could have.  But that's not who you are,

6  because you're incapable of that.  You show no remorse, none.

7  You have shown no culpability, and you both know it, but you

8  have to defend him; I get it.

9          THE COURT:  Ms. -- Ms. Doyle --

10          MS. DOYLE:  I'm sorry, I'm sorry.

11          THE COURT:  -- you're supposed to speak to me, not

12  anyone else.

13          MS. DOYLE:  I'm sorry, I'm sorry, I didn't know the

14  rules.

15          THE COURT:  Go ahead.

16          MS. DOYLE:  I'm sorry.

17          THE COURT:  Go ahead.

18          MS. DOYLE:  I'm serving a life sentence.  My life will

19  never be remotely the same again.  I live with this every day.

20  Every morning when I wake up, Noah is the first thing that

21  I think of and every night when I go to bed.

22          I can't bring him home, he can't have a proper burial,

23  because God knows what they've done with his body.  Because

24  again, they won't tell us, because they're protecting

25  themselves.

```
1              I'm just begging you to do the maximum that you can
2   do.  I'm going to be tortured by this for the rest of my life,
3   and my son's life was taken.  And they didn't have to do it in
4   the manner that they did; they could have taken the pot, and
5   they could have gone, and they could have sold it, but that's
6   not what they did.  It's pretty simple to me.  This is why we're
7   here.  This boy was brutally murdered, and he doesn't have a
8   voice now, or a life.  They will.
9              And I thank you for your time.
10             THE COURT:  Thank you very much, Ms. Doyle.
11             MS. GROSSI:  Your Honor, that is it from the
12  government.  Mr. Roger Smothers does not wish to speak at this
13  time; he wants to submit on his victim impact statement.
14             THE COURT:  Okay, and I have read all of those very
15  carefully.
16             Mr. Hawks, anyone you want to bring forward?
17             MR. HAWKS:  No, Your Honor.
18             THE COURT:  Okay.  So we'll hear, then, from the
19  government, then we'll hear from the defense, and then if he
20  would like to, we'll hear from Mr. Williams.
21             Ms. Grossi.
22             MS. GROSSI:  Thank you, Your Honor.  The government
23  recommends that this Court sentence the defendant to a life in
24  prison.  The government believes this recommended sentence is
25  sufficient but not greater than necessary to comply with the
```

1    purposes of sentencing as outlined in 18 U.S.C., 3553(a).

2        As this Court saw at trial, the nature and

3    circumstances of the instant events are incredibly serious,

4    disturbing, and cause a lot of distraught to Noah Smothers'

5    family.  The defendant and Taeyan Williams owed Mr. Smothers

6    money in their marijuana trafficking business.  They didn't want

7    to pay him back, so they kidnapped, robbed, tortured, killed,

8    and buried Mr. Smothers, and despite diligent efforts, law

9    enforcement has still not been able locate Mr. Smothers'

10   remains, five years after he was murdered.

11       At trial, witnesses testified about how much of

12   Mr. Smothers' blood was found on the outside and inside of his

13   rental car.  There was blood found on the rear bumper gate, the

14   back lift gate, rear doorframe, and in the trunk.  There was so

15   much blood that you could see it with your naked eye, through

16   the carpet in the back of the seat.  It appeared on the metal.

17   And once law enforcement applied luminol, which fluoresces when

18   it comes in contact with blood, you could see the outline of a

19   body in the back of the car.

20       Trial testimony established that the firearm with --

21   that was used in Mr. Smothers' kidnapping and torture had

22   Mr. Smothers' DNA and blood on it, and it was found in the shelf

23   in the basement closet of the defendant's home, not far from

24   Taeyan Williams' room in the basement.

25       The government filed statements from the parents and

1    brother of the victim, you just heard from the mother, but each

2    of those letters is heartbreaking to read.  They discuss the

3    person they love, and lost, and the immense impact that loss had

4    on them and their family.  And they have real concerns for when

5    this defendant is released.

6           Those letters speak for themselves, but I believe it's

7    also a window into the defendant's history and characteristics

8    as well.  The defendant's history and characteristics are

9    concerning.  He has four unscored prior criminal convictions and

10   a long list of contacts with the criminal justice system.  The

11   defendant was charged with assault, second degree, three times,

12   in 1998, 2006, and 2009.  The defendant also has --

13          THE COURT:  Hold on one second; let me just look at

14   this, because ... I mean, he was -- criminal history category I,

15   and let me just see what you're referring to.

16       (Pause.)

17          THE COURT:  So he's got four convictions for

18   motor vehicle driving offenses, or licenses offenses.  Where are

19   you referring to here, under Other Alleged Conduct?

20          MS. GROSSI:  Your Honor, I am referring to the charges

21   that he faced that were assault, second degree, that he faced in

22   1998, 2006, and 2009, for which he was not convicted.

23          THE COURT:  In district court, state district court.

24          MS. GROSSI:  Correct, correct, Your Honor.

25          THE COURT:  Okay, I see it now.

**JA2539**

1          MS. GROSSI:  The defendant also has a long list of

2    motor vehicle offenses.  He's had his license suspended six

3    times for child support enforcement.  And a ubiquitous concern

4    throughout this trial, throughout this prosecution, and even in

5    the instant offense is the defendant's attempt to obstruct

6    justice and destroy evidence, including Mr. Smothers' body.

7          He lied to the Court and Probation.  At the

8    defendant's arraignment hearing in this case on January 24th,

9    2019, the defendant told Magistrate Judge Timothy Sullivan on

10   two separate occasions that he was born in the United States and

11   that he was a United States citizen, but in actuality, the

12   defendant was born in Jamaica and came to the United States when

13   he was 15.

14          Likewise, during his interview with U.S. Probation,

15   the defendant again lied and told U.S. Probation that he's a

16   naturalized U.S. citizen, but in actuality, the defendant's

17   application for citizenship was denied in 2015.

18          You saw, Your Honor, the way in which the defendant

19   tried to intimidate Ms. Chaplin when she came in here, and

20   additionally, the defendant has multiple disciplinary

21   infractions since his time in this case serving time at the

22   Chesapeake Detention Facility.  We just have records through

23   October of 2022, so almost a year ago, and in those records, it

24   shows at least 11 separate disciplinary infractions while he was

25   housed at the Chesapeake Detention Facility.

1          Your Honor, the government submits that a long prison

2    sentence is appropriate in this case in order to protect respect

3    for the law, provide adequate deterrence of criminal conduct,

4    and protect the public from future crimes of the defendant.  The

5    government also asks the Court to incorporate the motion for

6    forfeiture and impose a 10-year supervised release sentence

7    as well, if the Court were to not give a life sentence.

8          And for those reasons and the reasons in the

9    memorandum, the government respectfully recommends that the

10   Court sentence him to life in prison.

11   THE COURT:  Okay, one -- a couple of questions before

12   you leave.  I understand the argument; I just want to get your

13   reaction or your thoughts on one of the questions that's

14   troubling me a little bit, which is, particularly given the

15   findings I have made on the enhancements, which I understand you

16   may disagree with, you're basically asking for an upward

17   variance, right, to life imprisonment, and I have already told

18   you, I think under 18 U.S.C., 3553(a), there is a basis for

19   factoring in some of the circumstances here, which are highly

20   unusual, highly egregious, and so therefore, I don't think

21   asking for an upward variance is at all inappropriate under

22   these circumstances.

23          But in terms of proposing the upward variance all the

24   way to life imprisonment, aren't you basically asking me to

25   ignore the jury verdict and just sentence someone for a murder

```
 1    which he hasn't been convicted of?  I mean, how do I square
 2    that, particularly given the findings I've made on the
 3    enhancements?
 4            You're really asking for an upward variance, where I
 5    just find that -- I mean, what other crimes do we give that for?
 6    And your argument is about the killing; it's not at all about
 7    the drug dealing.  So how do you reconcile that for me?
 8            MS. GROSSI:  Your Honor, I believe you spoke about the
 9    fact that you believe Noah Smothers' murder was in connection
10    with the drug conspiracy that the defendant was involved in.
11    The defendant had knowledge of Mr. Smothers' murder, he was
12    involved, I believe might be your words, in some way in Mr.
13    Smothers' death; however, you don't find that there was first
14    degree or second degree murder.
15            The government submits that there was ample evidence
16    to show that the defendant covered up this crime.  On the jail
17    calls, there was very frank conversations about the fact that he
18    should have destroyed of all the evidence, that he shouldn't
19    have kept his -- Mr. Taeyan Williams shouldn't have kept his
20    cell phone, and that they are trying to cover up a murder that
21    we -- the government, the United States, and Noah Smothers'
22    family has an interest in prosecuting, and through the
23    defendant's actions, we are unable to find Mr. Smothers' body,
24    evidence of that murder.
25            And the government believes that a variant sentence is
```

1  appropriate in this case for all of those reasons, as well as

2  the convictions for conspiracy to destroy evidence, as well as

3  the methamphetamines and the conspiracy for the --

4          THE COURT:  No, I understand the evidence, I saw the

5  evidence.  I mean, I'm not even saying I don't disagree with

6  your version or -- at all, but I'm just saying that -- help me

7  reconcile, for me and perhaps more importantly for the public.

8  If they see the result, here, how do we explain -- again, when

9  it's really just based on a variance, where it's really the

10  judge's discretion to some degree, how do we explain a sentence

11  that basically is a sentence for a murder conviction, when the

12  jury acquitted?  And how does anyone look at that and fully

13  understand how that comes about?

14          Because it seems as if you could have presented all

15  this evidence without a jury to me, asked for a finding by a

16  preponderance of the evidence, and gotten the same result, but

17  yet, we went through this whole trial exercise.  What was the

18  point of the trial, then, if you're asking for the exact same

19  sentence based on the discretion of the judge?

20          MS. GROSSI:  Yes, Your Honor.  I believe the

21  U.S. Supreme Court talked a little bit about this, in acquitted

22  conduct in the most recent decision in the McClinton v.

23  United States case, where they denied certiorari on the

24  challenge of the use of acquitted conduct at sentencing.  They

25  go into a little bit of the history of using that and the

1    reasons for that, and so I believe that there is some

2    disagreement between the justices on whether -- you know,

3    whether it is an appropriate standard and whether they're going

4    to take it up after the Sentencing Commission is looking at it.

5         But there are some reasons for that, Your Honor.

6    There is a lower standard of proof with regard to showing

7    relevant conduct at sentencing, and there is some times when,

8    you know, the government believes the jury got it wrong.  And so

9    we are coming to talk to you about the relevant conduct here

10   that we believe we proved at trial and the reasons under 3553(a)

11   that you should issue a variant sentence.

12        THE COURT:  No, I understand that, and I agree with

13   you on the law entirely.  I guess I'm just trying to understand,

14   how do you explain it to a layperson, a citizen who understands

15   that there is a Constitution, there's a right to a trial,

16   there's a -- you know, conviction is by a jury of your peers,

17   not by a judge sitting there, just making decision.  How do you

18   explain it to them in ways that they would understand it?

19        MS. GROSSI:  Your Honor, I believe that that is the

20   law of the land, that's the Supreme Court law of the land, and

21   there is reasons for that.  I think that some of them go into

22   the history of the right by jury that was instituted by --

23   you know, at the beginning of this country, and there is some

24   precedent to show that that conduct and all of the relevant

25   conduct regarding the defendant, the instant offense, his

**JA2544**

1  history and characteristics, all of that should be considered by

2  the Court when making a decision on a sentence.

3          THE COURT:  Okay, anything else?

4          MS. GROSSI:  No.  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          Mr. Hawks.

7          MR. MR. HAWKS:  Thank you, Your Honor.

8          Your Honor, the nature and circumstances of the

9  offense that bring us here is drug trafficking, and I'm very

10 mindful of the enhancements that you found, but in the end,

11 those are enhancements to a drug trafficking crime.

12         And so when you look at this drug trafficking crime, I

13 don't think there's really any dispute here that -- the numbers

14 that we're talking about, this is a one-off.  This is not the

15 normal quantity or conduct of Mr. Scott Williams.  This is --

16 Mr. Scott Williams did, from time to time, as the evidence is

17 clear, engage in drug trafficking.  He had a bucket with a

18 little bit of marijuana and some pills in it, and then all of a

19 sudden, that number went up.

20         And Your Honor, for that reason, I would ask you to

21 look to the lower end of the guidelines, actually, a downward

22 variant sentence of the guidelines that you have discussed, and

23 somewhere between that mandatory minimum and the lower end of

24 the guidelines are the 188 months that you found.

25         THE COURT:  What am I supposed to do with -- I know

1  you disagree with this, but if I made it -- I did make a

2  finding -- I didn't make a finding necessarily about specific

3  involvement by anybody, but I did make a finding that a death

4  resulted from this drug conspiracy.

5         And as I noted earlier, there is a very severe

6  enhancement for a death resulting from a drug conspiracy when

7  it's an overdose or something like that.  And so the law

8  understands that when something like that happens, it's not an

9  ordinary case anymore, and even though there isn't a guideline

10  enhancement for that, there's at least something to -- that's

11  something that can and should be considered, I believe.

12         And here we have a death which frankly is probably

13  more significant in terms of the unusual nature of it and the

14  serious nature of it than an overdose, which by most accounts,

15  those are not intended by anybody, and yet, we're very cognizant

16  of that -- when that happens in a case, we are looking at a

17  completely different situation, even if it's still drug

18  trafficking.

19         So if I just treated that the same as an overdose

20  death, you'd be looking at a very, very severe sentence, so why

21  should this be different than that?

22         MR. HAWKS:  Your Honor, I think, to fully answer that

23  question, you have to step back and look at the axioms that

24  animate American law, and one of those is the idea that the

25  sentence that you impose should be sufficient but not greater

```
 1   than necessary.

 2           And so you have concluded that he was a part of a drug

 3   conspiracy that among its ill effects, one of the ill effects is

 4   that a person died, perhaps violently, perhaps murdered, and

 5   even perhaps murdered by one of his associates -- and

 6   Your Honor, we are grateful for your judicial humility in that

 7   you acknowledge openly that you do not know the role that he

 8   played.

 9           And American law would say with that we understand

10   that a person can be next to awful conduct and not bear legal

11   responsibility for that conduct.  And then the sentencing

12   guidelines go further.  The sentencing guidelines have,

13   for example, in drug trafficking, a description where they talk

14   about circumstances where a drug trafficker can understand the

15   foreseeable effects; I'm getting drugs from a cartel that

16   imports millions of pounds of drugs and commits murders all over

17   the planet, and yet, I know that by doing business with that

18   cartel, in some metaphysical way, I support that, but I'm not

19   legally accountable for that.

20           And in the same way -- and I understand it's less

21   attenuated than with a cartel, but in the same way, Mr. Williams

22   can participate in a drug conspiracy or, in your words, take

23   advantage of the fruits of that drug conspiracy without bearing

24   in this case sentencing liability for the ill effects of that

25   conspiracy.
```

1              And so Your Honor, I think you have to go back to the

2    foundation of this country, that -- where there was a Seventh

3    Amendment.  It's not, you know, a law that got passed in 1941;

4    it's the seventh most important guarantee of rights that the

5    people who set up this country had and said, you have a right to

6    a jury that gets to decide, not officials.

7              One of the principal architects of this country,

8    Thomas Jefferson, said he would rather ten guilty people go free

9    rather than one innocent be wrongfully be punished, and it's

10   that idea that because we don't know -- we can make inferences,

11   we can make guesses, we can speculate, but we don't know what he

12   did.  And so we can't average the punishment, we can't take a

13   kind of statistical likelihood of the punishment; we have to

14   restrict your punitive capacity to what we know he did in this

15   case.

16             The only thing we know he did was help cover up after

17   the fact, which is accounted for in the obstruction enhancement

18   that you've already applied.  So he's getting more than

19   everything, not -- the defense would argue he's getting more

20   than everything, not less than everything that's coming to him.

21             THE COURT:  But wouldn't you agree that the

22   obstruction enhancement applies -- possibly; I'm not going to

23   say entirely; I think there's a -- in the guidelines, there's a

24   reference to, you know, trying to throw drugs away or flush them

25   at the moment that law enforcement comes, and it may not be

1    enough, but we also have this issue with the phone, wiping the

2    phone, which would certainly be enough for the two levels.

3         And so the law says that something like that is enough

4    for the two levels.  What we're talking about is a whole 'nother

5    level of obstruction, if we're talking about covering up some

6    kind of killing or something like that.  I mean, isn't that a

7    different animal?

8         MR. HAWKS:  Your Honor, the sentencing guidelines are

9    exceptionally robust.  Someone has thought about that issue,

10   that my goodness, couldn't it include not just throwing away a

11   joint when the policeman's coming or even erasing a phone a year

12   after the fact, when it really didn't have any data on it; it

13   could include helping someone out for a very serious crime.

14        And they said, that's where plus 2; they didn't say --

15   I mean there's -- you know, there are role enhancements that are

16   gradated, plus 1, plus 2, plus 3, plus 4.  They didn't do that;

17   they said, plus 2, and they gave you a guidelines range, and

18   then they gave you the ability to go below that range, they did

19   give you the ability to go above it.

20        I would argue, Your Honor, all of the things that

21   trouble you about Mr. Williams' involvement in this case are

22   captured in the number of enhancements, in the -- in this case,

23   you have acknowledged, he may have stored a gun used by someone

24   else that he never handled.  He's getting two levels.  He's

25   getting -- at this scale of the guidelines, he's getting years

1  of additional punitive exposure for what could have been a

2  moment's -- you know, put the box over there, he forgot about

3  it, the police come through the door, and he's like, oh, my

4  goodness, the box.

5          For that -- you know, that instant, put it over there,

6  near the crawl space, for that instant, he's getting years of

7  punitive exposure.  And so I'm not sure that the people who set

8  up the guidelines would have thought that's always appropriate.

9  They were thinking, the plus 2 levels for firearms is some guy

10 walking around the streets of New York City or Washington, D.C.

11 with the ability to shoot any person who they perceive a threat

12 from.  That's why they get two levels, not, you have a box in

13 a -- you know over a crawl space that you don't touch for two

14 months.

15         And so none of these things are exactly precise, but

16 Your Honor, they capture all of the concern that you would have

17 about the conduct that he engaged in.

18         THE COURT:  Okay.  Anything else you want to offer?

19         MR. HAWKS:  Yes, Your Honor.  Your Honor, I think it's

20 important to note, there's clear evidence, he's one of many.  I

21 know we have another defendant tomorrow, but there's clearly --

22 in their sentencing memo, they have this recorded colloquy

23 between Taeyan Williams and Scott Williams, and he says, You

24 need to -- Taeyan Williams says to Scott Williams, you need to

25 take accountability, and then he says, In fact, you all need to

58

1  take accountability. And he -- later on, he says there are
2  people fighting among themselves. Clearly, there are more
3  people involved with this.
4         In their sentencing memo, there's four pages of that
5  drug -- we're calling it a drug inventory that was found. Two
6  of those pages, two pages out of four, the drugs are attributed
7  to the team. Clearly, there's more people here in this drug
8  conspiracy than Scott Williams and Taeyan Williams.
9         And again, in a drug conspiracy, you know, many hands
10 make light work, but only two people are on the hook for it.
11 And so Your Honor, I think there's a tendency in this country to
12 look for a lottery justice. We know people get away with
13 things, so when we catch one, uh-oh, we throw it on them.
14 Your Honor, I would offer to you, that's not justice. The fact
15 that we know that there's other people who had something to do
16 with these drugs who aren't here isn't a reason to say, well,
17 then, we'll with give a little bit of their sentence to
18 Scott Williams.
19        And so Your Honor, for that reason, I would say, in
20 that range that you talked about, you should be looking to the
21 lower end of that range.
22        Your Honor, we talked about the obstruction. I would
23 just briefly say, for the charged obstruction, this thing with
24 the phone, remember, he's arrested in 2018, he's released, he's
25 rearrested in 2019. He gives the card to a lawyer, the lawyer

1   gives it to -- that phone that got erased was a year after

2   anything happened, it didn't affect it.  And I understand we're

3   punishing mens rea and not necessarily the actus reus, but the

4   actus reus really had no impact on the case.

5          Your Honor, the history and characteristics of the

6   defendant -- it's not my place to critique the prosecutor, but

7   my goodness, could some perspective be valuable, to -- to take a

8   step back and say, you're asking that a person be sentenced for

9   the remainder of their natural life, and your reasons for that,

10  unconvicted misconduct of a decade or two decades ago.  That's

11  what they're relying on.  You were confused because you said

12  charges, and -- it's charges; he was never convicted of any of

13  that.

14         They have given you a rendition of -- again, they're

15  saying, this is a basis to put a person away forever, for the

16  remainder of their natural life, and their basis is, he used the

17  "B" word in slowly complying with the orders of guards at CDF.

18  You know, You need to go back to your cell.  Screw you, I'm

19  going to wait.  Clearly, he went back his cell.  Clearly, he

20  hung up the phone.  But that's the basis by which they're trying

21  to offer this ridiculously significant sentence?

22         Your Honor, the people who know him best have written

23  letters to the Court.  Miss Earle:  This is maybe the only

24  honest car mechanic.  She repeatedly talked about how he was

25  there to help her fix her car.  That's character.  I mean,

1    that's a profession where people routinely -- I mean, they

2    essentially said, oh, he's very dishonest.  If you want to be

3    dishonest, be a car mechanic.  He is an honest car mechanic.

4         They talked about instances where he had problems with

5    his child support payments.  The letter from his daughter lays

6    out clearly what kind of father this is.  The lapses in child

7    support payments, they're statements about his finances, they're

8    not statements about his commitment to being a father.

9         The statement about his commitment to being a father

10   is written by Ms. Hoilett and Ms. Whittier.  Your Honor,

11   Ms. Hoilett -- I hope you can keep perspective of who she is.

12   She's Taeyan's mother.  She couldn't be happy about where her

13   son is.  She has every reason to offer no help to

14   Mr. Scott Williams, and yet, she acknowledged, this is a

15   stand-up dad.  When she got pregnant as a teenager and he was a

16   teenager, he didn't run; he showed up, and he stayed, and he's a

17   committed father.

18        That's his character, that's who he is, and there are

19   elements of that throughout the trial, where he didn't know

20   anything when he's in the back of the car with Sergeant Simms,

21   until Sergeant Simms says, Hey, listen, it's you on the hook or

22   it's Ms. Chaplin.  He says, Put everything on me, put everything

23   on me.  When he gets on the phone with Ms. Chaplin right after

24   he's arrested, he says -- Ms. Chaplin says -- he apologizes to

25   her, I'm sorry I put you through this.  He says, Don't worry

1    about me.  She says, Don't worry about me?  She says, These kids

2    are cracking up; these kids needs you.  That's a committed

3    father.

4         And so Your Honor, there can be no denying his

5    proximity to this profoundly troubling event, but this person

6    got handed a bad deck of cards and certainly didn't do what the

7    law presumes of him.  But it was written, The sins of the

8    cold-hearted and the warm-hearted are weighed on two different

9    scales.  This is a warm-hearted person.  He's not cruel, he's

10   not a monster, he doesn't have a genetic problem; he is a person

11   who is trying as best he can to navigate difficult moral

12   choices.

13        And he's not facing a trivial sentence.  15 years in

14   jail is a long, long, long, long, long time, Your Honor, and you

15   consider his role in the nature and characteristics of the

16   offense if you consider his actual demonstrated character by the

17   people who know him.

18        Your Honor, we hope you see that a sentence on the

19   lower end of that guidelines range is an appropriate one.

20        Thank you, Your Honor.

21        THE COURT:  Thank you.

22        So Mr. Williams, you have the opportunity, if you

23   would like to, to make a statement before the sentence is

24   issued.  If you would like to, now is your opportunity.

25        THE DEFENDANT:  Yes, Your Honor.  Your Honor, I would

1  like to present this motion to the Court to take a judicial

2  notice of a fraud concerning the drug quantity amongst,

3  Your Honor ...

4          THE COURT:  Well, since you have an attorney, I'm

5  going to let Mr. Hawks present whatever needs to be presented or

6  should be presented.

7          MR. HAWKS:  I'm sorry.  Judge Chuang --

8          THE COURT:  So is there a motion you want to present,

9  Mr. Hawks, on behalf of your client?

10          MR. HAWKS:  I think -- no, Your Honor.

11          MR. CRAWLEY:  May we have a moment?

12          MR. HAWKS:  Sure.

13      (Conference between Mr. Crawley and Mr. Hawks.)

14          MR. HAWKS:  Your Honor, there is a disagreement

15  between counsel and the client regarding the best avenue to

16  pursue what he believes is a discrepancy of evidence regarding

17  the drug weight at trial.  Counsel for the defendant have

18  reviewed his materials, and it's our decision not to present it

19  to the Court at this time.  However, we would make clear for the

20  record that he has concerns about the calculation of the drug

21  weight that at some point he wishes to pursue through judicial

22  action.

23          THE COURT:  Is there anything you want to put on the

24  record in the event that there is some judicial action in the

25  future?

**JA2555**

```
 1              THE DEFENDANT:  Yes, Your Honor.
 2              THE COURT:  We'll come back to Mr. Williams; I'm just
 3    asking Mr. Hawks.
 4              MR. HAWKS:  Yes, Your Honor.  Essentially, the concern
 5    is that the weight of the methamphetamine pills he believes
 6    are -- there are two bags of pills.  One has one weight, one has
 7    another average weight, and he believes that that's
 8    inconsistent, because the pills were fundamentally the same, so
 9    they should weigh the same, so that is evidence of a broader
10    quality control issue at the laboratory.
11              THE COURT:  Okay, thank you.  And just on that point,
12    again, just for the record, I mean, I did include that in the
13    drug quantity calculation.  It was something that the jury
14    actually made a finding on of at least 500 grams.  The exact
15    number I gave was, I believe, from the testimony or from what
16    the government presented, but even at least that 500-plus was
17    established and found by the jury, and I have no reason to doubt
18    that.  So anyway -- but Mr. Williams, go ahead.
19              THE DEFENDANT:  Yes, Your Honor.  On August 6th, when
20    Mrs. Amber Burns reported that the net worth of three pills is
21    weighing .978 grams and that three other pills and the bag
22    weight is.57- -- .573 grams.  And then, on a supplemental sheet
23    for -- there's no way that three pills are going to weigh
24    199 grams, Your Honor; that would be more than the size of a
25    golf ball.
```

**JA2556**

1    And then -- and the supplement -- and the same thing,

2 I noticed that from my supplement, and the same that is

3 superseding me on December 18, 2018, we report- -- the false

4 weight of three tablet in -- I mean, in each bag, the net worth

5 carrying one bag of 199 grams, Your Honor, and the net worth of

6 three other pills from the other bag is carrying three- --

7 347.84 grams, Your Honor.

8    And the total net worth of the pill is five hundred

9 and -- five- -- 546.93 grams, which I was superseded on the same

10 day for that 500 grams, Your Honor.  And more important is,

11 there are -- I mean, the original in the indictment was 300

12 pills.  And this is caused by -- resulted in my solitary

13 mandatory minimum sentence of five years for 300 grams, and

14 increase it to ten years when mandatory for 500 grams,

15 Your Honor.

16    THE COURT:  Okay.

17    THE DEFENDANT:  I do have everything presented right

18 here for you, just need to break it down.  Mr. Carty sings when

19 I hoped and swearing that the pills was 200 at one time, and

20 then, after that, Mr. Greg Saxton, and then -- and then

21 everybody, Your Honor.

22    THE COURT:  Okay.  Is there anything else you'd like

23 to say before the sentencing?

24    THE DEFENDANT:  And then -- yes, Your Honor.  I'd like

25 to apologize to my family, and to my kids, and to my mom.

**JA2557**

1    And -- from when -- since I've been incarcerated, I've been

2    having a lot of complication, a lot of stuff, Your Honor, and I

3    do want to say that I apologize to the Court too, Your Honor.

4              Thank you.

5              THE COURT:  Thank you.

6              THE DEFENDANT:  Then I'm asking you, if you could, in

7    your deep -- deepness of your heart, Your Honor, if you could at

8    least give me the lower end of my sentencing guideline,

9    because -- I'm just asking you to give me the lower end of the

10   sentencing guideline so I could be there for my kids, Your

11   Honor, more than me going away for my life.  That's all I live

12   and breathe for, is my kids, Your Honor, that's all I do, with

13   my kids.

14             THE COURT:  Thank you.

15             THE DEFENDANT:  Thank you, Your Honor.

16             THE COURT:  Mr. Hawks, I'm not going to question or

17   even disagree with your decision not to present the motion, but

18   it may be helpful, I think, just to have whatever papers

19   Mr. Williams wanted to present made -- preserved for the record

20   in case of any future discussions on this topic.  So I don't

21   know the best way to do that, but I don't think they need to be

22   filed as a motion, because you're not filing one, but just for

23   identification, if there's a way that that can be part of the

24   sentencing hearing as something that was ...

25             MR. HAWKS:  Thank you, Your Honor.

1          THE COURT:  Something to that effect, if you can do

2    that.  Thank you.  Or you can provide it to the Clerk after the

3    hearing, just for the record, perhaps as an exhibit.

4          (Conference between Mr. Hawks and Ms. Grossi.)

5          MR. HAWKS:  (Handing.)

6          (Conference between Mr. Crawley and Mr. Hawks.)

7          THE COURT:  Are we ready?

8          MR. HAWKS:  Yes, Your Honor, thank you.

9          THE COURT:  Okay, thank you.

10         (Conference at the Bench.)

11      It is the policy of this Court that every guilty plea and

12   sentencing proceeding include a bench conference concerning

13   whether the defendant is or is not cooperating.

14         (Open court.)

15         THE COURT:  In considering the appropriate sentence

16   for Mr. Williams, I have considered the advisory guideline

17   range, which is 188 to 235 months.  I have also considered all

18   of the factors in 18 U.S.C., 3553(a) and Congress' direction

19   that the sentence imposed be sufficient but not greater than

20   necessary to meet the purposes of sentencing.  And I will

21   discuss some but not all of those factors in detail.

22         As for the nature and circumstances of the offense,

23   this was a drug distribution crime, involving methamphetamine,

24   cocaine, and marijuana.  It's a very serious form of this

25   offense.  Methamphetamine and cocaine are serious drugs that

1    have a serious impact on our community.

2          Marijuana is now viewed by some as less serious, but

3    if there is any case that shows that marijuana dealing is still

4    a very serious crime, it is this one.  Not only did this crime

5    involve large interstate shipments and repeated drug dealing,

6    but one of the members of the conspiracy ended up losing his

7    life.  Now, whether or not there was a conviction for that

8    killing or whether it technically qualifies for enhancement,

9    that is a serious aggravating factor.

10          And while Mr. Williams hay not have been convicted of

11    the killing, or of the kidnapping, or a robbery, there's no

12    serious dispute that he ended up with Mr. Smothers' stash of

13    drugs after his death, which is not only highly troubling but

14    morally reprehensible, that anyone would be so opportunistic as

15    to profit from someone's disappearance or death in this way.

16          And also in this instance, Mr. Williams, at a minimum,

17    I have found, participated in covering up this event by allowing

18    his car or frankly most likely using his own -- using his car

19    himself to help dispose of Mr. Smothers' car.  And that's just

20    at a minimum; there may have been other conduct that he was

21    engaged in, in the cover-up, that was even more extreme.

22          So overall, this is an extremely serious form of the

23    offenses of conviction.

24          Now, even for those not accused of participating

25    directly in his death, I consider the fact that the conspiracy

**JA2560**

1  was at such a level that someone could or would get killed to be

2  a highly aggravating factor.  As an example, I point to another

3  person who came up in this trial, Mr. Rayburn.  Now, for the

4  life of me, I don't understand why someone at the top of a drug

5  dealing chain like this, like Mr. Rayburn, who is in charge of

6  interstate shipments of a large quantity of drugs involving who

7  knows what suppliers -- there was reference to an Armenian gang

8  or what have you -- why he has not been charged with any crime.

9          But if he were in this courtroom, I would absolutely

10  consider the fact that he was part of an enterprise in which one

11  of the dealers was killed to be a highly aggravating factor,

12  even if he didn't personally have anything to do with that.  So

13  here, where we have someone who was part of that conspiracy and

14  had some role at least in the aftermath, I do find the nature

15  and circumstances of the offense to be more significant than

16  most cases like this and will consider that in reaching a

17  sentence.

18          As for the history and characteristics of the

19  defendant, Mr. Williams has no meaningful criminal history.  And

20  to some degree, that's remarkable, given that he is convicted of

21  a drug trafficking crime.  And he has motor vehicle convictions.

22  The -- I'm not swayed really at all by the nol-prossed state

23  district court charges for assault back when he was 22 years

24  old; I see that as just an effort to be as zealous an advocate

25  as one could be.

1          So he has no criminal record, and that's significant.

2    He also has multiple children from different relationships,

3    including three children who are 15 or younger.  These are all

4    things that we typically consider to be mitigating factors in

5    our cases.  He also has some positive work history and has

6    submitted letters attesting to his character, including from, as

7    Mr. Hawks pointed out, the mother of Taeyan Williams, under

8    circumstances where there would be is a lot of reasons why she

9    would not be attesting to his character.

10          At the same time, he has engaged in these obstruction

11    of justice activities, which, while included in the guidelines,

12    are -- some of them are more significant than typical.  There

13    are these post offense issues in detention.  I agree with

14    Mr. Hawks, I'm not going to take that too far, but other

15    defendants try to better themselves or at least try to avoid any

16    kind of negative activities while in detention.  That has not

17    been the case with Mr. Williams.  There was also this veiled

18    attempt to intimidate Ms. Chaplin at the trial, which I

19    observed, which is highly troubling and indicative of someone

20    who does not have a respect for the law.

21          So even beyond the issues that already came up in the

22    presentence report, things like the wiping of the phone, the

23    flushing of the drugs, the efforts to dispose of the evidence

24    relating to the killing, those are additional negative factors.

25          Considering all of the factors and particularly the

1  nature and circumstances of this offense, I clearly conclude, at

2  a minimum, a high-end sentence is necessary to reflect the

3  seriousness of the offense, to promote respect for the law, to

4  provide just punishment, and to provide adequate deterrence.  I

5  also have carefully considered whether an upward variance is

6  warranted.

7        And I go back to my earlier comments about how the

8  guidelines provide for a very significant enhancement for

9  someone who is involved in either a drug transaction or a drug

10  conspiracy in which a death results from an overdose.  And for

11  some reason, there's a gap, where this type of situation is not

12  covered by that type of enhancement.  There is the potential

13  enhancements the government proposed.  For the reasons I have

14  stated, I am not going to give those enhancements.

15        We all agreed that the overdose enhancement does not

16  apply, but to me, the nature and circumstances of this offense,

17  as I said, are as serious if not -- and certainly, in my view

18  more serious than the ones involved in the overdose deaths,

19  because no one argues that the overdose deaths are things that

20  are intended, but they are certainly something that can be

21  expected, and people should know better than to be dealing under

22  those circumstances.

23        But I do find that to not -- to just stay within the

24  guidelines where there's no enhancement for being involved in a

25  conspiracy involving a death of this serious nature, the

1   violence that likely was involved with the death itself, would

2   create some unwarranted disparities with defendants who are

3   sentenced at severe levels for being involved in these other

4   forms of death from the overdose, and so I do think that an

5   upward variance is necessary, both to reflect the seriousness of

6   this offense, the egregious loss of life, the impact that it's

7   had on Mr. Smothers' family, which we heard from both in writing

8   and in person in a very persuasive way, but also, again, to

9   place this at least in the range of cases in which death results

10  from other means that are accounted for in the guidelines, such

11  as the death from an overdose or from the other forms of death

12  that were proposed by the government.

13         At the same time, an upward variance to the level of

14  life imprisonment to me is just not appropriate.  I understand

15  that the law allows enhancements based on relevant conduct, I've

16  already addressed my findings on that, but to in my discretion

17  on an upward variance vary upward to a life sentence effectively

18  would nullify the jury's verdict, I think would cast serious

19  doubt -- particularly when it's a judge's upward variance and

20  not based on an enhancement that's been found -- cast serious

21  doubt on the fairness of our justice system, where someone goes

22  to trial, gets acquitted of conduct -- for better or worse, even

23  if I agree or disagree with the jury's verdict, the jury spoke,

24  and to effectively ignore that and say, I'm going to step in and

25  give the same sentence that would have resulted otherwise, the

1    circumstances have to be even more extraordinary than these

2    here.

3            And they are extraordinary.  The loss of life, the

4    impact is extraordinary, but not to the level of -- or not a

5    basis in my mind to effectively act as if nothing happened in

6    the courtroom, when we had the trial a few months ago.

7            Nevertheless, as I said, because of the death that

8    resulted, the serious impact of that, the fact that it's

9    accounted for in other types of sentences for similar drug

10   trafficking offenses, where there is a death that results in

11   some other way, I do find that this is a factor not adequately

12   considered by the guidelines.  I also factor in the obstruction

13   of justice activity, which as I said, some of it's captured in

14   those two points, but I believe the activities involving perhaps

15   at least trying to dispose of the evidence of the killing is at

16   a different level.  It's not adequately considered by those two

17   guideline points.

18           So for those reasons, I will grant an upward variance.

19   Again, trying to balance that need with, again, making clear

20   that the sentence is consistent in both law and fact and in

21   perception with the jury's verdict, I conclude that a sentence

22   of 276 months of imprisonment in total is sufficient but not

23   greater than necessary to meet the purposes of sentencing.

24           So with that, I'm going to impose a sentence.

25   Mr. Williams, if you could stand while I impose the sentence.

1            In the case of The United States v. Williams, the

2    Court sentences the defendant as follows:

3            On Count One, conspiracy to distribute and possess

4    with intent to distribute controlled substances, the Court

5    sentences you to a term of imprisonment of 240 months, which is

6    the maximum penalty, on each count, on Count One and Count Six,

7    to be followed by five years of supervised release on each

8    count;

9            On Count Seven, possession with intent to distribute

10   500 grams or more of methamphetamine, the Court sentences you to

11   a term of imprisonment of 276 months, to be followed by five

12   years of supervised release;

13           On Count Nine, conspiracy to destroy or conceal

14   evidence, the Court sentences you to a term of imprisonment of

15   240 months, which is the maximum penalty on that count, to be

16   followed by three years of supervised release, which is the

17   maximum on that count.

18           All terms of imprisonment and terms of supervised

19   release will run concurrently for a total sentence of 276 months

20   of imprisonment and five years of supervised release.  I will

21   impose no fine, based on the lack of ability to pay.  You are

22   required to pay the special assessment of $400.  I will enter

23   the order of forfeiture, which has not been objected to, and

24   make it part of the judgment.  The standard and statutory

25   conditions of supervised release will apply.

1          Mr. Hawks, is there any reason to recite them?  They

2     are stated specifically in the presentence report.

3          MR. HAWKS:  No, Your Honor.

4          THE COURT:  Now, there are also additional special

5     conditions of supervised release which you will be following.

6     First, you must report to U.S. Immigration and Customs

7     Enforcement and follow all the instructions and reporting

8     requirements until any deportation proceedings are completed.

9     If you're ordered deported from the United States, you must

10    remain outside the United States unless legally authorized to

11    reenter.  If you reenter the United States, you must report to

12    the nearest probation officer within 72 hours after you return.

13         You must participate in a mental health treatment

14    program and follow the rules and regulations of that program,

15    and the probation officer, in consultation with the treatment

16    provider, will supervise your participation in that program.

17    You must also submit to substance abuse testing to determine if

18    you've used a prohibited substance.  You must not attempt to

19    obstruct or tamper with the testing methods.  And you must pay

20    the special assessment of $400 if you have not already done so.

21         You also must participate in a substance abuse

22    treatment program and follow the rules and regulations of that

23    program.  The probation officer will supervise your

24    participation in that program.

25         Any recommendations you would offer for the Bureau of

1  Prisons, Mr. Hawks?

2          MR. HAWKS:  Your Honor, just generally, geographically

3  close to Laurel, Maryland.

4          THE COURT:  Okay, I will include that recommendation.

5          Mr. Williams, although you've had no prior convictions

6  of this type, this was a very serious offense.  It was not

7  ordinary drug dealing, when at a minimum, one of your suppliers

8  was killed, and you took over his stash and drugs for your own

9  profit.  My finding is, it may have played some role in at least

10 covering up that death.  Even without finding every fact that

11 the government sought to prove, that conduct in and of itself is

12 morally reprehensible, and then you compounded it by trying to

13 destroy evidence.

14         So you are fortunate, based on the jury's verdict,

15 that the sentence is as limited as it is.  I found it remarkable

16 that even with the understanding that there hasn't been a

17 finding of the type that the government has asked for, that

18 you know, in your statement to the Court, you chose to focus on

19 the drug quantity.  You made some apologies but deliberately --

20 or it appears, to have deliberately avoided any -- not even

21 apology, because I understand you might not do that, but even a

22 sense of regret for what happened to the Smothers family, and I

23 think that's something that you need think about in the long

24 period you're going to be in prison.

25         You need to use the time you have in prison to think

1  about this crime and resolve to live a law abiding life going

2  forward, to make amends for your conduct, and to think about

3  what the result of this was, regardless of what your specific

4  role was, and until you come to terms with this, I am concerned

5  that you won't be ready to come back to society, and that's one

6  of the reasons for the length of the sentence.

7          But hopefully, with that amount of time, with the

8  programs that are available in prison, and with supervised

9  release, you will resolve to move in a positive direction, and

10  we certainly -- that is what we all hope for, with all

11  defendants.

12          With that, you may be seated.

13          Mr. Williams, you generally have the right to appeal

14  your conviction and sentence subject to any waivers you may have

15  made in the plea agreement.  If there's basis to appeal and you

16  wish to do so, you must file a notice of appeal within 14 days

17  of the entry of judgment.  If you request, the Clerk will

18  prepare and file a notice of appeal on your behalf.  If you

19  cannot afford to pay the cost of an appeal or for appellate

20  counsel, you can apply to have the court waive the filing fee

21  and appoint counsel to represent you on the appeal.

22          Are there prior indictments and charges that need to

23  be dismissed, Ms. Grossi?

24      (Conference among Ms. Grossi, Mr. Hanlon, and Mr. Moomau.)

25          MS. GROSSI:  The government moves to dismiss all prior

1  indictments, Your Honor.

2          THE COURT:  Okay.  As to Mr. Scott Williams --

3          MS. GROSSI:  Yes.

4          THE COURT:  -- that motion is granted.

5          MS. GROSSI:  Thank you, Your Honor.

6          THE COURT:  Is there anything else I need to address

7  from either side?

8          MS. GROSSI:  Not from the government, Your Honor.

9          MR. HAWKS:  No, Your Honor, thank you.

10          THE COURT:  Okay.

11          As I always do, I do want to recognize the members of

12  the public who have come to this sentencing.  I realize -- or

13  I think everyone is aware that criminal proceedings in the

14  United States are public proceedings.  An important part of that

15  is having individuals have the opportunity to participate,

16  either verbally or silently, and also to witness the proceedings

17  so there's a fair -- an understanding of whether they're being

18  conducted fairly or not.  I certainly want to therefore thank

19  everyone who came, regardless of purpose or who they were here

20  to support.  It's an important part of the proceedings, and I

21  thank you for taking the time to be here.

22          I do want to recognize, because they were here not

23  just today but throughout the trial, the Smothers family, who

24  sat through this trial.  While the outcome of the trial may not

25  have been what you hoped for and I have made findings that I

1 deem appropriate under the present circumstances that you may

2 not agree with, we in the justice system, including our jurors,

3 in whom I have the utmost confidence, do our best to faithfully

4 apply the law to each case to achieve just outcomes, and I

5 assure you that everyone here at the United States District

6 Court has done our best to do that in this case.

7 　　　　We all recognize the profound loss that you and our

8 entire community has suffered from the death of Noah Smothers.

9 We know that no verdict or sentence can ever bring him back or

10 make you whole again, but I do want to assure you that your

11 presence throughout this case has been a meaningful and

12 important part of our proceedings, and I certainly wish you

13 peace in the years to come.

14 　　　　Thank you all very much.

15 　　　　THE COURTROOM DEPUTY:  All rise.  This Honorable Court

16 now stands adjourned.

17 　　(The proceedings were adjourned at 11:28 a.m.)

18

19

20

21

22

23

24

25

**JA2571**

1    CERTIFICATE OF OFFICIAL REPORTER

2         I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                        Dated this 1st day of December, 2023.

10

11

                    _____/s/_____
12                  PATRICIA KLEPP, RMR
                    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

**JA2572**

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 1 of 7

DDS

# United States District Court
## District of Maryland



| | |
|---|---|
| **UNITED STATES OF AMERICA** | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed on or After November 1, 1987) |
| **SCOTT ANTHONY WILLIAMS** | Case Number: TDC-8-18-CR-00631-001 |

Defendant's Attorney: Kwasi L. Hawks and Dwight E. Crawley

Assistant U.S. Attorney: Leah B. Grossi, Michael C. Hanlon, and William D. Moomau

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ____

☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.

☒ was found guilty on count(s) <u>1ss, 6ss, 7ss, and 9ss of the Second Superseding Indictment</u> after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances | June 6, 2018 | 1ss |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances | June 6, 2018 | 6ss |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through <u>7</u> of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by <u>United States v. Booker</u>, 543 U.S. 220 (2005).

☒ The defendant has been found not guilty on count(s) <u>2ss, 3ss, 4ss, 5ss, and 8ss of the Second Superseding Indictment</u>.

☒ <u>The Original Indictment and the Superseding Indictment</u> are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

August 22, 2023
_____
Date of Imposition of Judgment

_____    August 22, 2023
Theodore D. Chuang    Date
United States District Judge

Name of Court Reporter:  Patti Klepp

**JA2573**

Judgment in a Criminal Case (Rev. 12/2019)                                                      Judgment Page 2 of 7

**DEFENDANT:**      **SCOTT ANTHONY WILLIAMS**
**CASE NUMBER:**    TDC-8-18-CR-00631-001

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) | Possession with Intent to Distribute 500g or More of Methamphetamine | June 6, 2018 | 7ss |
| 18 U.S.C. § 1512(c)(1) and (k) | Conspiracy to Destroy and Conceal Evidence | January 24, 2019 | 9ss |

**JA2574**

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                   Judgment Page 3 of 7

**DEFENDANT: Scott Anthony Williams**                          CASE NUMBER: TDC-8-18-CR-00631-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for terms of <u>240 months on each of Counts 1ss, 6ss, and 9ss, and a term of 276 months on Count 7ss, all to run concurrently with each other, for a total term of 276 months.</u>

☒ The court makes the following recommendations to the Bureau of Prisons:

☒ That the defendant be designated to a facility as close as possible to Laurel, Maryland, so that family may visit.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ a.m./p.m. on _____.
☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

☐ before 2:00 p.m. on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                         Judgment Page 4 of  7

**DEFENDANT: Scott Anthony Williams**                                    CASE NUMBER: TDC-8-18-CR-00631-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for terms of <u>5 years on each Counts 1ss,  6ss, and Count 7ss, and a term of 3 years on Count 9ss, all to run concurrently with each other, for a total term of 5 years</u>.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A.    MANDATORY CONDITIONS

1)  You must not commit another federal, state or local crime.
2)  You must not unlawfully possess a controlled substance.
3)  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.  *(check if applicable)*
4)  ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5)  You must cooperate in the collection of DNA as directed by the probation officer.
6)  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7)  ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B.    STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1)  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2)  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3)  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4)  You must answer truthfully the questions asked by your probation officer.
5)  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6)  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7)  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

**JA2576**

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                          Judgment Page 5 of 7

**DEFENDANT: Scott Anthony Williams**                                        CASE NUMBER: TDC-8-18-CR-00631-001

8)   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9)   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10)  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11)  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12)  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13)  You must follow the instructions of the probation officer related to the conditions of supervision.

# C.   SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

⊠ **COMPLY WITH ICE INSTRUCTIONS**
You must immediately report to U.S. Immigration and Customs Enforcement and follow all their instructions and reporting requirements until any deportation proceedings are completed.

⊠ **DEPORTED/REMAIN OUTSIDE OF THE UNITED STATES**
If you are ordered deported from the United States, you must remain outside the United States, unless legally authorized to re-enter.  If you re-enter the United States, you must report to the nearest probation office within 72 hours after you return.

⊠ **MENTAL HEALTH TREATMENT**
You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

⊠ **SUBSTANCE ABUSE TESTING**
You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

⊠ **DRUG TREATMENT**
You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

⊠ **SPECIAL ASSESSMENT**
You must pay the special assessment of $400.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

**JA2577**

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                 Judgment Page 6 of  7

**DEFENDANT: Scott Anthony Williams**                                                         CASE NUMBER: TDC-8-18-CR-00631-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $400.00 | N/A | Waived | N/A | N/A |

☐  CVB Processing Fee $30.00

☐  The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|

**TOTALS**                    $ _____         $ _____

☐  Restitution amount ordered pursuant to plea agreement  _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the  ☐  fine   ☐  restitution

☐  the interest requirement for the  ☐  fine   ☐  restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**JA2578**

Sheet 6 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 7 of 7

**DEFENDANT: Scott Anthony Williams**                    CASE NUMBER: TDC-8-18-CR-00631-001

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  ☒  $400 Special Assessment to be paid in full immediately.

B  ☐  $_____ immediately, balance due (in accordance with C, D, or E); or

C  ☐  Not later than _____; or

D  ☐  Installments to commence _____ day(s) after the date of this judgment.

E  ☐  In _____ (*e.g. equal weekly, monthly, quarterly*) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☒  **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM**.

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

☐  in equal monthly installments during the term of supervision; or

☐  on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐  Joint and Several
Case Number
Defendant and Co-Defendant
Names *(including defendant number)*                    Total Amount                    Joint and Several Amount                    Corresponding Payee, if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States:

**See attached Preliminary Order of Forfeiture.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**JA2579**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-18-631 |
| | * | |
| SCOTT ANTHONY WILLIAMS, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

### PRELIMINARY ORDER OF FORFEITURE

Whereas, on September 29, 2021, a federal grand jury sitting in the District of Maryland returned a Second Superseding Indictment charging Scott Anthony Williams (the "Defendant") with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count One), conspiracy to interfere with interstate commerce by robbery and extortion, in violation of 18 U.S.C. § 1951(a) (Count Two), interference with interstate commerce by robbery and extortion, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count Three), kidnapping with death resulting, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Count Four), possess, use, carry, and brandish a firearm during and in furtherance of a crime of violence and drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Five), possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Six), possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) and 18 U.S.C. § 2 (Count Seven), possession of firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Eight), and conspiracy to destroy and conceal evidence, in violation of 18 U.S.C. § 1512(c)(1) and (k) (Count Nine); and

Whereas, the Second Superseding Indictment also included a forfeiture allegation, which provided notice that the United States intended to seek forfeiture, pursuant to 18 U.S.C. §§ 924(d) and 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), upon conviction of the Defendant of the offenses alleged in Counts One through Nine of the Second Superseding Indictment; and

WHEREAS, following a twelve-day jury trial, on May 11, 2023, the Defendant was convicted on Counts One, Six, Seven, and Nine of the Second Superseding Indictment by a federal jury sitting in the District of Maryland; and

WHEREAS, the United States admitted evidence at trial establishing the requisite nexus between the Subject Property and the Defendant's offenses; and

WHEREAS, the United States is now entitled to a Preliminary Order of Forfeiture against the following items that are proceeds and/or facilitating property of the Defendant's controlled substances offenses pursuant to 21 U.S.C. § 853 and Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure:

1. approximately $213,573.00 in U.S. currency (18-DEA-642370);

2. one loaded Bryco 38 handgun bearing serial number: 371085 containing one .380 caliber magazine with approximately six rounds of .380 caliber ammunition (18-ICE-002843);

3. one loaded Sig Sauer P228 9mm handgun bearing serial number B188194 containing one 9mm magazine with approximately six rounds of 9mm ammunition (18-ICE-002844);

4. one loaded Beretta 21-A .25 caliber handgun bearing serial number DAA047571 containing one .25 caliber magazine with approximately eight rounds of .25 caliber ammunition (18-ICE-002845);

5. one Century Arms model VZ2008 Sporter AK47 style rifle bearing serial number V08PM013368 (18-ICE-002846);

6. three additional magazines for the Century Arms rifle containing approximately 78 rounds of 7.62x39 ammunition (18-ICE-002847)

2

**JA2581**

7. approximately 57 additional rounds of 7.62-39 ammunition (18-ICE-002848);

8. one box of 9mm caliber ammunition for the Sig Sauer handgun containing approximately 57 rounds of 9mm caliber ammunition (18-ICE-002849);

9. one box of .25 caliber ammunition for the Beretta handgun, containing approximately 53 rounds of ammunition (18-ICE-002850); and

10. one additional magazine for an AR 15 rifle, containing approximately two rounds of 5.56 caliber ammunition (18-ICE-002851)

(collectively, the "Subject Property");

ACCORDINGLY, it is hereby ORDERED, ADJUDGED, AND DECREED that:

The Court finds, pursuant to Rule 32.2(b)(1) of the Federal Rules of Criminal Procedure, that the United States has established the requisite nexus between the Subject Property and the offenses to which the Defendant was found guilty.

1. The Court shall retain jurisdiction in this case for the purpose of enforcing this Order.

2. Accordingly, all of Defendant's interests in the Subject Property are hereby forfeited to the United States for disposition pursuant to 21 U.S.C. § 853.

3. Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States is hereby authorized to seize the Subject Property and maintain it in its secure custody and control.

4. Pursuant to 21 U.S.C. § 853(n)(1), the United States shall publish, for thirty (30) consecutive calendar days on the government forfeiture website www.forfeiture.gov, notice of the Preliminary Order of Forfeiture and notice of the United States' intent to dispose of the Subject Property.

3

**JA2582**

5.       Pursuant to 21 U.S.C. § 853(n)(1), the United States shall give, to the extent practicable, direct written notice to any person known to have alleged an interest in the Subject Property to be forfeited.

6.       Pursuant to 21 U.S.C. § 853(n)(2) and (3), the notice referred to above shall state: (a) that any person, other than the Defendant, asserting a legal interest in the Subject Property, shall, within sixty (60) days after the first day of publication on the government forfeiture website or within thirty (30) days after receipt of actual notice, whichever is earlier, file a petition with the United States District Court for the District of Maryland, requesting a hearing to adjudicate the validity of his or her interest in the Subject Property; and (b) that the petition shall be signed by the petitioner under the penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the Subject Property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the Subject Property, any additional facts supporting the petitioner's claim, and the relief sought.

7.       Pursuant to 21 U.S.C. § 853(n)(7), following the Court's disposition of all petitions filed under 21 U.S.C. § 853(n)(6), or if no such petitions are filed following the expiration of the period provided in 21 U.S.C. § 853(n)(2) for the filing of such petitions, the United States shall have clear title to the Subject Property.

8.       Upon adjudication of all third party interests, this Court will enter a Final Order of Forfeiture, pursuant to 21 U.S.C. § 853 , and Rule 32.2(c) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

4

9.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture will become final as to the Defendant at the time of his sentencing, will be part of the Defendant's criminal sentence, and will be included in the criminal judgment entered by this Court against him.

The Honorable Theodore D. Chuang
United States District Judge

8/22/23

**JA2584**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

**UNITED STATES OF AMERICA**          *

         **v.**                                      *          **18-631-TDC-1**

**SCOTT WILLIAMS**                       *

<u>**NOTICE OF APPEAL**</u>

To the HONORABLE JUDGE of SAID COURT

Notice is hereby given that SCOTT WILLIAMS, the defendant in the above styled and numbered cause hereby appeals to the United States Court of Appeals for the Fourth Circuit the final judgment entered in this action on the 22nd day of August, 2023.

         _/Signed_____
         KWASI HAWKS
         Interim Counsel for the Appellant

**JA2585**

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 1 of 6

USDC- GREENBELT
'23 AUG 24 PM 12:41

# United States District Court
## District of Maryland

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Offenses Committed on or After November 1, 1987) |
| v. | Case Number: TDC-8-18-CR-00631-002 |
| **TAEYAN RAYMOND WILLIAMS** | |
| | Defendant's Attorney:   Christopher C. Nieto |
| | Assistant U.S. Attorney:  Leah B. Grossi, Michael C. Hanlon and William D. Moomau |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) ____
☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.
☒ was found guilty on count(s) <u>1ss and 6ss of the Second Superseding Indictment</u> after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances | June 6, 2018 | 1ss |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances | June 6, 2018 | 6ss |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through <u>6</u> of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by <u>United States v. Booker</u>, 543 U.S. 220 (2005).

☒ The defendant has been found not guilty on count(s) <u>2ss, 3ss, 4ss and 5ss of the Second Superseding Indictment</u>.
☒ The Indictment and the Superseding Indictment are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

August 23, 2023
Date of Imposition of Judgment

_____   August 23, 2023
Theodore D. Chuang            Date
United States District Judge

Name of Court Reporter:  Nadine Bachmann

**JA2586**

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 2 of 6

**DEFENDANT: Taeyan Raymond Williams**                    CASE NUMBER: TDC-8-18-CR-00631-002

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for terms of <u>150 months on each of Counts 1ss and 6ss of the Second Superseding Indictment, to run concurrently with each other, for a total term of 150 months</u>.

☒ The court makes the following recommendations to the Bureau of Prisons:

    ☒ That the defendant be designated to the FCI at Fort Dix, New Jersey or, in the alternative, a facility in the Mid-Atlantic area so that he may participate in Commercial Driver's License (CDL) programs and to allow family to visit.

    ☒ That the defendant be permitted to participate in the Residential Drug Abuse Program (RDAP) while in the custody of the Bureau of Prisons.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./p.m. on _____.
    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☐ before 2:00 p.m. on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

# RETURN

I have executed this judgment as follows:

    Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

**JA2587**

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 3 of 6

**DEFENDANT: Taeyan Raymond Williams**                                  CASE NUMBER: TDC-8-18-CR-00631-002

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for terms of <u>5 years on each of Counts 1ss and 6ss, to run concurrently with each other, for a total term of 5 years</u>.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

## A.   MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.
2) You must not unlawfully possess a controlled substance.
3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4) ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5) You must cooperate in the collection of DNA as directed by the probation officer.
6) ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7) ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

## B.   STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must answer truthfully the questions asked by your probation officer.
5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

**JA2588**

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                Judgment Page 4 of 6

| DEFENDANT: Taeyan Raymond Williams | CASE NUMBER: TDC-8-18-CR-00631-002 |
|---|---|

9)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13) You must follow the instructions of the probation officer related to the conditions of supervision.

# C.  SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

☒ **MENTAL HEALTH TREATMENT**
You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

☒ **DRUG TREATMENT**
You must participate in a substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

☒ **SUBSTANCE ABUSE TESTING**
You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods.

☒ **POSSESSION WITHOUT VALID PRESCRIPTION**
You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions on the prescription.

☒ **SPECIAL ASSESSMENT**
You must pay the special assessment of $200.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

**JA2589**

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                    Judgment Page 5 of  6

**DEFENDANT: Taeyan Raymond Williams**                                    CASE NUMBER: TDC-8-18-CR-00631-002

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $200 | N/A | Waived | N/A | N/A |

☐  CVB Processing Fee $30.00

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss***** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |

**TOTALS**          $ _____          $ _____

☐  Restitution amount ordered pursuant to plea agreement  _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the  ☐  fine  ☐  restitution

    ☐  the interest requirement for the  ☐  fine  ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**JA2590**

Sheet 6 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)         Judgment Page 6 of 6

**DEFENDANT: Taeyan Raymond Williams**        CASE NUMBER: TDC-8-18-CR-00631-002

# SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A  ☒  Special Assessment of $200 due in full immediately.

B  ☐  $_____ immediately, balance due (in accordance with C, D, or E); or

C  ☐  Not later than _____; or

D  ☐  Installments to commence _____ day(s) after the date of this judgment.

E  ☐  In _____ (*e.g. equal weekly, monthly, quarterly*) installments of $_____ over a period of _____ year(s) to commence when the defendant is placed on supervised release.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☒  **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

    ☐  in equal monthly installments during the term of supervision; or

    ☐  on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant<br>Names *(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☒  The defendant shall forfeit the defendant's interest in the following property to the United States:

    **See attached Preliminary Order of Forfeiture.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

USDC- GREENBEL
'23 AUG 24 PM 12:4

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-18-631 |
| | * | |
| TAEYAN RAYMOND WILLIAMS, | * | |
| | * | |
| Defendant | * | |
| | * | |
| | ******* | |

## PRELIMINARY ORDER OF FORFEITURE

Whereas, on September 29, 2021, a federal grand jury sitting in the District of Maryland returned a Second Superseding Indictment charging Taeyan Raymond Williams (the "Defendant") with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count One), conspiracy to interfere with interstate commerce by robbery and extortion, in violation of 18 U.S.C. § 1951(a) (Count Two), interference with interstate commerce by robbery and extortion, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count Three), kidnapping with death resulting, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Count Four), possess, use, carry, and brandish a firearm during and in furtherance of a crime of violence and drug trafficking crime, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Five), and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Six); and

Whereas, the Second Superseding Indictment also included a forfeiture allegation, which provided notice that the United States intended to seek forfeiture, pursuant to 18 U.S.C. §§ 924(d) and 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), upon conviction of the Defendant of the offenses alleged in Counts One through Six of the Second Superseding Indictment; and

**JA2592**

WHEREAS, following a twelve-day jury trial, on May 11, 2023, the Defendant was convicted on Counts One and Six of the Second Superseding Indictment by a federal jury sitting in the District of Maryland; and

WHEREAS, the United States admitted evidence at trial establishing the requisite nexus between the Subject Property and the Defendant's offenses; and

WHEREAS, the United States is now entitled to a Preliminary Order of Forfeiture against the following items that are proceeds and/or facilitating property of the Defendant's controlled substances offenses pursuant to 21 U.S.C. § 853 and Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure:

1. approximately $213,573.00 in U.S. currency (18-DEA-642370);

2. one loaded Bryco 38 handgun bearing serial number: 371085 containing one .380 caliber magazine with approximately six rounds of .380 caliber ammunition (18-ICE-002843);

3. one loaded Sig Sauer P228 9mm handgun bearing serial number B188194 containing one 9mm magazine with approximately six rounds of 9mm ammunition (18-ICE-002844);

4. one loaded Beretta 21-A .25 caliber handgun bearing serial number DAA047571 containing one .25 caliber magazine with approximately eight rounds of .25 caliber ammunition (18-ICE-002845);

5. one Century Arms model VZ2008 Sporter AK47 style rifle bearing serial number V08PM013368 (18-ICE-002846);

6. three additional magazines for the Century Arms rifle containing approximately 78 rounds of 7.62x39 ammunition (18-ICE-002847)

7. approximately 57 additional rounds of 7.62-39 ammunition (18-ICE-002848);

8. one box of 9mm caliber ammunition for the Sig Sauer handgun containing approximately 57 rounds of 9mm caliber ammunition (18-ICE-002849);

9. one box of .25 caliber ammunition for the Beretta handgun, containing approximately 53 rounds of ammunition (18-ICE-002850); and

10. one additional magazine for an AR 15 rifle, containing approximately two rounds of 5.56 caliber ammunition (18-ICE-002851)

2

**JA2593**

(collectively, the "Subject Property");

ACCORDINGLY, it is hereby ORDERED, ADJUDGED, AND DECREED that:

The Court finds, pursuant to Rule 32.2(b)(1) of the Federal Rules of Criminal Procedure, that the United States has established the requisite nexus between the Subject Property and the offenses for which the Defendant was found guilty.

1.     The Court shall retain jurisdiction in this case for the purpose of enforcing this Order.

2.     Accordingly, all of Defendant's interests in the Subject Property are hereby forfeited to the United States for disposition pursuant to 21 U.S.C. § 853.

3.     Pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, the United States is hereby authorized to seize the Subject Property and maintain it in its secure custody and control.

4.     Pursuant to 21 U.S.C. § 853(n)(1), the United States shall publish, for thirty (30) consecutive calendar days on the government forfeiture website www.forfeiture.gov, notice of the Preliminary Order of Forfeiture and notice of the United States' intent to dispose of the Subject Property.

5.     Pursuant to 21 U.S.C. § 853(n)(1), the United States shall give, to the extent practicable, direct written notice to any person known to have alleged an interest in the Subject Property to be forfeited.

6.     Pursuant to 21 U.S.C. § 853(n)(2) and (3), the notice referred to above shall state: (a) that any person, other than the Defendant, asserting a legal interest in the Subject Property, shall, within sixty (60) days after the first day of publication on the government forfeiture website or within thirty (30) days after receipt of actual notice, whichever is earlier, file a

3

**JA2594**

petition with the United States District Court for the District of Maryland, requesting a hearing to adjudicate the validity of his or her interest in the Subject Property; and (b) that the petition shall be signed by the petitioner under the penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the Subject Property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the Subject Property, any additional facts supporting the petitioner's claim, and the relief sought.

7.      Pursuant to 21 U.S.C. § 853(n)(7), following the Court's disposition of all petitions filed under 21 U.S.C. § 853(n)(6), or if no such petitions are filed following the expiration of the period provided in 21 U.S.C. § 853(n)(2) for the filing of such petitions, the United States shall have clear title to the Subject Property.

8.      Upon adjudication of all third party interests, this Court will enter a Final Order of Forfeiture, pursuant to 21 U.S.C. § 853 , and Rule 32.2(c) of the Federal Rules of Criminal Procedure, in which all interests will be addressed.

9.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture will become final as to the Defendant at the time of his sentencing, will be part of the Defendant's criminal sentence, and will be included in the criminal judgment entered by this Court against him.



The Honorable Theodore D. Chuang
United States District Judge

8/25/23

4

**JA2595**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA                    *

                                            *        Criminal Case No. TDC-18-0631

TAEYAN WILLIAMS                             *

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that the above-named defendant, Taeyan Williams, hereby appeals to

the United States Court of Appeals for the Fourth Circuit from the judgment imposed in the action

as set forth in open court on August 23, 2023.

Undersigned counsel were court-appointed for the limited purpose of representing Mr.

Williams at the District Court level. Undersigned counsel will not be continuing to represent Mr.

Williams in this appeal.

Respectfully submitted,

_____/S/_____

CHRISTOPHER C. NIETO, ESQ. #30031
Law Office of Christopher C. Nieto, LLC
1 North Charles Street, Suite 1301
Baltimore, MD 21201
Tel: 443.863.8189
Fax: 443.378.5723
Email: cnieto@nietolawoffice.com

ALFRED GUILLAUME, ESQ. #30117
Law Office of Alfred Guillaume, III, LLC
1350 Connecticut Ave. NW, Suite 308
Washington, D.C. 20036
Tel: 202-321-0549
Email: ag3law@gmail.com

**JA2596**